NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals
# for the District of Columbia Circuit

## Nos. 21-1253
## (Consolidated with 21-1251 and 21-1252)

RMS OF GEORGIA, LLC, d/b/a Choice Refrigerants,

*Petitioner,*

*v.*

ENVIRONMENTAL PROTECTION AGENCY, *et al.,*

*Respondents.*

*On Petition for Review of Final Agency Action*
*of the Environmental Protection Agency*

# PROOF OPENING BRIEF FOR PETITIONER
# RMS OF GEORGIA, LLC

DAVID M. WILLIAMSON
WILLIAMSON LAW + POLICY, PLLC
1850 M Street NW, Suite 840
Washington, DC 20036
Tel.: (202) 256-6155
Fax: (703) 519-0076
maxwilliamson@williamsonlawpolicy.com

*Counsel for Petitioner RMS of Georgia, LLC*

April 1, 2022

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, petitioner RMS of Georgia, LLC, through undersigned counsel, hereby certifies the following as to parties, rulings, and related proceedings in this case:

### *Parties, Intervenors, and Amici*

**A.    Petitioners**

RMS of Georgia, LLC d/b/a Choice Refrigerants (No. 21-1253); Worthington Industries Inc. (No. 21-1252); Heating, Air-Conditioning & Refrigeration Distributors International, Air Conditioning Contractors of America, and Plumbing-Heating Cooling Contractors National Association (No. 21-1251).

**B.    Respondents**

United States Environmental Protection Agency (Nos. 21-1251, -1252, and -1253) and Michael S. Regan, EPA Administrator (Nos. 21-1251, -1252, and -1253).

**C.    Intervenors for Petitioners**

None.

**D.    Intervenors for Respondents**

None.

**E.  Amici Curiae for Petitioners**

None.

**F. Amicus Curiae for Respondents**

None.

### Rulings Under Review

U.S. Environmental Protection Agency, *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act; Final Rule*, 86 Fed. Reg. 55,116 (Oct. 5, 2021) ("**Cap-and-Trade Rule**").

### Related Cases

Petitioner Choice Refrigerants filed its petition for review of the Cap-and-Trade Rule in this Court on December 6, 2021, and in the same petition protectively sought review of the agency's final action *Phasedown of Hydrofluorocarbons: Notice of 2022 Allowance Allocations for Production and Consumption of Regulated Substances Under the American Innovation and Manufacturing Act of 2020; Notice*, 86 Fed. Reg. 55,841 (Oct. 7, 2021) ("**Allocation Notice**").  On February 22, 2022, this Court ordered that the Allocation Notice petition be severed from this case (No. 21-1253) and assigned a new docket (No. 22-1025) (ECF# 19936059).  Petitioner has also sought review of the Allocation Notice in an action currently pending before the U.S. Court of Appeals for Eleventh Circuit (No. 21-14213).

## CORPORATE DISCLOSURE STATEMENT

## OF RMS OF GEORGIA, LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and

Circuit Rule 26.1, Petitioner RMS of Georgia, LLC d/b/a Choice Refrigerants

states the following:

Petitioner is a limited liability company which is not owned in whole or in

part by a parent corporation or a publicly traded company and which does not issue

stock.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT OF RMS GEORGIA, LLC........... iii

TABLE OF CONTENTS.......................................................................................iv

TABLE OF AUTHORITIES .............................................................................v

GLOSSARY......................................................................................................ix

JURISDICTION.................................................................................................1

STATEMENT OF ISSUES ................................................................................1

STATEMENT OF THE CASE..........................................................................2

    A.    AIM Act Regulation of Listed HFC Chemicals...............................2

    B.    Choice's Patented HFC Blend Product ................................8

SUMMARY OF ARGUMENT ..........................................................................9

STANDING .......................................................................................................10

STANDARD OF REVIEW ...............................................................................11

ARGUMENT .....................................................................................................11

    I.    EPA HAS NO AUTHORITY TO REQUIRE ALLOWANCES FOR HFC BLENDS ...............................11

    II.    EVEN IF EPA HAS AUTHORITY TO REGULATE HFCS WITHIN HFC BLENDS, IT DID NOT EXERCISE THAT AUTHORITY IN ITS REGULATIONS ............................18

    III.    THE AIM ACT CAP-AND-TRADE PROGRAM IS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER TO AN UNACCOUNTABLE ADMINISTRATIVE AGENCY ........................................21

CONCLUSION ..................................................................................................28

# TABLE OF AUTHORITIES*

**Page(s)**

**Cases:**

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935)..................................................................................23

*Am. Trucking Ass'ns v. EPA*,
   175 F.3d 1027 (D.C. Cir.), *opinion modified on reh'g*, 195 F.3d 4
   (D.C. Cir. 1999) .......................................................................................27

*\*Chevron U.S.A., Inc. v. NRDC, Inc.*,
   467 U.S. 837 (1984)...........................................................................11, 18

*Citizens to Save Spencer County v. EPA*,
   600 F.2d 844 (D.C. Cir. 1979)..................................................................17

*City of Arlington, Tex. v. FCC*,
   569 U.S. 290 (2013)..................................................................................18

*Clinton v. City of New York*,
   524 U.S. 417 (1998)..................................................................................25

*\*Gundy v. United States*,
   139 S.Ct. 2116 (2019)..............................................................21, 22, 23, 24

*Industrial Union Dept., AFL-CIO v. American Petroleum Institute*,
   448 U.S. 607 (1980)..................................................................................23

*J.W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928)..................................................................................23

*Louisiana Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)..................................................................................11

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..................................................................................10

*Panama Refining Co. v. Ryan*,
   293 U.S. 388 (1935)..................................................................................23

---

* Authorities upon which we chiefly rely are marked with asterisks.

v

*Paul v. United States*,
    140 S.Ct. 342 (2019) ........................................................................23

*Touby v. United States*,
    500 U.S. 160 (1991) ..........................................................................25

*Wayman v. Southard*,
    23 U.S. 1, 6 L. Ed. 253, 10 Wheat. 1 (1825) .........................23, 24

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ..........................................................................27

*Yakus v. United States*,
    321 U.S. 414 (1944) .....................................................................23, 27

**Statutes and Other Authorities:**

U.S. Const., art. I, §1 ....................................................................22, 25

42 U.S.C. § 7607(b)(1) .........................................................................1

42 U.S.C. § 7607(b)(2) .........................................................................9

42 U.S.C. § 7675 ..................................................................................2

42 U.S.C. § 7675(b)(11) ............................................................... 2-3, 13

42 U.S.C. § 7675(c)(1) ..................................................................2, 3, 19

42 U.S.C. § 7675(c)(2) ........................................................................13

42 U.S.C. § 7675(c)(3) ................................................................3, 7, 19

42 U.S.C. § 7675(c)(3)(A) ..................................................................12

42 U.S.C. § 7675(c)(3)(B) ..................................................................12

42 U.S.C. § 7675(c)(3)(B)(i) ........................ 4, 6, 11, 13, 14, 16, 17, 19

42 U.S.C. § 7675(c)(3)(B)(ii) ...........................6, 14, 15, 16, 17, 20

42 U.S.C. § 7675(d) ........................................................................7, 15

42 U.S.C. § 7675(e) ..............................................4, 6, 12, 13, 14, 21

42 U.S.C. § 7675(e)(1) ........................................................................24

42 U.S.C. § 7675(e)(2) ................................................................2, 7, 24

42 U.S.C. § 7675(e)(2)(A)(ii) ......................................................3, 13, 16

42 U.S.C. § 7675(e)(2)(C) ........................................................................22

42 U.S.C. § 7675(e)(3) ..................................................................13, 22, 27

42 U.S.C. § 7675(e)(3)(A) ........................................................................22

42 U.S.C. § 7675(e)(3)(B) ..............................................................6, 13, 22

42 U.S.C. § 7675(h) ....................................................................................7

42 U.S.C. § 7675(i) ................................................................................7, 15

42 U.S.C. § 7675(k)(1)(C) ..........................................................................1

40 C.F.R. § 84 ..................................................................................2, 19, 21

40 C.F.R. § 84.3 ..............................................................................3, 7, 19

40 C.F.R. § 84.31(c)(6) ............................................................................20

40 C.F.R. § 84.5(b) ............................................................................2, 19

40 C.F.R. § 84.5(b)(1)(i) ............................................................................7

40 C.F.R. § 84.5(i) ..............................................................................15, 20

86 Fed. Reg. 27,150 ....................................................................................3

86 Fed. Reg. 55,116 ..............................................................................4, 7

86 Fed. Reg. 55,142 ....................................................................................8

86 Fed. Reg. 55,178 ..........................................................................3, 6, 20

86 Fed. Reg. 55,187 ....................................................................................6

86 Fed. Reg. 55,841 ....................................................................................2

86 Fed. Reg. 55,843 ............................................................................11, 26

86 Fed. Reg. 57,141 ..................................................................................16

87 Fed. Reg. 1,117 ....................................................................................18

87 Fed. Reg. 1,119 ....................................................................................18

166 Cong. Rec. H7607 ..............................................................................13

166 Cong. Rec. S7924-02 ..........................................................................13

166 Cong. Rec. S7926 ................................................................................13

2A Sutherland Statutory Construction § 46:6 (7th ed.) ...........................17

ASHRAE Refrigerant Designations ....................................................................3, 5

American Innovation and Manufacturing Act, Pub. L. 116-260, div. S,
    § 103, Dec. 7, 2020, 134 Stat. 2255...................................................................2

U.S. EPA, Webinar, Rulemaking on HFC Allocation Program Updates
    (Mar. 30, 2022) ...................................................................................................4

# GLOSSARY

| | |
|---|---|
| AIM Act | American Innovation and Manufacturing Act of 2020 |
| ASHRAE | American Society of Heating, Refrigerating and Air-Conditioning Engineers |
| CAA | Clean Air Act |
| EPA | U.S. Environmental Protection Agency |
| HFC | Hydrofluorocarbon |
| JA | Joint Appendix |
| RTC | Response to Comments |

## JURISDICTION

This Court has jurisdiction under 42 U.S.C. §§7607(b)(1) and 7675(k)(1)(C) to review EPA's final rule published October 5, 2022, implementing the American Innovation and Manufacturing Act of 2020 ("***AIM Act***").  In the AIM Act, Congress expressly declared (somewhat unusually) that the statute is not part of the Clean Air Act but that certain provisions of the Clean Air Act, including §307 which governs judicial review, "shall apply to" the AIM Act and "any rule, rulemaking, or regulation" promulgated under the statute is treated "as though [the statute] were expressly included in title VI of [the Clean Air Act]." 42 U.S.C. §7675(k)(1)(C).

## STATEMENT OF ISSUES

1.     Whether an agency rule, which requires government-issued allowances for imports of hydrofluorocarbon (HFC) blends, exceeds the agency's authority under the AIM Act, where the statute expressly prohibits the agency from listing HFC blends as regulated substances for purposes of statutory import restrictions.

2.     Whether, assuming the agency was delegated authority to regulate HFC blends, the agency has actually exercised that authority in the rule at issue.

3.     Whether the AIM Act, which directs the agency to create an allowance trading system but fails to provide any intelligible principle for

allocation of such allowances, is an unconstitutional delegation of legislative authority.

## STATEMENT OF THE CASE

### A.    AIM Act Regulation of Listed HFC Chemicals

In the American Innovation and Manufacturing Act of 2020 ("*AIM Act*"), Congress directed the U.S. Environmental Protection Agency ("*EPA*") to create a cap-and-trade program using "allowances" to phase out certain hydrofluorocarbon ("*HFC*") chemicals over a 15-year period.[1]  Pub. L. 116-260, div. S, §103, Dec. 27, 2020, 134 Stat. 2255, *codified at* 42 U.S.C. §7675 (Addm.).  The AIM Act prohibits the importation, without an allowance, of 18 specified "regulated substances" that are "listed" in a statutory table at subsection (c)(1) of the Act.[2]  42

---

[1] Allowances are a type of permit to conduct business in the HFC market. *Phasedown of Hydrofluorocarbons: Notice of 2022 Allowance Allocations for Production and Consumption of Regulated Substances Under the American Innovation and Manufacturing Act of 2020; Notice*, 86 Fed. Reg. 55,841 (Oct. 7, 2021) ("*Allocation Notice*") ("An allowance allocated under the AIM Act . . . is a limited authorization for the production or consumption of a regulated substance.").

[2] Neither the statute nor EPA's implementing regulations at 40 C.F.R. Part 84 define the term "consume," but from the definition of "consumption" and EPA's usage of the term, "consume" obviously means imports of HFCs into the United States. *See, e.g.*, 40 C.F.R. §84.5(b) (referring to prohibition of "import" correlating to the Act's prohibition of "consume" in §7675(e)(2)). The AIM Act provisions also apply to production (*i.e.*, manufacture) of listed HFCs, but this brief focuses only on imports/consumption.

U.S.C. §§7675(b)(11) (definition of "regulated substance"), (c)(1) (statutory table of regulated substances), (e)(2)(A)(ii) (after January 1, 2022 "no person shall . . . consume a quantity of a regulated substance without a corresponding quantity of consumption allowances").[3]  The regulated substances in the statutory table are identified by their "common name," which refers to a unique numerical designation assigned to each chemical by the American Society of Heating, Refrigerating and Air-Conditioning Engineers ("*ASHRAE*").[4]  The Act authorizes EPA to add other HFC chemicals to the list of regulated substances if certain criteria are met, §7675(c)(3), but no other substances have been so designated by EPA to date.  Response to Comments ("*RTC*") 193 (JA__).  Essentially, the AIM Act establishes a cap-and-trade program to phase out particular older chemicals in

---

[3] 40 C.F.R. §84.3 (definitions) ("Regulated substance means a hydrofluorocarbon listed in the table contained in subsection (c)(1) of the AIM Act and a substance included as a regulated substance by the Administrator under the authority granted in subsection (c)(3). A current list of regulated substances can be found in appendix A to this part.").

[4] 86 Fed. Reg. at 55,178; *see also Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act; Proposed Rule*, 86 Fed. Reg. 27,150, 27,188 (proposed rule referring to ASHRAE designated blend); *see also* ASHRAE Refrigerant Designations, https://www.ashrae.org/technical-resources/standards-and-guidelines/ashrae-refrigerant-designations (last visited Mar. 30, 2022).

order to foster innovation in the development of new chemicals.[5]  In doing so, the Act delegates to EPA crucial decisions on how that phaseout will impact companies that currently manufacture and import the chemicals that are targeted for reduction.

Importantly for this case, Congress expressly prohibited EPA from adding "blend[s]" of HFCs to the statutory table for purposes of the cap-and-trade program "under subsection (e)." §7675(c)(3)(B)(i).  HFC blends are chemical mixtures created by combining component HFCs (such as those listed in the statutory table) into new blended products that have distinct physical and chemical properties.  Indeed, EPA frequently refers to blends in terms of their "chemistry."[6] Once produced from listed HFC components, HFC blends cannot be readily separated into their component feedstocks without complex fractionation equipment (the same process used to "crack" crude petroleum into gasoline) at

_____

[5] Although EPA obliquely describes the phaseout program as directed at greenhouse gases, 86 Fed. Reg. at 55,116 ("[t]his Act mandates the phasedown of hydrofluorocarbons, which are highly potent greenhouse gases"), the statute itself never mentions greenhouse gas or climate change; for good reason, the political divisiveness of climate change prevented Congress from reaching consensus on any policy explicitly directed at climate change, and instead (as evident in the title of the statute) focused on the economic benefits to certain U.S. chemical manufacturers of fostering innovation in the chemicals industry.

[6] *See, e.g.*, U.S. EPA, Webinar, Rulemaking on HFC Allocation Program Updates (Mar. 30, 2022) (transcript not yet available).

significant cost.[7]  Put simply, after blending, the original HFC feedstocks lose their

individual identity and become part of a new substance, similar to how sugar, flour

and water mixed together become a cake or cookie and lose their identity as the

original ingredients.

Each HFC blend used in commerce is assigned a unique ASHRAE number

(different than its component feedstocks) using the same convention referenced in

the statutory table.[8]  Thus, for practical purposes, an HFC blend is an entirely

different substance than the chemical components from which it was

manufactured, as evidenced by the fact that each HFC blend is recognized as a

different chemical, has different uses in refrigeration equipment and other real-life

_____

[7] Although EPA asserts in the record that feedstocks used to produce HFC blends
"can be identified after blending" and "are not chemically altered in the [blending]
process," EPA acknowledges the scientific fact that the feedstock components of
HFC blends cannot be separated after blending except through "technology such as
fractionation and distillation." RTC 193 (JA__).

[8] For example, Petitioner Choice Refrigerants' patented, proprietary blend is
designated as "R-421A" and described as a mixture of R-125 and R-134a (both of
which are listed regulated substances under the AIM Act) in a 58.0/42.0 ratio. *See*
ASHRAE Refrigerant Designations, https://www.ashrae.org/technical-
resources/standards-and-guidelines/ashrae-refrigerant-designations (last visited
March 30, 2022).

applications, and is bought and sold as a chemical product separate from the HFC components that were originally used to manufacture the blend.[9]

In the clause following the subsection (B)(i) prohibition on listing HFC blends for purposes of the allowance program, Congress included a savings clause specifying that EPA could regulate listed regulated substances "within" blends using its "authority . . . to regulate" under the AIM Act. §7675(c)(3)(B)(ii).  As noted, the Act itself establishes the cap-and-trade program for regulated substances (*i.e.*, 'listed' HFCs) in subsection (e) and the Act itself establishes the prohibition against importing regulated substances without an allowance.  There is no separate "authority to regulate" given to the agency to require allowances for HFCs "within" blends that would trigger the conditional exception in subsection (B)(ii) as it relates to the subsection (e) allowance program.[10]  However, in contrast to the absence of authority to require allowances for HFC blends, the Act does grant EPA several express authorities to regulate HFCs in other provisions of the Act.  For

---

[9] *See, e.g.*, Cap-and-Trade Rule, 86 Fed. Reg. at 55,178 (referring to "ASHRAE designated blend"); 86 Fed. Reg. at 55,187 (government assigns separate tariff codes for "mixtures or blends containing HFCs").

[10] Although EPA is directed in the Act to issue regulations governing "an allowance allocation and trading program" for listed HFCs, §7675(e)(3)(B), the Act does not grant EPA any discrete authority to expand the statutory table or to extend the cap-and-trade program beyond listed HFCs (which as noted cannot include HFC blends).

example, EPA is given authority to require monitoring and reporting of regulated substances, §7675(d), as well as comprehensive management of "any practice, process, or activity regarding the servicing, repair, disposal, or installation of equipment" involving regulated substances, §7675(h).  The Act also expressly grants EPA broad authority to "by rule restrict" the use of regulated substances in any "sector or subsector in which the regulated substance is used." §7675(i).

Pursuant to its authorities under the Act (which Petitioner does not challenge generally with respect to listed HFCs), EPA established "an allowance allocation and trading program" to implement Congress' requirement in §7675(e)(2) that all imports of regulated substances (*i.e.*, listed HFCs) be accompanied by an allowance.  Cap-and-Trade Rule, 86 Fed. Reg. 55,116.  Consistent with the Act, EPA defined "regulated substance" in the Cap-and-Trade Rule as an HFC that is "listed" in the AIM Act table or an HFC that is added to the table pursuant to §7675(c)(3).  40 C.F.R. §84.3 (definitions).  The regulations also state, consistent with the statutory prohibition at §7675(e)(2), that "[n]o person may import bulk regulated substances, except . . . [b]y expending . . . consumption . . . allowances." §84.5(b)(1)(i) (tracking AIM Act nearly verbatim).

Notably, nowhere in EPA's Cap-and-Trade regulations does the agency specifically state that allowances are required for imports of HFC blends.  Yet, despite the Act's express prohibition against adding HFC blends to the statutory

table, EPA took the position in the rulemaking proceeding that it would require allowances for imports of HFC blends based on their manufacture from listed HFC components feedstocks. RTC 193 (JA__); Cap-and-Trade Rule, 86 Fed. Reg. at 55,142 (method for "determining the amount of allowances necessary to . . . import that blend"). And in practice, EPA has begun demanding that Petitioner (and other importers of HFC blends) surrender allowances for imports of HFC blends if the blends were manufactured from listed HFC feedstocks.

### B.    Choice's Patented HFC Blend Product

Petitioner RMS of Georgia, LLC d/b/a Choice Refrigerants ("***Choice Refrigerants***") is an American small business in Alpharetta, Georgia, that imports, produces and sells refrigerants for heating and cooling in the U.S. refrigerant market. *Choice Refrigerants Comment Letter*, EPA-HQ-OAR-2021-0044-0168, p. 4 (July 6, 2021) (JA__). Choice's flagship product is a patented, proprietary HFC blend known as Choice® R-421A, which is popular as a substitute for older chlorofluorocarbon (CFC) refrigerants that depleted the ozone layer. R-421A (like other HFC blends) is manufactured by combining two HFC components, R-125 and R-134a (each of which is listed in the AIM Act table) along with another additive to form a new commercial chemical product. As noted, R-421A is specifically designated by ASHRAE as a unique chemical blend. For the past 15 years, Choice has produced and distributed its Choice® R-421A product from

Alpharetta; however, due to inability to source feedstocks in the United States, Choice contracts with an overseas chemical manufacturer to blend HFC components into its proprietary R-421A blend, which Choice then imports into the United States.  EPA is now taking the position that Choice and other importers of HFC blends must hold AIM Act allowances for these imports.  Essentially, the agency is blocking imports of Choice's product unless it surrenders allowances.

Choice Refrigerants brings this challenge to EPA's application of its new regulations in this forum at this time because it is aggrieved by EPA's implementation of its new rules and the agency's requirement that Choice obtain allowances for imports of its proprietary HFC blend product.[11]

## SUMMARY OF ARGUMENT

I.     The AIM Act requires cap-and-trade allowances for imports of listed regulated substances, *i.e.*, HFCs listed in a statutory table or added to the table by the EPA.  The statutory table includes certain HFCs, but does not list Petitioner's proprietary product (which is an HFC blend with a designated chemical number) or other HFC blends.  Congress spoke directly to the issue of regulating HFC blends

---

[11] Section 307(b)(2) of the Clean Air Act, 42 U.S.C. §7607(b)(2), provides that an "Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement," which arguably forecloses as-applied challenges.

by expressly prohibiting EPA from listing HFC blends as regulated substances for

purposes of the statute's cap-and-trade program.  Although Congress caveated that

such listing prohibition did not affect EPA's authority to regulate HFCs "within"

HFC blends, no provision of the statute gives the agency authority to require

allowances for HFC blends, in contrast to certain provisions that explicitly allow

the agency to impose labeling, recordkeeping and use restrictions for HFC blends.

II.      Even if, notwithstanding the listing prohibition, the statute gave the

EPA authority to regulate listed HFCs "within" HFC blends, the agency has not yet

actually exercised that authority in any implementing regulation; the regulations at

issue nowhere invoke any authority to regulate listed HFCs within blends.

III.     Because the statute provides no intelligible principle for deciding

what persons should receive valuable allowances under the statutory cap-and-trade

program, Congress unconstitutionally delegated to an unaccountable administrative

agency its legislative powers to decide which companies live and die under the

new cap-and-trade regime.

## STANDING

Petitioner, RMS of Georgia, LLC d/b/a Choice Refrigerants is an importer of

HFC chemicals and thus is directly regulated by the EPA regulation at issue. *Lujan

v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) (as the direct object of

agency regulation "there is ordinarily little question that the action or inaction has

- 10 -

caused [the regulated entity] injury, and that a judgment preventing or requiring the action will redress it").  Choice was allocated allowances under EPA's allocation system, *see* Allocation Notice, 86 Fed. Reg. at 55,843, but is aggrieved by the agency's attempt to require allowances for its imports of HFC blends that are not subject to the statute's cap-and-trade program.

## STANDARD OF REVIEW

Under the framework of *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842 – 43 (1984), "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Where Congress has directly spoken to the precise question at issue, no deference need be given to an agency's contrary interpretation.  *Id.* at 842-44.  An agency may only exercise authority which is provided by Congress.  *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986) ("an agency literally has no power to act . . . unless and until Congress confers power upon it").

## ARGUMENT

## I.    EPA HAS NO AUTHORITY TO REQUIRE ALLOWANCES FOR HFC BLENDS

As noted, in crafting express language in §7675(c)(3)(B)(i), Congress prohibited EPA from designating HFC blends as regulated substances "for

purposes of phasing down production or consumption of regulated substances." In context, this key provision reads:

> (3) Other regulated substances.
>
> (A) . . . the Administrator *may designate a substance* not included in the table contained in paragraph (1) *as a regulated substance* if − (i) the substance − (I) is a chemical substance that is a saturated hydrofluorocarbon; and (II) has an exchange value . . . greater than 53; and (ii) the designation of the substance as a regulated substance would be consistent with the purposes of this section.
>
> (B) Savings provision.
>
> (i) In general. *Nothing in this paragraph authorizes* the Administrator to *designate as a regulated substance a blend* of substances that includes a saturated hydrofluorocarbon for *purposes of phasing down production or consumption of regulated substances under subsection (e)*, even if the saturated hydrofluorocarbon is, or may be, designated as a regulated substance.
>
> (ii) Authority of administrator. Clause (i) does *not affect* the *authority of the Administrator to regulate* under this Act a regulated substance *within a blend* of substances.

§7675(c)(3)(A) and (B) (emphasis added).

On its face, the statute withholds from EPA any authority to designate HFC blends as regulated substances for purposes of the allowance trading program under subsection (e) of the AIM Act. The statutory table lists the subset of *certain* chemicals that are subject to the allowance program when imported into the United

States.[12]  The reference in subsection (c)(2) to "phasing down production or consumption of regulated substances under subsection (e)" unambiguously refers to the trading program under which EPA is authorized to require importers of HFC blends to hold allowances. §7675(e)(3) ("the Administrator shall issue a final rule . . . (B) phasing down the consumption of regulated substances in the United States through an allowance allocation and trading program"). Although the statute gives EPA broad authority to design the cap-and-trade program using allowances, the statutory table itself defines the subset of chemicals that are subject to the cap-and-trade system in the first place. The explicit prohibition in subsection (B)(i) barring EPA from adding HFC blends to the statutory table necessarily prevents EPA from requiring allowances for imports of those non-listed blends, because (1) *first*, the statutory requirement to hold allowances in §7675(e)(2)(A)(ii) refers only to regulated substances[13] and "regulated substance" is defined in §7675(b)(11) as "a

------

[12] There is sparse legislative history on the AIM Act provisions at issue, as the "within" language was added without explanation in late-hour House amendments. 166 Cong. Rec. H7607 (Dec. 21, 2020). But Petitioner's position is consistent with the statement of Senate sponsors on the day of passage who referred to "phase down . . . of *certain* HFC substances," rather than all HFCs. 166 Cong. Rec. S7924-02, S7926 (Dec. 21, 2020) (emphasis added).

[13] The AIM Act provides in pertinent part: "(e) Phase-down of production and consumption of regulated substances . . . (A) . . . ***no person shall . . . (ii) consume a quantity of a regulated substance without a corresponding quantity of consumption allowances***." §7675(e)(2)(A)(ii) (emphasis added).

substance listed in the table" and (2) *second*, the listing prohibition restricts adding HFC blends to the list for purposes of the subsection (e) allowance program.

The government may attempt to rely on the second "savings clause" in subsection (B)(ii), which states that the prohibition on designating HFC blends in subsection (B)(i) "***does not affect*** the authority of the Administrator to regulate under this Act a regulated substance within a blend of substances." §7675(c)(3)(B)(ii) (emphasis added).[14]  But EPA cannot bootstrap authority to regulate HFC blends from the same provision of the Act that prohibits listing of HFC blends.  By its express language, subsection (B)(ii) contains no authority for EPA to regulate HFCs.  Thus, EPA's ability to require allowances under subsection (e) for the listed HFC feedstocks in HFC blends, as if such blends were listed HFCs, is conditional on EPA using some authority expressly granted to it under the Act.  Congress' explicit phrasing "does not affect" cannot do the work that EPA wishes it to do.  Subsection (B)(ii) merely clarifies that any authority of EPA to regulate HFC blends is not diminished by subsection (B)(i).  Because Congress grammatically conditioned the regulation of HFC blends on "authority of the Administrator under this Act," EPA must necessarily identify an authority

---

[14] EPA never adequately explained its position in the rulemaking proceeding. In its Response to Comments document, EPA suggested that its authority to regulate HFC blends comes from the subsection (e) trading program authority itself, but failed to undertake a comprehensive statutory analysis. RTC 193 (JA__).

granted to it under the AIM Act, which it has not done.  In the end, subsection (B)(ii) does nothing more than preserve EPA's ability to regulate HFC blends in ways that do not implicate "phasing down production or consumption."

In fact, the AIM Act is significantly broader than just the cap-and-trade allowance mechanism and <u>does</u> grant EPA authority to regulate HFC blends in other provisions of the statute, which gives meaning to subsection (B)(ii).  For example, Congress granted EPA authority to broadly regulate the HFC sector by prescribing labeling, quality control, tracking and recordkeeping conditions applicable to all companies that buy and sell HFCs in the United States. Specifically, §7675(d) grants EPA unrestricted authority to prescribe monitoring and reporting requirements, and EPA chose to exercise this authority to regulate HFC blends by requiring the contents of all shipments of imported HFCs (including specifically HFC blends) to be labeled.  *See* §84.5(i) ("Labeling. (1) As of January 1, 2022, no person may sell or distribute . . . or import containers containing a regulated substance that lacks a label or other permanent markings stating the common name(s), chemical name(s), or ASHRAE designation of the ***regulated substance(s) or blend contained within***, and the percentages of the regulated substances if a blend.") (emphasis added). The Act also expressly grants EPA authority to "by rule restrict" the use of regulated substances in any "sector or subsector in which the regulated substance is used." §7675(i).  This is an express

- 15 -

authority of the nature referred to in subsection (B)(ii), and provides EPA fairly sweeping power to ban the use of any HFC or HFC blend in any commercial or industrial application, such as air conditioning, fire suppression or solvent cleaning. Indeed, only days after issuing its Cap-and-Trade Rule, EPA announced its intention to develop rules restricting HFCs in various sectors using its authority "under subsection (i) of the American Innovation and Manufacturing Act of 2020." *Notice of Determination to Grant or Partially Grant Certain Petitions Submitted Under Subsection (i) of the American Innovation and Manufacturing Act of 2020; Notice*, 86 Fed. Reg. 57,141 (Oct. 14, 2021).

In sum, the savings clause in subsection (B)(ii) of the AIM Act can only 'save' authorities expressly granted under the statute, but must be read consistently with subsection (B)(i) which carves out HFC blends from the subsection (e) allowance trading program. The one-sentence authorization for EPA to set up an allowance trading program in subsection (e) cannot be read to include an implied authority which would countermand and erase the listing prohibition in subsection (B)(i), especially where the requirement for importers to hold allowances is created by the statute itself in subsection (e)(2)(A)(ii), not delegated to the agency. And subsection (B)(ii), which refers to but does not itself confer "authority," cannot permissibly be bootstrapped as a separate grant of authority to EPA to require allowances for HFC blends. Either strained reading of subsection (e)(2)(A)(ii) or

subsection (B)(ii) would entirely gut subsection (B)(i) and would allow EPA for all practical purposes to treat HFC blends as regulated substances − which is exactly what subsection (B)(i) prohibits.  *See* 2A Sutherland Statutory Construction §46:6 (7th ed.) ("It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute" and courts must "construe a statute to give effect to all its provisions, so that no part is inoperative or superfluous"); *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 870 (D.C. Cir. 1979) ("maximum possible effect should be afforded to all statutory provisions, and, whenever possible, none of those provisions rendered null and void").

Logically and grammatically, if Congress had intended for EPA to require allowances for HFC blends, it surely would have so stated in clear simple language, such as 'EPA may require allowances for regulated substances within a blend of substances.'  Instead, Congress chose to expressly prohibit EPA in subsection (B)(i) from designating blends for purposes of the "subsection (e)" allowance requirement, while separately granting EPA authority to regulate HFC components within blends for purposes other than the subsection (e) cap-and-trade mechanism.  There is no ambiguity in Congress' statement that HFC blends may not be added to the statutory table.  EPA (and the Court) must interpret the statute with reference to the plain language that Congress chose to address this precise

- 17 -

question, in the context and grammatical structure in which Congress wrote those words. *Chevron*, 467 U.S. 837. As the Supreme Court admonished in *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013), courts must carefully consider the text, structure, history, and purpose of a regulation before resorting to deference to an administrative agency, and if genuine ambiguity remains, the agency's reading must still fall "within the bounds of reasonable interpretation."

Accordingly, the Court should vacate EPA's cap-and-trade rule insofar as it purports to require allowances under the subsection (e) allowance trading program for imports of HFC blends if those blends are a separate ASHRAE-listed chemical product.[15]

## II.    EVEN IF EPA HAS AUTHORITY TO REGULATE HFC'S WITHIN HFC BLENDS, IT DID NOT EXERCISE THAT AUTHORITY IN ITS REGULATIONS

As noted, in order to regulate listed HFCs as regulated substances when they are "within" an HFC blend, EPA must identify some unmistakable grant of

---

[15] The U.S. Department of Commerce recently took a similar approach to regulating HFC feedstocks "within" HFC blends when it exempted ASHRAE-designated blends from antidumping duties applicable to the HFC component that constituted part of the blend. *See Pentafluoroethane (R-125) From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 87 Fed. Reg. 1,117, 1,119 (Jan. 10, 2022) ("R-125 incorporated into a blend that conforms to ANSI/ASHRAE Standard 34 is excluded from the scope of this investigation"). The HFC chemical "R-125" is one of the HFCs listed as a regulated substance under the AIM Act.

authority given to it under the AIM Act, which could serve as the authority that is referenced in subsection (B)(ii) as not being "affect[ed]" by the listing prohibition in subsection (B)(i).  Put another way, EPA must identify some authority to regulate the sugar that was used to bake the cake, and then must actually exercise that authority.  Here, even if EPA could identify such authority in the statute, it has not actually invoked or exercised that authority affirmatively in its Cap-and-Trade Rule.

EPA's cap-and-trade regulations at 40 C.F.R. Part 84 require allowances only for imports of "regulated substances." §84.5(b) ("Import. This paragraph applies starting January 1, 2022. (1) No person may import bulk regulated substances, except: (i) By expending, at the time of the import, consumption or application-specific allowances").  EPA defines "regulated substance" in §84.3 as "a hydrofluorocarbon listed in the table contained in subsection (c)(1) of the AIM Act and a substance included as a regulated substance by the Administrator under the authority granted in subsection (c)(3)."  The rule states that the "current list of regulated substances can be found in appendix A to this part."  *Id.*  But as noted, the statutory table does not (and cannot contain HFC blends) and Appendix A to EPA's regulations does not currently list any HFC blends. Nor does EPA's definition of "bulk" in §84.3 mention HFC blends when it describes "Bulk" as "a regulated substance of any amount that is in a container for the transportation or

storage of that substance such as cylinders, drums, ISO tanks, and small cans."
Nowhere in the regulations does EPA invoke the AIM Act subsection (B)(ii)
savings clause, nor anywhere mention (much less discuss) in the regulations HFC
blends as substances that would require allowances.  The absence of any reference
in the regulations to HFC blends indicates that EPA has not invoked (or even
identified) whatever authorities it might have at its disposal to regulate HFC blends
under the AIM Act.

EPA's discussion in the rulemaking preamble and its response to comments
document, in which it seems to assume that it has invoked some authority to
regulate HFC blends, cannot counter the fact that the text of EPA's regulations
does not actually apply to HFC blends.  Indeed, the absence of any express
application of the allowance program to HFC blends does not appear to be mere
oversight.  EPA does expressly refer to HFC blends in contexts other than the
allowance trading program.  For example, as noted previously, EPA expressly calls
out HFC blends when specifying what substances must be properly labeled in
§84.5(i).[16]  EPA's regulations at §84.31(c)(6) similarly reference HFC blends by
name when requiring reporting of "each regulated substance or blend of regulated
substances offloaded." Similarly, while the preamble to EPA's implementing rule

---

[16] *See also* 86 Fed. Reg. 55,178 (label must include the "common name of the HFC
or HFC blend contained, and the composition and ratios of the HFCs if a blend").

alludes to how allowances might be calculated for HFC blends, the rule itself at 40 C.F.R. Part 84 is devoid of any mention of HFCs "within" HFC blends being subject to the subsection (e) allowance program.

Accordingly, if the Court determines that some authority to require allowances for HFC blends can be found in the AIM Act, Petitioner requests that, the Court also declare that EPA has not actually exercised that authority in its Cap-and-Trade Rule. Whereupon, the Court should remand the rule to EPA for further proceedings for the agency to determine how it might exercise that authority in light of Congress' recognition that HFC blends are separate ASHRAE-designated products.

## III.   THE AIM ACT CAP-AND-TRADE PROGRAM IS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER TO AN UNACCOUNTABLE ADMINISTRATIVE AGENCY

Although Congress specified in subsection (e) of the AIM Act that listed HFCs must be phased out using a cap-and-trade allowance trading mechanism, Congress unlawfully delegated the crucial decision as to *who* would receive allowances to an administrative agency without any meaningful guidance and without any standard by which courts could determine whether the agency faithfully carried out Congress' intent or "exceeded the bounds of the authority" given to the agency. *Gundy v. United States*, 139 S.Ct. 2116, 2145 (2019) (Gorsuch, J., dissenting). Delegation of such a core decision violates the

fundamental principle of our constitution that Congress shall make the laws. U.S. Const. art. I §1 ("All legislative Powers herein granted shall be vested in a Congress of the United States").

The AIM Act delegates to EPA the design of a program to phase out an entire industry in the United States in a single sentence which essentially reads "through an allowance allocation and trading program."[17] The statute says nothing about who will receive allowances or how EPA should allocate this essential right to stay in business as HFCs are phased out of commerce. This wholesale hand *off* to EPA of standardless power to hand *out* rights to produce and import (*i.e.*, consume) HFC refrigerants − on any basis the Administrator chooses − is the essence of an unconstitutional delegation of power from the legislative branch to the executive. *Gundy*, 139 S.Ct. at 2143 (Gorsuch, J., dissenting) (if Congress cannot "reach consensus" on a critical issue, it may not "hand off the job to the executive and direct there the blame for any later problems that might emerge").

There is no intelligible principle in the AIM Act guiding EPA's allocation of allowances, which contravenes the axiom that Congress may not "delegate . . .

---

[17] 42 U.S.C. §7675(e)(3) ("[T]he Administrator shall issue a final rule — (A) phasing down the production of regulated substances in the United States through an allowance allocation and trading program in accordance with this section; and (B) phasing down the consumption of regulated substances in the United States through an allowance allocation and trading program in accordance with the schedule under paragraph (2)(C).").

powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. 1, 42-43, 6 L.Ed. 253, 10 Wheat. 1 (1825); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928) (a statute must "lay down by legislative act an intelligible principle to which the [executive official] is directed to conform"). The delegation in the AIM Act is standardless in the same way as the delegation of power to prohibit interstate transport of "hot oil" that the Supreme Court found unconstitutional in *Panama Refining Co. v. Ryan*, where the court observed that Congress "has declared no policy, has established no standard, has laid down no rule." 293 U.S. 388, 415, 418, 430 (1935) (Congress must "lay down . . . an intelligible principle to which the [agency] is directed to conform"); *see also A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) (transfer of power to President to prescribe codes of fair competition was unconstitutional delegation); *accord Industrial Union Dept., AFL-CIO v. American Petroleum Institute*, 448 U.S. 607, 687 (1980) (Rehnquist, C.J., concurring) ("Congress itself [must, rather than administrative agencies] make the critical policy decisions"); *Gundy,* 139 S.Ct. at 2136 (Gorsuch, J., dissenting) (statutory delegation must be "sufficiently definite and precise to enable Congress, the courts, and the public to ascertain" whether Congress's guidance has been followed) (*citing Yakus v. United States*, 321 U.S. 414, 426 (1944)); *Paul v. United States*, 140 S.Ct. 342 (2019)

(Kavanaugh, J., statement respecting denial of certiorari) (nondelegation doctrine "may warrant further consideration in future cases").

Although the AIM Act provides a framework for a cap-and-trade program by specifying the phasedown baseline, percentages and timeframe, §7675(e)(1) and (2), Congress leaves the core question − what companies will receive allowances − entirely to the agency without any principles to guide the agency's decision making. How to allocate allowances is not merely a decision about how to "fill up the details." *Wayman*, 23 U.S. 1, 43. The allocation of allowances is quite literally life-or-death for companies that receive, or do not receive, allowances to continue their business. The unfettered delegation in the AIM Act to EPA to choose the beneficiaries of the allowance program gives the agency sweeping power to dismantle an entire U.S. industry and hand out the pieces to whomever it chooses.

These are critical decisions that, under our constitutional design, can "be done only by elected representatives in a public process" such that the public can know "whom to hold accountable for the laws." *Gundy*, 139 S.Ct. at 2134 (Gorsuch, J., dissenting). In the AIM Act, instead of elected representatives making hard decisions about how allocations should be handed out, Congress has abdicated its responsibility and passed the problem to an unaccountable administrative agency. *Gundy*, 139 S.Ct. at 2135 (Gorsuch, J., dissenting) ("legislators will face rational incentives to pass problems to the executive

branch"); *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring) (abdication is "not part of the constitutional design").

The broad delegation in the AIM Act is not one of those situations where Congress has, consistent with article I of the Constitution, conditioned application of a rule of conduct on executive fact-finding. The AIM Act does not direct EPA to make any determinations about what companies should receive allowances, such as Congress might have directed based on factors such as principles of fairness, expectations of market participants, effect on the HFC market, or sufficient supply to consumers. *Compare Touby v. United States*, 500 U.S. 160, 166 (1991) (upholding delegation where Controlled Substances Act allowed Attorney General to add a substance to a list of prohibited drugs upon determination that "necessary to avoid an imminent hazard to the public safety"). Rather, the AIM Act in one sentence hands over to the agency all decisions on the core question of who gets to survive in the HFC market.

EPA's actual choice of a method to allocate allowances illustrates the unbridled nature of the delegation.  In its implementing regulations, EPA chose to allocate allowances to companies that historically imported HFCs.  But in some instances, EPA handed out valuable allowances to companies that were merely shipping agents for HFC imports, where the shipping agents did not own or produce the products being imported.  *See Choice Refrigerants Comment Letter*

(JA__); Response to Comments 191 (JA__).  This is akin to handing the deed to a parcel of real estate to the realtor that brokered the sale, rather than to the homeowner who paid for the property.  In other instances, EPA gave valuable to allowances to intellectual property pirates that had illegally imported HFCs in violation of customs laws and while infringing U.S. patents.  *See Choice Refrigerants Comment Letter* (JA__); Response to Comments 191 (JA__).  This is equivalent to giving a 'salesman of the year' bonus to criminals selling flat screen TVs or counterfeit Rolex watches out of the back of a truck in a side alley.  These concerns are not merely hypothetical, as EPA in fact gave tens of millions of dollars of allowances to companies in those exact situations.  *See* Allocation Notice, 86 Fed. Reg. at 55,843 (showing allowances allocated to the companies identified by Choice Refrigerants in its comment letter) (JA __); RTC 191 (agency rejection of Choice Refrigerants' concerns about rewarding non-market actors and illegal imports) (JA __).

Much like an autocrat with power to divide up industrial sectors among oligarchs, the EPA Administrator is empowered to entirely reorder an industrial sector of the U.S. economy by dictating which companies will live or die under the new order. Even if the Administrator makes these decisions rationally and fairly, the sweeping delegation of power to decide who gets valuable government allowances dislocates this critical decision from Congress (where, in theory, small

companies like Choice Refrigerants are represented by their elected officials) to an unaccountable federal administrative bureaucracy.

Moreover, without any definite standard in the statute itself, this Court will be unable to determine whether EPA's decisions, as described above, are consistent with Congress' intent when it delegated EPA the design of the cap-and-trade program. *See Yakus*, 321 U.S. at 426 (Congress must set forth standards "sufficiently definite and precise to enable Congress, the courts, and the public to ascertain" whether Congress's guidance has been followed).

In sum, because the AIM Act delegation of authority to allocate allowances is so sweeping, terse and unconstrained, no saving construction of the statute can rescue this unconstitutional carte-blanche delegation. Accordingly, subsection (e)(3) of the AIM Act must be invalidated. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472-73 (2001) (an agency cannot "cure an unlawful delegation of legislative power"). The executive branch may, of course, approach Congress to make a decision on allowance allocations or to prescribe an intelligible principle for EPA to follow. *See Am. Trucking Ass'ns v. EPA*, 175 F.3d 1027, 1040 (D.C. Cir.), *opinion modified on reh'g*, 195 F.3d 4 (D.C. Cir. 1999) (EPA may "seek legislation ratifying its choice"). But the AIM Act's single sentence handing EPA all authority to decide the life-and-death fate of all participants in an entire market

sector, without any guiding principle, is an unconstitutional transfer of power from the legislative branch of government to the executive branch.

## CONCLUSION

The Court should grant the petition and vacate the agency's Cap-and-Trade Rule to the extent that it purports to regulate HFC Blends and remand the remainder of the Cap-and-Trade Rule to the agency for further proceedings consistent with the arguments above.

Respectfully submitted,

/s/ David M. Williamson
David M. Williamson
WILLIAMSON LAW + POLICY, PLLC
1850 M Street NW, Suite 840
Washington, DC 20036
(202) 256-6155
maxwilliamson@williamsonlawpolicy.com

*Counsel for RMS of Georgia, LLC*

April 1, 2022

- 28 -

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limit of this Court's order of March 15, 2022, because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this response contains **6,450** words.

This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this response has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ David M. Williamson
David M. Williamson
WILLIAMSON LAW + POLICY, PLLC
1850 M Street NW, Suite 840
Washington, DC 20036
(202) 256-6155
maxwilliamson@williamsonlawpolicy.com

*Counsel for RMS of Georgia, LLC*

April 1, 2022

**STATUTORY ADDENDUM**

## ADDENDUM TABLE OF CONTENTS

**Page**

42 U.S.C. §7675 ........................................................................... Addm.1

SUBCHAPTER VII—AMERICAN INNOVATION
AND MANUFACTURING

### § 7675. American innovation and manufacturing

#### (a) Short title

This section may be cited as the ''American Innovation and Manufacturing Act of 2020''.

#### (b) Definitions

In this section:

##### (1) Administrator

The term ''Administrator'' means the Administrator of the Environmental Protection Agency.

##### (2) Allowance

The term ''allowance'' means a limited authorization for the production or consumption of a regulated substance established under subsection (e).

##### (3) Consumption

The term ''consumption'', with respect to a regulated substance, means a quantity equal to the difference between—

(A) a quantity equal to the sum of—

(i) the quantity of that regulated substance produced in the United States; and

(ii) the quantity of the regulated substance imported into the United States; and

(B) the quantity of the regulated substance exported from the United States.

##### (4) Consumption baseline

The term ''consumption baseline'' means the baseline established for the consumption of regulated substances under subsection (e)(1)(C).

##### (5) Exchange value

The term ''exchange value'' means the value assigned to a regulated substance in accordance with subsections (c) and (e), as applicable.

##### (6) Import

The term ''import'' means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, regardless of whether that landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

##### (7) Produce

###### (A) In general

The term ''produce'' means the manufacture of a regulated substance from a raw ma-

USCA Case #21-1251    Document #1941598    Filed: 04/01/2022    Page 43 of 51

terial or feedstock chemical (but not including the destruction of a regulated substance by a technology approved by the Administrator).

**(B) Exclusions**

The term ''produce'' does not include—

(i) the manufacture of a regulated substance that is used and entirely consumed (except for trace quantities) in the manufacture of another chemical; or

(ii) the reclamation, reuse, or recycling of a regulated substance.

**(8) Production baseline**

The term ''production baseline'' means the baseline established for the production of regulated substances under subsection (e)(1)(B).

**(9) Reclaim; reclamation**

The terms ''reclaim'' and ''reclamation'' mean—

(A) the reprocessing of a recovered regulated substance to at least the purity described in standard 700–2016 of the Air-Conditioning, Heating, and Refrigeration Institute (or an appropriate successor standard adopted by the Administrator); and

(B) the verification of the purity of that regulated substance using, at a minimum, the analytical methodology described in the standard referred to in subparagraph (A).

**(10) Recover**

The term ''recover'' means the process by which a regulated substance is—

(A) removed, in any condition, from equipment; and

(B) stored in an external container, with or without testing or processing the regulated substance.

**(11) Regulated substance**

The term ''regulated substance'' means—

(A) a substance listed in the table contained in subsection (c)(1); and

(B) a substance included as a regulated substance by the Administrator under subsection (c)(3).

**(c) Listing of regulated substances**

**(1) List of regulated substances**

Each of the following substances, and any isomers of such a substance, shall be a regulated substance:

| Chemical Name | Common Name | Exchange Value |
|---|---|---|
| $CHF_2CHF_2$ | HFC–134 | 1100 |
| $CH_2FCF_3$ | HFC–134a | 1430 |
| $CH_3FCHF_2$ | HFC–143 | 353 |
| $CHF_2CH_2CF_3$ | HFC–245fa | 1030 |
| $CF_3CH_2CF_2CH_3$ | HFC–365mfc | 794 |
| $CF_3CHFCF_3$ | HFC–227ea | 3220 |
| $CH_2FCF_2CF_3$ | HFC–236cb | 1340 |
| $CHF_2CHFCF_3$ | HFC–236ea | 1370 |
| $CF_3CH_2CF_3$ | HFC–236fa | 9810 |
| $CH_2FCF_2CHF_2$ | HFC–245ca | 693 |
| $CF_3CHFCHFCF_2CF_3$ | HFC–43–10mee | 1640 |
| $CH_2F_2$ | HFC–32 | 675 |
| $CHF_2CF_3$ | HFC–125 | 3500 |
| $CH_3CF_3$ | HFC–143a | 4470 |
| $CH_3F$ | HFC–41 | 92 |
| $CH_3CHF_2$ | HFC–152 | 53 |
| $CH_3CHF_2$ | HFC–152a | 124 |
| $CHF_3$ | HFC–23 | 14800. |

**(2) Review**

The Administrator may—

(A) review the exchange values listed in the table contained in paragraph (1) on a periodic basis; and

(B) subject to notice and opportunity for public comment, adjust the exchange values solely on the basis of—

(i) the best available science; and

(ii) other information consistent with widely used or commonly accepted existing exchange values.

**(3) Other regulated substances**

**(A) In general**

Subject to notice and opportunity for public comment, the Administrator may designate a substance not included in the table contained in paragraph (1) as a regulated substance if—

(i) the substance—

(I) is a chemical substance that is a saturated hydrofluorocarbon; and

(II) has an exchange value, as determined by the Administrator in accordance with the basis described in paragraph (2)(B), of greater than 53; and

(ii) the designation of the substance as a regulated substance would be consistent with the purposes of this section.

**(B) Savings provision**

**(i) In general**

Nothing in this paragraph authorizes the Administrator to designate as a regulated substance a blend of substances that includes a saturated hydrofluorocarbon for purposes of phasing down production or consumption of regulated substances under subsection (e), even if the saturated hydrofluorocarbon is, or may be, designated as a regulated substance.

**(ii) Authority of Administrator**

Clause (i) does not affect the authority of the Administrator to regulate under this Act[1] a regulated substance within a blend of substances.

**(d) Monitoring and reporting requirements**

**(1) Production, import, and export level reports**

**(A) In general**

On a periodic basis, to be determined by the Administrator, but not less frequently than annually, each person who, within the applicable reporting period, produces, imports, exports, destroys, transforms, uses as a process agent, or reclaims a regulated substance shall submit to the Administrator a report that describes, as applicable, the quantity of the regulated substance that the person—

(i) produced, imported, and exported;

(ii) reclaimed;

(iii) destroyed by a technology approved by the Administrator;

(iv) used and entirely consumed (except for trace quantities) in the manufacture of another chemical; or

---

[1] So in original. Probably means ''this section''.

Addm.2

(v) used as a process agent.

**(B) Requirements**

**(i) Signed and attested**

The report under subparagraph (A) shall be signed and attested by a responsible officer (within the meaning of the Clean Air Act (42 U.S.C. 7401 et seq.)).

**(ii) No further reports required**

A report under subparagraph (A) shall not be required from a person if the person—

(I) permanently ceases production, importation, exportation, destruction, transformation, use as a process agent, or reclamation of all regulated substances; and

(II) notifies the Administrator in writing that the requirement under subclause (I) has been met.

**(iii) Baseline period**

Each report under subparagraph (A) shall include, as applicable, the information described in that subparagraph for the baseline period of calendar years 2011 through 2013.

**(2) Coordination**

The Administrator may allow any person subject to the requirements of paragraph (1)(A) to combine and include the information required to be reported under that paragraph with any other related information that the person is required to report to the Administrator.

**(e) Phase-down of production and consumption of regulated substances**

**(1) Baselines**

**(A) In general**

Subject to subparagraph (D), the Administrator shall establish for the phase-down of regulated substances—

(i) a production baseline for the production of all regulated substances in the United States, as described in subparagraph (B); and

(ii) a consumption baseline for the consumption of all regulated substances in the United States, as described in subparagraph (C).

**(B) Production baseline described**

The production baseline referred to in subparagraph (A)(i) is the quantity equal to the sum of—

(i) the average annual quantity of all regulated substances produced in the United States during the period—

(I) beginning on January 1, 2011; and

(II) ending on December 31, 2013; and

(ii) the quantity equal to the sum of—

(I) 15 percent of the production level of hydrochlorofluorocarbons in calendar year 1989; and

(II) 0.42 percent of the production level of chlorofluorocarbons in calendar year 1989.

**(C) Consumption baseline described**

The consumption baseline referred to in subparagraph (A)(ii) is the quantity equal to the sum of—

(i) the average annual quantity of all regulated substances consumed in the United States during the period—

(I) beginning on January 1, 2011; and

(II) ending on December 31, 2013; and

(ii) the quantity equal to the sum of—

(I) 15 percent of the consumption level of hydrochlorofluorocarbons in calendar year 1989; and

(II) 0.42 percent of the consumption level of chlorofluorocarbons in calendar year 1989.

**(D) Exchange values**

**(i) In general**

For purposes of establishing the baselines pursuant to subparagraphs (B) and (C), the Administrator shall use the exchange values listed in the table contained in subsection (c)(1) for regulated substances and the following exchange values for hydrochlorofluorocarbons and chlorofluorocarbons:

| Table 2 | | |
|---|---|---|
| Chemical Name | Common Name | Exchange Value |
| CHFCl$_2$ | HCFC-21 | 151 |
| CHF$_2$Cl | HCFC-22 | 1810 |
| C$_2$HF$_3$Cl$_2$ | HCFC-123 | 77 |
| C$_2$HF$_4$Cl | HCFC-124 | 609 |
| CH$_3$CFCl$_2$ | HCFC-141b | 725 |
| CH$_3$CF$_2$Cl | HCFC-142b | 2310 |
| CF$_3$CF$_2$CHCl$_2$ | HCFC-225ca | 122 |
| CF$_2$ClCF$_2$CHClF | HCFC-225cb | 595 |

| Table 3 | | |
|---|---|---|
| Chemical Name | Common Name | Exchange Value |
| CFCl$_3$ | CFC-11 | 4750 |
| CF$_2$Cl$_2$ | CFC-12 | 10900 |
| C$_2$F$_3$Cl$_3$ | CFC-113 | 6130 |
| C$_2$F$_4$Cl$_2$ | CFC-114 | 10000 |
| C$_2$F$_5$Cl | CFC-115 | 7370 |

**(ii) Review**

The Administrator may—

(I) review the exchange values listed in the tables contained in clause (i) on a periodic basis; and

(II) subject to notice and opportunity for public comment, adjust the exchange values solely on the basis of—

(aa) the best available science; and

(bb) other information consistent with widely used or commonly accepted existing exchange values.

**(2) Production and consumption phase-down**

**(A) In general**

During the period beginning on January 1 of each year listed in the table contained in subparagraph (C) and ending on December 31 of the year before the next year listed on that table, except as otherwise permitted under this section, no person shall—

(i) produce a quantity of a regulated substance without a corresponding quantity of production allowances, except as provided in paragraph (5);

(ii) consume a quantity of a regulated substance without a corresponding quantity of consumption allowances; or

(iii) hold, use, or transfer any production allowance or consumption allowance allo-

cated under this section except in accordance with regulations promulgated by the Administrator pursuant to subsection (g).

**(B) Compliance**

For each year listed on the table contained in subparagraph (C), the Administrator shall ensure that the annual quantity of all regulated substances produced or consumed in the United States does not exceed the product obtained by multiplying—

(i) the production baseline or consumption baseline, as applicable; and

(ii) the applicable percentage listed on the table contained in subparagraph (C).

**(C) Relation to baseline**

On January 1 of each year listed in the following table, the Administrator shall apply the applicable percentage, as described in subparagraph (A):

| Date | Percentage of Production Baseline | Percentage of Consumption Baseline |
|---|---|---|
| 2020–2023 | 90 percent | 90 percent |
| 2024–2028 | 60 percent | 60 percent |
| 2029–2033 | 30 percent | 30 percent |
| 2034–2035 | 20 percent | 20 percent |
| 2036 and thereafter | 15 percent | 15 percent |

**(D) Allowances**

**(i) Quantity**

Not later than October 1 of each calendar year, the Administrator shall use the quantity calculated under subparagraph (B) to determine the quantity of allowances for the production and consumption of regulated substances that may be used for the following calendar year.

**(ii) Nature of allowances**

**(I) In general**

An allowance allocated under this section—

(aa) does not constitute a property right; and

(bb) is a limited authorization for the production or consumption of a regulated substance under this section.

**(II) Savings provision**

Nothing in this section or in any other provision of law limits the authority of the United States to terminate or limit an authorization described in subclause (I)(bb).

**(3) Regulations regarding production and consumption of regulated substances**

Not later than 270 days after December 27, 2020, which shall include a period of notice and opportunity for public comment, the Administrator shall issue a final rule—

(A) phasing down the production of regulated substances in the United States through an allowance allocation and trading program in accordance with this section; and

(B) phasing down the consumption of regulated substances in the United States through an allowance allocation and trading program in accordance with the schedule under paragraph (2)(C) (subject to the same exceptions and other requirements as are applicable to the phase-down of production of regulated substances under this section).

**(4) Exceptions; essential uses**

**(A) Feedstocks and process agents**

Except for the reporting requirements described in subsection (d)(1), this section does not apply to—

(i) a regulated substance that is used and entirely consumed (except for trace quantities) in the manufacture of another chemical; or

(ii) a regulated substance that is used and not entirely consumed in the manufacture of another chemical, if the remaining amounts of the regulated substance are subsequently destroyed.

**(B) Essential uses**

**(i) In general**

Beginning on December 27, 2020, and subject to paragraphs (2) and (3) and clauses (ii) and (iii), the Administrator may, by rule, after considering technical achievability, commercial demands, affordability for residential and small business consumers, safety, and other relevant factors, including overall economic costs and environmental impacts compared to historical trends, allocate a quantity of allowances for a period of not more than 5 years for the production and consumption of a regulated substance exclusively for the use of the regulated substance in an application, if—

(I) no safe or technically achievable substitute will be available during the applicable period for that application; and

(II) the supply of the regulated substance that manufacturers or users of the regulated substance for that application are capable of securing from chemical manufacturers, as authorized under paragraph (2)(A), including any quantities of a regulated substance available from production or import, is insufficient to accommodate the application.

**(ii) Petition**

If the Administrator receives a petition requesting the designation of an application as an essential use under clause (i), the Administrator shall—

(I) not later than 180 days after the date on which the Administrator receives the petition—

(aa) make the complete petition available to the public; and

(bb) when making the petition available to the public under item (aa), propose and seek public comment on—

(AA) a determination of whether to designate the application as an essential use; and

(BB) if the Administrator proposes to designate the application as an essential use, making the requisite allocation of allowances; and

(II) not later than 270 days after the date on which the Administrator re-

ceives the petition, take final action on the petition.

### (iii) Limitation

A person receiving an allocation under clause (i) or (iv) or as a result of a petition granted under clause (ii) may not produce or consume a produced quantity of regulated substances that, considering the respective exchange values of the regulated substances, exceeds the number of allowances issued under paragraphs (2) and (3) that are held by that person.

### (iv) Mandatory allocations

#### (I) In general

Notwithstanding clause (i) and subject to clause (iii) and paragraphs (2) and (3), for the 5-year period beginning on December 27, 2020, the Administrator shall allocate the full quantity of allowances necessary, based on projected, current, and historical trends, for the production or consumption of a regulated substance for the exclusive use of the regulated substance in an application solely for—

(aa) a propellant in metered-dose inhalers;

(bb) defense sprays;

(cc) structural composite preformed polyurethane foam for marine use and trailer use;

(dd) the etching of semiconductor material or wafers and the cleaning of chemical vapor deposition chambers within the semiconductor manufacturing sector;

(ee) mission-critical military end uses, such as armored vehicle engine and shipboard fire suppression systems and systems used in deployable and expeditionary applications; and

(ff) onboard aerospace fire suppression.

#### (II) Requirement

The allocation of allowances under subclause (I) shall be determined through a rulemaking.

### (v) Review

#### (I) In general

For each essential use application receiving an allocation of allowances under clause (i) or (iv), the Administrator shall review the availability of substitutes, including any quantities of the regulated substance available from reclaiming or prior production, not less frequently than once every 5 years.

#### (II) Extension

If, pursuant to a review under subclause (I), the Administrator determines, subject to notice and opportunity for public comment, that the requirements described in subclauses (I) and (II) of clause (i) are met, the Administrator shall authorize the production or consumption, as applicable, of any regulated substance used in the application for renewable periods of not more than 5 years for exclusive use in the application.

### (5) Domestic manufacturing

Notwithstanding paragraph (2)(A)(i), the Administrator may, by rule, authorize a person to produce a regulated substance in excess of the number of production allowances held by that person, subject to the conditions that—

(A) the authorization is—

(i) for a renewable period of not more than 5 years; and

(ii) subject to notice and opportunity for public comment; and

(B) the production—

(i) is at a facility located in the United States;

(ii) is solely for export to, and use in, a foreign country that is not subject to the prohibition in subsection (j)(1); and

(iii) would not violate paragraph (2)(B).

## (f) Accelerated schedule

### (1) In general

Subject to paragraph (4), the Administrator may, only in response to a petition submitted to the Administrator in accordance with paragraph (3) and after notice and opportunity for public comment, promulgate regulations that establish a schedule for phasing down the production or consumption of regulated substances that is more stringent than the production and consumption levels of regulated substances required under subsection (e)(2)(C).

### (2) Requirements

Any regulations promulgated under this subsection—

(A) shall—

(i) apply uniformly to the allocation of production and consumption allowances for regulated substances, in accordance with subsection (e)(3);

(ii) ensure that there will be sufficient quantities of regulated substances, including substances available from reclaiming, prior production, or prior import, to meet the needs for—

(I) applications that receive an allocation under clause (i) of subsection (e)(4)(B); and

(II) all applications that receive a mandatory allocation under items (aa) through (ff) of clause (iv)(I) of that subsection; and

(iii) foster continued reclamation of and transition from regulated substances; and

(B) shall not set the level of production allowances or consumption allowances below the percentage of the consumption baseline that is actually consumed during the calendar year prior to the year during which the Administrator makes a final determination with respect to the applicable proposal described in paragraph (3)(C)(iii)(I).

### (3) Petition

#### (A) In general

A person may petition the Administrator to promulgate regulations for an accelerated schedule for the phase-down of production or consumption of regulated substances under paragraph (1).

Addm.5

**(B) Requirement**

A petition submitted under subparagraph (A) shall—

(i) be made at such time, in such manner, and containing such information as the Administrator shall require; and

(ii) include a showing by the petitioner that there are data to support the petition.

**(C) Timelines**

**(i) In general**

If the Administrator receives a petition under subparagraph (A), the Administrator shall—

(I) not later than 180 days after the date on which the Administrator receives the petition—

(aa) make the complete petition available to the public; and

(bb) when making the petition available to the public under item (aa), propose and seek public comment on the proposal of the Administrator to grant or deny the petition; and

(II) not later than 270 days after the date on which the Administrator receives the petition, take final action on the petition.

**(ii) Factors for determination**

In making a determination to grant or deny a petition submitted under subparagraph (A), the Administrator shall, to the extent practicable, factor in—

(I) the best available data;

(II) the availability of substitutes for uses of the regulated substance that is the subject of the petition, taking into account technological achievability, commercial demands, affordability for residential and small business consumers, safety, consumer costs, building codes, appliance efficiency standards, contractor training costs, and other relevant factors, including the quantities of regulated substances available from reclaiming, prior production, or prior import;

(III) overall economic costs and environmental impacts, as compared to historical trends; and

(IV) the remaining phase-down period for regulated substances under the final rule issued under subsection (e)(3), if applicable.

**(iii) Regulations**

After receiving public comment with respect to the proposal under clause (i)(I)(bb), if the Administrator makes a final determination to grant a petition under subparagraph (A), the final regulations with respect to the petition shall—

(I) be promulgated by not later than 1 year after the date on which the Administrator makes the proposal to grant the petition under that clause; and

(II) meet the requirements of paragraph (2).

**(D) Publication**

When the Administrator makes a final determination to grant or deny a petition under subparagraph (A), the Administrator shall publish a description of the reasons for that grant or denial, including a description of the information considered under subclauses (I) through (IV) of subparagraph (C)(ii).

**(E) Insufficient information**

If the Administrator determines that the data included under subparagraph (B)(ii) in a petition are not sufficient to make a determination under this paragraph, the Administrator shall use any authority available to the Administrator to acquire the necessary data.

**(4) Date of effectiveness**

The Administrator may not promulgate under paragraph (1) a regulation for the production or consumption of regulated substances that is more stringent than the production or consumption levels required under subsection (e)(2)(C) that takes effect before January 1, 2025.

**(5) Review**

**(A) In general**

The Administrator shall review the availability of substitutes for regulated substances subject to an accelerated schedule established under paragraph (1) in each sector and subsector in which the regulated substance is used, taking into account technological achievability, commercial demands, safety, and other relevant factors, including the quantities of regulated substances available from reclaiming, prior production, or prior import, by January 1, 2026 (for the first review), by January 1, 2031 (for the second review), and at least once every 5 years thereafter.

**(B) Public availability**

The Administrator shall make the results of a review conducted under subparagraph (A) publicly available.

**(6) Savings provision**

Nothing in this subsection authorizes the Administrator to promulgate regulations pursuant to this subsection that establish a schedule for phasing down the production or consumption of regulated substances that is less stringent than the production and consumption levels of regulated substances required under subsection (e)(2)(C).

**(g) Exchange authority**

**(1) Transfers**

Not later than 270 days after December 27, 2020, which shall include a period of notice and opportunity for public comment, the Administrator shall promulgate a final regulation that governs the transfer of allowances for the production of regulated substances under subsection (e)(3)(A) that uses—

(A) the applicable exchange values described in the table contained in subsection (c)(1); or

(B) the exchange value described in the rule designating the substance as a regulated substance under subsection (c)(3).

**(2) Requirements**

The final rule promulgated pursuant to paragraph (1) shall—

(A) ensure that the transfers under this subsection will result in greater total reductions in the production of regulated substances in each year than would occur during the year in the absence of the transfers;

(B) permit 2 or more persons to transfer production allowances if the transferor of the allowances will be subject, under the final rule, to an enforceable and quantifiable reduction in annual production that—

(i) exceeds the reduction otherwise applicable to the transferor under this section;

(ii) exceeds the quantity of production represented by the production allowances transferred to the transferee; and

(iii) would not have occurred in the absence of the transaction; and

(C) provide for the trading of consumption allowances in the same manner as is applicable under this subsection to the trading of production allowances.

**(h) Management of regulated substances**

**(1) In general**

For purposes of maximizing reclaiming and minimizing the release of a regulated substance from equipment and ensuring the safety of technicians and consumers, the Administrator shall promulgate regulations to control, where appropriate, any practice, process, or activity regarding the servicing, repair, disposal, or installation of equipment (including requiring, where appropriate, that any such servicing, repair, disposal, or installation be performed by a trained technician meeting minimum standards, as determined by the Administrator) that involves—

(A) a regulated substance;

(B) a substitute for a regulated substance;

(C) the reclaiming of a regulated substance used as a refrigerant; or

(D) the reclaiming of a substitute for a regulated substance used as a refrigerant.

**(2) Reclaiming**

**(A) In general**

In carrying out this section, the Administrator shall consider the use of authority available to the Administrator under this section to increase opportunities for the reclaiming of regulated substances used as refrigerants.

**(B) Recovery**

A regulated substance used as a refrigerant that is recovered shall be reclaimed before the regulated substance is sold or transferred to a new owner, except where the recovered regulated substance is sold or transferred to a new owner solely for the purposes of being reclaimed or destroyed.

**(3) Coordination**

In promulgating regulations to carry out this subsection, the Administrator may coordinate those regulations with any other regulations promulgated by the Administrator that involve—

(A) the same or a similar practice, process, or activity regarding the servicing, repair, disposal, or installation of equipment; or

(B) reclaiming.

**(4) Inapplicability**

No regulation promulgated pursuant to this subsection shall apply to a regulated substance or a substitute for a regulated substance that is contained in a foam.

**(5) Small business grants**

**(A) Definition of small business concern**

In this paragraph, the term ''small business concern'' has the same meaning as in section 632 of title 15.

**(B) Establishment**

Subject to the availability of appropriations, the Administrator shall establish a grant program to award grants to small business concerns for the purchase of new specialized equipment for the recycling, recovery, or reclamation of a substitute for a regulated substance, including the purchase of approved refrigerant recycling equipment (as defined in section 609(b) of the Clean Air Act (42 U.S.C. 7671h(b))) for recycling, recovery, or reclamation in the service or repair of motor vehicle air conditioning systems.

**(C) Matching funds**

The non-Federal share of a project carried out with a grant under this paragraph shall be not less than 25 percent.

**(D) Authorization of appropriations**

There is authorized to be appropriated to carry out this paragraph $5,000,000 for each of fiscal years 2021 through 2023.

**(i) Technology transitions**

**(1) Authority**

Subject to the provisions of this subsection, the Administrator may by rule restrict, fully, partially, or on a graduated schedule, the use of a regulated substance in the sector or subsector in which the regulated substance is used.

**(2) Negotiated rulemaking**

**(A) Consideration required**

Before proposing a rule for the use of a regulated substance for a sector or subsector under paragraph (1), the Administrator shall consider negotiating with stakeholders in the sector or subsector subject to the potential rule in accordance with the negotiated rulemaking procedure provided for under subchapter III of chapter 5 of title 5 (commonly known as the ''Negotiated Rulemaking Act of 1990'').

**(B) Negotiated rulemakings**

If the Administrator negotiates a rulemaking with stakeholders using the procedure described in subparagraph (A), the Administrator shall, to the extent practicable, give priority to completing that rulemaking over completing rulemakings under this subsection that were not negotiated using that procedure.

**(C) No negotiated rulemaking**

If the Administrator does not negotiate a rulemaking with stakeholders using the pro-

cedure described in subparagraph (A), the Administrator shall, before commencement of the rulemaking process for a rule under paragraph (1), publish an explanation of the decision of the Administrator to not use that procedure.

**(3) Petitions**

**(A) In general**

A person may petition the Administrator to promulgate a rule under paragraph (1) for the restriction on use of a regulated substance in a sector or subsector, which shall include a request that the Administrator negotiate with stakeholders in accordance with paragraph (2)(A).

**(B) Response**

The Administrator shall grant or deny a petition under subparagraph (A) not later than 180 days after the date of receipt of the petition.

**(C) Requirements**

**(i) Explanation**

If the Administrator denies a petition under subparagraph (B), the Administrator shall publish in the Federal Register an explanation of the denial.

**(ii) Final rule**

If the Administrator grants a petition under subparagraph (B), the Administrator shall promulgate a final rule not later than 2 years after the date on which the Administrator grants the petition.

**(iii) Publication of petitions**

Not later than 30 days after the date on which the Administrator receives a petition under subparagraph (A), the Administrator shall make that petition available to the public in full.

**(4) Factors for determination**

In carrying out a rulemaking using the procedure described in paragraph (2) or making a determination to grant or deny a petition submitted under paragraph (3), the Administrator shall, to the extent practicable, factor in—

(A) the best available data;

(B) the availability of substitutes for use of the regulated substance that is the subject of the rulemaking or petition, as applicable, in a sector or subsector, taking into account technological achievability, commercial demands, affordability for residential and small business consumers, safety, consumer costs, building codes, appliance efficiency standards, contractor training costs, and other relevant factors, including the quantities of regulated substances available from reclaiming, prior production, or prior import;

(C) overall economic costs and environmental impacts, as compared to historical trends; and

(D) the remaining phase-down period for regulated substances under the final rule issued under subsection (e)(3), if applicable.

**(5) Evaluation**

In carrying out this subsection, the Administrator shall—

(A) evaluate substitutes for regulated substances in a sector or subsector, taking into account technological achievability, commercial demands, safety, overall economic costs and environmental impacts, and other relevant factors; and

(B) make the evaluation under subparagraph (A) available to the public, including the factors associated with the safety of those substitutes.

**(6) Effective date of rules**

No rule under this subsection may take effect before the date that is 1 year after the date on which the Administrator promulgates the applicable rule under this subsection.

**(7) Applicability**

**(A) Definition of retrofit**

In this paragraph, the term "retrofit" means to upgrade existing equipment where the regulated substance is changed, which—

(i) includes the conversion of equipment to achieve system compatibility; and

(ii) may include changes in lubricants, gaskets, filters, driers, valves, o-rings, or equipment components for that purpose.

**(B) Applicability of rules**

A rule promulgated under this subsection shall not apply to—

(i) an essential use under clause (i) or (iv) of subsection (e)(4)(B), including any use for which the production or consumption of the regulated substance is extended under clause (v)(II) of that subsection; or

(ii) except for a retrofit application, equipment in existence in a sector or subsector before December 27, 2020.

**(j) International cooperation**

**(1) In general**

Subject to paragraph (2), no person subject to the requirements of this section shall trade or transfer a production allowance or, after January 1, 2033, export a regulated substance to a person in a foreign country that, as determined by the Administrator, has not enacted or otherwise established within a reasonable timeframe after December 27, 2020, the same or similar requirements or otherwise undertaken commitments regarding the production and consumption of regulated substances as are contained in this section.

**(2) Transfers**

Pursuant to paragraph (1), a person in the United States may engage in a trade or transfer of a production allowance—

(A) to a person in a foreign country if, at the time of the transfer, the Administrator revises the number of allowances for production under subsection (e)(2), as applicable, for the United States such that the aggregate national production of the regulated substance to be traded under the revised production limits is equal to the least of—

(i) the maximum production level permitted for the applicable regulated substance in the year of the transfer under this section, less the production allowances transferred;

(ii) the maximum production level permitted for the applicable regulated substances in the transfer year under applicable law, less the production allowances transferred; and

(iii) the average of the actual national production level of the applicable regulated substances for the 3-year period ending on the date of the transfer, less the production allowances transferred; or

(B) from a person in a foreign country if, at the time of the trade or transfer, the Administrator finds that the foreign country has revised the domestic production limits of the regulated substance in the same manner as provided with respect to transfers by a person in United[2] States under this subsection.

**(3) Effect of transfers on production limits**

The Administrator may—

(A) reduce the production limits established under subsection (e)(2)(B) as required as a prerequisite to a transfer described in paragraph (2)(A); or

(B) increase the production limits established under subsection (e)(2)(B) to reflect production allowances acquired under a trade or transfer described in paragraph (2)(B).

**(4) Regulations**

The Administrator shall—

(A) not later than 1 year after December 27, 2020, promulgate a final rule to carry out this subsection; and

(B) not less frequently than annually, review and, if necessary, revise the final rule promulgated pursuant to subparagraph (A).

**(k) Relationship to other law**

**(1) Implementation**

**(A) Rulemakings**

The Administrator may promulgate such regulations as are necessary to carry out the functions of the Administrator under this section.

**(B) Delegation**

The Administrator may delegate to any officer or employee of the Environmental Protection Agency such of the powers and duties of the Administrator under this section as the Administrator determines to be appropriate.

**(C) Clean Air Act**

Sections 113, 114, 304, and 307 of the Clean Air Act (42 U.S.C. 7413, 7414, 7604, 7607) shall apply to this section and any rule, rulemaking, or regulation promulgated by the Administrator pursuant to this section as though this section were expressly included in title VI of that Act (42 U.S.C. 7671 et seq.).

**(2) Preemption**

**(A) In general**

Subject to subparagraph (B), during the 5-year period beginning on December 27, 2020,

and with respect to an exclusive use for which a mandatory allocation of allowances is provided under subsection (e)(4)(B)(iv)(I), no State or political subdivision of a State may enforce a statute or administrative action restricting the management or use of a regulated substance within that exclusive use.

**(B) Extension**

**(i) In general**

Subject to clause (ii), if, pursuant to subclause (I) of subsection (e)(4)(B)(v), the Administrator authorizes an additional period under subclause (II) of that subsection for the production or consumption of a regulated substance for an exclusive use described in subparagraph (A), no State or political subdivision of a State may enforce a statute or administrative action restricting the management or use of the regulated substance within that exclusive use for the duration of that additional period.

**(ii) Limitation**

The period for which the limitation under clause (i) applies shall not exceed 5 years from the date on which the period described in subparagraph (A) ends.

(Pub. L. 116–260, div. S, §103, Dec. 27, 2020, 134 Stat. 2255.)

REFERENCES IN TEXT

The Clean Air Act, referred to in subsecs. (d)(1)(B)(i) and (k)(1)(C), is act July 14, 1955, ch. 360, 69 Stat. 322, which is classified generally to this chapter. Title VI of the Act is classified generally to subchapter VI (§7671 et seq.) of this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of this title and Tables.

CODIFICATION

Section was enacted as the American Innovation and Manufacturing Act of 2020, and also as part of the Consolidated Appropriations Act, 2021, and not as part of the Clean Air Act which comprises this chapter.

## CHAPTER 86—EARTHQUAKE HAZARDS REDUCTION

| Sec. | |
|---|---|
| 7701. | Congressional findings. |
| 7702. | Congressional statement of purpose. |
| 7703. | Definitions. |
| 7704. | National Earthquake Hazards Reduction Program. |
| 7704a. | Report on seismic safety property standards. |
| 7705, 7705a. | Repealed. |
| 7705b. | Seismic standards. |
| 7705c. | Acceptance of gifts. |
| 7705d. | Repealed. |
| 7705e. | Post-earthquake investigations program. |
| 7706. | Authorization of appropriations. |
| 7707. | Advanced National Seismic System. |
| 7708. | Network for Earthquake Engineering Simulation. |
| 7709. | Scientific Earthquake Studies Advisory Committee. |

## § 7701. Congressional findings

The Congress finds and declares the following:

(1) All 50 States, and the Commonwealth of Puerto Rico, are vulnerable to the hazards of

---

[2] So in original. Probably should be preceded by "the".

## CERTIFICATE OF SERVICE

I certify that on April 1, 2022, I caused to be filed a copy of this brief using the Court's case management electronic case filing system, which will automatically serve notice of the filing on registered users of that system.

/s/ David M. Williamson
David M. Williamson

April 1, 2022