ORAL ARGUMENT NOT YET SCHEDULED

No. 21-1251 and consolidated cases

––––––––––––––––––––

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

––––––––––––––––––––

HEATING, AIR-CONDITIONING, & REFRIGERATION
DISTRIBUTORS INTERNATIONAL, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

––––––––––––––––––––

Petition for Review of an Action of the
U.S. Environmental Protection Agency

––––––––––––––––––––

**INITIAL BRIEF FOR RESPONDENTS**

––––––––––––––––––––

Of Counsel:

KAREN BIANCO
*Attorney*
U.S. Environmental Protection
 Agency

TODD KIM
*Assistant Attorney General*
TSUKI HOSHIJIMA
*Attorney*
U.S. Department of Justice
Environment and Natural Resources
 Division
Environmental Defense Section
P.O. Box 7411
Washington, D.C. 20044
(202) 514-3468
tsuki.hoshijima@usdoj.gov

## CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Respondents ("EPA") submits this certificate as to parties, rulings, and related cases.

### A.    Parties and Amici

All parties, intervenors, and amici appearing in this court are listed in the opening briefs for Petitioners.

### B.    Rulings Under Review

The agency action under review is EPA's rule entitled "Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act," 86 Fed. Reg. 55,116 (Oct. 5, 2021).

### C.    Related Cases

In its petition, RMS of Georgia, LLC d/b/a Choice Refrigerants sought review of both the rule identified above and a separate EPA action under the American Innovation and Manufacturing Act. The Court granted EPA's motion to sever the challenge to the separate action. Order (Feb. 22, 2022), Doc. No. 1936059; Motion (Jan. 18, 2022), Doc. No. 1931100. The severed challenge was assigned a new docket,

*RMS of Georgia v. EPA*, No. 22-1025 (D.C. Cir.). Case No. 22-1025 is currently being held in abeyance pending resolution of the venue question in *RMS of Georgia v. EPA*, No. 21-14213 (11th Cir.). Order, No. 22-1025 (Mar. 14, 2022), Doc. No. 1939003.

/s/ *Tsuki Hoshijima*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
    RELATED CASES .....................................................................i

TABLE OF AUTHORITIES ...............................................................v

GLOSSARY ......................................................................... xiii

INTRODUCTION ......................................................................1

STATEMENT OF THE ISSUES .........................................................2

PERTINENT STATUTES AND REGULATIONS .........................................3

STATEMENT OF THE CASE ...........................................................3

I.    The AIM Act ......................................................................3

II.   The Framework Rule ...........................................................6

STANDARD OF REVIEW ............................................................13

SUMMARY OF ARGUMENT .........................................................14

ARGUMENT .........................................................................19

I.    EPA's approach to hydrofluorocarbon blends is lawful
    and reasonable. ................................................................19

    A.    EPA reasonably determined that importing a
        blend requires expending allowances necessary to
        import the regulated substances within the blend. ..............19

    B.    EPA's approach to blends is not foreclosed by the
        AIM Act's savings provision. ....................................30

II.   Choice's nondelegation argument is not properly before
    this Court and also lacks merit. ..............................................37

    A.    Choice's objection was not raised with reasonable
        specificity during the period for public comment. ..................37

B.     The AIM Act does not impermissibly delegate
        legislative authority to EPA. .......................................40

III.   The challenged compliance-related provisions are
       within EPA's statutory authority and reasonable............................48

A.     EPA established compliance-related measures
        designed to ensure the phasedown of
        hydrofluorocarbons. ..........................................................48

B.     The AIM Act authorizes EPA to establish
        compliance-related measures to ensure the
        phasedown of hydrofluorocarbons...............................51

C.     The disposable cylinder prohibition is not
        arbitrary or capricious. ..................................................62

       1.     EPA adequately explained why the
              prohibition combats illegal activity. .................63

       2.     EPA adequately considered alternatives. ......................67

       3.     EPA adequately considered the need for
              lead time to ramp up production of refillable
              cylinders.................................................................69

       4.     EPA adequately addressed other comments..................76

       5.     EPA's findings under the Regulatory
              Flexibility Act are not arbitrary or
              capricious. ..............................................................78

D.     The container tracking requirement is not
        arbitrary or capricious. ..................................................82

CONCLUSION .................................................................87

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ................................................................ 41

*Abbas v. Foreign Pol'y Grp.*,
  783 F.3d 1328 (D.C. Cir. 2015) .......................................... 47

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
  215 F.3d 61 (D.C. Cir. 2000) ............................................... 14

*Am. Power & Light Co. v. SEC*,
  329 U.S. 90 (1946) ..................................................... 40, 42

*Big Time Vapes, Inc. v. FDA*,
  963 F.3d 436 (5th Cir. 2020) ............................................... 47

*Bluewater Network v. EPA*,
  370 F.3d 1 (D.C. Cir. 2004) ................................................ 14

*Catawba Cnty. v. EPA*,
  571 F.3d 20 (D.C. Cir. 2009) ............................................... 55

*Cement Kiln Recycling Coal. v. EPA*,
  255 F.3d 855 (D.C. Cir. 2001) ....................................... 79, 80

*Cheney R.R. Co. v. ICC*,
  902 F.2d 66 (D.C. Cir. 1990) ............................................... 56

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 2003) ............................................ 14

*Consumer Elecs. Ass'n v. FCC*,
  347 F.3d 291 (D.C. Cir. 2003) ............................................ 52

*Corbett v. TSA*,
    19 F.4th 478 (D.C. Cir. 2021).......................................................52, 57

*Cnty. of Maui v. Haw. Wildlife Fund*,
    140 S. Ct. 1462 (2020).......................................................................26

*CTS Corp. v. EPA*,
    759 F.3d 52 (D.C. Cir. 2014)............................................................62

*Duncan v. Walker*,
    533 U.S. 167 (2001)...........................................................................55

*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014)...........................................................................38

*Nat. Res. Def. Council v. EPA*,
    571 F.3d 1245 (D.C. Cir. 2009).........................................................38

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020)...............................................................3

*FCC v. Nat'l Citizens Comm. for Broad.*,
    436 U.S. 775 (1978)...........................................................................72

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)...........................................................................60

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)...........................................................................14

*Fleming v. U.S. Dep't of Agric.*,
    987 F.3d 1093 (D.C. Cir. 2021).........................................................39

*Gundy v. United States*,
    139 S. Ct. 2116 (2019)........................................... 40, 44, 45, 46, 47

*Helicopter Ass'n Int'l, Inc. v. FAA*,
    722 F.3d 430 (D.C. Cir. 2013)...........................................................55

*Jama v. ICE,*
    543 U.S. 335 (2005) .............................................................. 35

*Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.,*
    476 F.3d 946 (D.C. Cir. 2007) ............................................ 86

*Lead Indus. Ass'n Inc. v. EPA,*
    647 F.2d 1130 (D.C. Cir. 1980) .................................... 14, 39

*Lichter v. United States,*
    334 U.S. 742 (1948) .............................................................. 41

*Loving v. IRS,*
    742 F.3d 1013 (D.C. Cir. 2014) ........................................ 60

*MD/DC/DE Broads. Ass'n v. FCC,*
    236 F.3d 13 (D.C. Cir. 2001) .............................................. 87

*Maryland v. EPA,*
    958 F.3d 1185 (D.C. Cir. 2020) ........................................ 13

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .............................................................. 52

*Melcher v. FCC,*
    134 F.3d 1143 (D.C. Cir. 1998) ........................................ 72

*Miss. Comm'n on Env't Quality v. EPA,*
    790 F.3d 138 (D.C. Cir. 2015) ...................................... 14, 25

*Mistretta v. United States,*
    488 U.S. 361 (1989) ............................................ 41, 42, 62

*Motor & Equip. Mfrs. Ass'n v. Nichols,*
    142 F.3d 449 (D.C. Cir. 1998) ...................................... 38, 79

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .......................................................................... 14, 86

*Nat'l Broad. Co. v. United States*,
  319 U.S. 190 (1943) ....................................................................... 41, 45

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
  630 F.3d 145 (D.C. Cir. 2010) ............................................................ 52

*Panama Ref. Co. v. Ryan*,
  293 U.S. 388 (1935) ............................................................................ 41

*Pers. Watercraft Indus. Ass'n v. Dep't of Com.*,
  48 F.3d 540 (D.C. Cir. 1995) .............................................................. 66

*Ross v. Blake*,
  578 U.S. 632 (2016) ............................................................................ 39

*Rural Cellular Ass'n v. FCC*,
  588 F.3d 1095 (D.C. Cir. 2009) .......................................................... 75

*Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*,
  132 F.3d 775 (D.C. Cir. 1998) ............................................................ 54

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981) ............................................................ 72

*Texas Mun. Power Agency v. EPA*,
  89 F.3d 858 (D.C. Cir. 1996) .............................................................. 39

*U.S. Cellular Corp. v. FCC*,
  254 F.3d 78 (D.C. Cir. 2001) .............................................................. 78

*United States v. Edge Broad. Co.*,
  509 U.S. 418 (1993) ............................................................................ 66

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ....................................................................... 41, 42

*Yakus v. United States,*
  321 U.S. 414 (1944) ............................................................... 41

**Statutes**

5 U.S.C. §§ 601–612 ............................................................... 78

5 U.S.C. § 603 ........................................................................ 78

5 U.S.C. § 604 ........................................................................ 78

5 U.S.C. § 605(b) ................................................................... 78

42 U.S.C. § 7413 .................................................................... 59

42 U.S.C. § 7604 .................................................................... 59

42 U.S.C. § 7607 ................................................................. 6, 13

42 U.S.C. § 7607(d)(1)(I) ....................................................... 13

42 U.S.C. § 7607(d)(4)(B)(ii) ................................................. 82

42 U.S.C. § 7607(d)(7)(A) ................................................. 14, 82

42 U.S.C. § 7607(d)(7)(B) ................................................... 6, 38

42 U.S.C. § 7607(d)(8) ........................................................... 73

42 U.S.C. § 7607(d)(9) ........................................................... 37

42 U.S.C. § 7607(d)(9)(A) ...................................................... 13

42 U.S.C. § 7607(d)(9)(D) ...................................................... 73

42 U.S.C. § 7675 ..................................................................... 3

42 U.S.C. § 7675(b)(2)........................................................................45

42 U.S.C. § 7675(b)(3)...............................................................5, 7, 19

42 U.S.C. § 7675(b)(7)(A)...................................................................5

42 U.S.C. § 7675(b)(11)..................................................................4, 30

42 U.S.C. § 7675(c)..........................................................................60

42 U.S.C. § 7675(c)(1)............................................................4, 22, 30

42 U.S.C. § 7675(c)(3)(A)..............................................................4, 30

42 U.S.C. § 7675(c)(3)(B)..............................................................4, 19

42 U.S.C. § 7675(c)(3)(B)(i).................................30, 31, 32, 33, 34, 35, 36

42 U.S.C. § 7675(c)(3)(B)(ii)......................................16, 31, 32, 34, 35, 36

42 U.S.C. § 7675(d)...................................................35, 53, 56, 57

42 U.S.C. § 7675(d)(1)(A).................................................................56

42 U.S.C. § 7675(e)(1)......................................................................4

42 U.S.C. § 7675(e)(1)(C)(i)..............................................................28

42 U.S.C. § 7675(e)(2)....................................................................4, 5

42 U.S.C. § 7675(e)(2)(A).....................................................5, 43, 45, 58

42 U.S.C. § 7675(e)(2)(A)(ii)...................................................19, 21, 34

42 U.S.C. § 7675(e)(2)(B)...........................5, 17, 51, 53, 54, 57, 58, 59, 61

42 U.S.C. § 7675(e)(2)(C)..............................................................58, 60

42 U.S.C. § 7675(e)(2)(D)......................................................................58

42 U.S.C. § 7675(e)(2)(D)(i) ...........................................................5, 43

42 U.S.C. § 7675(e)(2)(D)(ii) ...................................................5, 43, 45

42 U.S.C. § 7675(e)(3) ...........................................................5, 51, 53

42 U.S.C. § 7675(e)(3)(A) ........................................................42, 43

42 U.S.C. § 7675(e)(3)(B) ........................................................42, 43

42 U.S.C. § 7675(e)(4)(B)(i) .........................................................6, 44

42 U.S.C. § 7675(e)(4)(B)(ii) ............................................................44

42 U.S.C. § 7675(e)(4)(B)(iv) ...........................................6, 43, 44, 46

42 U.S.C. § 7675(e)(4)(B)(v)..............................................................44

42 U.S.C. § 7675(h) ..........................................................................35

42 U.S.C. § 7675(i) ...........................................................................35

42 U.S.C. § 7675(k)(1)(C)...................................................6, 13, 37, 53, 59

## Code of Federal Regulations

40 C.F.R. § 84.3 ...............................................................................22

40 C.F.R. § 84.5(b)(1).................................................................20, 21, 22

40 C.F.R. § 84.5(h)(1).......................................................................11, 79

40 C.F.R. § 84.5(h)(2).......................................................................11, 79

40 C.F.R. § 84.5(i) ...........................................................................22

40 C.F.R. § 84.23 ................................................................ 84

40 C.F.R. § 84.23(a)(1) ...................................................... 12

40 C.F.R. § 84.23(a)(2) ...................................................... 12

40 C.F.R. § 84.23(a)(3) ...................................................... 12

40 C.F.R. § 84.23(d) .......................................................... 12

40 C.F.R. § 84.31(c)(6) ...................................................... 22

40 C.F.R. pt. 98, subpt. OO ............................................... 28

40 C.F.R. § 98.416(c)(1) .................................................... 28

## Federal Register

86 Fed. Reg. 27,150 (May 19, 2021) ................................. 21, 23, 28, 70, 77

86 Fed. Reg. 55,116 (Oct. 5, 2021)....i, 1, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 20,
........ 21, 22, 28, 29, 33, 44, 48, 49, 50, 51, 52, 61, 63, 64, 65, 67, 68,
.......................... 69, 70, 71, 74, 75, 77, 78, 79, 80, 82, 83, 84, 85, 87

86 Fed. Reg. 9059 (Feb. 11, 2021) ........................................... 28

## Rules

Circuit Rule 28(a)(1) .................................................................. i

## Other Citations

Meriam Webster's Collegiate Dictionary 386 (10th ed. 1993) ................ 52

## GLOSSARY

| | |
|---|---|
| AIM Act | American Innovation and Manufacturing Act of 2020 |
| EPA | Environmental Protection Agency |
| RIA | EPA's Regulatory Impact Analysis, EPA-HQ-OAR-2021-0044-0227-02 |
| RTC | EPA's Response to Comments, EPA-HQ-OAR-2021-0044-0227-03 |

## INTRODUCTION

The American Innovation and Manufacturing Act of 2020 ("AIM Act") mandates the phasedown of the production and consumption of hydrofluorocarbons, which are highly potent greenhouse gases, to fifteen percent of baseline levels by 2036. The AIM Act charges EPA with the responsibility of ensuring that the phasedown is achieved. The AIM Act also directs EPA to establish a program for the allocation and trading of allowances that must be expended to produce or consume hydrofluorocarbons.

Petitioners challenge EPA's rule that, among other things, set up the allowance allocation and trading program and established various compliance-related provisions. 86 Fed. Reg. 55,116 (Oct. 5, 2021) ("Framework Rule"). Choice[1] challenges certain aspects of the rule relating to the allowance program. Association Petitioners[2] challenge two compliance-related provisions.

---

[1]      Petitioner RMS of Georgia, LLC, d/b/a Choice Refrigerants ("Choice").

[2]      Petitioners Heating, Air-Conditioning, & Refrigeration Distributors International; Air Conditioning Contractors of America; Plumbing-Heating Cooling Contractors–National Association; and Worthington Industries, Inc. (collectively, "Association Petitioners"). While recognizing that Worthington, unlike the other Petitioners in this

The petitions should be denied. EPA's approach to hydrofluoro-carbon blends is reasonable and consistent with the plain language of the statute. Choice's nondelegation challenge is not properly before the Court and also lacks merit. The challenged compliance-related measures are within EPA's statutory authority and adequately justified by the record.

## STATEMENT OF THE ISSUES

1.    Whether EPA reasonably determined that the statutory prohibition against importing a regulated substance without a corresponding quantity of allowances requires an importer of a hydro-fluorocarbon blend to expend allowances to account for the regulated substance components of the blend.

2.    Whether an objection based on the nondelegation doctrine is properly before the Court where no person raised the objection during the public comment period. Alternatively, whether Congress could establish the contours of an allowance allocation and trading program and dictate the priority allocation of allowances while leaving it to EPA

---

group, is not an association, this brief nonetheless uses this shorthand for ease of reference.

2

to reasonably allocate the remaining allowances among persons that have produced, imported, or used hydrofluorocarbons, or intend to do so.

3.    Whether EPA has statutory authority to establish complementary compliance-related measures that are designed to ensure that the hydrofluorocarbon phasedown mandated by Congress is actually achieved, and whether EPA reasonably justified its exercise of that authority to establish a disposable cylinder prohibition and a container tracking system.

## PERTINENT STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the opening briefs for Petitioners.

## STATEMENT OF THE CASE

### I.    The AIM Act

The AIM Act was enacted on December 27, 2020. Pub. L. No. 116-260, Div. S, § 103, 134 Stat. 1182, 2255–71 (2020) (codified at 42 U.S.C. § 7675). The AIM Act mandates the phasedown of the production and consumption of hydrofluorocarbons, which are highly potent greenhouse gases. Framework Rule at 55,123–25; *see also Nat. Res. Def. Council v.*

*Wheeler*, 955 F.3d 68, 74–75 (D.C. Cir. 2020).[3] The phasedown takes the form of stepwise percentage reductions down to fifteen percent of baseline levels by 2036. 42 U.S.C. § 7675(e)(2).

The statute identifies eighteen hydrofluorocarbons, along with their isomers, as "regulated substances." *Id.* § 7675(b)(11), (c)(1). EPA is also authorized to designate additional substances that meet certain criteria as regulated substances. *Id.* § 7675(c)(3)(A). EPA's authority to designate additional regulated substances is subject to a "savings provision" that limits EPA's authority "to designate as a regulated substance a blend of substances that includes a saturated hydro-fluorocarbon" but maintains EPA's authority "to regulate under this Act a regulated substance within a blend of substances." *Id.* § 7675(c)(3)(B).

The statute directs EPA to determine the baselines for the production and consumption of all regulated substances in the United States. *Id.* § 7675(e)(1). Production is the amount of regulated

---

[3]      "As EPA has previously recognized, elevated concentrations of [greenhouse gases] including [hydrofluorocarbons] have been warming the planet . . . . EPA has previously recognized that the changes taking place in the atmosphere are a result of the well-documented buildup of [greenhouse gases] due to human activities and are changing the climate at a pace and in a way that threatens human health, society, and the natural environment." Framework Rule at 55,124.

substances manufactured from a raw material or feedstock chemical. *See id.* § 7675(b)(7)(A). Consumption is the amount of regulated substances produced in or imported into the United States, subtracting the amount exported. *Id.* § 7675(b)(3).

The statute provides a schedule for a gradual phasedown of production and consumption relative to those baselines. *Id.* § 7675(e)(2). The statute directs EPA to "ensure that the annual quantity of all regulated substances produced or consumed in the United States does not exceed" the quantity permitted by the statutory phasedown schedule. *Id.* § 7675(e)(2)(B).

The statute also requires EPA to establish "an allowance allocation and trading program." *Id.* § 7675(e)(3). An allowance is a limited authorization for the production or consumption of a regulated substance, and it does not constitute a property right. *Id.* § 7675(e)(2)(D)(ii). No person may produce or consume a regulated substance without a corresponding allowance. *Id.* § 7675(e)(2)(A).

The number of available allowances decreases over the years based on the statutory phasedown schedule. *Id.* § 7675(e)(2)(D)(i). For at least the first five-year period after enactment of the AIM Act, EPA

must allocate some of the allowances for exclusive use in six specific applications identified by the statute. *Id.* § 7675(e)(4)(B)(iv). EPA may identify other essential uses that receive exclusive-use allowances. *Id.* § 7675(e)(4)(B)(i).

The AIM Act provides that certain sections of the Clean Air Act "shall apply to" the AIM Act and "any rule, rulemaking, or regulation promulgated by the Administrator [of EPA] pursuant to [the AIM Act] as though [the AIM Act] were expressly included in title VI of [the Clean Air Act]." *Id.* § 7675(k)(1)(C). Among the applicable sections of the Clean Air Act is section 307, *id.* § 7607, which includes provisions on judicial review. Section 307(d)(7)(B) of the Clean Air Act provides that "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review." *Id.* § 7607(d)(7)(B).

## II.    The Framework Rule

Following public notice and comment, EPA signed the Framework Rule on September 23, 2021. Framework Rule at 55,117. In the Framework Rule, EPA applied statutory formulas to establish the

baselines for the production and consumption of all regulated substances in the United States. *Id.* at 55,118. EPA then applied the percentages in the statutory phasedown schedule to those baselines to determine the quantity of allowances that will be available nationwide for each calendar year. *Id.*

EPA did not designate any additional regulated substances in the Framework Rule. Response to Comments ("RTC") at 193, EPA-HQ-OAR-2021-0044-0227-03, JA___. Nor has EPA done so in any other action to date.

In the Framework Rule, EPA established the allowance allocation and trading program required by the AIM Act. EPA established three types of allowances: production allowances, consumption allowances, and application-specific allowances. Framework Rule at 55,142. Producing hydrofluorocarbons will require expending both production allowances and consumption allowances. *Id.* That is because the AIM Act defines consumption to include production, which means that a person that produces a regulated substance is also consuming that substance. *See* 42 U.S.C. § 7675(b)(3). Importing hydrofluorocarbons will require expending only consumption allowances. Framework Rule

7

at 55,142. Application-specific allowances are a third category of allowances that can be expended to either produce or import hydrofluorocarbons, but only for exclusive use in the six specific applications identified by statute. *Id.*; *id.* at 55,148.

EPA determined that allowances will be weighted by exchange values rather than chemical-specific. *Id.* at 55,142. Exchange value is a way to compare different regulated substances based on their global warming potentials. *Id.* at 55,133 & n.34 (providing example of exchange value calculation); *see also id.* at 55,121 n.5. EPA decided to establish exchange value-weighted allowances rather than chemical-specific allowances to maintain flexibility for companies to select the appropriate regulated substance, to allow for efficient distribution of allowances according to market needs, and to encourage transitions into regulated substances with lower exchange values. *Id.* at 55,142; *see also* RTC 167, JA___ (noting that "restrict[ing] the use of allowances to those regulated substances that the company has previously imported . . . would prevent companies from moving to lower-[global warming potential] [hydrofluorocarbons]").

8

EPA also established the methodology for allocating the limited quantity of allowances between entities for calendar years 2022 and 2023.[4] *Id.* at 55,118. Under this methodology, end users in the six statutorily specified applications would receive priority access to the pool of available allowances. *Id.* at 55,147. After allocating the application-specific allowances, EPA would set aside some other allowances for allocation at a later time. *Id.*; *see also id.* at 55,155. The remainder would be the general allowance pool. *Id.* at 55,147.

To allocate the general allowance pool, EPA would issue production and consumption allowances to companies that historically produced or imported regulated substances and continued to do so in 2020.[5] *Id.* at 55,144. For those companies, EPA would issue allowances based on the average of their three (not necessarily consecutive) highest years of production or consumption between 2011 and 2019. *Id.* at 55,145. EPA would divide each company's average by the sum of all

---

[4]     EPA stated that it would establish the allowance allocation methodology for calendar year 2024 and beyond in a future rulemaking. Framework Rule at 55,118.

[5]     EPA would give individualized consideration to circumstances of historical importers that were not active in 2020, such as if the inactivity in 2020 was due to the COVID-19 pandemic. Framework Rule at 55,144.

companies' averages to determine each company's share of the general allowance pool. *Id.* at 55,147.

EPA did not apply this methodology in the Framework Rule itself. Instead, EPA stated its intent to issue 2022 allowances in a later separate action based on the approach established in the Framework Rule.[6] *Id.* at 55,118.

In addition, EPA established provisions relating to the transfer of allowances; recordkeeping and reporting; and implementation, compliance, and enforcement. *Id.* As EPA explained, the compliance-related provisions are part of "a multifaceted approach to deter, identify, and penalize illegal activity" with the goal of ensuring that the statutory phasedown limits are actually achieved. *Id.* As relevant to this case, EPA established the following two compliance-related provisions.

---

[6]    EPA did in fact issue 2022 allowances in a subsequent separate action. Choice is currently challenging that separate action in two cases: *RMS of Georgia, LLC v. EPA*, No. 22-1025 (D.C. Cir.), and *RMS of Georgia, LLC v. EPA*, No. 21-14213 (11th Cir.). The first of those cases was originally consolidated with these cases but then severed on EPA's motion. Order (Feb. 22, 2022), Doc. No. 1936059.

First, EPA prohibited the use of disposable cylinders for regulated substances. The prohibition is based on extensive record documentation that disposable cylinders are commonly used in the smuggling of hydrofluorocarbons. *Id.* at 55,173. EPA implemented the prohibition in two stages:

- As of July 1, 2025,[7] the importing of a regulated substance in a disposable cylinder and the domestic filling of a disposable cylinder with a regulated substance are prohibited. *Id.* at 55,208 (codified at 40 C.F.R. § 84.5(h)(1)).

- As of January 1, 2027, the sale or distribution of a regulated substance in a disposable cylinder is prohibited. *Id.* (codified at 40 C.F.R. § 84.5(h)(2)).

Second, EPA established a certification identification system that would use QR codes to track the import, sale, and distribution of containers of regulated substances. *Id.* at 55,183. A QR code is a "type of matrix barcode" that links to a website or application that stores data.

---

[7]    The preamble to the rule erroneously stated that this prohibition begins on January 1, 2025. Framework Rule at 55,172. The correct (and legally operative) date is the date in the regulatory text, which is July 1, 2025. *Id.* at 55,208 (codified at 40 C.F.R. § 84.5(h)(1)).

*Id.* at 55,183 n.98. Under the certification identification system, a QR code for each container of a regulated substance is generated by entering certain information into the system. *Id.* at 55,212 (codified at 40 C.F.R. § 84.23(d)). EPA established the container tracking requirement in multiple stages:

- As of January 1, 2025, there must be a QR code on all containers of bulk regulated substances imported, sold, or distributed by producers and importers. *Id.* at 55,211 (codified at 40 C.F.R. § 84.23(a)(1)).

- As of January 1, 2026, there must be a QR code on all containers of bulk regulated substances filled, sold, or distributed by all other repackagers and cylinder fillers. *Id.* (codified at 40 C.F.R. § 84.23(a)(2)).

- As of January 1, 2027, there must be a QR code on all containers of bulk regulated substances sold or distributed, offered for sale or distribution, purchased or received, or attempted to be purchased or received. *Id.* (codified at 40 C.F.R. § 84.23(a)(3)).

## STANDARD OF REVIEW

The AIM Act provides that section 307 of the Clean Air Act, 42 U.S.C. § 7607, shall apply to any rulemaking under the AIM Act "as though [the AIM Act] were expressly included in title VI of [the Clean Air Act]." 42 U.S.C. § 7675(k)(1)(C). Section 307(d) of the Clean Air Act sets out various provisions that apply to the "promulgation . . . of regulations under subchapter VI." *Id.* § 7607(d)(1)(I).[8] Section 307(d) of the Clean Air Act therefore applies to the Framework Rule. *See* Framework Rule at 55,116 ("[T]his rule is covered by the rulemaking procedures in section 307(d) of the Clean Air Act."); *id.* at 55,123 (same).

Under Section 307(d)(9)(A) of the Clean Air Act, the Court may "reverse any . . . action found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). "To determine whether an action is arbitrary and capricious, 'we apply the same standard of review under the Clean Air Act as we do under the Administrative Procedure Act.'" *Maryland v.*

---

[8]    The AIM Act refers to "title VI," not "subchapter VI," of the Clean Air Act. But the AIM Act's parenthetical citation to "42 U.S.C. 7671 et seq." clarifies that the AIM Act is referring to subchapter VI of the Clean Air Act. *See* 42 U.S.C. § 7675(k)(1)(C).

*EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020) (quoting *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000)).

This standard is narrow, and the Court cannot substitute its policy judgment for EPA's. *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004). Where EPA has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its decisions must be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1160 (D.C. Cir. 1980). The Court gives an "extreme degree of deference" to EPA's "evaluation of 'scientific data within its technical expertise.'" *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003)). The Court's review is limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985); 42 U.S.C. § 7607(d)(7)(A).

## SUMMARY OF ARGUMENT

I.    EPA reasonably determined that importing a hydrofluoro-carbon blend requires expending allowances to account for the regulated substance components of the blend. This is a straightforward

14

reading of the statutory prohibition against importing a regulated

substance without a corresponding quantity of consumption allowances.

There is no merit to Choice's argument that a blend is an entirely

different substance from its components and that EPA cannot require

blend importers to expend allowances for blend components. EPA

explained in the record that the components of a blend and the amount

of each component can still be identified after blending. The components

are not chemically altered in the process of blending.

Any contrary interpretation would significantly undermine the

allowance program. Allowing foreign blends to be imported without

expending a consumption allowance would create a massive loophole

that would allow for circumvention of the entire allowance program.

Further, there is no unfairness to EPA's approach, given that regulated

substances within blends were part of EPA's baseline calculation and

that historic imports of regulated substances within blends are

considered when allocating allowances.

In making this determination, EPA did not designate any blend as

a new regulated substance. Accordingly, the "savings provision" in the

AIM Act does not prohibit this approach. Any possible remaining doubt

is dispelled by the part of that provision that clarifies that Congress did not intend to affect EPA's authority to regulate "a regulated substance within a blend of substances." 42 U.S.C. § 7675(c)(3)(B)(ii).

II.    Choice's argument based on the nondelegation doctrine is not properly before this Court because Choice failed to raise the objection during the public comment period. There is no exception to the statutory exhaustion requirement for constitutional claims or where an objection would be futile to present to the agency, and the Court cannot create such an exception.

Even if the argument were properly before the Court, it lacks merit because the delegation at issue here is sufficiently narrow. Congress defined the nature and purpose of allowances, established the method for determining the number of allowances, identified which specific uses of hydrofluorocarbons must receive priority access to allowances, created a process and criteria for identifying other priority uses, and left it to EPA to allocate the remaining allowances among persons that have produced, imported, or used hydrofluorocarbons, or intend to do so. The grant of authority to EPA to determine exactly how

to allocate the remaining allowances falls well within the range of delegations upheld by the Supreme Court.

III.    EPA has authority under the statute to establish the disposable cylinder prohibition and container tracking requirement.

The statute charges EPA to "ensure" that the hydrofluorocarbon phasedown mandated by Congress is actually achieved. 42 U.S.C. § 7675(e)(2)(B). Congress intended to provide EPA with the authority to establish complementary measures beyond the allowance allocation and trading program that are closely linked to the achievement of the phasedown limits. The complementary measures established in the Framework Rule support EPA's ability to enforce the requirement that regulated substances may only be produced or consumed when the necessary allowances are expended. The two challenged provisions are basic measures intimately tied to compliance and designed to ensure that the phasedown is actually effective. The argument that they are categorically outside EPA's authority is thus meritless, with the real question being whether they are arbitrary or capricious on this record.

The disposable cylinder prohibition is not arbitrary or capricious. EPA explained that disposable cylinders are associated with illicit

17

traffic in hydrofluorocarbons. Their prohibition is reasonably aimed at combatting illegal activity, as part of a multifaceted approach to ensuring compliance. EPA reasonably deferred the start of the prohibition for multiple years to facilitate the transition from disposable cylinders to refillable cylinders. EPA adequately addressed comments on the prohibition, and it reasonably found that the disposable cylinder prohibition will not have a significant economic impact on a substantial number of small entities. In all, EPA considered the relevant information and adequately articulated its explanation in the record, so the prohibition is not arbitrary or capricious.

The container tracking requirement is also not arbitrary or capricious. The tracking system allows for easy identification of regulated substances that did not enter the market legally, allowing buyers to know that they are purchasing legal hydrofluorocarbons. EPA adequately addressed any concerns about implementation burdens by deferring the container tracking requirement for multiple years. By doing so, EPA allowed for time to consult industry while developing the technical details of the tracking system and gave industry adequate time to adapt existing systems.

# ARGUMENT

## I. EPA's approach to hydrofluorocarbon blends is lawful and reasonable.

Under the allowance program that EPA established in the Framework Rule, importing a blend of chemicals that includes regulated substances requires expending allowances to account for the regulated substances within the blend. That approach is based on a straightforward reading of the statute, and a contrary approach would significantly undermine the statutory scheme. The approach is fully consistent with the savings provision in 42 U.S.C. § 7675(c)(3)(B) because EPA did not designate any blend as a new regulated substance.

### A. EPA reasonably determined that importing a blend requires expending allowances necessary to import the regulated substances within the blend.

The AIM Act provides that "no person shall . . . consume a quantity of a regulated substance without a corresponding quantity of consumption allowances." 42 U.S.C. § 7675(e)(2)(A)(ii).[9] In the

_____

[9]     Choice expresses uncertainty about the meaning of the word "consume" and asserts that "'consume' obviously means imports." Choice Br. 2 n.2. That is incorrect. The statute defines "consumption" as the amount of regulated substances produced in or imported into the United States, subtracting the amount exported. 42 U.S.C. § 7675(b)(3);

Framework Rule, EPA promulgated regulations that implement that statutory prohibition. As relevant here, the regulations provide that "[n]o person may import bulk regulated substances" except by expending allowances "in a quantity equal to the exchange-value weighted equivalent of the regulated substances imported." Framework Rule at 55,207 (codified at 40 C.F.R. § 84.5(b)(1)).

In the preamble to the Framework Rule, EPA explained how this prohibition applies to hydrofluorocarbon blends. In doing so, EPA did not designate any blend as a new regulated substance. Rather, EPA explained that "allowances [are] necessary to produce or import [a] blend, or more precisely, the regulated [hydrofluorocarbon] components contained in the blend." Framework Rule at 55,142; *see also* RTC 193, JA___ ("[T]he Agency is not requiring a set amount of allowances to be expended to import a blend that contains regulated substances, but rather import of the regulated [hydrofluorocarbon] components contained in the blend that is imported in bulk requires expenditure of

---

Framework Rule at 55,121, 55,201. EPA reasonably interpreted the term "consume" as the verb form of the statutorily defined term "consumption." Framework Rule at 55,122 n.7. Consumption therefore includes imports, but it is not limited to imports. Choice's misunderstanding does not affect the key point, which is that importing a regulated substance requires expending consumption allowances.

allowances."); 86 Fed. Reg. 27,150, 27,161–62 & n.29, 27,168 (May 19, 2021) (similar explanation in EPA's notice of proposed rulemaking).

The necessary number of allowances is determined by the exchange values of the blend components that are regulated substances. Exchange values allow for a comparison between different regulated substances. *See supra* p.8 (explaining EPA's choice to establish exchange value-weighted allowances rather than chemical-specific allowances). If a blend contains multiple regulated substances, then the exchange values of each component are used to determine the number of necessary allowances. Framework Rule at 55,133 & n.34. If a blend contains components that are not regulated substances, then those components are not included in determining the number of necessary allowances. *Id.* at 55,142; RTC 193, JA___.

This approach is based on a straightforward reading of the statutory language. Importing a regulated substance requires expending allowances. 42 U.S.C. § 7675(e)(2)(A)(ii); 40 C.F.R. § 84.5(b)(1). A person who imports a blend that contains regulated substances is, necessarily, also importing the regulated substances within that blend. After all, the statute identifies regulated substances

21

by molecular formula, 42 U.S.C. § 7675(c)(1), and chemicals with that molecular formula can be present in a blend even where there are other substances that are also part of the blend. Therefore, a person that imports a blend of regulated substances must expend allowances for "the regulated [hydrofluorocarbon] components contained in the blend." Framework Rule at 55,142.[10]

Choice points out that EPA's regulation requiring allowances to import regulated substances does not specifically mention blends. *See* 40 C.F.R. § 84.5(b)(1). Choice contrasts that with 40 C.F.R. § 84.5(i) and § 84.31(c)(6), which are labeling and reporting requirements that specifically mention blends. Choice Br. 15, 20. But, for purposes of labeling and reporting, it is sensible for EPA to specifically require identification of the blend names, not only the regulated substance

---

[10]     The relevant regulatory provision requires expending consumption allowances for the importation only of "bulk" regulated substances. 40 C.F.R. § 84.5(b)(1). EPA defines "bulk" as "a regulated substance of any amount that is in a container for the transportation or storage of that substance." 40 C.F.R. § 84.3; Framework Rule at 55,129–30, 55,201. If a person imports a hydrofluorocarbon blend in bulk (i.e., in a container for transportation or storage), then they are also importing the regulated substance components in bulk (since the regulated substances are also "in a container for the transportation or storage of that substance").

components. After all, as Choice points out, the blends themselves have their own names. *See* 86 Fed. Reg. at 27,194 (proposing that recordkeeping by importers include codes to properly identify the hydrofluorocarbon blend). If EPA had required labeling and reporting using only the names of the blend components and not the blend names, then that would not have captured all of the relevant and useful information for identifying what is being imported. In contrast, the general requirement to expend allowances to import regulated substances is enough to require the expenditure of an appropriate number of allowances to import the regulated substances within blends. There was no need to specify any further allowance-expenditure requirement for blends.

To resist this straightforward application of the law, Choice argues that "for practical purposes, [a hydrofluorocarbon] blend is an entirely different substance" from its components. Choice Br. 5. Choice points out that blends "cannot be readily separated into their component feedstocks without complex fractionation equipment," *id.* at 4, and that the American Society of Heating, Refrigerating and Air-Conditioning Engineers assigns unique numerical designations to

blends, *id.* at 5. Choice offers an analogy to "how sugar, flour and water mixed together become a cake or cookie and lose their identity as the original ingredients." *Id.*

As EPA explained in the record, Choice is wrong that regulated substances "lose their identity" when they become part of a blend. "The components in a blend (and the amount of each component) can be identified after blending and . . . separated through technology such as fractionation and distillation. The components are not chemically altered in this process." RTC 193, JA___. Creating a blend is therefore different from producing hydrofluorocarbons in the first instance. Unlike in the production of hydrofluorocarbons, in which the feedstock chemical is entirely consumed as part of the production process, "[hydrofluorocarbon] components remain in the blend and are discernable using technology such as refrigerant analyzers or gas chromatography." *Id.* In other words, creating a blend merely involves "repackaging existing molecules of [hydrofluorocarbons] in various ratios." *Id.* at 191, JA___. Choice does not appear to dispute these facts in the record, and EPA's findings on these technical matters are entitled

to deference anyway. *Miss. Comm'n*, 790 F.3d at 150 (courts must give an "extreme degree of deference" to EPA's evaluation of scientific data).

For that reason, Choice's cake analogy is flawed. It seems unlikely that a person would attempt to circumvent a limitation on the importation of flour by importing cakes instead, as a cake serves a different purpose than flour and could not typically be used in place of flour. A better analogy would be ordinary flour mixed with whole wheat flour to make a flour mix. The components cannot be easily separated, but they are not chemically altered and remain readily identifiable. Choice's position is similar to arguing that mixing some whole wheat flour into ordinary flour and calling it a flour mix somehow makes all of the flour in the mix exempt from a limitation on the import of flour. That cannot be.

Because regulated substances remain identifiable within a blend, an importer of a blend must expend allowances to account for the regulated substances within the blend. That the blend itself can be identified with a unique numerical designation from the American Society of Heating, Refrigerating and Air-Conditioning Engineers has no legal bearing. Although there may be practical reasons for having an

25

industry standard convention for identifying specific blends by name, that does not mean that a blend has been transformed into something wholly different from its component parts.

Any contrary interpretation would significantly undermine the allowance program by creating a massive loophole. Under the approach that Choice advocates, an importer could blend a regulated substance with something else — even another regulated substance — and would become exempt from the annual phasedown limits. In fact, under Choice's theory, even a miniscule amount of something else mixed into a regulated substance could immediately free the resulting mix from any regulation under the allocation program. That would allow for circumvention of the entire allowance program and nullify the statutory phasedown of hydrofluorocarbon consumption that Congress directed in the AIM Act. *See Cnty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1473 (2020) ("We do not see how Congress could have intended to create such a large and obvious loophole in one of the key regulatory innovations of [the statute]."). It would also put domestic producers at a disadvantage if foreign blends could be imported without being subject to limits under the allowance program.

Accepting Choice's interpretation would be particularly problematic given that many hydrofluorocarbons are imported as blends currently, and a transition to new blends with lower global warming potentials is an expected part of the industry's response to the phasedown of hydrofluorocarbons. Hydrofluoroolefins are hydrofluorocarbon alternatives that have significantly lower global warming potentials. Regulatory Impact Analysis ("RIA") at 172, EPA-HQ-OAR-2021-0044-0227-02, JA___. EPA expects that as a result of the phasedown mandated by the AIM Act, there will be a transition toward, among other things, blends of hydrofluorocarbons and hydrofluoroolefins. Such a transition would help "reduce the impacts of climate change." *Id.*; *see also id.* at 40, JA___; *see also* Framework Rule at 55,133 n.34. Under EPA's approach, importing such blends would still require allowances for the regulated substance components, although fewer allowances than importing an unblended regulated substance or a blend that is entirely comprised of regulated substances. That is important because if the importation of blends were entirely free from the allowance program, then the allocation program would not result in a transition from higher to lower global warming potential blends.

Finally, Choice's approach would create a mismatch in the allowance program. The statute directs EPA to establish the consumption baseline by considering "the average annual quantity of all regulated substances consumed in the United States" between 2011 and 2013. 42 U.S.C. § 7675(e)(1)(C)(i). Consistent with a straightforward reading of "all regulated substances consumed," EPA included in that quantity all regulated substances contained within imports of hydro-fluorocarbon blends. Specifically, EPA relied largely on data about historic hydrofluorocarbon production and consumption that had been reported to EPA under the Greenhouse Gas Reporting Program. Framework Rule at 55,140–41 (citing 40 C.F.R. pt. 98, subpt. OO); 86 Fed. Reg. at 27,164 (describing data available through Greenhouse Gas Reporting Program). Imports of hydrofluorocarbons within blends were required to be reported under that program. 40 C.F.R. § 98.416(c)(1) (reporting requirement for bulk imports of fluorinated greenhouse gases); *see also* 86 Fed. Reg. 9059, 9063 (Feb. 11, 2021) ("Under the [Greenhouse Gas Reporting Program], each importer and exporter of [hydrofluorocarbons] must submit an annual report that includes total mass in metric tons of each [hydrofluorocarbon] imported and exported,

including each [hydrofluorocarbon] in a product that makes up more than 0.5 percent of the product by mass."). Also, when allocating allowances, EPA assigned consumption allowances to companies by relying largely on historical data reported to the Greenhouse Gas Reporting Program, which included historical imports of hydrofluorocarbons within blends. *See* Framework Rule at 55,146.

Given that regulated substances within blends were part of the baseline calculation and that historic imports of regulated substances within blends are considered in the allocation of allowances, there is no unfairness in requiring the expenditure of allowances for future imports of regulated substances within blends. On the contrary, if allowances are not required for the regulated substance components of a blend, then the allowance program will not operate as intended. That would mean that the number of available allowances is higher than otherwise due to historical imports of regulated substances within blends but that allowances need not be spent for future such imports. Such a mismatch would undermine the Congress's statutory phasedown scheme.

**B.    EPA's approach to blends is not foreclosed by the AIM Act's savings provision.**

Choice challenges EPA's approach to hydrofluorocarbon blends based on the savings provision in 42 U.S.C. § 7675(c)(3)(B)(i), but that provision has no relevance for the Framework Rule. Choice's contrary reading of the provision is inconsistent with the plain language of the statute.

The AIM Act identifies eighteen hydrofluorocarbons and their isomers as "regulated substances." *Id.* § 7675(b)(11), (c)(1). Subject to notice and opportunity for public comment, EPA is authorized to designate additional regulated substances that meet certain criteria. *Id.* § 7675(c)(3)(A).

Subsection (c)(3)(B)(i) limits EPA's authority under subsection (c)(3)(A) to designate additional regulated substances. Specifically, subsection (c)(3)(B)(i) provides that for purposes of the hydrofluorocarbon phasedown, EPA is not authorized to designate a blend as a regulated substance. *Id.* § 7675(c)(3)(B)(i). That is so even if the blend includes a saturated hydrofluorocarbon that itself is, or may be, designated as a regulated substance. *Id.*

The Framework Rule did not overstep that limitation. In the Framework Rule, EPA did not designate any additional regulated substances beyond the eighteen hydrofluorocarbons listed in the statute. As EPA explained, "[t]he Agency is not, at this time, designating any new regulated substances under Subsection (c)(3), but rather in this rule the Agency is setting up a framework to allocate allowances for the regulated substances listed by Congress in Subsection (c)(1)." RTC 193, JA___. Because EPA did not designate any regulated substances in the Framework Rule, the limitation in subsection (c)(3)(B)(i) on EPA's authority to designate a blend as a regulated substance did not apply. That is the end of the matter.

Subsection (c)(3)(B)(ii) removes any possible remaining doubt. In that provision, Congress provided that subsection (c)(3)(B)(i) "does not affect the authority of [EPA] to regulate under this Act a regulated substance within a blend of substances." 42 U.S.C. § 7675(c)(3)(B)(ii). That provision confirms the congressional understanding that the default statutory framework allows for regulation of a regulated substance within a blend of substances. EPA's approach in the Framework Rule is exactly what subsection (c)(3)(B)(ii) states is

permissible. EPA did not designate any blends as additional regulated substances, which would have been prohibited by subsection (c)(3)(B)(i). Instead, EPA recognized that allowances are required to import a regulated substance "within a blend of substances," which is consistent with subsection (c)(3)(B)(ii).

Choice argues that EPA's approach nullifies subsection (c)(3)(B)(i) by "allow[ing] EPA for all practical purposes to treat [hydrofluoro-carbon] blends as regulated substances." Choice Br. 17. As a practical matter, it may be true that under the approach in the Framework Rule, the number of allowances required to import the regulated substances within a blend might be equal to the number of allowances that would be required if the blend itself were designated as a regulated substance. But that is only because in the Framework Rule, EPA established a program of exchange value-weighted allowances that uses a common measure across different regulated substances. *See supra* p.8 (citing Framework Rule at 55,142). Had EPA decided instead to establish a program of chemical-specific allowances, *see id.*, then subsection (c)(3)(B)(i) would have had considerable practical significance. In that case, subsection (c)(3)(B)(i) would have precluded a requirement that an

importer expend blend-specific allowances on top of allowances specific to each regulated substance within the blend. In other words, Congress ensured through subsection (c)(3)(B)(i) that importation of one substance would not require multiple overlapping allowances: one as part of a blend and another as a regulated substance in its own right.

Congress did not specify whether allowances under the AIM Act must be exchange value-weighted or chemical-specific, leaving EPA with discretion to choose. *See* Framework Rule at 55,142. No party argues that EPA lacked the discretion to make that choice or that EPA unreasonably chose to establish exchange value-weighted allowances. Although subsection (c)(3)(B)(i) might have had more practical significance if EPA had established chemical-specific allowances, that does not make it unreasonable for EPA to have established exchange value-weighted allowances or to have made those allowances available for regulated substances within a blend — particularly where EPA provided a thorough explanation of that choice. *See id.*

Ultimately, none of that is any reason to read subsection (c)(3)(B)(i) more broadly than its plain language. By its plain terms, subsection (c)(3)(B)(i) provides a narrow limitation only on EPA's

33

authority to designate a blend as a regulated substance for purposes of the phasedown. RTC 193, JA___. Mindful of that limitation, EPA did not designate any blend as a new regulated substance in the Framework Rule. *Id.* Subsection (c)(3)(B)(i) imposes no further limitation on EPA. That is particularly so where subsection (c)(3)(B)(ii) expressly preserves EPA's authority to regulate a regulated substance within a blend.

Choice's other arguments are unavailing. Choice argues that subsection (c)(3)(B)(ii) does not itself confer any authority and that EPA has no other source of "authority . . . to regulate" regulated substances within blends. Choice Br. 14. EPA agrees that subsection (c)(3)(B)(ii) does not itself confer any additional authority on EPA, but that subsection does preserve authority provided elsewhere and clarify the meaning of subsection (c)(3)(B)(i). As explained *supra* Section I.A, EPA's authority to require allowances to import regulated substances within a blend comes from a straightforward reading of a different part of the statute — namely, the prohibition in subsection (e)(2)(A)(ii) on importing regulated substances without expending allowances.

Subsection (c)(3)(B)(ii) clarifies that subsection (c)(3)(B)(i) does not limit that authority.

Choice also argues that subsection (c)(3)(B)(ii) is intended to preserve EPA's authority under parts of the statute other than subsection (e). Choice Br. 7, 15. Choice points to EPA's authority under subsection (d) relating to monitoring and reporting requirements; under subsection (h) relating to management of regulated substances; and under subsection (i) relating to technology transition. 42 U.S.C. § 7675(d), (h), (i). Choice argues that those other subsections actually "grant EPA authority to regulate [hydrofluorocarbon] blends," Choice Br. 15, and that subsection (c)(3)(B)(ii) was intended to preserve those authorities rather than any nonexistent authority under subsection (e). But nothing in the statute supports Choice's argument that Congress intended to limit subsection (c)(3)(B)(ii) to only certain parts of the AIM Act. If Congress had intended to exclude subsection (e) from the scope of subsection (c)(3)(B)(ii), then it would have done so; after all, Congress demonstrated in the immediately adjacent subsection (c)(3)(B)(i) that it "knows how" to do so. *See Jama v. ICE*, 543 U.S. 335, 341 (2005). Moreover, none of the other subsections cited by Choice refers

specifically to blends. Those subsections instead provide EPA with various authorities over regulated substances, just as subsection (e) does. If Choice is conceding that those other subsections thereby confer EPA "authority . . . to regulate" regulated substances within blends, then subsection (e) must do so as well.

In sum, Choice reads subsection (c)(3)(B)(i) broader than the plain language and subsection (c)(3)(B)(ii) narrower than the plain language. Choice reads subsection (c)(3)(B)(i) as not only a limitation on EPA's designation of a blend as a regulated substance, but also a broader implied limitation on EPA's authority to regulate regulated substances within blends. To harmonize that atextual reading with subsection (c)(3)(B)(ii), Choice reads subsection (c)(3)(B)(ii) as though it excludes subsection (e), even though Congress provided no such carve-out. The better reading of the statute is EPA's, which is consistent with both subsections (c)(3)(B)(i) and (c)(3)(B)(ii). EPA's approach to hydrofluoro-carbon blends should be upheld.[11]

---

[11]    As an alternative remedy, Choice asks the Court to declare that the Framework Rule does not require Choice to expend allowances to import regulated substances within a blend. Choice Br. 21. That is incorrect, as explained *supra* Section I.A. Besides, the judicial review provision of the Clean Air Act, which is incorporated by reference by the

## II.    Choice's nondelegation argument is not properly before this Court and also lacks merit.

Choice raises a nondelegation argument for the first time in litigation. Having failed to raise this objection during the public comment period, Choice cannot do so for the first time in a challenge brought under Section 307(d) of the Clean Air Act. That is so even though the argument is constitutional in nature, and regardless of whether it would have been futile to present the argument to EPA in the first instance. If the Court were nonetheless to reach the merits of this argument, Supreme Court precedent on the nondelegation doctrine requires this Court to uphold Congress's limited delegation of authority to EPA.

### A.    Choice's objection was not raised with reasonable specificity during the period for public comment.

Choice's nondelegation argument was not raised during the comment period, so it is not properly before the Court. The Clean Air Act establishes a mandatory exhaustion requirement with no exception

---

AIM Act, 42 U.S.C. § 7675(k)(1)(C), allows a reviewing court only to "reverse" an agency action under review, *id.* § 7607(d)(9). It does not provide for the Court to declare whether the agency action under review does or does not contain a particular requirement, and Choice identifies no other source of authority for the Court to do so.

for objections of a constitutional nature or where an objection would be futile to present to the agency. The Court cannot create such an exception where Congress did not.

Under section 307(d)(7)(B) of the Clean Air Act, "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review." 42 U.S.C. § 7607(d)(7)(B); *see supra* p.13 & n.8 (explaining that Clean Air Act section 307(d) applies to this rulemaking). This Court "enforce[s] this provision strictly." *Nat. Res. Def. Council v. EPA*, 571 F.3d 1245, 1259 (D.C. Cir. 2009) (quoting *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998)); *see also EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 512 (2014) (describing section 307(d)(7)(B) as a "mandatory" rule).

Choice did not raise its nondelegation argument during the public comment period. *See* EPA-HQ-OAR-2021-0044-0168, JA___–___; *see also* RTC 141–43, 186–93, JA___–___, JA___–___ (summarizing and responding to Choice's comment). Nor did any other commenter. Therefore, this argument is not properly before the Court.

Section 307(d)(7)(B) contains no exception for constitutional claims. *Lead Indus. Ass'n*, 647 F.2d at 1173 ("By the very terms of the statute Section 307(d)(7)(B)'s timeliness requirement applies to all objections, not just nonconstitutional challenges."). Judge-made exhaustion doctrines are amenable to judge-made exceptions. *Ross v. Blake*, 578 U.S. 632, 639 (2016). But where Congress imposed a mandatory issue exhaustion requirement such as in section 307(d)(7)(B), there is no judicial discretion to create an exception, even for constitutional issues. *See id.*; *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1098 (D.C. Cir. 2021). To create such an exception would be to rewrite the statute to create an exception that Congress chose not to provide.

Choice may argue that raising this nondelegation argument to the agency would have been futile because the agency has no ability to cure an unlawful delegation of legislative power by Congress. But section 307(d)(7)(B) provides no futility exception either, and the Court cannot create one where Congress chose not to. *Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996) (per curiam). Thus, there is no

exception that allows Choice to raise its nondelegation argument in this Court despite having failed to do so during the comment period.

### B. The AIM Act does not impermissibly delegate legislative authority to EPA.

Even if the issue were properly before the Court, Choice's nondelegation argument lacks merit. The delegation here is narrower than delegations that have been upheld by the Supreme Court.

A delegation by Congress is constitutional so long as Congress has set out an "intelligible principle" to guide the exercise of authority. *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality opinion). "Or in a related formulation, the Court has stated that a delegation is permissible if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of [his] authority.'" *Id.* (alteration in original) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

The Supreme Court has "over and over upheld even very broad delegations" under that standard. *Id.* Only twice ever has the Supreme Court found a delegation to be unconstitutional. *Id.* One "provided literally no guidance for the exercise of discretion," and the other "conferred authority to regulate the entire economy on the basis of no

more precise a standard than stimulating the economy by assuring 'fair

competition.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474

(2001) (discussing *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935), and

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).

In the more than eighty years since those two decisions, the

Supreme Court has consistently upheld "Congress' ability to delegate

power under broad standards," *Mistretta v. United States*, 488 U.S. 361,

373 (1989), and "ha[s] 'almost never felt qualified to second-guess

Congress regarding the permissible degree of policy judgment that can

be left to those executing or applying the law,'" *Am. Trucking*, 531 U.S.

at 474–75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

The Supreme Court has upheld statutes authorizing the Secretary of

War to determine and recover "excessive profits" from military

contractors, *Lichter v. United States*, 334 U.S. 742, 785–86 (1948);

authorizing the Price Administrator to fix "fair and equitable"

commodities prices, *Yakus v. United States*, 321 U.S. 414, 420 (1944);

authorizing the Federal Communications Commission to regulate

broadcast licensing as "public interest, convenience, or necessity"

requires, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943);

authorizing the Securities and Exchange Commission to ensure that a holding company's structure does not "unfairly or inequitably distribute voting power among security holders," *Am. Power & Light*, 329 U.S. at 104–05; and directing the Sentencing Commission to promulgate then-binding Sentencing Guidelines for federal crimes, *Mistretta*, 488 U.S. at 374–77.

The grant of authority to EPA to establish an allowance allocation and trading program falls well within the range of delegations approved by the Supreme Court. "[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Am. Trucking*, 531 U.S. at 475. Here, the task that Congress delegated is sufficiently narrow.

Congress did not broadly delegate authority to EPA to regulate hydrofluorocarbons and leave it at that. Nor did Congress define the statutory phasedown schedule and then otherwise leave it up to EPA to achieve that phasedown. Rather, Congress specifically directed EPA to establish "an allowance allocation and trading program." 42 U.S.C. § 7675(e)(3)(A)–(B). Congress further specified that EPA was to do so "in accordance with this section" and "in accordance with the schedule

under paragraph (2)(C) (subject to the same exceptions and other
requirements as are applicable to the phasedown of production of
regulated substances under this section)." *Id.* Elsewhere in the AIM
Act, Congress provided further direction. Congress prescribed the
method for determining the total number of available allowances each
year. *Id.* § 7675(e)(2)(D)(i). Congress defined the nature of the
allowances. *Id.* § 7675(e)(2)(D)(ii). And Congress imposed a prohibition
on the production or consumption of regulated substances without
allowances. *Id.* § 7675(e)(2)(A).

Choice argues that Congress impermissibly delegated the decision
as to who will receive allowances. Choice entirely overlooks subsection
(e)(4)(B)(iv). In that subsection, Congress identified six specific uses of
hydrofluorocarbons: propellants in metered-dose inhalers, defense
sprays, structural composite preformed polyurethane foam for marine
use and trailer use, etching of semiconductor material or wafers and the
cleaning of chemical vapor deposition chambers within the
semiconductor manufacturing sector, mission-critical military end uses,
and onboard aerospace fire suppression. *Id.* § 7675(e)(4)(B)(iv). Upon
identifying those six specific uses, Congress required the allocation of

"the full quantity of allowances necessary" toward those uses "based on projected, current, and historical trends" for at least the first five years and provided a process for extending that period of time. *Id.*; *id.* § 7675(e)(4)(B)(v). Congress thus made the policy decision of who must receive first priority in receiving allowances. Congress further provided specific criteria and a petition process by which other essential uses of hydrofluorocarbons could be identified and provided with exclusive-use allowances. *Id.* § 7675(e)(4)(B)(i), (ii).

Having determined who must receive a priority allocation, and having established criteria and a process for identifying other priority allocations, Congress left it to the discretion of EPA to allocate the remainder of the allowances in a manner both reasonable and reasonably explained. *See* Framework Rule at 55,142. It was permissible for Congress to do so. The scope of the delegated authority was limited once Congress established enough parameters of the allowance program and directed the priority allocations, thereby deciding the "general policy" for the program. *Gundy*, 139 S. Ct. at 2129 (plurality opinion).

It is worth bearing in mind that this is not a case involving the wisdom or constitutionality of the regulatory framework that Congress established in the AIM Act writ large. Instead, Choice premises its standing, and by extension its attendant legal challenge, specifically on the AIM Act and the Framework Rule's regulation of "imports of [hydrofluorocarbon] blends." Choice Br. at 11. The remedy that Choice seeks is also about blends. Choice Br. 28. On that issue, for the reasons discussed *supra* Section I, a straightforward reading of the statute provides for regulation of blends of chemicals that include regulated substances.

But even if a broader look at the statute were appropriate, the context and purpose of the statute provide some further guideposts for EPA in allocating allowances. *Gundy*, 139 S. Ct. at 2126 (plurality opinion) ("To define the scope of delegated authority, we have looked to the text in 'context' and in light of the statutory 'purpose.'" (quoting *Nat'l Broad. Co.*, 319 U.S. at 214)). Allowances are limited authorizations that are required for the production and consumption of regulated substances. 42 U.S.C. § 7675(b)(2), (e)(2)(A), (e)(2)(D)(ii). The statute also provides for the allocation of allowances for the use of

45

regulated substances in particular applications. *Id.* § 7675(e)(4)(B)(iv).
Thus, the context of the statute indicates that Congress required EPA
to allocate the remaining allowances among persons that have
produced, imported, or used hydrofluorocarbons, or intend to do so.

Congress was not required to further dictate the minutiae of how
the remaining allowances would be allocated among such persons. That
is the exact sort of fact-intensive technical judgment that can
permissibly be delegated to executive officials. *See Gundy*, 139 S. Ct. at
2130 (plurality opinion). That is particularly so because of the nature of
an allowance trading program. Because persons can trade allowances,
the initial allocation of allowances is not determinative of who is
ultimately allowed to produce or consume hydrofluorocarbons. The very
nature of a trading program is to permit the market to efficiently
reallocate allowances, so Choice overstates matters when it argues that
the initial allocation is "quite literally life-or-death for companies."
Choice Br. 24. Thus, considering the limited nature of the task that
Congress left for EPA, the delegation in the AIM Act falls well within
constitutional bounds as identified in the controlling Supreme Court
case law.

Rather than grapple with controlling precedent, Choice relies primarily on the dissent in *Gundy*. But this Court is bound by existing Supreme Court precedent. *See Abbas v. Foreign Pol'y Grp.*, 783 F.3d 1328, 1337 (D.C. Cir. 2015); *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 447 (5th Cir. 2020). Besides, even under a broader view of the nondelegation doctrine, it would be permissible for Congress to define the nature and purpose of allowances, prescribe the method for determining the number of allowances, identify which specific uses of hydrofluorocarbons must receive priority access to allowances, create a process and criteria for identifying other priority uses, and then leave it to EPA to allocate the remaining allowances among persons that have produced, imported, or used hydrofluorocarbons, or intend to do so. To hold even that limited delegation unconstitutional would make much of government unworkable. *See Gundy*, 139 S. Ct. at 2130 (plurality opinion).[12]

_____

[12]    Choice takes a passing swipe at EPA's choice of methodology to allocate the allowances, but it is not clear that Choice is directly challenging the methodology. Choice Br. 25–26. Choice certainly does not develop, and so forfeits, a full argument that EPA's methodology was unlawful or unreasonable. To respond briefly to Choice's half-formed accusations, EPA chose to allocate allowances to companies that historically produced or imported regulated substances and continued

## III. The challenged compliance-related provisions are within EPA's statutory authority and reasonable.

EPA established the disposable cylinder prohibition and the container tracking requirement as part of "a multifaceted approach to deter, identify, and penalize illegal activity" given the statutory mandate to "ensure" that the phasedown mandated by Congress is actually achieved. Framework Rule at 55,118. These compliance-related prohibitions are within EPA's statutory authority and are supported by the administrative record.

### A. EPA established compliance-related measures designed to ensure the phasedown of hydrofluorocarbons.

Based on EPA's experience with the phase-out of ozone-depleting substances and the experiences of other countries that have already begun to phase down hydrofluorocarbons, EPA found that illegal trade in hydrofluorocarbons is likely to increase as the AIM Act phasedown begins. *Id.* at 55,166. EPA therefore "establish[ed] a comprehensive

---

to do so in 2020. Framework Rule at 55,144. EPA also established a set-aside pool for later allocation to certain other types of companies, including new market entrants. *Id.* at 55,155. EPA adequately responded to the issues raised in Choice's comments by explaining that issuing allowances to customers of importers would double-allocate allowances and that EPA did not have authority to limit allowances based on alleged patent violations. RTC 191, JA___.

system of mechanisms that together and by themselves discourage and prevent illegal production, import, and subsequent sales of illegally produced or imported [hydrofluorocarbons]." *Id.*

Specifically, EPA reviewed the European Union's experience with preventing illegal imports of hydrofluorocarbons. *Id.* EPA found "evidence of significant noncompliance" with the European Union's hydrofluorocarbon phasedown requirements. *Id.* EPA determined that noncompliance rates of 16 to 33 percent were reflected in various studies and that if there were similar compliance in the United States, then that would equate to an additional 43 to 90 million metric tons of exchange value equivalent of additional consumption in 2022 alone. *Id.* at 55,166–67 & n.74; *see also id.* at 55,173 & n.80. EPA found that such a high level of noncompliance would have environmental consequences; put complying businesses at a regulatory disadvantage; inhibit research and development into hydrofluorocarbon alternatives; and raise significant consumer and worker safety concerns. *Id.* at 55,167. EPA also described its experience with the phase-out of ozone-depleting substances in the United States, which similarly involved significant

noncompliance, and how important the enforcement and compliance efforts were to ensuring success of the phase-out. *Id.* at 55,167–68.

The disposable cylinder prohibition and the container tracking requirement are among the various provisions in the Framework Rule that "each stand independently from the others" but also "work together as a comprehensive system" with the goal of ensuring that the statutory phasedown is actually achieved. *Id.* at 55,166; *see also id.* at 55,168. In establishing the disposable cylinder prohibition, EPA noted that in the European Union, disposable cylinders were "a common feature of illegally imported [hydrofluorocarbons]." *Id.* at 55,166; *see also id.* at 55,167 (reviewing reports that "note that illegally imported [hydro-fluorocarbons] that are caught are shipped primarily in disposable cylinders"). That is because disposable cylinders are "cheaper, easier to transport, and difficult to trace." *Id.* at 55,173. The container tracking requirement similarly helps to deter and identify illegally imported hydrofluorocarbons. *Id.* at 55,168. The container tracking requirement is also "especially important for identifying illegal production," which does not have a check at the port like imports do. *Id.* at 55,185.

## B.    The AIM Act authorizes EPA to establish compliance-related measures to ensure the phasedown of hydrofluorocarbons.

Subsection (e)(2)(B) of the AIM Act, titled "Compliance," provides that EPA "shall ensure" that the annual quantity of all regulated substance production or consumption does not exceed the phasedown limit for that year. 42 U.S.C. § 7675(e)(2)(B).[13] That provision is separate from subsection (e)(3), which requires EPA to promulgate regulations establishing an allowance allocation and trading program. *Id.* § 7675(e)(3).

As EPA explained in the preamble to the Framework Rule, these subsections together establish "not only the need to issue allowances and a system for their allocation, but also the responsibility to ensure that the statutorily required phasedown occurs." Framework Rule at 55,172. In particular, the congressional direction in subsection (e)(2)(B) that EPA "shall ensure" that the phasedown is accomplished "provides the Agency authority to establish complementary measures such that the Agency can meet the statutory reduction steps and enforce the

---

[13]    In various parts of their brief, Association Petitioners mistakenly refer to "subsection (e)(B)(2)," but it is apparent that they meant to refer to subsection (e)(2)(B).

requirement that regulated substances may only be produced or consumed when the necessary allowances are expended." *Id.*; *see also* RTC 467, JA___.

The ordinary meaning of the word "ensure" is "to make sure, [or] certain." *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 153 (D.C. Cir. 2010) (quoting Merriam Webster's Collegiate Dictionary 386 (10th ed. 1993)). "Congress thus delegated authority to EPA to make certain," *id.*, that the statutory phasedown is achieved. The directive that EPA "shall ensure" the achievement of the phasedown is broad. The choice of such broad language "reflects an intentional effort to confer the flexibility necessary" to the agency to accomplish the statute's aims. *Corbett v. TSA*, 19 F.4th 478, 488 (D.C. Cir. 2021) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007)); *see also Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003). Thus, the directive in Section (e)(2)(B) reflects Congress's choice to provide EPA with more general authority to establish complementary measures to ensure that the statutory phasedown is achieved, such as the

disposable cylinder prohibition and the container tracking requirement.[14]

Association Petitioners attempt to limit the meaning of subsection (e)(2)(B) based on the existence of other, more specific provisions in the AIM Act. They point to subsection (e)(3), which directs EPA to establish an allowance allocation and trading program; subsection (d), which provides EPA with authority related to reporting requirements; and subsection (k)(1)(C), which incorporates the Clean Air Act's enforcement provision. Association Br. 22. Arguing that those are "the tools Congress provided," *id.*, Association Petitioners draw a negative inference that there are no other tools available to EPA to accomplish the directive in subsection (e)(2)(B).

That logic is unsound. Association Petitioners' argument is undermined by the very authority that they cite for the proposition that

_____

[14]    EPA clarified in its Response to Comments document that it was not relying on subsections (h) or (k)(1)(A) as substantive authority for the disposable cylinder prohibition. RTC 467, JA___. Nor is EPA relying on those subsections as substantive authority for the container tracking requirement. To be clear, subsection (k)(1)(A) does provide EPA with general procedural authority to "promulgate such regulations as are necessary to carry out functions of [EPA] under [the AIM Act]," which includes the authority to promulgate regulations implementing EPA's substantive authority under subsection (e)(2)(B).

"the mention of one thing implies the exclusion of another." Association

Br. 25 (quoting *Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 132

F.3d 775, 782 (D.C. Cir. 1998)). That case went on to explain that "this

maxim is often misused." *Shook*, 132 F.3d at 782. Sometimes, "Congress

means to clarify what might be doubtful — that the mentioned item is

covered — without meaning to exclude the unmentioned ones." *Id.* In

other words, Congress defined certain specific EPA authorities over

hydrofluorocarbons to avoid any doubt about those authorities, but that

is not an indication that the more general authority in subsection

(e)(2)(B) is limited to those specific authorities. Association Petitioners

thus present no basis to disregard the plain meaning of Congress's

charge that EPA "ensure" actual achievement of the statutory

phasedown.

Association Petitioners' contrary interpretation of the statute

would deprive subsection (e)(2)(B) of any independent meaning. If

Congress had intended that EPA accomplish the phasedown solely by

establishing the allowance allocation and trading program and

exercising other specific authorities in the AIM Act, then there would be

no reason for Congress to have also provided EPA with the more

general mandate that it "shall ensure" that the phasedown is achieved. Association Petitioners' interpretation violates the fundamental rule of statutory interpretation that the Court must give effect to every part of the statute and avoid treating statutory terms as surplusage. *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

To give independent effect to subsection (e)(2)(B), it must mean something more than that EPA shall establish an allowance allocation and trading program under subsection (e)(3). The better interpretation is that Congress intended to mandate that EPA perform certain specific actions — the establishment of an allowance allocation and trading program, for instance — while also providing EPA with more general discretionary authority to ensure that the annual phasedown limits are met. *See Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 435 (D.C. Cir. 2013) (holding that specific statutory provisions amplifying the agency's regulatory authority merely indicated that Congress intended to address the matters subject to regulation in several different ways, not to limit the statute's broad grant of authority); *Catawba Cnty. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (per curiam) (congressional mandate in one part of statute and silence in another part is simply a decision not

to mandate and may be read as "permission rather than proscription");
*Cheney R.R. Co. v. ICC*, 902 F.2d 66, 68–69 (D.C. Cir. 1990).

Further supporting this interpretation is that subsection (e)(3) set a short deadline for EPA to establish an allowance allocation and trading program. It makes sense that Congress would require EPA to take an immediate mandatory measure toward ensuring the phasedown while also permitting EPA to exercise more general authority under subsection (e)(2)(B), not necessarily subject to that short-term deadline, to take additional measures to ensure the phasedown.

By the same rationale, Association Petitioners are wrong that the reporting requirements in subsection (d) preclude EPA's establishment of any other reporting-related requirements, such as the container tracking requirement. Association Br. 45–46. Subsection (d) provides for periodic reporting of quantities of regulated substances that each person produces, imports, exports, or uses in certain other ways. 42 U.S.C. § 7675(d)(1)(A). Such aggregate reporting requirements are not inconsistent with, and do not preclude, a system for achieving an entirely different purpose: to prevent illegal production, import, and sales by tracking the transport of containers of regulated substances.

By directing EPA to "ensure" achievement of the phasedown, Congress provided EPA with authority to adopt other complementary measures in addition to the reporting requirements in subsection (d).

It would make little sense for Congress to have made such complementary measures categorically off-limits if it had wanted EPA to "ensure" the achievement of the phasedown. Congress would have undermined its own purposes if it had directed EPA to establish an allowance program but had left the agency powerless to curb the various means by which smugglers or fraudulent producers might try to circumvent the program. It makes practical sense that Congress, not knowing exactly what means of circumvention might be attempted and wanting to allow EPA the flexibility to combat future problems as they arise, would allow EPA a more general authority to establish such complementary measures designed to ensure achievement of the statutory phasedown, subject to review for arbitrariness or capriciousness. *See Corbett*, 19 F.4th at 488. Congress thus chose the word "ensure."

Association Petitioners raise several additional unpersuasive arguments about the meaning of subsection (e)(2)(B). First, Association

Petitioners point to the title of subsection (e)(2)(B), "Compliance," and argue that subsection (e)(2)(B) is therefore about compliance with the allowance allocation and trading program. Association Br. 23 n.2. But EPA's authority to establish the allowance allocation and trading program is in subsection (e)(3). Subsection (e)(2)(B) is read more naturally as related to other parts of subsection (e)(2), not (e)(3). Subsection (e)(2)(A) prohibits producing or consuming regulated substances without an allowance; subsection (e)(2)(C) establishes the annual phasedown limits; and subsection (e)(2)(D) directs EPA to determine the quantity of allowances available in each particular year. 42 U.S.C. § 7675(e)(2)(A), (C), (D). Read alongside those subsections, subsection (e)(2)(B) must be a provision about ensuring "compliance" with the annual limits on production and consumption, which is broader than ensuring compliance with the allowance allocation and trading program. The measures that EPA established, such as the disposable cylinder prohibition and container tracking requirement, serve that compliance function by ensuring that regulated substances are not being produced or consumed above the annual limits.

58

Second, Association Petitioners argue that subsection (k) already supplies a comprehensive enforcement scheme by incorporating the Clean Air Act provisions relating to enforcement, citizen suits, and civil and criminal penalties. Association Br. 26 (citing 42 U.S.C. §§ 7675(k)(1)(C), 7413, 7604). But EPA did not exercise its authority under subsection (e)(2)(B) to create an additional or alternative remedial scheme. The challenged provisions in the Framework Rule do not create any additional penalties or means of bringing suit, beyond those in the referenced parts of the Clean Air Act, to enforce the requirements. Thus, they do not interfere with the enforcement scheme that Congress incorporated into the AIM Act. Rather, they support the exercise of this enforcement scheme by making it easier to identify violations of the statute's allowance-expenditure requirements.

Third, Association Petitioners argue that Congress would not have impliedly delegated an issue of such major economic significance. To start, it is not true that subsection (e)(2)(B) contains "no explicit grant of authority." Association Br. 28–29. Subsection (e)(2)(B) explicitly authorizes EPA — in fact, requires EPA — to ensure that the statutory phasedown is achieved. No clearer statement was necessary. Congress

addressed the major policy questions by specifically identifying the

hydrofluorocarbons to be regulated and establishing the annual

phasedown requirements. 42 U.S.C. § 7675(c), (e)(2)(C). EPA is relying

on subsection (e)(2)(B) for additional regulatory authority only within a

limited realm, which is to establish auxiliary measures closely related

to compliance to ensure achievement of the phasedown objectives

defined by Congress.

Besides, regulation of the type of cylinders used for hydrofluoro-

carbon transport and the QR-code tracking of containers are not

remotely comparable in terms of economic significance to the issues in

the cases that Association Petitioners cite. In *FDA v. Brown &

Williamson Tobacco Corp.*, the logical implication of the Food and Drug

Administration's interpretation was that the statute would require the

agency to ban tobacco products entirely. 529 U.S. 120, 135–37 (2000). In

*Loving v. IRS*, the agency's interpretation would have empowered the

Internal Revenue Service "for the first time to regulate hundreds of

thousands of individuals in the multi-billion tax-preparation industry."

742 F.3d 1013, 1021 (D.C. Cir. 2014). By contrast, the challenged

provisions are directly related to ensuring compliance with phasedown

requirements that Congress expressly established, for substances that Congress expressly directed EPA to regulate. And Association Petitioners overstate the economic impact of the disposable cylinder prohibition. Total average annual costs are only $22 million per year through 2050. Framework Rule at 55,174. After 2027, once industry has built up a fleet of refillable cylinders, the disposable cylinder prohibition is expected to create a net annual savings for industry from having to buy significantly fewer cylinders each year. *Id.*

Finally, Association Petitioners argue that there is "no stopping point" for EPA's authority under subsection (e)(2)(B). Association Br. 29. But EPA's regulatory authority to ensure the achievement of the phasedown is limited to complementary measures that are closely linked to the achievement of the phasedown limits. Association Petitioners' far-flung hypothetical examples involve EPA treading into areas of transportation policy and international trade policy in ways far removed from the phasedown. But the statute, when read as a whole, makes it clear that subsection (e)(2)(B) does not delegate to EPA authority entirely outside of EPA's realm of expertise, in areas where Congress has already delegated authority to other federal agencies.

Besides, EPA is not pushing the limits here. The disposable cylinder

prohibition is consistent with measures that multiple other countries

have taken to address illegal hydrofluorocarbon trade, and there is a

well-established relationship with achievement of the phasedown. *See*

*infra* Section III.C.[15]

### C. The disposable cylinder prohibition is not arbitrary or capricious.

The record-based challenges to the disposable cylinder prohibition

lack merit. The disposable cylinder prohibition is reasonably aimed at

combatting illegal trade, even if it does not by itself solve the problem.

EPA therefore adopted it as part of a multifaceted approach to ensuring

compliance. EPA deferred the start of the prohibition for multiple years

to facilitate the transition from disposable cylinders to refillable

cylinders. EPA adequately addressed comments, and it reasonably

---

[15]    Association Petitioners close with cursory, footnoted — and thus
forfeited, *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) —
argument related to the nondelegation doctrine. Association Br. 30 n.4.
As explained *supra* p.41, the Supreme Court has consistently upheld
"Congress' ability to delegate power under broad standards." *Mistretta*,
488 U.S. at 373. Congress permissibly delegated EPA authority to
establish limited complementary measures with the goal of ensuring
the achievement of specifically defined phasedown limits.

found that the rule will not have a significant economic impact on a substantial number of small entities.

### 1. EPA adequately explained why the prohibition combats illegal activity.

EPA rationally connected the use of disposable cylinders with illicit activity that results in production and consumption of regulated substances exceeding the statutory phasedown limits. As EPA explained, "[d]isposable cylinders are favored for illicit trade because they are cheaper, easier to transport, and difficult to trace." Framework Rule at 55,173. The disposable cylinder prohibition is an effective measure to ensure compliance because "[t]he visual differences allow Customs officials and law enforcement personnel to easily distinguish a disposable cylinder from a refillable cylinder." *Id.* Thus, "[r]equiring the use of refillable cylinders has a proven track record of facilitating the detection and interdiction of illegal [hydrofluorocarbons]." *Id.*

EPA cited a variety of record information from a range of sources in drawing the connection between disposable cylinders and illegal activity:

- A report by the Environmental Investigation Agency UK found that "72% [of industry survey respondents] had seen or been

offered refrigerants in illegal disposable cylinders." EPA-HQ-OAR-2021-0044-0044-13 at 4, JA___ (cited by Framework Rule at 55,166 nn.63–66, 55,173 n.81). The report also explained that "[d]isposable cylinders facilitate illegal trade because they are easy to transport and difficult to trace," *id.* at 14, JA___, and that "[t]he use of illegal disposable cylinders has also been repeatedly reported in the media, showing up in the UK, Ireland, Germany, France, and The Netherlands," *id.* at 17, JA___. The report concluded that disposable cylinders are "attractive to black market traders" and that therefore, "efforts should be made to pursue a ban on [hydrofluorocarbons] in disposable cylinders at a global level." *Id.* at 24, JA___.

- A webinar by the European Fluorocarbons Technical Committee identified "[p]rohibit[ing] supply and use of non-refillables" as a step toward stopping the black market for hydrofluorocarbons. EPA-HQ-OAR-2021-0044-0228-79 at 20, JA___ (cited by Framework Rule at 55,167 n.69).

- A press release by the European Fluorocarbons Technical Committee described an investigative study that found large

quantities of illegal hydrofluorocarbon imports into the European Union and noted that "[a]larmingly, most reports are related to single-use canisters." EPA-HQ-OAR-2021-0044-0044-08, JA___ (cited by Framework Rule at 55,167 n.73).

- EPA also found that "disposable cylinders make up the overwhelming number of cases taken against illegal imports," noting for instance that of the incidents of illegal hydrofluoro-carbon imports reported to the Montreal Protocol's Ozone Secretariat from 2019 to 2020, "close to 90 percent . . . involve[d] the use of disposable cylinders." Framework Rule at 55,173 & nn.82–84.

Upon review of that information, EPA concluded that "[d]isposable cylinders facilitate illegal refrigerant trade, and inhibiting this trade would be a benefit of a ban on the use of non-refillable cylinders." EPQ-HQ-OAR-2021-0044-0046-08 at 20, JA___. This is the same conclusion previously reached by the European Union, Canada, Australia, and India, which have previously imposed disposable cylinder prohibitions. Framework Rule at 55,173; RIA 71, JA___.

Association Petitioners argue that smuggling of hydrofluoro-carbons continues in Europe even after the European Union's ban on disposable cylinders. They argue that some smugglers have switched to refillable cylinders, demonstrating that disposable cylinders are not "uniquely" suited to illegal trade. Association Br. 32. Nowhere did EPA claim that disposable cylinders are "uniquely" used for illegal activity. Nor did EPA have to make such a finding to justify the disposable cylinder prohibition. The disposable cylinder prohibition is not arbitrary or capricious simply because it did not by itself solve the whole problem. *Pers. Watercraft Indus. Ass'n v. Dep't of Com.*, 48 F.3d 540, 544 (D.C. Cir. 1995) ("An agency does not have to 'make progress on every front before it can make progress on any front.' . . . Regulations, in other words, are not arbitrary just because they fail to regulate everything that could be thought to pose any sort of problem." (quoting *United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993))).

Association Petitioners argue that "basic economics" undermines the justification for the disposable cylinder prohibition, since smugglers do not seem to be deterred by the higher cost of non-refillable cylinders. Association Br. 32. But the difference is not solely the cost. EPA

explained that disposable cylinders also facilitate illicit activity because

they are "easier to transport, and difficult to trace." Framework Rule at

55,173. Further, "[t]he visual differences allow Customs officials and

law enforcement personnel to easily distinguish a disposable cylinder

from a refillable cylinder," making it easier to catch illegal imports at

the border. *Id.* Given the various characteristics of disposable cylinders

that facilitate illegal activity and the ways that a prohibition could aid

enforcement efforts, it was reasonable for EPA to conclude that a

prohibition would be an important part of ensuring compliance with the

phasedown. That is so even if the prohibition alone would not stop all

law-breaking.

### 2.    EPA adequately considered alternatives.

Association Petitioners are incorrect that EPA failed to consider

alternatives to the disposable cylinder prohibition. Association Br. 33–

34. First, EPA did consider various other ways to address illegal

activities, and EPA in fact adopted some of them. For instance, EPA

established a container tracking system to track transports of

hydrofluorocarbons.[16] Framework Rule at 55,183–86. EPA also established labeling requirements, *id.* at 55,178–79, and auditing requirements, *id.* at 55,179–82.

Second, the possibility of other means of addressing illegal activity did not make it unreasonable for EPA to have also adopted the disposable cylinder prohibition. The possible ways of addressing illegal activity are not mutually exclusive. Rather, EPA expected smugglers to employ a range of tactics, so EPA reasonably adopted a "multifaceted approach that uses a variety of tools to deter, identify, and penalize illegal activity." Framework Rule at 55,168. The various elements together "create a robust enforcement and compliance system." *Id.*; *see also id.* at 55,185 (describing container tracking as "reinforc[ing]" the disposable cylinder prohibition). Given the nature of the problem, EPA found that it was "imperative to use every reasonable tool at [its] disposal to ensure compliance and thus the objectives of the AIM Act."

_____

[16]     Despite faulting EPA for not sufficiently considering other measures to fight illegal activity, Association Petitioners challenge one of the other measures that EPA did take: establishing a container tracking system. They do so even though Petitioner Worthington commented in support of the use of QR codes to allow verification of legal cylinders with a quick scan. EPA-HQ-OAR-2021-0044-00215 at 15–16, JA___–___.

*Id.* at 55,185. That decision to use multiple complementary strategies was reasonable and adequately explained.

Finally, Association Petitioners point to what they describe as the "impressive results" achieved by an interagency task force on illegal hydrofluorocarbon trade. Association Br. 34. The press release that they cite postdates the Framework Rule and is not part of the record for judicial review. That said, EPA's rationale for the disposable cylinder prohibition is not undermined by the subsequent success of other enforcement efforts. If anything, the experience of the interagency task force reinforces EPA's findings in the Framework Rule that illegal trade in hydrofluorocarbons is a real problem of sufficient magnitude to warrant a multifaceted response.

### 3. EPA adequately considered the need for lead time to ramp up production of refillable cylinders.

To "facilitate the transition" from disposable cylinders to refillable cylinders, EPA established the disposable cylinder prohibition in two stages. Framework Rule at 55,172. The first prohibition is on importing or filling a disposable cylinder with a regulated substance. *Id.* The

second prohibition is on the sale or distribution of a regulated substance in a disposable cylinder. *Id.*

EPA had proposed July 1, 2023 and January 1, 2025 as the dates for the two prohibitions. 86 Fed. Reg. at 27,210. After considering comments about the supply of refillable cylinders, EPA delayed those dates by two additional years and finalized dates of July 1, 2025 and January 1, 2027. Framework Rule at 55,172, 55,208; *see supra* p.11 n.7. EPA did so to "allow[] for a more gradual approach to mitigate concerns about the supply of cylinders." Framework Rule at 55,175. EPA also decided that "[t]his additional time will also allow for companies to develop a plan for transition to refillable cylinders and allow companies to adjust their storage and management practices to account for empty cylinders on their way back to the original filler." *Id.*

From the date of publication of the Framework Rule, EPA allowed over three and a half years for companies to comply with the prohibition on importing or filling disposable cylinders with regulated substances. EPA allowed over five years for companies to comply with the prohibition on selling or distributing regulated substances in disposable cylinders.

70

EPA reasonably determined that these multiple years were enough time to expect the market to meet the need for refillable cylinders, even without identifying exactly which sources of refillable cylinders would arise to meet the need. That determination was particularly reasonable given that other countries, including the European Union member states, Canada, and Australia, had already required the transition to refillable cylinders, which meant that "there is significant global capacity for the production of refillable cylinders." RTC 488, JA___. Moreover, EPA received a supportive comment from an entity that would be regulated by the disposable cylinder prohibition that "[f]rom an implementation standpoint, [the commenter] supports a phasing out of non-refillable cylinders beginning in 2024, with a complete ban on non-refillable cylinders beginning in 2025." EPA-HQ-OAR-2021-0044-0154 at 7, JA___; RTC 457, 462, JA___, ___ (acknowledging that comment).

EPA is entitled to significant deference for its judgment that this was enough time to allow companies to "develop a plan to transition." Framework Rule at 55,175. Where an agency's determinations are "primarily of a judgmental or predictive nature . . . complete factual

support in the record for the [agency]'s judgment or prediction is not possible or required; 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.'" *Melcher v. FCC*, 134 F.3d 1143, 1151 (D.C. Cir. 1998) (quoting *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813–14 (1978)).

Association Petitioners argue that EPA misapprehended the number of refillable cylinders that would be needed. Association Br. 34–36. That analysis, which was part of EPA's Regulatory Impact Analysis for this rule, was based on a detailed projection of the number of refillable cylinders that would be required. EPA explained that, based on input from industry sources, approximately four to five million cylinders are currently used each year in the United States for hydrofluorocarbons.[17] RIA 72, JA___. EPA took the midpoint of that

---

[17]    Association Petitioners argue that the source of those numbers were two oral communications that are not "in" the administrative record. Association Br. 35. It is entirely permissible for EPA to rely on facts learned from oral communications with knowledgeable industry sources. EPA adequately documented those conversations in the record by identifying the date of those communications, the persons involved, and what was learned. RIA 72 & nn.60–61, 249, JA___, ___; *see also Sierra Club v. Costle*, 657 F.2d 298, 402 n.513 (D.C. Cir. 1981) (describing with approval EPA's practice of summarizing oral

range and used 4.5 million as the number of hydrofluorocarbon

cylinders sold each year. *Id.* EPA then estimated that, to avoid

disruption, two refillable cylinders would be required to replace each

disposable cylinder. *Id.* at 91, JA___.

Association Petitioners disagree on both the annual usage of

disposable cylinders and the replacement ratio, Association Br. 34–36,

but EPA responded reasonably. As to the annual usage, Association

Petitioners argue that 4.5 million disposable cylinders a year is an

underestimate. They rely on confidential sales data from Worthington,

along with data from the International Trade Commission that shows

an additional 3.9 million per year imported from China. However,

Worthington's comment described its annual U.S. shipments of

disposable cylinders generally, without being limited to disposable

cylinders used for hydrofluorocarbons. EPA-HQ-OAR-2021-0044-0215

---

communications in record). If Association Petitioners are suggesting
that these communications are not properly "in" the record absent a
recording or transcript, then they cite no authority for such a
burdensome requirement. To the extent there was any procedural error
in the way that EPA documented these oral communications, the error
was not "so serious and related to matters of such central relevance to
the rule that there is a substantial likelihood that the rule would have
been significantly changed if such errors had not been made." 42 U.S.C.
§ 7607(d)(8), (d)(9)(D).

at 4, JA___; *see also* SJA___ (unredacted version produced under confidentiality order). The same is true for that International Trade Commission figure. *See* Non-Refillable Steel Cylinders from China at IV-4, JA___ (cited by EPA-HQ-OAR-2021-0044-0215 at 4 n.4, JA___, available at https://usitc.gov/publications/701_731/pub5188.pdf). As that International Trade Commission report explained, disposable cylinders are used for purposes other than hydrofluorocarbons, such as helium and various liquid chemical mixtures such as foam insulations, sealants, and adhesives. *Id.* at 6, JA___. EPA thus reasonably adhered to its 4.5 million estimate, which was limited to disposable cylinders used for regulated substances, rather than using a total that includes use for various unregulated substances. Framework Rule at 55,176.

As to the replacement ratio, Association Petitioners rely on analysis by the California Air Resources Board that "for every disposable cylinder sold, four refillable cylinders" are required. EPA-HQ-OAR-2021-0044-0215 at 5 n.6, JA___. EPA explained, however, that a four-to-one ratio represented "a very inefficient distribution chain" in which a refillable cylinder is refilled only once every four years. Framework Rule at 55,177. EPA explained that systems could be

developed to incentivize the return of cylinders and improve that ratio. *Id.* Indeed, the very California Air Resources Board report cited by Association Petitioners made that same point. That report stated that "[t]he actual number of reusable cylinders that must be manufactured would depend on the rate of cylinder return." EPA-HQ-OAR-2021-0044-0228-48 at 110, JA___. The report noted that experience from Australia and the United Kingdom showed that each cylinder could be filled 1.3 to 4 times a year. *Id.*; Framework Rule at 55,177. EPA thus reasonably rejected Association Petitioners' theory that the number of refillable cylinders needed was four times the number of disposable cylinders used each year. EPA instead used a two-to-one replacement ratio, which was conservative given the information in the record.[18] RIA 91, JA___. Because EPA acknowledged these issues and thoroughly explained its prediction, its judgment is entitled to significant deference. *See Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).[19]

---

[18]    EPA also conducted a sensitivity analysis that analyzed the transition to refillable cylinders under different assumptions, ranging from a "low scenario" and "high scenario." RIA 91–92, 95–98, JA___–___, ___–___.

[19]    Association Petitioners claim that Worthington submitted a "fact-based analysis" about global manufacturing capacity. Association Br. 36 (citing EPA-HQ-OAR-2021-0044-0215 at 6, 17, JA___, ___). Those parts

### 4.    EPA adequately addressed other comments.

EPA adequately addressed comments about the weight of refillable cylinders. Association Br. 37–38. EPA acknowledged that the weight of an empty refillable cylinder is higher than that of an empty disposable cylinder. RTC 525, JA___. EPA also explained that when filled, the difference in carrying weight is not substantial because the weight of the refrigerant makes up most of the total weight. *Id.* As EPA further explained in its Regulatory Impact Analysis, a standard refillable cylinder weighs approximately 42 pounds (25 pounds for the gas and 17 pounds for the cylinder) while a standard disposable cylinder weighs 39 pounds (30 pounds for the gas and 9 pounds for the cylinder).[20] RIA 92, JA___. Moreover, technicians already carry reusable recovery cylinders that are heavier than refillable supply cylinders. RTC 525, JA___. And while Association Petitioners note the impact of

---

of Worthington's comment letter include only a conclusory statement about current manufacturing capacity. It does not include any factual support for that statement, let alone any factual basis to draw any conclusion about the ability of the market (including market entities other than Worthington) to adapt to meet any unfilled need in the available time.

[20]    Association Petitioners criticize EPA for obtaining these numbers from an oral communication. But as explained *supra* p.72 n.17, EPA adequately documented these communications in the record.

any additional weight on transportation and fuel costs, Association Br. 38, EPA accounted for such impacts in its cost analysis. RIA 94–95, JA___–___.

EPA provided a reasonable estimate of the amount of "heel" that is vented from disposable cylinders, although that potential reduction of emissions from vented heels was not part of EPA's justification for its decision. Association Br. 38. The "heel" is the residual amount of hydrofluorocarbons remaining in the cylinder when the cylinder is "empty." Framework Rule at 55,174. Although EPA noted that transitioning to refillable cylinders would reduce the release of heel to the atmosphere, EPA explained that the reduction in emissions is not "part of the fundamental rationale" for the disposable cylinder prohibition.[21] *Id.* In any event, EPA thoroughly explained its empirical study of the amount of residual hydrofluorocarbons in empty disposable cylinders. RIA 246–49, JA___–___.

_____

[21]    Association Petitioners are incorrect that reducing heel emissions was the "primary justification" for the disposable cylinder prohibition in the proposed rule. Association Br. 25 n.3. The proposed rule explained that ensuring compliance with the allowance program and reducing the emissions from venting heels were both reasons for prohibiting disposable cylinders, and it did not identify either as the "primary" reason. 86 Fed. Reg. at 27,187.

### 5.    EPA's findings under the Regulatory Flexibility Act are not arbitrary or capricious.

EPA adequately supported its finding under the Regulatory Flexibility Act that the rule "will not have a significant economic impact on a substantial number of small entities." Framework Rule at 55,199; Association Br. 39–44.

The Regulatory Flexibility Act, 5 U.S.C. §§ 601–612, is a "[p]urely procedural" statute that "obliges federal agencies to assess the impact of their regulations on small businesses." *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001). Agencies must determine whether a rule would "have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). Only if a regulation would have such an impact is an agency required to perform a regulatory flexibility analysis under 5 U.S.C. §§ 603 and 604.

EPA explained its finding of no significant economic impact in both the preamble to the rule and a lengthy memorandum in the docket. Framework Rule at 55,199; EPA-HQ-OAR-2021-0044-0227-07, JA___–___. EPA started by identifying the small entities subject to the requirements of the rule. EPA found that no hydrofluorocarbon

78

producers are small businesses but that some importers and reclaimers are. Framework Rule at 55,199. EPA determined that only a small number of the potentially affected businesses would incur significant costs. *Id.* EPA reached that conclusion by comparing direct compliance costs to those businesses' annual sales. EPA-HQ-OAR-2021-0044-0227-07 at 4, JA___.

Association Petitioners argue that EPA failed to consider the effects of the disposable cylinder prohibition on small businesses in the heating, ventilation, air-conditioning, and refrigeration industry that use regulated substances. Association Br. 40. EPA's analysis under the Regulatory Flexibility Act was appropriately focused on directly regulated entities. Agencies need only conduct Regulatory Flexibility Act analyses for small entities that are directly "subject to the proposed regulation — that is, those 'small entities to which the proposed rule will apply.'" *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001); *see also Motor & Equip. Mfrs.*, 142 F.3d at 467. The prohibition at issue is of the importation, filling, selling, and distributing of regulated substances in disposable cylinders. Framework Rule at 55,208 (codified at 40 C.F.R. § 84.5(h)(1)–(2)). EPA thus

properly identified producers, importers, exporters, reclaimers, sellers, and distributors — not end users — as the regulated entities. Framework Rule at 55,199; EPA-HQ-OAR-2021-0044-0227-07 at 23, JA___; *see also* RTC 724, JA___ (explaining that "end users of regulated gases" are not directly regulated by this rule because unlike producers or importers, they do not need allowances). It was appropriate for EPA to do so even though the rule could "have economic impacts in many sectors of the economy." *Cement Kiln*, 255 F.3d at 869. The Regulatory Flexibility Act did not require EPA to analyze indirect impacts of the prohibition on small entities that are end users of hydrofluorocarbons in disposable cylinders.

Association Petitioners mischaracterize the record anyway. EPA adequately documented its sources of information about the longevity of refillable cylinders, frequency of refilling, and weight. EPA-HQ-OAR-2021-0044-0227-07 at 24–25, JA___–___; *see also supra* Section III.C.4 (addressing arguments about weight of canisters and impact on transportation and fuel costs); *supra* p.72 n.17 (addressing arguments about documenting conversations in record). When EPA discussed the ability of distributors to recover refrigerant "heel" and sell it, EPA

80

simply used the average price of refrigerants. RIA 95–96, JA___–___;

EPA-HQ-OAR-2021-0044-0227-07 at 27, JA___. Overall, EPA found

that the delayed compliance dates for the disposable cylinder

prohibition "alleviate[] many concerns about the burden of this

provision on small businesses." RTC 699, JA___. Moreover, "while there

may be increased costs in early years, most businesses will realize cost

savings over time as they no longer must pay for newly manufactured

disposable cylinders." *Id.* at 700, JA___.

Finally, Association Petitioners argue that they cannot "possibly

discern" the exact details of how EPA calculated its cost estimates

relating to the disposable cylinder prohibition. Association Br. 43. EPA

provided extensive narrative detail of its methodology and assumptions

in the docket. EPA-HQ-OAR-2021-0044-0227-07 at 23–28, JA___–___.

That was sufficient, particularly where the cost estimates were "to

provide the public with information and to comply with executive

orders" but the "requirements put in place in the rulemaking do not

depend on" the cost estimates. RTC 679, JA___. Association Petitioners

try to attack the cost estimate anyway based on statements by the

Office of Management and Budget during interagency review of the

draft rule, Association Br. 43, but those statements are not part of the

administrative record and may not be considered in judicial review. *See*

Certified Record Index (Feb. 1, 2022), Doc. No. 1933281; 42 U.S.C.

§ 7607(d)(4)(B)(ii), (7)(A) (directing EPA to make interagency review

comments publicly available, but not including such materials in the

"record for judicial review"). In sum, EPA considered the relevant

information about effects on small entities and adequately explained its

findings in the record.

### D.   The container tracking requirement is not arbitrary or capricious.

Association Petitioners do not dispute the connection between the

container tracking requirement and the prevention of unlawful

production or consumption of hydrofluorocarbons without the required

allowances. After all, it is undeniable that the tracking system

"facilitates verification by EPA and industry" of the sources of the

hydrofluorocarbons. RTC 552, JA___. "Distribution and sale of

[hydrofluorocarbons] that did not enter the market legally would lack a

tracking identifier and thus could be easily spotted." Framework Rule

at 55,183. "Buyers would also be able to know that they are purchasing

legal [hydrofluorocarbons]." *Id.* The tracking system is "especially

important for identifying illegal production — as that material will not have a check at the port like imports." *Id.* at 55,185. Thus, the container tracking program "supports compliance and, where needed, enforcement action." *Id.* at 55,183.

The basic operation of the container tracking system is as follows. EPA would assign certification identifications to producers and importers based on the quantity of allowances that they have. *Id.* at 55,184. As allowances are expended, the certification identifications associated with those allowances will be assigned to the corresponding containers prior to importation or transport from a production facility. *Id.* The certification will be tracked using a QR code affixed to the container. *Id.* When the QR code is scanned, it will point to a database that will indicate if the regulated substance in the container was legally produced or imported. *Id.* The container will be tracked each time the material is bought or sold, until it is sold to the final customer. *Id.* Thus, legally produced or imported regulated substances can be "tracked from the point of import, sale, distribution, or offer for sale or distribution to the point of sale to the final customer . . . so that any

illegal [hydrofluorocarbons] offered for sale at any point in the distribution chain could be identified." *Id.*

Association Petitioners do not challenge any particular part of this tracking system or take issue with any particular regulatory text in the Framework Rule. *See id.* at 55,211–23 (codified at 40 C.F.R. § 84.23) (detailed regulatory requirements related to container tracking). Rather, Association Petitioners make a generalized argument that the container tracking requirement would be burdensome because it would add complexity to existing inventory management systems. Association Br. 47–50.

EPA adequately recognized those concerns. EPA stated that it "appreciates that it will require logistical adaptation and technological investment to set up and implement such a system effectively." Framework Rule at 55,185. To address the concerns, EPA delayed the proposed dates for the start of the container tracking requirements for multiple years. Under the final rule, the first requirement — that there is a QR code on all containers of bulk regulated substances imported, sold, or distributed by producers and importers — does not apply until January 2025. *Id.* at 55,183, 55,211. That is more than three years after

publication of the Framework Rule. The other requirements do not apply until even later in time. *Supra* p.12.

EPA explained that during that "extended, phased-in roll out," EPA "will have more time to consult industry and develop an appropriate tracking system." *Id.* at 55,185. That time would also allow "industry [to] have more time to adapt existing systems and/or procure any technology needed to support the tracking system and train staff." *Id.* EPA stated that "[t]hese later dates allow for additional time to develop and pilot test the system in consultation with stakeholders (e.g., including identifying ways to integrate EPA's system with a company's existing inventory management software and packaging equipment) and conduct training for users of the system." *Id.*

EPA adequately explained the need for a comprehensive container tracking system to identify illegal hydrofluorocarbons. No Petitioner disputes that need. Having established that need, EPA reasonably decided that any implementation burdens could be adequately mitigated by providing industry with multiple extra years to adapt. Association Petitioners do not argue that it will be impossible or impracticable for industry to adapt in that time. Rather, Association

Petitioners' argument boils down to a complaint that EPA's regulation will require industry members to makes changes in their existing inventory management and fulfillment systems. But a regulation cannot be impermissibly burdensome merely because it would require industry to change behavior. Nor is the container tracking requirement arbitrary or capricious because of Association Petitioners' speculation that there would "likely" be mistakes and that perfectly accurate container tracking would be "highly unlikely." Association Br. 48–49. The container tracking need not be perfect to achieve its intended purpose. *Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007) ("[O]ur standard of review under the arbitrary and capricious test is only reasonableness, not perfection.").

The container tracking requirement in the Framework Rule is reasonable and was adequately explained in the record. *See State Farm*, 463 U.S. at 43 (requiring only that the agency "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made").

## CONCLUSION

The petitions should be denied. In the alternative, if the Court were to grant any part of the Association Petitioners' petitions, then the disposable cylinder prohibition and/or the container tracking requirement should be severed and the remainder of the Framework Rule should be left in place. As EPA explained, these compliance-related provisions are complementary but "EPA intends for, and has designed, these provisions to each stand independently from the others." Framework Rule at 55,166. As such, they are severable from each other and also each severable from the rest of the rule in the event that the Court finds them to be unlawful. *See MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) ("Whether the offending portion of a regulation is severable depends upon the intent of the agency and upon whether the remainder of the regulation could function sensibly without the stricken provision."). Association Petitioners correctly recognize this, seeking a remedy of severance and vacatur of only those particular provisions. Association Br. 50 n.6.

Respectfully submitted,

/s/ *Tsuki Hoshijima*
TODD KIM
*Assistant Attorney General*
TSUKI HOSHIJIMA
*Attorney*
U.S. Department of Justice
Environment and Natural Resources
 Division
Environmental Defense Section
P.O. Box 7411
Washington, D.C. 20044
(202) 514-3468
tsuki.hoshijima@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the Court's order of March 15, 2022 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 16,327 words.

2.    This document complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

<u>/s/ *Tsuki Hoshijima*    </u>

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed through the ECF filing system and will be sent electronically to the registered participants as identified in the Notice of Docket Activity.

<u>/s/ *Tsuki Hoshijima*    </u>