**PUBLIC COPY—SEALED MATERIAL DELETED**

ORAL ARGUMENT NOT SCHEDULED

Nos. 21-1251, 21-1252 & 21-1253

# In the United States Court of Appeals for the District of Columbia Circuit

HEATING, AIR-CONDITIONING, & REFRIGERATION
DISTRIBUTORS INTERNATIONAL, *et al.*,
*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Respondents*.

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency
86 Fed. Reg. 55,116 (October 5, 2021)

**JOINT APPENDIX
VOLUME I**

Ethan G. Shenkman
Jonathan S. Martel
Stephen K. Wirth
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
ethan.shenkman@arnoldporter.com

*Counsel for Association Petitioners*

Wayne J. D'Angelo
KELLY DRYE & WARREN LLP
3050 K Street, NW
Washington, DC 20007
(202) 342-8451
wdangelo@kelleydrye.com

*Counsel for Worthington Indus.*

David M. Williamson
WILLIAMSON LAW + POLICY, PLLC
1850 M Street, NW, Suite 840
Washington, D.C. 20036
(202) 256-6155
maxwilliamson@
  williamsonlawpolicy.com

*Counsel for RMS of Georgia LLC
  d/b/a Choice Refrigerants*

Todd Kim, *Assistant Attorney General*
Eric G. Hostetler, *Attorney*
U.S. Department of Justice
Env't & Nat. Res. Div., Envtl. Def. Sec.
P.O. Box 7411, Washington, D.C. 20044
(202) 514-3468
eric.hostetler@usdoj.gov

*Counsel for Respondents*

## TABLE OF CONTENTS

| Volume I | | |
|---|---|---|
| EPA Docket No. | Description | Page |
| EPA-HQ-OAR-2021-0044-0044-08 | EFCTC Kroll Press Release on Illegal Imports of HFCs into EU | JA1 |
| EPA-HQ-OAR-2021-0044-0044-13 | EIA Doors Wide Open | JA3 |
| EPA-HQ-OAR-2021-0044-0046-07 | HFC Production and Consumption - Proposed Rule | JA31 |
| EPA-HQ-OAR-2021-0044-0046-08 | Refillable and Non-refillable Cylinders: Analysis of Use, Emissions, Disposal, and Distribution of Refrigerants | JA37 |
| EPA-HQ-OAR-2021-0044-0066 | Comment submitted by First Continental International (FCI) | JA78 |
| EPA-HQ-OAR-2021-0044-0103 | Comment submitted by Heating, Air-conditioning & Refrigeration Distributors International (HARDI) | JA92 |
| EPA-HQ-OAR-2021-0044-0116 | Comment submitted by Air Conditioning Contractors of America (ACCA) | JA119 |
| EPA-HQ-OAR-2021-0044-0142 | Comment submitted by Small Business Administration (SBA) | JA121 |
| EPA-HQ-OAR-2021-0044-0154 | Comment submitted by A-Gas, Inc. | JA128 |
| EPA-HQ-OAR-2021-0044-0168 | Comment submitted by RMS of Georgia, LLC d/b/a Choice Refrigerants | JA135 |
| EPA-HQ-OAR-2021-0044-0193 | Comment submitted by Plumbing-Heating-Cooling Contractors - National Association (PHCC) | JA192 |

| Volume I | | |
|---|---|---|
| EPA Docket No. | Description | Page |
| EPA-HQ-OAR-2021-0044-0195 | Comment submitted by USA Refrigerants | JA195 |
| EPA-HQ-OAR-2021-0044-0215 | Comment submitted by Worthington Industries (redacted copy) | JA199 |
| EPA-HQ-OAR-2021-0044-0216 | Comment submitted by Chemours Company FC, LLC | JA233 |

| Volume II | | |
|---|---|---|
| EPA Docket No. | Description | Page |
| EPA-HQ-OAR-2021-0044-0219 | Comment submitted by Waysmos USA, Inc. | JA558 |
| EPA-HQ-OAR-2021-0044-0226-02 | Email to Elke L. Hodson Marten, OMB from Luke Hall-Jordan | JA564 |
| EPA-HQ-OAR-2021-0044-0226-21 | Email to Luke Hall-Jordan et al. from Elke L. Hodson Marten, OMB | JA651 |
| EPA-HQ-OAR-2021-0044-0227-02 | Regulatory Impact Analysis | JA652 |

| Volume III | | |
|---|---|---|
| EPA Docket No. | Description | Page |
| EPA-HQ-OAR-2021-0044-0227-03 | Response to Comments | JA919 |

| Volume IV | | |
|---|---|---|
| EPA Docket No. | Description | Page |
| EPA-HQ-OAR-2021-0044-0227-07 | Economic Impact Screening Analysis for the Allowance System for an HFC Production and Consumption Phasedown | JA1692 |
| EPA-HQ-OAR-2021-0044-0228-48 | ICF Lifecycle Analysis Of High GWP GHG Destruction | JA1723 |
| EPA-HQ-OAR-2021-0044-0228-79 | Stop Illegal Cooling Webinar Slides | JA1936 |
| EPA-HQ-OAR-2021-0044-0229 | Worthington Petition for Partial Administrative Reconsideration | JA1956 |
| EPA-HQ-OAR-2021-0044-0230 | HARDI Petition for Partial Administrative Reconsideration | JA1963 |

| Volume V | |
|---|---|
| Description | Page |
| *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 55,116 (Oct. 5, 2021) (Final Rule) | JA1969 |
| *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 27,150 (May 19, 2021) (Proposed Rule) | JA2076 |
| *Phasedown of Hydrofluorocarbons: Notice of 2022 Allowance Allocations for Production and Consumption of Regulated Substances Under the American Innovation and Manufacturing Act of 2020*, 86 Fed. Reg. 55,841 (Oct. 7, 2021) (Allocation Notice) | JA2150 |

 

## New Kroll findings reveal how illegal imports of HFCs continue to enter EU

**Brussels, 15 April 2020** – New findings from corporate investigations firm Kroll provide evidence on how large quantities of illegal imports of HFCs (hydrofluorocarbon) gases are still entering the EU market, despite improvement in enforcement activities in 2019. Kroll's investigation identifies various means in which the illegal gases are entering the EU, shedding light on the enormity of the problem.

"The latest findings from Kroll reveal the complexity of the problem. The numerous ways HFCs are crossing European borders is truly concerning and shows this problem requires a concerted approach," said Mark Vergnano, President and CEO of The Chemours Company, member of the European FluoroCarbons Technical Committee (EFCTC).

Through an investigative study, commissioned by the EFCTC, Kroll has followed up on **228 reports of illegal activity** between March and December 2019. Hundreds of shipments, many from China, were identified. This intelligence was shared with enforcement agencies in a dozen member states, resulting in increased enforcement activity, evident in recent seizures in Bulgaria and Italy. Alarmingly, most reports are related to single-use canisters (illegal on the EU market). Many of these products were sold on internet market platforms, such as eBay, OLX, and MarktPlaats. 2019 saw **444 requested takedowns** by Kroll from 15 market platforms.

Kroll reveals shipments arrive through various ways including misdirected transhipments, quota abuse, open smuggling, and counterfeit products. Combined, Kroll has been able to build evidence of a total of at least 3,000 tonnes of HFCs. Extrapolated data indicates that this could be equivalent to as much as **4.7 million tonnes of $CO_2$ equivalent**, or as much as driving more than 3.5 million new cars for one year. As investigations continue, this may prove to be just **the tip of the iceberg**. Large-scale illegal imports not only hamper the EU's climate goals, but also fund other illegal activities and reduces national tax revenue from legal alternatives.

"However, the new findings do show that efforts to stop illegal imports are starting to have an impact. The 228 reports on the Action Line from across Europe have enabled us to track where some of the shipments are coming from, where they are going, and how they're transported," Mark Vergnano added. "I hope these measures will continue to have an impact."

***The EFCTC Action Line for anonymous reporting of illegal F-gas products and illegal F-gas trade is available at:*** *https://efctc.integrityline.org/index.php*

---

**EFCTC**
Rue Belliard 40 b.15 B-1040 Brussels Belgium
Tel. 32.2.436.93.00 www.fluorocarbons.org



European Chemical Industry Council - Cefic aisbl
EU Transparency Register n° 648791423323-90

 

**For more information please contact:**

Barbara Gonzato
Barbara.Gonzato@hkstrategies.com
+32 2 737 95 23

**www.fluorocarbons.org**

**About EFCTC**
The European FluoroCarbons Technical
Committee is a sector group of the European
Chemical Industry Council (Cefic) and is
represented by the companies Arkema,
Chemours, Daikin Chemical, Honeywell and Koura.
Its main objectives are to provide up to date
information about applications, safety, health and
environmental effects for HFCs
(hydrofluorocarbons), HFOs (hydrofluoro-olefins),
and the relevant European and international
legislation.

**EFCTC**
Rue Belliard 40 b.15 B-1040 Brussels Belgium
Tel. 32.2.436.93.00 www.fluorocarbons.org



European Chemical Industry Council - Cefic aisbl
EU Transparency Register n° 64879142323-90



JA2

**ENVIRONMENTAL INVESTIGATION AGENCY**

# Doors wide open

Europe's flourishing illegal trade in hydrofluorocarbons (HFCs)

**April 2019**



**eia** Climate

©EIAimage

### ABOUT EIA

We investigate and campaign against environmental crime and abuse.

Our undercover investigations expose transnational wildlife crime, with a focus on elephants, pangolins and tigers, and forest crimes such as illegal logging and deforestation for cash crops like palm oil. We work to safeguard global marine ecosystems by addressing the threats posed by plastic pollution, bycatch and commercial exploitation of whales, dolphins and porpoises. Finally, we reduce the impact of climate change by campaigning to eliminate powerful refrigerant greenhouse gases, exposing related illicit trade and improving energy efficiency in the cooling sector.

### OUR CLIMATE WORK

EIA has almost three decades of experience working with international bodies, governments, enforcement agencies and industry to tackle illegal trade in refrigerants. It began in the 1990s when we exposed the illegal trade of chlorofluorocarbons (CFCs) in Europe.

EIA's pioneering investigations shone a light on the illegal trade in Ozone-Depleting Substances (ODS) across the globe. Our exposés and advocacy helped increase awareness of the illegal trade among Parties to the Montreal Protocol on Ozone-Depleting Substances and spur action to curtail it, including through the adoption of ODS licensing systems.

### EIA UK

62-63 Upper Street,
London N1 0NY  UK
**T:** +44 (0) 20 7354 7960
**E:** info@eia-international.org
**eia-international.org**

Environmental Investigation Agency UK
UK Charity Number: 1182208
Company Number: 7752350
Registered in England and Wales

2     Environmental Investigation Agency



## CONTENTS

| | |
|---|---|
| Summary | 4 |
| HFC customs data analysis | 6 |
| EIA industry survey | 14 |
| Illegal trade in HFCs | 16 |
| Methods of illegal trade | 18 |
| Action being taken by EU member states to address illegal trade in HFCs | 20 |
| Regulatory Loopholes and Tools to Combat Illegal Trade | 22 |
| Conclusions | 25 |
| Recommendations | 26 |
| References | 27 |

JA5

# Summary

Hydrofluorocarbons (HFCs) were introduced as replacement chemicals for Ozone-Depleting Substances (ODS), which are being phased out by the Montreal Protocol due to their impact on the ozone layer.

**More than 80% of companies surveyed were aware of or suspected illegal HFC trade and 72% had seen or been offered refrigerants in illegal disposable cylinders.**

Although HFCs do not deplete the ozone layer, they are potent greenhouse gases, with global warming potentials (GWP) of the commonly used HFCs ranging between 675 and 3,922.[1] In the past two decades, global emissions of HFCs have soared and, in 2015, baseline emissions were predicted to reach 4.0-5.3 billion tonnes of carbon-dioxide equivalence per year ($GtCO_2e$/year) by 2050.[2]

Furthermore, as relatively short-lived climate pollutants, their global-warming impact, typically measured over a 100-year time horizon, actually impacts over just a few decades. Given the dire need for urgent emission reductions, cutting HFC use is one of the most effective tools to help prevent runaway climate change.

The need to address HFCs has long been recognised by the European Union (EU). Initially, EU legislation focused on addressing HFC leakage from cooling equipment. In 2014, the EU significantly strengthened the old F-gas Regulation, including an economy-wide phase-down in HFC supply and a number of bans on HFC use in certain equipment and products.[3] The new F-gas Regulation aims to cut HFC use by 79% by 2030 over average use during the 2009-12 period. Starting in 2015, it stipulates a step-wise decrease in HFC supply, with major reductions from the baseline of 37% in 2018 and 45% in 2021. In 2017, in anticipation of the 2018 supply cut, HFC prices skyrocketed.[4]

As early as 2016, and despite huge stockpiling of HFCs in 2014 before the F-gas Regulation came into effect, reports of illegal (non-quota) HFCs in European markets began to emerge. Major HFC producer Honeywell claimed that 10 million tonnes $CO_2e$ of HFCs had been illegally imported in 2015, equivalent to more than 5% of the total allocation.[5] Such reports have since grown both in frequency and severity, with 2018 witnessing a deluge of reports of illegal HFC use and trade throughout the EU.[6]

In late 2018, EIA conducted two surveys, the first to determine the status of EU member state efforts to comply with the F-gas Regulation and the second to obtain data and views on the illegal trade directly from key industry stakeholders.

This report summarises information from these surveys and presents an analysis of customs and HFC Registry data, which supports claims from prominent industry stakeholders that large quantities of illegal HFC refrigerants are entering the EU market.

Reports from industry indicate that large-scale illegal HFC trade and use is occurring in an absence of effective enforcement by member states. More than 80% of companies surveyed were aware of or suspected illegal HFC trade and 72% had seen or been offered refrigerants in illegal disposable cylinders.



4

Customs data for 2018 demonstrates that a large number of EU member states significantly increased HFC imports, despite the major HFC supply cut of 37%. EIA's analysis of European customs data indicates that bulk HFC imports in 2018 were too high for compliance with the 2018 quota. If EU-based HFC production and equipment authorisations are assumed to be at 2017 levels, the amount of HFCs placed on the market in 2018 would be 117.5 $MtCO_2e$, some 16.3 $MtCO_2e$ above the available quota of 101.2 $MtCO_2e$. This could be characterised as open smuggling of HFCs (i.e. imports openly shipped through customs without quota). In addition, there is clearly some level of cross-border smuggling of HFCs which is under the radar of customs authorities. There are significant discrepancies between Chinese export and European import data that could indicate fraudulent import declarations.

EIA's customs data analysis also indicates an additional 14.8 $MtCO_2e$ were imported in 2017, over and above that reported by companies to the HFC Registry under the F-gas Regulation. The significant discrepancies between EU customs data and HFC Registry data need to be examined further at company, country and EU level.

Given the availability of cheap HFCs outside the EU, it is not surprising that much of the illegal trade is reported to be occurring at EU border countries. The current HFC reporting system does not allow customs authorities to determine whether or not HFC shipments are within quota and a number of loopholes in the system allow unscrupulous traders to reap quick profits, exploiting a demand for cheap HFCs with little risk of punitive measures.

Illegal trade of HFCs undermines the F-gas Regulation, results in additional HFC emissions that fuel global warming and significantly reduces government income and the profits of legitimate businesses. Continued availability of HFCs outside the HFC phase-down schedule will hinder the uptake of climate-friendly technologies and ultimately threaten the success of the F-gas Regulation and the EU's climate goals. EIA is concerned that the illegal trade, along with stockpiling of HFCs in 2017, has produced a false sense of security in terms of availability of HFCs to meet the phase-down steps from 2018 onwards. Future quota cuts will be difficult to meet unless the transition to low-GWP alternatives is accelerated.

There is an urgent need for all EU member states and the European Commission to immediately improve enforcement of the F-gas Regulation and implement additional measures to accelerate the transition to HFC alternatives.

EIA's analysis of European customs data indicates that bulk HFC imports in 2018 were too high for compliance with the 2018 quota.

Below: ISO tank in transit



5

# HFC customs data analysis

EIA utilised HFC customs data from Europe (Eurostat)[7] and China (CTI)[8] to examine trade in bulk HFCs from 2016-18 and to compare EU-reported HFC imports and exports to company reported HFC Registry data presented by the European Environment Agency (EEA).

The analysis is relatively complex due to the range of codes used by the international Harmonised System (HS) and European Combined Nomenclature (CN) system. At the international level (including Chinese customs data), six-digit HS codes 290339 and 382478 are used to cover all HFCs and some other chemicals. HS code 290339 covers fluorinated, brominated or iodinated derivatives of acyclic hydrocarbons, including HFC-32, HFC-23,

HFC-125, HFC-143a, HFC-152a, HFC-134a, HFC-1234yf, HFC-1234ze and other saturated and unsaturated fluorides. HS code 382478 covers mixtures containing perfluorocarbons (PFCs) and HFCs (but not containing CFCs or HCFCs). It includes HFC-507A, HFC-404A, HFC-410A and HFC-407C as well as other HFC and PFC blends.

European trade data adds an additional two numbers to each code, with distinct codes for some widely used HFCs and HFC blends. Therefore the data can more clearly define imports and exports of specific HFCs subject to the HFC phase-down, including on a $CO_2$e basis (see Table 1).

| CN CODE | Chemical name | HFC | Blend components |
|---|---|---|---|
| 2903 39 21 | Difluoromethane | HFC-32 | |
| 2903 39 23 | Trifluoromethane | HFC-23 | |
| 2903 39 24 | Pentafluoroethane and 1,1,1-trifluoroethane | HFC-125, HFC-143A | |
| 2903 39 25 | 1,1-difluoroethane | HFC-152a | |
| 2903 39 26 | 1,1,1,2-tetrafluoroethane | HFC-134a | |
| 2903 39 27 | Pentafluoropropanes, hexafluoropropanes and heptafluoropropanes | Incl. HFC-245fa, HFC-236fa, HFC-236ea, HFC-227ea | |
| 2903 39 31 | 2,3,3,3-tetrafluoropropene | HFC-1234yf | |
| 2903 39 35 | 1,3,3,3-tetrafluoropropene | HFC-1234ze | |
| 2903 39 39 | Other unsaturated fluorides | Other HFOs | |
| 3824 78 10 | Containing only 1,1,1-trifluoroethane and pentafluoroethane | HFC-507A | HFC-143a/HFC-125 |
| 3824 78 20 | Containing only 1,1,1-trifluoroethane, pentafluoroethane and 1,1,1,2-tetrafluoroethane | HFC-404A | HFC-142a/HFC-125/HFC-134a |
| 3824 78 30 | Containing only difluoromethane and pentafluoroethane | HFC-410A | HFC-32/HFC-125 |
| 3824 78 40 | Containing only difluoromethane, pentafluoroethane and 1,1,1,2-tetrafluoroethane | HFC-407C | HFC-32/HFC-125/HFC-134a |
| 3824 78 80 | Containing unsaturated hydrofluorocarbons | Incl. HFC-448, HFC-450A | |

**Table 1: EU trade codes for key HFCs and HFC mixtures**

6

## Customs data for 2018 indicates significant over-supply of HFCs to the European market

European customs data shows that bulk[9] HFC imports fell in 2018 compared to 2017 but increased compared to 2016 (See Figure 1). Taking the Global Warming Potential (GWP) of the HFCs based on the CN codes of the imports,[10] EIA estimates that bulk HFC imports in 2018 represented 119.4 $MtCO_2e$, while exports represented 48.5 $MtCO_2e$. If the exports are subtracted from the imports, it can be estimated that 70.9 $MtCO_2e$ of HFCs were placed on the market from bulk trade (see Table 2).

The calculation for the amount placed on the market (POM) under the HFC phase-down is essentially bulk HFCs physically placed on the market (import minus export plus EU production) added to issued authorisations for HFCs contained in imported refrigeration, air-conditioning and heat pump equipment. Exemptions under Article 15(2) (e.g. HFCs used as feedstock, for use in military equipment or metered dose inhalers) are subtracted from the POM, which is all calculated on a $CO_2$ basis.[11]

In 2017, HFC production of 49.6 $MtCO_2e$ and authorisations of 11.1 $MtCO_2e$ were reported. In addition, the 2018 quota was reduced by 14.2 $MtCO_2e$ to account for exemptions.* If these values are used as a proxy for 2018 data (which is not available), the estimated quota-relevant POM in 2018 would be 117.5 $MtCO_2e$. **This is some 16.3 $MtCO_2e$ above the 2018 available quota of 101.2 $MtCO_2e$.**



**Figure 1: HFC imports into the EU from 2016-2018 according to European customs data**

| Year | Tonnes | | | $MtCO_2e$ | | |
|------|--------|--------|-------------------------|-----------|-----------|-------------------------|
| | HFC imports | HFC exports | Imports minus Exports | HFC imports | HFC exports | Imports minus Exports |
| 2016 | 66,405 | 24,144 | 42,261 | 140.78 | 44.26 | 96.51 |
| 2017 | 80,440 | 24,321 | 56,119 | 166.58 | 47.91 | 118.68 |
| 2018 | 69,988 | 24,348 | 45,640 | 119.42 | 48.47 | 70.95 |

**Table 2: 2016-18 import and export of HFCs according to European customs data**

*based on the amount subtracted from the baseline in order to calculate the 2018 quota of 101.2 $MtCO_2e$, as per Annex 5 of the F-Gas Regulation. Discussions with industry suggest that exemptions may be as high as 17 $MtCO_2e$, however there is no available data to confirm this.

7

## HFC imports country by country

The overall reduction in 2018 imports (See Figure 1) is primarily due to a reduction in reported imports to the Netherlands, the largest importing country in the EU. There is, however, a worrying trend of significantly increased imports over 2016-18 in a number of countries that could indicate illegal trade hotspots. For example, imports of HFCs in 2018 were more than 100% higher than 2016 imports in Austria, Belgium, Denmark, Greece, Ireland, Latvia, Malta, Poland, Portugal, Romania and Sweden (See Figure 2).











**Figure 2: HFC imports from 2016-18 according to European customs data**

8

JA10













JA11

Calculated on a $CO_2e$ basis, in 2017 European customs data indicates HFC imports of 166.6 $MtCO_2e$, 12.1 $MtCO_2e$ higher than the HFC Registry data (see Table 3).



## Comparison of customs data with reported data

The EEA produces an annual report on HFC data reported by companies to the HFC Registry according to the requirements of the F-gas Regulation. The latest EEA report analysed 2017 reported data, concluding that the HFC phase-down is operating within quota, although EU-wide bulk POM of HFCs increased from 2016 to 2017, from 159.1 $MtCO_2e$ to 166.6 $MtCO_2e$. This was just 0.4% below the 2017 quota limit (170.3 $MtCO_2e$) compared to previous years where POM was 4-6% below the limit.[12]

Although a few cases of quota exceedance were reported in 2017, both by importers of bulk HFCs and equipment importers, these were balanced by companies that did not fully use their quotas.

## Import Data

EIA compared 2016 and 2017 bulk import data according to HFC Registry data (presented by the EEA) and European customs data. For European customs data, EIA excluded HFCs and PFCs that do not fall within the quota (i.e. HFOs and PFCs).

Both HFC Registry and European customs data show a more than 10% increase in bulk imports, on a tonnage and $CO_2e$ basis, from 2016-17, suggesting stockpiling (see Table 3). In fact, according to HFC Registry data, bulk HFC imports on a $CO_2e$ basis in 2017 were the highest level in 10 years, other than in 2014 when significant HFC stockpiling took place. European customs data indicates that the increased imports come from China as opposed to the second largest trading partner, the USA.[13]

According to European customs data, 2016 bulk imports were lower than those reported to the HFC Registry by 2,557 tonnes, while in 2017 the imports according to the European customs data are higher by 728 tonnes. However, if the $CO_2e$ of the imports are calculated, based on the GWPs of the reported CN codes, the discrepancy between the two sets of data is much higher in 2017 than in 2016. **Calculated on a $CO_2e$ basis, in 2017 European customs data indicates HFC imports of 166.6 $MtCO_2e$, 12.1 $MtCO_2e$ higher than the HFC Registry data** (see Table 3).

| Year | HFC imports (tonnes) | | | HFC imports ($MtCO_2e$) | | |
|------|-----------------|-------------------|------------|-----------------|-------------------|------------|
|      | HFC registry | European customs | Difference | HFC registry | European customs | Difference |
| 2016 | 68,962 | 66,405 | -2,557 | 142.2 | 140.8 | -1.4 |
| 2017 | 79,712 | 80,440 | 728 | 154.5 | 166.6 | 12.1 |

**Table 3: Comparison between HFC Registry and European customs bulk HFC import data**

## Export Data

Since an increase in HFC imports might be balanced by an increase in HFC exports, EIA also examined European export statistics, comparing them to HFC Registry data.

The export data shows a larger discrepancy between HFC Registry data and European customs data than the import data. European customs data shows significantly lower exports in 2016 and 2017 than data reported to the HFC Registry (see Table 4). In 2017, European customs data reports 24,321 tonnes of HFCs exported from the EU, compared to 29,120 tonnes reported to the HFC Registry. If $CO_2$ exports are calculated according to the CN codes, the data indicates that only 47.9 $MtCO_2e$ HFCs were exported in 2017, while companies reported exports of 50.6 $MtCO_2e$ to the HFC Registry, a difference of 2.7 $MtCO_2e$.

Taking the import and export data together, the European customs data indicates that a significantly higher amount of HFCs (5,527 tonnes) was placed on the European market in 2017 than was reported to the HFC Registry. In $CO_2e$ terms, the discrepancy is 14.8 $MtCO_2e$, equivalent to 8.7% of the total quota (see Table 5).

There are a number of possible explanations for these discrepancies, including:

- incorrect CN codes have been used for imports or exports
- companies not registered to the HFC Registry are importing significant quantities of high-GWP HFCs
- registered companies have misreported import data to the HFC Registry (e.g. reported high-GWP imports as lower-GWP)
- registered companies have misreported export data to the HFC Registry (e.g. reported exports but actually sold the HFCs on the European market)

- a large number of small imports of 100 $tCO_2e$ or less (which are exempt from the phase-down) account for at least part of the 728 tonne import discrepancy. This seems unlikely since the average GWP of the 728 tonnes of HFCs would have to be over 16,500 to account for the 12.1 $MtCO_2e$ discrepancy. In addition, according to the EEA, some companies importing amounts under 100 $tCO_2e$ still report to the HFC Registry.

Given that reports to the HFC Registry are self-declared (only companies importing over 10,000 $tCO_2e$ are subject to audit) and there is limited or no cross-checking with customs data, there is great potential for manipulation of HFC Registry reported data. **EIA is concerned at the discrepancy between European customs and HFC Registry data of 14.8 $MtCO_2e$, which represents approximately 8.7% of the 2017 quota.**

| Year | HFC exports (tonnes) | | | HFC exports ($MtCO_2e$) | | |
|------|-----------------|------------------|------------|-----------------|------------------|------------|
| | HFC registry | European customs | Difference | HFC registry | European customs | Difference |
| **2016** | 27,414 | 24,144 | -3,270 | 50.7 | 44.3 | -6.4 |
| **2017** | 29,120 | 24,321 | -4,799 | 50.6 | 47.9 | -2.7 |

**Table 4: Comparison between HFC Registry and European customs HFC export data.**

| Year | Imports minus exports (tonnes) | | | Imports minus exports ($MtCO_2e$) | | |
|------|-----------------|------------------|------------|-----------------|------------------|------------|
| | HFC registry | European customs | Difference | HFC registry | European customs | Difference |
| **2016** | 41,548 | 42,261 | 713 | 91.5 | 96.5 | 5.0 |
| **2017** | 50,592 | 56,119 | 5,527 | 103.9 | 118.7 | 14.8 |

**Table 5: Difference between HFC Registry and European customs import/export combined data**

JA13

**Chinese customs data highlights further inconsistencies**

A comparison of European customs import data (import of CN codes included in HS codes 290339 and 382478 from China) with Chinese customs export data (export of HS codes 290339 and 382478 to the EU) during 2016-17 reveals additional variations, with the Chinese data consistently higher. According to European customs import data, 51,858 tonnes of HFCs were imported from China to the EU in 2016 and 67,820 tonnes in 2017, whereas Chinese customs export data puts these figures at 57,753 and 70,023 tonnes, a difference of 5,895 and 2,203 tonnes respectively (see Table 6).

|  | **2016** | **2017** |
|---|---|---|
| EU HFC imports from China (tonnes) – European customs data | 51,858 | 67,820 |
| Chinese HFC exports to EU (tonnes) – Chinese customs data | 57,753 | 70,023 |
| Difference between European and Chinese customs data (tonnes) | 5,895 | 2,203 |
| Percentage difference between European customs and Chinese customs data | 10.2% | 3.2% |

**Table 6: Comparison between European customs import data and Chinese customs export data**

If the average GWP of 2016 bulk imports is assumed to be 2,062, as per HFC Registry data reported by the EEA, the additional 5,895 tonnes of HFC imports would equate to 12.2 MtCO$_2$e, equivalent to more than 7% of the 170.3 MtCO$_2$e quota allocation for the year.

If the average GWP of 2017 bulk imports is assumed to be 1,938, as per HFC Registry data reported by the EEA, the additional 2,203 tonnes in 2017 imported into the EU would equate to 4.3 MtCO$_2$e, equivalent to an additional 2.5% of the quota.

EIA acknowledges the need for caution in drawing conclusions from EU and Chinese customs data comparisons. For example, discrepancies may potentially be explained by time lag between export and import or where the exporter has incorrectly assigned a transit country as the final destination point. However, the trade discrepancies are quite pronounced in some specific countries and bear further examination. Over the 2016-17 period, Chinese export data was more than 100% higher than European import data in Denmark (238%), Greece (104%), Lithuania (123%) and Croatia (304%) (see Figure 3). Luxembourg is another outlier; Chinese trade data shows an export of 3,000kg to Luxembourg in 2017, but European customs data has zero imports during 2016 or 2017 (for this reason it was excluded from the graph).

Other notable discrepancies include Latvia, which in 2017 imported 16.1 tonnes of pure HFCs (HS code 290339) according to European customs data and 245 tonnes according to Chinese customs data. Similarly, Malta imported 3.8 tonnes of pure HFCs in 2017 according to European customs data but 31.3 tonnes according to Chinese customs data. These discrepancies could be an indication of undeclared or mis-declared imports and illegal trade.



**Figure 3: European customs import data compared to Chinese customs export data as a percentage of European import data for 2016 and 2017 combined.**

JA14

## 2017 stockpiling

It is also clear from the HFC Registry data, customs data and 2018 HFC price signals (see Box) that significant stockpiling took place in 2017 in preparation for the 2018 cut. Bulk HFC imports to the EU as a whole were 21% higher in 2017 than in 2016.[14] The customs data shows a significant spike (more than 200%) in 2017 imports in Denmark, Latvia and Poland over 2016. The increase in imports to Poland is also supported by the significant increase in Polish companies reporting imports. In 2015, 27 companies reported bulk imports; this rose to 53 in 2016 and 181 in 2017, far higher than any other EU country.[15]

The EEA report (based on HFC Registry data) also notes that there is a reserve of quota authorisations (i.e. authorisations for placing HFC-containing equipment on the market) built up by equipment importers during 2015 and 2016. The reserve was partially used up in 2017, the first year that imports of HFC-containing equipment had to be covered by the phase-down. It is currently almost twice the amount of actual annual equipment imports,[16] therefore a reasonable assumption is that the reserve will be fully used up for equipment imports in 2018 and 2019.

**EIA is concerned that stockpiling of bulk HFCs in 2017, the reserves of authorisations and illegal imports have created a false sense of security in terms of the supply of HFCs from 2018 onwards.** Given the steep cut in supply in 2018, future stockpiling will not be possible and a further cut in 2021 is likely to be difficult to achieve unless a faster transition to low-GWP alternatives is achieved.



# HFC prices

HFC prices have been closely monitored by Öko-Recherche on behalf of the European Commission since the start of the F-gas Regulation. The data include prices reported by 25 service companies (in Estonia, France, Germany, Italy, Portugal and Spain) and 23 Original Equipment Manufacturers (OEMs).[17]



HFC prices in Europe began seriously rising in 2017 in anticipation of the 2018 HFC quota cut. By the second quarter of 2018, the price of HFC-410A was 859% higher for OEMs and 833% higher for service companies than in 2014. Similar price hikes have been seen for other HFCs, with the highest price increases for those HFCs with the highest GWP (e.g. HFC-404A).

According to the latest Öko-Recherche report, prices in 2018 have flattened out to a large extent and demand for refrigerants, despite the large quota cut, was said to be low.[18] Potential reasons for this given in the report include stockpiling in previous quarters (i.e. in 2017), increased care in handling refrigerants, reduced demand due to transitions to lower GWP technologies and possible illegal trade in refrigerants.

HFC-404A prices in particular dropped in 2018; after reaching a high of 1,190% of the 2014 baseline in quarter one, prices paid by service companies dropped in the next two quarters to 1,042%. Companies indicated that large HFC-404A quantities were available on the market, due to large quantities stockpiled in 2014, virgin quantities supplied at low prices (i.e. illegal trade) and reclaimed quantities.

# EIA industry survey

In September and October 2018, EIA sent a questionnaire to a range of heating, ventilation, air-conditioning and refrigeration (HVACR) representatives, including industry associations, refrigerant suppliers and contractor associations. The survey requested information on refrigerant prices, the scale and severity of illegal HFC use, potential drivers of illegal trade, awareness of current penalty regimes in member states and recommendations for improving enforcement of the F-gas Regulation. Responses were received from 18 companies, primarily refrigerant suppliers and industry associations, in 11 EU member states (see Fig 4, results at a glance).

## Price Rises

In all, 95% of the 18 companies reported that customers had expressed concern relating to refrigerant price rises over the previous 12 months. Nine companies gave detailed price information; price rises were on average between 136-147% for high-GWP refrigerants (HFC-404A, HFC-410A, HFC-134a, HFC-407C and HFC-407F) while prices for HFC-1234yf decreased by an average of 14%.

The survey data revealed some significant regional price variations that might be an indicator of illegal trade. For example, the average price of HFC-404A in September 2018 quoted by two refrigerant suppliers and an association in Greece and Cyprus was €44.80/kg, compared to an average price of €140.09/kg in two companies in Denmark (taking out the impact of the tax) and Belgium. Similar variations were quoted for other high-GWP gases (e.g. HFC-410A cost €37.50/kg in Greece/Cyprus compared to €105.48/kg in Denmark/Belgium).

## Refrigerant supply

Some 66% of respondents experienced refrigerant supply problems over the 12-month period preceding September 2018, particularly for HFC-404A and HFC-134a. Several companies indicated the supply situation was more severe in 2017 and eased up in 2018, albeit with very high prices.

Price increases in HFCs were of greater concern to users than supply problems. All but one company had received complaints about refrigerant prices. One respondent noted the link to supply problems since customers were reducing the amount of stock kept in warehouses, given the high prices. Another explained how high prices fuel illegal trade: "The reason [for] importing illegal material is mainly the incomprehensible rise in prices."[19]

## Awareness of illegal trade

In response to the question "Are you aware of or suspect ongoing illegal HFC use (non-quota HFC use or illegal cross-border trade) in the sector/country you work in",



## Results at a glance

*September 2017 to September 2018     ● Yes     ● No

**Have you experienced any refrigerant supply problems in the last 12* months?**   67% / 33%

**Have any of your members/clients expressed concern about refrigerant price the last 12* months?**   94% / 6%

**Have any of your members/clients expressed concern about refrigerant supply the last 12* months?**   17% / 83%

**Figure 4: EIA industry survey – results at a glance**

15 out of 18 companies answered 'yes'. Three companies noted receiving anecdotal and media reports, while just three companies were unaware of illegal HFC use. The widespread use of disposable cylinders was repeatedly mentioned, while many companies also stated their belief that illegal HFCs were being placed on the market in refillable containers, either by companies outside the quota system or companies placing amounts over their allocated quota. Eastern Europe was repeatedly mentioned as a potential source of illegal HFCs, along with several non-EU countries including Albania, China and Turkey.

Five companies mentioned web-based platforms, including eBay and Facebook, as a source of illegal sales. Informal sales through SMS texts were also mentioned several times.

## Theft

Seven out of 18 companies reported that they or their clients had either experienced HFC theft or been offered HFCs they suspect to be stolen. Reported HFC thefts were located in Germany, Greece, The Netherlands and the UK. One German refrigerant supplier reported a large-scale theft in July (of over 800 cylinders) and an attempted theft from its Munster headquarters and two thefts from its Dutch branch. One refrigerant supplier noted a rise in offers of refrigerants from companies that do not normally deal with refrigerants.

## Disposable cylinders

Disposable cylinders facilitate illegal trade because they are easy to transport and difficult to trace; they have been banned in the EU since 2007.

                                                               Environmental Investigation Agency

JA16

**Are you aware of or suspect ongoing illegal HFC use?** 83% 17%

**Have you or your clients directly experienced HFC theft?**
heard about it anecdotally 17%
offered suspect HFCs 22%
direct experience 22%
none 39%

**Are your clients/members aware that the use of disposable cylinders is illegal in Europe?** 94% 6%

**Have you seen or been offered refrigerants in disposable cylinders?** 72% 28%

**In your view, are your clients/members adequately aware of the impact of the 2018 reduction step under the HFC phase-down, as well as the other measures under the EU F-Gas Regulation?**
some/most of industry are aware 24%
59%
17%

**Is there an adequate supply of affordable low-GWP alternatives in your area/sector?** 47% 53%

**Are you aware of any actions your national government is taking to tackle illegal trade of HFCs?** 17% 83%

EIA asked whether respondents were aware that disposable cylinders were illegal and if they had been offered HFCs in disposable cylinders or seen any in use. Only one respondent felt that its clients/members were unaware of the ban. Despite this, 72% of respondents had seen or been offered refrigerants in disposable cylinders. Respondents from Denmark and Greece noted that although their clients are aware of the ban, they may still buy disposable cylinders as they are cheaper and easily available. The automotive sector was highlighted as an area where they are used heavily. Trading platforms such as eBay and Facebook were mentioned as key selling tools for disposable cylinders.

## Awareness of the HFC phase-down

EIA asked if respondents felt their clients were adequately aware of F-gas Regulation measures, in particular the impact of the 2018 reduction step. Ten out of 17 respondents (59%) felt their clients and members were adequately aware, four (24%) felt that some or most of industry were aware, while three companies felt their clients were not adequately aware. Given 2018 is the third year of implementation with a significant cut in HFC use, this lack of awareness, which will result in higher ongoing demand for HFCs than expected, is of concern.

## Supply of low-GWP alternatives

Asked if there was an adequate supply of affordable low GWP alternatives available, eight out of 17 respondents (47%) stated there was. Several other companies noted there was adequate supply; however, they were expensive (five), transitional substances only (three) or technical challenges remained (one).

## Industry views on government enforcement action against illegal trade in HFCs

Only three out of 18 companies were aware of government action to address illegal HFC trade. Croatia, Italy and the UK were the only countries where respondents were aware of enforcement actions being taken, although no prosecutions were reported. EIA also asked what governments should be doing to enforce the F-gas Regulation. Almost half of the companies responded that greater capacity to inspect and investigate illegal trade was required (including market surveillance) and many companies noted the need for higher penalties and better enforcement by customs. Companies also noted the need for more information at the contractor and customs levels, and that additional actions to remove barriers to the adoption of low-GWP alternatives (including training and safety standards) should be addressed.

## Industry views on actions it can take to reduce illegal trade

Fourteen companies had suggestions on how industry itself can tackle illegal trade. The most common response was to lower prices of new refrigerants, followed by speeding up the availability of compressors working with low-GWP refrigerants and raising awareness among clients of illegal trade and the availability of alternatives. Carrying out market surveillance, putting pressure on authorities to carry out more inspections and implementing training for the servicing sector were also mentioned.

JA17

# Illegal trade in HFCs

The information provided by industry stakeholders alongside multiple media reports and trade data analysis suggests a growing prevalence of illegal HFC use impacting countries across the EU. In November 2018, the European association of refrigeration, air-conditioning and heat pump contractors (AREA) published a member survey covering 16 countries. Results of their industry survey showed over three quarters of the respondents were aware of illegal trade of higher GWP products. AREA stated that illegal trade was most significant in EU border countries, with the number of cases growing throughout 2018.[20]

In early 2019, Coolektiv, a 'Committee of Experts' including refrigerant producers Chemours and Honeywell, refrigeration components association Asercom, German refrigerant suppliers Westfalen and Frigoteam Handels and retailer Rewe stated that illegal refrigerants entering Europe in 2018 were equivalent to 20% of the legal HFC quota. Chemours claims that in 2018 around 22.5 MtCO$_2$e were illegally imported into the EU.[21]

Figure 5 illustrates potential trade routes for smuggled HFCs according to industry reports and intelligence gathered by EIA. Industry stakeholders report that illegal HFCs are entering the EU from Russia and Ukraine in the north-east and from Turkey and Albania in the south-east. Poland has been repeatedly highlighted as a first point of import for illegal HFCs entering through Ukraine and shipped directly from China.



**Figure 5: Potential trade routes for illegal HFCs entering the EU**

JA18

PROZON, a Polish NGO dedicated to reducing emissions of ODS, has expressed concern about "massive and growing" HFC smuggling entering Poland through the border with Ukraine and from Turkey (via Romania, Bulgaria, Hungary and Slovakia). It has also raised concerns that companies exceeding quotas is an even bigger problem.[22]

Italian industry sources have pointed to Albania, Malta, Poland and Greece (via Turkey) as the source of most black market HFCs in Italy. One source claimed that ISO tanks of illegal HFCs are entering Italy from Croatia, a statement supported by the fact that Chinese trade data shows significantly higher exports to Croatia than Croatia's import data (e.g. 480.8 tonnes compared to 57.3 tonnes in 2017).

Media reports have also highlighted illegal HFC trade in the Baltic States. In August 2018, the customs authority of Estonia reported "a significant increase" in the number of attempts to import refrigerant from outside the EU, with more than 200 attempts to bring illegal cylinders across the border from Russia.[23] The same report suggested Lithuania's exchequer had lost up to €5m in 2018 due to increased sales of illegal refrigerants.[24] A refrigerant supplier from Latvia reported to EIA a drop in sales in 2018 of 44% due to illegal refrigerants on the market.[25]

Greek industry raised strong concerns about the high levels of ongoing illegal HFC trade in responses to EIA's survey. All Greek respondents mentioned Albania and mainland Turkey as non-EU countries from which illegal HFCs were arriving; one specified trucks coming over the border as the method of smuggling. EIA spoke with multiple industry sources at Chillventa 2018 who reported that illegal refrigerants constituted 50-80% of the total market in Greece, Bulgaria and Romania. In July 2018, 14 Greek HVACR representatives wrote to the Greek Government claiming that illegal refrigerants from Bulgaria, Albania, Macedonia and Turkey were costing the Greek state over €20 million in lost VAT and taxes.[26]

Areas with different taxation rates were also cited as source points, for example the Faroe Islands, which is not subject to the Danish HFC tax, was mentioned by a respondent to EIA's survey as an entry point for suspect HFCs into Denmark. This could partly explain why China's customs data shows an export of more than 10 tonnes of HFC mixtures to Denmark in 2017 while European customs data shows no imports from China.

The prevalence of illegal HFC-134a in the mobile air-conditioning (MAC) servicing market has been repeatedly raised. In Italy, about 5-10% of the mobile air-conditioning HFC market is estimated to be illegal[27]

## WHY IT PAYS TO BREAK THE LAW

In March 2018, a two-day inspection of cars crossing the Polish-Ukraine border at Dolhobyczow highlighted the lucrative nature of black market trade in HFCs.

Three attempts to smuggle HFCs hidden in LPG tanks were prevented by customs officers. The cars contained between 64-90 litres of refrigerant; two of the cases were confirmed to be smuggling HFC-134a, with a market value of PLN4,600 (€1,060)-PLN6,500 (€1,510). The culprits were fined between 15-21% of the market value.[31]

According to PROZON, the culprits and the cars, with refrigerant still in them, were sent back to Ukraine, leaving them at liberty to make another attempt at smuggling the HFCs into Poland.[32]

This not only highlights the potential scale of illegal HFCs flooding into Poland from non-EU border countries but also shows the need for more effective enforcement through confiscation of illegal refrigerant and higher fines to deter repeat offenses.

while PROZON estimates at least 30% of HFC-134a currently used in Poland's MAC servicing sector is from questionable or simply illegal sources.[28] A refrigerant supplier in Croatia stated: "We think that [a] much bigger problem are refrigerants imported into the EU and placed on the market outside of quota system. This practice is the most obvious in automotive aftermarket where according to the info we get from the market, the vast majority of HFC-134a being sold by automotive spare parts dealers in Croatia had probably been placed on the EU market outside of quota system".

The use of illegal disposable cylinders has also been repeatedly reported in the media, showing up in the UK, Ireland, Germany, France and The Netherlands.[29] According to a recent news article, after a tip-off from Dutch customs authorities, the Dutch inspectorate seized 123 disposable cylinders of HFC-134a from a car parts warehouse in Rotterdam that had been imported outside of the EU quota system.[30]

Traders reported that illegal use was incentivised by the lack of enforcement; even if caught, fines and penalties are too low to act as a deterrent, especially in comparison to the profits that can be made on the black market.

JA19

# Methods of illegal trade

There are two distinct mechanisms with respect to the illegal trade of HFCs in the EU. The first can be characterised as open smuggling of HFCs. This is where companies import non-quota HFCs though the normal customs channels. EIA's analysis of 2018 customs data suggests that as much as 16.3 MtCO$_2$e of bulk HFCs were illegally placed on the market in this way in 2018 and more than 14.8 MtCO$_2$e in 2017. The companies responsible could be registered in the HFC Registry or not, although one would expect the latter to be picked up by customs authorities as it is a simple matter to check if a company is registered or not.

A recent shipment seized in Rotterdam is an example of this. An illegal shipment of 600 cylinders of HFC-134a was directly imported from Turkey by sea container. The shipment was openly imported with the correct commodity codes, however the Dutch importing company was not registered in the HFC Registry.[33]

The second mechanism, which is much harder to quantify, is the more traditional smuggling of HFCs across borders. This can occur outside customs channels altogether or where HFCs are concealed either physically or through fraudulent documentation of HFC shipments (e.g. mislabelling the type, purpose or destination of the HFC shipment). The significant discrepancies between Chinese export and European import data could be to some extent an indication of fraudulent import declarations.

## Small scale/opportunistic smuggling via land and sea borders

There have been multiple accounts of relatively small amounts of illegal HFCs entering the EU via land borders in vehicles (see box 'Why it pays to break the law'). One Austrian stakeholder told EIA: "What we hear is that HFCs are brought in from Turkey or Serbia, via Bulgaria or Croatia, and in small quantities, i.e. in single use bottles, in private cars, mostly. So there's a few bottles here and a few bottles there. Mostly 134a, for use in MAC. I have now also heard that there's a lot coming in via Poland from Ukraine."[34] The Estonian tax and Customs Board claimed in 2018 there had been over 200 attempts to bring illegal cylinders of refrigerant across the border from Russia.[35] Bulgarian customs officers seized 12 disposable cylinders (six 10.9kg cylinders of HFC-404A and six 13.6kg cylinders of HFC-134a) from an empty minibus covered by a blanket. The bus was allegedly on its way to Western Europe from Romania.[36] German authorities stopped a vehicle crossing the

Below: Polish customs stopping smugglers with R-404A in LPG car tank



18

©PROZON Fundacja Ochrony Klimatu



©PROZON Fundacja Ochrony Klimatu

Above: Tanks and cylinders for F-gases

border from Poland containing seven 10kg cylinders of HFC-404A and eleven 12kg cylinders of HFC-134a. The occupants of the vehicle claimed to be en route to Romania but were unable to provide proof of ownership of the cylinders.[37]

In April and May 2018, there were also reported incidents of refrigerants coming into southern Italy on fishing boats from Malta to Sicily (originally from Turkey). The number of fishing boats from Malta makes this difficult to monitor.[38]

## Offloading in transit

Instances have been reported of refrigerants coming through Greece 'in transit' from non-EU countries to other non-EU countries but then offloaded and replaced with empty cylinders to ship onwards.[39] EIA spoke with one Italian company which sent a shipment of HFC-134a to Serbia via Bulgaria; two weeks later it realised the disposable cylinders, intended for export outside EU, were illegally made available on the Italian market. The company filed an official complaint and found that the company in charge of the shipment had used fake papers. An investigation is ongoing.[40]

## Large shipments of non-quota HFCs or HFCs in excess of quota

To date, EIA is not aware of any seizures of illegal HFCs shipped into the EU in large tanks or ISO tanks. However, one industry source claimed ISO tanks were coming into Italy from Croatia[41] while others have claimed large-scale imports are entering Poland.[42] In EIA's experience, such large shipments are rarely checked due to unfamiliarity with the process, lack of adapters needed to take a sample or lack of facilities to test the refrigerants. Industry insiders have noted concern that customs may only check if an importer is on the HFC Registry and do not always check the amount of quota it has or request the Document of Conformity (DoC) in the case of equipment imports.[43] Given that customs officials have no way of determining how much quota has already been used, the system is wide open to abuse (see Section on Regulatory Loopholes).

## Illegal internet sales

Online platforms are a popular way of selling illegal HFCs. They allow sellers to reach a large network of potential buyers without necessarily being registered as an F-gas-licensed company. Some platforms simply give a number to call or text to arrange for a private sale. Some enforcement efforts have enabled suspicious adverts to be removed but the actual seller is rarely prevented from posting a new advert the following day. To date, EIA is aware of just one successful prosecution of illegal online HFC selling, in Italy.[44]



Above: Screenshot of disposable cylinders of R-134a for sale on facebook in Greece

In July 2018, Cooling Post conducted a simple search of German site eBay Kleinanzeigan, finding 80 German vendors offering HFC-134a in disposable cylinders. By August, this number had increased to 120 vendors. Many vendors appeared to have access to reasonable quantities with offers of discounts for multiple cylinders.[45] In Italy, a presenter on a Canale 5 TV programme Striscia la Notizia successfully purchased (without an F-gas licence) an 800g bottle of HFC-410A from a seller on Amazon.[46]

JA21

# Action being taken by EU member states to address illegal trade in HFCs

If a company is known to have exceeded its HFC quota under the F-gas Regulation, the European Commission will reduce its next quota by double the amount by which it was exceeded. In all other respects, the burden of enforcement lies on the member states.

In September 2018, EIA contacted each EU member state requesting information on efforts to implement and enforce the F-gas Regulation. Thirteen responses were received from the following countries: Austria, Belgium, Bulgaria, Cyprus, Czech Republic, Denmark, Finland, Germany, Luxembourg, the Netherlands, Poland, Slovenia and the UK.

The responses demonstrate a variety of approaches and some clear enforcement successes but EIA is concerned at the lack of strict penalties being applied, which reduces the deterrent effect for would be criminals.

| Breach | Penalty |
|---|---|
| Intentional release of HFCs in breach of Art 3(1) | • Czech Republic − fine up to €39,000<br>• Cyprus − fine up to €5,000 (forward to Court of Justice if bigger)<br>• Belgium − none<br>• Denmark − fine or in severe cases imprisonment up to two years, case by case basis<br>• Luxembourg − prison sentence one month - one year or fine €50,000 - €500,000<br>• Poland − fine apx €930-€3,500<br>• Slovenia − fines of €1,200-30,000<br>• UK − max penalty apx €225,000 |
| Placing HFCs on the market without a quota in breach of Art 15(1) para 2<br><br>Placing equipment or products on the market in breach of Art 11 & Annex II<br><br>Importing equipment containing HFCs without a quota in breach of Art 14(1) | • Czech Republic − fine up to €39,000<br>• Cyprus − fine up to €5,000 (forward to Court of Justice) if bigger<br>• Belgium − prison sentence eight days − three years, fines €160 up to €4,000,000.<br>• Denmark − fine or in severe cases imprisonment up to two years, case by case basis<br>• Luxembourg − prison sentence one month − one year or fine €50,000 - €500,000<br>• Poland − fine apx €1,400-€10,500<br>• Slovenia − fines of €1,200-30,000<br>• UK − max penalty apx €225,000 |
| Importing equipment containing HFCs without a declaration of conformity in breach of Art 14(2) | • Czech Republic − fine up to €39,000<br>• Cyprus − fine up to €5,000 (forward to Court of Justice) if bigger<br>• Belgium − prison sentence eight days − three years, fines €160 up to €4,000,000.<br>• Denmark − fine or in severe cases imprisonment up to two years, case by case basis<br>• Luxembourg − prison sentence one month − one year or fine €50,000 - €500,000<br>• Poland − fine apx €1,400-€10,500<br>• Slovenia − fines of €1,200-30,000<br>• UK − max penalty apx €225,000 |
| Placing on the market non-refillable containers (e.g. disposable cylinders) in breach of Annex III(1) | • Czech Republic − fine up to apx €58,500<br>• Cyprus − up to €5,000 (forward to Court of Justice if bigger)<br>• Belgium − Seizure of property and fines, potential destruction or re-export (decided by the Inspectorate)<br>• Denmark - fine or in severe cases imprisonment up to two years, case by case basis<br>• Luxembourg − prison sentence one month − one year or fine €50,000 - €500,000<br>• Poland − fine apx €1,400-€10,500<br>• Slovenia − fines of €1,200-30,000<br>• UK − max penalty apx €225,000 |

Note: Bulgaria did not have an English version available, Finland gave limited information and Germany/Austria did not give details

Table 7: Penalties for breaching provisions of the F-gas Regulation in member states

JA22



Right: F-gas LPG analyzer used by customs

Table 7 shows the levels of penalties reported by member states. The level of penalties imposed varies considerably from country to country, from as low as €160 to as much as €4 million (both Belgium). Finland did not specify types of penalties for each infraction but stated that the punishment for deliberate criminal action which results in destruction of the environment would warrant a two- to six-year jail sentence. EIA also requested information from member states on action taken to punish offences under the F-gas Regulation. The responses suggest that very few penalties have been applied and most of those imposed have related to leakage checks and record keeping.

In 2017, Bulgarian customs seized 7,000 kgs of HFCs. The country also imposed 36 fines (of unknown amounts) relating to disposable cylinders, non-quota POM of HFCs, importing HFC-containing equipment without a quota and paperwork infringements. Denmark reported a seizure of non-refillable containers at Copenhagen airport in 2018, although no further details were given.

Czech authorities have issued 95 fines since 2015 amounting to 2,264,000 CZK (approx €88,600). Most fines were issued for infringements related to incorrect leakage checks. The biggest fine issued was 290,000 CZK (approx €11,350) for leak checks and record-keeping infringements. Cyprus also reported fines had been applied for record-keeping infringements although no details were given.

Poland conducted over 600 inspections in 2017 preventing over 80 attempts to illegally import HFCs. In the first half of 2018, more than 400 illegal HFC imports were stopped. One fine was issued in 2017. Poland maintains its own electronic database of HFC reporting, which includes imports and exports of less than 100 $tCO_2e$. The reports are analysed and compared with reports submitted to its Database of Reports (DBR) and discrepancies followed up with the companies in question.

The UK reported 23 investigations in 2018 covering a range of breaches including imports of F-gas without quota, sales of gas in disposable cylinders, sales of gas or equipment to undertakings without appropriate qualifications or certifications, sellers of gas not carrying out the appropriate checks when they sell to undertakings, deliberate release of F-gas and failure to carry out the appropriate leak checks or record keeping. However, no prosecution has been carried out to date. In 2018, the UK changed its criminal sanctions to civil penalties (in all but one infringement) in the hope that it would be easier to apply and therefore act as a more effective deterrent.

**The scale of penalties and their application has a big impact on illegal trade. The lucrative nature of selling black market HFCs in the EU means that large profits can be made through criminal activity. Unless penalties are high enough and imposed regularly, black market traders will simply factor penalties into regular business costs.** Moreover, without proportionate and dissuasive penalties applicable across all member states, those with lesser penalties will undermine efforts undertaken by neighbouring countries.

## Measures to monitor and enforce the F-gas Regulation

Member states reported on a number of activities undertaken to support implementation and enforcement of the F-gas Regulation. These included:

• publishing information on web-based platforms and through associations
• production of an F-gas Regulation handbook for Custom Officers
• including F-gases in Custom's Risk Analysis, risk-profiling for imports of bulk F-gases
• organising workshops and seminars for stakeholders including customs
• on-site customs training and use of mobile gas analysers
• regular inspections at customs and regular in-country inspections/market surveillance
• monitoring of online marketplaces such as eBay, including daily searches for illegal products and working with e-retailers to remove illegal products from sale, prevent them being sold and gather evidence about those involved in these activities
• intelligence-led investigations
• targeted campaigns – e.g. in Denmark aimed at marketing of split heat pumps to non-authorised persons, in the UK on the servicing ban.

JA23

# Regulatory loopholes and tools to combat illegal trade

## Control of HFC trade at the customs level

In order to place HFCs on the EU market, companies must apply for and secure HFC quotas which are allocated for free. Since 2017, imports of HFCs in pre-charged equipment have also required an HFC quota. Importers of pre-charged equipment must either have HFC quotas allocated to them directly or secure an "authorisation" from another HFC quota-holder.

Quotas and authorisations are not needed for imports of less than 100 $tCO_2$ of HFC per year (in equipment or as bulk gas). This is almost 70kg of HFC-134a or 25.5kg HFC-404A. Bulk HFCs supplied directly to an undertaking for export are also exempt from the phase-down, as are HFCs for military equipment, destruction, feedstocks, and, from 2018, MDIs.[47]

Currently the European Commission is not generally obliged to cross check data reported by F-gas traders to the HFC Registry with EU customs data. If a company places more than 10,000 $tCO_2e$ HFCs (almost seven tonnes HFC-134a) on the market in any one year it must have its report verified by an external auditor. However, it is not clear how transparent the auditing process is and whether auditors have any minimum standards they must adhere to.

All goods imported into the EU should be declared to the customs authorities of the respective member state using the Single Administrative Document (SAD), which is the common import declaration form for all the member states.[48] The SAD details information regarding the importer, exporter, CN Code, weight and units of goods, country of origin, destination and other key data contained in the Integrated Tariff of the European Communities (TARIC) database. [49] The information is self-declared by the importer and is not cross-checked with any information from the exporter. Other documents may be required, e.g. a Customs Value Declaration if the value exceeds €20,000 and transport documentation (e.g. a Bill of Lading or Air Waybill). For equipment containing HFCs, the F-gas Regulation requires a Declaration of Conformity (DoC), confirming that the HFCs inside the equipment are accounted for within the quota system of the F-gas Regulation (i.e. that they have quotas or authorisations covering the amount of HFCs in the equipment).[50]

Customs have access to the HFC Registry where they can check whether or not an importer is registered and access the importer's annual quota allocation or authorisation, although there is no access to information to let customs know how much a company has already imported.

Furthermore, the quota allocation and authorisation are measured in tonnes $CO_2$ equivalent, whereas the SAD describes quantities in kilogrammes or tonnes. While it is potentially possible for customs to calculate the $tCO_2e$ based on the GWP of the HFC or HFC blends being imported, this adds an extra administrative burden to the customs procedure. ASHRAE reports some 82 different HFC blends with varying GWPs that are subject to the F-gas Regulation.[51]

Even if an importer is clearly importing an amount in excess of the company's annual quota (e.g. in one shipment), customs are still not able to determine that the shipment is in contravention of the F-gas Regulation since the importer could claim (legitimately or otherwise) that part of the shipment is for re-export outside the EU.

The lack of customs control is of particular concern given the influx of new companies reporting on F-gas activity since the F-gas Regulation began. A total of 1,699 companies reported during 2017, 33% more than the previous year.[52] The increase is mostly due to the large increase in new companies reporting bulk HFC imports; some 564 companies reported imports of bulk HFCs compared to just 282 in 2015.

The current system is inadequate to confirm the legitimacy of new entrants and to prevent them from importing in excess of quota. Companies can simply shut down to avoid repercussions or mis-declare data to the HFC Registry.

**It is clear that the current system does not allow customs officials to effectively enforce the F-gas Regulation. From EIA's perspective, there are two potential solutions:**

1. **A per-shipment licensing system akin to the EU's licensing system for ozone-depleting substances (ODS), whereby customs officials have documentation authorised by the exporter and importer within a system managed by the European Commission**

2. **A real-time live updating of the centrally held F-gas register, whereby customs authorities can check if an importer has available quota. Additional documentation would be needed for imports which are destined for immediate re-export or when claiming another exemption to the quota system.**



©PROZON F...

## HFC licensing

Trade in ODS has historically been controlled by licensing systems, as required by the Montreal Protocol. The Protocol considers a licensing system to be a scheme whereby a license is granted by a competent authority (here, the European Commission) for an individual to export and import controlled substances. To be effective, it should cover all controlled substances – whether new, used, recycled or reclaimed and regardless of the purpose of the export or import – and should be supported by a ban on unlicensed exports and imports. In addition to facilitating compliance with relevant reporting requirements, licensing systems help prevent illegal trade by allowing cross-checking of information between exporting and importing countries.[53]

While a licensing system for ODS exists, the EU does not have an HFC licensing system, based on an early decision made by the Commission not to incorporate one in the revised F-gas Regulation. At the time, the Commission cited certain barriers, explaining its decision as follows:
*"Unless required by an international agreement under the Montreal Protocol, a licensing system should not be envisaged for the HFC in order to reduce the administrative burden for the companies and authorities involved. Furthermore, the applicable customs codes do not (yet) distinguish between HFCs and other substances serving the same purposes."*[54]

Whether valid at the time or not, these barriers no longer exist; the Kigali Amendment adopted in 2016 makes clear that an HFC licensing system is now required while new CN codes for specific HFCs and groups of HFCs have been in place since 2015.[55]

The F-gas electronic registry, with some modifications, could fulfil part of the function of an HFC licensing system. To do so, it would need to be electronically linked to the TARIC database employed by customs authorities, which contains the information declared on the SAD.[56] The creation of an electronic link between the HFC Registry (HFC quota allocation in $tCO_2e$) and the information on the SAD (HFC imports by CN code) could allow a real-time comparison between actual HFC imports declared at the border and current available HFC quota in the HFC Registry.

In order to function, the SAD would need to contain information on the $tCO_2e$ of HFC trade, not just the CN code since the CN codes for HFC imports are usually not sufficient on their own to calculate the $tCO_2e$.[57] The system would be further enhanced by future inclusion in the EU Single Window, assuming this becomes mandatory across the EU.

## Other customs tools

The EU's Import Control System (ICS) requires a pre-declaration from the carrier or authorised representative to be submitted prior to goods arriving in the EU.[58] The ICS has the potential to be a useful tool to combat illegal trade in HFCs as it can enable information from the exporter to be cross-checked with the self-declared information from the importer. However, discussions with industry suggest that this system is not always enforced.

Informal Prior Informed Consent (iPIC) is a voluntary program run by the United Nations Environment Program (UNEP) to provide participating countries with real-time access to licensing system data from other participating countries.[59] It currently focuses on ODS but some countries already include screening for HFCs and a newly updated version will allow for information on HFCs to be included. As Montreal Protocol Parties begin to implement HFC licensing systems, greater efforts should be made to enhance communication on HFC trade with key EU trading partners.

*Below: Customs trained by PROZON at Gdansk container terminal*



©PROZON Fundacja Ochrony Klimatu

## Non-refillable containers

The EU first banned placing non-refillable (disposable) containers of ODS on the market in the EU ODS Regulation in 2000 and then again in 2009.[61] It later banned placing non-refillable containers of HFCs on the market in the F-gas Regulation in 2006 and then again in 2014.[62] The justification for this prohibition was emissions-related, namely non-refillable containers "are designed to be disposable, which means that any fluorinated gas left in such containers will eventually be emitted to the atmosphere."[63]

The F-gas Regulation defines a non-refillable container as "a container which cannot be refilled without being adapted for that purpose or is placed on the market without provision having been made for its return for refilling."[64] This definition, which was not included in the EU ODS Regulation, therefore creates an exception for disposable containers where "provision ha[s] been made for its return for refilling." It complicates enforcement since it is not clear what evidentiary requirements one must meet to show provision has been made for its return for refilling and no guidance has been forthcoming from the Commission.

Although it is often relatively easy to detect disposable cylinders, it is not always easy to prove that they have been placed on the market since the start of the ban in 2006. From a compliance and enforcement perspective, a use ban (without the return exception) would be superior to the current POM provision since it avoids the additional burden on authorities to prove whether or not the non-refillable container was placed on the market prior to the ban entering into force.

Non-refillable containers are popular globally as they allow refrigerant sellers to avoid investing in a fleet of refillable containers and their disposable nature means they can be freely traded. These attributes also make them attractive to black market traders, as highlighted in EIA's industry survey and multiple media reports. The use of non-refillable containers is not banned by the Montreal Protocol; however, Decision XIX/12 asks Parties to consider banning the use of non-refillable containers on a voluntary basis.[65] In addition to the EU, India, Canada and Australia have all banned HFCs in disposable cylinders. Given the entry into force of the Kigali Amendment, efforts should be made to pursue a ban on HFCs in disposable cylinders at a global level.

## THE COST OF FREE HFC QUOTAS

Under the F-gas Regulation, HFC quotas are allocated for free. Most of the quotas (89%) are grandfathered to incumbents, primarily the large producer companies and some major distributors, allowing monopolistic price increases of legal HFCs (which in turn supports lucrative black markets for illegal HFCs). The other 11% of HFC quota each year is divided evenly between new entrants. After three years, new entrants become incumbents.

Allocating quotas for free encourages profiteering from quota trading, given the volatility of HFC prices. Allocating HFC quotas at cost would reduce the incentive to trade quotas and help secure important financial resources to support enforcement of the F-gas Regulation.[60]

## Lost profits due to illegal HFC trade

Governments are losing considerable tax revenues due to the illegal HFC trade, through direct loss of VAT and import duty, but also through the indirect impact that illegal trade has to lower the price of legal refrigerants. A recent report from Polish NGO PROZON estimated that Poland's treasury lost €7 million in 2018 due to illegal refrigerant imports valued at €55 million, some 40% of Polish demand.[66]

A previous report suggested Lithuania's exchequer had lost up to €5m in 2018 due to increased sales of illegal refrigerants.[67] In July 2018, 14 Greek HVACR representatives wrote to the Greek Government claiming that illegal refrigerants from Bulgaria, Albania, Macedonia and Turkey were costing the Greek state over €20 million in lost VAT and taxes and posing a threat to the environment and public health.[68]

These reports demonstrate that the illegal HFC trade is causing significant financial impacts on multiple EU states, as well as on legitimate businesses that are seeing profits squeezed by the low prices of illegal refrigerants. Ironically, poor enforcement is often blamed on the lack of finances available to build sufficient capacity to tackle it.

# Conclusions

**A review and analysis of survey, HFC Registry and customs data alongside widespread media reports indicates that Europe is faced with a substantial level of illegal use and trade in HFCs.**

EIA's analysis of 2018 customs data suggests that as much as 16.3 $MtCO_2e$ of bulk HFCs were illegally placed on the market in 2018. This represents more than 16% of the 2018 quota and is in addition to illegal imports of HFC-containing equipment and illegal HFCs that are undoubtedly being smuggled under the radar of customs.

EIA's analysis also indicates a discrepancy between European customs data and HFC Registry data of at least 14.8 $MtCO_2e$ in 2017, equivalent to 8.7% of the 2017 quota.

HFCs are being illegally imported in large and small containers, including in illegal disposable cylinders, and are sold on the market through various channels including web-based platforms. Illegal HFCs are coming into Europe from China directly and via EU-border countries, in particular via Russia, Ukraine, Turkey and Albania. Customs data discrepancies indicate key entry points are likely Denmark, Greece, Latvia, Poland and Malta, however all member states should take steps to examine customs data in relation to company data in the HFC Registry.

There is an urgent need to immediately improve enforcement of the F-gas Regulation, particularly at the EU border level. Member states need to seize, prosecute and apply sufficiently high penalties. Penalties that have been determined by member states are generally not high enough to deter HFC smuggling and are rarely applied. Those applied to date are primarily related to leakage and record keeping infringements, suggesting that awareness of illegal trade and/or capacity to act on it at customs level is low.

Enforcement of the F-gas Regulation is clearly hampered by the absence of a system whereby customs officials can determine if an import of bulk HFCs or HFC in equipment is covered by quota and have the power to prevent a shipment which takes an importer over its quota. This is an essential requirement of a licencing system, which is now required under the Montreal Protocol's Kigali Amendment, and should be implemented without delay.

This is particularly critical in light of the significant rise in the number of companies registered to trade. Thousands of companies are now, to some extent, legitimised at customs level through their company name being registered in the HFC Registry; however, customs has no way of assessing whether they are importing within their quota or reporting actual imports

to the HFC Registry. Allocating quota at cost would help deter illegitimate traders from joining as new entrants in the future.

The 100 $tCO_2e$ exemption for imports also muddies the waters and encourages illegal trade. This amount is equivalent to almost 70kg of HFC-134a (GWP 1,430), which means that a company can legally import five 13kg HFC-134a cylinders without registering with the HFC Registry or having quota.

The widespread use of disposable cylinders in the illegal trade (including HCFC illegal trade) warrants efforts by member states to make legislative changes to ease the enforcement challenge. The current ban under the F-gas Regulation should be strengthened to ban the use (not just the placing on the market) of all non-refillable cylinders, no matter whether or not provision is made for their return. The EU and its industry should also work toward a global ban on disposable cylinders.

EIA believes that the illegal trade in HFCs and stockpiling of HFCs in 2017, alongside the reserve of authorisations built up by equipment importers since 2015 have produced a false sense of security in terms of meeting the phase-down target from 2018 onwards. Future supply cuts will not allow stockpiling, given the 2018 step is already some 48% of the baseline in real terms. Companies therefore could face HFC shortages in 2019 and 2020 and critical shortages in 2021 (when supply is again reduced) unless action is taken to speed up the transition to low-GWP alternatives and better manage HFCs in circulation through improved leakage control and reclamation.

Additional or stronger bans on HFCs in certain equipment (e.g. heat pumps and air-conditioners) would further support the right direction of the market, which in some sectors has failed to keep up with the phase-down. There also remain barriers to the adoption of climate-friendly alternatives created by outdated standards and a lack of training on flammable refrigerants.

Reclamation of HFCs, while increasing, is still falling far short of what is required to ensure a smooth phase-down and will be impacted by ongoing illegal trade which reduces the price incentive to reclaim. In 2017, 1,659 tonnes (3.9 $MtCO_2e$) was reclaimed, an increase of about 26% over 2016 and around 2% of the EU supply of virgin HFCs (in $CO_2e$ terms).[69] In comparison, one industry analysis calculates that around 24 $MtCO_2e$ of reclaimed HFCs would be required in 2018 for smooth implementation of the F-gas Regulation.[70]

# Recommendations

## Recommendations for the European Commission and EU member states:

- Implement a fully functional per shipment HFC licensing system which allows customs officials to obtain necessary real-time information to determine if HFC imports are within the specified quota for a particular company. A first step towards this could be through a real-time quota system connecting the HFC Registry to the Single Window environment for customs and requiring the $tCO_2e$ of any bulk or equipment import to be noted on the SAD. The real-time per shipment licensing system must ensure that a company stays within its quota at all times. For example, if a company wishes to export HFCs it can only receive that credit back on its quota once the export has occurred.

- Explore ways to improve reporting and monitoring of HFC trade with exporting countries, given that many of these countries are also ratifying the Kigali Amendment and will be implementing licensing systems. The iPIC system could be used to help monitor, record and collate all the data on HFC imports and exports even before controls come into force. The ICS could help provide export data to be cross-checked with import data at customs.

- Make the HFC Registry more transparent in order to improve accountability. Names of new entrants and data on quotas allocated to individual companies should be publicly available.

- Allocate HFC quotas at cost to reduce the pressure on customs from the rapid rise in new incumbents and to help fund the HFC licensing system.

- Revise the ban on non-refillable cylinders to prohibit the use of all disposable cylinders.

- Remove the exemption from the phase-down under Article 15(2) for producers or importers of less than 100 $tCO_2e$ of HFCs per year.

## Recommendations for EU member states:

- Ensure capacity-building, training and support for customs, including ensuring adequate refrigerant identifiers are available that are adaptable to test large containers.

- Carry out regular risk profiling (especially of bulk imports) and customs inspections.

- Set up a system to systematically compare reported data under the F-gas Regulation with customs data and investigate discrepancies.

- Provide greater resources to investigate illegal HFC trade, carry out regular market surveillance and inspections including online marketplaces.

- Increase penalties for Regulation infractions and ensure they are regularly applied and communicated through industry and media channels.

- Carry out regular targeted awareness raising and training and ensure effective dialogue between customs and environment ministries; for example, through workshops, webinars, production of customs handbooks etc. Consider formal information sharing agreements between customs, industry and regulators.

- Promote low-GWP energy efficient technologies through incentives, such as tax rebates, and additional bans on HFC-containing equipment.

- Invest in the installation and servicing sector, ensuring contractors are trained and equipped to work with flammable refrigerants and to ensure the efficient recycling and reclamation of HFCs.

- Reduce further demand for illegal HFCs by increasing incentives and reducing barriers to HFC reclamation.

26    Environmental Investigation Agency

# References

1. E.g. GWP of HFC-32 is 675, GWP of HFC-410A is 2,088, HFC-404A is 3,922.
2. Velders et al (2015). Future atmospheric abundances and climate forcings from scenarios of global and regional hydrofluorocarbon (HFC) emissions. Atmospheric Environment Volume 123, Part A, Pages 200-209. Available at https://www.sciencedirect.com/science/article/pii/S135223101530488X
3. Regulation (EU) No 517/2014 of the European Parliament and of the Council of 16 April 2014 on fluorinated greenhouse gases and repealing Regulation (EC) No 842/2006. Available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32014R0517
4. Cooling Post (2017). 2017 ends with 60% price rise. Available at: https://www.coolingpost.com/uk-news/2017-ends-60-price-rise/
5. Cooling Post (2016). 10m tonnes of illegal F-gas enters Europe. Available at: https://www.coolingpost.com/world-news/over-10m-tonnes-of-illegal-f-gas-enters-europe/
6. As reported in Cooling Post, ACR Journal and racplus.
7. Eurostat Database (2018/19). Available at: https://ec.europa.eu/eurostat
8. China Trade Information (2018). Goodwill China Business Information. Available at: http://www.b2bchina.com.hk/
9. Bulk refers to HFCs not placed inside equipment.
10. For CN codes containing only one HFC the GWP stated in the AR4 are used. For CN codes covering multiple gases an average GWP has been calculated of all gases covered. E.g. For CN code 29033924 covering HFC-125 (GWP 3500) and HFC-143a (GWP 4470) an average GWP of 3985 has been used.
11. See Table A5.21 in European Environment Agency (2018). Fluorinated Greenhouse Gases 2018. EEA Report No 21/2018. Available at: https://www.eea.europa.eu/publications/fluorinated-greenhouse-gases-2018
12. European Environment Agency (2018). Fluorinated Greenhouse Gases 2018. EEA Report No 21/2018. Available at: https://www.eea.europa.eu/publications/fluorinated-greenhouse-gases-2018
13. European Environment Agency (2018). Fluorinated Greenhouse Gases 2018. EEA Report No 21/2018. Available at: https://www.eea.europa.eu/publications/fluorinated-greenhouse-gases-2018
14. Eurostat Database (2018/19). Available at: https://ec.europa.eu/eurostat
15. European Environment Agency (2018). Fluorinated Greenhouse Gases 2018. EEA Report No 21/2018. P13. Available at: https://www.eea.europa.eu/publications/fluorinated-greenhouse-gases-2018
16. EEA (2018)
17. Öko-Recherche (2019). Monitoring of refrigerant prices against the background of Regulation (EU) No 517/2014. Q3/2018 – January 2019.
18. Öko-Recherche (2019). Monitoring of refrigerant prices against the background of Regulation (EU) No 517/2014. Q3/2018 – January 2019.
19. Pers. Comm. (2018). EIA Illegal Trade Survey, OEM
20. AREA survey on availability & supply of refrigerants (Nov 2018) available at: http://area-eur.be/news/installers-increasingly-aware-illegal-trade-refrigerants
21. Cooling Post (2019). Illegal imports equivalent to 20% of quota. Available at: https://www.coolingpost.com/world-news/illegal-imports-equivalent-to-20-of-quota/
22. Cooling Post (2018). Banned R22 openly sold on disposables. Available at: https://www.coolingpost.com/world-news/banned-r22-openly-sold-in-disposables/
23. Cooling Post (2018). Baltic states hit by illegal imports. Available at: https://www.coolingpost.com/world-news/baltic-states-hit-by-illegal-imports/
24. Cooling Post (2018). Baltic states hit by illegal imports. Available at: https://www.coolingpost.com/world-news/baltic-states-hit-by-illegal-imports/
25. Pers. Comm. (2018). EIA Industry Survey
26. ACR Journal (2018). Greece calls for action on illegal refrigerants. Available at: http://www.acrjournal.uk/international/greece-calls-for-action-on-illegal-refrigerants
27. Pers. Comm. (2018). Italian refrigerant supplier.
28. Cooling Post (2018). Poland swamped by illegal refrigerant. Available at: https://www.coolingpost.com/world-news/poland-swamped-by-illegal-refrigerant/
29. Cooling Post (2018). UK a hub for illegal refrigerant sales. Available at: https://www.coolingpost.com/uk-hub-illegal-refrigerant-sales/
30. Cooling Post (2019). Dutch authorities intercept illegal R134a refrigerant. Available at: https://www.coolingpost.com/world-news/dutch-authorities-intercept-illegal-r134a-refrigerant/
31. Cooling Post (2018). Poland swamped by illegal refrigerant" Available at https://www.coolingpost.com/world-news/poland-swamped-by-illegal-refrigerant/
32. Pers. Comm. (2018). Prozon.
33. Cooling Post (2018). Dutch authorities intercept illegal R134a refrigerant" Available at https://www.coolingpost.com/world-news/dutch-authorities-intercept-illegal-r134a-refrigerant/ & Pers. Comm. (2018) Dutch Inspectorate.
34. Pers. Comm. (2018). Austrian stakeholder.
35. Cooling Post (2018). Baltic states hit by illegal imports. Available at: https://www.coolingpost.com/world-news/baltic-states-hit-by-illegal-imports/
36. Cooling Post (2018). Bulgarian customs Seize Disposables. Available at : https://www.coolingpost.com/world-news/bulgarian-customs-seize-disposables/
37. Cooling Post (2018). German Thieves Target R134a. Available at: https://www.coolingpost.com/world-news/german-thieves-target-r134a/
38. Pers. Comm. (2018). Italian refrigerant supplier.
39. Pers. Comm. (2018). Industry stakeholder.
40. Pers. Comm. (2018). Italian refrigerant supplier.
41. Pers. Comm. (2018). Italian refrigerant supplier.
42. Anon. Pers. Comm. (2018)
43. Pers. Comm. (2018). Croatian refrigerant distributor.
44. Cooling Post (2018). Italy acts on illegal refrigerant sales. Available at: https://www.coolingpost.com/world-news/italy-acts-on-illegal-refrigerant-sales/
45. Cooling Post (2018). German ebay awash with illegal R134A. Available at: https://www.coolingpost.com/world-news/german-ebay-awash-with-illegal-r134a/
46. Cooling Post (2018). Phase down spurs rise in illegal sales. Available at: https://www.coolingpost.com/world-news/phase-sparks-rise-illegal-sales/
47. Regulation (EU) No 517/2014. Art 15. Available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32014R0517&from=EN
48. Trade Helpdesk (2019). Documents for customs clearance. European Commission. Available at: http://trade.ec.europa.eu/tradehelp/documents-customs-clearance#Packinglist
49. TARIC, the integrated Tariff of the European Union, is a multilingual database integrating all measures relating to EU customs tariff, commercial and agricultural legislation, which includes the Combined Nomenclature (CN) which is a further development of the World Customs Organisation Harmonized System nomenclature.
50. Commission Implementing Regulation (EU) 2016/879. Official Journal of the European Union. Available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32016R0879&from=EN
51. Fluorocarbons.org. (2017). Refrigerants subject to the F-gas Regulation 517/2014. Available at: https://www.fluorocarbons.org/wp-content/uploads/2017/12/Refrigerant-Blends-Table-04.12.2017.pdf
52. European Environment Agency (2018). Fluorinated Greenhouse Gases 2018. EEA Report No 21/2018. P12. Available at: https://www.eea.europa.eu/publications/fluorinated-greenhouse-gases-2018
53. Montreal Protocol, Decision IX/8. Licencing System. Available at: https://ozone.unep.org/en/handbook-montreal-protocol-substances-deplete-ozone-layer/740
54. European Commission, Impact Assessment Accompanying the Proposal for a Regulation of the European Parliament and the Council on Fluorinated Greenhouse Gases. SWD(2012) 364 final. p. 171. Available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52012SC0364&from=IT
55. Commission Implementing Regulation (EU) 2015/1754. Official Journal of the European Union. Available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32015R1754&from=EN
56. Council Regulation (EEC) No 2658/87. Official Journal of the European Communities. Available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:31987R2658&from=en
57. For example, CN codes cover multiple HFC chemicals and blends of varying global warming potentials (GWP) and, for pre-charged equipment, the quantities of HFC imports are not always readily available, making calculations of the TCE difficult.
58. HM Revenue & Customs (2015). Import Control System. Available at: https://www.gov.uk/guidance/import-control-system
59. OzonAction. Informal Prior Consent Mechanism. UN Environment. Available at: https://www.ozonaction.org/IPIC/Account/Login.aspx?ReturnUrl=%2fipic%2f
60. See Article 16 and Annex VI of Regulation (EU) No 517/2014 of the European Parliament and of the Council of 16 April 2014 on fluorinated greenhouse gases and repealing Regulation (EC) No 842/2006.
61. Regulation (EC) No 237/2000, Article 16(4); Regulation (EC) No 1005/2009.
62. Regulation (EC) No 842/2006, Annex II; see also Regulation (EU) No 517/2014, Annex III(1).
63. See European Commission, Proposal for a Regulation on Certain Fluorinated Greenhouse Gases (11 August 2003), COM (2003) 492 final, p. 9.
64. Regulation (EU) No 517/2014, Article 2(13).
65. Decision XIX/12: Preventing Illegal Trade in Ozone-Depleting Substances, ¶ (3)(e). Available at: http://www.ciesin.columbia.edu/repository/entri/docs/cop/Montreal_COP019_Dec012.pdf
66. Cooling Post (2019). Illegal imports cost Polish treasury €7m in 2018. Available at: https://www.coolingpost.com/world-news/illegal-imports-cost-polish-treasury-e7m-in-2018/
67. Cooling Post (2018). Baltic states hit by illegal imports. Available at: https://www.coolingpost.com/world-news/baltic-states-hit-by-illegal-imports/
68. ACR Journal (2018). Greece calls for action on illegal refrigerants. Available at: http://www.acrjournal.uk/international/greece-calls-for-action-on-illegal-refrigerants
69. European Environment Agency (2018). Fluorinated Greenhouse Gases 2018. EEA Report No 21/2018. P54. Available at: https://www.eea.europa.eu/publications/fluorinated-greenhouse-gases-2018
70. Gluckman, R. (2018). Presentation to EPEE roundtable.





# HFC Production and Consumption – Proposed Rule

Stratospheric Protection Division
Office of Air and Radiation
U.S. Environmental Protection Agency
Washington, D.C. 20460

**April 2021**

April 5, 2021

Data contained in this memo are derived from the Environmental Protection Agency (EPA)'s Greenhouse Gas Reporting Program (GHGRP). While EPA has received additional data in response to the Notice of Data Availability published February 11, 2021, the Agency has not included that production, import, and export data in tables 1 and 2 to protect information claimed as confidential. EPA is in the process of collecting additional data (e.g., for companies that have not previously had to report to GHGRP) and intends to release revised production and consumption data for the baseline and more recent years with the final rule.

The American Innovation and Manufacturing (AIM) Act provides formulas for how to set baselines for both production and consumption of regulated hydrofluorocarbons (HFCs). The equations are composed of an HFC component, a hydrochlorofluorocarbon (HCFC) component, and a chlorofluorocarbon (CFC) component. For the HFC component, EPA is directed to calculate the average annual quantity of all regulated substances produced in the United States from January 1, 2011, through December 31, 2013. Tables 1 and 2 provide EPA's current estimate of the data it is proposing to use to establish the baselines for production and consumption. Table 3 provides a list of companies that reported production, destruction, import, and/or export data to EPA for the baseline years. Table 4 provides a list of companies that reported production, destruction, import, and/or export data to EPA for 2017-2019, which are the years EPA is proposing to base allowance allocations on. EPA has updated the lists of companies in tables 3 and 4 to include those that have reported for the first time in 2021.

HFC Production, Import, and Export (2011-2019)

| Table 1: Net Supply of AIM-Listed HFCs (excluding HFC-23) Reported to GHGRP in Years 2011-2019 (Million Metric Tons Exchange Value equivalent (EVe)[1]) | | | | |
|---|---|---|---|---|
| Reporting Year | Net Supply[2] | Production minus Destruction minus Transformation | Imports | Exports |
| 2011 | 244 | 323 | 49.6 | 129 |
| 2012 | 235 | 321 | 48.2 | 135 |
| 2013 | 288 | 348 | 70.6 | 131 |
| 2014 | 266 | 336 | 64.8 | 134 |
| 2015 | 297 | 273 | 116 | 91.6 |
| 2016 | 239 | 251 | 102 | 114 |
| 2017 | 285 | 259 | 122 | 95.9 |
| 2018 | 303 | 233 | 145 | 74.3 |
| 2019 | 294 | 218 | 142 | 65.9 |

---

[1] The exchange values listed in the AIM Act for each regulated HFC are numerically identical to the 100-year global warming potentials (GWPs) of each substance, as given in the Errata to Table 2.14 of the IPCC's Fourth Assessment Report (AR4) and Annex F of the Montreal Protocol. As such, for the HFCs regulated under the AIM Act, EVe and carbon dioxide equivalent ($CO_2$e) are identical.

[2] "Net supply" means the $CO_2$e quantities of bulk HFC produced + imported – exported – transformed – destroyed, and is equivalent to the term "consumption."

2

April 5, 2021

**Table 2: Imports of AIM-Listed HFCs Reported to GHGRP in Years 2011-2019 (Million Metric Tons EVe)**

| Reporting Year | HFC-134a | HFC-125 | HFC-32 | All Other AIM-Listed HFCs, Excluding HFC-23 |
|---|---|---|---|---|
| 2011 | 16.7 | 14.6 | 1.26 | 17.0 |
| 2012 | 19.1 | 17.1 | 2.63 | 9.38 |
| 2013 | 17.3 | 31.3 | 5.33 | 16.7 |
| 2014 | 15.3 | 28.6 | 7.24 | 13.6 |
| 2015 | 28.1 | 48.2 | 9.53 | 29.8 |
| 2016 | 33.0 | 42.8 | 4.81 | 21.5 |
| 2017 | 21.0 | 71.5 | 8.02 | 21.5 |
| 2018 | 12.4 | 93.8 | 10.5 | 28.3 |
| 2019 | 12.4 | 60.9 | 10.4 | 58.0 |

Companies Reporting Production, Import, Export, or Destruction of AIM-listed HFCs

**Table 3: List of Companies that Reported Production, Import, Export, or Destruction to the GHGRP for Any AIM-Listed HFC (2011–2013)***

| Company name | Imported | Exported | Produced and/or destroyed |
|---|---|---|---|
| 3M Company | x | x | x |
| Advanced Specialty Gases | x | | |
| A-Gas | x | | x |
| Air Liquide | x | x | |
| Airgas Refrigerants, Inc | x | x | |
| Airgas Specialty Gases | x | x | |
| Altair Partners LP | x | | |
| Arkema Inc | x | x | x |
| Automart Dist | x | | |
| AutoZone Parts, Inc | x | | |
| BMP International Inc | x | | |
| Brooks Automation, Inc | | x | |
| Chemours | x | x | x |
| Combs Gas, Inc | x | | |
| Covestro LLC | | x | |
| Daikin America Inc./MDA Manufacturing | x | | |
| Electronic Fluorocarbons | x | x | |
| First Continental International | x | | |

3

April 5, 2021

| Table 3: List of Companies that Reported Production, Import, Export, or Destruction to the GHGRP for Any AIM-Listed HFC (2011–2013)* | | | |
|---|---|---|---|
| **Company name** | **Imported** | **Exported** | **Produced and/or destroyed** |
| FSD Group LLC | x | | |
| General Motors LLC | x | | |
| GlaxoSmithKline LLC | x | | |
| HARP USA** | x | | |
| Honeywell International Inc | x | x | x |
| Hudson Technologies Company | x | | |
| ICOR International Inc | x | x | |
| Iofina Chemical** | | | x |
| Kidde Fenwal, Inc | | x | |
| Kivlan & Company, Inc | x | | |
| Lenz Sales & Dist., Inc | x | | |
| Linde Electronics & Specialty Gases | x | x | |
| Matheson Tri-Gas, Inc | | x | |
| Mexichem Fluor Inc | x | x | x |
| Mondy Global, Inc | x | x | |
| National Refrigerants, Inc | x | x | |
| Ninhua Group Co Ltd | x | | |
| Old World Industries, LLC | x | | |
| Praxair Inc | x | x | |
| Refricenter of Miami Inc | x | | |
| Solvay Fluorides, LLC | x | | |
| Technical Chemical Co | x | | |
| Tulstar Products, Inc | x | x | |
| USA Refrigerants | x | | |
| Wal-Mart Stores, Inc | x | | |
| Weitron, Inc | x | | |

* Up to date as of 3/31/2021.

** Companies denoted with two asterisks reported to the GHGRP for the first time in 2021. EPA has not yet verified their data, and has not included their HFC production, destruction, import, and/or export figures in tables 1 and 2.

April 5, 2021

| Table 4: List of Companies that Reported Production, Import, Export, or Destruction to the GHGRP for Any AIM-Listed HFC (2017-2019)* | | | |
|---|---|---|---|
| Company Name | Imported | Exported | Produced and/or Destroyed |
| 3M Company | x | x | x |
| Accella Polyurethane Systems | | x | |
| Aerosol Gas Company | x | | |
| A-Gas | x | | x |
| Air Liquide | x | x | |
| Airgas Specialty Gases | x | | |
| Altair Partners LP | x | | |
| Arkema Inc. | x | x | x |
| AutoZone Parts, Inc. | x | | |
| BMP International Inc | x | | |
| Brooks Automation, Inc. | x | x | |
| CC Packaging LLC | x | | |
| Chemours | x | x | x |
| ComStar International | x | | |
| CRC Industries Inc | x | | |
| Daikin America Inc./MDA Manufacturing | x | x | |
| E.I. DUPONT DE NEMOURS | x | | |
| Electronic Fluorocarbons | x | | |
| FCI USA INC | x | | |
| First Continental International | x | | |
| FluoroFusion Specialty Chemicals, Inc. | x | | |
| FSD Group LLC | x | | |
| GlaxoSmithKline LLC | x | | |
| Honeywell International Inc. | x | x | x |
| Hudson Technologies Company | x | | |
| ICOOL USA Incorporated | x | x | |
| ICOR International Inc | x | x | |
| Iofina Chemical** | | | x |
| Kidde Fenwal, Inc. | | x | |
| Kivlan & Company, Inc. | x | | |
| Lenz Sales & Dist., Inc. | x | | |
| Linde Electronics & Specialty Gases (division of Linde Gas North America LLC) | x | x | |
| Matheson Tri-Gas, Inc. | | x | |

5

April 5, 2021

| Table 4: List of Companies that Reported Production, Import, Export, or Destruction to the GHGRP for Any AIM-Listed HFC (2017-2019)* | | | |
|---|---|---|---|
| Company Name | Imported | Exported | Produced and/or Destroyed |
| Mexichem Fluor Inc. | x | x | x |
| Mondy Global, Inc. | x | x | |
| National Refrigerants, Inc | x | x | |
| Ninhua Group Co Ltd | x | | |
| Praxair Inc. | x | x | |
| Quality Chemical International Inc | x | | |
| Refrigerants, Inc. | x | | |
| RGAS LLC | x | | |
| RLX REFRIGERANTS | x | | |
| RMS of GEORGIA, LLC | x | | |
| Scales N Stuff | x | | |
| Showa Chemicals of America Inc** | x | | |
| Solvay Fluorides, LLC | x | | |
| Spray Products Corporation | x | | |
| Summit Refrigerants | x | | |
| Technical Chemical Co | x | | |
| Tradequim LLC | x | | |
| Tulstar Products, Inc. | x | | |
| Tyco Fire Products, LP | | x | |
| Veolia | x | | |
| Wal-Mart Stores, Inc. | x | | |
| Weitron, Inc. | x | | |

* Up to date as of 3/31/2021.
** Companies denoted with two asterisks reported to the GHGRP for the first time in 2021. EPA has not yet verified their data, and has not included their HFC production, destruction, import, and/or export figures in tables 1 and 2.

6

# Refillable and Non-refillable Cylinders: Analysis of Use, Emissions, Disposal, and Distribution of Refrigerants

Stratospheric Protection Division
Office of Air and Radiation
U.S. Environmental Protection Agency
Washington, D.C. 20460

**April 2021**

# Table of Contents

1.  Introduction ................................................................................................................. 4

2.  Cylinders in the United States ................................................................................. 5

    2.1.  Non-refillable Cylinders ................................................................................. 6

    2.2.  Refillable Cylinders ....................................................................................... 6

3.  Emissions from Cylinders ........................................................................................ 7

    3.1.  Cylinder Transport and Storage .................................................................... 7

    3.2.  Disposal of Non-refillable Cylinders ............................................................. 10

    3.3.  Emission Reductions by Replacing Non-refillable with Refillable Cylinders ............ 15

4.  Cost Analysis of Replacing Non-refillable with Refillable Cylinders ................. 15

    4.1.  Entities Potentially Subject to Non-refillable Cylinder Ban ......................... 16

    4.2.  Estimated Economic Impacts ....................................................................... 16

5.  Global and State Policies ........................................................................................ 19

    5.1.  Non-refillable Cylinder Ban in Australia ....................................................... 19

    5.2.  Non-refillable Cylinder Ban in Canada ......................................................... 19

    5.3.  Non-refillable Cylinder Ban in the European Union ..................................... 19

6.  Illegal Trade and Enforcement Case Studies ....................................................... 20

    6.1.  Smuggling of Non-Refillable Cylinders and its Financial Implications ......... 20

    6.2.  CFC and HCFC Enforcement Programs in the United States ...................... 21

7.  Conclusion ............................................................................................................... 22

References ...................................................................................................................... 23

Appendix A. Emission Estimates for Cylinders during Transport and Storage ......... 26

    Methodology ........................................................................................................... 26

    Assumptions ........................................................................................................... 28

    Results .................................................................................................................... 29

Appendix B. Estimate of Emissions from Heels (Theoretical and Empirical) in Non-refillable Cylinders ................................................................................................. 32

    Theoretical Estimates of Amount of Refrigerant Remaining in Non-Refillable Cylinders ..... 32

    Empirical Study of Amounts of Refrigerant Remaining in Non-Refillable Cylinders ........... 35

Appendix C. Estimation of Emissions under Various Recovery Scenarios for Non-refillable Cylinders during Disposal ........................................................................................................ 38

## 1. Introduction

Hydrofluorocarbons (HFCs) are generally gases at standard temperature and pressure but are stored as liquids in pressurized metal containers for transport and storage. HFCs used as refrigerants in stationary air-conditioning, refrigeration, and to a lesser extent motor-vehicle air-conditioning (MVAC) are most commonly stored and transported in "30-pound" metal cylinders.

There are two primary types of cylinders; Disposable cylinders are used once before disposal, and refillable cylinders which can be used multiple time throughout the cylinder lifetime. Refrigerants can be emitted from non-refillable and refillable cylinders due to several conditions, including overfilling and subsequent exposure to excessive heat or blunt contact; mechanical damage to valves; valve defects; cylinder corrosion; and human error. Refrigerants may also be emitted from heels (i.e., the portion of refrigerant that remains in an otherwise empty cylinder) in non-refillable cylinders during disposal.

To prevent refrigerant remaining in non-refillable cylinders from being emitted to the atmosphere upon disposal, service technicians can recover the refrigerant heel before recycling the cylinders. However, refrigerant remaining in the cylinders is not typically recovered, resulting in venting of refrigerant to the atmosphere when disposing of the cylinders.[1]

Non-refillable cylinders have been banned in a number of countries including Australia, Canada, India, and the European Union (EU) member states. These countries have implemented different legislative approaches, including use bans, placement on market bans, and bans as conditions of the permits needed to handle refrigerants.

This report combines and updates several previous analyses on the refrigerant cylinder market and associated emissions prepared in 2010 and 2012, which included research and industry outreach (Stratus 2010a; Stratus 2010b; Stratus 2012). This report evaluates the use of non-refillable and refillable refrigerant cylinders in the United States and estimates emissions from cylinders resulting from transport, storage, improper disposal, and heels. In addition, this report examines the impacts associated with replacing non-refillable refrigerant cylinders with refillable cylinders in the United States, including potential emission savings, costs, and other implications, and highlights non-refillable cylinder bans in Australia, Canada, India, and the EU. The remainder of the report is organized as follows:

- **Section 2** provides an overview of non-refillable and refillable cylinders in the United States;
- **Section 3** provides estimates of emissions from cylinders resulting from transport, storage, improper disposal, and heels, and provides emissions savings estimates for replacing non-refillable with refillable cylinders;

---

[1] Section 608 of the Clean Air Act required the U.S. Environmental Protection Agency (EPA) to establish regulations to reduce emissions of ozone-depleting substances (ODS) and their substitutes, including hydrofluorocarbons (HFCs). 40 CFR Part 82, Subpart F details the rules and regulations that prohibit knowingly venting ODS and HFC refrigerant during maintenance, service, repair, or disposal of refrigeration and air-conditioning equipment.

- **Section 4** analyzes the costs associated with replacing non-refillable cylinders with refillable cylinders;
- **Section 5** provides an analysis of global and state policies banning non-refillable cylinders;
- **Section 6** provides a summary of illegal trade and enforcement case studies;
- **Section 7** provides conclusions;
- **Appendix A:** Methodology Used to Calculate Emissions from Cylinders during Transport and Storage;
- **Appendix B**: Methodology Used to Calculate Emissions from Heels (Theoretical and Empirical) in Non-refillable Cylinders; and
- **Appendix C**. Estimation of Emissions under Various Recovery Scenarios from Non-refillable Cylinders during Disposal.

## 2.  Cylinders in the United States

The "30-lb" cylinder is the most commonly used cylinder for air-conditioning and refrigerant servicing and is the focus of this report. Both virgin and reclaimed refrigerant[2] can be transported and stored in refillable and non-refillable 30-pound cylinders. Based on input from industry sources, it is estimated that there are approximately four to five million 30-pound HFC cylinders used to charge stationary air-conditioning and refrigeration systems annually in the United States, including both non-refillable and refillable cylinders (Airgas 2021a; Fluorofusion 2021). For the purposes of this report, it is assumed that 4.5 million HFC cylinders were sold in the United States in 2020. Industry estimates that refillable cylinders account for between less than 1 percent and 10 percent of all 30-pound cylinders used, with a general assumption that the quantity of refillable cylinders as a percentage of all 30-pound cylinders used is closer to 1 percent as of 2020 (Airgas 2021a; Fluorofusion 2021; National Refrigerants 2021). Table 1 provides the distribution of HFC refrigerant types assumed to be sold in 30-pound cylinders in the United States in 2020 based on refrigerant demand for servicing and charging equipment estimated by EPA's Vintaging Model (EPA 2020).

**Table 1. HFC Refrigerants in Cylinders**

| Refrigerant | Distribution of Refrigerants in Cylinders |
|---|---|
| HFC-134a | 22% |
| R-410A | 51% |
| R-407C | 3% |
| R-404A | 12% |
| R-507A | 2% |
| R-407A | 9% |
| **Total** | **100%** |

Source: EPA (2020)

---

[2] Refrigerant that is recovered from equipment, however, is transported and stored in special recovery cylinders that are designed differently from non-refillable and refillable cylinders. Recovery cylinders are outside the scope of this analysis.

## 2.1. Non-refillable Cylinders

Disposable cylinders are specifically manufactured to be single-use. These cylinders are charged with refrigerant, sold for use to fill or service equipment, and disposed (EIA 2018). Many stationary air-conditioning and refrigeration systems are serviced using refrigerants transported in non-refillable cylinders that receive classification from the U.S. Department of Transportation (DOT) as DOT-39 cylinders. These cylinders come in several sizes, including 15-pound, 30-pound, and 50-pound varieties, with the 30-pound cylinder being the most commonly used in the stationary air-conditioning and refrigeration system servicing industry.

DOT-39 cylinders have a single one-way valve, and because of this feature, DOT prohibits the refilling of cylinders due to safety concerns[3]. They must be disposed of after use, either by recycling as scrap metal or disposed of as solid waste in a landfill. Non-refillable cylinder valves come with a rupture disk pressure relief device that allows the contents to be released when the pressure limits are exceeded. Once activated, this type of relief device ruptures and cannot reseal. If cylinders are disposed of improperly (i.e., without recovering all refrigerant remaining in the cylinder), the residual refrigerant is emitted to the atmosphere. Table 2 summarizes the specifications for DOT-39 non-refillable cylinders.

**Table 2. Specifications of "30-lb" DOT-39 non-refillable cylinder**

| | 30-lb | | |
|---|---|---|---|
| Service Pressure (psi) | 260 | 308 | 400 |
| Test Pressure (psi) | 325 | 385 | 500 |
| Water Capacity (lb) | 30.4 | 30.4 | 30.4 |
| Height (in) | 16.8 | 16.8 | 16.8 |
| Diameter (in) | 9.5 | 9.5 | 9.5 |
| Construction Standards | DOT39 TC39M | DOT39 TC39M | DOT39 TC39M |

Source: AMTROL 2017, 40 CFR 178,65 (i)

As discussed above, for purposes of this analysis it is assumed that the vast majority of refrigerant cylinders sold annually in the United States (i.e., 99 percent) are non-refillable, or approximately 4.46 million cylinders. The remaining 45,000 cylinders (i.e., 1 percent) are assumed to be refillable.

## 2.2. Refillable Cylinders

Refillable cylinders reduce emissions of refrigerant resulting from the improper disposal of non-refillable cylinders and have been mandated in several countries.[4] Refillable cylinders have a combination valve with separate ports for refrigerant removal and refrigerant filling, and a safety-relief device. The refrigerant filling port is typically locked so that only the refrigerant supplier can fill the cylinder. Upon being emptied[5] by service technicians, refillable cylinders are typically

---

[3] 49 CFR 178.65 (i)
[4] Canada, Australia, and European Community member countries.
[5] As with non-refillable cylinders, refillable cylinders will not typically be 100 percent empty. Service technicians will generally stop using a cylinder once all the liquid-phase gas has been extracted while the vapor-phase gas remains as a "heel."

returned to the wholesaler, who refunds the deposit paid when the cylinder was purchased. The empty refillable cylinders are collected by the wholesaler and returned to the refrigerant manufacturers to be refilled. The refrigerant manufacturers evaluate, clean, and refill the cylinders to be sent back onto the market. A refillable cylinder would be filled an average of 1.5 times per year and could be filled up to 3–4.5 times per year (Refrigerant Services 2012, A-Gas 2021b).[6] Assuming refillable cylinders are properly maintained, they can be reused for more than 20 years (A-Gas 2021b, National Refrigerants 2021, ICF 2011).

## 3. Emissions from Cylinders

Emissions from refrigerant cylinders can occur under various conditions. The frequency with which these conditions occur and the amount of refrigerant released varies and depends in part on the type of cylinder. Refrigerant heels are also emitted during disposal once the cylinder breaks down enough for refrigerant to be released.

### 3.1. Cylinder Transport and Storage

In order to allow for safe levels of gas expansion, cylinders should not be filled to more than 80 percent of their capacity (UNEP 2010). Overfilling cylinders at levels above this capacity can lead to refrigerant losses from exposure to excessive heat. When temperatures increase, the liquid refrigerant in the cylinder will expand into the vapor space above the liquid. If the liquid is heated to approximately 130°F, it will fill the available space in the cylinder. Continued heating and expansion of the liquid will result in the cylinder pressure relief valve releasing the contents to relieve excess pressure (in the case of refillable cylinders) or all of the refrigerant charge (in non-refillable cylinders). It could also result in the cylinder's rupture if the safety-relief valve is not functioning or not present, and the temperature reaches a sufficiently high level (Rapid Recovery 2012b). The United Nations Environment Programme (UNEP) Manual for Refrigeration Servicing Technicians states that cylinders should never be exposed to temperatures above 52°C (~ 126°F) (EPATest 2019; UNEP 2010). This type of refrigerant loss is of particular concern during cylinder transport, because temperatures inside closed vans or trucks can reach levels sufficient to cause cylinder overheating on hot, sunny days (EPATest 2019). This type of refrigerant loss can also occur during cylinder storage. However, it is unlikely that cylinders would be stored in locations where they are exposed to temperatures above 126°F for a sufficient amount of time to bring the liquid refrigerant to a sufficient temperature to cause a release or rupture (Rapid Recovery 2012b).

Cylinders that are overfilled – and thus under excessive pressure – are more vulnerable to rupturing when they come into blunt contact with something (e.g., with other cylinders if they are not well secured in the back of a truck, or with the ground if they fall out of a truck). Also, a damaged safety-relief valve can increase a cylinder's vulnerability to rupturing if the cylinder is overfilled. Mechanical damage to a cylinder valve can result in the refrigerant being lost to the atmosphere even if the cylinder is not overfilled. Valves can be damaged when cylinders are mishandled (e.g., if they are dropped or not properly secured in a truck); they can also function

---

[6] To be conservative, refillable cylinders were assumed to be filled 1.5 time per year.

improperly if they are plugged (e.g., by dirt) or covered (e.g., by labels or plastic wrap) (UNEP 2010).

Valves that are poorly manufactured also can contribute to refrigerant loss. A valve that does not properly close will not provide a sufficient protective seal against the high-pressure contents within the cylinder. This type of refrigerant loss can occur during cylinder storage as well as transport.

Cylinders can also rust and corrode over time, which can result in pathways developing through the metal for refrigerant to escape. This refrigerant loss condition would not typically occur in cylinders in transport because those cylinders are generally in active use and would be regularly evaluated and resorted (as necessary) by refrigerant manufacturers. This condition is more applicable to cylinders in storage, especially those that are improperly stored outdoors where they may be exposed to the elements, although such storage conditions are unlikely (UNEP 2010).

Cylinders can lose refrigerant if the individuals handling them open the valves (deliberately or accidentally). Over the course of its travels from refrigerant manufacturer to end use, a cylinder is typically transported to three or four locations (i.e., wholesalers, distributors, and end users, and potentially brokers) and can be handled as many as 10 to 20 times (Refrigerant Services 2012). Thus, there are many opportunities for human error. This type of refrigerant loss can occur during cylinder storage as well as transport.

### 3.1.1. Refrigerant Loss Types and Prevalence of Refrigerant Losses

The amount of refrigerant that is emitted during cylinder transport and storage depends on the conditions under which the refrigerant is lost, such as ruptures, slow leaks, and safety-valve releases. Types of refrigerant losses and the prevalence of these refrigerant losses for refillable and non-refillable cylinders were identified by Stratus (2012) through industry outreach. Cylinders that rupture lose their entire refrigerant charge. When the cylinder ruptures, the pressure drop causes the liquid refrigerant to flash into vapor, which has an explosive effect. Slow leaks due to defective valves will eventually lose their entire charge (minus the heel) if the leaks are not detected in time.

If a refillable cylinder has a functional safety-relief valve and experiences an excessive increase in internal pressure (e.g., due to overfilling), the safety-relief valve will allow venting of a small amount of the refrigerant to prevent the cylinder from rupturing. The amount vented will be only enough to bring the internal cylinder pressure back down to a safe level before the valve recloses. Depending on the internal pressure (which in turn depends on factors such as the atmospheric pressure and temperature), this amount could be as much as 20 percent of the cylinder's capacity (i.e., because a cylinder is considered to be overfilled if it is filled to greater than 80 percent capacity) or as little as 1 percent of the refrigerant in the cylinder (Refrigerant Services 2012).

For non-refillable cylinders, the safety-relief valve has a rupture disk pressure-relief device that does not reseal once activated. As a result, the entire refrigerant charge will be lost if a non-refillable cylinder's safety-relief valve is activated.

The frequency of the different types of refrigerant losses can differ by cylinder type. For instance, defective valves are considered "very rare" among domestically manufactured non-refillable cylinders (Rapid Recovery 2012a). It is estimated that approximately 0.02 percent of all refillable cylinders have defective valves that result in refrigerant loss (Refrigerant Services 2012).

Refillable cylinders are more prone to refrigerant losses associated with mechanical damage and corrosion because they are reused many times (Rapid Recovery 2012a). It is estimated that 0.02 percent of all refillable cylinders experience mechanical damage or corrosion that results in refrigerant loss (Refrigerant Services 2012). The overall percentage of refillable cylinders that experience refrigerant loss due to human error and overfilling is about 0.04 percent (Refrigerant Services 2012). Table 3 summarizes the refrigerant loss types for non-refillable and refillable cylinders during transport and storage identified by Stratus (2012).

**Table 3. Summary of Refrigerant Loss Types from Cylinders during Transport and Storage**

| Type of refrigerant loss | % of refrigerant in cylinder that is emitted due to this type of loss | % of cylinders that experience this type of loss |
|---|---|---|
| **Non-refillable cylinders** | | |
| Mechanical damage to valve | 95%[a] | 0.01%[b] |
| Overfilled cylinder with defective safety-relief valve ruptures (e.g., due to extreme heat or blunt contact) | 100% | 0.01%[b] |
| Overfilled cylinder with effective safety-relief valve releases overfilled amount (e.g., due to extreme heat or blunt contact) | 95%[a] | 0.01%[b] |
| **Refillable cylinders** | | |
| Mechanical damage to valve | 95%[a] | 0.02% |
| Overfilled cylinder with defective safety-relief valve ruptures (e.g., due to extreme heat or blunt contact) | 100% | 0.01%[b] |
| Overfilled cylinder with effective safety-relief valve releases overfilled amount (e.g., due to extreme heat or blunt contact) | Up to 20% | 0.01%[b] |

[a] Assumes all refrigerant is lost, minus the heel. The heel is estimated to be approximately 1.25 lbs. (~5 percent) (see Appendix A for full list of assumptions).
[b] The likelihood of these types of losses occurring is considered negligible. 0.01 percent is considered the smallest likelihood of a loss occurring.

### 3.1.2. Emission Estimates from Cylinder Transport and Storage

Based on the refrigerant loss types and prevalence of loss types for non-refillable and refillable cylinders identified by Stratus (2012), emissions from cylinders during transport and storage were updated for 2020 to reflect an updated distribution of refrigerants sold annually in 30-pound cylinders. See Appendix A for a more detailed review of the methodology for these estimates.

Annual emissions from refrigerant losses during cylinder transport and storage currently total approximately 31,500 pounds of refrigerant (including approximately 31,000 pounds and 500

pounds emitted from non-refillable and refillable cylinders, respectively). In total, these emissions contribute approximately 31,300 MTCO$_2$e per year as shown in Table 4.

**Table 4. Emissions from Cylinder Transport and Storage**

| Refrigerant | % of all refrigerants in cylinders | Pounds emitted | Metric tons emitted | MTCO$_2$e |
|---|---|---|---|---|
| **Non-refillable Cylinders** | | | | |
| R-134a | 22% | 6,840 | 3.10 | 4,437 |
| R-410A | 51% | 15,841 | 7.19 | 15,003 |
| R-407C | 3% | 1,080 | 0.49 | 869 |
| R-404A | 12% | 3,600 | 1.63 | 6,405 |
| R-507A | 2% | 720 | 0.33 | 1,302 |
| R-407A | 9% | 2,880 | 1.31 | 2,753 |
| **Total** | **100%** | **30,962** | **14.0** | **30,768** |
| **Refillable Cylinders** | | | | |
| R-134a | 22% | 111 | 0.05 | 72 |
| R-410A | 51% | 257 | 0.12 | 243 |
| R-407C | 3% | 17 | 0.01 | 14 |
| R-404A | 12% | 58 | 0.03 | 104 |
| R-507A | 2% | 12 | 0.01 | 21 |
| R-407A | 9% | 47 | 0.02 | 45 |
| **Total** | **100%** | **502** | **0.23** | **498** |
| **Total (All Cylinders)** | **-** | **31,464** | **14.27** | **31,267** |

Note: Totals might not sum due to rounding.

## 3.2. Disposal of Non-refillable Cylinders

Non-refillable cylinders are not designed to be reused and are prohibited from refilling under DOT regulations given safety concerns, and therefore they must be disposed of after they are used. If cylinders are disposed of without recovering the remaining refrigerant heel, that refrigerant would be emitted to the atmosphere.

There is substantial uncertainty regarding the volume of heels that remain in cylinders when they are not properly disposed of or the magnitude of the resulting emissions. To better understand the emissions of refrigerant remaining in non-refillable cylinders, it is necessary to determine the amount of refrigerant remaining in the cylinders at the time that they are deemed to be "empty" by service technicians. A theoretical study was conducted by Stratus (2010a) to estimate true heel ratios that would remain in cylinders under differing field servicing and recovery conditions. A second study by Stratus (2010a) involved collecting empirical data on refrigerant remaining in cylinders collected after use in the field by service technicians for charging stationary refrigeration and air-conditioning systems. Based on the average heel amount found in the theoretical and empirical studies, an analysis of potential emissions from non-refillable cylinders under various recovery scenarios was also conducted (Stratus 2012).

### 3.2.1. Theoretical Heel Estimation

The theoretical heel estimation study conducted by Stratus (2010a) included six refrigerants based on input from EPA technical experts and industry sources, as well as a review of available literature.

**Table 5. Refrigerants included in theoretical study**

| Refrigerant | Constituents | Cylinder Masses |
|---|---|---|
| HCFC-22 | HCFC-22 | Non-refillable – 15 lbs., 30 lbs., 50 lbs. Refillable – 30 lbs., 125 lbs. |
| HFC-134a | HFC-134a | Non-refillable – 30 lbs. Refillable – 30 lbs., 125 lbs. |
| R-410A | HFC-32 and HFC-123 | Non-refillable – 25 lbs. Refillable – 100 lbs. |
| R-407C | HFC-32, HFC-125, and HFC-134a | Non-refillable – 25 lbs. Refillable – 115 lbs. |
| R-404A | HFC-125, HFC-134a, HFC-143a | Non-refillable – 24 lbs. Refillable – 100 lbs. |
| R-507A | HFC-125 and HFC-143a | Non-refillable – 25 lbs. Refillable – 100 lbs. |

The theoretical heel amount that would remain in a typical cylinder was estimated under two different scenarios. In the first scenario, the cylinder is assumed to have been emptied in the field and disposed of without a vapor recovery process. When the liquid phase refrigerant is being charged, the pressure in the cylinder approaches the system suction pressure.

The theoretical study described estimated heel amounts based on the thermodynamic properties of six refrigerants HCFC-22, R-134a, R-410A, R-407C, R-404A, and R-507A – considering use and disposal of 13.5-L (822 in$^3$) non-refillable cylinders (i.e., 30-pound cylinders) exclusively. In this study, the heel amounts were theoretically estimated under three conditions:

1. Heel amounts in cylinders after field charging without recovery;
2. Heel amounts in cylinders after vapor recovery until the cylinder pressure reaches 10 percent of the initial cylinder pressure; and
3. Heel amounts in cylinders after vapor recovery until the cylinder pressure reaches certain vacuum pressures (0, 5, 10, 15, 20, 25, 29 inHg at vacuum).

For comparison with other studies, theoretical heel amounts estimated following field charging without recovery were also considered. The study results show that for cylinders after field charging, but without recovery, the heel amounts range from:

- 0.50 lbs. to 1.08 lbs. for air-conditioning;
- 0.29 lbs. to 0.66 lbs. for medium-temperature refrigeration; and
- 0.15 lbs. to 0.35 lbs. for low-temperature refrigeration.

The average heel amounts included 0.31 pounds for HFC-134a and 0.65 pounds for R-410A.

### 3.2.2. Empirical study of heels

To complement the findings of the theoretical study, Stratus (2010a) collected data from a refrigerant technician company measuring quantities of refrigerant remaining in non-refillable cylinders after being used to service stationary air-conditioning and refrigeration equipment in the field. The range in heel amounts estimated in the theoretical study are smaller than the amounts of refrigerant remaining generated in the empirical study. In the empirical study, the average amount of refrigerant remaining across all refrigerant types and applications was 1.08 lbs., with a range of 0.28 lbs. to 3.69 lbs. Stratus (2010a) indicated one reason why the amounts in the empirical study exceed the estimates in the theoretical study could be that often, a service technician will decline to take a cylinder "into the field" if he determines, simply by lifting the cylinder, that there is not enough refrigerant remaining in the cylinder to make transporting it worthwhile. Service technicians would prefer to have their service vehicle loaded with full cylinders at the beginning of the day to minimize the number of trips back to the vehicle that would be necessary when charging systems in the field.

### 3.2.3. Comparison of results to other studies

A comparison of the theoretical and empirical studies by Stratus (2010a) shows that the results of this analysis are comparable to the results of other studies (see Table 6). In a previous study of 30-pound non-refillable cylinders commissioned by EPA, the estimated heel amount after recovery to 29 psi was approximately 0.56 pounds (EPA 2007). Another proprietary study of amounts of refrigerant remaining in non-refillable cylinders conducted by a private company indicates an average amount of 0.59 pounds (approximately 2 percent) for 128 cylinders. In this study, cylinders containing HCFC-22 accounted for nearly 70 percent of all cylinders and had an average amount of 0.66 pounds. Cylinders containing R-404A, which accounted for approximately 25 percent of all cylinders, contained an average amount of 0.39 pounds. AHRI estimated that heel amounts in cylinders at system suction pressure (i.e., following use of cylinder for charging in the field) range from approximately 0.45 pounds (1.5 percent) to roughly 0.90 pounds (3 percent). These estimates were based on AHRI calculations; the specific assumptions made in these calculations were not provided (AHRI 2000).

**Table 6. Comparison of amount of refrigerant remaining from different sources**

| Source | Average Amount | Amount by sector or use |
|---|---|---|
| Theoretical study | NA | AC: 0.5 lbs. to 1.08 lbs. Medium-temp 0.29 lbs. to 0.66 lbs. Low-temp: 0.15 lbs. to 0.35 lbs. |
| Empirical study | 1.08 lbs. (3%) | Appliance Servicing: 0.64 lbs. Residential AC: 1.02 lbs. Commercial AC: 1.13 lbs. Chillers: 1.15 lbs. |
| EPA, 2007 | 0.56 lbs. (2%) | NA |
| Airgas, 1998 | 1.65 lbs. (6%) | NA |
| AHRI, 2000 | 0.45 lbs. (2%) – 0.90 lbs. (3%) | NA |

Stratus (2010a) indicated potential causes for variation between the results of the different studies could be due to differing baseline assumptions and whether the study was theoretical or empirical. The results of an empirical study can vary depending on assumptions about operating

conditions and the size of the sample. Theoretical studies can also produce varying results depending on assumptions about operating conditions (e.g., whether there are any assumed inefficiencies in the cylinder-to-system connection). For example, the theoretical study in this analysis was based on ideal operating conditions, such that the cylinder temperature achieves equilibrium with ambient air.

This assumes that the service technician spends more time charging the system and recovering the refrigerant than may be reasonable, where a technician might sacrifice refrigerant for the sake of expediency. As shown in Table 6, estimates of the amount of refrigerant remaining in cylinders at the time of their disposal vary. Industry sources contacted by Stratus (2010a) confirmed the fact that there is uncertainty as to how much refrigerant remains in cylinders when they are determined to be "empty." In general, several sources suggested an estimate of approximately 1.0 pounds (roughly 4 percent of the 24- pounds of refrigerant in a 30-pound cylinder's capacity) would be reasonable.

However, recent industry outreach indicated non-refillable cylinders contain approximately 1 to 1.25 pounds of residual heel and another estimated the typical heel in a non-refillable cylinder is approximately 1.5 pounds (A-gas 2021a, Fluorofusion 2021). This analysis therefore assumes a residual heel of approximately 1.25 pounds.

### 3.2.4.  Avoided Emissions Under Different Refrigerant Recovery Assumptions

Disposal emissions can be reduced by employing refrigerant recovery practices to minimize the heel or by utilizing refillable refrigerant cylinders that can be used multiple times before they need to be disposed. How service technicians dispose of used non-refillable cylinders will determine whether refrigerant that remains in the cylinder is vented to the atmosphere or recovered for reuse. To understand whether refrigerant remaining in cylinders is emitted to the atmosphere, it is important to know:

- When service technicians make the decision to switch to fresh cylinders;
- Whether service technicians recover the refrigerant remaining in the cylinders before they dispose of them;
- How (and to whom) service technicians dispose of the cylinders; and
- Whether there are downstream opportunities for refrigerant recovery after cylinders are no longer in the service technician's possession.

Disposal of non-refillable cylinders could present opportunities for downstream recovery (i.e., after the cylinder leaves the hands of the service technician). These practices have implications for the potential for refrigerant remaining in the cylinders to be either vented or recovered.

The prevalence of the different disposal practices is difficult to estimate. Input from industry sources varied considerably, and the majority of sources noted that there is no conclusive evidence about how service technicians dispose of cylinders. Several sources indicated that service technicians are aware of appropriate disposal methods (i.e., following AHRI guidelines for evacuating cylinders and opening their valves before having them recycled), but there seems to be less certainty on the issue of whether service technicians recover all refrigerant before recycling cylinders, or whether they allow the refrigerant to vent.

Stratus (2012a) examined potential total avoided emissions under different refrigerant recovery practices based on the amount of refrigerant that remains in the cylinder and the percentage of cylinders that are vented. These emission estimates were updated for 2020 to reflect an updated distribution of refrigerants sold annually in 30-pound cylinders. Appendix C describes the full methodology and emission estimates across various recovery scenarios.

These estimates varied depending on the stringency of the recovery effort. The annual GHG emissions decrease substantially when refrigerant remaining in the cylinder is recovered to just 0 inHg vacuum, compared to venting the refrigerant remaining in the cylinders. Increases in vacuum pressure during recovery lead to more substantial avoided emissions.

In the scenario where the typical amount of refrigerant remaining is approximately 1.25 pounds, estimated annual emissions can amount to between 0.55 MMTCO$_2$e and 5.5 MMTCO$_2$e, depending upon the percentage of cylinders vented (see Appendix C). The assumed baseline is that 1.25 pounds of refrigerant remain in the cylinder that is vented unless recovered, and that 95 percent of all cylinders are vented (A-gas 2021a, Fluorofusion 2021). Therefore, the assumed annual emissions are 5.2 MMTCO$_2$e.

Avoided emissions increases as refrigerant recovery vacuum pressure increases, as shown in Table 7. Based on the findings of the theoretical study, it is estimated that true heel amounts for different end uses are typically close to 0.5 pounds. The results of the empirical study revealed that cylinders are typically disposed of with an average of approximately 1.0 pounds of refrigerant remaining.

**Table 7. Heel amounts (lbs.) assuming vapor recovery to various vacuum pressures**

| InHg vacuum | Psig vacuum | Kpa abs. | R-134a | R-410A | R-407C | R-404A | R-507A |
|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 101.35 | 0.13 | 0.09 | 0.11 | 0.12 | 0.12 |
| 5 | 2.46 | 84.42 | 0.11 | 0.07 | 0.09 | 0.10 | 0.10 |
| 10 | 4.91 | 67.49 | 0.08 | 0.06 | 0.07 | 0.08 | 0.08 |
| 15 | 7.37 | 50.56 | 0.06 | 0.04 | 0.05 | 0.06 | 0.06 |

Based on this analysis, it is apparent that there are benefits to be gained through recovering refrigerant from non-refillable cylinders and that these benefits become larger with more stringent recovery practices. More time is required to achieve higher vacuum pressures, ranging from approximately 3 minutes to reach a 0 InHg vacuum to approximately 9 minutes to reach a 15 InHg vacuum (AHRI 2000).

### 3.3. Emission Reductions by Replacing Non-refillable with Refillable Cylinders

To understand the potential emission effects of replacing all non-refillable 30-pound cylinders with refillable ones, the calculations were run using the assumption that all 4.5 million 30-pound cylinders manufactured each year are refillable.[7]

To model the number of new refillable cylinders each year, an estimate of 5 percent of the total fleet needs to be newly manufactured to account for disposals from refillable cylinders reaching end-of-life annually and to account for any damaged cylinders. Emissions from cylinder disposal were estimated assuming 1.25 pounds of refrigerant are remaining in the cylinders (see Appendix C). The emissions between the current scenario with both refillable and non-refillable and the hypothetical scenario with all cylinders replaced with refillable cylinders is shown in Table 8. Replacement of non-refillable cylinders with refillable cylinders in the United States would be estimated to prevent approximately 5.2 MMTCO$_2$e per year in emissions.

**Table 8. Estimated Annual Emission Changes from Replacing Non-refillable Cylinders with Refillable Cylinders**

| Scenario | Pounds emitted | Metric tons emitted | MTCO$_2$e |
|---|---|---|---|
| **Transport and Storage** | | | |
| Actual scenario (mostly non-refillable cylinders) | 31,464 | 14.27 | 31,267 |
| Hypothetical scenario (all refillable cylinders) | 33,602 | 15.24 | 33,392 |
| **Change in emissions under hypothetical scenario** | **2,138** | **0.97** | **2,125** |
| **Disposal** | | | |
| Actual scenario (mostly non-refillable cylinders) | 5,530,100 | 2,508 | 5,497,009 |
| Hypothetical scenario (all refillable cylinders) | 281,250 | 128 | 279,487 |
| **Change in emissions under hypothetical scenario** | **-5,248,850** | **-2,381** | **-5,217,523** |
| **Total Change in Emissions** | **-5,246,711** | **-2,380** | **-5,215,398** |

## 4. Cost Analysis of Replacing Non-refillable with Refillable Cylinders

Replacing non-refillable cylinders with refillable cylinders could have other implications for businesses in addition to emission savings. Estimating the economic impacts of replacing non-refillable cylinders with refillable cylinders must account for the costs associated with replacing the cylinders themselves and the costs associated with the change in procedure handling of refillable cylinders (i.e., returning the cylinders to be refilled).

---

[7] In actuality, if all non-refillable cylinders were replaced with refillable ones, there would need to be more than 4.5 million cylinders in circulation to avoid lags in transport times. This issue is addressed in ICF (2011). For this analysis, it is assumed that an all-refillable scenario would still involve a total of 4.52 million cylinder trips per year because the volume of refrigerant produced, transported, and stored would not change simply due to the transition to all refillable cylinders.

## 4.1. Entities Potentially Subject to Non-refillable Cylinder Ban

A ban on the use of non-refillable cylinders would directly impact those companies that sell, distribute, or repackage refrigerant in disposable cylinders. For this preliminary analysis, affected entities are assumed to be producers, importers, exporters, reclaimers, and companies that sell and distribute HFCs (e.g., blenders, repackagers, and wholesalers or distributors of refrigerants).[8] Table 9 lists the affected industries by NAICS code and the estimated number of businesses affected.

**Table 9. List of Potentially Affected Industries of Non-refillable Cylinder Ban by NAICS Code**

| NAICS Code | NAICS Industry Description | Estimated Number of Businesses Affected |
|---|---|---|
| 325120 | Industrial Gas Manufacturing | 0[a] |
| 562920 | Materials Recovery Facilities | 65[a] |
| 423740 | Refrigeration Equipment and Supplies Merchant Wholesalers | 645[b] |
| 423730 | Warm Air Heating and Air-Conditioning Equipment and Supplies Merchant Wholesalers | 2,220[b] |
| 424690 | Other Chemical and Allied Products Merchant Wholesalers | 6,069[b] |

Source: Census Bureau (2020)
[a] Based on known HFC producers and reclaimers.
[b] It was assumed that 50 percent of businesses within these NAICS codes are refrigerant wholesalers and would be affected by the non-refillable cylinder ban.

## 4.2. Estimated Economic Impacts

For the purposes of quantifying direct compliance costs for this analysis, it was assumed that reclaimers, wholesalers, and distributors of refrigerant cylinders currently sell refrigerant solely in non-refillable cylinders.[9]

**Cost of cylinders.** Industry estimates that refillable cylinders are approximately three times the cost of a disposable cylinder (A-Gas 2021a, National Refrigerants 2021). This analysis assumes a disposable cylinder costs approximately $12, and a refillable cylinder is $36 (National Refrigerants 2021). While the price of a refillable cylinder is higher than that of a non-refillable cylinder, a refillable cylinder has a lifetime of 20 years and is refilled an average of 1.5 times per year and could be refilled as many as 3–4.5 times per year (Refrigerant Services 2012, A-Gas 2021b), resulting in one refillable cylinder potentially replacing 30 non-refillable cylinders over its

---

[8] For the purposes of this preliminary analysis, it is conservatively assumed that producers transport refrigerant primarily in containers larger than 30-lbs. cylinders and therefore the total inventory of 4.5 million cylinders was distributed across importers, exporters, reclaimers, and companies that sell and distribute HFCs (e.g., blenders, repackagers, and wholesalers or distributors of refrigerants) defined by the NAICS codes in Table 9

[9] Industry estimates that refillable cylinders account for between less than 1 percent and 10 percent of all 30-pound cylinders used, with a general assumption that the quantity of refillable cylinders as a percentage of all 30-pound cylinders used is closer to 1 percent (A-Gas 2021a, National Refrigerants 2021, Fluorofusion 2021). For the purposes of this analysis, it is assumed that all cylinders sold in the United States are non-refillable.

lifetime. Assuming all refillable cylinders are refilled an average of 1.5 times per year, approximately 3,015,000 refillable cylinders would need to be purchased to replace non-refillable cylinders. Cylinder sales were distributed across businesses in proportion to their annual sales (Census Bureau 2020). The costs of purchasing refillable cylinders were also annualized over the 20-year lifetime, using a 9.8 percent[10] discount rate appropriate for this industry.

**Cost of transport.** Refillable cylinders are heavier than non-refillable cylinders. Industry estimates are that a non-refillable cylinder weighs approximately 6–7 lbs. when empty and a refillable cylinder is approximately 15–17 lbs. empty (National Refrigerants 2021). Additional transportation costs are anticipated due to the increased weight from refillable cylinders during transport from refrigerant distributor or wholesaler to end user and from the return of refillable cylinders for refilling.

Transportation costs were established based on the incremental cost to ship a truckload of non-refillable versus refillable cylinders.[11] Costs were estimated assuming a truck could fit approximately 1,120 non-refillable cylinders or 870 refillable cylinders (ICF 2011). A truckload of either cylinder type would cost approximately $6,600 per trip (FedEx 2021). Because refillable cylinders are returned after use, an additional return trip is required.

Table 10 summarizes the cost assumptions associated with replacing non-refillable cylinders with refillable cylinders.

**Table 10. Cost Assumptions Associated with Non-refillable Cylinder Ban**

| Parameter | Assumption | |
|---|---|---|
| Cylinder type | Non-refillable | Refillable |
| Cylinder purchases | 4,522,500 | 3,015,000 |
| Cost of cylinder[a] | $12 | $36 |
| Lifetime of cylinder | 1 year | 20 years |
| Weight of cylinder[a] | 7 lbs. | 17 lbs. |
| Number of cylinders per truckload[b] | 1,120 | 870 |
| Freight cost per truckload[c] | $6,600 | $6,600 |
| Freight cost per cylinder | $5.89 | $7.59 |
| Annual trips | 1 | 3[d] |

[a] National Refrigerants (2021)
[b] ICF (2011)
[c] FedEx (2021)
[d] Refillable cylinders are assumed to be refilled 1.5 times per year and require two-way transport, or a total of three trips.

---

[10] The average cost of capital over the last 8 quarters available (September 2018 to June 2020) in three industry segments: Chemicals and Allied Products; Industrial, Computers, Electronics and Auto Manufacturing; and Wholesale and Retail Trade. Duff & Phelps, 2021. Available at https://dpcostofcapital.com/us-industry-benchmarking, accessed March 1, 2021.
[11] Although cylinders containing refrigerant cannot be shipped via a commercial carrier, the incremental cost difference between shipping a 17-lbs. refillable cylinder and a 7-lbs. disposable cylinder is assumed to proxy the additional costs associated with transporting cylinders to end-use.

**Management Costs.** Because refillable refrigerant cylinders need to be returned to a reclaimer or wholesaler/distributor for reuse, it is assumed that each company will utilize approximately 10 percent of a full-time employee (i.e., 4 hours per week) to coordinate the return of refrigerant cylinders. The cost assumptions for each industry to maintain a cylinder return program are presented in Table 11**.**

**Table 11. Costs to Manage a Cylinder Return Program**

| NAICS Code | NAICS Industry Description | FTE Annual Wage[a] | % of FTE Needed to Run a Cylinder Return Program | Annual Cost per Firm |
|---|---|---|---|---|
| 562920 | Materials Recovery Facilities | $42,260.00[b] | 10% | $4,226 |
| 423740 | Refrigeration Equipment and Supplies Merchant Wholesalers | $38,400.00[c] | 10% | $3,840 |
| 423730 | Warm Air Heating and Air-Conditioning Equipment and Supplies Merchant Wholesalers | $39,570.00[d] | 10% | $3,957 |
| 424690 | Other Chemical and Allied Products Merchant Wholesalers | $38,400.00[c] | 10% | $3,840 |

[a] FTE annual wage is for occupation code 43-5000: Material Recording, Scheduling, Dispatching, and Distributing Workers.
[b] BLS (2020a)
[c] BLS (2020b)
[d] BLS (2020c)

Using the methodology and additional assumptions described above, Table 12 below summarizes the estimated number of businesses potentially affected by the non-refillable cylinder ban as well as the estimated annualized costs at a 9.8 percent discount rate. Using a 9.8 percent discount rate, total annualized compliance costs across affected businesses are estimated to be $18.2 million.

**Table 12. Estimated Economic Impact from Non-refillable Cylinder Ban using a 9.8 percent Discount Rate**

| NAICS Code | Estimated Number of Businesses Impacted | Total Annualized Cost |
|---|---|---|
| 562920 | 65 | $276,879 |
| 423740 | 645 | $1,256,168 |
| 423730 | 2,220 | $4,543,467 |
| 424690 | 6,069 | $12,156,183 |
| **Total** | **8,999** | **$18,232,696** |

## 5.  Global and State Policies

Non-refillable cylinders have been prohibited in Australia, Canada, the EU, and India[12] through different approaches ranging from use-bans to placement on market bans. The success of these legislative actions has been mixed, influenced by intricacies of the regulations, trade with other countries, and labeling inaccuracies.

### 5.1. Non-refillable Cylinder Ban in Australia

Disposable cylinders were banned in Australia in 2007 after an amendment was added to the *Ozone Protection and Synthetic Greenhouse Gas Management Regulations of 1995*, which falls under the *Ozone Protection and Synthetic Greenhouse Gas Management Act of 1989*.

The ban was implemented as a condition of the permits needed for refrigerant trading authorization and refrigerant handling. The section states that the permit holders must only use refillable storage containers for the storage of refrigerant (Australian Refrigeration Council 2020). This approach avoids burden associated with proving whether a container was placed on the market before or after the ban was put in place (EIA 2019).

### 5.2. Non-refillable Cylinder Ban in Canada

Disposable cylinders were banned in Canada in incremental phases, taking into account different refrigerants with each additional regulation. The two main pieces of legislation were the *Federal Halocarbon Regulations of 2003* followed by the *Ozone-depleting Substances and Halocarbon Alternatives Regulations of 2016*, both of which were under the *Canadian Environmental Protection Act of 1999*. The ban on non-refillable cylinders includes the following restrictions:

- The storage, transport, and purchase of halocarbons must be in a container designed and manufactured to be refilled (Government of Canada 2003).
- Any imports of HFCs and HCFCs to be used as refrigerants must be stored in a refillable cylinder (Government of Canada 2016).
- Any HCFC that is manufactured to be used as refrigerant must be stored in refillable cylinders (Government of Canada 2016).

### 5.3. Non-refillable Cylinder Ban in the European Union

Disposable cylinders were banned in the EU in 2007 (EIA 2018). The placement on market ban began with non-refillable containers of ODS in 2000 and again in 2009 in the European Union Ozone Depleting Substances Regulations. Eventually, non-refillable containers of HFCs were also banned from market placement under the Fluorinated Gas (F-Gas) Regulation in 2006 and again in 2014 (EIA 2019).

Because regulations ban placement on market, it is often difficult to determine whether a cylinder was placed on the market before or after the ban went into place (EIA 2019).

---

[12] The use and ownership of disposable cylinders is illegal in India (Cooling Post 2019). Due to limited available information, India's ban is not elaborated on further in this section.

Additionally, some refrigerant suppliers have found ways around the ban, by using refillable cylinders but with no plan to return them for refill (Cooling Post 2019).

## 6. Illegal Trade and Enforcement Case Studies

The phasedown of HFCs (in certain regions) has led to illegal smuggling of these substances globally, often using non-refillable containers. Disposable cylinders facilitate illegal refrigerant trade, and inhibiting this trade would be a benefit of a ban on the use of non-refillable cylinders. This section discusses the implications of illegal trade of HFCs, highlights several examples of illegal trade in Asia and Europe, and discusses current CFC and HCFC enforcement programs in the United States.

### 6.1. Smuggling of Non-Refillable Cylinders and its Financial Implications

Non-refillable cylinders are popular in some countries as they do not require the seller to invest in a fleet of refillable containers (EIA 2019). In regions with HFC import restrictions, smuggling has often occurred in non-refillable cylinders. The smuggling of non-refillable cylinders has significant emissions and financial implications. From an emissions perspective, the continued trade and use of HFCs from smuggling can result in the release of the refrigerant heel into the atmosphere (EIA 2019). Illegal trade also has negative financial implications for governments and legitimate businesses (EIA 2019). Governments with HFC taxes are at risk of losing tax revenue (i.e., VAT and import duty) and businesses can experience indirect impacts from the effects illegal trade can have on lowering the price of legal refrigerants (EIA 2019). For example, Poland's treasury lost 7 million Euros in 2018 due to illegal refrigerant imports valued at 55 million Euros, and Lithuania's exchequer lost approximately 5 million Euros in 2018 as a result of increased sales of illegal refrigerants (EIA 2019). Moreover, legitimate businesses are seeing their profits decrease as consumers are attracted to the low prices of illegal refrigerants. Illegal imports of HFCs in Europe also slows the adoption of HFC alternatives and undermines the success and benefits of the F-gas regulation (EIA 2019).

In 2007, the EU banned disposable refrigerant cylinders in the EU and on EU flagged vessels. However, reports of illegal (non-quota) HFCs in European markets began to emerge in 2016. Honeywell reported that 10 MMTCO$_2$e of HFCs had been illegally imported in 2015, totaling about 5 percent of the total allocation (EIA 2019). In more recent years, the industry has seen an increase in both the frequency and severity of illegal HFC reports (EIA 2019). From 2016 to 2018, illegal trade hotspots occurred in Austria, Belgium, Denmark, Greece, Ireland, Latvia, Malta, Poland, Portugal, Romania, and Sweden. These countries' 2018 HFC imports were more than 100 percent higher than their 2016 imports (EIA 2019). One report found that reported imports to European customs officials exceeded the quota amount by 16 percent in 2019 and 33 percent in 2020 (King & Spalding, 2020).

Industry reports highlight concerns about effective enforcement to regulate illegal large-scale HFC trade and use, with more than 72 percent of surveyed companies indicating they had seen or been offered refrigerants in illegal disposable cylinders (EIA 2019). Analysis of European customs data revealed that bulk HFC imports in 2018 exceeded the 2018 quota, which could indicate open smuggling of HFCs (EIA 2019). Moreover, EIA (2019) also identified

discrepancies between Chinese export and European import data which could signal potential cross-border smuggling and false import declarations by European countries (EIA 2019).

There are two main methods of illegal trade in the EU. The first mechanism includes open smuggling of HFCs where companies import non-quota HFCs through normal customs channels (EIA 2019). EIA's analysis of 2018 customs data suggests that as much as 16.3 $MTCO_2e$ of bulk HFCs were illegally placed on the market in this way in 2018 and more than 14.8 $MTCO_2e$ in 2017 (EIA 2019). The second mechanism encompasses smuggling HFCs across country borders, which can occur outside customs channels altogether or where HFCs are concealed either physically or through fraudulent documentation of HFC shipments (e.g., mislabeling the type, purpose or destination of the HFC shipment) (EIA 2019, European Fluorocarbons Technical Committee 2020).

## 6.2. CFC and HCFC Enforcement Programs in the United States

The United States has established two specific programs targeting illegal imports of CFCs and HCFCs at the national level: Operation Cool Breeze and Catch-22 (UNEP 2013).

Operation Cool Breeze was designed to respond to the growing illegal trade of CFCs, which accelerated soon after the phaseout of CFC production in 1995. EPA estimated that 7,500 to 15,000 MT of illegal CFC-12 were imported between 1994 and 1995 (UNEP 2013). Operation Cool Breeze was an effective strategy that highlighted the importance of national coordination, cross-agency information sharing, customs trainings and awareness, and criminal prosecution. As a result, close coordination between the U.S. EPA, Customs, and U.S. Department of Justice prosecutors resulted in 44 prosecutions and the seizure of more than 862 MT of CFCs. The United States also relied on international cooperation with counterparts in Mexico, Canada, China, and Russia to support international efforts to halt the illegal trade of CFCs (UNEP 2013).

Catch-22 was an extension of Operation Cool Breeze. Catch-22 was an inter-agency campaign to aggressively identify and convict those found to be illegally smuggling HCFCs into the United States (UNEP 2013). Similar to Operation Cool Breeze, Catch-22's operations relied on the cooperation and communication of several parties including EPA, customs personnel, industry groups, and other stakeholders, such as freight forwarders. Catch-22 was a successful operation, resulting in criminal prosecutions (most of which have occurred in Miami, Florida) (UNEP, 2013).

For example, in 2010 Mar-Cone Appliance Parts Co. (Marcone) was convicted and sentenced due to the illegal receipt, purchase, and sale of 101 MT of HCFC-22 smuggled into the United States. Marcone was sentenced to five years of probation, ordered to pay a $500,000 fine, perform community service (a $400,000 payment to an environmental enforcement not-for-profit), implement an Environmental Compliance Plan, and re-pay the United States the total value of the crime. The success of Marcone's investigation was a result of the coordination of EPA; Immigration and Customs Enforcement's Office of Investigations in Miami; the Florida Department of Environmental Protection, Criminal Investigation Bureau; and the Miami-Dade Police Department, Environmental Investigation Unit, united under Catch-22 (Offices of the United States Attorneys 2010).

21

## 7. Conclusion

Refrigerant losses can occur from refrigerant cylinders under a variety of circumstances during transport, storage, and disposal, the frequency and severity of which depends in part on the type of cylinder. In 2020, virtually all refrigerant cylinders sold in the United States are non-refillable, which can result in approximately 31,000 $MTCO_2e$ in emissions from transport and storage per year from 4.46 million cylinders. In addition, non-refillable cylinders can experience emissions during disposal if unrecovered refrigerant is released. The amount of refrigerant heel remaining in non-refillable cylinders can vary by refrigerant type and recovery practices by servicing technicians, but is estimated to be approximately 1.25 pounds of refrigerant per cylinder. Disposal emissions from non-refillable cylinders can therefore equal 5,222,000 $MTCO_2e$ per year, assuming the heel is completely released from 95 percent of the cylinders .

By comparison, refillable cylinders can also experience refrigerant losses during transport and storage of approximately 500 $MTCO_2e$ per year from approximately 45,000 cylinders in the United States. While refillable cylinders have emissions during disposal, they have a lifetime of 20 years and are continually refilled throughout their lifetime, reducing annual disposal emissions relative to disposable cylinders due to a smaller proportion of refillable cylinders disposed of per year compared to disposable cylinders.

Replacement of non-refillable cylinders with refillable cylinders in the United States would therefore be estimated to save approximately 5,215,000 $MTCO_2e$ per year in emissions.

There are other implications associated with replacing non-refillable cylinders with refillable cylinders, including potentially higher costs associated with purchasing and transporting refillable cylinders (e.g., due to heavier weight and increased transportation time to return cylinders). Non-refillable cylinders have been successfully banned in several countries, including Australia, Canada, the European Union, and India. These bans appear to be helpful in identifying illegally imported material and have been part of comprehensive regulatory approaches to ensure effective implementation of programs phasing down regulated substances. Additionally, bans on non-refillable cylinders help reduce landfill waste through the reuse and refill of cylinders.

## References

American Carbon Registry (ACR). 2012. Canada faces disposable refrigerant cylinder battle. Available at: https://www.acr-news.com/canada-faces-disposable-refrigerant-cylinder-battle-.

AHRI. 2000. Comments by the Air-conditioning, Heating, and Refrigeration Institute at the EPA stakeholder meeting on May 16, 2000. EPA Docket A-2000-21, ID II-B-04.

Air-Conditioning, Heating, and Refrigeration Institute (AHRI). 2004. Standard for Performance Rating of Positive Displacement Refrigerator

Compressors and Compressor Units – AHRI Standard 540-2004. Available at: https://gost-snip.su/download/ansi_ahri_standard_5402004_performance_rating_of_positive_di.

A-Gas. 2021a. Personal communication between EPA and representatives of A-Gas. February 24, 2021.

A-Gas. 2021b. Personal communications between ICF and representatives of A-Gas. April 12, 2021.

Airgas. 1998. Analysis of Refrigerant Emissions Resulting from Improper Disposal of 30-lb Cylinders. Report prepared for Airgas Incorporated. Washington, DC.

Airgas. 2009. Communication with John Batt, Jen Levin, and Chuck Broadus. August 14, 2009.

AllCool. 2009. Communication with Jimmy Trout. August 12, 2009.

AMTROL. 2017. Refrigerant Cylinders: Refillable, Non-Refillable and Recovery. Available at: https://www.amtrol.com/wp-content/uploads/2017/06/MC10229_01_17_Refrigerant_Cylinders_Brochure.pdf.

ARS. 2009. Communication with Joe Ward, American Refrigeration Supplies. October 2009.

Australian Institute of Refrigeration, Air Conditioning and Heating (AIRAH). 2019. Auto mechanic fined for illegal R134a cylinders. Available at: https://www.hvacrnews.com.au/news/auto-mechanic-fined-for-illegal-r134a-cylinders/.

Australian Refrigeration Council. 2020. Newsletter for the Refrigeration and Air Conditioning Industry, Issue 55: Cool Change. Available at: https://www.arctick.org/media/17386/coolchangenewsletter55_web.pdf.

CARB. 2007. Solicitation of Ideas for Implementation of AB32: Mandating Use of 30-lb Refillable Refrigerant Cylinders in the Professional Service Sector. Proposal submitted by Airgas Incorporated.

Cooling Post. 2019. Rise of the disposable "refillable." Available at: https://www.coolingpost.com/world-news/rise-of-the-disposable-refillable/.

Environmental Investigation Agency (EIA). 2019. Doors wide open: Europe's flourishing illegal trade in hydrofluorocarbons (HFCs). Available at: https://eia-international.org/wp-content/uploads/EIA-report-Doors-wide-open.pdf.

Environmental Investigation Agency (EIA). 2018. Tip of the Iceberg: The Implications of Illegal CFC Production and Use. Available at: https://eia-international.org/wp-content/uploads/Tip-of-the-Iceberg-CFCs-FINAL.pdf.

Environmental Investigation Agency (EIA). n.d. Search Reuse and Destroy: How States Can Take the Lead on a 100 Billion Ton Climate Problem. Available at: https://content.eia-

global.org/posts/documents/000/000/829/original/EIAReport_100billiontonclimateopportunity.pdf?1550165022.

EPATest. 2019. R-410A FAQ. Available at: https://ww2.epatest.com/faq/r-410a-faq/. Accessed 2/19/2021.

FedEx 2021. FedEx Freight® volume services freight quotes. Available online at: https://ratefinder.van.fedex.com/en-us/.

Fluorofusion. 2021. Personal communication between EPA and representatives of Fluorofusion. March 26, 2021.

Government of Canada. 2016. Ozone-depleting Substances and Halocarbon Alternatives Regulations. Available at: https://laws-lois.justice.gc.ca/eng/regulations/SOR-2016-137/FullText.html.

Government of Canada. 2003. Federal Halocarbon Regulations. Available at: https://laws-lois.justice.gc.ca/eng/regulations/sor-2003-289/page-1.html#docCont.

ICF. 2011. Lifecycle Analysis of High-Global Warming Potential Greenhouse Gas Destruction. Prepared for the California Air Resources Board. Available at: https://ww2.arb.ca.gov/sites/default/files/classic//research/apr/past/07-330.pdf.

King & Spalding. 2020. Alliance For Responsible Atmospheric Policy – Refrigerant Imports Committee. Available at: https://www.alliancepolicy.org/site/usermedia/application/10/Bradford%20KS%20HFC%20Presentation%2023%20Nov%202020%20v4.pdf.

National Refrigerants. 2021. Personal communication between ICF and Maureen Beatty. February 19, 2021.

National Refrigerants. 2009a. Personal communication between Stratus Consulting and Communication with Maureen Beatty. August 13, 2009.

National Refrigerants. 2009b. Product Specifications. Available: http://www.refrigerants.com/product. Accessed 9/13/2009.

Offices of the United States Attorneys. 2010. International Product Support Company Convicted and Sentenced for The Illegal Purchase and Sale Of Smuggled Ozone-Depleting Refrigerant Gas. Available at: https://www.justice.gov/archive/usao/fls/PressReleases/2010/100319-01.html.

Ozone Secretariat. 1987. The Montreal Protocol on Substances that Deplete the Ozone Layer. United National Environment Programme (UNEP). Available Online at: https://ozone.unep.org/treaties/montreal-protocol.

Rapid Recovery. 2012a. Personal communication between Stratus Consulting and Rich Dykstra, Rapid Recovery, September 11, 2012.

Rapid Recovery. 2012b. Personal communication between Stratus Consulting and Rich Dykstra, Rapid Recovery, November 16, 2012.

Refrigerant Services. 2012. Personal communication between Stratus Consulting and Jim Thomas, Refrigerant Services, September 12, 2012.

Stratus Consulting. 2012. Environmental Impacts Resulting from Emissions during 30-lb Cylinder Transport and Storage. Report prepared for the U.S. Environmental Protection Agency under Contract #EP-W-10-032, Task Order 0109 by Stratus Consulting Inc., Boulder CO. November 28.

Stratus Consulting. 2010a. Analysis of Implications Resulting from Disposal of Non-Refillable Cylinders. Report prepared for the U.S. Environmental Protection Agency under Contract EP-W-06-010, Task Order 16 by Stratus Consulting Inc., Boulder, CO. April 16.

Stratus Consulting. 2010b. Options for Reducing Emissions from Disposal of Non-Refillable Cylinders. Memorandum prepared for the U.S. Environmental Protection Agency under Contract EP-W-06-010, Task Order 16 by Stratus Consulting Inc., Boulder, CO. April 23.

United Nations Environment Programme (UNEP). 2010. Manual for Refrigeration Servicing Technicians. United Nations Environment Programme. Available: http://www.unep.fr/ozonaction/information/mmcfiles/7443-e-ref_manual_servicing_technicians.pdf.

United Nations Environment Programme (UNEP). 2011. Risk Assessment of Illegal Trade in HCFCs. Available at: https://wedocs.unep.org/bitstream/handle/20.500.11822/28217/7507RiskAssessment.pdf?sequence=1&isAllowed=y.

United Nations Environment Programme (UNEP). 2013. Enforcement Strategies for Combating the Illegal Trade in HCFCs and Methyl Bromide. Available at: http://www.igsd.org/wp-content/uploads/2014/10/Illegal_Trade_HCFCs_Methyl-Bromide.pdf.

U.S. Bureau of Labor Statistic 2020a.May 2019 National Industry-Specific Occupational Employment and Wage Estimates, NAICS 562900 - Remediation and Other Waste Management Services. Available online at: https://www.bls.gov/oes/current/naics4_562900.htm.

U.S. Bureau of Labor Statistic 2020b. May 2019 National Industry-Specific Occupational Employment and Wage Estimates, NAICS 4240A2 - Merchant Wholesalers, Nondurable Goods (4242 and 4246 only). Available online at: https://www.bls.gov/oes/current/naics4_4240A2.htm.

U.S. Bureau of Labor Statistic 2020c. May 2019 National Industry-Specific Occupational Employment and Wage Estimates, NAICS 4230A1 - Merchant Wholesalers, Durable Goods (4232, 4233, 4235, 4236, 4237, and 4239 only) Available online at: https://www.bls.gov/oes/current/naics4_4230A1.htm.

U.S. Census Bureau 2020. 2017 SUSB Annual Data Tables by Establishment Industry. Available online at: https://www.census.gov/data/tables/2017/econ/susb/2017-susb-annual.html.

U.S. Census Bureau 2020. 2017 SUSB Annual Data Tables by Establishment Industry. Available online at: https://www.census.gov/data/tables/2017/econ/susb/2017-susb-annual.html.

U.S. Environmental Protection Agency (EPA). 2021. EPA-Certified Refrigerant Reclaimers. Available online at: https://www.epa.gov/section608/epa-certified-refrigerant-reclaimers.

U.S. Environmental Protection Agency (EPA). 2020. Vintaging Model. Version VM IO file_v5.1_10.08.20.

U.S. Environmental Protection Agency (EPA). 2007. Disposable Container Heel Testing Study Report. Prepared for U.S. EPA by Perrin Quarles Associates under subcontract to Stratus Consulting.

Worthington Cylinders. 2009. Personal communication between Stratus Consulting and Dave Burks. September 1, 2009.

## Appendix A. Emission Estimates for Cylinders during Transport and Storage

This section presents the results of an analysis of total annual emissions from refrigerant losses during cylinder transport and storage conducted by Stratus (2012).[13] It includes a description of the methodology used to calculate these impacts and resulting emissions. These emission estimates were updated for 2020 to reflect an updated distribution of refrigerants sold annually in 30-pound cylinders.

### Methodology

The following steps explain how the total annual emissions from refrigerant losses during cylinder transport and storage were calculated. More information on the variables identified in these steps can be found in Table A- 1 and Table A- 2.

1. For each type of cylinder, the total number of cylinder "trips" (i.e., times traveling from refrigerant manufacturer to end use) in a year was calculated as the product of:
   a. The number of cylinders of that type manufactured in the United States each year
   b. The average number of times per year that a cylinder is filled (only once for non-refillable cylinders).
2. For each type of cylinder and for each type of refrigerant loss that a cylinder could experience, the total amount of refrigerant emitted each year was calculated as the product of:
   a. The total number of cylinder trips per year (result from Step 1)
   b. The percentage of cylinders transported and stored that experience the specific type of refrigerant loss
   c. The average amount of refrigerant in a full cylinder
   d. The percentage of the refrigerant in the cylinder that is emitted due to the type of loss.
3. The resultant products for each cylinder/refrigerant loss type combination (from Step 2) were then summed to produce the total annual emissions (in pounds) resulting from refrigerant losses during cylinder transport and storage.
4. The total annual emissions resulting from refrigerant losses during cylinder transport and storage (from Step 3) were then converted into GWP-weighted emissions using each refrigerant's GWP.

The values used for several of the variables identified above are based on the information presented in Sections 2 and 3 and are presented in Table A- 1. Table A- 2 presents values for several other key inputs used in the analysis, indicating the corresponding step in the above process.

---

[13] Other factors in evaluating the comparative advantages and disadvantages of the two types of cylinders is the amount of resources consumed in their manufacture and potential waste due to improper disposal. One argument for using refillable cylinders is to reduce the amount of recyclable metal that is landfilled. Another differentiating factor is the implications of the cylinders' differences in size and weight for the amount of energy required to transport them (ICF 2011). These considerations are outside the scope of this analysis.

**Table A- 1. Summary of information on types of refrigerant loss from transported and stored cylinders**

| Type of refrigerant loss | % of refrigerant in cylinder that is emitted due to this type of loss | % of cylinders that experience this type of loss |
|---|---|---|
| **Non-refillable cylinders** | | |
| Mechanical damage to valve | 95%[a] | 0.01%[b] |
| Overfilled cylinder with defective safety-relief valve ruptures (e.g., due to extreme heat or blunt contact) | 100% | 0.01%[b] |
| Overfilled cylinder with effective safety-relief valve releases overfilled amount (e.g., due to extreme heat or blunt contact) | 95%[a] | 0.01%[b] |
| **Refillable cylinders** | | |
| Mechanical damage to valve | 96%[a] | 0.02% |
| Overfilled cylinder with defective safety-relief valve ruptures (e.g., due to extreme heat or blunt contact) | 100% | 0.01%[b] |
| Overfilled cylinder with effective safety-relief valve releases overfilled amount (e.g., due to extreme heat or blunt contact) | Up to 20% | 0.01%[b] |

a. Assumes all refrigerant is lost, minus the heel. The heel is estimated to be approximately 5 percent (see list of assumptions below).
c. The likelihood of these types of losses occurring is considered negligible. We use 0.01 percent as the smallest likelihood of a loss occurring. See list of assumptions below


**Table A- 2. Key variables used in calculations**

| Step | Variable | Value | Source/notes |
|---|---|---|---|
| 1 | Total number of 30-pound cylinders manufactured in the United States each year | 4.5 million | A-Gas 2021; Fluorofusion 2021 |
| 1 | % of 30-pound cylinders that are refillable | 1% | A-Gas 2021; Fluorofusion 2021; National Refrigerants 2021 |
| 1 | Total number of 30-pound cylinders of each type manufactured in the United States each year | Non-refillable cylinders: 4,455,000 Refillable cylinders: 45,000 | Derived from total number of 30-pound cylinders manufactured and percentage of 30-pound cylinders that are refillable |
| 1 | Average number of times per year that a cylinder is filled | Non-refillable cylinders: 1 Refillable cylinders: 1.5 | ICF 2011; Refrigerant Services 2012 |
| 2 | Total number of cylinder "trips" per year | Non-refillable cylinders: 4,455,000 Refillable cylinders: 67,500 | Derived from Step 1 calculations |

| 2 | Average amount of refrigerant in a "full" cylinder | 24 lbs[a] | See assumptions in notes below |
|---|---|---|---|
| 2 | Types of refrigerant losses | See Table A- 1 | N/A |
| 2 | % of refrigerant in cylinder that is emitted due to each type of loss | See Table A- 1 | N/A |
| 2 | % of cylinders that experience each type of loss | See Table A- 1 | N/A |
| 2 | % of cylinders containing each type of refrigerant | R-134a: 22%<br>R-410A: 51%<br>R-407C: 3%<br>R-404A: 12%<br>R-507A: 2%<br>R-407A: 9% | EPA 2020 |
| 4 | GWP | As reported in The Montreal Protocol on Substances that Deplete the Ozone Layer | Ozone Secretariat 1987 |

[a] Assuming cylinder is filled to 80 percent capacity, and full capacity is 30 lbs (see assumptions below).

## Assumptions

Stratus (2012) made several assumptions to estimate the total annual emissions resulting from refrigerant losses during cylinder transport and storage:

- Analysis only includes emissions from 30-pound cylinders. As noted above, 30-pound cylinders are the most commonly used cylinders for transporting refrigerant in the United States. For simplicity, this analysis does not include emissions from transport and storage of cylinders of other sizes.
- Analysis only considers emissions from "outbound" cylinder trips. Cylinders returning from service technicians to wholesalers and then to reclaimers, disposers, and refrigerant manufacturers (the actual life cycle will depend on the type of cylinder) are not considered.
- Every type of refrigerant loss is assumed to occur in at least 0.01 percent of all cylinders. Based on input from experts contacted for this analysis, the likelihood of certain types of refrigerant losses occurring in cylinders is negligible. For this analysis, every type of refrigerant loss is assumed to occur in at least 0.01 percent of all cylinders.
- All cylinders have a maximum capacity of 30 lbs. and are filled to 80 percent capacity, unless overfilled. This assumption is made to simplify the analysis. The cylinder capacity will vary depending on the cylinder manufacturer, because every cylinder has slight differences in size.
- Refrigerant heels remain in cylinders that lose refrigerant due to defects in or damage to valves. The heel is assumed to equal approximately 5 percent of the original refrigerant charge. It is assumed that cylinders that experience a rupture will lose the refrigerant heel, and cylinders that experience a safety-valve refrigerant release will retain the heel.

## Results

Emissions from transport and storage of cylinders for 2020 are presented in terms of absolute pounds and in terms of their impact on climate (using MTCO$_2$e) and the ozone layer (using ODP metric tons).

### Non-refillable cylinders

Table A- 3 presents the estimated pounds of emissions resulting from each type of refrigerant loss that non-refillable cylinders might experience. The table shows that refrigerant losses from non-refillable cylinders result in emissions of approximately 31,000 pounds of refrigerant per year.

**Table A- 3. Emissions from non-refillable cylinder transport and storage – pounds emitted**

| Type of loss | Total number of cylinder trips per year | Average amount of refrigerant in full cylinder | % of refrigerant in cylinder that is emitted due to this type of loss | % of cylinders that experience this type of loss | Pounds emitted |
|---|---|---|---|---|---|
| Mechanical damage to valve | 4,455,000 | 24 | 95% | 0.01% | 10,135 |
| Overfilled cylinder with defective safety-relief valve ruptures (e.g., due to extreme heat or blunt contact) | 4,455,000 | 24 | 100% | 0.01% | 10,692 |
| Overfilled cylinder with effective safety-relief valve releases overfilled amount (e.g., due to extreme heat or blunt contact) | 4,455,000 | 24 | 95% | 0.01% | 10,135 |
| Total | N/A | N/A | N/A | N/A | 30,962 |

Table A- 4 presents the estimated MTCO$_2$e of emissions resulting from refrigerant losses from non-refillable cylinders, based on the breakdown of refrigerants transported and stored in 30-pound cylinders. As the table shows, emissions from non-refillable cylinders account for approximately 30,768 MTCO$_2$e per year.

**Table A- 4. Emissions from non-refillable cylinder transport and storage – MTCO$_2$e emitted**

| Refrigerant | % of all refrigerants in cylinders | Pounds emitted (using total pounds emitted from Table A- 3) | Metric tons emitted | MTCO$_2$e |
|---|---|---|---|---|
| R-134a | 22% | 6,840 | 3.10 | 4,437 |
| R-410A | 51% | 15,841 | 7.19 | 15,003 |
| R-407C | 3% | 1,080 | 0.49 | 869 |
| R-404A | 12% | 3,600 | 1.63 | 6,405 |
| R-507A | 2% | 720 | 0.33 | 1,302 |
| R-407A | 9% | 2,880 | 1.31 | 2,753 |

| Refrigerant | % of all refrigerants in cylinders | Pounds emitted (using total pounds emitted from Table A- 3) | Metric tons emitted | MTCO$_2$e |
|---|---|---|---|---|
| Total (All) | 100% | 30,962 | 14.04 | 30,768 |

Note: Totals might not sum due to rounding.

### Refillable Cylinders

**Error! Reference source not found.** presents the estimated pounds of emissions resulting from each type of refrigerant loss that refillable cylinders might experience. The table shows that refrigerant losses from refillable cylinders result in emissions of approximately 500 pounds of refrigerant per year. This amount is considerably smaller than the amount emitted from non-refillable cylinders. This discrepancy is logical, considering the estimation that refillable cylinders account for only 1 percent of all 30-pound cylinders in use.

**Table A- 5. Emissions from refillable cylinder transport and storage – pounds emitted**

| Type of Loss | Total number of cylinder trips per year | Average amount of refrigerant in full cylinder | % of refrigerant in cylinder that is emitted due to this type of loss | % of cylinders that experience this type of loss | Pounds emitted |
|---|---|---|---|---|---|
| Mechanical damage to valve | 67,500 | 24 | 95% | 0.02% | 307 |
| Overfilled cylinder with defective safety-relief valve ruptures (e.g., due to extreme heat or blunt contact) | 67,500 | 24 | 100% | 0.01% | 162 |
| Overfilled cylinder with effective safety-relief valve releases overfilled amount (e.g., due to extreme heat or blunt contact) | 67,500 | 24 | 20% | 0.01% | 32 |
| Total | N/A | N/A | N/A | N/A | 502 |

Table A- 6 presents the estimated MTCO$_2$e of emissions resulting from refrigerant losses from refillable cylinders, based on the breakdown of refrigerants transported and stored in 30-pound cylinders. As the table shows, emissions from refillable cylinders account for approximately 500 MTCO$_2$e per year. Again, the discrepancy between these figures and those indicated for non-refillable cylinders (Table A- 4) are due to the very small percentage of 30-pound cylinders that are refillable compared to those that are non-refillable.

**Table A- 6. Emissions from refillable cylinder transport and storage – MTCO$_2$e emitted**

| Refrigerant | % of all refrigerants in cylinders | Pounds emitted (using total pounds emitted from Table A- 5) | Metric tons emitted | MTCO$_2$e |
|---|---|---|---|---|
| R-134a | 22% | 111 | 0.05 | 72 |
| R-410A | 51% | 257 | 0.12 | 243 |
| R-407C | 3% | 17 | 0.01 | 14 |
| R-404A | 12% | 58 | 0.03 | 104 |
| R-507A | 2% | 12 | 0.01 | 21 |
| R-407A | 9% | 47 | 0.02 | 45 |
| **Total (All)** | **100%** | **502** | **0.23** | **498** |

Note: Totals might not sum due to rounding.

31

# Appendix B. Estimate of Emissions from Heels (Theoretical and Empirical) in Non-refillable Cylinders

## Theoretical Estimates of Amount of Refrigerant Remaining in Non-Refillable Cylinders

This section describes the approach used by Stratus (2010a) to estimate theoretical heels in non-refillable cylinders under different field servicing and recovery conditions.

### *Refrigerants studied*

Based on input from EPA technical experts and industry sources, as well as a review of available literature, six refrigerants were included in the theoretical study. Table B- 2 lists the refrigerants that were selected for inclusion, along with information about the cylinder sizes they are typically sold in and the use for which they are commonly purchased. These refrigerants include HCFC-22 (HCFC-22) and HFC-134a (R-134a) and blended refrigerants R-410A, R-407C, R-404A, and R-507A.

*The estimated theoretical heel amounts resulting from the three refrigerant recovery conditions.* Table B- 1 presents the estimated heel amounts for each of the six refrigerants for three applications (air-conditioning, mid-temperature refrigeration, and low-temperature refrigeration) assuming that no vapor recovery process was used following field servicing. Average estimated heel amounts ranged between 0.31 lbs. and 0.70 lbs.

It is important to note that the four blends are comprised of different measures of multiple pure refrigerants. Aside from R-134a, which was included in the study, refrigerants that are combined to create the mixtures were not considered individually and for the purposes of this study, these refrigerants, are included only insofar as they determine the characteristics of the refrigerant blends of interest.

Table B- 1**Error! Reference source not found.** shows the typical quantities of refrigerant contained in a 13.5-L non-refillable cylinder for each refrigerant studied. As shown, the amount of refrigerant in a 13.5-L cylinder is 30 lbs. for pure refrigerants (HCFC-22 and R-134a) and 24 lbs. to 25 lbs. for refrigerant blends. The difference between refrigerant charge sizes for pure and blended refrigerants is due to the potential fractioning of the refrigerant mixtures, which could selectively vaporize the low boiling temperature constituent of the mixture.

**Table B- 1. Typical refrigerant mass in a 13.5-L non-refillable cylinder**

|          | HCFC-22 | R-134a | R-410A | R-407C | R-404A | R-507A |
|----------|---------|--------|--------|--------|--------|--------|
| Mass (lb) | 30      | 30     | 25     | 25     | 24     | 25     |

Source: National Refrigerants 2009b.

### *Model used and simulated operating conditions*

Xprops™, a refrigerant property analysis software developed by Thermal Analysis Partners (TAP), was used to estimate heel amounts for the six refrigerants. This model can generate theoretical heel amounts and other outputs based on inputs that simulate operating conditions. The Air-Conditioning, Heating, and Refrigeration Institute's (AHRI's) Standard 540-2004 was used to determine typical operating conditions of air-conditioning and refrigeration systems (AHRI 2004). The AHRI standard provided information on the suction dew point temperature,

discharge dew point temperature, and the return gas temperature. Based on the suction dew point temperature that corresponds with different uses of refrigerant (e.g., air-conditioning, mid-temperature refrigeration, and low temperature refrigeration), the suction pressure of the six targeted refrigerants was calculated using Xprops.

### *Heel estimation*

The estimated theoretical heel amount that would remain in a typical cylinder was estimated considering two different scenarios. In the first scenario, the cylinder is assumed to have been emptied in the field and disposed of without a vapor recovery process. When the liquid phase refrigerant is being charged, the pressure in the cylinder approaches the system suction pressure.

This causes the moisture in the air to condense on the cylinder surface. As the last of the liquid refrigerant is removed from the cylinder, the refrigerant is in the vapor phase. As heat is transferred from the high temperature ambient air to the low temperature cylinder, the refrigerant in the cylinder becomes superheated vapor. During this process, the cylinder pressure decreases and ultimately reaches the system suction pressure.

Using the calculated system suction pressure ($P_{suction}$) and the assumption that the typical ambient temperature ($T_{amb}$) is 24°C, the density of the refrigerant vapor ($\rho_{vapor, cylinder}$) can be calculated for each of the refrigerants based on the following function by using the Xprops software:

$$\rho_{vapor,cylinder} = f(P_{suction}, T_{amb})$$

Once the density of the refrigerant vapor and the internal volume ($V_{internal}$) of the cylinder are known, the mass of the heel ($m_{heel}$) can be calculated as follows:

$$m_{heel} = \rho_{vapor,cylinder} \; x \; V_{internal}$$

In the second scenario, the cylinder is assumed to have been used in the field and then subjected to a vapor recovery process. In the vapor recovery process, the cylinder ultimately reaches a final recovery pressure. Two final recovery pressures were explored: vapor recovery to a certain final pressure based on AHRI Standard 740-1998 and vapor recovery to several specific vacuum pressures.

**Recovery to AHRI Standard**. To estimate the heel in a cylinder that has undergone vapor recovery based on AHRI Standard 740-1998, the following assumptions were made:

- Cylinder is at ambient temperature ($T_{amb}$) 24°C;
- Initial recovery pressure ($P_{recovery, initial}$) is at the system suction pressure ($P_{suction}$); and
- Final recovery pressure ($P_{recovery, final}$) is 10 percent of the initial cylinder pressure.

Given these assumptions, the density of the refrigerant vapor in the cylinder was calculated using Xprops for each of the six refrigerants. Given the cylinder's internal volume and the previously calculated density of the refrigerant vapor, the masses of the refrigerant heels and the percentage of the total that the heel accounts for were calculated.

**Recovery to specific pressure**. To estimate the heel in a cylinder that has undergone vapor recovery based on several specific vacuum pressures, the following assumptions were made:

- Cylinder is at ambient temperature ($T_{amb}$) 24ºC; and
- Final recovery pressure is below the atmospheric pressure [measured at 0, 5, 10, 15, 20, 25, and 29 inches of mercury (inHg) vacuum].

As in the process to estimate the heel in a cylinder that has undergone AHRI standard for refrigerant recovery (Standard 740-1998), once the final recovery pressure and the ambient temperature were known, the density of the refrigerant vapor was calculated for each of the six refrigerants.

The estimate of the mass of the heel and the percentage of the initial volume remaining are calculated based on the density of refrigerant vapors.

### *Results*

This section presents the results of the theoretical study, including the estimated theoretical heel amounts resulting from the three refrigerant recovery conditions. Table B- 2 presents the estimated heel amounts for each of the six refrigerants for three applications (air-conditioning, mid-temperature refrigeration, and low-temperature refrigeration) assuming that no vapor recovery process was used following field servicing. Average estimated heel amounts ranged between 0.31 pounds and 0.70 pounds.

**Table B- 2. Suction dew heel amounts (lbs.) assuming no vapor recovery at $P_{suction}$ and $T_{ambient}$**

| Application | point temp. (°C) | HCFC-22 | R-134a | R-410A | R-407C | R-404A | R-507A |
|---|---|---|---|---|---|---|---|
| Air-conditioning | 7.2 | 0.72 | 0.50 | 1.02 | 0.66 | 1.03 | 1.08 |
| Mid-temp. refrigeration | -6.7 | 0.44 | 0.29 | 0.61 | 0.39 | 0.62 | 0.66 |
| Low-temp. refrigeration | -23.3 | 0.23 | 0.15 | 0.32 | 0.20 | 0.33 | 0.35 |
| Average | NA | 0.46 | 0.31 | 0.65 | 0.42 | 0.66 | 0.70 |

Note: Figures have been rounded to two decimal points.

Table B- 3 provides the estimated heel amounts for each of the six refrigerants for three applications (air-conditioning, mid-temperature refrigeration, and low-temperature refrigeration) assuming a vapor recovery process based on the AHRI standard for refrigerant recovery (Standard 740-1998) was used following field servicing. Average estimates ranged between 0.03 lbs. and 0.06 lbs.

**Table B- 3. Heel amounts (lbs.) assuming vapor recovery to AHRI standards**

| Application | point temp. (°C) | HCFC-22 | R-134a | R-410A | R-407C | R-404A | R-507A |
|---|---|---|---|---|---|---|---|
| Air-conditioning | 7.2 | 0.07 | 0.05 | 0.09 | 0.06 | 0.09 | 0.09 |
| Mid-temp. refrigeration | -6.7 | 0.04 | 0.03 | 0.06 | 0.04 | 0.06 | 0.06 |
| Low-temp. refrigeration | -23.3 | 0.02 | 0.01 | 0.03 | 0.02 | 0.03 | 0.03 |

34

| Application | point temp. (°C) | HCFC-22 | R-134a | R-410A | R-407C | R-404A | R-507A |
|---|---|---|---|---|---|---|---|
| Average | NA | 0.04 | 0.03 | 0.06 | 0.04 | 0.06 | 0.06 |

Note: Figures have been rounded to two decimal points.

Table B- 4 provides the estimated heel amounts for each of the six refrigerants at different vacuum pressures assuming a vapor recovery process following field servicing. Average estimates ranged between 0.04 lbs. and 0.06 lbs. The range of heel amounts indicated in Table B- 6 corresponds to heel ratios of between 0.01 percent to 0.51 percent, across all refrigerants and at vacuum recovery pressures ranging from 0 inHg to 29 inHg. These ratios are consistent with the results of a study conducted by AHRI (2000) that considered the effects of different recovery pressures on heel ratios. The results of this study showed that under pressures ranging from system suction pressure to 20 inHg, the ratios decline from system suction pressure (ratios between 1.5 percent and 3 percent for different refrigerants) to less than 0.5 percent at 0 psig (for all refrigerants and close to 0.1 percent at 20 inHg for all refrigerants (AHRI 2000).[14] Figure 1 illustrates the declining heel amounts at higher vacuum pressures for each of the refrigerants.

**Table B- 4. Heel amounts (lbs.) assuming vapor recovery to various vacuum pressures**

| InHg vacuum | Psig vacuum | Kpa abs. | HCFC-22 | R-134a | R-410A | R-407C | R-404A | R-507A |
|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 101.35 | 0.11 | 0.13 | 0.09 | 0.11 | 0.12 | 0.12 |
| 5 | 2.46 | 84.42 | 0.09 | 0.11 | 0.07 | 0.09 | 0.10 | 0.10 |
| 10 | 4.91 | 67.49 | 0.07 | 0.08 | 0.06 | 0.07 | 0.08 | 0.08 |
| 15 | 7.37 | 50.56 | 0.05 | 0.06 | 0.04 | 0.05 | 0.06 | 0.06 |

## Empirical Study of Amounts of Refrigerant Remaining in Non-Refillable Cylinders

Stratus (2010a) collected data by measuring quantities of refrigerant remaining in non-refillable cylinders after being used to service stationary air-conditioning and refrigeration equipment in the field. A refrigerant recovery, measurement, and recording framework was designed to facilitate collection and analysis of the data obtained with a Phoenix, Arizona refrigerant distributor. This section describes the methodology employed for collecting the data and the results produced.

### Methodology

A sample of 30-pound non-refillable cylinders was collected by the Phoenix distribution company from service technicians who used the cylinders for various applications (i.e., servicing of residential air conditioners, appliances, commercial refrigeration systems, and chillers). The amounts of refrigerant remaining in the cylinders were measured, recorded, and analyzed. The cylinders were subjected to a recording and testing process that involved identifying the application for which the cylinder was used and the type of refrigerant it contained and measuring the amounts of refrigerant remaining by weighing the cylinders when they were obtained after use in the field.

*Results*

For this study, 110 30-pound non-refillable cylinders were collected and evaluated over a two-month period. As they were collected, the cylinders were identified as having been used to service stationary equipment in four categories of applications:

- Residential air-conditioning (e.g., standard home roof/split systems);
- Chillers (e.g., industrial and mechanical uses);
- Appliances (e.g., refrigerators and air conditioners); and
- Commercial refrigeration (e.g., supermarket refrigeration systems).

Many service technicians might service systems in only one of these applications, but some might service systems across multiple applications. The term "refrigerant remaining" is used in this section of the report. Due to the constraints of the cylinder collection component of the empirical study, it was not possible to determine whether the refrigerant remaining in the cylinder meets the regulatory definition of a heel (as defined in 40 CFR 82.3).

The cylinders collected for this study contained the following refrigerants: HCFC-22, R-404A, R-408A, R-410A, and R-507. Table B- 5 provides the distribution of the cylinders by refrigerant type and application.

**Table B- 5. Summary of cylinders collected by refrigerant and application**

| Application | HCFC-22 30 lb cylinder | R-404A 24 lb cylinder | R-408A 24 lb cylinder | R-410A 25 lb cylinder | R-507 25 lb cylinder | Total |
|---|---|---|---|---|---|---|
| Appliance servicing | 2 | 0 | 0 | 0 | 0 | 2 |
| Residential A/C | 32 | 0 | 0 | 0 | 0 | 32 |
| Commercial refrigeration | 24 | 12 | 0 | 2 | 5 | 43 |
| Chillers | 26 | 5 | 2 | 0 | 0 | 33 |
| Total | 84 | 17 | 2 | 2 | 5 | 110 |

Source: ARS 2009

For each cylinder collected, an initial pressure gauge reading was taken and the cylinder's weight recorded. Refrigerant recovery equipment was then used to extract the refrigerant remaining in the cylinder by pulling a vacuum. For 47 (or 43 percent) of the 110 cylinders collected, there was no pressure in the cylinder, either because the cylinder valve was opened and the refrigerant remaining in the cylinder was vented or because the refrigerant had already been recovered. Of these 47 cylinders:

- The refrigerant remaining in the cylinder was recovered by the source for 16 cylinders (all contained HCFC-22);
- Twelve cylinders had no pressure, but the valves had been closed; and
- Nineteen cylinders had no pressure and the valves were open.

Of the latter two types, it is unknown whether refrigerant was recovered by the source or if the refrigerant was vented. Of the 63 cylinders that remained under pressure (i.e., had measurable amounts of refrigerant remaining), most contained HCFC-22 and came from the residential air-

conditioning sector. Table B- 6 provides a summary of cylinders with pressure by refrigerant and source.

**Table B- 6. Summary of cylinders collected with pressure by refrigerant and application**

| Application | HCFC-22 30 lb cylinder | R-404A 24 lb cylinder | R-408A 24 lb cylinder | R-410A 25 lb cylinder | R-507 25 lb cylinder | Total |
|---|---|---|---|---|---|---|
| Appliance servicing | 1 | 0 | 0 | 0 | 1 | 1 |
| Residential A/C | 28 | 0 | 0 | 0 | 28 | 28 |
| Commercial refrigeration | 7 | 8 | 2 | 2 | 19 | 7 |
| Chillers | 11 | 4 | 0 | 0 | 15 | 11 |
| **Total** | **47** | **12** | **2** | **2** | **63** | **47** |

Of the cylinders that remained under pressure, the amounts of refrigerant remaining varied, with a mean of 1.08 lbs. Table B- 7 and Table B- 8 provide summary statistics of the amounts by refrigerant and application.

**Table B- 7. Mean and median amounts of refrigerant remaining (lbs.), by refrigerant**

| Refrigerant | Number of cylinders | Mean amount | Median amount | Standard deviation | Minimum | Maximum |
|---|---|---|---|---|---|---|
| R-404a | 12 | 1.40 | 0.96 | 0.91 | 0.42 | 2.91 |
| R-410A | 2 | 0.96 | 0.96 | 0.09 | 0.89 | 1.02 |
| R-507 | 2 | 0.53 | 0.53 | 0.03 | 0.51 | 0.55 |
| **Total** | **63** | **1.08** | **0.70** | **0.79** | **0.28** | **3.69** |

**Table B- 8. Mean and median amounts of refrigerant remaining (lbs.), by application**

| Application | Number of cylinders | Mean amount | Median amount | Standard deviation | Minimum | Maximum |
|---|---|---|---|---|---|---|
| Appliance servicing | 1 | 0.64 | 0.64 | N/A | N/A | N/A |
| Residential A/C | 28 | 1.02 | 0.68 | 0.80 | 0.28 | 3.69 |
| Commercial refrigeration | 19 | 1.13 | 0.87 | 0.78 | 0.33 | 2.91 |
| Chillers | 15 | 1.15 | 0.68 | 0.84 | 0.47 | 3.26 |
| **Total** | **63** | **1.08** | **0.70** | **0.79** | **0.28** | **3.69** |

## Appendix C. Estimation of Emissions under Various Recovery Scenarios for Non-refillable Cylinders during Disposal

Stratus (2010a) implemented a five-step process to estimate the quantity of annual emissions resulting from disposal of non-refillable cylinders. These steps include estimating or identifying the following:

1. Number of non-refillable cylinders used per year;
2. Percentage of cylinders containing different refrigerants;
3. Amount of refrigerant remaining in typical 30-pound non-refillable cylinders after use;
4. GWP of the refrigerants in question; and
5. Total amount of GHG emissions resulting from disposal of non-refillable cylinders with refrigerant remaining under varying assumptions about venting.

The information used to complete each of these steps was collected through a review of available information in previous studies and input from industry sources. Detailed explanations of each step of the approach are provided below.

*Estimate the number of non-refillable cylinders used per year*. Based on input from industry sources, it is estimated that there are between 4 million and 5 million 30-pound cylinders used to charge stationary air-conditioning and refrigeration systems annually, including both non-refillable and refillable cylinders (Airgas 2021a; Fluorofusion 2021). For this study, it is assumed that there are 4.5 million cylinders (non-refillable and refillable) used to service stationary air-conditioning and refrigeration systems annually.

In addition, based on conversations with those familiar with the stationary air and refrigeration servicing industry, it is estimated that refillable cylinders account for between less than 1 percent and 10 percent of all 30-pound cylinders used, with a general assumption that the quantity of refillable cylinders as a percentage of all 30-pound cylinders used is closer to 1 percent (Airgas 2021b; Fluorofusion 2021; National Refrigerants 2021). For this study, it is assumed that the percentage of refillable cylinders is 1 percent, meaning that the total number of non-refillable cylinders would be or 4.46 million (99 percent of 4.5 million).

*Estimate the percentage of cylinders containing different refrigerants*. Table 1 presents the estimated distribution of non-refillable cylinders sold annually for servicing stationary air conditioning and refrigeration systems, by type of refrigerant. For this study, the distribution of refrigerant types assumed to be sold in 30-pound cylinders in the United States in 2020 was based on refrigerant demand for servicing and charging equipment estimated by EPA's Vintaging Model (EPA 2020).

**Table C- 1. Breakdown of cylinders by refrigerant type**

| Refrigerant | Distribution of Cylinders |
|-------------|---------------------------|
| HFC-134a | 22% |
| R-410A | 51% |
| R-407C | 3% |
| R-404A | 12% |

| R-507A | 2% |
|--------|------|
| R-407A | 9% |
| **Total** | **100%** |

*Estimate the total amount of refrigerant remaining annually in typical 30-pound non-refillable cylinders after use.* The total annual amount of refrigerant emitted each year from disposing of non-refillable 30-pound cylinders was estimated based on (1) the typical amount of refrigerant remaining in a non-refillable 30-pound cylinder; (2) the total number of non-refillable cylinders used per year (estimated in Step 1 to be 4.46 million); and (3) the distribution of the total number of cylinders used by type of refrigerant.

Four scenarios were developed based on different assumptions of the amount of refrigerant remaining in cylinders at the time of disposal, as follows:

> *Scenario 1:* 0.5 lbs. of refrigerant remaining per cylinder;
>
> *Scenario 2:* 1.0 lbs. of refrigerant remaining per cylinder;
>
> *Scenario 3:* 1.25 lbs. of refrigerant remaining per cylinder;
>
> *Scenario 4:* 1.5 lbs. of refrigerant remaining per cylinder; and
>
> *Scenario 5:* 2.0 lbs. of refrigerant remaining per cylinder.

For each scenario, the total volume of refrigerant remaining was calculated by multiplying the appropriate amount of refrigerant remaining per cylinder times the estimated number of cylinders (i.e., 4.5 million cylinders distributed across the six refrigerants). Table C- 2 shows the estimated volume of refrigerant remaining under each scenario, for each type of refrigerant and in total. If all cylinders are disposed of while still containing 1.25 pounds of refrigerant, an estimated that 5.53 million pounds of refrigerant would be vented.

**Table C- 2. Total Amount of Refrigerant Emitted by Scenario and Refrigerant**

| Refrigerant | Pounds per cylinder | Number of cylinders | Total pounds |
|-------------|:-------------------:|:-------------------:|:------------:|
| **Scenario 1 0.5 lbs. of refrigerant remaining** | | | |
| R-134a | 0.5 | 984,741 | 492,371 |
| R-410A | 0.5 | 2,280,453 | 1,140,227 |
| R-407C | 0.5 | 155,485 | 77,743 |
| R-404A | 0.5 | 518,285 | 259,142 |
| R-507A | 0.5 | 103,657 | 51,828 |
| R-407A | 0.5 | 414,628 | 207,314 |
| **Total (All)** | | **4,457,250** | **2,228,625** |
| **Scenario 2 – 1.0 lbs. of refrigerant remaining** | | | |
| R-134a | 1.0 | 984,741 | 984,741 |
| R-410A | 1.0 | 2,280,453 | 2,280,453 |
| R-407C | 1.0 | 155,485 | 155,485 |
| R-404A | 1.0 | 518,285 | 518,285 |
| R-507A | 1.0 | 103,657 | 103,657 |

| Refrigerant | Pounds per cylinder | Number of cylinders | Total pounds |
|---|---|---|---|
| R-407A | 1.0 | 414,628 | 414,628 |
| **Total (All)** | | **4,457,250** | **4,457,250** |
| **Scenario 3 – 1.25 lbs. of refrigerant remaining** | | | |
| R-134a | 1.25 | 984,741 | 1,230,927 |
| R-410A | 1.25 | 2,280,453 | 2,850,567 |
| R-407C | 1.25 | 155,485 | 194,357 |
| R-404A | 1.25 | 518,285 | 647,856 |
| R-507A | 1.25 | 103,657 | 129,571 |
| R-407A | 1.25 | 414,628 | 476,822 |
| **Total (All)** | | **4,457,250** | **5,530,100** |
| **Scenario 4 – 1.5 lbs. of refrigerant remaining** | | | |
| R-134a | 1.5 | 984,741 | 1,477,112 |
| R-410A | 1.5 | 2,280,453 | 3,420,680 |
| R-407C | 1.5 | 155,485 | 233,228 |
| R-404A | 1.5 | 518,285 | 777,427 |
| R-507A | 1.5 | 103,657 | 155,485 |
| R-407A | 1.5 | 414,628 | 621,942 |
| **Total (All)** | | **4,457,250** | **6,685,875** |
| **Scenario 5 – 2.0 lbs. of refrigerant remaining** | | | |
| R-134a | 2.0 | 984,741 | 1,969,483 |
| R-410A | 2.0 | 2,280,453 | 4,560,907 |
| R-407C | 2.0 | 155,485 | 310,971 |
| R-404A | 2.0 | 518,285 | 1,036,570 |
| R-507A | 2.0 | 103,657 | 207,314 |
| R-407A | 2.0 | 414,628 | 829,256 |
| **Total (All)** | | **4,457,250** | **8,914,500** |

Note: For the purposes of this table, it is assumed under each scenario that every cylinder is disposed with the same amount of refrigerant being emitted.

*Estimate the total amount of GHG emissions resulting from disposal of cylinders with refrigerant remaining in them*. The total amount of emissions resulting from each of the four scenarios was calculated based on (1) the total estimated amount of refrigerant remaining in cylinders by type of refrigerant and (2) the percentage of cylinders that are vented.

Table 3 provides the resulting estimates. For example, under Scenario 3 (1.25 pounds refrigerant remaining), assuming 100 percent of cylinders are vented, it is estimated that the disposal of non-refillable cylinders would result in GHG emissions of approximately 5.50 MMTCO$_2$e. Because it is unlikely that all cylinders will be vented, emissions for each refrigerant were also estimated based on varying assumptions about the percentage of cylinders that are vented. For example, under Scenario 3, if 95 percent of cylinders is vented (with the remaining 5 percent of cylinders disposed of properly), the resultant estimated emissions of GHGs would be equivalent to approximately 5.22 MMTCO$_2$e.

**Table C- 3. Refrigerant emissions under cylinder recovery scenarios, distributed by percent of cylinders vented**

| Percent of cylinders vented | Scenario 1 (0.5 lbs. Heel) | Scenario 2 (1.0 lbs. Heel) | Scenario 3 (1.25 lbs. Heel) | Scenario 4 (1.5 lbs. Heel) | Scenario 5 (2.0 lbs. Heel) |
|---|---|---|---|---|---|
| | $MMTCO_2e$ | $MMTCO_2e$ | MMTCO2e | $MMTCO_2e$ | $MMTCO_2e$ |
| 10 | 0.29 | 0.58 | 0.58 | 0.86 | 1.15 |
| 20 | 0.58 | 1.15 | 1.15 | 1.73 | 2.30 |
| 30 | 0.86 | 1.73 | 1.73 | 2.59 | 3.46 |
| 40 | 1.15 | 2.30 | 2.30 | 3.46 | 4.61 |
| 50 | 1.44 | 2.88 | 2.88 | 4.32 | 5.76 |
| 60 | 1.73 | 3.46 | 3.46 | 5.19 | 6.91 |
| 70 | 2.02 | 4.03 | 4.03 | 6.05 | 8.07 |
| 80 | 2.30 | 4.61 | 4.61 | 6.91 | 9.22 |
| 90 | 2.59 | 5.19 | 5.19 | 7.78 | 10.37 |
| 100 | 2.88 | 5.76 | 5.76 | 8.64 | 11.52 |



11 Harristown Road
Glen Rock, NJ 07452
Tel: (201) 670-9848
Fax: (201) 670-9840
www.fci-nj.com

June 18, 2021

Cindy Newberg
Director, Stratospheric Protection Division, EPA
1201 Constitution Ave NW
Washington, DC 20004
newberg.cindy@epa.gov

<u>FCI Comments on Notice of Proposed Rulemaking</u>

Dear Cindy,

From the NPRM we already feel that the EPA has considered all of the most vital factors that will have an effect on the HFC phasedown. It has become all the clearer that the EPA is an agency that all US citizens can rely on to have a positive impact on the environment, our human health, and simultaneously our economic wellbeing.

We are very grateful for and appreciate that the EPA can offer this opportunity to us to share our ideas formally with the agency, and all other stakeholders during this very important time affecting each of our industries.

For many of the subjects discussed in the NPRM we strongly agree, and for others we have prepared comments that propose suggestions that we hope would further protect U.S. industries and American jobs. Today we hope to share our input and comments sought by the EPA, and have listed those discussions below following the sequential order of the NPRM:

**1.** <u>**Using 2017-2019 to Calculate Allowance is Best for American Companies**</u>

*VI. What are EPA's Proposed Options for Determining Allocations?*

With regards to determining who is eligible for allowance, the NPRM states the *"EPA is proposing to issue allowances to companies that produced or imported HFCs in 2017, 2018, and/or 2019, and were still active in 2020."*

*"EPA proposes that considerations for determining who should receive allowances in this initial rulemaking would include providing a seamless a transition as possible to a regime where allowances are needed to produce and import HFCs, promoting equity, timeliness of implementation, and availability of robust data."*

We firmly concur with the decision to use the years of 2017-2019 because these years reflect the most current market. Additionally, we strongly agree that by excluding those who were absent in the market in 2020 gives a clearer idea as to who is still active in the HFC market presently.

A.

By using 2017-2019, the EPA will guarantee that small to medium sized businesses who have recently entered or innovated within the market, such as FluoroFusion, can begin the phase-down fairly. For example, industries using low-GWP products like HFC-152a are fast-growing and environmentally friendly, therefore using any earlier years would represent an inaccurate landscape of market share. Data from the EPA in Table 1 shows how the total consumption of HFCs went from an average GWP of 249 MMTEVe in 2011-2013, to an average of 294 MMTEVe in 2017-2019. This is an 18% increase in total consumption of HFCs during that time, and any industry with that much change will have a significant evolution of market players.

**Table 1. Total Consumption of HFC (EPA's GHG)**

| Year | Total Consumption (as GWP) |
|------|----------------------------|
| 2010 | 235,000,000 |
| 2011 | 241,000,000 |
| 2012 | 227,000,000 |
| 2013 | 278,000,000 |
| 2014 | 254,000,000 |
| 2015 | 264,000,000 |
| 2016 | 240,000,000 |
| 2017 | 285,000,000 |
| 2018 | 304,000,000 |
| 2019 | 294,000,000 |
| 2020 | N/A |

B.

Ms. Lisa Massaro from DuPont's Public Comment published on February 24th, 2021, advocated for the use of 2017-2019 to calculate allowance as well. Her reasoning is because many industries have taken time to innovate their products to meet "new SNAP rules/notices and shifts in demand for higher energy efficient products" that became effective in 2010, such the XPS industry being required to transition from HCFCs to HFCs. Since it was only 2010 when these changes became effective, then the years 2011-2013 would be too soon to represent the most accurate demand and usage rates. However, by using the years 2017-2019 to calculate allowances, the HFC market will have had time to re-center, and be accurately represented. This is an ideology that we agree with wholeheartedly.

C.

Finally, another important reason to use 2017-2019 is because China, Mexico and India have later HFC phasedown timelines based on their signing of the Kigali Amendment that are 7-11 years later than the United States' phasedown in the AIM Act.

Leading up to 2017-2019, there have been costly innovative efforts to either implement lower GWP HFCs, like HFC-152a, into applications like foam blowing based on BASF's public comment or to transition from HCFCs to HFCs, as also mentioned in DuPont's public comment by Lisa Massaro.

If we do not ensure these companies or their suppliers receive the proper allowance based on these recent innovation efforts between 2017-2019, it could halt these projects that would otherwise benefit the environment and progress of the industry.  It is likely those technologies would be redeveloped or moved to countries that have more lenient HFC phasedown policies like China, Mexico, and India. At the very least, this would mean a loss of competitive advantage in the USA for these newly innovated products.

Over the next 7-11 years HFC production and end products in these developing countries will be unhindered by any downturn, becoming stronger and stronger global competitors. Therefore the U.S. should rely on the latest and most accurate market information of 2017-2019 to be better poised to protect American industries and be against this competitive disadvantage.

Once again, China, India, and Mexico are the first, second, and third largest HFC manufacturers in the world other than America, and based on the Kigali Amendment phase down timeline they each will first feel the effects of an HFC phasedown 10 and 13 years later than the U.S. In Table 2, it can be seen that the group China and Mexico are in will not experience changes of 10% all the way until 2029. India will wait even further and have their first 10% reduction all the way until 2032! These are 7 and 11 years later compared to the 2022 date for the US required in the AIM Act.

For your reference, China has more than 10 HFC factories, and produces all major types of HFCs such as HFC-32, HFC-125, HFC-134a, HFC-143a, HFC-152a, HFC-223, HFC-236fa, and HFC-245fa. Although India has one factory currently, they produce HFC-134a, HFC-32 and HFC-125, and another 2 HFC factories were announced to be built in the next 2 years! Mexico is another large producer of HFCs, and potential competitive threat to the US since their 10% phasedown will not be until 2029 as well. Mexico is currently a significant supplier of HFC-134a to the US, they have the supply to be able to take advantage of the US in the same way.

As you can see, HFC production is already shifting towards the other 3 nations. It is unreasonable to apply legislation that would also shift production of newly innovated end products there as well by not providing adequate allowance to the needs to the recently developed U.S. market between 2017-2019.

Table 2. Group 1 (China, Mexico) and Group 2 (India) Delayed Phasedown Timeline



Due to their later phasedowns than the US and resulting abundant supply, China, India, and Mexico are poised to compete intensely with exports of their lower-priced HFCs and HFC end products to the United States. There is a great risk for them to overtake American markets, who will be forced to rely on those foreign markets' unregulated HF finished goods especially. Using 2017-2019 will be vital to protect all American companies and especially small businesses and from this competitive threat.

## 2. Transfer Offset of 1% Promoting Flexibility

*D. What are EPA's Proposed Provisions for Transferring Allowances?*

"*EPA is proposing that the offset be five (5%) percent and is taking comment on a range from one percent to 10 percent. A five percent offset would meet the AIM Act statutory directive and provide a net environmental benefit without discouraging trading necessary to meet market demands.*"

A.

Especially during the first several years of the phasedown, we believe a transfer offset of 1% will permit these innovators the flexibility to sustain their new operations. In the case they require more allowance because of the greater market share gained, then they would not be dramatically hindered with a 5-10% offset. Once again, China, India, and Mexico are still growing their HFC production and exports quickly, and will be a tough competitor for the U.S.

In the case that an American company will require less allowance, a 1% transfer offset will allow for those in need to acquire more at a minimal cost. A company in need may be challenged with less allowance than needed, a high price per allowance, and a high transfer offset per allowance. This will add costs to small businesses that they may not be able to cover and as a result lose business and inevitably their company. A 1% transfer offset would help to alleviate one additional cost to smaller businesses and help sustain their livelihood.

B.

Furthermore, we believe and suggest that any third-party brokers of consumption and production allowances should only be permitted to facilitate in buying and selling the allowance but would not be eligible to hold the allowance. If a third-party broker were able to hold allowance, it would be a way for a company to bypass the set aside pool for new entrants, which should be the EPA's decision only. This would also deter brokers from hoarding allowance and manipulating the allowance market by accruing a sizable pool of allowance. This will also ensure brokers are fulfilling their imperative role in this phasedown, which is to effectively contribute to coordinating allowance transfers responsibly so that the HFC market can thrive and be as efficient as possible.

### 3. Sustaining Existing Markets with a Modest Set Aside Pool of Allowance

*Part VI. E. What is EPA's Proposed Set Aside Pool of Allowances*
*"Accordingly, EPA is proposing to establish a set aside pool for new HFC importers of a total of five MMTEVe of consumption allowances for 2022 but is considering a range up to 15 MMTEVe. Because application-specific allowances can also function as production allowances, EPA is proposing to set aside one MMTEVe of production allowances as well. Because EPA anticipates the application-specific end users to be a smaller group than the other two groups, EPA is proposing a smaller set aside amount. EPA specifically invites comments on the size of the set aside for consumption and production allowances."*

A.

The set aside pool of allowance presents a chance to leave room for certain beneficial opportunities. This includes further careful attention paid toward mandatory application-specific allowances and ensuring any emergency or new needs of HFCs can be considered at the forefront of every distribution of allowance.

However, FCI believes the currently proposed level of 15 MMTEVe is much higher than would be needed, as this is significantly more than the currently evaluated mandatory application-specific allowance. The total mandatory application usage is between 3.1 and 3.6 MMTEVe per year, which can be calculated based on the NPRM's discussion of volumes and HFCs within each application-specific sector. The set aside pool is designed to prioritize this mandatory application-specific sector, so it would be an overcalculation to assume something 5 times as much is required.

Furthermore, 15 MMTEVe is one and a half times more than the entire HFC Aerosol market, that the EPA states is 4% of the entire HFC market. At 4% of the consumption baseline of 299 MMTEVe, the aerosol market is equivalent to 12 MMTEVe. Therefore, it would be an overcalculation to reserve a pool of 15 MMTEVe, already larger than certain sectors in the HFC industry.

B.

Our suggestion is to cap the set aside pool to 3 MMTEVe, which based on the above details should be more than enough to satisfy the demands of the application-specific sector, and minimal small-business new entrants. The benefit of this includes giving current allowance holders clarity as to how much allowance they will be allocated at the beginning of the year, rather than counting on allowances leftover from the set aside pool to supplement their allocation. It will give allowance holders the opportunity to seek the purchase of allowance at appropriate times and prices.

Since the EPA will be revisiting these rules in 2 years, a set aside pool of 15 MMTEVe would be an extremely large quantity for only a 2-year period. Major innovation efforts and new applications will push this envelope for new business entrants, which would be well-discussed during the continuing rulemaking processes.

C.

FCI agrees with the EPA's current requirements that the new entrants meet certain criteria, such as the small business criteria from the Small Business Administration (SBA) to access the set aside pool. To further ensure that the set aside pool is responsibly used, FCI proposes that new entrants must boast a new application or innovation for HFCs. This would close a loophole for banned companies to gather colleagues to access the set aside pool and disrupt a stable market.


## 4. International Transfers Should Include Consumption Allowance Holders

*Part VII. A. How is EPA Proposing to Address International Trades or Transfers of HFC Allowances?*

*"International transfers of production allowances allow for the production of a chemical to be consolidated at fewer plants in order to be able to achieve economies of scale as demand shrinks and the HFC phasedown progresses. EPA proposes to allow such production transfers where the requirements of the AIM Act are met."*

A.

FCI requests more clarity on international import transfers. The remarks contain insight for production allowance transfers, but those using consumption allowances should also be given the opportunity to transfer allowance to or from another country. FCI proposes only countries that are in the same phase down timetable should be eligible for international trading allowance.

If not, we are defeating the purpose of phasing down HFCs globally. Instead, it would be equivalent to transferring the same level of GWP to different countries with later schedules, and not working towards the goal of eliminating the environmental impact of HFCs within the timeframes expected.

B.

Regarding the international transfer offset, we suggest maintaining the low transfer offset of 1%, for companies who are transferring with their own internal firm or parent company in an international country. Once again, the country should be within the same phasedown Group as outlined in the Kigali Amendment, such as USA to Canada, but not USA to China. In this way, the 1% offset will have minimal disruption towards business operations and can be used to correct a need for allowance effectively. Additionally, companies who wish to consolidate their production for economies of scale, as the EPA states in the NPRM, will be given the opportunity to do so effectively.

For any other international transfer between unrelated companies, we suggest the higher end of 10% transfer offset. We propose this high international transfer offset between unrelated companies because allowance holders should be encouraged to prioritize the economic health of the domestic HFC market, and channel any unused or sold allowance back to the general pool of US available allowance. The 10% international transfer offset will challenge any HFC allowance valuation that exists outside of the domestic allowance pricing, which could be much higher since some countries are further along in their HFC phasedown. It will be an important opportunity to encourage that allowance be returned to US companies whose employees and continuation rely on it.

## 5. Incentivizing Compliance Enforcement of Allowance Holders

A.

We appreciate the EPA's efforts to combat noncompliance based on "significant evidence of noncompliance with HFC quotas in the EU" and that "this level of noncompliance would put businesses complying with regulatory requirements at a competitive disadvantage and could inhibit companies from investing in research and development to identify new alternatives." (Section VIII).

To achieve the most perfect enforcement to prevent similar noncompliance as the EU of "five to 33 percent of the total U.S. allocation" or "13-90 MMTEVe of additional consumption", it will be very necessary for the EPA and CBP to rely on reporting from the public to identify bad actors. An accessible reporting platform and incentives must be provided to ensure whistle blowing participation.

This would be easy to implement since this type of reporting platform already exists as the eAllegations platform in the CBP and can be utilized by the EPA. We are happy that the EPA already "intends to work with CBP" and recognizes that "illegal imports of HFCs have

consequences for other U.S. agencies, such as the Customs and Border Protection who collect duties on imports of HFCs." Utilizing the eAllegations reporting platform is a convenient and logical way the EPA could rely on the public reporting of bad actors trying to import HFCs without proper allowance.

To ensure a smooth HFC phasedown and avoid "smuggling" and other noncompliance that has already happed in the EU, we hope the EPA would encourage companies to report bad actors and provide incentive to do so. The CBP has the Moiety Statute (10 USC 1619) which the EPA can use to provide similar incentives for reporting violations to the AIM Act's rulemaking.

The Moiety Statute compensates any person up to 25% from the United States Government of any amount the U.S. Government recovers from an illegal transshipment based on information provided to any Customs officer or US attorney.

In the instance of noncompliance within the AIM Act phasedown, it would be a great fit to apply the Moiety Statute. It would also be appropriate to have HFC consumption allowance be used as compensation through this practice, when the reported violator is either a potential allowance holder, or a current allowance holder. That is, if any person uses the eAllegations platform to successfully alert the EPA or CBP of a potential or current allowance holder and they are found to be in noncompliance based on the eAllegations report, then that person should be eligible to receive a reward of up to 25% of any allowance that is retired, revoked, or withheld as a result. The reward percentage should be no less than 20%, per reporter. In the case there is more than one reporter, each would receive 20% of any allowance retired, revoked, or withheld. For example, if 100,000 MTEVe is revoked, retired, or withheld because of 2 reporters' efforts, each reporter should receive 20,000 MTEVe, or 20% each of 100,000 MTEVe.

The possibility of rewarding retired, revoked, or withheld allowance to successful reporters already falls within the scope of the NPRM which says, "production allowances, consumption allowances, and application-specific allowances <u>do not constitute property rights</u>" and "the EPA [will have] the authority to retire, revoke, or withhold allowances <u>at the discretion of the Administrator</u>".

Once again, the CBP already has an eAllegations and Moiety Statute in place that the EPA could utilize to provide and incentivize the public of alerting both the EPA and CBP of noncompliance.

   B.

*Section VIII. B. What Practices Could Warrant EPA's Proposed Administrative Action for Allowance?*

This section of the NPRM identifies "types of practices that could warrant the Agency exercising its discretion to levy administrative consequences for allowances." Part 3 of this section discusses "Violations of Department of Commerce and Customs and Border Protection Trade Provisions" which includes only dumping and failure to use correct HTS codes. Please note, there are many more duty evasion violations that would be relevant for importing HFCs illegally once the phase down is in effect.

The CBP lists types of Duty Evasion Violations that the EPA should exercise administrative consequences for allowances. These are the relevant violations that should be included in Part 3 of this section with the CBP's own description of the violation:

- Undervalued Merchandise
  - "The undervaluation of merchandise can result in the evasion of significant amounts of duty, fees, and taxes.  Sometimes merchandise is undervalued due to the failure to include the cost of material assists, royalties, selling commissions, packing, overhead, portions of merchandise resale proceeds remitted to foreign supplier, etc."
- Falsely Described Merchandise
  - "Falsely describing merchandise generally results in misclassification of the merchandise with a significantly lower (possibly free) rate of duty and may also put it outside the scope of an anti-dumping and/or countervailing duty order."
- Misclassified Merchandise
  - "Deliberate misclassification of merchandise can result in a significantly lower (possibly free rate of duty) and may also put it outside the scope of an anti-dumping and/or countervailing duty order."
- False Country of Origin Declaration
  - "By falsely declaring the country of origin of merchandise, the importer will pay significantly less in duty, fees, and taxes than what is legally owed and may also be evading anti-dumping and/or countervailing duties."
- False Manufacturer Declaration
  - "By falsely declaring the manufacturer of merchandise, the importer may be evading anti-dumping and/or countervailing duties or avoiding seizure of unsafe merchandise."
- False Trade Agreement Claim
  - "By falsely declaring that merchandise is eligible under a special trade program, the importer will pay significantly less in duty, fees, and taxes than what is legally owed."
- False Preferential Treatment Claim
  - "By falsely declaring that merchandise is eligible under a special trade program, the importer will pay significantly less in duty, fees, and taxes than what is legally owed."
- Tariff Quota Evasion
  - "Import quotas control the amount or volume of various commodities that can be imported into the United States during a specified period. Quotas are established by legislation, Presidential Proclamations or Executive Orders. Quotas are announced in specific legislation or may be provided for in the Harmonized Tariff Schedule of the United States (HTSUS)."
- False Drawback Claims
  - "Some importers and individuals submit false statements to U.S. Customs and Border Protection (CBP) to obtain improper drawback refunds.  Under the

Drawback program, U.S. importers may have 99% of the duty paid upon importation refunded when they export merchandise."

For the violations above with respect to allowance penalties, duty evasion as described in Part 3 should also be subject to "administrative action [should] not be contingent on a concluded enforcement case. Instead, it would be based on information available to EPA" as it is in Part 2. Enforcement at the EPA with respect to allowance (not duties) should be at the sole discretion of the EPA. Once again, "allowances do not constitute property rights". To effectively prevent similar noncompliance as the EU of "five to 33 percent of the total U.S. allocation" or "13-90 MMTEVe of additional consumption", the EPA should use their power to take swift and reasonable actions when presented with obvious evidence.


## 6. Lab Testing Considerations

*Part VIII. D. 3. Labeling*

*"To provide a way to check the accuracy of the label, EPA is proposing to require producers and importers to batch test their product and retain records indicating the results of the batch testing."*

*"HFC identifiers and a certified laboratory to verify the contents of a container may not be available, for example at a port, so providing a clear presumption that could be used in such circumstances would facilitate compliance and enforcement efforts."*

The idea to test each container of HFCs that comes into port is a great one in principle. In doing so, the EPA would be able to quickly weed out smugglers and bad actors who intentionally mislabeled their materials in efforts to hide the contents and engage in activities that are counterproductive to the EPA's goals of the HFC phase down. Also, it would enable the EPA to keep track of the amount of HFCs being imported into the US.

However, in practicality, this plan would suffer three major hurdles that would be detrimental towards its efficacy. Firstly, testing would add time to the delivery of the imported materials. In a significant number of cases, this could create temporary/permanent shutdowns of smaller companies because of lack of raw materials. Secondly, it would also add an additional cost to imported materials. Finally, the logistics of sampling imports may further exacerbate the first two issues. The EPA acknowledges this latter point in the NPRM via the quote above. The combination could put the livelihood of HFC importers in jeopardy.

While the testing of HFCs would certainly help in the short term, it would not over the long term. Therefore, we propose several different tactics.

First is to test only blends and no single component HFCs. This would ensure the accuracy of the blended materials and streamline the testing process.

However, we also acknowledge that some imported materials may come under mislabeled containers to skirt the inspection. Therefore, our second approach is to test all HFC

importers for a trial period of 1 year. If the importer can prove that they are importing what they say they are, then they have proven that they are trustworthy enough to forego future testing on their HFC imports. If, on the other hand, they fail to prove their trustworthiness, then they should be put on an additional 1-year probationary period.

Additionally, for any new entrants, they should be put on an immediate 1-year probationary period. This would help to weed out any bad actors who were expunged from holding allowance who are trying to get back into the HFC market, as well as give credibility to new entrants.

## 7. Importing HFCs as Feedstock Should Have Extended Timeframe Before Use

*Part VIII. F. Petitions to Import HFCs as Feedstocks or for Destruction*

*"EPA is proposing that HFCs imported under this process for transformation or destruction be transformed or destroyed, as applicable, within 60 days of being imported into the United States. EPA is taking comment on whether it should consider a longer timeframe such as 90 days. EPA is also taking comment on whether it is appropriate to allow a longer timeframe for regulated substances to be used as feedstocks, up to 12 months."*

FCI agrees with the fact that HFCs imported for transformation and destruction should not require spent allowance. We also appreciate the EPA's consideration to the timeframe that should be allowed between import, and when the material is finally transformed or destroyed. As per the wording on part F, FCI believes it would be appropriate to allow a longer timeframe of 12 months for regulated materials to be used as feedstocks. It will benefit users to have a "cushion" of inventory that could last them several months, rather than a rolling inventory that must be turned over every 60 days, for example.

This consideration is even more important due to the unique ocean transit and general transportation volatility that is presently an issue and is expected to continue well into the future. Since container ships' lead times are almost doubling, many importers must create a large enough inventory to cover the inevitable delays. With a timeframe of 12 months, the importers and/or the users of the feedstock will be able to comfortably operate their supply chain.

## 8. QR Code Tracking: Omit Private and Closely Held Data from View

*Part VIII. G. How is EPA Proposing to Track the Movement of HFCs in Commerce?*
*"While EPA sees value in releasing all of these data to the general public in a comprehensive database both for transparency and to enable the certification ID tracking system to fully operate in support of overall program compliance, EPA anticipates that if all information was publicly available in the database, item (6) could potentially divulge information submitters customarily keep private or closely held."*

*"EPA is seeking comment on whether submitters consider the information submitted for item (6) to be information they customarily keep private or closely held. If so, the Agency will make a decision in the final rule as to whether the Agency will provide an express assurance of confidentiality for the information and how it will protect that information from unauthorized disclosure."*

FCI agrees that the implementation of a QR code-based tracking system would be beneficial in protecting U.S. companies from noncompliance, especially in the way it would mirror the threats that occurred in the EU as mentioned in the NPRM. However, there are concerns about the depth of the information assigned to each code, as well as what would possibly be viewed publicly that would normally be considered sensitive, and we suggest the EPA move forward to "protect that information from unauthorized disclosure."

As per the list of information proposed for release, FCI strongly agrees that the QR code should include:

- *(1) whether the HFC being sold is legal to purchase based on existing records.*
- *(2) when the HFC was produced, imported, or reclaimed and by whom.*
- *(3) what HFCs are included in the container;*
- *(4) if reclaimed HFC, whether the purity of the batch was confirmed to meet the refrigerant purity standard in appendix A to 40 CFR part 82, subpart F (based on AHRI 700- 2016), when was that confirmed, and by whom;*

FCI does not believe that "*(5) what the brand name associated with the container"* is necessary at all, considering that point (3) will already reflect the HFC included in the container. The official chemical name of the HFC in question, as represented in part (3) is already the most appropriate way for labeling within the QR code. This process is meant to track compliance during the HFC phasedown, and not act as a sort of advertising tool in listing brand names.

Finally, *(6) all prior sales of the certification ID associated with a container of HFCs"* would effectively track the entire chain of custody of the material, and FCI considers this information we "customarily keep private or closely held" as stated in the NPRM. Especially during the phasedown where many businesses are navigating change and the challenges that go along with it, it is imperative to keep market competition reasonable. We urge the EPA to protect this confidential business information so that customers, suppliers, handlers, and other entities in the chain of custody of the material remain private, and "protect that information from unauthorized disclosure" and protect American companies at the same exact time.

## 9. Importer Recordkeeping, Proposing Annual Reports

*Part XI. C. How is EPA Proposing to Coordinate AIM Act Reporting with other EPA Reporting Requirements?*

*"EPA is proposing to require quarterly reporting of data that includes the quantity of each regulated substance produced, the quantity of allowances expended, and quantities produced for transformation or destruction. EPA is proposing quarterly reporting to ensure that annual production and consumption limits are not exceeded."*

FCI feels that an annual reporting of data is a sufficient frequency to ensure that annual production and consumption limits are not exceeded. Since the EPA will be tracking the transfers and adjusted quantities of allowances year-round, we feel one annual report will minimize burden on cost of time and money. Especially if the EPA implements the use of QR codes offering real-time calculations, there would be a constant oversight already instated. Therefore, the annually provided reports would greatly limit the burden of time and money allowance holders as well as the EPA endures.

## 10. Future Rulemaking for Allowance: Approaches 1 & 2 Recommended

*Part XI. A. How should EPA Consider Future Allowance Allocations?*

*"EPA seeks advance input on the following concepts, as well as suggestions for additional approaches the Agency could consider for 2024 and later years.*

*(1) Allocating allowances based on past production and consumption from a set period of years and only adjusting allowance holders to reflect transfers between companies;*

*(2) Allocating allowances based on a reevaluation of the most recent years of production and consumption data as reported to EPA (e.g., three years);*

*(3) Allocating allowances based on past production and consumption, but requiring a fee for every allowance provided for production or import of HFCs;*

*(4) Establishing an auction system for the total set, or some subset, of generally available allowances;*

*(5) A combination of the above approaches, such as phasing in the use of an auction or fee over time."*

With regards to the future approaches of allowance on page 208, FCI supports the use of approaches 1 and 2. It will be in allowance holders' best interests to have their future allowance be determined from set years in option 1, or from the past 3 years' data as stated in option 2. For many companies it will be impossible to foresee how their business may unfold in the next three years before 2024 allowance is awarded, and therefore may prefer option 1 or 2 in order to be better equipped for the next stage of the phasedown. In this sense, a combination of only approaches 1 and 2 may be the most appropriate before 2024.

FCI suggests that options 3 and 4 would promote unfairness and a loss of control to the EPA. We believe they should be avoided in practice, or as part of a combination of approaches, since they each place too much power into rich companies' hands. By applying a fee to each allowance provided, or by establishing an auction system, it would make it so that "money talks" and those allowance holders with more capital will be unfairly advantaged. It will ultimately lead to monopolization of markets and allowance, and the downfall of small businesses.

Perhaps most importantly, the EPA will lose control of the phasedown to a select few allowance holders who can collect virtually as much allowance as they can purchase. We

strongly believe the EPA should be the sole government agency and deciding factor of the fate of the HFC phasedown, not money. Options 3 and 4 would be assigning power to unchecked firms with more capital, who would detriment both the economic and environmental health of the U.S. We hope the EPA can continue to represent the sole, fair leader of the phasedown, and not release this vital role to the power of money.

## 11. Conclusion

Once again, we greatly appreciate this opportunity that the EPA has given us to make direct suggestions and comments on the NPRM. The chance to share our ideas publicly with the EPA and each stakeholder is greatly valued.

FCI welcomes any comments or questions from the EPA regarding our feedback and suggestions. We believe strongly that the NPRM is an excellent starting point and are looking forward to continued opportunities to elaborate on considerations that may protect the environment and US companies even further.


Most sincerely,

Signature:     *Daniel Gagliano*
Name:          Daniel Gagliano
Title:         Sales & Marketing Manager
Date:           6/18/2021

Signature:     *Greg Heden*
Name:          Greg Heden
Title:         Senior Sales & Marketing Manager
Date:          6/18/2021

Signature:     *Michael Valenti*
Name:          Michael Valenti
Title:         Vice President
Date:          6/18/21

# HARDI
HEATING AIR-CONDITIONING REFRIGERATION DISTRIBUTORS INTERNATIONAL

445 Hutchinson Avenue
Suite 550
Columbus, OH 43235

July 2, 2021

Ms. Cindy Newberg
Division Director
U.S. Environmental Protection Agency
Office of Atmospheric Programs
Stratospheric Protection Division
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460

Submitted electronically

RE: Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program under the American Innovation and Manufacturing Act [Docket ID: EPA-HQ-OAR-2021-0044]

Dear Ms. Newberg,

On behalf of Heating, Air-conditioning & Refrigeration Distributors International (HARDI) I write to offer comments on the Environmental Protection Agency's (EPA) proposed regulation for the Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program under the American Innovation and Manufacturing Act [Docket ID: EPA-HQ-OAR-2021-0044].

HARDI is a trade association comprised of over 800 member companies, more than 400 of which are U.S.–based wholesale distribution companies. Over 80 percent of HARDI's distributor members are classified as small businesses that collectively employ in excess of 60,000 U.S. workers, representing more than $40 billion in annual sales and an estimated 70 percent of the U.S. wholesale distribution market of heating, ventilation, air-conditioning and refrigeration (HVACR) equipment, supplies, and controls.

HARDI appreciates EPA's request for comments on this proposed rule and its many components. As wholesaler-distributors of HVACR products HARDI members generally are not directly

1

impacted by the allocation and allowance process but are affected by the overall phasedown of HFCs and the compliance measures included in the rule are burdensome to distributors. These comments will focus on components of the allowance and allocation system and the compliance measures that impact distribution.

## 1. Legislative History of the American Innovation and Manufacturing Act

### a. American Innovation and Manufacturing Act

HARDI and the entire HVACR industry have been strong supporters of the American Innovation and Manufacturing Act[1] (AIM Act) along with the Kigali Amendment to the Montreal Protocol. Full implementation of the AIM Act is the best option for the HVACR industry as the legislation builds upon past successes in transitioning away from harmful ozone-depleting substances and moves the industry up the technological ladder towards more environmentally friendly products. This innovation in HVACR will help the U.S. continue to be a market leader in this global industry. Based upon previous transitions, we know that the market will accelerate the transition to new refrigerants simply by ensuring that domestic production and imports match decreases in production globally.

HARDI supported the AIM Act because it provided a limited grant of authority[2] to the Environmental Protection Agency (EPA) to regulate the production and consumption of HFCs. This grant of authority was specifically meant to be limited because it utilized the parts of previous

---

[1] American Innovation and Manufacturing Act, Public Law No: 116-260 Division S, Sec. 103 (Date: December 27, 2020, enacted H.R. 133) Available from: https://www.congress.gov/bill/116th-congress/house-bill/133/text?r=6&s=1.
[2] *Federal HFC Phase-down* [Issue Brief], Heating, Air-conditioning, & Refrigeration Distributors International (2019). https://f.hubspotusercontent40.net/hubfs/4929193/HFC%20Phasedown%20Issue%20Brief.pdf.

2

phaseouts that worked without the need to add additional regulations that could potentially harm parts of the industry. Phasing down the use of HFCs at the production and import stage paves the way for new technologies and protects U.S. jobs across the HVACR industry. HARDI supports the efforts of the AIM Act to phasedown the production and import of HFCs over 15 years to gradually reduce the availability of older refrigerants until 15 percent of the baseline remains. This remaining 15 percent production and import of HFCs will provide industries time to find acceptable alternatives to current HFCs and ensure no consumer is forced into changing products before the end of its useful life.

*b. State regulations of HFCs*

HARDI also supports this federal phasedown because of its impact on state regulations. While the AIM Act does not contain any preemption clause, the mere existence of federal regulations on HFCs will reduce the need for many states to develop their own HFC regulations. HARDI does not support a patchwork of state-by-state regulations on HFCs that would make it harder if not impossible for distributors to conduct business across state lines.

*c. History of the Montreal Protocol*

The Montreal Protocol is an international agreement, finalized in 1987 and ratified by the U.S. Congress in 1988,[3] to protect the stratospheric ozone layer. This international agreement led to the phaseout of ozone-depleting substances including many older chlorofluorocarbon and hydrochlorofluorocarbon refrigerants. The U.S. HVACR industry was an early supporter of the

---

[3] Montreal Protocol on Substances that Deplete the Ozone Layer. Signed 16 September 1987. Ratified 3 March 1988. UNTS vol. 1522 nos. 26369-26373.

Montreal Protocol and helped shape the phasedown contained in Title VI of the Clean Air Act.[4] That phaseout is the blueprint for the phasedown of HFCs authorized under the AIM Act.

*d. History of the Kigali Amendment*

Recognizing the importance of phasing down the use of HFCs due to their high global warming potential (GWP) the parties to the Montreal Protocol signed the Kigali Amendment in 2016.[5] This global agreement to phasedown the production and consumption of HFCs is another opportunity for the U.S. HVACR industry to lead and while not yet ratified by the United States, the industry wants to work with EPA to achieve the goals of the amendment through the AIM Act.

## 2. Allocation and Allowance System

*a. Production and consumption baseline*

The allocation rule is one of the most important parts of ensuring an orderly phasedown, HARDI has historically stayed away from commenting on the calculation of the overall production and consumption baseline and will continue to do so as our members are downstream entities in the supply chain.

*b. Allowance allocation time-period and equitable allowance system*

As purchasers of HFC refrigerants HARDI does want to comment on the allowance allocation system. EPA is seeking feedback on the period used for determining allowances and we support using the full 2011-2019 range for determining allowances and allowing each applicant to use the

---

[4] 42 USC § 7671.
[5] Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer. Signed 15 October 2016. C.N.872.2016.

average from the highest three years of market share from within this range. The three-year period can be non-contiguous and any applicant that does not have three years to choose from should be considered for the new-entrant set-aside pool of allowances. Allowing applicants to use their best three years of market share will provide better equity to the system by ensuring applicants are not harmed by past market manipulation. HARDI also urges EPA to correct applicants' market share averages for any improper actions including documented cases of dumping[6789] of product or investigations into circumvention of anti-dumping duties as had been identified by the U.S. Department of Commerce.

While there is little legislative history to the AIM Act, when introducing the legislation Senator John Kennedy (R-LA) was quoted in his press release, "The world is moving away from hydrofluorocarbons, and the U.S. is in danger of getting stuck at the starting gate. We want these new refrigerants to be produced in the U.S., not in China."[10] Correcting for market manipulation,

---

[6] *Difluoromethane (R-32) From the People's Republic of China: Antidumping Duty Order*, International Trade Administration (11 March 2021), https://www.federalregister.gov/documents/2021/03/11/2021-05099/difluoromethane-r-32-from-the-peoples-republic-of-china-antidumping-duty-order.

[7] *1,1,1,2 Tetrafluoroethane (R-134a) from the People's Republic of China: Antidumping Duty Order*, International Trade Administration (19 April 2017), https://www.federalregister.gov/documents/2017/04/19/2017-07913/1112-tetrafluoroethane-r-134a-from-the-peoples-republic-of-china-antidumping-duty-order.

[8] *Hydrofluorocarbon Blends From the People's Republic of China: Antidumping Duty Order*, International Trade Administration (19 August 2016), https://www.federalregister.gov/documents/2016/08/19/2016-19873/hydrofluorocarbon-blends-from-the-peoples-republic-of-china-antidumping-duty-order.

[9] *Pentafluoroethane (R-125) From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, International Trade Administration (8 February 2021), https://www.federalregister.gov/documents/2021/02/08/2021-02529/pentafluoroethane-r-125-from-the-peoples-republic-of-china-initiation-of-less-than-fair-value.

[10] Press Release, Senator John Kennedy, Sens. Kennedy And Carper File Legislation To Save Jobs During Phasedown Of Hydrofluorocarbons (Oct. 30, 2019), https://www.kennedy.senate.gov/public/press-releases?ID=47698154-41C9-4CF9-809D-DB75FF32291B.

5

while not expressly written in the legislation is within the intent of the introducing senator and should be considered. As purchasers we want to see a healthy market that ensures a fair price for products, and we believe EPA should correct for manipulation in determining allowances. We also want to see new entrants into the market and support the new-entrant set-aside to ensure continued competition. Using this method for 2022 and 2023 will give EPA time to study how the allocation system works in time to make changes for the allocation rule affecting 2024 and beyond.

*c. Reclaimer access to set-aside*

In addition to the traditional allowance holders of producers and importers, HARDI supports other commentors' proposals for allowing all reclaimers access to a set-aside of allowances for virgin refrigerant gases. Reclaim is a vital component to the refrigerant management process and data on reclaimed gases in recent years shows the need to ensure more recovery is done to feed the reclaim process. The AIM Act specifically calls on EPA to increase opportunities for reclaim.[11] One such method is allowing all reclaimers to access a set-aside of allowances for virgin refrigerant gases to be used to bring recovered gas to match specifications outlined in AHRI 700-2016 as required by section 608.[12]

Reclaimers need access to virgin material to ensure recovered gas blends are rebalanced to the appropriate ratio of components. These components must be accurate within one half of one percent of the prescribed blend. If any component is below this threshold, virgin material can be added to bring the blend into the appropriate balance. The more a blend is out of balance, the costlier it is to reclaim; allowing reclaimers access to allowances will ensure they have the

---

[11] Sec. 103(h)(2)(A) of the American Innovation and Manufacturing Act.
[12] 42 USC § 7671g.

components necessary to properly blend reclaimed gases for sale into the market. Allowances will also make it economical to reclaim more out of balance blends which will help ensure a strong supply of reclaimed refrigerant to provide service gases to the industry.

Allowing all reclaimers access to a set-aside is one component to increasing reclaim, and HARDI encourages EPA to put appropriate guardrails in place to ensure any allowances received by the reclaimers are used exclusively for reclaim and that the use of virgin material is limited to the amount necessary to rebalance these HFC blends. Any company receiving an allocation as a reclaimer should guarantee they will not use the allowance to enter the virgin refrigerant market or claiming refrigerant that is mostly virgin material is being sold as reclaim. Appropriate reporting requirements from reclaimers using allowances from the set-aside in 2022 and 2023 will ensure they are not abusing the set-aside and serve as a learning tool for EPA to develop a better calibrated set-aside for the next allocation rule if necessary. HARDI also encourages EPA to pursue additional regulations to increase recovery of HFC refrigerants to increase the supply of reclaimed gas beyond 2024. Recovery regulations will be possible in a future rulemaking on technician certification, and we look forward to working with EPA as proposals are developed.

*d. Batch testing and AHRI 700 purity standard*

EPA is seeking comment on requiring refrigerants to be batch tested to meet the specifications contained in Appendix A to subpart F of part 82. HARDI supports the batch testing requirement and encourages EPA to require all refrigerants to meet the AHRI 700-2016 standard used by reclaimers. Reports of illegal HFC imports being of low quality and impure should concern the

7

industry[13] and a simple solution to help identify illegal production or imports of HFCs is to require all refrigerants are batch tested to meet the AHRI 700-2016 standard. Reclaimed refrigerant already goes through the expense of testing gases for purity, all producers or importers should be required to meet the same standard to provide assurances to customers and will help put reclaimed refrigerant on a level playing field.

*e. Concerns with the allocation rule*

Overall, HARDI supports and appreciates the allocation and allowances system proposal contained in the proposed rule. HARDI also appreciates EPA seeking feedback on many components of the proposed rule, however there are several concerning compliance measures proposed by EPA that go far beyond the authority of the agency and will be outlined in sections 3 and 4 of these comments.

**3. Ban on non-refillable cylinders**

*a. EPA's proposed limits on packaging of regulated substances*

One of the proposals HARDI is concerned with is the plan to ban the use of non-refillable cylinders for regulated substances. The proposed rule refers to non-refillable cylinders as disposable cylinders, HARDI rejects this phrasing as even refillable cylinders are disposable when they reach the end of their usable life. This ban would effectively end the use of non-refillable cylinders from the industry as most next generation refrigerants use a regulated substance in its blend. HARDI

---

[13] *Reports of R-134a Contaminated with R-40 and Other Refrigerants* [White paper], Air Conditioning, Heating, and Refrigeration Institute (2013), https://www.ahrinet.org/App_Content/ahri/files/News%20Room/Press%20Releases/2013/AHRI _R_40_Contaminati on_white_paper.pdf.

opposes this proposed ban because of its effect on the industry and believes other methods can achieve the same environmental benefits.

According to the reasons given by EPA, up to 8 percent of the service gas contained in a non-refillable cylinder can remain as a "heel"[14] and can potentially be released to the atmosphere if not properly recovered. This 8 percent estimate is vastly larger than most other estimates of average heel remaining in non-refillable cylinders. One study conducted for the California Air Resources Board found the average remaining heel was 1.85 percent[15] or approximately 9 oz. from a 30-pound cylinder. Additionally, other commenters that commonly deal with recycling non-refillable cylinders have found much smaller heels than 8 percent.

The EPA proposal says that banning the use of non-refillable cylinders, "would increase environmental benefit including by ensuring the heels left in a cylinder are not released to the atmosphere when non-refillable cylinders are discarded." This proposal skips many other reasonable steps in reducing the environmental impact of non-refillable cylinders including improving service technician requirements on evacuation and recycling of cylinders. In creating California's Refrigerant Management Program,[16] the state's Air Resources Board studied the idea of banning non-refillable cylinders[17] and after careful study, research, and stakeholder feedback determined the better course of action was to strengthen requirements on the evacuation and

---

[14] 40 CFR part 82 subpart F: Heel means the amount of a controlled substance that remains in a container after it is discharged or off-loaded (that is no more than ten percent of the volume of the container).

[15] *Lifecycle Analysis of High-Global Warming Potential Greenhouse Gas Destruction,* ICF International (October 2011), https://ww2.arb.ca.gov/sites/default/files/classic//research/apr/past/07-330.pdf.

[16] *Refrigerant Management Program*, California Air Resources Board (2009), https://ww2.arb.ca.gov/our-work/programs/refrigerant-management-program/about.

[17] *Id.*

9

recycling of cylinders.

*b. Proper disposal of non-refillable cylinders*

A better solution to reducing the environmental impact of service gas heels would be to improve the regulations surrounding end of life management (ELM) for cylinders. Proper ELM regulations should focus on evacuation and recycling of non-refillable cylinders. The AIM Act requires EPA to increase opportunities for reclaim, strengthening evacuation requirements can both increase reclaim and provide the same environmental benefits sought by the agency. Strengthening ELM requirements can be done in a later rulemaking as EPA is expected to develop new certification requirements to deal with next generation A2L refrigerants[18][19] that are anticipated to be used in air-conditioning and refrigeration systems because of the refrigerants' low-GWP ratings.[20] As part of this update to technician certification, EPA should reinforce system service regulations to include stronger ELM requirements. One way to increase technician compliance is to ban all service gas cylinders from landfills using authority granted under the Resource Conservation and Recovery Act (RCRA). RCRA allows EPA to ban certain materials from entering landfills while not regulating the materials itself. Banning cylinders from landfills will force technicians to

---

[18] Refrigerants are classified into safety groups consisting of two or three alphanumeric characters. The first character indicates the toxicity as class A or class B, class B has higher toxicity than class A. The Arabic numeral with or without suffix letter denotes one of the four flammability classes: 1, 2L, 2, or 3. Class 2L is referred to as lower flammability and meets the four following conditions: exhibits a flam propagation when tested at 140°F and 14.7 psia; has an LFL >0.0062 lb/ft$^3$; has a heat of combustion <8169 Btu/lb; and has a maximum burning velocity of $\leq$ 3.9 in./s when tested at 73.4°F and 14.7 psia in dry air.

[19] *Designation and Safety Classification of Refrigerants*, American Society of Heating, Refrigerating and Air-Conditioning Engineers (2019), https://ashrae.iwrapper.com/ASHRAE_PREVIEW_ONLY_STANDARDS/STD_34_2019.

[20] *Protection of Stratospheric Ozone: Listing of Substitutes Under the Significant New Alternatives Policy Program,* Environmental Protection Agency (6 May 2021), https://www.govinfo.gov/content/pkg/FR-2021-05-06/pdf/2021-08968.pdf.

10

dispose of cylinders in an approved manner including evacuation of service gases. Recovery of service gases will naturally increase as reclaimers increase purchase price of recovered refrigerants. EPA should allow technicians to pay for evacuation by service providers such as reclaimers, distributors, or metal recyclers to meet the ELM requirement. Proper evacuation of non-refillable cylinders will have minimal impact on technicians already possessing the proper equipment, according to one study[21] it would take a proficient technician approximately two hours to empty 40 cylinders to bring each cylinder to vacuum measured at 15 inHg.[22]

Reinforced service standards are also a proposal that has been endorsed by the National Academy of Sciences. In studying the seasonal contributions of HFC-134a and HCFC-22 researchers discovered[23] there was a connection between service standards and the release of refrigerant. It was surprising to see EPA ignore the recommendations of the National Academy of Science on reducing the impact of refrigerant releases and move to banning non-refillable cylinders. Section 307 of the Clean Air Act[24] requires EPA to evaluate recommendations from the Scientific Review Committee or the National Academy of Sciences and the agency must provide reasons for ignoring this recommendation.

*c. Banning non-refillable cylinders is costly to the supply chain*

The proposed ban on non-refillable cylinders would add immense cost to every segment of the industry that uses small cylinders and in many ways is not feasible in the timeline outlined by EPA.

---

[21] Id., 9.
[22] Inches of Mercury, unit of measurement for pressure when determining vacuum.
[23] Xiang, Bin et al., *Global emissions of refrigerants HCFC-22 and HFC-134a: Unforeseen seasonal contributions* (Proceedings of the National Academy of Sciences of the United States of America, 9 December 2014), https://www.pnas.org/content/111/49/17379.
[24] 42 USC 7607(c)(3).

11

Based on estimates from discussions with market experts[25] the industry uses between 6 and 7 million non-refillable cylinders, significantly higher than the 4.5 million estimated by EPA. The agency also assumes that due to the turnover rate of cylinders a smaller fleet of refillable cylinders is needed compared to the annual number of non-refillable cylinders consumed. HARDI disagrees with this assumption and a CARB lifecycle analysis[26] determined that four refillable cylinders would be necessary for each non-refillable cylinder currently in the market. This increase in fleet size is due to the number of cylinders in storage, use, refilling, and transit at any given moment. Based on this information, a minimum of 24 million refillable cylinders would be needed to meet demand caused by banning non-refillable cylinders. There is simply no way to construct 24 million cylinders within the timeframe necessary to meet the non-refillable cylinder ban.

This large of a fleet of cylinders will also have a major financial impact on the cylinder owners, distributors, and contractors in the form of cylinder deposits. As cylinders are transferred from producer/importer to distribution deposits must be also transferred from distributors to producer/importer. Distributors would need to then wait for deposits to be paid by contractors to bring the balance sheet back to zero. At $120[27] per cylinder the entire fleet of cylinders would remove $2.88 billion from the industry. Cylinder deposits are further locked out of the industry as lost or stolen cylinders are not returned and new replacement cylinders enter the market. It can take years for the lost/stolen cylinder deposits to be forfeited.

Storage of returned cylinders will also have an impact on distributors. Technicians will not necessarily swap out cylinders at a one-for-one rate as small heels may not be enough to do a full

---

[25] Discussions with Worthington Industries and The Chemours Company
[26] Id., 9.
[27] Cylinder deposits in Canada are currently $120/cylinder and the U.S. would be expected to have a similar deposit price

day of jobs and a new cylinder is purchased while the nearly empty cylinder is not returned until it can be fully emptied. As groups of empty cylinders are returned these cylinders will overtake the space emptied by sales of new cylinders taking valuable floor space away from other products.

This storage issue will be further complicated by the introduction of lower-flammability A2L refrigerants. HARDI has been advocating for increased storage amounts of flammable gases as limited by the International Fire Code. A proposal[28] is working its way through the code process that would allow a distributor to store up to 20,000 pounds of lower-flammability service gases without needing expensive retrofits to current buildings. According to a survey of HARDI members,[29] 69 percent of members store up to 20,000 pounds of service gases in cylinders at the peak of cooling season. Due to the increased danger caused by the lower-flammability service gas there is also a limit on the height these cylinders can be stored with a maximum height of 6 feet 6 inches causing storage to take up even more floor space.[30] Requiring the use of refillable cylinders would effectively double the storage limits needed to be approved by the fire code, an alternative that is not viable at this time. This is due to the fire code treating "empty" cylinders that have not been cleaned as containing the full capacity of the cylinder for determining the maximum allowable quantity to be stored.[31] The only possible storage solution during peak season would be

---

[28] *Proposal 6059, Flammable Gas MAQ to the 2021 International Fire Code,* Fire Code Action Committee (2021), https://www.cdpaccess.com/proposal/6059/20179/preview/ (CDPAccess login required).
[29] *Refrigerant Storage Practices* [Presentation], Heating, Air-conditioning, & Refrigeration Distributors International (2020), https://f.hubspotusercontent40.net/hubfs/4929193/HARDI%20Member%20Refrigerant%20Storage%20Practices%20Public.pdf
[30] *Id.*, 12.
[31] *International Fire Code,* 5704.3.3.4 Empty containers or portable tank storage., International Code Council (2018).

to store the empty cylinders outside accelerating the deterioration of the cylinder due to weather.[32]

Transportation costs for moving refillable cylinders will also increase. Refillable cylinders weigh more, approximately 15 additional pounds per cylinder according to Worthington, a manufacturer of service gas cylinders. This increased weight would reduce the capacity of a semi-trailer to 870 refillable service gas cylinders from the current capacity of 1,120 full disposable service gas cylinders.[33] The change to refillable cylinders would increase transportation costs to move the same amount of service gas by nearly 30 percent[34] for the delivery of full cylinders. The change in cylinder type would increase the per mile costs from the June national average of $2.67[35] to $3.44[36] per mile to transport the same amount of service gas based on current trucking costs. Transportation costs increase further when empty cylinders need to be returned to the producer/importer for cleaning and refilling.

The increased weight of the refillable cylinder will also have an impact on technicians. Air-conditioning units are often located away from driveways or access points including on rooftops for many multifamily and commercial buildings. The increased weight will take a toll on technicians hauling service gas cylinders across job sites. This increased stress on technicians'' bodies could lead to long-term healthcare costs or transitions out of the industry.

In totality the move to ban non-refillable cylinders will increase costs at every point in the supply chain from the packager down to the technician level. The increase in all these costs could have

---

[32] *Facts You Should Know About Storing Compressed Gas Cylinders,* Parker (29 December 2017), http://blog.parker.com/facts-you-should-know-about-storing-compressed-gas-cylinders.
[33] *Id.,* 9.
[34] 1,120/870=1.29
[35] DAT Trendlines, DAT Freight & Analytics (30 June 2021), https://www.dat.com/industry-trends/trendlines/van/national-rates.
[36] 2.69*1.29=3.44

14

an unintended impact on the service gas market.

*d. Displacement of service gas sales from HVACR distributors*

For many wholesaler-distributors, supplying service gases is an extra product provided by the business to attract customers, not a major source of revenue. Wholesale-distribution is a business and as such, product decisions must be made based around how that product affects the profitability of the business. Service gases have low margins, but distributor expertise in refrigerants brings in customers looking for higher margin products such as equipment. Rising costs for service gases will not only drive down margins but could cause customers to search for other distributors offering a better price. This shift in the market caused by the ban on non-refillable cylinders will make it more likely that distributors will exit the service gas business, forcing service gas sales out of the distribution channel.

If enough distributors stop supplying service gases, a third party outside the traditional HVACR channel will need to fill the gap and a logical source would be suppliers of other industrial gases. These businesses focus their revenue on cylinder leasing instead of the value of the gases sold. Most industrial gas distributors are focused on driving down costs,[37] their business model is more closely aligned with the fast-food industry, minimal variance in products leading to competition on price. On the other hand, HVACR distribution is based on being a specialist and offering that specialist knowledge to customers who buy their products. With no incentive to provide training or expert advice, the contractor community will suffer if industrial gas distributors take over the

---

[37] Aase, Guttorm et al., *Getting value from advanced digital technology for industrial gas companies* (McKinsey & Company, 16 February 2021),
https://www.mckinsey.com/industries/chemicals/our-insights/getting-value-from-advanced-digital-technology-for-industrial-gas-companies#.

15

JA106

market.

The loss of expert advice and training will cause further disruptions to the contractor community as the transition to new refrigerants occurs. Distributors provide expert knowledge on new equipment lines and ensure contractors and technicians understand any changes to how a product is installed. Dividing the purchases of equipment and service gases make it less likely this level of service will continue. Industrial gas suppliers rarely see changes in regulations affecting their products and are less likely to be experts on new refrigerants and the impact of changing regulations on those gases. This lack of expert advice will decrease the safety and efficiency of the contractor community.

Having a less well-trained contractor community will lead to increased mistakes ranging from equipment failures that require additional consumer dollars to fix in the future to more instances of injuries to the contractor community through preventable accidents. Distributors leaving the service gas market is the worst-case scenario of what could happen if EPA bans non-refillable cylinders and should be a consideration before finalizing the proposed non-refillable cylinder ban.

*e. EPA lacks authority to ban non-refillable cylinders*

In addition to opposing the proposed ban on non-refillable cylinders because of its impact on the industry, HARDI is also concerned the ban goes beyond the authority granted by the AIM Act. The proposed rule does not explicitly provide where the agency is granted the authority to ban non-refillable cylinders and after careful analysis of both the AIM Act and the Clean Air Act Amendments of 1990,[38] we have concluded EPA does not have the authority to ban non-refillable

---

[38] Public Law No: 101-549 (Date: 15 November 1990, enacted as S. 1630), Available from: https://www.congress.gov/101/statute/STATUTE-104/STATUTE-104-Pg2399.pdf.

16

cylinders.

The AIM Act grants EPA broad authority for the "Management of Regulated Substances" however this authority does not extend to cylinders. Subsection (h)(1) of the AIM states:

> IN GENERAL.—For purposes of maximizing reclaiming and minimizing the release of a regulated substance from equipment and ensuring the safety of technicians and consumers, the Administrator shall promulgate regulations to control, where appropriate, any practice, process, or activity regarding the servicing, repair, disposal, or installation of equipment (including requiring, where appropriate, that any such servicing, repair, disposal, or installation be performed by a trained technician meeting minimum standards, as determined by the Administrator) that involves—

> (A) a regulated substance;

> (B) a substitute for a regulated substance;

> (C) the reclaiming of a regulated substance used as a refrigerant; or

> (D) the reclaiming of a substitute for a regulated substance used as a refrigerant.

While the section appears to provide the agency very broad authority, that authority is limited to equipment. The plain language reading of this subsection forecloses any regulatory authority beyond the regulation of equipment or any practice, process, or activity regarding the servicing, repair, disposal, or installation of equipment. The storage of services gases, specifically what kind

of cylinder is used for storage, is beyond the authority granted by the AIM Act.

To the casual observer, topping off equipment using services gases would be considered part of the servicing, repair, or installation of equipment. However, the type of cylinder the service gas is sourced from is irrelevant to the practice, process, or activity, which means any regulations defining what kind of cylinders can be used to store and transport HFCs is beyond the agency's power to regulate. This distinction is important in understanding the limits on what products EPA can and cannot regulate. Many components are included in the servicing, repair, or installation of equipment but are not a component of the refrigerating system used by the equipment and should not be regulated by EPA. Allowing EPA to extend its reach is a slippery slope that could lead to the regulation of component parts unrelated to the refrigerating system.

EPA also does not have authority to ban non-refillable cylinders through any other part of the AIM Act. The proposed rule includes a reference to subsection (k)(1)(A) of the AIM Act in which EPA says, "the AIM Act provides EPA with the authority to promulgate necessary regulations to carry out EPA's functions under the Act, including its obligations to ensure that the Act's requirements are satisfied." While subsection (k)(1)(A) does give EPA power to do rulemakings and propose rules, those rules are limited to the "carry[ing] out EPA's functions under the Act." The AIM Act does not include anti-venting functions and the proposed rule specifically states in the section on banning non-refillable cylinders the purpose is to reduce the release of heels to the atmosphere.

While the AIM Act does not include anti-venting statues, section 608 of the Clean Air Act Amendments of 1990[39] does regulate the venting of ozone depleting substances and substitutes including HFCs. Section 608 also does give EPA the authority to stop the knowingly venting of a

---

[39] 42 USC §7671g.

substitute substance, but this regulatory power is limited to the "maintaining, servicing, repairing, or disposing of an appliance…which contains and uses as a refrigerant any such substance." Section 608 also contains a definition of appliance for this section, "For purposes of this paragraph, the term 'appliance' includes any device which contains and uses as a refrigerant a substitute substance and which is used for household or commercial purposes, including any air conditioner, refrigerator, chiller, or freezer." Both portions of section 608 are consistent in using the phrase "which contains and uses as a refrigerant." While service gases stored in cylinders are commonly called refrigerants, refrigerant is defined under 40 CFR part 82 subpart F and requires that the ODS or substitute is "used for heat transfer purposes" which can only be done inside of equipment as there is no heat transfer purpose created by storage in cylinders. For this reason, section 608 cannot be used to ban non-refillable cylinders.

EPA must also be careful not to attempt to expand the currently undefined term "equipment" in the final rule to include cylinders. While the common definition of equipment, "The necessary items for a particular purpose,"[40] may seem to include cylinders as a necessary item to the "practice, process, or activity regarding the servicing, repair, disposal, or installation," in the context of this rule, the common definition should not be used. The recent Supreme Court case Van Buren v. United States[41] goes into detail on the difference between common definitions and specialized meaning. Footnote 7 specifically quotes, "When a statute, like this one, is 'addressing a . . . technical subject, a specialized meaning is to be expected.'" To meet this specialized meaning within the HVACR industry, any definition of equipment would need to be materially similar to

---

[40] "Definition of equipment". Oxford University Press. Lexico.com. 21 June 2021. https://www.lexico.com/en/definition/equipment.

[41] Van Buren v. United States, No. 19-783, slip op. at 1 (U.S. 3 June 2021) (majority opinion), https://www.supremecourt.gov/opinions/20pdf/19-783_k53l.pdf.

19

products classified as "appliance[s]" under the Clean Air Act. 40 CFR part 82 subpart F defines appliance:

> Appliance means any device which contains and uses a class I or class II substance or substitute as a refrigerant and which is used for household or commercial purposes, including any air conditioner, motor vehicle air conditioner, refrigerator, chiller, or freezer. For a system with multiple circuits, each independent circuit is considered a separate appliance.

Cylinders containing service gases do not meet the definition of appliance and would not be considered equipment by the common HVACR industry definition of equipment.

In finalizing the proposed rule, EPA should also consider the requirement contained in the AIM Act that specifies EPA rulemakings shall follow administrative procedures under Section 307 of the Clean Air Act.[42] Section 307(d)(9) allows the courts to review and reverse any section found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

*f. No path forward for non-refillable cylinder ban in final rule*

For the reasons outlined above, EPA's proposal to ban the use of non-refillable cylinders, and any attempts to alter definitions in the final rule to allow the proposal, would be beyond the authority granted by the AIM Act or the Clean Air Act. EPA should not finalize the proposal to ban non-refillable cylinders in the final rule and should instead work with the industry to strengthen regulations regarding the evacuation and disposal of cylinders to provide the same environmental

---

[42] 42 USC § 7607(d).

benefits while acting within the authority granted by the AIM Act and Clean Air Act.

## 4. Proposed Tracking of Service Gas Cylinders Through the Supply Chain

### a. Certification is valuable to final customer, tracking is not

While HARDI supports the concept of a certification program to "ensure that HFCs introduced into and distributed or sold in the United States are covered by an allowance or were reclaimed," we are very concerned that EPA is pursuing a misguided attempt to blend certification with tracking. The final rule should be limited to a certification program where end-users can verify their purchase was produced or imported with an allowance. In our opinion, certification should focus on the upstream entities from when the final product is created. Once the product is in its final state, which for the HVACR industry means a refrigerant gas sold as service gas or to be used in the initial factory charging of equipment, there is no longer a need for tracking. Additionally, any tracking beyond its final product stage is filled with potential legal hurdles for maintaining confidential business information including market share, customer lists, and other potential trade secrets.

### b. Tracking individual cylinders would be a massive burden on the supply chain

As outlined in the docket memo *Overview of Supply Chains for Selected Hydrofluorocarbon (HFC) Product Types*, there are multiple steps within the HVACR service gas supply chain including producers/importers, packagers, regional distributors, wholesaler-distributors, and end-users. While this document describes the supply chain for a single product, HFC service gases, it does not adequately show the full impact of how the HVACR supply chain works. Figure 1 shows a more accurate, but still simplified version of the HVACR channel. Wholesaler-distributors serve

as a single point of sale for the various equipment, parts, and supplies including service gases necessary for contractors/technicians to install, maintain, repair, or replace equipment. This requires distributors to manage inventory from multiple sources and requires complex inventory management systems.



*Figure 1. Diagram of HVACR Channel*

Adding a cylinder tracking system involving the scanning of individual cylinders runs counter to any current inventory tracking system and would disrupt the current method of fulfilling customer orders. Additionally, the method of fulfilling customer orders can vary by the size of the distributor. Some larger, more complex, companies use Enterprise Resource Planning (ERP)

22

systems to send electronic pick tickets[43] to warehouse workers identifying where the individual product is known to be stored and exactly which product to pick if an individual serial number is known. Other smaller companies rely on a customer making a purchase at a sales counter while a warehouse worker uses a paper pick ticket to pick inventory from a cache of products and it is unknown which specific piece of product is selected. Adding a cylinder tracking system that does not operate with existing ERP or manual pick ticket systems would add complexity to the system and likely lead to mistakes.

This system would further be complicated if EPA finalizes the proposed ban on non-refillable cylinders. Under a scenario where all cylinders are refillable, the tracking system must not only account for the process to move from producer/importer/reclaimer through the channel to the end-user but also track the cylinder back to the producer/importer/reclaimer including cylinders shipped to the wrong producer/importer/reclaimer and transferred back to the correct owner where the cylinder is refilled and the QR code or other identification system must be reset to allow for the certification and tracking of the new refrigerant in the cylinder.

Overall, it is highly unlikely that the addition of a complex tracking system across multiple market actors using multiple inventory tracking systems will be able to accurately track all cylinders through the supply chain and back to the owners.

*c. The burden of protecting confidential business information outweighs benefits of cylinder tracking*

The AIM Act requires EPA to follow the requirements of Clean Air Act section 307[44] which

---

[43] A pick ticket is a list used to gather items to be shipped from a warehouse.
[44] 42 USC § 7607(a).

includes strong protections of confidential information including trade secrets. Additionally, the Defend Trade Secrets Act[45] provides businesses with a cause of action for the divulging of trade secrets including business information such as market share and customer lists. The Defend Trade Secrets Act only has two requirements for economic or financial information to be considered a trade secret: (1) the business owner has taken reasonable measures to keep the information private; and (2) the information has economic value separate from the business that is valuable because it is not generally known. Customer lists and market share information both meet these requirements and maintaining the secrecy of this information is necessary for other business operations including lines of credit from banks used to buy inventory and maintain operations.

The proposed rule includes a planned public database of information containing listings of sales between business entities. This information would allow competitors to not only determine market share based on the number of cylinders sold but also create a customer list that can be misappropriated. While the mere listing of customers does not necessarily grant trade secret protection, the addition of sales history of service gases purchases does meet the courts' test[46] for determining a customer list to be a trade secret. Even if the information is kept confidential by EPA, the threat of cyberattack still provides liability to the agency if this information is released. The best option is to not collect tracking information that would lead to the creation of a database with trade secrets contained.

*d. AIM Act authority for reporting requirements limited to upstream entities*

The AIM Act grants EPA the authority to require disclosure of information for monitoring and

---

[45] 18 U.S.C. § 1839.
[46] Select Energy Servs., Inc. v. Mammoth Energy Servs., Inc., No. CIV-19-28-R, 2019 WL 1434586, at *5 (W.D. Okla. Mar. 29, 2019).

reporting, however these requirements are limited to "each person who, within the applicable reporting period, produces, imports, exports, destroys, transforms, uses as a process agent, or reclaims a regulated substance."[47] Distributors and contractors generally do not produce, import, export, destroy, transform, use as a process agent, or reclaim any HFCs and therefore should not be subject to monitoring and reporting requirements such as the tracking of cylinders containing regulated substances.

*e. Final rule should embrace certification and ignore tracking*

HARDI agrees with the agency in the value of a certification program by assuring the product was produced or imported legally; however, the reasons provided by EPA do not show the same value in developing a cylinder tracking system. EPA has expressed interest in using tracking to identify HFCs that did not enter the market legally, but it is only when a customer wants to determine if a product was produced or imported with an allowance that this process is successful. EPA can achieve this same goal by simply having a QR code or other scannable logo that points the user to a proof of certification without the need for additional tracking.

Tracking is also unlikely to lead to better enforcement. Based on history of enforcement actions taken under section 608 regulations it is unclear how tracking could lead to better compliance. The tracking system as currently written would not provide the data necessary for improved section 608 compliance and it is unlikely any tracking system the EPA has authority to implement could lead to future enforcement.

HARDI encourages EPA to promulgate a final rule containing the certification system without the

---

[47] *Id., 2.*

proposed tracking system. The proposed tracking system is unnecessary, burdensome, and beyond the authority of EPA to fully implement.

## 5. Purpose of this Rulemaking

This allocation rule is the first of many rules to be proposed regarding the phasedown of HFCs and we want to work with EPA staff to ensure future rules look at key issues that must be addressed including ensuring proper certification and training of technicians and contractors, increasing recovery for reclaim, and ensuring a robust reclaim market is available to supply our wholesale distributor members. Using the allocation rule for other purposes including reducing venting is an unwise rule development process. The allocation rule should focus on the allocation and allowance system only. Addressing industry comments on extraneous proposals will slow down the rule-making process when time is needed to prepare for the 2022 production year to meet market demand within the allocation allowances. As we have seen in previous phasedowns a perceived shortage of refrigerant can cause havoc on market prices for gases. These perceived shortages will be made worse by the fact that components of current HFCs will either be used as standalone refrigerants or as components in other low-GWP refrigerants.

It is also HARDI's opinion that while the discussion of compliance measures to reduce venting of gases is important, proposals to ban non-refillable cylinders or add excessive tracking burdens are unnecessary in the allocation rule. These types of proposals are best suited in a rule that looks specifically at all practices, processes, and activities associated with contractors and technicians installing and maintaining equipment as the best way to reduce venting. Only when we take a holistic approach to reducing venting can the industry adequately provide feedback to EPA on how best to improve the practices, processes, and activities that technicians are trained to use in the

field to reduce venting of refrigerants from equipment. HARDI does recognize that while some of these anti-venting proposals are also meant to reduce illegal importation of refrigerant gases which are valid in enforcing the allocation rule, we believe these proposals go above and beyond any sensible proposals that could easily decrease illegal imports while having less of a negative impact on good industry actors.

## 6. Conclusion

HARDI thanks EPA for soliciting feedback on this important proposed rule. While we vehemently disagree with some of the ancillary proposals contained in the rulemaking, we do fully support the allowance and allocation process and believe this is a necessary component to the success of the HFC phasedown authorized under the American Innovation and Manufacturing Act.

Sincerely,

Alex Ayers
Director of Government Affairs
Heating, Air-conditioning, & Refrigeration Distributors International

27



**Air Conditioning Contractors of America**
1330 Braddock Place, Suite 350
Alexandria, VA 22314

July 5, 2021

U.S. Environmental Protection Agency
Office of Air and Radiation
Stratospheric Protection Division
1200 Pennsylvania Ave., NW
Washington, D.C. 20460

**Re: Comment on Phasedown of Hydrofluorocarbons (EPA-HQ-OAR-2021-0044)**

To Whom it May Concern:

The Air Conditioning Contractors of America writes in opposition to the proposed ban on non-reusable cylinders under the American Innovation and Manufacturing (AIM) Act. The proposed ban on non-refillable cylinders would cause unnecessary burdens to HVAC-R contractors as well as the broader HVAC-R industry. It would impose a major shift on the manufacturing of refrigerant tanks, increasing prices as well as fuel needs associated with transporting larger, heavier cylinders. In addition, the increased weight and non-disposable nature of the new containers will impose logistical hurdles for contractors. Moreover, the rule's attempt to prevent illegal imports of containers may prove ineffective as evidenced by the adaptability of smugglers in the EU. Finally, the target date of July 2023 would not give American manufacturing companies enough time to increase their capacity. The overall result would be a weakened American market, riddled with lower quality containers that may be more likely to leak and a more difficult regulatory landscape for ACCA members to navigate. Our belief is that the EPA's intended goal of reducing the improper handling of HFCs can be achieved in a more efficient way that does not punish law abiding contractors.

A transition of this magnitude would require a massive investment in terms of capital and infrastructure. Refrigerant cylinder manufacturer Worthington Industries estimates that a conversion from the nonreusable cylinders that are most found in today's HVAC-R market to an entirely reusable fleet of cylinders would cost roughly $2 billion. This cost would be an enormous anchor for the industry and would be most punishing towards our members (who are overwhelmingly small businesses), distributors, and ultimately consumers. Large manufacturers have also indicated that they "do not have the capacity needed to produce enough refillable cylinders to support the U.S industry by 2023." (Worthington Industries, 2021). This could lead to two potential outcomes. The first would be a massive shortage of refillable cylinders that would in turn lead to an overall price spike. The second possibility is a massive influx of lower quality, government subsidized cylinders into the United States to meet the market's demand.

Aside from price considerations, the proposed ban on non-reusable cylinders will also lead to logistical constraints for contractors. Contractors' vehicle fleets will likely need to be retrofitted to safely transport the new containers. The containers, which are 200 to 320 percent heavier, will place greater stress on vehicles as well as the bodies of technicians who are tasked with carrying them around the jobsite. The

*THE ESSENTIAL PARTNER FOR CONTRACTOR EXCELLENCE*

increased weight will also require more fuel for transportation, further increasing emissions and detracting from the EPA's goal. This is in addition to the man hours and fuel that will be spent taking empty cannisters back to distributors. Further, ACCA members have raised the possibility that some contractors may put large cylinders of refrigerant at their office that they attempt to refill themselves, increasing the chance of venting refrigerants in the transfer process and detracting from EPA's stated goal. The total costs associated with a transition away from non-reusable cylinders will add up quickly, and be passed along to consumers, hurting HVAC-R contracting businesses in the process.

Banning disposable cylinders may also not work to stop or even deter smugglers from bringing HFCs into the US illegally. Recent findings show that traffickers have adapted quite easily to the ban on disposable cylinders in the EU under the recent F – Gas Regulation. Referring to its effect on smuggling, Daniel Michaels from the Washington Post notes that "success was short – lived, by early 2020, traffickers had shifted from smuggling truckloads of canisters to more openly importing large quantities of HFCs and then defrauding customs authorities" (Michaels, 2021). The EPA proposal does acknowledge this issue, saying that US businesses complying with these new regulations such as the ban on disposable cylinders could face significant competitive disadvantages. Despite this acknowledgement, there is little comfort in the proposed solution. To prevent the issues of the EU unfolding in the US, the EPA emphasized increasing enforcement of auditing, labeling and other regulations. The effectiveness of these new provisions has yet to be seen, but we feel it is too risky and unjust to law abiding contractors to require the industry move away from disposable cylinders based on preventing illegal imports.

Rather than adding unnecessary and potentially harmful hurdles for contractors, such as the proposed ban on non-refillable refrigerant tanks, ACCA believes increased enforcement on existing laws regulations would be more effective from both an environmental and industry standpoint. There are already laws and regulations in place to both prevent illegal venting as well as refrigerants being purchased and handled by unqualified individuals. Moreover, the proposed ban on non-reusable cylinders would be more costly and difficult for law abiding contractors to adapt to than traffickers. If actions pertaining to the improper sale and handling came with a real threat of punitive damages, then we might see a reduction in their frequency. The solution does not need to harm the broader HVAC-R contracting industry—especially those that **do** follow the rules. For these reasons, we respectfully ask that EPA rescind the proposed ban on non-refillable cylinders.

Sincerely,

Chris Czarnecki
Government Relations Manager
Air Conditioning Contractors of America

*THE ESSENTIAL PARTNER FOR CONTRACTOR EXCELLENCE*



U.S. SMALL BUSINESS ADMINISTRATION

**OFFICE OF ADVOCACY**

REGULATION ● RESEARCH ● OUTREACH

July 6, 2021

VIA ELECTRONIC SUBMISSION

The Honorable Michael S. Regan
Administrator
Environmental Protection Agency
Washington, DC 20460

**Re: Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act (Docket ID EPA-HQ-OAR-2021-0044)**

Dear Administrator Regan:

On May 19, 2021, the Environmental Protection Agency (EPA) published a proposed rule titled "Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act."[1] This letter constitutes the Office of Advocacy's (Advocacy) public comments on the proposed rule.

A wide range of small businesses will be affected by this proposed rule, from importers and blenders, to equipment servicers and reclaimers, and eventually the owners and operators of refrigeration equipment. Because of this diversity of views and effects, Advocacy believes that EPA should be evaluating alternatives for the long-term health of a future market for hydrofluorocarbons (HFCs), including minimizing transaction costs and encouraging innovation. EPA should recognize that allowances have a market value and give small business blenders and reclaimers reasonable preferences in their allocation to aid their long-term viability. EPA should reconsider its proposed HFC tracking system and ban on disposable cylinders since they raise transaction costs significantly.

---

[1] 86 Fed. Reg. 27150 (May 19, 2021)

409 3rd Street SW / MC 3110 / Washington, DC 20416
Ph 202-205-6533 / advocacy.sba.gov



U.S. Small Business Administration

## I. Background

### A. The Office of Advocacy

Congress established Advocacy under Pub. L. 94-305 to represent the views of small entities before Federal agencies and Congress. Advocacy is an independent office within the U.S. Small Business Administration (SBA). As such, the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration. The Regulatory Flexibility Act (RFA),[2] as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA),[3] gives small entities a voice in the rulemaking process. For all rules that are expected to have a significant economic impact on a substantial number of small entities, the RFA requires federal agencies to assess the impact of the proposed rule on small entities and to consider less burdensome alternatives.

The Small Business Jobs Act of 2010 requires agencies to give every appropriate consideration to comments provided by Advocacy.[4] The agency must include, in any explanation or discussion accompanying the final rule's publication in the *Federal Register*, the agency's response to these written comments submitted by Advocacy on the proposed rule, unless the agency certifies that the public interest is not served by doing so.[5]

### B. The Proposed Rule

On December 27, 2020, the American Innovation and Manufacturing Act (AIM Act) was enacted as section 103 in Division S, Innovation for the Environment, of the Consolidated Appropriations Act, 2021.[6] The AIM Act mandates a phase-down of hydrofluorocarbons (HFCs) domestic production and net imports to 15 percent of a 2011-2013 baseline, weighted by the global warming potentials (GWPs) of each component HFC. It grants EPA new authorities in three main areas: implement the phase-down of production and net imports of listed HFCs, manage these HFCs and their substitutes, and facilitate the transition to next-generation technologies by restricting use of these HFCs where they are used. The AIM Act requires EPA to have most of this system in place for calendar year 2022.

On May 19, 2021, EPA published a proposed rule partially implementing this program. The proposed rule includes creation of:

- Allowances and allocation of those allowances in 2022 and 2023;
- Application-specific allowances for six uses of HFCs listed in the AIM Act;
- A pool of allowances set aside primarily for small businesses;
- Rules for transfer and conveyance of allowances;

---

[2] 5 U.S.C. §601 et seq.

[3] Pub. L. 104-121, Title II, 110 Stat. 857 (1996) (codified in various sections of 5 U.S.C. §601 et seq.).

[4] Small Business Jobs Act of 2010 (PL. 111-240) §1601.

[5] *Id*.

[6] Pub. L. 116-260

- A ban on disposable cylinders; and
- A certification and labeling system for HFCs in domestic commerce.

In addition, EPA has requested comment on the program design and allocation of allowances for 2024 and beyond.

Advocacy held two Small Business Environmental Roundtables on this rule, both with EPA's participation: in February 2021, in advance of the proposal, and in June 2021, after the proposal was published. EPA and Advocacy have also met with a significant number of small businesses and their representatives during development of the proposed rule and during Executive Order 12866 review.

## II. Advocacy's Small Business Concerns

A wide range of small businesses will be affected by this rule. The direct impacts of this rule will fall on small businesses that currently import HFCs into the United States or may wish to at some point in the future. To our knowledge, no small businesses produce HFCs domestically. However, small businesses dominate the industries that process, resell, use, and reclaim HFCs, and the reduced availability of HFCs under the AIM Act's phase-down schedule will affect them significantly through increased costs of HFCs and, eventually, the need to transition away from equipment that uses HFCs.

Because small businesses fulfill different roles in the supply chain and have different short-term and long-term priorities, there is no one set of regulatory alternatives that will satisfy all small business interests. Therefore, Advocacy believes that EPA should be evaluating alternatives for the long-term health of the market in HFCs, including minimizing transaction costs and encouraging innovation that furthers the goals of the AIM Act.

### A. Advocacy supports EPA's proposed set aside pool of allowances.

EPA has proposed a set aside pool of allowances for small businesses that are new market entrants and not otherwise eligible in an allocation scheme based on historical activity. Advocacy supports this set aside, given that the AIM Act mandates a phase-down rather than a phase-out, and appreciates that EPA recognizes prior barriers to small business access in programs under Title VI of the Clean Air Act. Advocacy does not have information to suggest an appropriate size of the set aside pool for 2022 or 2023. EPA should leave open the ability to adjust the size of the pool based on applications and demonstrated use of the set aside pool.

### B. Advocacy supports the maximum flexibility in trading allowances.

EPA has proposed a system of trading allowances. This gives allowances asset value, but only for the one-year duration of the allowance. Combined with the weighting of HFCs in accordance with their greenhouse gas potential, the system creates a powerful incentive for rapid use of the allowance and toward low GWP HFCs.

**1. EPA should allow for trading of set aside allowances.**

As part of the set aside pool of allowances, EPA proposed that holders of these allowances would not be able to sell or trade them. EPA states that this will discourage small businesses from requesting allowances that exceed their need or solely for the purpose of selling. Advocacy appreciates this concern and encourages EPA to consider each application on a case-by-case basis to evaluate a small businesses ability to use the HFCs requested.

However, a restriction on the sale or transfer of these allowances may have the unintended consequence of limiting the total HFC allowances available in the covered year. For the individual small business, it could have two unintended consequences. First, it could incentivize the immediate purchase of HFCs to capitalize the value of the allowance before it expires. Second, it would force the small business to purchase and stockpile HFCs for future use before cashflow may justify it.

Advocacy recommends EPA allow for sale and transfer of set aside allowances. EPA has proposed gathering information on sales and transfers as they occur. EPA could identify abuses of the program through this data and address issues through denial of future applications for set aside allowances.

**2. EPA should adopt the lowest possible transfer offset.**

EPA is proposing to allow transfers of allowances for HFCs provided the transferor's remaining allowances are reduced by the amount it transferred plus some percentage of the amount transferred (i.e., an offset). This offset would reduce the total amount of allowances available and create a disincentive to trading allowances. However, EPA has included this provision in response to section (g)(2) of the AIM Act, which requires that transfers under this provision result in greater total reductions in HFCs that in the absence of transfers.

Advocacy believes that this offset provision will reduce HFC availability and make it less likely allowances will be put to their best economic use, including towards low-GWP alternatives. Therefore, Advocacy recommends EPA adopt the lowest reasonable offset possible.

**C. EPA should consider an additional set aside to encourage HFC-related practices that have environmental benefits.**

Small businesses have discussed with EPA several activities with significant environmental benefits that may require special consideration. These activities include the recovery, reclamation, and/or destruction of HFC refrigerants. One small business has also discussed with EPA an industrial use of HFCs that lowers lifecycle GHG emissions. Other small businesses have discussed their efforts to develop new low-GWP substitutes.

The AIM Act intends EPA to encourage these activities. For reclaimers, the AIM Act tasks EPA with increasing opportunities for reclaiming and creates a grant program for the purchase of recycling, recovering, and reclaiming equipment. It is unclear what role the reclaiming industry will play after 2036, when the HFC phase-down is complete and end-users will be further along in a transition away from HFCs, but the availability of reclaimed HFCs will help mitigate the economic impacts between now and then.

EPA should use its authority to allocate allowances to economic activities that have economic benefits related to the reduction of HFC production and GHG impacts. Advocacy suggests EPA propose for 2024 and beyond an additional set aside pool of allowances for reclaimers and innovators, to encourage growth of these industries.

EPA should also consider granting allowances for destruction of HFCs. Reclaimers want to establish reliable and consistent recovery programs, but that may require accepting recovered HFCs that cannot be economically reclaimed. A grant of allowances would give them the ability to recoup these costs while making more reclaiming possible.

### D. EPA should not ban disposable cylinders.

EPA has proposed a ban on disposable cylinders for the storage and transport of HFCs. EPA's justification based in part on a concern about leftover HFCs at the bottom of disposed cylinders and on experiences in other countries with smuggling.

Advocacy recommends EPA not include this provision in this final rule. Small businesses oppose it. This provision will significantly raise their costs, requiring large expenditures in the next year for a product that is increasingly expensive and difficult to procure. It will significantly increase transportation costs, both because refillable cylinders are heavier than disposable and because they will require a return trip to the owner. Refillable cylinders are not easily reused for virgin or reclaimed HFCs, since they need to be extensively cleaned to meet the mandated AHRI purity standards, an expense these small businesses do not currently bear.

Small businesses challenge EPA's assertion that leftover HFCs present an environmental risk. Reclaimers say that they accept disposable cylinders for recycling, reclaiming the leftover HFC in the process. Requiring the proper disposal of disposable cylinders would be a better solution, better for reclaimers, and more consistent with existing business practice.

EPA also states that a ban on disposable cylinders will make customs enforcement easier because illegal HFCs smuggled into other countries are often in disposable cylinders. However, this characteristic of smuggled HFCs is a function of the regulatory design, not of the cylinder itself or its legitimate users. In contrast to other countries, EPA is proposing a broad range of measures related to imports, including a real-time check to ensure importers have the required allowances and labeling requirements. EPA should consider whether a ban on disposable cylinders is necessary in conjunction with the rest of the proposal, not in isolation. Further, Advocacy believes that it is unfair to impose such significant costs on the domestic market if the solution can be more tightly focused on imports.

### E. EPA should delay implementation of the proposed certification and labeling system.

Small businesses have expressed significant concern about the cost and complexity of EPA's proposed certification and labeling system. Some small businesses agree that a well-designed low-cost system could help them compete against illegal HFCs but still raise concerns that the system, sight unseen, will be hard to use, impose significant costs on their customers, and impede acceptance of low-GWP HFC replacements. EPA's proposal lacks the details necessary

to address these concerns. EPA will need the confidence and buy-in of the regulated community if this tracking system is to have its desired effect.

Advocacy recommends EPA delay adoption in the regulations of this proposed system until EPA has had more time to design the system, consult with regulated parties and run a pilot program to identify and resolve unreasonable costs and challenges.

### F. EPA should reconsider the audit requirement for producers, importers, and reclaimers.

#### 1. EPA should reconsider the audit requirement for reclaimers.

EPA proposes an audit requirement to improve the integrity of the allocation program. This program would require annual audits for producers, importers, and reclaimers. However, reclaimers are not required to hold allowances, and other users of HFCs that might get allowances through, for example, the application-specific allowances are not covered by this audit requirement. As written, it is unclear why reclaimers are singled out. Thus, EPA should exclude reclaimers from this audit requirement.

#### 2. EPA should tailor the impact of the audit requirement to its stated purpose.

EPA requested comment on limiting the frequency of audits for companies below a certain threshold. Advocacy supports all reasonable efforts to reduce the paperwork burden of these regulations. Audits should only be conducted annually and on a continuing basis for those companies with a history of compliance difficulties. If the purpose of the audit program is to improve integrity of the program rather than to duplicate compliance reporting, then an audit of the previous year should be required only periodically.

### G. EPA should consider whether imported HFCs should meet AHRI purity standards.

The AIM Act defines reclaiming by referencing AHRI purity standards and verification of that purity and prohibits the sale of recovered HFCs that are not reclaimed. Small business reclaimers are concerned that this definition puts them at a competitive disadvantage to importers, who can bring HFCs into the country without a similar requirement. EPA should take this concern seriously, particularly since the AIM Act requires EPA to expand opportunity for reclaiming. However, there are small businesses that import or purchase imported HFCs for processing and blending, for whom such a requirement would be unnecessarily burdensome and would not address the reclaimers concern about competition from low quality imports.

Advocacy recommends EPA consider requiring imports intended to be sold to end users without subsequent processing, blending, or reclamation demonstrate compliance with AHRI purity standards.

## III.    Conclusion

Advocacy appreciates the efforts EPA has made in this proposed rule to identify and address small business concerns. EPA makes an explicit recognition of the history and role of small businesses in the Title VI programs and the crucial role they will fulfill in implementation of the AIM Act. Nonetheless, Advocacy believes that there are additional opportunities to maximize

availability of HFCs within the statutory bounds, avoid unreasonable costs on small businesses and encourage environmentally beneficial activities. Advocacy also recommends EPA to move more cautiously on measures that will directly regulate the entire supply chain.

If you have any questions or require additional information, please contact me or Assistant Chief Counsel Dave Rostker at (202) 285-6860 or by email at david.rostker@sba.gov.

Sincerely,


/s/

Major L. Clark, III
Acting Chief Counsel
Office of Advocacy
U.S. Small Business Administration

/s/

Dave Rostker
Assistant Chief Counsel
Office of Advocacy
U.S. Small Business Administration


Copy to:     Sharon Block, Acting Administrator
             Office of Information and Regulatory Affairs
             Office of Management and Budget

## COMMENTS OF A-GAS, INC.

ON THE

PHASEDOWN OF HYDROFLUOROCARBONS: ESTABLISHING THE ALLOWANCE ALLOCATION AND TRADING PROGRAM UNDER THE AMERICAN INNOVATION AND MANUFACTURING ACT; PROPOSED RULE

86 Fed. Reg. 27150 (May 19, 2021)

Docket ID No. EPA-HQ-OAE-2021-0044

Mike Armstrong, President

Bruce Ernst, EVP, Regulatory & Government Affairs

A-Gas, Inc.

1100 Haskins Road

Bowling Green, Ohio 43402

419-867-8990

## 1. INTRODUCTION

A-Gas, Inc. (A-Gas) is pleased to provide these comments on the U.S. Environmental Protection Agency's (EPA) proposed rule *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, at 86 Fed. Reg. 27150 (May 19, 2021), Docket ID No. EPA-HQ-OAE-2021-0044 (Proposed Rule).

A-Gas, headquartered in Bowling Green, Ohio, is a global leader in refrigerant recovery and reclamation. The company's core business provides environmental solutions and lifecycle management services for ozone depleting substances (ODSs) and greenhouse gases (GHGs), including CFCs, HCFCs, HFCs and Halons in the HVACR and Fire Suppression Industries.

For more information about A-Gas, please visit www.agas.com/us.

## 2. RECLAIM & REFRIGERANT MANAGEMENT

Hydrofluorocarbons (HFCs) are potent greenhouse gases, with global warming potentials (GWPs) thousands of times greater than that of carbon dioxide. Most HFC refrigerants can be recovered and either reclaimed or destroyed – preventing their release into the atmosphere.

This is best accomplished by an ambitious and integrated approach to refrigerant management. Refrigerant management involves installation and servicing of equipment and the recovery, transportation, reclaim, resale and, ultimately, destruction of refrigerants.

Over the past 10 years, A-Gas has invested significantly to build refrigerant reclamation and destruction technologies at its facilities in Bowling Green, Ohio, and Rhome, Texas. This equipment is capable of reclaiming a broad spectrum of recovered refrigerant, including CFCs, HCFCs, HFCs, and other mixed gases.

Our investments in these capabilities represent A-Gas' commitment to protecting the climate and contributing to the circular economy. The principle at the core of our business model is the same as the principle at the core of our environmental, social, and governance policies – that no molecule of refrigerant, once produced, should ever be released into the atmosphere.

Today, even as *The American Innovation and Manufacturing Act* (AIM Act) seeks to constrain the production and consumption of HFCs and restrict the use of high GWP HFCs in refrigerators and air conditioners, significant quantities of already-produced refrigerant continue to accumulate in existing products and equipment and remain at high risk of leaking or being vented into the atmosphere.

By one measure, this could amount to emissions of 750 million tons of $CO_2e$ in the United States over the next 10 years.[1] Globally, this could result in emissions of 58 billion tons of $CO_2e$ by 2050.[2] These emissions are a legitimate threat to efforts to combat climate change. These emissions also are nearly entirely avoidable, as both the technology and the legal authority exist to prevent them.

After all, unlike with the phase out of ozone-depleting substances (ODS), which involved transitions to entirely new compounds, the HFC phase down mostly involves transitions to blends of HFCs with lower GWPs.

This means the AIM Act is not so much reducing HFCs as it is reducing GWP. This underscores the importance of refrigerant management, particularly reclaim, because the substitute refrigerants are likely to contain a significant quantity of HFCs, just at a lower GWP:

- The more reclaim, the more flexibility in the market, since the reuse of existing HFCs (which otherwise would be emitted) increases overall refrigerant supply while displacing demand for new production and import, as there are no material barriers to using reclaimed refrigerant in most types of new equipment.

- The more flexibility in the market, the more the market can shed GWP without raising prices or otherwise imposing practical or commercial hardships on manufacturers and consumers, since low-GWP blends can be made, in part, using reclaimed HFCs.

- The lower the prices and the fewer the hardships, the easier it will be to accelerate the schedule for phasing down HFC production and consumption in the United States, given the historic trend of accelerations to phase down schedules in prior refrigerant transitions over the past 30 years.

Looking ahead, there is ample capacity in the U.S. market for significant increases in the recovery, reclaim, and re-use of HFC refrigerants. In fact, the U.S. reclaim industry will simply be challenged by the amount of HFC material that is available to be recovered from refrigeration and air conditioning systems in the early years of the HFC phase down.

Although beyond the immediate scope of this Proposed Rule, A-Gas raises these points to signal its commitment to pursuing policy outcomes that maximize the recovery, reclaim, and, ultimately, destruction of refrigerants over the course of the AIM Act's HFC production and consumption phase down. Maximizing reclaim, A-Gas believes, also maximizes the climate benefits of phasing down HFCs.

Specific to the Proposed Rule, as discussed more fully below, are several measures on which EPA has sought comment that would represent important steps forward in strengthening refrigerant management and expanding the role reclaim should have in the HFC phase down. A-Gas' comments focus on these measures and the issues they raise for the initial implementation of the AIM Act.

### 3.   SUPPORTING REFRIGERANT MANAGEMENT & RECLAIM UNDER THE AIM ACT

In implementing the AIM Act, A-Gas believes EPA should seek to maximize opportunities for enhanced refrigerant management and greater opportunities for reclaim. As discussed more fully below, A-Gas believes the following actions and initiatives would provide vital support for refrigerant management and reclaim:

- Expanding the set aside pool of allowances to include reclaimers, subject to certain conditions;

- Requiring refillable cylinders;

- Requiring certification for all HFCs;

- Prohibiting the export from the United States of recovered HFC refrigerant unless it has been certified as being reclaimed at a U.S. facility; and

- Providing public funding for reclaimers to support gas cleaning technology to deal with next generation refrigerants.

## 4. ALLOCATION OF ALLOWANCES

### a. In General

In the Proposed Rule, EPA proposes to issue allowances to entities that produced or imported HFCs in the 2017-2019 period, provided such an entity was still active in 2020. EPA also suggests two alternative methods: (a) issuing allowances only to those companies that produced or imported HFCs in 2011-2013 or (b) issuing allowances to entities that produced or imported HFCs between 2011 and 2019, provided such an entity was still active in 2020.

A-Gas believes the best approach is to base the allocation of allowances to an entity on its single highest annual production or import total between 2017 and 2019, provided such entity participated in the market in 2020. However, for this and for any other approach, EPA should not allocate any allowances to any entity found by the Department of Commerce to have failed to pay anti-dumping duties during this time period.

This approach best reflects the reality of the market as it exists today and is likely to exist at least over the next several years. A-Gas further believes this position is superior to the 2011-2013 and 2011-2019 periods because it maximizes the number of potential market participants and, as a result, provides greater liquidity in the market. This, in turn, creates more choices and provides more flexibility for purchasers of refrigerants.

Furthermore, the 2011-2013 period would fall well short of representing prevailing market conditions by disproportionately favoring long-term market participants and by relying on obsolete market data nearly a decade old.

A-Gas would consider supporting EPA in using an average of the three highest production or import annual totals during the 2011-2019 period – subject to several qualifications. First, where an entity has fewer than three years during that time, each missing year would be counted as zero, for purposes of averaging. A-Gas would oppose requiring any entity with fewer than three years of activity during that period to enter into a new entrant or other set aside pool. As stated, each year fewer than three should count as zero for purposes of averaging.

Second, for this 2011-2019 approach, EPA need not consider whether an entity was active in 2020, given the longer timeframe involved and the averaging of highest years. A-Gas would oppose requiring active market participation in 2020 for this particular approach.

A-Gas opposes all other approaches and concepts, on grounds they are inequitable, not representative of market realities, and favor market-distorting practices.

### b. Allowance Set Aside

A-Gas supports increasing the proposed set aside of allowances from 5 million metric tons of $CO_2e$, as provided in the Proposed Rule, to 7.5 million metric tons of $CO_2e$. Certified reclaimers could be eligible to participate in this set aside, provided the recipients of these allowances:

- have the internal capability to process HFCs for their end users;

- not have a third party also receiving production or consumption allowances that owns a stake or other interest of greater than 10 percent of its business; and

- have reported a quantity of reclaimed HFCs to EPA in the years 2017-2019.

A-Gas would offer further that any new entrant receiving allowances from this set aside be prohibited from selling or otherwise transferring such allowances. Moreover, A-Gas believes EPA should release under-utilized allowances in the fourth quarter of each year via this set aside.

### c. Application Specific Allowances

Regarding application specific allowances, A-Gas would assert that entities eligible for such allowances be allocated a minimum quantity sufficient to fulfill the requirements of the AIM Act. A-Gas would caution EPA against allocating quantities of allowances based on unsubstantiated projections or other assumptions about prospective growth, as these entities typically do not face direct compliance obligations under the AIM Act and remain free to procure HFCs on the open market.

### d. Destruction

A-Gas believes EPA should not allocate consumption allowances based on the destruction of HFC refrigerants, given (a) the limited data on virgin HFC stockpiles that were built, at least in part, over the past five years in anticipation of a domestic HFC phase down program; (b) the unknown size of such stockpiles; and (c) the unknown size of yet to be processed, recovered, and un-reclaimed HFCs.

Moreover, given the prospect of increasingly constrained supplies of HFCs over the course of the phase down, the market would be better served by incentivizing the recovery and reclaim of HFC refrigerants rather than their destruction – at least until a much greater share of the market has transitioned to lower GWP HFC blends and other substitutes and alternatives.

Finally, EPA also should ensure that any destruction of any HFCs be performed by a destruction technology approved by EPA with a destruction and removal efficiency (DRE) of 99.99 percent, with a preference for state-of-the-art non-incineration technologies.

### e. Future Allowance Allocations

A-Gas believes EPA should consider alternate processes for allocating allowances that can facilitate a transition from high GWP HFCs while also accommodating those parts of the market unable to transition early in the phase down.

However, A-Gas also believes there is a significant role for reclaim and refrigerant management to play in the forthcoming 2024 allocation period, given the substantial step down in the AIM Act's phase down schedule to 60 percent of the production and consumption baselines.

To be prepared for such a substantial contraction in HFC production and consumption in 2024, A-Gas believes EPA should avail itself of all regulatory and non-regulatory means to promote recovery and reclaim and otherwise facilitate its practice in the U.S. economy. For whatever system EPA ultimately adopts for distributing allowances in 2024 and beyond, the greatest challenge facing the U.S. market will not be how allowances are allocated, but whether adequate supplies of HFC, new and reclaimed, are accessible to market participants.

## 5. COMPLIANCE

As a general matter, A-Gas broadly supports measures to ensure HFC production and consumption in the United States are properly tracked and verified in accordance with all applicable requirements.

### a. *Reporting*

A-Gas supports quarterly reporting requirements but would request EPA align and harmonize any such requirements with those under the Clean Air Act that apply to ODS and other GHGs. A-Gas also supports reporting for both imports of bulk HFCs and imported products containing HFCs. In all such reporting, A-Gas would request EPA maintain the agency's Confidential Business Information (CBI) protocols, notwithstanding the importance of transparency and publicly available data.

### b. *QR Codes*

A-Gas supports the use of QR codes to identify and track HFCs in the United States. A-Gas already uses QR codes on all its refillable cylinders and considers this to be a basic and readily available approach to identification and tracking. Our QR codes are easy and inexpensive to place on cylinders and generally last for multiple uses without fading or peeling.

In implementing a QR code program, A-Gas believes EPA should allow for a grace period or otherwise phase in the requirements over time, potentially in a coordinated manner with requirements for refillable cylinders.

### c. *Banning Non-Refillable Cylinders*

A-Gas strongly supports EPA's proposal to require refillable cylinders, believing a market shift to refillable cylinders is necessary for effective refrigerant management, as evidenced by refillable cylinder requirements in Canada, the United Kingdom, Australia, and the European Union.

Reclaimers already rely substantially on refillable cylinders and can attest to their practicality and efficacy. Indeed, transitioning to refillable cylinders provides reclaimers with additional refrigerant materials often found in the bottom, or heel, of refillable cylinders.

A-Gas believes sufficient manufacturing capacity exists to support a transition to refillable cylinders nationwide, and globally if necessary, and would benefit both Original Equipment

Manufacturers (OEMs) and reclaimers by providing additional supplies of HFCs for market participants.

From an implementation standpoint, A-Gas supports a phasing out of non-refillable cylinders beginning in 2024, with a complete ban on non-refillable cylinders beginning in 2025. However, A-Gas believes it is important to avoid uncertainty when it comes to affecting a transition to refillable cylinders and, if necessary, would support EPA seeking additional data to bolster the case for such a requirement and include it as part of a future rulemaking over the next two years.

---

[1] *Search, Reuse, and Destroy: How States Can Take the Lead on A 100 Billion Ton Climate Problem*, ENVIRONMENTAL INVESTIGATION AGENCY (February 14, 2019), *citing* *ODS Destruction in the United States and Abroad*, EPA 430-R-18-001 (February 2018) (assuming roughly half of the annual 75-80 million metric tons of $CO_2e$ in refrigerant emissions reported by ICF could be recovered and reclaimed and/or destroyed, projected over the next decade and using 20 year Global Warming Potentials).

[2] *See* Project Drawdown, *at* https://drawdown.org/solutions/refrigerant-management.

**RMS of Georgia, LLC**
610 McFarland 400 Dr.
Alpharetta, GA 30004
770-777-0597
770-777-0599 Fax
www.rmsgas.com





**D.O.T. & E.P.A. Certified Center**

July 6, 2021

**_VIA ELECTRONIC SUBMISSION_**
Hon. Michael Regan, Administrator
U.S. Environmental Protection Agency
EPA Docket Center Air and Radiation Docket
Mail Code 28221T
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

www.regulations.gov

Docket ID: EPA–HQ– OAR–2021–0044

> **Re:    Comments of Choice Refrigerants –** _**Phasedown of Hydrofluorocarbons:
> Establishing the Allowance Allocation and Trading Program under the
> American Innovation and Manufacturing Act; Proposed Rule**_**, 86 Fed. Reg.
> 27,150 (May 19, 2021)**

Dear Administrator Regan:

RMS of Georgia, LLC d/b/a Choice Refrigerants appreciates the opportunity to submit the
following comments on EPA's proposed allocation system implementing the American Innovation
and Manufacturing Act phasedown of hydrofluorocarbons (HFCs).[1] Our comments are
supplemented by our February 5, 2021 and March 29, 2021 letters transmitting confidential
business information which were previously submitted to EPA via electronic mail.

Choice Refrigerants is a producer of patented hydrofluorocarbon ("HFC") blends,
including Choice® R-421A and Choice® R-421B refrigerants, as well as Choice®-branded R-410A.
Choice is a small business employer based in Alpharetta, Georgia and was one of the first EPA-
certified refrigerant reclaimers in the United States.[2]

---

[1] American Innovation and Manufacturing Act of 2020, Consolidated Appropriations Act § 103 (H.R. 2764),
Pub. L. No. 110—161, 121 Stat. 2128 (2020).

[2] _See_ https://www.epa.gov/section608/epa-certified-refrigerant-reclaimers.

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 2

## I.    Allowances Must Be Allocated to the Company That Would Now Need Allowances

EPA is proposing an HFC allowance allocation system that issues allowances to market participants based on import data and corresponding greenhouse gas reporting data.  Import data in EPA's greenhouse gas reporting program and customs records may be appropriate for purposes of calculating the phasedown cap levels for the overall AIM Act allowance pool, but because the data does not necessarily reflect commercial market realities, it is not appropriate or accurate information for purposes of apportionment of baseline allowances or allocation of annual emissions allowances for HFCs – particularly if EPA intends to require allowances for HFC blends.[3]  To the extent that EPA decides that producers or importers of HFC blends must hold allowances on the basis of HFC components "within" HFC blends, those allowances must be allocated to the HFC blends producer/importer, not to the producer/importer of the HFC component feedstocks.  Otherwise, producers of HFC blends (particularly those like Choice Refrigerants which hold patent rights to proprietary HFC blends products) will suffer an unfair and economically devastating mismatch between the party that receives allowances and the party that ultimately bears the economic burden of the allowance system.  EPA's decisions on allowance allocation, quite literally, may mean life or death for small businesses like Choice Refrigerants who have used middlemen importers in past years to import HFC components but would now have to hold allowances for their own products.

### A.    Background on Historical HFC Blend Production/Import

Choice Refrigerants is an American small business based in Alpharetta, Georgia, that has invented several environmentally preferable HFC blend products that substitute for older ozone-damaging Class II refrigerants.  Choice's current products include Choice® R-421A, which is a popular drop-in substitute for R-22 in refrigeration systems. Choice® R-421A is an HFC blend produced by combining 1,1,1,2-tetrafluoroethane (known as R-134a when used in stand-alone applications) and pentafluoroethane (known as R-125 when used in stand-alone applications) in a specific ratio, together with a proprietary lubricant. Choice® R-421B is a similar blend product with a different ratio of components. Choice has at times also blended a branded version of R-410A, which is a blend of difluoromethane (R-32) and pentafluoroethane (R-125).

The HFC components R-32, R-134a and R-125 that are used as feedstock to produce Choice's patented and branded products are listed in the AIM Act as regulated substances.  *See* AIM §103(c) (table).  However, HFC blends generally, and Choice R-421A specifically, are **not** themselves regulated substances under the AIM Act.  We are concerned that EPA may require allowances for production or import of Choice® R-421A or other HFC blends on the basis of their HFC feedstock components. Although it does not appear that EPA actually has the authority to regulate HFC blends in this manner, if EPA does require allowances for HFC blends, the ***allowances should be allocated to the blends producer/importer***, rather than to the HFC

---

[3] As discussed below in Part IV, EPA lacks authority to regulate HFC blends that are manufactured from HFC component feedstocks.

components importer, regardless of what years are used to establish allowance allocations and regardless of what company name is reflected on customs documents.

Because of the unusual language in the AIM Act and the nature of HFC blends, EPA must approach allowance allocations in this context differently from how allowances were allocated in the CFC and HCFC phaseout programs, which did not involve this unusual aspect. This potential mismatch between the importer of components and owner of HFC blend products would be much more aggravated if EPA uses older years of market data for purposes of allowance allocations. For example, prior to international signing of the Kigali Agreement in October 2016, there would have been little reason for market participants to anticipate that EPA would require allowances for HFCs or would use data from years before 2016. This was especially true as EPA was continuing to approve HFC substitutes under its SNAP program.

Choice Refrigerants' confidential letters of February 5, 2021 and March 29, 2021, have provided information to EPA on how our HFC blend products have historically been produced, whether manufactured in the U.S. from imported components or whether imported as pre-blended HFC blends. Business data on Choice's HFC blend production and HFC component purchases for the years 2010–2019 is summarized for EPA's convenience in Appendix A (for R-421A) and Appendix B (for R-410A) of the February 5th letter.

B.    Choice's HFC Blend Production/Import

As described in the business confidential letters, from 2011 thru approximately 2017, Choice Refrigerants produced Choice® R-421A in the United States using HFC components imported primarily from China. In that time period, Choice typically arranged to have HFC components manufactured by a Chinese chemical supplier and shipped to Choice's production facility in Alpharetta, where the components were blended together with a proprietary additive according to ASHRAE specifications. The blend product was then packaged, labeled, and sold to various downstream distributors in the U.S. refrigerant market. Notably, at that time Choice was unable to source HFC components from domestic U.S. chemical manufacturers (and is still unable to do so) because, as has been documented in official government reports, the major domestic HFC chemical producers are unwilling to supply HFC components to smaller producers of R-22 substitutes that compete against their own products and have so-called "swap" agreements among themselves which exclude small businesses such as Choice.[4]

Prior to 2017, Choice had a commercial distribution arrangement with one of its distributors under which that company would arrange for the purchase of shipments of bulk HFC

---

[4] *See* USITC, *Hydrofluorocarbon Blends and Components from China*, *Inv. No. 731-TA-1279 (Final)*, Pub. 4629 at 11 (Aug. 2016) ("Three domestic integrated producers, Arkema, Chemours, and Honeywell, swap HFC components amongst themselves for use in the production of refrigerant blends. Although the swapping of components subject to these arrangements does not constitute captive production, as that term is ordinarily understood, the swap arrangements constitute something less than a pure merchant market."); *see also* Choice

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 4

component feedstocks from China on behalf of Choice. The shipments were nominated and shipped through a U.S. port of entry (typically Charleston) to Choice's production facility in Alpharetta. These components were earmarked and used exclusively by Choice for the production of its proprietary HFC blends. All production of the HFC blends occurred in Choice's Alpharetta facility as described above. Once the HFC blends were produced by Choice, Choice would ship the finished HFC blend products to its various distributors, including the distributor that facilitated the imports, for further sale to the U.S. refrigerant and air conditioning market.

Although the cost of shipping the HFC components under this arrangement was initially advanced by the distributor who arranged the imports, those costs were credited to the distributor at the time of sale and delivery of the produced HFC blend, such that the purchase price of the HFC components was in reality borne by Choice Refrigerants. Similarly, although the distributor's name appears on customs records, the shipments were at all times intended for Choice and destined for Choice's Alpharetta production facility for use in production of Choice's patented and branded products. Essentially, the distributor acted as Choice's shipping agent in arranging for shipment overseas, advanced the initial purchase costs, and was reimbursed through an adjustment to the distributor's purchase of HFC blend products from Choice. Similarly, the distributor reported the import of the HFC components which it had arranged on Choice's behalf in EPA's Greenhouse Gas Reporting Program ("GHGRP"). We believe these reports were filed in the name of the distributor, but as noted those components were intended as chemical feedstocks for the production of Choice's patented and branded products, to which the distributor had no legal or intellectual property rights. Of course, at this time of this arrangement there was no indication that HFC substitutes (which were being actively encouraged under EPA's SNAP program) would be phased out or that HFC imports during these years would ever be considered for purposes of an allowance scheme. Choice and the distributor currently have no commercial relationship.

Beginning in about 2017, due to market conditions, Choice transitioned to sourcing pre-blended HFC blends from Chinese chemical manufacturers. (Again, Choice was forced to source these HFC feedstocks from overseas because the domestic HFC production industry was unwilling to sell HFC components to smaller U.S. competitors.) Under this arrangement, Choice's direct Chinese supplier would blend HFC components at a Chinese chemical manufacturing facility on Choice's behalf and export the blended HFC product to Choice in Alpharetta.[5] Choice would either

---

Refrigerants, *Hydrofluorocarbon Blends from the People's Republic of China: Pre-Preliminary Determination Comments of Choice Refrigerants and Request to Expand the Circumvention Inquiry* at 12 (Apr. 3, 2020) (Barcode # 3961066-01) ("Because the integrated producers trade almost exclusively amongst themselves, domestic components are not freely available to independent U.S. blenders like Choice who market competing, patented blends, and it is therefore critical that access to non-domestic HFC components remain open for such blenders.").

[5] Patented HFC blend products like Choice® R-421A have special status under U.S. trade laws in that they are expressly excluded from antidumping duties on HFC blends. *See Hydrofluorocarbon Blends From the People's Republic of China: Antidumping Duty Order,* Dck. A–570–028, 81 Fed. Reg. 55,436 (Aug. 19, 2016) ("Also excluded from this order are patented HFC blends, including, but not limited to, ISCEON® blends, including MO99™ (R– 438A), MO79 (R–422A), MO59 (R–417A), MO49Plus™ (R–437A) and MO29™ (R–4

supply its proprietary lubricant to the Chinese supplier to be blended before shipping, or at other times, Choice would add the proprietary lubricant at its Alpharetta facility once it received the pre-blended product. Choice would then sell the finished HFC blend products, such as Choice® R-421A, to various U.S. distributors for wholesale and retail sales in the refrigerant market.

    C.    <u>Allowances Must Be Allocated to Producers/Importers of HFC Blends, Not to HFC Components Importers</u>

Section 103(e)(3) of the AIM Act directs EPA to phase down production and consumption of regulated HFCs "through an allowance allocation and trading program." Nothing in the statute dictates any particular method for allocation of allowances; however, under general rules of administrative law, any system that EPA adopts must be consistent with the statute and rationally supported by data and policy considerations. Although Congress chose to establish a baseline for HFC reductions (*i.e.*, the "cap") based on the years 2011-2013 (which is the same approach taken in the Kigali Amendment to the Montreal Protocol), EPA is not directed by the statute to use this three-year period as a reference point for allowance allocations. Similarly, to the extent that EPA chooses the 2011-2013 period as the allocation baseline (to the extent the agency could articulate a rational basis for doing so), the statute does not dictate any particular method of selecting recipients of allocations.

EPA previously published a notice of data availability ("NODA") that identifies importers of HFCs during the 2011-2013 period based on self-reporting through EPA's GHGRP.[6] EPA suggested that this data might be used as a basis for allocation of HFC allowances under the AIM Act. This data, however, reflects only the reporter of HFC as a supplier of U.S. imports, which is not necessarily the entity that actually used or consumed the HFCs in the U.S. market. For example, an importer may import HFCs as blending components for a customer that then blends the components into the product that is actually sold in commerce. During the 2011-2013 period (almost a decade ago) those parties may not have had an express written agreement as to future allowances, as no legislation was anticipated at that time. In other situations, the importer of record for customs purposes may be acting as an agent for a customer who would be considered the actual user or consumer of the imported HFCs. In either situation, if EPA determines that the underlying rationale for allocating allowances is to reflect actual market share of the U.S. refrigerants market during the 2011-2013 period, allocating allowances merely on the basis of what company is listed as the GHGRP reporter or customs importer of record would distort the allocation scheme, as the actual consumer of the HFC product would not receive allowances, and the importer would receive an unwarranted windfall. These concerns are particularly heightened in the case of patented HFC products, for which importers of HFC components would have no legal license to manufacture or import a patented product except when acting on behalf of, or with the permission of, the patent holder. Where an allocation system is based on market share, it is incumbent on EPA to look to

---

22D), Genetron® Performax™ LT (R–407F), Choice® R–421A, and Choice® R–421B.").

[6] *Notice of Data Availability Relevant to the United States Hydrofluorocarbon Baselines and Mandatory Allocations*, 86 Fed. Reg. 9,059 (Feb. 11, 2021), EPA–HQ–OAR–2021–0044; FRL–10020–30–OAR.

the reality behind the data to identify the companies with actual market share, not just blindly apply data that were collected for other purposes.

Applied to this particular situation, it would be fundamentally unfair to require Choice to hold allowances for its continuing importation of pre-blended Choice® R-421A product, but to give free allowances to a different entity (the distributor) based on its arranger role which terminated years ago. In contrast, allocating allowances to the producer of HFC blends accords with the AIM Act's focus on what company is using HFCs in the marketplace, rather than on what company supplied the chemical feedstocks from which the HFC was produced. As discussed, EPA cannot require allowances for HFC blends except within the parameters of §103(c)(3)(B) of the Act, which refers to HFCs "within" HFC blends.

Other sections of the AIM Act similarly indicate that Congress intended allowances to be allocated according to the ultimate user of HFCs, not necessarily to the party that nominally imported HFC component feedstock. For example, §103(e)(4)(B)(iv) of the Act provides for mandatory allocations of allowances to products used in particular applications such as metered-dose inhalers, defense sprays, foams and other commercial uses. This focus on the commercial use of HFCs supports an approach in which allowances for HFCs used in commercial HFC blends should be allocated to the producer and owner of the HFC blend.

The policy considerations are even more compelling when applied to the context of HFC components that were imported as components of domestically produced HFC blends. As discussed below, the statute expressly excludes listing of HFC blends as regulated substances. *See* AIM Act §103(c)(3)(B)(i). If, notwithstanding this express limitation, EPA includes HFC blends in the phaseout program by requiring allowances based on their constituent HFC components, then the producer of HFC blends should receive production and consumption allowances as if the HFC blends were themselves produced in the United States.

This very real concern about a mismatch of allowance allocation and production of blended products has historical roots in EPA's Title VI ODS allocation system, which in certain instances resulted in price spikes and unfair burdens on blend owners. As a particularly close to home example, in the HCFC phaseout, EPA declined to provide allowances to Choice Refrigerants as the producer of the patented blend R-420A, which is a blend of R-142b (a CFC component) and R-134a (an HFC component). At the time, EPA assured Choice that there would be plenty of supply of R-142b and that prices would not increase substantially as a result of the allocation program. Yet, in reality, allowance shortages drove up the price of components such that the blended product could no longer compete in the refrigerant market. Choice Refrigerants encourages EPA to avoid the same mistake when designing the current HFC allowance allocation system.

D.    Greenhouse Gas Reporting Data Is Not Necessarily Appropriate for HFC Allowance Allocation

As EPA recognized in the February 2021 NODA, the purposes of the GHGRP are not identical to the purposes of the AIM Act, although there is some overlap. EPA describes the NODA as reporting "information . . . regarding hydrofluorocarbon consumption and production in the United States for the years 2011, 2012, and 2013." 86 Fed. Reg. at 9,059. EPA stated that the purpose of providing the information was "in preparation for upcoming regulatory actions under the [AIM Act]." *Id*. However, the data in the NODA is actually greenhouse gas reporting data, which is not necessarily the same as consumption and production data as those terms are used in the AIM Act. For the reasons discussed above, the company listed as the reporter for purposes of the GHGRP is not necessarily the party that should be considered to be the importer or producer of HFCs for purposes of allowance allocations, particularly as applied to HFC blends.

Accordingly, for purposes of the AIM Act, if EPA decides to regulate HFC blends for purposes of setting baselines or allocating allowances, producers/importers of HFC blends (particularly patented HFC blends) should be considered the primary market actors for purposes of regulation and should receive any allocation of HFC allowances.

## II.    EPA Must Issue Allowances to the Patent Holder for Imports of Patented HFC Blends or Components Used to Blend Patented HFC Blends, Not to Intellectual Property Pirates

As noted, Choice Refrigerants, is an American small business based in Alpharetta, Georgia that produces patented environmentally preferable HFC blend refrigerant products.  One of our products, Choice® R-421A, has been "pirated" by Chinese-backed refrigerant importers and other market actors that have acted illegally. To the extent that EPA decides under the AIM Act to require producers or importers of HFC blends like Choice® R-421A to hold allowances on the basis of the HFC components "within" those blends,[7] any allowances attributable to HFC components that were used to produce pirated versions of R-421A must be allocated to Choice Refrigerants as the owner of the patented product. Handing allowances to sellers of pirated versions of products would magnify the economic damage to U.S. intellectual property interests wreaked by Chinese-backed companies, contrary to the stated policy of Congress and the last several presidential administrations.

The following imports of non-patented R-421A, as well as blending components R-125 and R-134a used to blend non-patented R-421A, should be credited to Choice Refrigerants under any allowance allocation and trading system. As noted, Choice Refrigerants is the only licensed producer of R-421A under U.S. law; moreover, Choice Refrigerants is the only producer to have been issued SNAP approval for R-421A and the SNAP approval was based on a data set submitted

---

[7] AIM Act §103(c)(3)(B).

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 8

solely by Choice Refrigerants. Allowances associated with the following imports of R-421A or components used to manufacture pirated R-421A are by right allocable to Choice Refrigerants:

1.   <u>BMP Imports</u>.  All allowances associated with R-421A imported by LM Supply, Inc., Cool Master USA, LLC, BMP USA, Inc., or other affiliated companies controlled by or under common ownership of Ben Meng should be credited to Choice Refrigerants. This category includes at least 1,410,944 pounds of R-421A known to have been imported by BMP and its affiliates in the 2016-2017 timeframe. These imports represent 1,855,391 tons CO2e (at GWP/Exchange Value of 2,630) [(1,410,944/2000)*2630=1,855,391] for purposes of computing HFC phasedown allowances under the proposed allowance allocation and trading system. This pirated R-421A was imported illegally without a license and was used by Meng-controlled companies to circumvent U.S. antidumping laws, as determined in an official government investigation by the U.S. Department of Commerce, which found that the R-421A imported by Meng-related companies was non-patented and was used to circumvent antidumping duties on HFC blends.[8]

2.   <u>Dynatemp "R-421A" Product</u>. All allowances associated with HFC blend product labeled as R-421A produced by Dynatemp International, Inc. and/or FluoroFusion Specialty Chemicals, Inc., including any blending components imported to blend such R-421A products, should also be credited to Choice Refrigerants. Beginning in or about 2019 or 2020, these companies began producing and selling a product claimed to be "R-421A", but which is neither patented by them nor licensed to them and is infringing U.S. patent rights.[9] The amount of R-421A produced by these companies is not known at this point, but EPA can determine the amount through customs records, GHGRP data, and information requests directed at those companies.

In sum, EPA must not implement the AIM Act in a manner that allows companies that flagrantly violate American patent rights to receive economic windfalls from their illegal actions while American inventors and patent holders bear the economic burden. EPA's decisions on allowance allocation may, quite literally, mean life or death for small businesses like Choice Refrigerants who have their intellectual property stolen.

## III.   EPA Must Adjust Allowance Allocation for Market Distortion

EPA has proposed to allocate HFC consumption allowances on the basis of imports of HFCs into the United States during a designated period of years and has indicated its preference to use a high-water mark approach across the years 2017-2019.[10]  EPA describes its rationale for

---

[8] *See Hydrofluorocarbon Blends From the People's Republic of China: Final Scope Ruling on Unpatented R-421A; Affirmative Final Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A*, 85 Fed. Reg. 34,416 (June 4, 2020).

[9] *See* Complaint, *R421A LLC v. Dynatemp Int'l*, No. 20-cv-00142 (E.D.N.C. July 27, 2020); *see also* Choice Refrigerants, *Hydrofluorocarbon Blends from the People's Republic of China: Request to Apply Tariff Act § 781(a) and (d) to Prevent Circumvention; Later-Developed HFC Blends,* dated Sept. 9, 2020 (Barcode # 4024206-01).

[10] Proposed Rule, 86 Fed. Reg. at 27,170 ("EPA is proposing that under this initial framework, the amount of allowances to allocate to producers and importers would be determined based on the level of production and import

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 9

this approach as using import data as a proxy for market share in the U.S. HFC markets in order to allocate allowances to market participants in proportion to market share. *See, e.g.*, 86 Fed. Reg. at 27,170 ("EPA is proposing that under this initial framework, the amount of allowances to allocate to producers and importers would be determined based on the levels of production and import in 2017-2019 . . . Every company's highest year amount [of production or import] would then be added together and used to ***determine a percentage market share*** for each company. EPA proposes to then multiply each company's percentage market share with the total amount of available calendar-year allowances to determine each company's production or consumption allowances.") (emphasis added).

We are generally supportive of an allowance system that allocates based on market share over a period of years, as Congress was surely aware that EPA had successfully used a similar system for phaseout of HCFCs and CFCs under the Clean Air Act. However, imports of HFCs into the U.S. have been heavily affected by trade distortions, including dumping of HFCs by Chinese companies, circumvention of trade duties, subsidies by the Chinese government and manipulation of markets by certain importers, all of which have artificially increased imports by certain companies. As a consequence, the raw import data that EPA would normally be able to rely on is not an accurate proxy for market conditions, market activity, or market share for all companies.

These trade distortions began as early as 2015 but grew more pronounced over the years and reached a crisis level by the 2018-2019 timeframe. If EPA selects years for its allocation system that were affected by trade distortions, it is incumbent on EPA to adjust the import data for each market participant to reflect the level of imports that would have occurred in absence of the trade distortion. Although it might be inconvenient for EPA to conduct the investigation and auditing needed to correct for these market distortions, the evidence of these practices – as established through U.S. government investigations and record evidence before the agency – is so glaring that EPA cannot blind itself to these distortive effects. Only by using recent market data, but adjusting the data to correct for market distortion, can EPA achieve the goals that it identifies in the proposal: (1) to provide a seamless transition; (2) to promote equity and fairness; and (3) to base the system on robust data. 86 Fed. Reg. at 27,169. To ignore the market distortions brought to EPA's attention by various stakeholders would be inconsistent with EPA's obligations under administrative law to act rationally, consider all factors, and explain its reasoning.

A.     EPA Should Adjust Import Data In Light of Market Manipulation

EPA has recognized the existence of market distortions and proposed to take these into consideration, although it does not specify in the proposed rule how it will adjust for the distortion. As EPA states in the proposed rule preamble:

> *EPA is proposing that any entity that is subject to a DoC Final Determination and is requesting allowances for 2022 or 2023 must provide documentation of payment of the AD/CVD for HFC imported in 2017 through the date of this proposed rule,*

---

in 2017-2019. Specifically, EPA is proposing to use a company's highest year of production or import, on an EVe basis, in those years.")

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 10

> *or provide evidence that those imports were not required to pay AD/CVD for those years. EPA is proposing not to allocate to companies in 2022 or 2023 that CBP determines are not in compliance with or are otherwise in arrears with their AD/CVD during those years. After an entity is issued allowances, if it is subject to a DoC Final Determination and does not pay the required AD/CVD within the required time frame, as determined by CBP, EPA proposes that the company may have its allowances for that year revoked or retired, or may not be issued future allowances or may receive a reduced allocation. EPA proposes that it could, after consulting with CBP, also ban a company from receiving allowances in the future as a result of noncompliance with the regulations governing payment of AD/CVD. EPA is also proposing that the Agency would have the discretion to revoke, retire, or withhold allowances for companies that fail to use the correct Harmonized Tariff Schedule (HTS) codes with each shipment of HFCs or HFC blends. Intentionally misdeclaring the HFC or HFC blend in a shipment is one way importers may attempt to illegally import HFCs without allowances or with fewer allowances.*

86 Fed. Reg. at 27,186.  Although EPA's proposal to link allowance allocation to payment of trade duties on a company-by-company basis is on the right track, in order to correct for trade distortion EPA must better understand how certain companies have skirted, gamed and circumvented trade laws and taken advantage of the limitations of the trade laws to artificially increase imports that EPA is using as the basis for consumption allowance allocations.

The history of market distortion in the U.S. HFC market is extensive and well-documented and has manifested in various schemes that have distorted the market by artificially increasing imports for some market participants, which would reward wrongdoing if allowances are allocated based on import data without adjustment for market distorting behaviors and unfair advantages. These various schemes that artificially increased imports by some companies, at the expense of others, are described below.

B.    Dumping and Countervailing Subsidies

It is well documented and incontrovertible that certain importers and their affiliates (which in some cases are owned or controlled by large Chinese chemical companies) unfairly and illegally increased their imports through a variety of schemes, including dumping in contravention of U.S. trade laws, circumvention of trade duties, and sharp business practices, all of which enabled those companies to sell HFCs in the U.S. market at artificially low prices and increase their own imports while strangling imports of other market participants.

The U.S. government has found that beginning in about 2015 and accelerating throughout the 2018-2019 period, Chinese exporters and certain affiliated importers took advantage of trade policies in China that encouraged and rewarded dumping of HFCs into the U.S. market in order to undermine free market pricing and build Chinese export market share in advance of an anticipated

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 11

phasedown of HFCs in the United States.[11] This serious dumping activity involving a range of HFC chemicals has been documented in official findings of the U.S. Department of Commerce ("Commerce") and the U.S. International Trade Commission ("ITC"). These findings include unfair dumping of HFC blends (specifically, R-404A, R-407A, R-407C, R-410A, and R-507A),[12] as well as dumping of HFC chemical components R-134a,[13] R-32,[14] and R-125.[15] Each of these chemicals have significant global warming potential, ranging from 675 to 3500. The degree of dumping is and continues to be so severe that the U.S. government imposed antidumping duties as high as 285% to counteract the market distorting effect of this anti-competitive market behavior.[16]

Another way that certain importers have gained an unfair market advantage is receiving government subsidies from the government of China. For example, the Commerce Department found after an extensive investigation that Chinese chemical companies such as Zhejiang Juhua Co., Ltd. ("Juhua") received Chinese government subsidies which allowed them to sell HFC-125 at below market prices, thus injuring the U.S. economy.[17] Juhua is the parent company of a prominent HFC importer that presumably will claim allowances under the proposed HFC allocation system.[18] This particular importer recently disclosed that it increased its market share of the U.S. HFC market from zero to 50% in only a few years, a distortive shift which is implausible without unfair advantage.[19] Other importers have been found to have received subsidies warranting 291% additional duties to counteract the illegal foreign government

---

[11] EPA has acknowledged in its rulemaking proposal the concern that "[t]o reward such behavior could harm companies that were already participating in the market." Proposed Rule, 86 Fed. Reg. at 27,170.

[12] *Hydrofluorocarbon Blends from the People's Republic of China: Antidumping Duty Order*, 81 Fed. Reg. 55,436 (Aug. 19, 2016).

[13] *See 1,1,1,2 Tetrafluoroethane (R-134a) From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 12,192) (March 1, 2017) (Barcode # 3547518-01).

[14] *See Difluoromethane (R-32) From the People's Republic of China: Antidumping Duty Order*, 86 Fed. Reg. 13,886 (March 11, 2021) (Barcode # 4097862-01).

[15] *See Pentafluoroethane (R-125) from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination* (June 14, 2021) (C-570-138) (Barcode # 4132385-01) ("R-125 Preliminary CVD Determination").

[16] *Hydrofluorocarbon Blends From the People's Republic of China: Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016—2017*, 84 Fed. Reg. 17,380, 17,381 (Apr. 25, 2019) (Barcode # 3825161-01).

[17] *See* R-125 Preliminary CVD Determination at 4; *see also Decision Memorandum for the Preliminary Determination of the Countervailing Duty Investigation of Pentafluoroethane (R–125) From the People's Republic of China*, dated June 11, 2021 ("R-125 PDM").

[18] See R-125 Preliminary CVD Determination at 5 n.10 ("Commerce has found the following companies to be cross-owned with [Zhejiang Quzhou Juxin Fluorine Chemical Co., Ltd. ("Juxin"), a mandatory respondent in the investigation]; Juhua Group Corporation; Zhejiang Juhua Co., Ltd.; Ningbo Juhua Chemical & Science Co., Ltd.; Zhejiang Quzhou Fluoxin Chemicals Co., Ltd.; and Zhejiang Juhua Chemical Mining Co., Ltd."); Zhejiang Juhua Co., Ltd. 2018 Annual Report (disclosing joint venture ownership of iGas USA Inc.) (Attachment A).

[19] *See* iGas USA, Inc., *Notice of Data Availability Relevant to the United States Hydrofluorocarbon Baselines and Mandatory Allocations* (Feb. 25, 2021) (EPA-HQ-OAR-2021-0044-0029) ("iGas NODA Letter").

support.[20]  These importers will likely claim a share of allowance allocations on the basis of their artificially increased market shares.

Notwithstanding that Commerce has taken action on a number of illegal dumping and subsidy schemes, it is not sufficient for EPA to only consider trade distortion schemes that were actually discovered and addressed by the Department of Commerce because the trade remedies available have been inadequate to restore balance to the U.S. HFC market. In the rulemaking proposal, EPA is proposing to only take cognizance of schemes that resulted in "payment of the AD/CVD of HFC imported in 2017 through the date of this proposed rule" and where the party failed to pay the amount owed. 86 Fed. Reg. at 27,186 (allowances withheld if company is "not in compliance with or are otherwise in arrears with their AD/CVD during those years"). EPA's approach would be insufficient for several reasons. First, government investigations and findings of antidumping or countervailing subsidies are by nature after-the-fact proceedings, which result only after the distortive behavior occurs. An investigation typically begins when an injured U.S. stakeholder petitions for a proceeding. Usually duties are only imposed prospectively on the cheaters after the Commerce Department initiates an investigation, and there is no standard retroactive remedy or correction for the effects on the market of anti-competitive behavior that occurred prior to the preliminary determination.[21] Second, many cheating schemes go undetected, even if they involve avoidance or circumvention of tariffs or duties. Third, neither the Commerce Department nor apparently any other agency is screening HFC imports for schemes that involve anti-competitive pricing. In other words, Commerce only investigates imports that fall within the traditional pigeon-hole of antidumping or countervailing subsidy investigations, not those involving unfair business practices, collusion or intellectual property theft. In the HFC markets, the Commerce Department has looked at sales by exporters generally but has never investigated how certain importers were able to access unrealistically low HFC pricing in the 2017-2019 timeframe, *i.e.*, pricing that anecdotally undercut the HFC market and which most other U.S. importers could not access (or even dream of). As discussed, this pricing disparity enabled certain companies to dramatically manipulate pre-existing import levels and market shares.  Yet this effect on the HFC market apparently has never been investigated by the Commerce Department, Customs and Border Patrol, or EPA.  Ignoring illegal trading schemes because they have gone unpunished would be like giving a refund to tax dodgers who cheated on their taxes but were never audited or didn't get caught during the 3-year statute of limitations.

---

[20] Preliminary R-125 CVD Determination at 5.

[21] *See, e.g.*, 19 C.F.R. § 351.205(d) (Commerce will require posting of cash deposits only after affirmative preliminary determination months after initiation of an antidumping investigation).  Thus, EPA's memorandum of antidumping and circumvention proceedings in the docket is helpful but is in some respects inaccurate or seems to misunderstand the available trade remedies and severity of the market distortion that can be caused by cheating schemes.  For example, EPA's statement that "CBP will collect duties retroactively" is misinformed because Commerce will only impose retroactive duties for a brief period of 90 days prior to an affirmative finding in the unusual situation of finding critical circumstances under its regulations.  See EPA, *Summary of Antidumping and Countervailing Subsidy Duties Concerning Hydrofluorocarbon (HFC) Imports to the United States* (Apr. 2021) (EPA-HQ-OAR-2021-0044-0046) at 4 (citing 19 C.F.R. 351.206). In reality, Commerce rarely finds critical circumstances and in all cases any HFC imports before that brief 90-day period get away scot-free.

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 13

C.    Circumvention Schemes

Although the U.S. government has attempted to staunch the flood of illegal imports of HFCs into the U.S., certain importers devised various circumvention schemes to dodge import duties. Such circumvention ploys have included importing pirated versions of patented HFC blends,[22] imports of intentionally off-specification chemicals,[23] imports of HFCs processed or transshipped through other countries,[24] and imports of HFC components used to blend covered HFC blends, all of which were found by the government to be schemes to avoid paying duties on Chinese imports.[25] In each of these circumvention cheating cases, specific companies were identified that engaged in prohibited behavior to avoid duties and thereby gained market advantage over importers that abided by U.S. trade laws.  However, like the antidumping and subsidy cases, no retroactive correction of the market distortion was taken by the government. However, EPA can easily identify these importers from Commerce Department investigative files and can request information from these importers that will show how these companies artificially increased their HFC imports by undercutting pricing in the U.S. market.

D.    Other Market Manipulation Schemes

In addition to trade violations, certain importers have also used other stratagems to artificially snatch market share away from incumbent market participants.  For example, in a

---

[22] *See Hydrofluorocarbon Blends From the People's Republic of China: Final Scope Ruling on Unpatented R-421A; Affirmative Final Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A*, 85 Fed. Reg. 34,416 (June 4, 2020).  In this particularly brazen cheating scheme, the Commerce Department investigation found that certain importers imported over a million pounds of an unpatented version of the HFC product R-421A and secretly used that product to blend other HFC blend products that were covered by a 285% import duty. The Commerce Department found that this behavior constituted circumvention of the HFC Blends antidumping duties. By illegally avoiding these duties, these companies gained an immediate unfair economic advantage in the HFC market that facilitated their sales at lower prices than any other company could match, thus allowing those companies to unfairly build market share.  This scheme increased their imports of HFCs, as reflected in customs records and EPA's greenhouse gas reporting system, while lowering imports by other law-abiding importers.

[23] *See Hydrofluorocarbon Blends from the People's Republic of China*: *Affirmative Final Determination of Circumvention of the Antidumping Duty Order; Unfinished R-32/R-125 Blends*, 85 Fed. Reg. 15,428 (Mar. 18, 2020) (Barcode # 3955044-01).

[24] *See Hydrofluorocarbon Blends from the People's Republic of China: Final Negative Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-410A Blend; Affirmative Final Determination of Circumvention of the Antidumping Duty Order by Indian Blends Containing Chinese Components*, 85 Fed. Reg. 61,930 (Oct. 1, 2020) (Barcode # 4035170-01).

[25] *See Hydrofluorocarbon Blends from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for HFC Components; and Extension of Time Limit for Final Determination*, 85 Fed. Reg. 20,248 (Apr. 10, 2020) (Barcode # 3963390-01); *Anti-Circumvention Inquiry of Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China-HFC Components: Final Determination Not to Include Within the Scope of the Order*, 85 Fed. Reg. 51,018 (Aug. 19, 2020) (Barcode # 4017378-01).  Although in this proceeding the Commerce Department ultimately did not include HFC components in the HFC Blends antidumping order because of an objection by the ITC relating to the ability of the U.S. government to remedy the illegal behavior, the Commerce Department's factual finding that certain companies circumvented the antidumping duties still stands.  The ITC's objection is on appeal to the Court of International Trade, which remains pending. *The American HFC Coalition, and its Members et al v. United States* (1:20-cv-00178-LMG).

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 14

federal lawsuit filed in Florida, a major Chinese supplier of HFCs has alleged that certain importers ran up over $70 million in unpaid accounts payable debt for imports of HFCs during the 2017-2018 timeframe.[26] By importing HFCs but bilking suppliers out of payments, importers can artificially lower their cost of doing business and afford to sell more refrigerant at below-market prices, thus leading to more market share and more imports, in an unending vicious circle of unfair market advantage. In such a situation, even if an importer is sued and eventually has to repay the debt, the importer has already achieved its anti-competitive goal of importing cheap HFCs (because they didn't have to pay for the product), undercutting market pricing, and grabbing market share. If the allegations in the T.T. International lawsuit are true, the importers named in that suit essentially got a free (non-consensual) $70 million subsidy by Chinese exporters that no other U.S. importers had access to. As a result, these importers were able to artificially inflate their imports. EPA cannot in good conscience reward such behavior by using those distorted import volumes as a basis to allocate valuable HFC allowances.

E.    Unexplained Capture of Market Share

Certain companies in the U.S. market dramatically increased their market share of HFC imports since 2016, which raises red flags that EPA should not ignore. Not coincidentally, many of the companies that disproportionately increased market share are the same companies that were identified by the Commerce Department as benefiting from unfair trade practices. For example, in a recent letter to EPA, one group of companies boasted that "through an intense commitment to customer service, new and innovative equipment, and lean operations . . . now supplies over 50% of the aftermarket refrigerants in the United States and a significant percentage of refrigerant sales to original equipment manufacturers."[27]

The U.S. market for HFCs is very much a commodity market that is driven primarily by marginal price differentials. It is implausible that any company could enter the market and in only a few years capture 50% market share without having some economic advantage that is unavailable to the market generally. Incidental factors such as customer service and lean operations cannot explain this distortion of the market. Similarly, the equipment used in the HFC market is well understood and generally available to any market participant. The companies that boasted about capturing market share have not disclosed the nature of such supposed innovative equipment that could explain such an economic advantage. Notably, these companies were targets of two of the circumvention schemes investigated by the government.

Before awarding valuable allowances to companies that have increased market share in a manner that is inconsistent with market trends and economically implausible without the help of unfair market advantages, EPA must undertake an economic evaluation to determine if such a

---

[26] Complaint, *T.T. International Co. Inc. v. BMP International Inc. et al.*, No. 8:19-cv-02044 (M.D. Fla., filed Aug. 16, 2019) ¶ 59 ("Defendants failed to pay T.T. in excess of $70 million that remains outstanding for refrigerants and related products" in the 2017 to 2018 timeframe") (Attachment B).

[27] iGas NODA Letter at 1. The letter states that it is "submitted on behalf of iGas USA Inc. ("iGas") and its affiliated companies BMP USA Inc., BMP International Inc., LM Supply Inc., and Cool Master USA Inc."

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 15

startling jump in market share can be explained, substantiated and justified. In short, sometimes what seems too good to be true is not true.

       F.      <u>EPA Must Adjust for Market Distortion in Any Allowance System</u>

Although the U.S. government has tried to respond to these widespread anti-competitive schemes by imposing antidumping duties prospectively, the nature of our trade laws unfortunately does not remedy retroactive damage to competitors that distorts import levels and market share. In the antidumping and circumvention cases, the damage has already been done in the critical sense that importers who took advantage of dumping or dodged duties through circumvention were able to import HFCs at discounted cost, then sold those HFCs into the U.S. market at discount prices. Through these schemes, those importers increased their own market share while undermining the market share of other market participants. Indeed, in many instances, the economics of the market forced legitimate companies that would normally import directly from China from above-board suppliers to become downstream buyers of HFCs from the companies identified by the government as having gained an unfair economic advantage from dumping, subsidies or circumvention. In short, while certain companies increased their imports through questionable means, other companies unfairly suffered a decrease of imports.

Overall, the activities documented by the Commerce Department had the effect of distorting import data such that, without proper adjustment, import data cannot be used as a reliable proxy for market share. EPA simply cannot use the unadjusted import data for purposes of allocating allowances without unjustly rewarding certain companies that engaged in unfair trade practices or received subsidies from the Chinese government. Put simply, if the EPA were to allocate HFC allowances on raw import data, without adjusting for this documented and obvious market distortion, it would be rewarding Chinese-affiliated exporters and importers or companies who have access to special pricing or subsidies from Chinese connections or that engaged in unfair business practices. EPA may not have authority to enforce trade laws or police business practices, but it does not have to reward market manipulators with valuable allowances.

## IV.    EPA Has No Clear Authority to Require Allowances for HFC Blends

As noted, §103(c)(3)(B)(i) of the AIM Act prohibits EPA from designating HFC blends as regulated substances "for purposes of phasing down production or consumption of regulated substances." Accordingly, on its face the statute does not authorize EPA to require producers or importers of HFC blends to acquire or hold allowances. The subsequent sub-section, §103(c)(3)(B)(ii), states that the prohibition on designating HFC blends "does not affect the authority of the Administrator to regulate under this Act a regulated substance within a blend of substances." By its plain language, subsection (ii) is not itself a grant of regulatory authority, but rather clarifies that any <u>other</u> authority of EPA to regulate is not diminished by subsection (i).

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 16

Subsection (ii) does nothing more than  preserve EPA's ability to regulate HFC blends in ways that do not implicate "phasing down production or consumption."[28]

Subsection (ii) cannot permissibly be interpreted as a separate grant of authority to EPA to require allowances for HFC blends based on the chemical feedstocks that were used to produce those HFC blends before the products were imported into the United States. Such a strained reading of subsection (ii) is neither logical nor grammatical, as it would gut subsection (i) and would allow EPA for all practical purposes to treat HFC blends as regulated substances, which is exactly what subsection (i) prohibits.  If Congress had intended for EPA to require allowances for HFC blends, it could have – and arguably would have – so stated in clear simple language, such as 'EPA may require allowances for regulated substances within a blend of substances.'  Instead, Congress chose to specifically prohibit EPA in subsection (ii) from designating or regulating blends for phase-down purposes, while leaving intact EPA's authority to regulate HFC components for purposes other than the HFC phasedown.  EPA must interpret the statute with reference to the plain language that Congress chose in the context and grammatical structure that Congress wrote.

HFC blends are chemical mixtures created by physically combining component HFCs into a new product that has unique physical chemical properties, including being an azeotropic mixture in which the gaseous components physically interact to create new behaviors.[29] HFC blends cannot be easily separated back into their component feedstocks without complex fractionation equipment. For all practical purposes, an HFC blend is an entirely different substance than the chemical components from which it was manufactured. The original HFC feedstocks that were used to manufacture the blend lose their individual identity and become part of a new substance, just as sugar, flour and water mixed together become a cake or cookie and lose their identity as the original ingredients.

Even if EPA interprets §103(c)(3)(B) of the Act as authorizing EPA to require allowances for HFC components "within" HFC blends, as discussed in Part I above, it would be fundamentally unfair to allocate allowances to suppliers of HFC components while requiring producers/importers of the HFC blends themselves to hold allowances.  This mismatch would be inconsistent with the statutory reference to a "regulated substance within a blend of substances," which implies (if not dictates) that the regulatory focus should be on the HFC substances in its state of being "within" a blend, not as a feedstock component which is physically incorporated into a new HFC blend product and loses its original identity.  EPA should not interpret the Act in a manner that creates a situation where one party in the supply chain receives an economic windfall and another party

---

[28]  One example of EPA's authority to regulate HFCs, other than requiring allowances for listed regulated substances, is EPA's authority in §103(d) of the Act to require monitoring and reporting of HFC blends imports.

[29] *See, e.g.*, Oxford Dictionary of Physics (8 ed.) (definition of azeotrope); *see also* Air Conditioning, Heating, & Refrigeration Institute, *Blends 101: an introduction to refrigerants* ("Azeotrope: a blend that behaves like a single component refrigerant. When a blend forms an azeotrope, it displays unique and unexpected properties.") (https://www.achrnews.com/articles/82752-blends-101-an-introduction-to-refrigerants).

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 17

bears the economic burden based on market activity nearly a decade ago.

\*   \*   \*

In sum, Choice Refrigerants supports EPA's approach to establishing an allowance allocation system for phasedown of HFCs, provided that the system takes into consideration the important issues discussed above. Choice Refrigerants appreciates the opportunity to comment on this proposal. If you have any questions, please contact me at (770) 777-0597 or choice.refrigerants@gmail.com.

Respectfully submitted,

Kenneth Ponder
President

Attachments

cc:   Christopher Grundler, Director, Office of Atmospheric Programs
      Cynthia Newberg, Director, Stratospheric Protection Division

Attachment A

(Zhejiang Juhua Co., Ltd. 2018 Annual Report)

The Honorable Wilbur L. Ross, Jr.
July 10, 2019
Page 4.

Imports LLC and EDX, are importing on behalf of iGas.[9]  Both TTI and Lianzhou were

respondents in the original antidumping duty investigation and continue to export HFC

components to iGas, BMP, or their affiliates.[10]  In addition, Juhua (aka "Quhua") is a Chinese

producer and supplier of TTI[11] as well as an affiliate of iGas, as evidenced by Juhua's 2018

annual report.[12]

Based on the evidence of the conduct by these specific companies, Commerce can either

make a company-specific finding of circumvention or establish a broader country-wide finding

to prevent circumvention in the future.

*Second*, Commerce should establish a period of investigation ending May 31, 2019.  This

anti-circumvention proceeding was initiated June 18, 2019.  As shown by the statistics included

in the *Circumvention Allegation*, imports of HFC blends into Tampa (iGas's address) were

surging through the end of 2018.  In 2019, Census statistics indicate that these imports continue

---

[9] **Exhibit 1** (indicating Golden G Imports LLC and EDX are importing HFC components
destined for iGas, as shown by [

]).

[10] *See Circumvention Allegation* at Exhibit 2.

[11] *See 1,1,1,2 Tetrafluoroethane (R-134a) from … China: Antidumping Duty Order*, 82 Fed. Reg.
18,422 (Apr. 19, 2017).

[12] *See* **Exhibit 2** (demonstrating Juhua recently made substantial investments in iGas) (excerpts
translated).

CASSIDY LEVY KENT

Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  HFC Components

Exhibit 2

*Translated via Google Translate*

Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  HFC Components

2018 年年度报告

公司代码：600160                                        公司简称：巨化股份

Zhejiang Juhua Co. Ltd 2018 Annual Report

# 浙江巨化股份有限公司
# 2018 年年度报告



## 浙江巨化股份有限公司董事会

Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved

JA155

*Translated via Google Translate*

Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry - HFC Components
2018 年年度报告

☐适用　√不适用

**5　环保与安全情况**

**(1).公司报告期内重大安全生产事故基本情况**

☐适用　√不适用

**(2).报告期内公司环保投入基本情况**

√适用　☐不适用

单位：万元　币种：人民币

| 环保投入资金 | 投入资金占营业收入比重（%） |
|---|---|
| 1，940 | 0.12 |

报告期内发生重大环保违规事件基本情况

☐适用　√不适用

**(3).其他情况说明**

☐适用　√不适用

**(五)　投资状况分析**

Investment Status Analysis

**1、对外股权投资总体分析**

Overall analysis of external equity investment

√适用　☐不适用

报告期对外股权投资总额 141991.37 万元与上年同比增加 8443.92 万元，上升 6.32%，主要原因为 2018 年度出资 37000 万元增资浙江晋巨化工有限公司、38000 万元增资浙江衢州巨塑化工有限公司、25284.88 万元收购浙江巨化技术中心有限公司、18411.20 万元收购巨化集团财务有限责任公司 16%股权所致。

Company Invested in　Main Business

Unit: 10,000 Yuan

单位：万元

Investment Amount

| 被投资的公司名称 | 主要业务 | 投资方式 | 投资额 |
|---|---|---|---|
| 上海爱新液化气体有限公司 | 批发危险化学品等 | 增资入股 | 433.92 |
| 浙江衢州巨塑化工有限公司 | 聚偏二氯乙烯树脂、聚偏二氯乙烯乳液生产、销售 | 增资 | 38000 |
| 浙江衢州联б致冷剂有限公司 | 混配及单质致冷剂充装等 | 增资 | 6000 |
| iGas USA Inc. | 生产、采购、混配、储存、运输和销售致冷剂及相关产品等 | 新设 | 1000（美元）Dollar |
| 浙江晋巨化工有限公司 | 甲醇、液氨等生产和销售等 | 增资 | 37000 |
| 天津百瑞高分子材料有限公司 | 塑料薄膜制品、机械设备制造、加工、销售等 | 收购 | 3046 |
| 巨化集团财务有限责任 | 银监会批准业务 | 收购 | 18411.2 |

Production, procurement, mixing, storage, transportation and sale of refrigerants and related products

Filed By: jcannon@cassidylevy.com, Filed Date: 7/15/19 2:45 PM, Submission Status: Approved

*Translated via Google Translate*

Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry - HFC Components
2018 年年度报告

### （六）　　重大资产和股权出售

√适用　□不适用

　　　　经公司董事会七届十次会议、公司2018年第一次临时股东大会审议批准，公司将全资子公司浙江凯圣氟化学有限公司100%股权和浙江博瑞电子科技有限公司100%股权共同作为一个标的进行公开挂牌转让。详见公司临2017－53号《巨化股份转让全资子公司股权及变更部分募集资金投资项目公告》、临2018-02号《巨化股份2018 年第一次临时股东大会决议公告》及临2018－08号《巨化股份转让全资子公司股权进展公告》。

### （七）　　主要控股参股公司分析

√适用　□不适用

Name of Subsidiaries and Associated Companies

| 子公司及联营公司全称 | 业务性质 | 经营范围 | 注册资本（万元） | 总资产（万元） | 净资产（万元） | 净利润（万元） |
|---|---|---|---|---|---|---|
| 浙江衢化氟化学有限公司 | 工业制造 | 氟化工原料及氟致冷剂生产、销售 | 22,359.22 | 197,691.08 | 166,679.27 | 60,659.54 |
| 浙江衢州巨新氟化工有限公司 | 工业制造 | 氟致冷剂生产、销售 | 113,014.10 | 170,750.75 | 151,122.08 | 31,194.45 |
| 浙江衢州氟新化工有限公司 | 工业制造 | 氢氟酸生产、销售 | 2,000.00 | 37,990.80 | 16,334.50 | 5,724.32 |
| 浙江衢州巨塑化工有限公司 | 工业制造 | 三氯乙烯、PVDC等生产、销售 | 73,000.00 | 90,601.19 | 71,118.48 | 10,073.51 |
| 大津白瑞高分子材料有限公司 | 工业制造 | 塑料薄膜制品生产、销售 | 1,036.83 | 2,049.11 | 1,652.12 | −35.49 |
| 宁波巨化化工科技有限公司 | 工业制造 | 氟化工原料生产、销售 | 26,231.67 | 121,780.49 | 105,356.78 | 41,019.09 |
| 宁波巨化新材料有限公司 | 工业制造 | 化工原料及产品生产销售 | 5,000.00 | 8,012.62 | 3,374.36 | −237.48 |
| 宁波巨榭能源有限公司 | 商品贸易 | 化工原料及产品销售 | 5,000.00 | 28,063.64 | 11,173.32 | 859.59 |
| 衢州巨化锦纶有限责任公司 | 工业制造 | 己内酰胺、环己酮等生产、销售 | 102,067.00 | 94,316.64 | 80,339.95 | 10,848.15 |
| 浙江巨圣氟化学有限公司 | 工业制造 | 氟产品生产、销售 | USD1,200 | 31,394.15 | 22,555.73 | 7,850.35 |
| 浙江衢州鑫巨氟材料有限公司 | 工业制造 | 超高分子量聚四氟乙烯生产、销售 | 3,000.00 | 1,792.82 | 1,404.72 | −0.48 |
| 浙江博瑞电子科技有限公司 | 工业制造 | 电子特气产品等生产、销售 | 72,600.00 | 0.00 | 0.00 | −979.50 |
| 浙江凯圣氟化学有限公司 | 工业制造 | 电子湿化学品生产、销售 | 15,000.00 | 0.00 | 0.00 | −1,179.37 |
| 浙江凯恒电子材 | 工业 | 电子级氢氟酸生 | 1,200.00 | 0.00 | 0.00 | −45.44 |

Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved

*Translated via Google Translate*

Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry - HFC Components
2018 年年度报告

| 工科技有限公司 | 制造 | 售 | | | | |
|---|---|---|---|---|---|---|
| 浙江硅谷巨赋投资管理有限公司 | 投资 | 投资管理,投资咨询(除证券、期货),股权投资及相关咨询服务。 | 600.00 | 439.68 | 388.82 | −49.76 |
| 衢州巨化华辰物流有限公司 | 仓储 | 货物仓储 | 2,000.00 | 104.08 | −1,479.55 | −0.02 |
| 浙江巨化股份有限公司兰溪农药厂 | 工业制造 | 农药产品生产 | 2,688.00 | 9.40 | −9,368.56 | −0.14 |
| 中巨芯科技有限公司 | 工业制造 | 电子化学材料、化工产品等生产销售 | 100,000.00 | 111,034.18 | 100,733.58 | −789.91 |
| 上海爱新液化气体有限公司 | 商品贸易 | 危险化学品、化工产品批发,货物及技术进出口 | 428.00 | 8,782.39 | 1,852.68 | 1,048.65 |
| iGas USAInc | 商品贸易 | 化工原料及产品销售 | USD2941.17 | 41,661.58 | 19,574.19 | −595.87 |

注:公司所持浙江博瑞电子科技有限公司、浙江凯圣氟化学有限公司及其子公司浙江凯恒电子材料有限公司股权于 2018 年 4 月全部转让给中巨芯科技有限公司。

来源于单个子公司的净利润或单个参股公司的投资收益对公司净利润影响达到 10%以上的说明:

| 子公司及联营公司全称 | 营业收入（万元） | 营业利润（万元） | 净利润（万元） |
|---|---|---|---|
| 浙江衢化氟化学有限公司 | 356,047.49 | 67,074.65 | 60,659.54 |
| 浙江衢州巨新氟化工有限公司 | 214,217.99 | 40,423.18 | 31,194.45 |
| 宁波巨化化工科技有限公司 | 211,822.82 | 48,953.84 | 41,019.09 |

2018 年,本公司有 3 家子公司及联营企业业绩变动在 30%以上,且对公司合并经营业绩造成重大影响,其业绩变动情况及原因如下:

| 公司名称 | 净利润(万元) | | 变动幅度% | 变动原因 |
|---|---|---|---|---|
| | 2018 年 | 2017 年 | | |
| 浙江衢化氟化学有限公司 | 60,659.54 | 28,674.83 | 111.54 | 产品价格上升及产销量增加 |
| 浙江衢州巨新氟化工有限公司 | 31,194.45 | 22,100.97 | 41.15 | 产品价格上升及产销量增加 |
| 宁波巨化化工科技有限公司 | 41,019.09 | 21,382.41 | 91.84 | 产品价格上升及产销量增加 |

Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved

JA158

*Translated via Google Translate*

Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  HFC Components
2018 年年度报告

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 巨化集团财务有限责任公司 | 300,543,75 1.19 | 184,112,00 0.00 | | 21,614,237.7 9 | | | | | 506,269,988. 98 |
| 浙江硅谷巨赋投资管理有限公司 | 2,149,040. 18 | | | −243,817.42 | | | | | 1,905,222.76 |
| 中巨芯科技有限公司 | 389,999,84 4.00 | | | −3,232,319.2 5 | 1,250,380. 19 | | | | 388,017,904. 94 |
| 杉杉新材料(衢州)有限公司 | 67,508,626 .21 | | | −24,619,434. 24 | 200,937.47 | | | | 43,090,129.4 4 |
| 杭州巨赋隆晖股权投资合伙企业（有限合伙） | 10,264,381 .80 | | 10,681,433 .28 | 417,051.48 | | | | | |
| 上海爱新液化气体有限公司 | | 4,339,200. 00 | | 3,102,356.08 | | | | | 7,441,556.08 |
| iGas USAInc | | 68,317,000 .00 | | −2,025,952.1 9 | 261,192.28 | | | | 66,552,240.0 9 |
| 小计 | 876,596,40 9.68 | 256,768,20 0.00 | 10,681,433 .28 | −246,179.03 | 1,865,202. 37 | 4,180,000.00 | −50,900,878. 53 | | 1,069,221,32 1.21 |
| 合计 | 903,476,40 9.68 | 256,768,20 0.00 | 10,681,433 .28 | −246,179.03 | 1,865,202. 37 | 4,180,000.00 | −50,900,878. 53 | 1,096,101,32 1.21 | 26,880,000 .00 |

其他说明

［注 1］：本期公司控股合并了原联营企业晋巨化工公司，因原对其账面价值因合并抵消进行了转出，同时其对浙江衢州巨化昭和电子化学材料有限公司的股权投资因纳入合并范围而增加。

［注 2］：兰溪农药厂股权投资已全额计提减值准备。


**15、 投资性房地产**

投资性房地产计量模式

**(1).采用成本计量模式的投资性房地产**

单位：元  币种：人民币

| 项目 | 房屋、建筑物 | 土地使用权 | 在建工程 | 合计 |
|---|---|---|---|---|
| 一、账面原值 | | | | |
| 1.期初余额 | 34,619,200.25 | | | 34,619,200.25 |
| 2.本期增加金额 | 42,001,038.36 | 2,439,581.28 | | 44,440,619.64 |
| （1）外购 | 7,697,038.36 | | | 7,697,038.36 |
| （2）存货\固定资产\在建工程转入 | 34,304,000.00 | | | 34,304,000.00 |
| （3）企业合并增加 | | 2,439,581.28 | | 2,439,581.28 |
| 3.本期减少金额 | | | | |
| （1）处置 | | | | |
| （2）其他转出 | | | | |

Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved

JA159

*Translated via Google Translate*

2018 年年度报告

**7、 本期内发生的估值技术变更及变更原因**

□适用 √不适用

**8、 不以公允价值计量的金融资产和金融负债的公允价值情况**

□适用 √不适用

**9、 其他**

□适用 √不适用

**十二、 关联方及关联交易**

**1、 本企业的母公司情况**

√适用 □不适用

单位：万元　币种：人民币

| 母公司名称 | 注册地 | 业务性质 | 注册资本 | 母公司对本企业的持股比例(%) | 母公司对本企业的表决权比例(%) |
|---|---|---|---|---|---|
| 巨化集团有限公司 | 杭州 | 制造业、商业等 | 400,000.00 | 51.91% | 54.09% |

本企业的母公司情况的说明

　　截至 2018 年 12 月 31 日，巨化集团有限公司直接持有本公司 38.65%的股份，另有 13.26%的股份作为 17 巨化 EB 的信托及担保财产存放于巨化集团-浙商证券-17 巨化 EB 担保及信托财产专户（由 17 巨化 EB 的受托管理人浙商证券为名义持有人），通过全资子公司浙江巨化投资有限公司持有本公司 2.18%的股份，合计表决权比例为 54.09%。

本企业最终控制方是浙江省人民政府国有资产监督管理委员会

其他说明：

无

**2、 本企业的子公司情况**

本企业子公司的情况详见附注

√适用 □不适用

详见本财务报表附注在其他主体中的权益之说明。

**3、 本企业合营和联营企业情况**

本企业重要的合营或联营企业详见附注

□适用 √不适用

本期与本公司发生关联交易，或前期与本公司发生关联方交易形成余额的其他合营或联营企业情况如下

√适用 □不适用

Relationship with Company

| 合营或联营企业名称 | 与本企业关系 |
|---|---|
| TGAS USA, INC. | 本公司联营企业 Joint Venture |
| 上海巨化实业发展有限公司 | 本公司联营企业 |
| 杉杉新材料（衢州）有限公司 | 本公司联营企业 |
| 浙江工程设计有限公司 | 本公司联营企业 |
| 浙江衢州福汇化工科技有限公司 | 本公司联营企业 |

Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved

*Translated via Google Translate*
Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry - HFC Components
2018 年年度报告

| 浙江菲达环保科技股份有限公司 | 同受巨化集团有限公司控制 |
|---|---|

其他说明
无

## 5、关联交易情况

### (1). 购销商品、提供和接受劳务的关联交易

采购商品/接受劳务情况表
√适用 □不适用

单位：元 币种：人民币

| 关联方 | 关联交易内容 | 本期发生额 | 上期发生额 |
|---|---|---|---|
| 巨化集团有限公司 | 材料、水电等 | 2,362,818,813.23 | 2,031,097,204.12 |
| 浙江晋巨化工有限公司 | 甲醇、氯气等 | 515,518,739.46 | 553,853,481.63 |
| 巨化集团公司汽车运输有限公司 | 运费、修理服务等 | 263,998,048.42 | 237,961,986.10 |
| 浙江巨化装备制造有限公司 | 工程物资、备件材料等 | 67,506,828.10 | 36,726,486.37 |
| 浙江巨化化工矿业有限公司 | 萤石矿 | 65,446,333.35 | 66,284,099.72 |
| 浙江巨化工材料有限公司 | 工程物资、彩扩费 | 51,214,115.33 | 14,618,386.65 |
| 巨化集团公司兴业实业有限公司 | 绿化费、餐费等 | 36,646,253.99 | 43,537,992.92 |
| 浙江巨化电石有限公司 | 高纯氮、电石等 | 23,456,011.13 | 29,794,467.80 |
| 浙江巨化物流有限公司 | 运费、仓储服务等 | 5,498,919.83 | 3,869,973.74 |
| 浙江歌瑞新材料有限公司 | 钢衬 PTFE 直管等 | 5,201,834.21 | 14,506,069.67 |
| 上海巨化实业发展有限公司 | 烟煤、技术咨询服务 | 3,839,696.85 | 166,337.83 |
| 浙江巨化新联化工有限公司 | 编织袋等 | 3,692,695.79 | 60,613,224.82 |
| 衢州氟硅技术研究院 | 检测费、咨询服务 | 3,527,097.08 | 1,797,659.25 |
| 浙江南方工程建设监理有限公司 | 监理服务 | 3,389,502.01 | 2,443,138.91 |
| 巨化控股有限公司 | 咨询服务 | 1,547,169.82 | |
| 浙江博瑞电子科技有限公司 | 氯化氢 | 1,497,432.00 | |
| 浙江科健安全卫生咨询有限公司 | 危害预防评价服务 | 639,622.64 | |
| 杉杉新材料（衢州）有限公司 | 六氟磷酸锂 | 436,068.38 | 670,016.56 |
| 浙江凯圣氟化学有限公司 | 硝酸、盐酸等 | 354,128.21 | |
| 浙江巨化集团进出口有限公司 | 化工原料 | 309,860.68 | 3,802,921.92 |
| 浙江巨化汉正新材料有限公司 | 化工原料 | 287,145.21 | 1,078,888.89 |
| 巨化集团公司工程有限公司 | 修理费等 | 159,262.04 | 40,264,778.00 |
| 浙江清科环保科技有限公司 | 技术咨询服务 | 61,320.76 | |
| 浙江华江科技股份有限公司 | 技术测试服务 | 55,660.38 | 2,564.11 |
| 浙江衢州巨泰建材有限公司 | 过磅费等 | 53,070.32 | |
| 浙江工程设计有限公司 | 技术咨询服务 | 37,735.85 | 1,149,260.01 |
| 巨化集团公司制药厂 | 仓储服务 | 8,490.57 | |
| 浙江衢州福汇化工科技有限公司 | 无水氢氟酸 | | 3,896,154.70 |
| 兰溪市双凤巨龙供水有限公司 | 水电费 | | 177,366.99 |
| 合 计 | | 3,417,201,855.64 | 3,148,312,460.71 |

出售商品/提供劳务情况表  <mark>Sale of goods / provision of labor</mark>
√适用 □不适用

单位：元 币种：人民币

| 关联方 | 关联交易内容 | 本期发生额 | 上期发生额 |
|---|---|---|---|
| IGAS USA, INC. | 材料销售 | 233,708,704.68 | |

<mark>Current period</mark>

**211 / 235**

**Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved**

*Translated via Google Translate*

4、本期支付巨化集团财务有限责任公司借款利息 193,877.08 元, 上年同期为 188,681.25
元。

6、关联方应收应付款项  Related party receivables and payables

(1). 应收项目

√适用  □不适用

单位:元  币种:人民币

| 项目名称 | 关联方 | 期末余额 | | 期初余额 | |
|---|---|---|---|---|---|
| | | 账面余额 | 坏账准备 | 账面余额 | 坏账准备 |
| 应收票据及应收账款 | IGAS USA, INC. | 24,593,101.95 | 1,229,655.10 | | |
| 应收票据及应收账款 | 巨化集团有限公司 | 21,277,887.26 | 295.83 | 16,045,382.49 | 751,769.11 |
| 应收票据及应收账款 | 杉杉新材料(衢州)有限公司 | 15,369.52 | 1,536.95 | 97,293.84 | 4,864.69 |
| 应收票据及应收账款 | 浙江博瑞电子科技有限公司 | 313,783.56 | 4,104.66 | | |
| 应收票据及应收账款 | 浙江歌瑞新材料有限公司 | 8,744,970.60 | 437,248.53 | | |
| 应收票据及应收账款 | 浙江锦华新材料股份有限公司 | 7,053,685.18 | 352,684.26 | | |
| 应收票据及应收账款 | 浙江凯恒电子材料有限公司 | 2,144,559.42 | 107,227.97 | | |
| 应收票据及应收账款 | 浙江凯圣氟化学有限公司 | 1,756,659.06 | 87,832.95 | | |
| 应收票据及应收账款 | 浙江衢州福汇化工科技有限公司 | 3,977,494.45 | 198,874.72 | 13,593,935.91 | 334,696.80 |
| 应收票据及应收账款 | 浙江衢州巨化昭和电子化学材料有限公司 | 106,740.47 | 5,337.02 | | |
| 应收票据及应收账款 | 浙江巨化化工矿业有限公司 | 113.74 | 5.69 | 390.62 | 19.53 |
| 应收票据及应收账款 | 兰溪农药厂 | 60,266,197.95 | 33,507,430.15 | 60,266,197.95 | 33,507,430.15 |
| 应收票据及应收账款 | 浙江晋巨化工有限公司 | | | 3,750.00 | 187.50 |
| 应收票据及应收账款 | 浙江巨化汉正新材料有限公司 | | | 5,682,377.27 | 284,118.86 |
| 应收票据及应收账款 | 浙江巨化装备制造有限公司 | | | 6,339,527.36 | 316,976.37 |
| 应收票据及应收账款 | 巨化集团公司工程有限公司 | | | 366,630.86 | 18,331.54 |
| 应收票据及应收账款 | 浙江巨化化工材料有限公司 | 300,000.00 | | 982,000.00 | |
| 应收票据及应收账款 | 上海巨化实业发展有限公司 | | | 77,595.00 | |

**216 / 235**

*Translated via Google Translate*

Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry - HFC Components
2018 年年度报告

| | | | | | 期计提减值准备 | 准备期末余额 |
|---|---|---|---|---|---|---|
| 宁波巨化公司 | 157,390,000.00 | | | 157,390,000.00 | | |
| 衢江氟化公司 | 310,415,418.21 | | | 310,415,418.21 | | |
| 兰溪氟化公司 | 39,500,000.00 | | | 39,500,000.00 | | |
| 凯圣氟化公司 | 158,142,190.40 | | 158,142,190.40 | | | |
| 巨塑化工公司 | 345,314,463.69 | 380,000,000.00 | | 725,314,463.69 | | |
| 巨邦高新公司 | 8,295,155.94 | | | 8,295,155.94 | | |
| 联州致兴公司 | 23,228,533.69 | 60,000,000.00 | | 83,228,533.69 | | |
| 巨圣氟化公司 | 57,904,009.55 | | | 57,904,009.55 | | |
| 宁波巨橄公司 | 50,000,000.00 | | | 50,000,000.00 | | |
| 衢州鑫巨公司 | 19,500,000.00 | | | 19,500,000.00 | | |
| 巨化香港公司 | 81,712,100.00 | | | 81,712,100.00 | | |
| 巨新氟化公司 | 1,130,141,018.00 | | | 1,130,141,018.00 | | |
| 巨化锦纶公司 | 1,162,474,055.83 | | | 1,162,474,055.83 | | |
| 氟新化工公司 | 25,428,126.93 | | | 25,428,126.93 | | |
| 博瑞电子公司 | 726,000,000.00 | | 726,000,000.00 | | | |
| 丽水福华公司 | 10,000,000.00 | | | 10,000,000.00 | | |
| 巨化检安公司 | 25,572,575.48 | | | 25,572,575.48 | | |
| 技术中心 | | 76,528,276.98 | | 76,528,276.98 | | |
| 研究院 | | 42,994,445.78 | | 42,994,445.78 | | |
| 晋巨化工公司 | | 429,471,794.54 | | 429,471,794.54 | | |
| 兰溪农药厂 | 26,880,000 | | | 26,880,000 | | 26,880,000 |
| 合计 | 4,357,897,647.72 | 988,994,517.30 | 884,142,190.40 | 4,462,749,974.62 | | 26,880,000 |

（2）．对联营、合营企业投资 Investment in joint ventures and joint ventures

√适用 □不适用

单位：元  币种：人民币

| 投资单位 | 期初余额 | 本期增减变动 | | | | | | | | | 期末余额 | 减值准备期末余额 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 追加投资 | 减少投资 | 权益法下确认的投资损益 | 其他综合收益调整 | 其他权益变动 | 宣告发放现金股利或利润 | 计提减值准备 | 其他 | | | |
| 一、合营企业 | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| 小计 | | | | | | | | | | | | |
| 二、联营企业 | | | | | | | | | | | | |
| 中巨芯科技有限公司 | 389,999,844.00 | | | -3,232,319.25 | 1,250,380.19 | | | | | 388,017,904.94 | | |
| 上海巨化 | 24,568, | | | 1,479,4 | | | | | | 26,048 | | |

Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved

*Translated via Google Translate*

Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry - HFC Components
2018 年年度报告

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 实业发展有限公司 | 740.70 | | | 45.96 | | | | | , 186.66 |
| 浙江衢州巨化昭和电子化学材料有限公司 | 11,878,211.12 | | | 752,629.33 | 90,368.99 | | | | 12,721,209.44 |
| 浙江晋巨化工有限公司 | 58,762,360.14 | | | 709,434.40 | | | | −59,471,794.54 | |
| 浙江衢州福汇化工科技有限公司 | 10,921,454.34 | | | 1,660,180.60 | | 4,180,000.00 | | | 8,401,634.94 |
| 巨化集团财务有限责任公司 | 300,543,751.19 | 184,112,000.00 | | 21,614,237.79 | | | | | 506,269,988.98 |
| 浙江硅谷巨赋投资管理有限公司 | 2,149,040.18 | | | −243,817.42 | | | | | 1,905,222.76 |
| 杉杉新材料（衢州）有限公司 | 60,900,227.72 | | | −24,248,869.84 | 200,937.47 | | | | 36,852,295.35 |
| 杭州巨赋隆睿股权投资合伙企业（有限合伙） | 10,264,381.80 | | 10,681,433.28 | 417,051.48 | | | | | |
| 上海爱新液化气体有限公司 | | 4,339,200.00 | | 3,102,356.08 | | | | | 7,441,556.08 |
| iGas USAInc | | 68,317,000.00 | | −2,025,952.19 | 261,192.28 | | | | 66,552,240.09 |
| 小计 | 869,988,011.19 | 256,768,200.00 | 10,681,433.28 | −15,623,878.06 | 1,802,878.93 | 4,180,000.00 | | −59,471,794.54 | 1,054,210,239.24 |
| 合计 | 869,988,011.19 | 256,768,200.00 | 10,681,433.28 | −15,623,878.06 | 1,802,878.93 | 4,180,000.00 | | −59,471,794.54 | 1,054,210,239.24 |

其他说明：
无

4、营业收入和营业成本
(1). 营业收入和营业成本情况
√适用 □不适用

单位：元 币种：人民币

| 项目 | 本期发生额 | | 上期发生额 | |
|---|---|---|---|---|
| | 收入 | 成本 | 收入 | 成本 |
| 主营业务 | 4,605,156,440.59 | 3,691,011,791.29 | 3,991,059,783.62 | 3,251,273,922.28 |
| 其他业务 | 538,996,389.97 | 519,169,614.52 | 422,155,610.92 | 415,092,948.07 |
| 合计 | 5,144,152,830.56 | 4,210,181,405.81 | 4,413,215,394.54 | 3,666,366,870.35 |

Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved

JA164

Attachment B

(Complaint, T.T. International Co. Inc. v. BMP International Inc. et al.,
No. 8:19-cv-02044 (M.D. Fla., filed Aug. 16, 2019))

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

T.T. INTERNATIONAL CO., LTD.,

       Plaintiff,

v.

    CASE NO.:

BMP INTERNATIONAL INC.,
BMP USA, INC., and iGAS USA, INC.,

       Defendants.

## COMPLAINT

Plaintiff T.T. International Co., Ltd. ("T.T." or "Plaintiff") sues Defendants, BMP International, Inc., BMP USA, Inc., and iGas USA, Inc. (collectively the "Defendants"), and alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for damages arising out of T.T.'s shipment and the Defendants' acceptance of (a) over $14 million of refrigerants, disposable cylinders, and related products to Defendant BMP International; (b) over $58 million of refrigerants, disposable cylinders, and related products to Defendant BMP USA; and (c) over $1 million of refrigerants, disposable cylinders, and related products to Defendant iGas USA. Thus, the Defendants owe T.T. in excess of $70 million, plus interest.

2.      The shipments are evidenced by, among other things, invoices issued by T.T. to each of the three Defendants, as follows:

a.  Complete, accurate, and authentic copies of the invoices for T.T.'s shipments to Defendant BMP International are attached as composite **Exhibit A** (the "BMP International Invoices"). These invoices are dated between June 9 and August 1, 2017.

b.  Complete, accurate, and authentic copies of the invoices for T.T.'s shipments to Defendant BMP USA are attached as composite **Exhibit B** (the "BMP USA Invoices"). These invoices are dated between July 28, 2017 and May 25, 2018.

c.  Complete, accurate, and authentic copies of the invoices for T.T.'s shipments to Defendant iGas USA are attached as composite **Exhibit C** (the "iGas USA Invoices"). These invoices are dated between July 10 and 25, 2018.

3.  The Defendants received, retained, and in all or some instances resold these goods. However, they have refused and failed to pay T.T. for these refrigerants, disposable cylinders and related products. Consequently, T.T has suffered damages in excess of $70 million.

**THE PARTIES**

4.  Plaintiff T.T. is a company organized under the laws of the People's Republic of China, which at all material times had its principal place of business in Dalian, China.

5.  Defendant BMP International is a Florida corporation with its principal place of business in Tampa, Florida. Thus, it is a Florida citizen.

6.  Defendant BMP USA is a Florida corporation with its principal place of business in Tampa, Florida. Thus, it is a Florida citizen.

7.     Defendant iGas USA is a Florida corporation with its principal place of business in Tampa, Florida.  Thus, it is a Florida citizen.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and it is between the citizens of a State and a citizen of a foreign state.

9.     The Court has personal jurisdiction over BMP International because it is a citizen of Florida.

10.    The Court has personal jurisdiction over BMP USA because it is a citizen of Florida.

11.    The Court has personal jurisdiction over iGas USA because it is a citizen of Florida.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because BMP International, BMP USA, and iGas USA reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred here.

## FACTUAL ALLEGATIONS

13.    T.T. is engaged in the business of manufacturing and selling of refrigerants, disposable cylinders, and related products.  T.T. often works with importers in countries such as the United States to sell its products into markets outside of China.  T.T. does not maintain any offices, employees, or agents within the United States.  Nor does T.T. itself import product into the United States.

14.     The Defendants are business organizations that, among other things, import refrigerants, disposable cylinders, and related products to the United States.  The Defendants market themselves as wholesalers of refrigerant and related products.  Accordingly, the Defendants resell the refrigerant and related products that they receive from T.T. and presumably other suppliers.

15.     At all relevant times, the Defendants were controlled, in whole or in part and directly or indirectly, by Xianbin "Ben" Meng, who resides in the Tampa Bay area.

16.     On or about February 1, 2012, Meng contacted T.T. by email on behalf of BMP International.  Meng stated that he viewed T.T.'s materials at the AHR Expo in Chicago—an industry trade show—and that he wanted a price quotation for several refrigerants.

17.     At all relevant times, Meng controlled and directed the operations of BMP International.  On information and belief, Meng has served, and continues to serve, as BMP International's president.

18.     As Meng requested, T.T. provided a price quotation for refrigerants and related products.  Meng subsequently notified T.T. that BMP International accepted its proposed terms.

19.     Consequently, T.T. sent invoices and shipping documents for BMP International's first order to Meng.  In or about August 2012, T.T., through its shipping agent, shipped the refrigerants and related products that BMP International had ordered to an address in Tampa, Florida that Meng had provided.

20.     T.T.'s invoices for BMP International's orders placed in 2012 stated the number and type of packages, described the goods and quantity, provided shipping details, and

included the following terms of payment: "10% against proforma invoice, 90% balance before arriving".

21.     On or about March 27, 2015, T.T. transmitted the first invoice to BMP International that substituted "O/A 60 days" as the term of payment.  The term "O/A" means "open account."

22.     During the month of September 2015, T.T. transitioned to using "O/A 60 days from B/L date" as the term of payment on all invoices it sent to the Defendants and their related entities.  The term "B/L" means "bill of lading."

23.     At Meng's request, in or about June 2015, T.T. began shipping refrigerants and related products to Defendant BMP USA.

24.     The invoices and shipping documents that T.T. sent to BMP USA for these goods were identical or substantially similar in form to those that T.T. utilized for BMP International and, accordingly, they contained essentially the same information.

25.     At all relevant times, Meng controlled and directed the operations of BMP USA.  On information and belief, Meng has served, and continues to serve, as BMP USA's president.

26.     At Meng's request, in or about August 2015, T.T. began shipping refrigerants and related products to LM Supply, Inc.  Meng represented to T.T. that BMP International controlled LM Supply and was responsible for making payments on its behalf.

27.     The invoices and shipping documents that T.T. sent to LM Supply for these goods were identical or substantially similar in form to those that T.T. utilized for BMP International and BMP USA.  Accordingly, they contained essentially the same information.

28.     Thus, BMP International (a) placed orders with T.T. for LM Supply; and (b) paid for the refrigerants and related products that T.T. shipped to LM Supply from one of the same accounts which BMP International made payments for goods it received from T.T.

29.     At Meng's request, in or about March 2016, T.T. shipped refrigerants and related products to BMP International while invoicing "R Lines."  On information and belief, R Lines is controlled, in whole or in part and directly or indirectly, by Meng.  BMP International served as the consignee on the corresponding shipping documents and made payment for the goods shipped.

30.     The invoices and shipping documents that T.T. sent to R Lines for these goods were identical or substantially similar in form to those that T.T. utilized for BMP International and other Meng-controlled companies.  Accordingly, they contained essentially the same information.

31.     Thus, BMP International (a) placed orders with T.T. ostensibly in the name of R Lines; and (b) paid for the refrigerants and related products that T.T. shipped to BMP International with invoices in R Lines' name but with shipping documents showing BMP International as consignee.

32.     At Meng's request, in or about June 2016, T.T. began shipping refrigerants and related products sending invoices to Assured Comfort AC, Inc.  Meng represented that BMP International controlled Assured Comfort, and was responsible for making payments on its behalf.

33.     The invoices and shipping documents that T.T. sent to Assured Comfort for these goods were identical or substantially similar in form to those that T.T. utilized for BMP

International and other Meng-controlled companies.  Accordingly, they contained essentially the same information.

34.     Thus, BMP International (a) placed orders with T.T. for Assured Comfort; and (b) paid for the refrigerants and related products that T.T. shipped to Assured from one of the same accounts from which BMP International made payments for goods it received from T.T.

35.     During the period from July 2017 to May 2018, the orders T.T. received for refrigerants and related products: (a) decreased significantly from BMP International; and (b) increased significantly from BMP USA.  Thus, while Meng continued to place the orders for these goods, he increasingly directed T.T. to ship to and invoice BMP USA rather than BMP International.

36.     During the period from July 2017 to May 2018, Meng continued to direct some invoices to affiliate entities including: (a) R-Lines, and (b) Coolmaster USA, Inc.—another Meng-controlled entity.   During this period, T.T. understood—based upon Meng's representations among other things—that BMP USA and or BMP International would ultimately take responsibility for payment.

37.     Meng introduced Coolmaster USA as a related company to BMP USA and sought to have T.T. enter a relationship with Coolmaster USA as part of its continued relationship with BMP USA and BMP International.

38.     The invoices and shipping documents that T.T. sent to Coolmaster USA for these goods were identical or substantially similar in form to those that T.T. utilized for BMP USA and other Meng-controlled companies.  Accordingly, they contained essentially the same information.

39.    During 2018, Meng also directed T.T. to make shipments directly to customers and or suppliers of his companies including: (a) Materiales Electricos de Const. y Refrig., S.A.; (b) Lenz Sales & Distribution, Inc.; and (c) Puremann, Inc.  T.T. understood—based upon Meng's representations among other things—that if the customer and or supplier invoiced did not pay for the refrigerant gases and related products, BMP USA or BMP International would bear ultimate responsibility for the payment.

40.    At Meng's request, in or about June 2018, T.T. began shipping refrigerants and related products to Defendant iGas USA, another company controlled, in whole or in part by Meng.

41.    T.T.'s invoice and shipping documents to iGas USA were identical or substantially similar in form to those that T.T. utilized for BMP International and other Meng-controlled companies.  Accordingly, they contained essentially the same information.

42.    During July 2018, T.T. received orders for refrigerants and related products from Defendant iGas USA, but not from BMP International, BMP USA, or any of their affiliates.

43.    At all relevant times, the following companies were controlled, directly or indirectly and in whole or in part, by Meng:

        a.  BMP International, Inc.;

        b.  BMP USA, Inc.;

        c.  LM Supply, Inc.;

        d.  R Lines;

        e.  Assured Comfort AC;

     f.   iGas USA, Inc.; and

     g.   Coolmaster USA, Inc.

44.    From approximately February 2012 until approximately July 2018, T.T. maintained a business relationship with one or more of the Defendants.  During that time, T.T. received orders from Meng or someone under his direction, who would inform T.T. of (a) the products and quantities requested, and (b) to which of the Defendants, affiliated companies, customers, or suppliers of a Defendant the order should be shipped.

45.    During this time period, T.T. maintained a custom and practice of consistently sending invoices and attendant shipping documents for the refrigerants and related products ordered by the Defendants, or by or for LM Supply, R Lines, Assured Comfort AC, or Coolmaster USA (collectively, the "affiliates"), which specified the type and quantity of goods, number and kind of packages, related shipping details, and terms of payment.

46.    From approximately August 2012 to approximately November 2018, the Defendants continued to make payments on account for amounts owed to T.T. for goods it supplied to them.

47.    When T.T. received a payment from the Defendants, it generally credited that payment to the oldest outstanding invoice or invoices.  If, however, there was a newer invoice closer in amount to the payment received, T.T. would, at times, credit the payment to the invoice closer in amount due to the payment rather than to the oldest invoice.

48.    Thus, in its normal business operations, T.T. generally employed a balance forward system of accounting.

49.     However, the Defendants have not made any payments to T.T. since approximately November of 2018.

50.     In or about late July 2018, Meng, acting in his capacity as a representative of each of the Defendants, met with representatives of T.T. in Shanghai, China.  During that meeting, Meng stated that the Defendants no longer wished to purchase refrigerants and related products from T.T.

51.     Consequently, T.T. demanded that the Defendants pay all of the amounts due T.T. for goods it supplied to the Defendants and their affiliates.

52.     Moreover, T.T. provided Meng and, therefore, the Defendants, with a USB drive containing a statement of outstanding invoices rendered by T.T. to the Defendants.

53.     Thereafter, the Defendants did not dispute the amounts that T.T. had detailed that each Defendant owed.  Moreover, Defendants continued to make payments to T.T. until approximately November 2018.

54.     Throughout the period from approximately November 2018, until near the time this Complaint was filed, T.T. made repeated demands via email, telephone, and other messaging forms to Meng and the Defendants that the Defendants pay for the goods they received.

55.     In or about May 2019, a T.T. representative traveled from Dailan, China to Tampa, Florida, met with Meng, and demanded payment from the Defendants.

56.     Despite these repeated demands, the Defendants have made no payments since approximately November 2018, and have never disputed the amounts owed.

57.    Neither the Defendants, or any of their affiliates, have ever returned any of T.T.'s shipments as defective, deficient, or otherwise.  On the contrary, the Defendants and their affiliates retained the refrigerants and related products that they received from T.T.

58.    Moreover, on information and belief, the Defendants, either directly or through one or more of their affiliates, resold all or, at a minimum, a significant amount of the goods they received from T.T.   Nevertheless, the Defendants failed to pay T.T. in excess of $70 million that remains outstanding for refrigerants and related products.

59.    T.T. has engaged Dentons US LLP and Greenberg Traurig, P.A. to represent it in this action and is obligated to pay counsel reasonable fees for their services.

60.    All conditions precedent to the commencement of this action and the granting of the relief requested have occurred, have been satisfied, or have been waived.

### COUNT I - Breach Of Contract By BMP International

61.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

62.    T.T. made offers to enter into contracts with Defendant BMP International by transmitting invoices ahead of the transfer of goods that contained a description of the kind and quantity of the goods, the price of those goods, and attendant payments terms.  Complete, accurate, and authentic copies of each invoice are included in composite **Exhibit A**.

63.    T.T. rendered the BMP International Invoices between approximately June and August 2017.

64.    The BMP International Invoices require this Defendant to pay T.T. the amounts set forth on them—which totals in excess of $14 million in principal—for the refrigerants and related products BMP International received from T.T.

65.     All of the BMP International Invoices included the payment term "O/A 60 days from B/L date".

66.     As to each invoice, BMP International accepted T.T.'s offer by, among other things, accepting and retaining the refrigerants and related products that this Defendant received from T.T.

67.     T.T. shipped all of the goods in the quantity and kind specified by the BMP International Invoices.

68.     BMP International breached these contracts by failing to pay the total amounts due under the BMP International Invoices within the time specified by the payment term on each invoice.

69.     As a direct result of Defendant BMP International's breach of the contracts, T.T. has suffered damages.

WHEREFORE, T.T. demands judgment against BMP International for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

**COUNT II - Breach of Contract by BMP USA**

70.     T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

71.     T.T. made offers to enter into contracts with Defendant BMP USA by transmitting invoices ahead of the transfer of goods that contained a description of the kind and quantity of the goods, the price of those goods, and attendant payments terms.  Complete, accurate, and authentic copies of each invoice are included in composite **Exhibit B**.

72.     T.T. rendered the BMP USA Invoices between approximately July 2017 and May 2018.

73.     The BMP USA Invoices require this Defendant to pay T.T. the amounts set forth on them—which totals in excess of $58 million in principal—for the refrigerants and related products BMP USA received from T.T.

74.     All of the BMP USA Invoices included the payment term "O/A 60 days from B/L date".

75.     As to each invoice, BMP USA accepted T.T.'s offer by, among other things, accepting and retaining the refrigerants and related products that this Defendant received from T.T.

76.     T.T. shipped all of the goods in the quantity and kind specified by the BMP USA Invoices.

77.     BMP USA breached these contracts by failing to pay the total amounts due under the BMP USA Invoices within the time specified by the payment term on each invoice.

78.     As a direct result of Defendant BMP USA's breach of the contracts, T.T. has suffered damages.

WHEREFORE, T.T. demands judgment against BMP USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT III - Breach of Contract by iGas USA

79.     T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

80.     T.T. made offers to enter into contracts with Defendant iGas USA by transmitting invoices ahead of the transfer of goods that contained a description of the kind and quantity of the goods, the price of those goods, and attendant payments terms.  Complete, accurate, and authentic copies of each invoice are included in composite **Exhibit C**.

81.     T.T. rendered the iGas USA Invoices in or around July 2018.

82.     The iGas USA Invoices require this Defendant to pay T.T. the amounts set forth on them—which totals in excess of $1 million in principal—for the refrigerants and related products iGas USA received from T.T.

83.     All of the iGas USA Invoices included the payment term "O/A 60 days from B/L date".

84.     As to each invoice, iGas USA accepted T.T.'s offer by, among other things, accepting and retaining the refrigerants and related products that this Defendant received from T.T.

85.     T.T. shipped all of the goods in the quantity and kind specified by the iGas USA Invoices.

86.     iGas USA breached these contracts by failing to pay the total amounts due under the iGas USA Invoices within the time specified by the payment term on each invoice.

87.     As a direct result of Defendant iGas USA's breach of the contracts, T.T. has suffered damages.

WHEREFORE, T.T. demands judgment against iGas USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

**COUNT IV - Unjust Enrichment by BMP International**

88.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

89.    From approximately June to approximately August 2017, T.T. shipped to Defendant BMP International refrigerant gas and related products worth in excess of $14 million with the expectation that BMP International would timely remit payment for the goods it received.

90.    BMP International acknowledged that the goods were sent and accepted the benefit of these refrigerant gas and related products by arranging for them to pass through United States Customs and subsequently taking possession.

91.    BMP International also accepted the benefit of the goods it received from T.T. by, among other things, reselling all or, at a minimum, a significant amount of these refrigerant gas and related products.

92.    BMP International failed to remit any payment to T.T. for the goods this Defendant received during this period.

WHEREFORE, T.T. demands judgment against BMP International for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

**COUNT V - Unjust Enrichment by BMP USA**

93.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

94.    From approximately August 2017 to approximately October 2018, T.T. shipped refrigerant gas and related products worth in excess of $58 million at the direction of Defendant

BMP USA with the expectation that BMP USA would timely remit payment for the goods it received.

95.     BMP USA acknowledged that the goods were sent and accepted the benefit of these refrigerant gas and related products by arranging for them to pass through United States Customs and subsequently taking possession.

96.     BMP USA also accepted the benefit of the goods it received from T.T. by, among other things, reselling all or, at a minimum, a significant amount of these refrigerant gas and related products.

97.     BMP USA failed to remit any payment to T.T. for the goods this Defendant received during this period.

98.     In addition, BMP USA directed T.T. to ship some refrigerant gas and related products to its customers and or suppliers with the promise that BMP USA would render payment to T.T.

99.     Upon information and belief, BMP USA retained the benefit of these goods by, among other things, accepting and retaining compensation and or product from customers and or suppliers that received goods from T.T.

100.    T.T. received no compensation from BMP USA for the goods BMP USA directed T.T. to ship to its customers and or suppliers.

101.    Furthermore, BMP USA directed T.T. to ship refrigerant gas and related products to its various affiliates with the promise that BMP USA would render payment to T.T.

102.    Upon information and belief, BMP USA retained the benefit of these refrigerant gas and related products by sharing in the proceeds realized by its affiliates from the resale of those goods.

103.    Despite BMP USA's promise to pay for goods received by its affiliates, T.T. has not received any compensation for the goods shipped to BMP USA's affiliates at its direction.

WHEREFORE, T.T. demands judgment against BMP USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT XII - Unjust Enrichment by iGas USA

104.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

105.    From approximately July to approximately August 2018, T.T. shipped to Defendant iGas USA refrigerant gas and related products worth in excess of $1 million with the expectation that iGas USA would timely remit payment for the goods it received.

106.    iGas USA acknowledged that the goods were sent and accepted the benefit of these refrigerant gas and related products by arranging for them to pass through United States Customs and subsequently taking possession.

107.    iGas USA also accepted the benefit of the goods it received from T.T. by, among other things, reselling all or, at a minimum, a significant amount of these refrigerant gas and related products.

108.    iGas USA failed to remit any payment to T.T. for the goods this Defendant received during this period.

WHEREFORE, T.T. demands judgment against iGas USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT VII - Account Stated by BMP International

109.   T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

110.   Before the institution of this action, T.T. and Defendant BMP International had business transactions between them beginning in 2012.

111.   T.T. stated the amounts due to it from BMP International by, among other things, issuing invoices for each transaction.

112.   The invoices issued to BMP International included those invoices from approximately June until approximately August 2017, for which the stated accounts remain unpaid.  Complete, accurate and authentic copies of these invoices are attached as composite **Exhibit A**.

113.   The total value of these business transactions was in excess of $14 million.

114.   In addition, T.T. provided BMP International, through Meng, with a USB drive containing a statement of all amounts due on or about July 30, 2018.

115.   The USB drive contained a statement of BMP International and BMP USA's accounts itemized by invoice number.  Thus, BMP International could engage in simple arithmetic to confirm the total of its unpaid invoices to T.T. according to the stated account.

116.   T.T. continued to demand payments through at least May of 2019.

117.   During the period T.T. demanded payments, BMP International did not dispute the total amounts due.

118.    BMP International implicitly promised to make payment to T.T. on the account by, among other things: (a) retaining the refrigerants and related products that it received from T.T.; (b) reselling these goods to customers; (c) not objecting to the stated amounts due; and (d) continuing to make payments on the account after receiving the stated balances.

119.    Nevertheless, BMP International ceased making payments in or about November 2018, leaving a balance due on the account in excess of $14 million.

WHEREFORE, T.T. demands judgment against BMP International for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT VIII - Account Stated as to BMP USA

120.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

121.    Before the institution of this action, T.T. and Defendant BMP USA had business transactions between them beginning in 2015.

122.    T.T. stated the amounts due to it from BMP USA by, among other things, issuing invoices for each transaction.

123.    The invoices issued to BMP USA included those invoices from approximately July 2017 until approximately May 2018, for which the stated accounts remain unpaid. Complete, accurate and authentic copies of these invoices are attached as composite **Exhibit B**.

124.    The total value of these business transactions was in excess of $58 million.

125.    In addition, T.T. provided BMP USA, through Meng, with a USB drive containing a statement of all amounts due on or about July 30, 2018.

126.    The USB drive contained a statement of BMP USA and BMP International's accounts itemized by invoice number.  Thus, BMP USA could engage in simple arithmetic to confirm the total of its unpaid invoices to T.T. according to the stated account.

127.    T.T. continued to demand payments through at least May of 2019.

128.    During the period T.T. demanded payments, BMP USA did not dispute the total amounts due.

129.    BMP USA implicitly promised to make payment to T.T. on the account by, among other things: (a) retaining the refrigerants and related products that it received from T.T.; (b) reselling these goods to customers; (c) not objecting to the stated amounts due; and (d) continuing to make payments on the account after receiving the stated balances.

130.    Nevertheless, BMP USA ceased making payments in or about November 2018, leaving a balance due on the account in excess of $58 million.

WHEREFORE, T.T. demands judgment against BMP USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

**COUNT IX - Account Stated as to iGas**

131.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

132.    Before the institution of this action, T.T. and Defendant iGas USA had business transactions between them beginning in 2018.

133.    T.T. stated the amounts due to it from iGas USA by, among other things, issuing invoices for each transaction.

134.   The invoices issued to iGas USA included those invoices from in or around July 2018, for which the stated accounts remain unpaid.  Complete, accurate and authentic copies of these invoices are attached as composite **Exhibit C**.

135.   The total value of these business transactions was in excess of $1 million.

136.   In addition, T.T. provided iGas USA, through Meng, with a USB drive containing a statement of all amounts due on or about July 30, 2018.

137.   The USB drive contained a statement of iGas USA's accounts itemized by invoice number.

138.   T.T. continued to demand payments through at least May of 2019.

139.   During the period T.T. demanded payments, iGas USA did not dispute the total amounts due.

140.   iGas USA implicitly promised to make payment to T.T. on the account by, among other things: (a) retaining the refrigerants and related products that it received from T.T.; (b) reselling these goods to customers; and (c) not objecting to the stated amounts due.

141.   Nevertheless, iGas USA did not make payments, leaving a balance due on the account in excess of $1 million.

WHEREFORE, T.T. demands judgment against iGas USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT X - Open Account as to BMP International

142.   T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

143.    From approximately June to approximately August 2017, T.T. sold Defendant BMP International refrigerant gas and related products worth in excess of $14 million.

144.    Throughout T.T.'s business relationship with BMP International, T.T. maintained an account for this Defendant containing charges and payments for all sales transactions between the companies.  T.T. kept Defendants BMP International's and BMP USA's accounts in a ledger and determined the amounts due from each Defendant by itemizing each of their respective invoices.

145.    T.T. generally included the charges invoiced to BMP International's affiliates in the account as it was BMP International's practice to (a) direct T.T. to ship to and or invoice the affiliates and (b) pay T.T. for goods shipped to and or invoiced to the affiliates.

146.    Until approximately November 2018, BMP International made payments on its account, which T.T. duly recorded.

147.    Since approximately November 2018, BMP International has not made a payment on its account with T.T.

148.    Through simple analysis of the itemized invoice numbers in the account, T.T. could identify the transactions for which BMP International was responsible.

149.    A complete, accurate, and authentic copy of BMP International's itemized account with T.T. is attached as **Exhibit D**.

150.    As set forth on **Exhibit D**, BMP International owes the principal amount stated in the open account, which is in excess of $14 million, for goods this Defendant received and accepted from T.T.

WHEREFORE, T.T. demands judgment against BMP International for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT VIII - Open Account as to BMP USA

151.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

152.    From approximately July 2017 to approximately May 2018, T.T. sold Defendant BMP USA refrigerant gas and related products worth in excess of $58 million.

153.    Throughout T.T.'s business relationship with BMP USA, T.T. maintained an account for this Defendant containing charges and payments for all sales transactions between the companies.

154.    T.T. kept Defendants BMP USA's and BMP International's accounts in a ledger and determined the amounts due from each Defendant by itemizing each of their respective invoices.

155.    T.T. generally included the charges invoiced to BMP USA's affiliates in the account as it was BMP USA's practice to (a) direct T.T. to ship to and or invoice the affiliates and (b) pay T.T. for goods shipped to and or invoiced to the affiliates.

156.    T.T. generally included charges invoiced to BMP USA's customers and or suppliers in the account when BMP USA directed T.T. to ship refrigerant gas and related products to those customers and or suppliers with the promise that BMP USA would pay T.T. for the goods.

157.    Until approximately November 2018, BMP USA made payments on its account, which T.T. duly recorded.

158.    Since approximately November 2018, BMP USA has not made a payment on its account with T.T.

159.    Through simple analysis of the itemized invoice numbers in the account, T.T. could identify the transactions for which BMP USA was responsible.

160.    A complete, accurate, and authentic copy of BMP USA's itemized account with T.T. is attached as **Exhibit D**.

161.    As set forth on **Exhibit D**, BMP USA owes the principal amount stated in the open account, which is in excess of $58 million, for goods this Defendant received and accepted from T.T.

WHEREFORE, T.T. demands judgment against BMP USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT XII - Open Account as to iGas USA

162.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

163.    From approximately June to approximately July 2018, T.T. sold Defendant iGas USA refrigerant gas and related products worth in excess of $1 million.

164.    Throughout T.T.'s business relationship with iGas USA, T.T. maintained an account for this Defendant containing charges and payments for all sales transactions between the companies.

165.    T.T. kept Defendant iGas USA's accounts in a ledger itemized by each of its invoices.

166.    Until approximately October 2018, iGas USA made payments on its account, which T.T. duly recorded.

167.    Since approximately October 2018, iGas USA has not made a payment on its account with T.T.

168.    A complete, accurate, and authentic copy of iGas USA's itemized account with T.T. is attached as **Exhibit E**.

169.    As set forth on **Exhibit E**, iGas USA owes the principal amount stated in the open account, which is in excess of $1 million, for goods this Defendant received and accepted from T.T.

WHEREFORE, T.T. demands judgment against iGas USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

[Attorney's Signature Appears on Following Page]

Dated:  August 16, 2018

Respectfully submitted,

*/s/ David B. Weinstein*
David B. Weinstein (FBN 604410)
weinsteind@gtlaw.com
Ryan T. Hopper (FBN 0107347)
hopperr@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 East Kennedy Blvd., Suite 1900
Tampa, Florida 33602
(813) 318-5700 - telephone
(813) 318-5900 - facsimile

*and*

Mark G. Trigg
*Application for Special Admission will be submitted*
Roy Xiao
*Application for Special Admission will be submitted*
**DENTONS US LLP**
303 Peachtree Street, NE, Suite 5300
Atlanta, GA 30308
(404) 527-4000 - telephone
(404) 527-4198 - facsimile
mark.trigg@dentons.com
roy.xiao@dentons.com

**PHCC**

**PLUMBING-HEATING-COOLING CONTRACTORS ASSOCIATION**®

*Best People. Best Practices.*

July 6, 2021

Hon. Michael Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460

Docket ID No. EPA-HQ-OAR-2021-0044

The Plumbing-Heating-Cooling Contractors—National Association (PHCC) is the oldest construction trades association in the country representing approximately 3,200 plumbing and HVACR contractors employing over 64,000 professionals across the United States. Since 1883, this organization has been concerned with the safe installation of plumbing and HVAC systems. The members of PHCC are the last point of contact with consumers repairing, installing, or upgrading a system. Ultimately, these contractors are tasked with explaining the related costs for the work with the consumer.

PHCC is grateful for the opportunity to comment on EPA's proposed regulation for the Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program. This Association has been supportive of the AIM Act and its intent to keep the United States a leader in the HVAC industry. Further, PHCC generally supports many parts of this rule which can help limit the effects of global warming through professional design, application, installation, and servicing of refrigerant bearing equipment.

A particular concern is the schedule of product phasedown. PHCC believes baseline allocations should be calculated using the time frame of 2011 through 2019 with selection of the three highest years market share. It is a significant concern that gasses remain available for legacy products that may currently not be very old in the marketplace. The transition from R22 to R410A for air conditioning products is not very far behind us in the rearview mirror. Many of the consumers who elected to replace equipment to more ozone friendly refrigerants now find themselves with another ecological dilemma. If the industry cannot supply refrigerants to service these products, EPA will have forced those consumers into an early replacement of efficient, sometimes highly efficient, HVAC systems. These consumer discussions happen over the kitchen table with a contractor, not scientists from Washington D.C.

PHCC would support increased availability of reclaimed refrigerant products provided they meet AHRI 700-2016 standard quality. It is important for service personnel to be able to rely on products in the marketplace, having proper certifications will assure reliable equipment operation. PHCC shares with many partners in the industry a concern for illegal gasses that may be smuggled in or fraudulently marketed. Not many years ago, the industry raised serious concerns over a product marketed to replace R-22, a product that was essentially propane. This

PHCC—National Association
Docket ID No. EPA-HQ-OAR-2021-0044

industry worked with EPA to resolve that unsafe condition and protect workers, consumers, and property from a very hazardous situation.

Given that history, PHCC does have concern for the illegal trade in refrigerants but does not see the elimination of disposable cylinders as a solution. The unscrupulous actors in the market will still attempt to operate and will use the least cost options available. If disposable cylinders are not available, they will simply switch to refillable cylinders. The added cylinder cost will be insignificant to them given the profits that may be made. Removing disposable cylinders will not stop those bad actors but will penalize the good actors.

Contractors will have added costs to acquire these cylinders, either outright purchase or lease deposits. Contractors will have to manage two sets of cylinders, in their shops, in their vehicles, and on jobsites. Mix-ups will happen and someone will get to a job with an empty cylinder that was believed to be full. It is a greater possibility to have contaminated refrigerant, some individuals may try to fill their own from a master cylinder. These cylinders do weigh more, over time that adds up to fuel costs, truck expense, and bad backs.

The empty cylinders must be returned to be refilled; these must go to the right supplier. While many contractors have their preferred vendor, it is not unusual for a contractor to deal with multiple distribution points; Company A likely will not exchange a cylinder from Company B. The supply chain will undergo an overhaul to effect this change, that overhaul will not be free. The contractor will have one more item to discuss over the kitchen table with the consumer.

EPA has concern for the amount of left over refrigerant, the "heel," and supposes it to be as much as 8 percent. For many HFC's that can be two pounds or more of product. Contractors are very cost conscious and operate on relatively low margins, it does not behoove them to throw away 8 percent of a valuable commodity. It is further discouraged if the commodity is a regulated product subject to significant fines for improper disposal. PHCC believes the 8 percent is greatly overstated.

EPA would also push for tracking of product to solve these issues as well. The tracking of serial numbered tanks would be onerous and infeasible. Many smaller contractors lack the system to perform this operation, other larger operations may be able to do this but in the peak of season it is impractical. Technicians or delivery personnel trade tanks at jobsites when convenient, another service truck may be much closer to a service worker trying to finish a job, sometimes hours closer. This would be a logistical nightmare.

The greatest issue for tracking is the confidential business information that would necessarily be logged in a public forum. It is a serious question of how EPA staff would process the overwhelming data that would be generated and what would be done with it after the fact. There are current rules in place for refrigerant handling, rules which have had infrequent, probably rare, enforcement actions, apparently EPA lacks staff for today's rules already.

Writing the rules does not guarantee results in the field. Large public data bases are, however, useful to some competitors, larger operators or data management operations may look for information to take mine for valued customers, estimate replacement schedules, or make

2

PHCC—National Association
Docket ID No. EPA-HQ-OAR-2021-0044

spurious accusations against other competitors in their market. PHCC has no support for making confidential business information publicly available.

PHCC would however support developing professional requirements and standards for contractors and technicians to comply with. Without some form of certification, anyone who says they are an air conditioning service technician, is one. It is true that there is EPA 608 certification, most contractors will tell you they have had a card for many years and have shown it once or twice. The original 608 card was not too difficult to test for. Lack of enforcement of any regulation renders it useless. As the industry moves to more complex refrigerants, some more flammable than traditional refrigerants, it will become more important to assure competency in the workforce.

PHCC has for many years been a strong proponent of registered apprenticeship and has approved programs in place across the country. PHCC would welcome any regulation supporting the education of the workforce.

The members of PHCC believe in a motto, The Best People, The Best Practices and hopes to live up to that in practice. The Association thanks EPA for this opportunity to be heard on these actions that would affect many of our members and their employees. PHCC is willing to participate in any fashion that would help advance the next generation of HVAC products.

Respectfully submitted,

Charles R. White
V.P. Regulatory Affairs
PHCC—National Association

white@naphcc.org



July 6, 2021

**Ms. Cynthia Newberg**
**Director**
**Stratospheric Protection Division**
**U.S. Environmental Protection Agency**
**1201 Constitution Ave NW**
**Washington, DC 20004**

**Docket ID No. EPA-HQ-OAR-2021-0044**

We genuinely acknowledge the opportunity to provide advance input on how the EPA may determine an initial methodology to allocating allowances and whereby the agency may alter its determination of company specific allocations. Open and robust discourse only serves to strengthen the AIM Act's purpose of environmental health and a principled and equitable HFC marketplace.

The EPA's recommendation to establish the "Allowance Allocation and Trading Program" using the baseline years 2017-2019 neglects and underestimates this periods distinct acute HFC market volatility based on fraudulent, improper and deceptive business practices. In particular, throughout these years there have been relentless efforts by Chinese State Owned or Subsidized Entities (CSOSE's) and their partners, to flood the United States market with subsidized and secured low priced HFC refrigerants, blends and components. These practices have artificially, unfairly and disproportionately negatively impacted U.S. company market share and by default their expected appropriations under the AIM Act.

Object lesson, in June 2019, the U.S. Department of Commerce initiated several investigations to determine whether imports of CSOSE HFC's were circumventing the 2016 anti-dumping order on HFC blends. Since 2016, importers have begun blending CSOSE HFC components, including R-125, R-32, R-134a and R-143a, in third party countries and in the United States. Importers have also begun importing blends that do not meet ASHRAE specifications. Those blends are completed in the United States by adding small amounts of HFC components to bring the blends to specification. Unequivocal attempts to circumvent U. S. law and evade anti-dumping duties.

Further, investigations by the DOC were initiated with respect to CSOSE HFC components that are blended in the United States, CSOSE and Indian HFC's that are blended in India, imports of patented HFC blend that are converted into a standard (non-patented) product after importation and imports of semi-finished blends that are finished in the U. S. to meet industry standards. As reported by ACHR News, these requests were triggered by some staggering statistics that show a 260 percent increase in the volume of these components. Direct imports of HFC components now exceed the volume of imports of HFC blends in 2016, when

JA195

the original anti-dumping duty order was published. Between 2017 and 2019, CSOSE imports of HFC refrigerants were greater than ever. Practices that have excessively and arbitrarily impacted market share.

This is a far-reaching distinction and contrary to the essence of what the ITC intended. Imports of HFC components were exempt from the anti-dumping order as the ITC determined that they did not injure the U.S. market. The fact is, this very exemption is causing many of the illegal import issues today. Multiple CSOSE's have put packaging facilities in the U.S. and are importing artificially underwritten low cost HFC components, formulating them and selling them in the U.S. marketplace. Over the last several years, The American HFC Coalition has documented millions of pounds of refrigerant components coming to the U.S. going to multiple company names. Often through "shell" companies, where it is to the same address – sometimes to the same person in different companies. A spike in imports is witnessed, then the company inexplicably stops importing. There is a laxity of oversight that these components are coming into the U.S. at a competitive price as well as whether or not they are properly documented. This is of singular concern as some importers are circumventing the anti-dumping duties by claiming they were made there as well. As an example, they have seen R-134a coming into the U.S. from South Korea when no one is producing R-134a in South Korea. It is produced in China, shipped to Korea, packaged in Korea and labeled "Made in Korea". Which makes it exempt from the duty.

Currently, there is nothing criminal about components arriving into the U.S. from China when pertinent laws and corresponding tariffs are adhered to. The problem is if some importers are receiving unique purchasing conditions from Chinese manufacturers that are not available to other U.S. companies. That puts U.S. importers and blenders at a distinct economic disadvantage. This bypassing of anti-dumping duty orders has a consequential negative impact on U.S. industry sales volume, market share, revenues, price levels and profits.

Moreover, China and India dominate and monopolize global HFC production accounting for over 75% market share as of 2017. From 2017-2019, China and India's enormous capacity and scale continued to grow and expand constructing an unfair and inequitable economic advantage. As imports of single component HFC's continue to flood the U.S. market prices are depressed below the cost of production. U.S. producers have been forced out of business or compelled to downsize as there is not sufficient return on investment to be practical and viable. Powerless to compete, imports by U.S. owned companies from 2017-2019 have dropped to their lowest levels in decades. Throughout this term, CSOSE's have intentionally and calculatingly saturated the marketplace to secure more sympathetic allocations. This is notably perilous for U.S. companies given the AIM Act's qualifier and declared intention of no imports in the base years, no allocation. One more decisive disadvantage that will create an unreasonable and unequal allocation methodology.

AIM aligns the U.S. with the 85% phase down of HFC's production and chronicled consumption parameters formerly required under the Kigali Amendment. Actually, the AIM Act is wholly aligned with almost all primary tenets and doctrines of the Kilgali Amendment with the curious exception of the baseline years for allowance allocation. The EPA states that the

establishing the allocations on 2017-2019 market share production or imports recognizes recent market entrants and avoids windfalls to companies that left the business years ago. The EPA believes some of the recent entrants appear to be minority-owned businesses, and this approach may help make the phasedown process more equitable. In fact, the contradictory is true. As the bias and distortion of CSOSE's behavior has not been altogether presumed. This premise and argument puts U.S. companies at a deliberate prejudice given the multitude of negative market forces attributable to CSOSE's examined in detail above from 2017-2019.

Under AIM the EPA plans to retire or revoke allowances to importers that have been found guilty of dumping, selling HFCs below cost or with unpaid import duties by the U.S. DOC. There is also a major plan to enforce these HFC requirements. The enforcement program will include collaboration with other U.S. agencies to track all HFCs from point of origin to point of use, including use of QR codes on individual HFC cylinders, border enforcement, limits on acceptable HFC containers to reduce likelihood of mischief, and more. All decisive objectives and intentions leading onward. However, this is insufficient when it comes to past historical and factual market place misconduct and exploitation as it relates to the framework of endowing future allowances.

The AIM Act has many citations that refer to the importance of refrigerant recovery and reuse. This activity is covered under 42 U.S. Code § 7671g - National Recycling and Emission Reduction Program. Within the proposed rule the EPA suggests the creation of a set aside for new entrants. Here is another opportunity to acknowledge the importance of the reclaim industry. We would ask that the EPA make provisions for the reclaim industry to have access to this set aside to conduct vital work consistent with the requirements of AIM Act. Now more than ever the reclaim industry must have access to HFCs to preform that work of reconstituting the legacy alternative blend refrigerants. The reclaim industry is expected to take back and make these blends reusable to reduce the demand for virgin HFCs. The availability to accomplish this task will be dependent on having access to HFC consumption allowances. The proposed 5 MMT of EV will not accommodate the true intent of new entrants.

The proposed rule is seeking to eliminate the use of non-refillable cylinders. The justification suggests that the use of a refillable cylinder will cure several ills. There are significant barriers to accomplishing this type of transition. The EPA should consider the tremendous capital investment associated with this type of requirement. The EPA should again consider the burden placed on the reclaim industry as well as the blender packagers with respect to the upfront cost to purchase a fleet of cylinders. In addition, the EPA does not acknowledge that there must be other Agency Rules changed to allow for such a radical change in the US Refrigerant markets. Bar codes, branding deposits on cylinders are a few of the issues that we would ask the EPA to consider before attempting to implement this action. Another important and critical consideration is that by going to a refillable cylinder there will be considerable increase in the consumption of fossil fuel. The multiple movements and handling of these refillable cylinders in the supply chain is not in the best interest of the environment and represents an unreasonable and unwarranted tradeoff. The supply chain from cylinder manufacturer to the filler, through the downstream user and back should be of considerable concern. In addition, we would note that the number of cylinders will be reduced in any one shipment based on the increased weight of the refillable cylinder. These considerations are

environmental impact issues that must be reevaluated under current conditions to ensure that there is no an unnecessary negative impact on the environment.

The idea that a bar code and tracking a cylinder will somehow reduce the illegal imports is neither reasonable or prudent. Smuggling of refrigerant is a condition of the lack of inspections at our ports of entry. This action would stretch the already strained resources of the US Customs and Border Protection.

We place confidence in and presume true that the AIM Act's preeminent ambition regarding HFC allowance allocations is to oversee and regulate an equitable and proportional marketplace. Where all competitors and participants interests are uniformly respected based upon a rational and dependable set of evidence, statistics and conduct. Notwithstanding, we energetically and staunchly conclude that the prevailing endorsement to use 2017-2019 as the base years for future allocations and allowances is inaccurate and unsound given the CSOSE's predominant ramification on the HFC marketplace. Attentively, we request a more unbiased and equitable methodology be applied to these forecast and estimations. One that recognizes and differentiates the contributions and benefits of old and new shareholders and a free and impartial HFC market economy.

Sincerely,

Ted Broudy

President USA Refrigerants

# Comments of Worthington Industries

## to

## U.S. Environmental Protection Agency

## regarding

## Proposed Rule:  Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program under the American Innovation and Manufacturing Act

REDACTED VERSION:  CONFIDENTIAL BUSINESS INFORMATION OMITTED

**(EPA–HQ–OAR–2021–0044; 86 Fed. Reg. 27,150 (May 19, 2021))**

## July 6, 2021

*Submitted via Regulations.gov and via Electronic Mail to:*

Andy Chang
U.S. Environmental Protection Agency
Stratospheric Protection Division
Chang.Andy@epa.gov

*Submitted by:*

Wayne Powers
Director, Refrigerants, Foams and Adhesives
Worthington Industries
200 W. Old Wilson Bridge Rd.
Columbus, OH 43085
(614) 840-4746
Wayne.Powers@WorthingtonIndustries.com

# Comments of Worthington Industries

Worthington Industries ("Worthington") is pleased to submit the following comments regarding the U.S. Environmental Protection Agency ("EPA") proposal on the phasedown of hydrofluorocarbons ("HFCs") under the American Innovation and Manufacturing Act of 2020 ("AIM Act"), and specifically the agency's proposed ban on "disposable" (a/k/a "non-refillable") cylinders.  86 Fed. Reg. 27,150 (May 19, 2021).  While Worthington supports the objectives of the AIM Act, the proposed ban on non-refillable cylinders ("NRCs") is not consistent with the goals of the legislation and not supported by the facts or the rulemaking record.  EPA's proposal also does not consider the unintended consequences of an NRC ban: namely, the strong possibility of disruptions in the supply of refrigerants to meet both critical infrastructure needs (such as healthcare/medicine, the food supply, etc.) and consumer demand during heat waves due to the lack of available cylinders as the industry builds capacity to manufacture the millions of refillables that are needed to serve the U.S. market.  Instead of banning NRCs, EPA should adopt alternative measures, including modifications to cylinder design and labeling, establishment of a take-back program, and other actions that can achieve the emission and waste reduction goals of the AIM Act while minimizing economic disruption and harm to the U.S. heating, ventilation, air conditioning and refrigeration ("HVACR") industry.  We look forward to working with EPA to achieve these goals.

Worthington Industries is the only domestic U.S. manufacturer of both refillable and non-refillable refrigerant cylinders.  We are a leading industrial manufacturing company delivering innovative solutions that span many industries including healthcare, home and portable heating, transportation infrastructure, construction, industrial, agriculture, retail and energy.  Worthington is a global leader in manufacturing pressure cylinders for refrigerant, propane, and industrial gases, water well tanks for commercial and residential uses, and consumer products for camping, grilling, hand torches, and helium balloon kits.

Worthington began as a steel facility in Columbus, Ohio in 1955, and has expanded substantially to include a number of product lines used by a wide variety of American businesses.  Today, Worthington has over 8,000 employees across 15 U.S. states and is the only domestic manufacturer of the non-refillable cylinders that are critical to the HVACR industry and other sectors.  Worthington employs over 500 men and women to manufacture these cylinders at our facilities in Columbus, Ohio and Paducah, Kentucky.

Accordingly, Worthington is deeply concerned about the proposed ban on NRCs.  As an initial matter, EPA includes the ban in a manner that hides its true costs and benefits.  EPA's own analysis states that "[o]ther provisions of the rule, such as that regarding disposable cylinders [. . .] are expected to have relatively minor impact or no effect on the overall calculation of costs

and benefits."[1] However, if the NRC ban were proposed as a separate regulation, EPA would have clearly analyzed the significant costs and benefits as this would be a major rule and economically significant regulation (i.e., greater than $100 million a year in impacts).[2] As part of that analysis, EPA would also have evaluated a less stringent alternative to banning NRCs, such as those more cost-beneficial measures we have identified in our comments.

   EPA's proposed ban is unsupported and counterproductive for several reasons, including:

(1) The available data do not support the assumed environmental benefits of a ban on NRCs. In particular, EPA's analysis:

- Underestimates by at least a factor of four the number of refillable cylinders needed to replace the quantity of NRCs currently on the market, and does not account for the carbon footprint and environmental impact of switching to heavier refillable containers that require additional trips and maintenance in closed-loop systems;

- Overestimates the residual amount of HFCs ("heel") that remain in NRCs. While there is a need for better data, existing studies show that the average NRC heel is less than a third of what EPA assumes, and possibly substantially less; and

- Relies on improper assumptions regarding existing recovery and recycling of residual HFCs, assuming widespread noncompliance with venting prohibitions by licensed HVACR professionals;

(2) EPA improperly assumes that a ban on NRCs will curb illegal production and import of HFCs, contrary to the experience of the European Union which continues to see extensive illegal refrigerant imports despite banning NRCs in 2007. EPA also has not considered the recent reduction of imports of refrigerants and NRCs resulting from successful unfair trade cases; and

(3) EPA has failed to address in any meaningful way the significant economic impact of banning NRCs, including:

---

[1] EPA, "Draft Regulatory Impact Analysis for Phasing Down Production and Consumption of Hydrofluorocarbons (HFCs)," at 8.

[2] *See* Executive Order 12866 §3(f)(1), (f)(4) ("significant regulatory actions" include those with $100 million annual impact, those that "adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety," and those that "[r]aise[] novel legal or policy issues").

- The risk to the domestic cooling supply chain – and, consequently, the ability to meet the critical cooling and refrigeration needs of a major portion of the nation's economy, including the healthcare and medical community, agriculture and food supply, major manufacturing and industrial operations, energy generation and transmission, and transportation, as well as to meet residential demand during summer heat waves and otherwise – due to the lack of refillable cylinder availability and manufacturing capacity in the United States, as well as the lack of infrastructure needed for the widescale deployment of refillable cylinders.  U.S. capacity is not expected to be available before the proposed two year effective date of the NRC ban, rendering it difficult to package and move allocated HFCs when the ban is in place;

- The economic effects of the ban on the U.S. NRC manufacturing industry.  Importantly, the International Trade Commission ("ITC") and the U.S. Department of Commerce recently took action to impose duties on foreign-produced NRCs that were being dumped at prices below fair value to the detriment of U.S. industry.  Prior to that, both agencies had imposed duties on dumped imports of refrigerants.  EPA's HFC phasedown rulemaking should not undercut the actions of both the Commerce Department and ITC, but build off them by recognizing that U.S.-manufactured NRCs are not part of the HFC problem, but, in fact, are part of the solution in ensuring that HFCs are transported and stored in high quality containers that can be authenticated; and

- EPA does not account for the negative health impacts from HVACR occupational workers having to carry refillable cylinders that are at least 50% heavier than NRCs.

Alternatively, as detailed in Section IV of the following comments, there is a better path forward to address concerns related to residual HFCs in NRCs, while avoiding the risks to the nation's supply of critical refrigerants and the negative environmental and economic consequences of an NRC ban.  Alternatives to a ban were not analyzed or evaluated by EPA in the proposed rule and should be for any final rule if the agency believes it is necessary to address NRCs within this rulemaking.  Worthington stands ready to assist EPA and HVACR stakeholders in the prompt development and implementation of an effective long-term solution.

REDACTED VERSION:  Confidential Business Information Omitted

**I.      EPA Overstates the Potential Benefits from a Ban on Non-Refillable Cylinders and Overlooks Significant Unintended Consequences**

The proposed ban on NRCs will not achieve the emission reductions asserted by EPA and will have unintended consequences that result in significant and unaccounted for additional greenhouse gas ("GHG") emissions.  In particular:

- The current number of NRCs and the future number of refillable cylinders needed to support the U.S. market was incorrectly assumed, creating a gap in the full carbon footprint and environmental impact of switching refrigerant containers.

- EPA has not accounted for the dramatic increase in transportation miles and additional trucks required to manage a market exclusive to refillable cylinders, given the expansive geography of the United States and the heavier and larger number of refillable cylinders required to serve the market.

- EPA's estimate of emission reductions attributable to the "heel" assumed to be present in NRCs lacks a current, factual basis.

- EPA assumes – without sufficient justification – that end-users currently are not properly recovering and recycling NRCs.  The agency should consider alternative approaches to better educate users about and enforce proper practices to achieve desired  environmental goals.

**A.      Refillable Cylinder System Requirements Far Exceed Assumptions**

EPA asserts that refillable cylinders can replace, on a one-to-one basis, the 4.5 million NRCs the agency assumes are sold annually in the United States.[3]  However, as indicated in a recent determination of the U.S. International Trade Commission,[4] imports from China alone totaled 3,941,577 units in 2019.  Adding Worthington's sales, annual U.S. shipments of NRCs totaled ███████████████████████████████████████████████████████████████.

---

[3]   See EPA, "*Refillable and Non-refillable Cylinders: Analysis of Use, Emissions, Disposal, and Distribution of Refrigerants*" at 5 (April 2021) ("*EPA Cylinder Analysis*").

[4]   *Non-Refillable Steel Cylinders from China*, Inv. Nos. 701-TA-644 and 731-TA-1494, USITC Pub. 5188 (Final) (May 2021) at IV-4 (Table IV-2) (https://usitc.gov/publications/701_731/pub5188.pdf).

[5]   ███████████████████████████████████████████████████
███████████████████

4



**CYLINDER LOGISTICS**

It takes at least four refillable cylinders to replace every single non-refillable cylinder. This is to account for where the cylinders are in their cycle.

1.  In use
2.  In transit
3.  In a warehouse or distributor shelf
4.  In filling, refurbishment or recertification

Perhaps more importantly, EPA's assumption of "one-to-one" replacement is incorrect, based on industry sources and EPA supporting documents.[6] Curiously, EPA initially acknowledges that "[i]n actuality, if all non-refillable cylinders were replaced with refillable ones, there would need to be more than 4.5 million cylinders in circulation to avoid lags in transport times."[7] Yet the agency fails to follow through on this fact and proceeds to assume, without support, "that an all-refillable scenario would still involve a total of 4.52 million cylinder trips per year because the volume of refrigerant produced, transported, and stored would not change simply due to the transition to all refillable cylinders."[8]  This assumption is incorrect.

For every one NRC, at least *four* refillable cylinders would be required to be in circulation.[9] Thus, to replace NRCs, and maintain full refrigerant supply and availability, the total "fleet" of refillable cylinders in the market at any given time would have to be <u>four times the annual number of NRCs required to meet the same level of demand</u>.

The closed-loop system required to manage refillable cylinders is the reason for this "four-to-one" minimum replacement level.  For the refillable system to function, one refillable cylinder is in use with a technician or installer on a job site; one is in transit between filler, reclaimer or distributor; one is in storage with an end-user or distributor; and another is in the process of being filled, refurbished or recertified.

---

[6]  *See* ICF International, "*Lifecycle Analysis of High-Global Warming Potential Greenhouse Gas Destruction*" at 110, (2011) (available at: https://ww2.arb.ca.gov/sites/default/files/classic//research/apr/past/07-330.pdf) ("*CARB Lifecycle Analysis*") ("[F]or every disposable cylinder sold, four refillable cylinders must be in circulation to account for cylinders in use and in transit.")  As the CARB analysis explains:

> According to National Refrigerants Inc., for each disposable cylinder replaced: one refillable cylinder is needed for the contractor, one for the wholesaler (to keep in stock to give the contractor upon return of an empty cylinder), one is in transit (back to the manufacturer for maintenance and refill), and one is filled in the manufacturer's inventory (to replace the empty one in transit).

> Worthington has confirmed these numbers with multiple industry stakeholders who have refillable cylinder fleets.

[7]  *EPA Cylinder Analysis* at 15, n. 7.

[8]  *Id.*

[9]  *See infra* note 6.

REDACTED VERSION:  Confidential Business Information Omitted

**Therefore, given an existing market of** ███████████████████████ **the number of refillable cylinders needed to serve the market would be at least 26 million.** In contrast, EPA's analysis grossly underestimates the required number of refillable canisters to replace NRCs at just over 3 million,[10] ████████████ than the actual number required to maintain a reliable refrigerant replacement system.

In addition, in Worthington's experience and discussions with industry stakeholders (reclaimers and refrigerant producers who currently purchase refillable cylinders) there is a need to replace 10-15% of refillable cylinders every year due to damage, loss, or reaching the end of the cylinder's useful life.  In fact, a well-established business in the EU stated they experience 30% turnover in refillable cylinders annually.  Hence, in a market of exclusively refillable cylinders, at least an additional 2.6 to 3.9 million new cylinders would be needed to be manufactured annually to replenish the fleet.

The significantly larger "fleet" of refillable cylinders required to service the existing NRC market will produce a substantial increase in GHG emissions related to the production of the cylinders, given refillables' heavier weight (21 pounds tare weight for refillables versus 5 pounds for the majority of NRCs).[11]  Based on a 2011 report prepared for the California Air Resources Board ("CARB") that EPA cites in its own analysis,[12] GHG emissions produced during the manufacture of one refillable cylinder total 28.98 $kg\text{-}CO_2e$ in comparison to 9.67 $kg\text{-}CO_2e$ per NRC.  Setting aside the initial need to produce at least 26 million refillable cylinders (approximately 725 million $kg\text{-}CO_2e$ in manufacturing emissions), to meet annual refillable replacement cylinder needs equates to GHG emissions of between approximately 74 million and 111 million $kg\text{-}CO_2e$ annually. ████████████████████████████████
████████████████████████████

**B.      Refillable Cylinder Trips Add to Greenhouse Gas Emissions**

EPA's analysis does not consider the magnitude of increased emissions attributable to the substantially greater transportation requirements of shifting to an all-refillable cylinder market in the United States.  Today, as shown in the chart below, NRCs make three trips between filler and their end-of-life at a steel recycler:  from the gas producer to distributor, from distributor to the end user, and, finally, from end user to the steel recycling facility.  In the closed-loop system for refillable cylinders, there are *at least* five trips involved:  from gas producer to distributor, from distributor to end user, from end user back to the distributor, from distributor to a reclaimer, and from the reclaimer to the gas producer for refilling to start the cycle over again.  In some scenarios, a sixth trip to a warehouse is required for storage of the cylinder prior to delivery to the wholesale

---

[10]   *EPA Cylinder Analysis* at 17 ("Assuming all refillable cylinders are refilled an average of 1.5 times per year, approximately 3,015,000 refillable cylinders would need to be purchased to replace nonrefillable cylinders.").

[11]   The majority of NRCs currently shipped by Worthington are the 260 p.s.i. cylinders (low pressure) that weigh 5 pounds.  Higher-pressure (320/400 p.s.i.) cylinders typically weigh 6-7 pounds.

[12]   *CARB Lifecycle Analysis* at 113, Table III-5.

6

distributor.  Likewise, imported cylinders often will be trucked from the port to a warehouse for storage before going to the wholesale distributor.



According to the *CARB Lifecycle Analysis* referenced by EPA, when examining this issue with respect to the distribution of cylinders within the state of California, the average distance traveled by each refillable cylinder is 5,100 miles compared to 3,080 miles for NRCs, over 65% more.[13]  While this analysis was limited to the state of California, the vast geographic scope of the United States suggests that a similar or greater difference in the magnitude of refillable versus non-refillable cylinder transport miles would be seen on a national scale, with corresponding increases in GHG emissions attributable to refillable cylinders.

In addition to the greater number of trips required per cylinder, trucks can carry fewer refillable cylinders per trip compared to NRCs due to weight and size differences.  As EPA notes, a typical transport truck can carry approximately 1,120 non-refillable cylinders or 870 refillable cylinders.[14]  Based on discussions with our customers, depending on the packaging appropriate for the type of gas being transported, a truckload will carry 720-800 refillable cylinders.  This translates to an additional 28.7 to 45.9% trips needed to transport the same number of refillable cylinders as NRCs.

Further, a substantial increase in the shipment of foreign-produced imports will be needed to meet the vastly increased demand for 30-pound refillable cylinders.  Many such

---

[13]    *CARB Lifecycle Analysis* at 115, Table III-8.

[14]    *EPA Cylinder Analysis* at 17.

shipments will involve overseas shipping from ports in Shanghai, China, Mumbai, India, and Bangkok, Thailand to domestic receiving ports in Newark, NJ, Baltimore, MD, Philadelphia, PA, Norfolk, VA, and Long Beach, CA.  Shipment of the heavier, standard 30-pound refillable cylinders via ocean liner to the United States will result in substantial additional transportation-related GHG emissions.

In sum, EPA should recognize the substantial increase in total GHG emissions attributable to a system dependent solely on refillable containers.  The emissions associated with the added number of trucks needed to move the same number of cylinders, plus the at least two additional trips inherent to the closed-loop refillable distribution system, as well as the overseas transport of refillable containers to the United States – emissions increases EPA has not accounted for in its analysis – will offset the theoretical emissions savings that may be achieved by replacing NRCs with refillables.

### C.    EPA's NRC Heel Data Is Unreliable and Inconsistent, and Incorrectly Assumes Trained Professionals Regularly and Illegally Vent Refrigerants

EPA's analysis assumes that the residual amount of refrigerant ("heel") left in an end-of-life NRC averages 1.25 pounds (5% of the initial 25-pound charge).  This assumption is based on two personal communications between EPA staff and representatives of an industrial gas supplier and refrigerant reclaimer.[15]  EPA does not explain how phone conversations in which two individuals provided unverifiable and anecdotal estimates of heel amounts are appropriate sources of data in comparison to historic studies of the issue that are in the rulemaking record, almost all of which show that the average heel is substantially lower than EPA's assumption.

In fairness, the existing studies on the average "heel" amount are mostly a decade or two old and include data that may pre-date the increased education and awareness of the need to recover refrigerant heels at the end-of-life.  These studies show, outside of an outlier from 1998, that the "heel" averages about 1.5-3%.  For example, in a 2000 study, AHRI found that the average amount of heel was 0.45 pounds (1.5%) to 0.90 pounds (3%).  EPA's 2007 study found 0.56 pounds (2%).  EPA's most recently cited empirical study (Stratus, 2010) reported an average of 1.8 pounds and a 3% heel, though this was a small, non-representative sample of 110 cylinders in one area.  In addition, CARB, which has studied this issue more than any other U.S. regulatory

---

[15]    *EPA Cylinder Analysis* at 13:  "However, recent industry outreach indicated non-refillable cylinders contain approximately 1 to 1.25 pounds of residual heel and another estimated the typical heel in a non-refillable cylinder is approximately 1.5 pounds (A-Gas 2021a, FluoroFusion 2021). This analysis therefore assumes a residual heel of approximately 1.25 pounds."

body, estimated an average heel of 1.85% (or 0.44 pounds of the standard 24 pounds in a 30-pound cylinder).[16]

Clearly, there is a need for more data regarding the amount of the heel.  In discussions with other industry stakeholders, Worthington has been told that heel amounts average 0.30 pounds (1.2%).  While there are some outliers (roughly 2% had one or more pounds of heel in a recent review), the lower average heel amount is likely due to the fact that the HVACR industry, including service technicians and reclaimers, have become better educated during the last two decades on proper handling of end-of-life cylinders and compliance with venting prohibitions, as well as greater adoption of voluntary industry standards such as AHRI's *Guideline Q:  Content Recovery & Proper Recycling of Refrigerant Cylinders*.[17]

From existing data in EPA's rulemaking record, it is apparent that the agency's assumption of a 5% heel is greatly overstated and serves to inflate the claimed emissions reduction benefits of the NRC ban by at least double (based on the heel of 1.5-3% from the historic reports cited in EPA's rulemaking record).  Based on the information received by Worthington, it is clear that EPA's assumption is not consistent with current industry experience, and that an average heel of 0.30 pounds is closer to reality.

Further, EPA makes the extraordinary assumption, again based on two phone conversations (transcripts of which do not appear to be in the docket),[18] that 95% of NRCs currently are vented illegally without proper reclamation of the refrigerant.[19]  To accept the assumption that 95% of NRCs are vented without reclamation is to believe that, despite the fact that it is illegal to vent refrigerants, licensed professionals are willing to violate the law (and industry standards, such as Guideline Q) and risk Clean Air Act criminal penalties and fines of up to over $48,000 per violation.  It is unclear what the basis of the 95% estimate is, though it is certainly possible that the industry sources cited by EPA were estimating that 95% of NRCs are not returned to the companies after they are sold.  This makes sense as there is no take-back requirement and the licensed professionals who use the cylinders would not be expected to return them but, rather, dispose of them properly without illegal venting, such as through recovery of

---

[16]  *CARB Lifecycle Analysis* at 103:  "Based on an assumed average heel of 1.85% (Perrin Quarles Associates 2007), ARB (2008) estimated current 'heel' emissions from disposable cylinders to range from 0.25 to 0.31 million metric tons of carbon dioxide equivalent (MMTCO2e) per year."

[17]  Available at:    https://www.ahrinet.org/App_Content/ahri/files/Guidelines/AHRI_Guideline_Q_2016.pdf. ("*AHRI Guideline Q*").

[18]  EPA Document Number EPA-HQ-OAR-2021-0044-0040 (Email to Jill Tronca and Luke Hall-Jordan from Dave Couchot, President, FluoroFusion Specialty Chemicals, Inc., regarding call script (Apr. 9, 2021)).

[19]  *EPA Cylinder Analysis* at 14 ("the assumed baseline is that 1.25 pounds of refrigerant remain in the cylinder that is vented unless recovered, and that 95 percent of all cylinders are vented (A-gas 2021a, FluoroFusion 2021).").  Copies of the referenced "personal communications" do not appear to be available in the docket.

refrigerant heel with a vacuum pump in the field; in-house refrigerant recovery and recycling; or sending NRCs to a reclamation and recycling facility.

        CARB previously estimated that 70% of NRCs were recycled or disposed without evacuation.[20]  Importantly, this estimate was prior to California adopting refrigerant management rules that require proper evacuation and reclamation of the heel.  It stands to reason that after the adoption of heel evacuation requirements that the percentage of NRCs that are disposed without proper recovery would be substantially lower, given the potentially massive monetary and criminal penalties associated with a violation, as well as loss of professional license or employment.  Accordingly, while clearly more data are needed on this issue, a more reasonable assumption is that the number of improperly disposed NRCs is less than the 70% that CARB estimated over a decade ago, and likely significantly so. Given the consequences involved, it would not be unexpected if less than 10% of NRCs today are improperly vented; but it is at least reasonable that the percentage is somewhere in the range of 10-70%.

---

[20]  *CARB Lifecycle Analysis* at 138:

    Based on previous research and communication with industry before the California heel evacuation requirements existed (per ARB's Refrigerant Management Rule), it was assumed that about 70% of non-refillable cylinders reaching EOL were recycled or disposed by technicians without evacuation; the remaining 30% were assumed to be evacuated down to the ARI standard of 15-inch mercury vacuum.

REDACTED VERSION:  Confidential Business Information Omitted

**Table I-1  Update to EPA Table C- 3. Refrigerant emissions under cylinder recovery scenarios, distributed by percent of cylinders vented**

| | | EPA Case (MMTCO2e) – 4.5M NRCs | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | LBS remaining | | | | | | |
| | Heel (Lbs) | 0.50 | 1.00 | 1.25 | 1.50 | 2.00 | 0.44 | 0.30 |
| | | MTCO2e Scenario 1 (0.5 LB heel) | MTCO2e Scenario 2 (1.0 LB heel) | MTCO2e Scenario 3 (1.25 LB heel) | MTCO2e Scenario 4 (1.5 LB heel) | MTCO2e Scenario 5 (2.0 LB heel) | MMTCO2e CARB Scenario (0.44 LB heel) | MTCO2e WI Scenario (0.3 LB heel) |
| % Vented | 10% | 0.22 | 0.45 | 0.56 | 0.67 | 0.89 | 0.20 | 0.13 |
| | 20% | 0.45 | 0.89 | 1.11 | 1.34 | 1.78 | 0.39 | 0.27 |
| | 30% | 0.67 | 1.34 | 1.67 | 2.01 | 2.67 | 0.59 | 0.40 |
| | 40% | 0.89 | 1.78 | 2.23 | 2.67 | 3.57 | 0.78 | 0.53 |
| | 50% | 1.11 | 2.23 | 2.79 | 3.34 | 4.46 | 0.98 | 0.67 |
| | 60% | 1.34 | 2.67 | 3.34 | 4.01 | 5.35 | 1.18 | 0.80 |
| | 70% | 1.56 | 3.12 | 3.90 | 4.68 | 6.24 | 1.37 | 0.94 |
| | 80% | 1.78 | 3.57 | 4.46 | 5.35 | 7.13 | 1.57 | 1.07 |
| | 90% | 2.01 | 4.01 | 5.01 | 6.02 | 8.02 | 1.77 | 1.20 |
| | 95% | 2.12 | 4.23 | 5.29 | 6.35 | 8.47 | 1.86 | 1.27 |
| | 100% | 2.23 | 4.46 | 5.57 | 6.69 | 8.91 | 1.96 | 1.34 |

| | | Worthington Case (MMTCO2e) – [TOTAL MARKET] NRCs | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | LBS remaining | | | | | | |
| | Heel (Lbs) | 0.50 | 1.00 | 1.25 | 1.50 | 2.00 | 0.44 | 0.30 |
| | | MMTCO2e Scenario 1 (0.5 LB heel) | MMTCO2e Scenario 2 (1.0 LB heel) | MMTCO2e Scenario 3 (1.25 LB heel) | MMTCO2e Scenario 4 (1.5 LB heel) | MMTCO2e Scenario 5 (2.0 LB heel) | MMTCO2e CARB Scenario (0.44 LB heel) | MMTCO2e WI Scenario (0.3 LB heel) |
| % Vented | 10% | 0.33 | 0.65 | 0.81 | 0.98 | 1.30 | 0.29 | 0.20 |
| | 20% | 0.65 | 1.30 | 1.63 | 1.95 | 2.60 | 0.57 | 0.39 |
| | 30% | 0.98 | 1.95 | 2.44 | 2.93 | 3.90 | 0.86 | 0.59 |
| | 40% | 1.30 | 2.60 | 3.25 | 3.90 | 5.20 | 1.14 | 0.78 |
| | 50% | 1.63 | 3.25 | 4.06 | 4.88 | 6.50 | 1.43 | 0.98 |
| | 60% | 1.95 | 3.90 | 4.88 | 5.85 | 7.80 | 1.72 | 1.17 |
| | 70% | 2.28 | 4.55 | 5.69 | 6.83 | 9.10 | 2.00 | 1.37 |
| | 80% | 2.60 | 5.20 | 6.50 | 7.80 | 10.40 | 2.29 | 1.56 |
| | 90% | 2.93 | 5.85 | 7.31 | 8.78 | 11.70 | 2.57 | 1.76 |
| | 95% | 3.09 | 6.18 | 7.72 | 9.26 | 12.35 | 2.72 | 1.85 |
| | 100% | 3.25 | 6.50 | 8.13 | 9.75 | 13.00 | 2.86 | 1.95 |

Table I-1 updates EPA's analysis of emissions attributable to the NRC heel (Table C-3 in *EPA's Cylinder Analysis*) to (1) reflect the greater number of NRCs in the market today; and (2) add columns showing the average heel found via CARB (1.85% or 0.44 pounds) and through Worthington's recent outreach to industry stakeholders (0.30 pounds).  The analysis highlights the substantially lower assumed GHG emission savings when applying more realistic assumptions regarding the heel estimate and percentage of NRCs illegally vented.  Under even a worst-case venting scenario that presumes, as EPA did, massive and wide-scale illegal venting by licensed professionals handling NRCs, the potential emissions savings are less than a quarter of what EPA asserts.  When more realistic, yet conservative, assumptions on the frequency of NRC disposal without proper recovery are considered (somewhere in the range of 10-70% as discussed above), the potential emissions savings are reduced to 0.20-1.37 MMTCO2e per year.  Notably, even if the heel estimates relied on by CARB (1.85% or 0.44 pounds) are utilized, then emissions would be no more than approximately a third of what EPA estimates, even using EPA's

unsupported 95% venting assumption, and much lower if the more reasonable 10-70% range is considered.

If EPA were to factor in the emissions increases related to GHG emissions from the production of new refillable cylinders and the transportation of those cylinders, as detailed above, then any GHG emissions savings from the NRC ban would be substantially reduced if not eliminated.

### D. CARB's Analysis Shows that Heel Emissions Can Be Addressed with Appropriate Recycling Measures

The state of California has been the leader in mobilizing the phasedown of HFCs. After commissioning the detailed *CARB Lifecycle Analysis* and considering other studies on options to address emissions from NRCs, CARB opted to continue the use of NRCs with appropriate contractor and technician education programs:[21]

> In December 2009, ARB adopted various control measures, including mandating cylinder evacuation prior to recycling or disposal down to a 15-inch mercury vacuum, relative to standard atmospheric pressure of 29.9 inches of mercury. Evacuating refrigerant cylinders would remove all but 0.2% (approximately 0.05 lbs) of the leftover refrigerant heel normally remaining after the cylinder is used, resulting in annual emissions of 0.025 MMTCO2eq per year. ARB considered, but did not adopt a control measure banning the use of disposable 30-lb. cylinders and requiring the use of refillable cylinders instead.

CARB's determination points to a better path forward than a simplistic and overly burdensome ban on NRCs – continuing education on proper reclamation and cylinder recycling and better enforcement of the venting prohibitions in existing law.

### Conclusion

In sum, EPA has dramatically overstated the benefits of the proposed ban on NRCs. First, the rulemaking record clearly shows that the best data in EPA's possession while developing the proposal indicates that the average heel identified in historic studies is 1.5-3%.  More recent data from Worthington's discussion with industry stakeholders demonstrate that the average "heel" today is substantially lower than EPA has assumed.  Accordingly, at best, the reductions EPA claims from the NRC ban are no more than a third, and likely much lower, than the agency's analysis contends.

Second, EPA's analysis does not take into account the substantial *increase* in GHG emissions that the proposed NRC ban will generate from the production of a much larger fleet of refillable cylinders and, even more so, the exponential increase in transportation-related emissions that the refillable cylinder fleet will necessitate.

---

[21]    *CARB Lifecycle Analysis* at 103.

REDACTED VERSION:  Confidential Business Information Omitted

For these reasons, Worthington urges EPA to consider the path taken by CARB and to mandate control and other measures that will achieve substantial reductions in venting emissions, while avoiding an unnecessary ban on NRCs.

**Table I-2:  Summary Comparison of Key Assumptions**

|  | EPA | Worthington | Basis |
|---|---|---|---|
| **Non-refillable Cylinders/year** | 4,500,00 | ▓▓▓▓ | Actual shipment and ITC Data |
| **Refillable Cylinders Needed** | 3,015,000 | 26,000,000 | EPA Cylinder Analysis, CARB, Industry sources |
| **% Refillable Cylinders Disposed/year** | 5% | 10-15% (12.5% average) | Industry sources with refillable cylinder fleets |
| **Refillable Cylinders Disposed/year** | 150,750 | 3,250,000 | Calculated from above data |
| **% NRCs Vented** | 95% | Unknown | EPA supporting data not provided in docket; EPA assumes widespread illegality and lack of enforcement; CARB indicated 70% in 2007 before meaningful educational and enforcement efforts |
| **Lbs Refrigerant Remaining at Disposal** | 1.25 | 0.30-0.44 | CARB; Industry sources |

## II.    EPA Improperly Assumes That a Ban on Non-Refillable Cylinders Will Curb Illegal Production and Import of HFCs

One of EPA's stated objectives in proposing a ban on NRCs is to discourage and prevent illegal production, import and subsequent sales of HFCs. As EPA correctly states, "the phasedown of HFCs (in certain regions) has led to illegal smuggling of these substances globally, often using non-refillable containers."[22]  However, the agency extends this observation by asserting, without support, that "[d]isposable cylinders facilitate illegal refrigerant trade, and inhibiting this trade would be a benefit of a ban on the use of non-refillable cylinders."  The experience of the European Union ("EU"), by far the largest refrigerant market to ban NRCs, demonstrates the fallacy of this assumption.  Illegal activity in the EU is rampant as the next step of the F-Gas Phasedown approaches, yet the NRC ban has been in place since 2007.

In fact, common sense, and basic economics, explain that illegal refrigerant smuggling is the obvious consequence of the phasedown in refrigerants that are widely sought for use in HVACR equipment that remains in operation and on the market.  Demand necessitates supply, and such supply will be provided regardless of the container the desired substance is in. EPA's reasoning conflates the container with its contents.

### A.    Illegal Refrigerant Smuggling in the EU Is Not a Non-Refillable Cylinder Problem, But a Matter of Compliance Enforcement

---

[22]    *EPA Cylinder Analysis* at 20.

13

Despite a ban on NRCs, regulated refrigerants continue to be smuggled into the EU. Indeed, EPA's own analysis highlights the extent to which illegal refrigerant smuggling remains a major problem in the EU.[23]  Omitted from EPA's discussion is the fact that such smuggling occurs with both refillable and non-refillable containers.  For example, while EPA notes that "more than 72 percent of surveyed companies indicat[ed] they had seen or been offered refrigerants in illegal disposable cylinders,"[24] the agency neglects to mention that the same report from the EU-based Environmental Investigation Agency ("EIA")[25] also indicates that "many companies also stated their belief that illegal HFCs were being placed on the market in refillable containers."  Similarly, a report submitted to the U.S. Trade Representative by U.S. producers and exporters of HFCs, and cited in EPA's current rulemaking record, notes that "[m]ore recently, illegal HFCs have been found in reusable cylinders, making it even more difficult to identify them."[26]

In a May 2021 open letter to EU Policymakers, the European Fluorocarbons Technical Committee ("EFCTC") and several organizations in the HFC value chain detailed the black market in illegally imported HFCs, which "continues to thrive across Europe," and asked for action to tighten and harmonize enforcement in all Member States by:  (1) promoting best practices in terms of border controls and VAT checks; (2) asking Member States to set higher, more dissuasive fines; and (3) building knowledge on the issue of illegal HFCs.

In a June 4, 2021 article, *The Wall Street Journal* ("*WSJ*") found the EU's ban on NRCs has not worked.[27]  In fact, the *WSJ* found that, despite the ban, foreign manufacturers, mainly from China, have dumped massive quantities of illegal refrigerants on the market.[28]  Smuggled refrigerant enters the EU in a variety of containers, including NRCs, refillables, and via filled air conditioning units, other equipment, and ISO tanks.

*The Wall Street Journal* article also makes the obvious point that "[t]he price difference between sophisticated new EU-approved refrigerants and cheaper, abundant and generally interchangeable older formulas has sparked a black market and drawn smugglers, many from international crime syndicates."  Clearly, these bad actors will find a way to move product

---

[23]    *EPA Cylinder* Analysis at 20-21.

[24]    *EPA Cylinder Analysis* at 20.

[25]    EIA, "*Doors Open:  Europe's flourishing illegal trade in hydrofluorocarbons (HFCs)*" at 14 (April 2019) (available at: https://stopillegalcooling.eu/wp-content/uploads/EFCTC_OpenLetter_English_2-1.pdf).

[26]    Letter to Edward Gresser, Chair of the Trade Policy Staff Committee, Office of the United States Trade Representative from Bradford L. Ward, Counsel for Arkema Inc., The Chemours Company et al., concerning Comments Regarding Foreign Trade Barriers to U.S. Exports of Hydrofluorocarbons, at 11 (Oct. 26, 2020).

[27]    "Smugglers Undercut Green Targets for Air Conditioners, Refrigerators in Europe," *The Wall Street Journal* (June 4, 2021) (available at https://www.wsj.com/articles/black-market-undercuts-green-targets-for-air-conditioners-refrigerators-in-europe-11622804684).

[28]    *Id.*

and dump it on a market, no matter the container. The solution to the problem is not to engage in a "whack-a-mole" style regulatory effort aimed at the containers, but, rather, enhance education and compliance efforts.

### B.    EPA Has Not Considered the Added Risk From Smuggled Refillable Cylinders

As mentioned above, the EU NRC ban did not stop illegal smuggling but simply resulted in a shift from NRCs to refillable cylinders and other containers. Even if EPA believes that banning NRCs results in a decrease in smuggling, EPA must also consider the disbenefits from the smuggling of poorly constructed and potentially dangerous "single use refillable" cylinders.

A January 2019 *Cooling Post* article, "The Rise of the Disposable 'Refillable,'"[29] describes how low-quality refillable cylinders are spreading throughout the EU market with no intention of being returned and refilled:

> The high price of refrigerants, means that the comparatively low cost of the cylinder is no barrier to the potential huge profits to be made from importing and selling the gas in "refillable" cylinders. These cylinders, possibly imported outside of the quota system, are now being sold with no provision for their return for refilling as required under the F-gas regulations.

Thus, in Europe, the NRC ban has resulted in the proliferation of poorly manufactured, leak-prone refillable containers that pose a threat to the environment and increase HFC emissions (and are less likely to meet safety specifications necessary to protect technicians, homeowners and workers), but also "orphan" containers that no longer have an owner to properly recover contents or maintain the cylinder. When discovered empty, the market must reject them, essentially rendering these larger, heavier "refillable" cylinders as waste that must be moved to scrap yards or landfills.

### C.    Technology Can Be Part of the Solution

Technological options exist that can be part of the compliance solution.  For example, to address economic harm from low-quality counterfeit product in the past, Worthington employs distinct markings and rotating codes to authenticate our product.

---

[29]   "The Rise of the Disposable 'Refillable,'"   *The Cooling Post*   (Jan. 23, 2019) (https://www.coolingpost.com/world-news/rise-of-the-disposable-refillable/).  ("While a clampdown by the authorities in some European countries may have stemmed the flow of gas in illegal disposables, some of the illegal activity has now switched to supposedly legal refillable cylinders.  The refrigeration and air conditioning industry, along with environmental groups are calling on the authorities to take action to stop this increasingly worrying illegal trade.").



Further, for years, at customer request, Worthington has printed QR codes on NRCs and packaging cartons to combat counterfeiting. Likewise, some gas producers use anti-counterfeiting stickers that can verify legally filled cylinders via quick scan.  Examples of such labeling are provided below.





Notably, the U.S. Department of Commerce and ITC recently took action to impose duties on foreign-produced NRCs that the agencies recognized were being dumped at prices below fair value to the detriment of the U.S. industry.  Prior to that, both agencies had imposed duties on dumped imports of refrigerants.  EPA's HFC phasedown rulemaking should not undercut the actions of both the Commerce Department and ITC, but build off them by recognizing that U.S.-manufactured NRCs are not part of the HFC problem, but, in fact, as explained further in Section IV, part of the solution in ensuring that HFCs are transported and stored in high quality containers that can be authenticated.

III.     **EPA Has Neglected to Assess the Economic Impact of the Proposed NRC Ban on the U.S. Refrigerant Supply Chain or on U.S. Cylinder Manufacturers**

A.    **The Proposed NRC Ban Risks Serious Unintended Consequences from a Disruption of the Critical Cooling Supply Chain**

Global cylinder manufacturing capacity currently is incapable of meeting the demand for refillable cylinders – a four-fold increase from the current number of NRCs in the market, as detailed in Section I of these comments – that the proposed NRC ban would generate. ███████████████████████████████████████████████████████████████ ████████████████████████████████████ Implementing a 2023 ban on NRCs, as EPA proposes, will necessitate massive investment and reconfiguration of the cylinder manufacturing industry, as well as the dramatic expansion of the infrastructure needed to manage the deployment of refillable cylinders on such a wide scale. Even with a major sustained effort, the likelihood of sufficient manufacturing capacity being in place within two years is speculative at best.

As proposed, EPA's banning of NRCs threatens to disrupt, and decrease the reliability of, the U.S. supply of refrigerants to meet the critical cooling and refrigeration needs of a major portion of the nation's economy, including the healthcare and medical community, agriculture and food supply, major manufacturing and industrial operations, energy generation and transmission, and transportation.  If shortages do arise, it is likely that the ability to satisfy residential demand, particularly during summer heat waves, will be compromised.

EPA should evaluate the potential unintended consequences of an NRC ban and account for them in the rulemaking.  In particular, EPA should assess alternatives, as discussed in Section IV of these comments, in comparison to the risks posed by an NRC ban.

B.    **The Proposal Does Not Account for the Economic Impact of the NRC Ban on the HVACR Industry**

EPA has not addressed the financial burden the proposed NRC ban will impose on the U.S. HVACR industry, given the infrastructure requirements necessary to support refillable fleets of the magnitude that the ban will necessitate.  As discussed above, each of the millions of NRCs annually produced for the U.S. market by American and foreign manufacturers will need to be replaced with at least four refillable cylinders to service the entire U.S. industry. This could mean up to $2 billion in cylinder fleet conversion, plus vehicle retrofits, filling retrofits, requalification, lost time and sales in empty cylinder drop-off to a wholesale location, and wholesaler staffing, tracking and warehouse size increases (increases that may not be attainable due to business size and location). The result will be the loss of some, and perhaps many, small and medium-sized HVACR businesses.

Key questions that EPA should address include:  Will HVACR businesses be able to bear such a huge increase in capital expenses?  How will wholesalers – especially in space-constrained cities – afford, or even have the opportunity to acquire, increased warehouse space for

REDACTED VERSION:  Confidential Business Information Omitted

refillable cylinders?  How will roles change for each of the refrigerant segments today – repackers, reclaimers and producers?  These issues are completely unexamined by EPA.

### C.    EPA Has Not Considered the Economic Impact on the U.S. Cylinder Manufacturing Industry

EPA's "Cost Analysis of Replacing Non-refillable with Refillable Cylinders"[30] is limited in scope and flawed in a number of respects.  For the following reasons, the agency's economic analysis is incomplete and inadequate to support proper assessment of the proposed ban on NRCs:

- Failed to consider the economic impact of the NRC ban on the U.S. NRC manufacturing industry;
- Does not account for the substantial additional number of cylinders that will be required to serve the market;
- Does not consider the costs associated with periodic inspection and reconditioning of refillable cylinders; and
- Numerous other assumptions regarding the costs of refillable cylinders and their transportation are in error.

First and foremost, the EPA analysis does not take account of the impact of the proposed NRC ban on the U.S. industry producing NRCs.  The domestic industry producing NRCs currently consists of a single producer, Worthington Industries.  Worthington produces NRCs at its two manufacturing facilities in Columbus, Ohio and Paducah, Kentucky.

The U.S. market for NRCs consists of three different areas of application: refrigerant and related gases; foam and adhesives; and helium.  HFC refrigerant applications account for the majority volume of NRCs.

While Worthington could in theory reconfigure its NRC production operations to produce refillable cylinders, such a transition would be complex, expensive, and challenging.  Such a transition would entail a full redesign of the production line, including interaction with existing

---

[30]    *EPA Cylinder Analysis*, Section 4.

18

JA217

refrigerant customers and extensive product testing, working with producers of capital equipment to develop new production equipment capable of producing the product and/or retrofitting current production equipment, creation and installation of new production lines, training production employees, changing packaging and transportation materials as needed, modifying software related to production, inventorying, and sales of the product, potential new storage facilities, and so forth. ███████████████████████████████████████████████████████████

Second, due to the refillable nature of this cylinder type, the introduction of such a product would require a huge initial production volume in order to fill the distribution pipeline for the product, but then substantially lower production volumes in years to come once this initial stocking of the system took place.  Based on its experience with refillable cylinders for other uses, as well as from input from current refrigerant producers and reclaimers who use refillables in other markets, Worthington estimates that in order to transition the market from non-refillable to refillable cylinders, there will need to be multiple refillable cylinders for each NRC currently in the system.  As detailed in Section I of these comments, for the market to function there will need to be cylinders in each of the different distribution phases of the refillable cylinder:  (1) in use; (2) in transit; (3) in a warehouse or on a distributor shelf; and (4) in filling, refurbishment, or recertification.  Thus, in relation to NRCs, there will initially need to be four times as many refillable cylinders in the market. ██████████████████ the market will require at least 26 million refillable cylinders to "prime the system" when the product is introduced.  In following years, a lower number of refillable cylinders will need to be produced, as our experience in Europe and customers with refillable fleets indicate, that 10-15 percent of cylinders will need to be replaced due to damage, loss, or reaching the end of their life cycle.  In sum, the EPA analysis fundamentally underestimates the costs associated with a move to refillable cylinders by overlooking the need for cylinders in the various stages of distribution.

Indeed, the EPA analysis completely overlooks a significant, fundamental factor in the potential transition to a refillable cylinder for refrigerant gases, namely that if the cylinders have a 20-year life cycle, and are required to be introduced as of a certain year, all 26 million cylinders will be needed simultaneously in that year, with a substantially lower number of cylinders needed in future years.  This production schedule will be utterly uneconomic and infeasible, given that Worthington will need to make a massive investment (as discussed above) in order to modify its product and manufacturing process to transition from a non-refillable to a refillable cylinder.  This radical change in annual production volumes will deprive the production process of any regularity or predictability as to the proper capacity and staffing levels, and will require substantial up-front investment with little long-term return.  At the very least, this disparity in annual output levels will mandate a substantial transition period in order to build up initial product volumes.

███████████████████████████████████████████

███████████████████████████  While the domestic industry was successful in limiting imports of refillable cylinder imports from China through an antidumping case, low import prices from Thailand and Vietnam continue to keep domestic producers under severe price pressure. A ban on NRCs could cause a surge in low-priced imports of refillable cylinders, which would result in financial injury to the domestic industry, making investments in additional capacity impractical if not impossible. Indeed, one unintended consequence of the ban on NRCs would be the decimation of the U.S. refillable cylinder manufacturers (which consists of two companies) by encouraging low-priced imports.

Third, the EPA analysis also does not take into account the fact that refillable cylinders need to be inspected and reconditioned periodically, typically every five years for a cylinder of this type.[31]  DOT regulations stipulate that in order to ensure the continued safety of a cylinder carrying gases under substantial pressure, refillable cylinders of essentially all types must be rigorously inspected, reconditioned as needed, and certified on a regular basis after an initial period of qualification after manufacturing.[32]  It is likely that over a 20-year cylinder life, a refillable cylinder would need to be refurbished 3-4 times.  Not only does this process involve costs to inspect, recondition, and certify the cylinder, there are also costs associated with tracking cylinders and maintaining the database of certification records.  In addition, industry stakeholders who manage refillable cylinders indicate that refillables are cleaned and repainted upon each return, adding more costs to fleet management.  EPA should reference DOT and other publicly available information as a basis for the additional costs that EPA did not consider when developing the proposed rule.

EPA should be aware that the product currently under examination is produced as non-refillable for well-defined reasons.  The DOT standards covering NRCs (DOT-39) mandate that these cylinders cannot be refilled under penalty of law.  Producers of refrigerant gases insist the cylinders that store and transport their products not contain traces of other gases or liquids because the presence of even a small amount of other substances can contaminate the contents of a refilled cylinder and damage systems.  Further, the products of some refrigerant manufacturers are proprietary compositions, so that producers have a fundamental concern over maintaining the integrity of their product by ensuring that the cylinders in which they pack their product can never be reused and filled by unscrupulous actors that might attempt to counterfeit their proprietary product.

---

[31]   *See CARB Lifecycle Analysis* at 117:  "Cost of refurbishing refillable cylinders every five years throughout their 20-year lifetime is assumed to be $13/cylinder, based on communication with Dupont (2011) and Airgas (2011). This cost reflects any repainting, cleaning, inspection, hydrotesting, or revalving that must be conducted."

[32]   49 C.F.R. §180.209.

REDACTED VERSION:  Confidential Business Information Omitted

Finally, EPA's analysis also reflects a number of errors in its basic assumptions. While the EPA analysis estimates the total current volume of non-refillable cylinders for use with refrigerant gases as 4.5 million units, the actual volume of annual NRC shipments is approximately ███████████.[33]  Further, while EPA's analysis assumes that the price of a NRC is approximately $12 per unit,[34] ███████████████████████████████████████████ The EPA analysis also assumes that refillable cylinders for refrigerants will cost approximately three times the cost of an NRC, or $36 per unit.[35] This price does not include the valve, which comprises a substantially greater portion of the cost of the cylinder. ███████████████████████████████████████████ higher than the EPA's estimate for a refillable cylinder, ██████████████ higher than the EPA assumption of the price of a non-refillable cylinder.  Based on the EPA's unrealistic assumptions concerning the market size and prices for both non-refillable and refillable cylinders, the EPA analysis grossly understates the estimated economic impact of the proposed move to refillable cylinders.

The EPA analysis also understates the additional costs associated with the transportation of refillable cylinders.  First, the EPA analysis assumes tare (empty) weights of 6-7 pounds per NRC and 15-17 pounds for a refillable cylinder.[37]  For Worthington, however, as explained in Section I of these comments, the relative weights are 5 pounds for the majority of NRCs and 21 pounds for refillable cylinders.  Thus, while the EPA analysis assumes that the refillable cylinder will weigh two to three times as much as a non-refillable, Worthington estimates that a refillable cylinder designed to hold refrigerant gases would embody a weight more than four times higher than a NRC.  Second, the EPA analysis estimates that 870 refillable cylinders can be packed on a truckload.[38]  This estimate is at odds with the experience of Worthington customers, who report that 720-800 cylinders of this type could be packed per truckload.  The assumptions of the EPA analysis in relation to product weight and cylinders per truckload have the combined effect of substantially underestimating the disparity in freight costs between non-refillable and refillable cylinders.

---

[33]  *See* Section II of these comments.

[34]  *EPA Cylinder Analysis* at 16.

[35]  *Id.*

[36]  Worthington Recovery & Refillable Cylinders Price List (July 1, 2021) (30-lb. DOT-4BA-400, ████ single-port (CGA 165) L/V (600 psi PRD)).

[37]  *EPA Cylinder Analysis* at 17.

[38]  *Id.*

**D.      Economic Impact Analysis Demonstrates that the Proposed NRC Ban Will Be Much Costlier than EPA Assumes**

Worthington recreated EPA's economic impact analysis for the proposed NRC ban, then sequentially revised the analysis by adjusting key assumptions to reflect Worthington's real-world industry experience, as well as to incorporate factors missing from the agency's analysis. (*See* Exhibit A)  As detailed below, when all of these adjustments are considered, **the cumulative effect shows that the annualized cost of the proposed NRC ban is almost 30 times what EPA's analysis suggests ($521,399,762 – an increase of 2,725.2% over EPA's estimated $18,232,696 in annualized costs).**  These costs are excessive and underscore why an alternative approach to an NRC ban should be pursued, as described in the following section of these comments.

The methodology utilizes EPA's various cost assumptions (*e.g.,* cylinder, transport, and management cost assumptions) to construct cash flows for 2022 to 2050.  In particular, the analysis constructs cash flows associated with the use of refillable cylinders and cash flows associated with the use of NRCs.  Worthington discounts the cash flows (using EPA's 9.8 percent discount rate) and sums the discounted cash flows to calculate the net present value ("NPV") cost of using refillable cylinders and for using NRCs.  The difference between these two NPVs is the net cost of switching from NRCs to refillable cylinders.  The equivalent annual cost ("EAC") of this difference is calculated to provide the "annualized" economic impact of switching from non-refillable to refillable cylinders.

To ensure the proper calculations and baseline from which to build out the analysis, Worthington used EPA's methodology and assumptions as proposed, and calculated an annualized cost of $18,455,041 to switch from NRCs to refillable cylinders.  (*See* Exhibit A, Att. 1)  Worthington's calculations are essentially the same (within 1 percent) as EPA's estimate of $18,232,696.[39]

Attachment 2 of Exhibit A shows EPA's cost assumptions (Scenario 1) along with Worthington's alternative cost assumptions (Scenarios 2 to 7).  In scenarios 2 to 6, Worthington introduces adjustments to EPA's assumptions one at a time. Scenario 7 incorporates all of the adjustments to EPA's assumptions.  Accounting for all of these adjustments increases the annualized cost of switching to refillable cylinders to as high as $521,399,762 (an increase of 2,725.2% over the annualized cost under the EPA's assumptions).  (*See* Exhibit A, Att. 1).  Below, Worthington quantifies the impact of each adjustment to EPA's cost assumptions.

<u>First</u>, as Worthington previously explained, it has two facilities that produce NRCs: Columbus, Ohio and Paducah, Kentucky.  Worthington cannot produce refillable cylinders at these facilities without significant retooling, as described above. ████████████████████████

---

[39]      *Id.*



(*See* Exhibit A, Att. 2)  Including these costs increases the annualized cost of switching to refillable cylinders to $29,118,852   (an increase of 57.8 percent from the annualized cost under the EPA's assumptions). (*See* Exhibit A, Att. 1)

Second, as discussed above, EPA made erroneous assumptions concerning NRC market size, the number of refillable cylinders necessary to replace one NRC, and the refillable cylinder replacement rate (*i.e.,* the rate at which refillable cylinders are replaced due to damage, disposal, *etc.*). In Scenario 3, Worthington assumes (1) ███████████████████████ ████████████████████████████ (2) that four refillable cylinders are necessary to replace one NRC (instead of the EPA's 2/3 of a refillable cylinder for one NRC), and (3) that the refillable cylinder replacement rate is 12.5 percent (instead of EPA's assumed 5 percent). (*See* Exhibit A, Att. 2)  With these data points included, the annualized cost of switching to refillable cylinders increases to $121,871,968 (an increase of 560.4 percent from the annualized cost under the EPA's assumptions).  (*See* Exhibit A, Att. 1)

Third, EPA neglected to account for periodic cylinder inspection and refurbishment costs.  According to the *CARB Lifecycle Analysis*, refillable cylinders are inspected and refurbished every five years at a cost of $13 per cylinder.[40]  Because the $13 per cylinder is in 2011 dollars, Worthington inflates the cost to 2020 dollars, or $14.96 per cylinder. (*See* Exhibit A, Att. 3)  Worthington calculates the present value of a cost of $14.96 every five years over a 20-year period, and then annualized that cost to yield an annualized refurbishment cost of $2.46 per cylinder.  In Scenario 4, Worthington includes the annualized refurbishment cost. (*See* Exhibit A, Att. 2)  Adding in these costs increases the annualized cost of switching to refillable cylinders to $25,871,304 (an increase of 40.2 percent from the annualized cost under the EPA's assumptions). (*See* Exhibit A, Att. 1.).

Fourth, EPA used incorrect cylinder prices.  In scenario 5, ██████████ ████████████████████████████████████████ *See* Exhibit A, Att. 2)  This adjustment increases the annualized cost of switching to refillable cylinders to $37,410,286 (an increase of 102.7 percent from the annualized cost under EPA's assumptions). (*See* Exhibit A, Att. 1)

---

[40]    *CARB Lifecycle Analysis* at 117.  Worthington believes that refurbishment costs are higher today than the 2011 CARB report estimated.  In addition, the CARB estimate does not account for the costs of cleaning and, in some cases, repainting, refillable cylinders each time they are returned.

<u>Fifth</u>, EPA overestimated the number of refillable cylinders (870) that can fit in a truckload. In Scenario 6, Worthington instead assumes that only 800 refillable cylinders can fit in a truckload based on the experience of industry stakeholders who ship filled cylinders today. (*See* Exhibit A, Att. 2) This change increases the annualized cost of switching to refillable cylinders to $24,459,049 (an increase of 32.5 percent from the annualized cost under EPA's assumptions). (*See* Exhibit A, Att. 1)

<u>Finally</u>, in Scenario 7, Worthington included all the above-described modifications to EPA's assumptions. (*See* Exhibit A Att. 2)  Accounting for all of these adjustments increases the annualized cost of switching to refillable cylinders to $521,399,762 (an increase of 2,725.2% over the annualized cost under the EPA's assumptions)[41]. (*See* Exhibit A, Att. 1)

**E.      EPA Has Not Examined the Impact on Worker Health from Handling Heavier Refillable Cylinders**

EPA's analysis of the proposed NRC ban does not account for the impact on HVACR industry workers who will be required to handle these heavier refillable cylinders. Notably, a standard 30-pound refillable cylinder (51 pounds when filled) is 16 pounds heavier than today's standard NRC.  This is in addition to the 30- or 50-pound recovery tank that also will be carried around job sites.  EPA should assess the effects of an NRC ban on service technicians and other workers who will be required to handle cylinders that are approximately 50 percent heavier than NRCs.

---

[41]  The cumulative effect of all Worthington's adjustments together is greater than the effect of each adjustment individually.  For example, increasing the number of refillable cylinders (Scenario 3), increases the cost impact of introducing cylinder refurbishment costs (Scenario 4) and the cost impact of revising refillable cylinder prices (Scenario 5). (*See* Exhibit A, Att. 1 and Att. 2). Consequently, the increase in annualized cost under Scenario 7 (which includes all Worthington's adjustments) is greater than the sum of that under Scenarios 2 through 6. (*See id.*)



Due to the significant increase in weight of refillable cylinders versus NRCs, there is both a health and economic impact on service technicians and installers.  As a result of the heavier weight, EPA should analyze the long-term health impacts to occupational workers who now have to lift significantly heavier cylinders than currently.  EPA also must analyze the impacts of needing to hire additional occupational workers and the additional time to move these heavier refillable cylinders up flights of stairs and to various locations.[42]  No such analysis was included in EPA's regulatory impact analysis.

---

[42]  The cost analysis for the rule also should consider the increased wear and tear, and the associated cost to contractors, from this additional weight on vehicle fleets used to transport the cylinders.

# IV.        There Is a Better Path Forward

 Worthington and other industry stakeholders believe there are better ways to manage refrigerant containment that meet EPA's goals of reducing emissions and waste without disrupting or displacing U.S. HVACR businesses with a move to refillable cylinders. Worthington asks the EPA to consider these alternative solutions that allow the continued use of recyclable, non-refillable cylinders in the most sustainable manner.

## A.        Alternative Solution to Address Heel Emissions in Non-Refillable Cylinder Design

The Department of Transportation ("DOT") regulates NRCs through the "DOT-39" specifications that are widely used in the U.S. and other parts of the world. "DOT-39" cylinders are the preferred containers for virgin refrigerant containment due to their affordability, lightweight construction, and excellent valve design. Consistent with DOT-39, Worthington's valve prevents refilling of different or counterfeit refrigerants. Refrigerant loss via defect is very rare, as referenced by multiple stakeholders in EPA's supporting documents.[43] In fact, the defect rate for Worthington NRCs was less than one-tenth of one percent (<0.1%) of cylinders shipped between 2017 and 2019, a world class rating.

Worthington's innovation team regularly designs cylinders and valves in response to market needs. As a company, Worthington has consistently moved with the industry, designing and adapting pressurized containers to meet the needs of new refrigerant blends as well as specific stakeholder needs. Most recently, a vessel that would safely store Class A2L, mildly flammable refrigerants, was required. Worthington researched and sourced the proper components for a spring-loaded pressure relief valve and integrated it into the design to be compliant with PHMSA/DOT requirements. For R-1234yf, replacing R-134a Automotive, Worthington incorporated the left-hand thread (CGA 164) so that an end-user cannot inadvertently connect a non-flammable and flammable gas.

To address EPA concerns with NRCs, Worthington's innovation team is committed to finding an appropriate solution. In fact, Worthington already has several ideas of how to revise cylinder design to alleviate concerns about poor venting practices that result in heel emissions. As detailed below, Worthington proposes equipping NRCs with an alternative pressure relief device ("PRD") and/or installing self-sealing valves to stop venting and preserve the ability to move refrigerants in this preferred container.

---

[43]   *EPA Cylinder Analysis* at 9 ("[D]effective valves are considered "very rare" among domestically manufactured nonrefillable cylinders (Rapid Recovery 2012a). It is estimated that approximately 0.02 percent of all refillable cylinders have defective valves that result in refrigerant loss (Refrigerant Services 2012).").

### (1)    Install a resealable pressure relief device to prevent fugitive emissions

Currently, some DOT-39 cylinders have a CG-1 rupture disk PRD that does not reseal. However, in NRCs rated for flammable refrigerants, or A2Ls, a CG-7 spring-loaded, resealable pressure relief valve ("PRV") is required.  When activated by pressure, this PRV will open and reseal itself at set point, preventing fugitive emissions.

### (2)    Use a self-sealing valve with gas flow control to prevent intentional venting

DOT-39 cylinder valves also could be redesigned with a redundant pressure-tight seal to prevent the end user from intentionally or inadvertently venting refrigerant to atmosphere. This could be achieved with a check valve that controls gas flow, preventing the venting of contents by simply opening the valve.

In fact, in 2016, EPA adopted an exemption for small cans of refrigerant for use in motor vehicle AC systems that are equipped with a self-sealing valve, defined as a valve affixed to a container of refrigerant that automatically seals when not actively dispensing refrigerant and that meets or exceeds established performance criteria.[44]  In finalizing that regulation, EPA determined that:

> self-sealing valves are an effective mechanism for controlling the release of non-exempt substitute refrigerants to the atmosphere, making it unnecessary to impose burdensome training and/or certification requirements more broadly at this time.[45]

The regulation includes a standard for self-sealing valves that is based largely on CARB's *Test Procedure for Leaks from Small Containers of Automotive Refrigerant,* TP–503 (as amended January 5, 2010).[46]  Under that standard, the leakage rate may not exceed 3.00 grams per year when the self-sealing valve is closed.

While the 2016 regulation applies to small cans with under two pounds of refrigerant, the same concept and technology is transferable to other size containers, including larger NRCs.

---

[44]    81 Fed. Reg. 82,272, 82,306 (Nov. 18, 2016); 40 C.F.R. §82.154(c)(2).

[45]    81 Fed. Reg. at 82,306.

[46]    40 C.F.R. Subpart F, Appendix E.

**B.     Alternative Solutions to Address Improper Disposal of NRCs**

HVACR professionals are responsible for the proper evacuation and recycling of NRCs. Worthington has been in contact with several industry stakeholders and organizations that support enabling compliance through multiple methods—saving emissions, increasing reclamation and reducing landfill waste.  We encourage EPA to seek industry input on alternative methods and pursue reasonable options in a different rulemaking.

**(1)     Develop a Non-Refillable Cylinder Take-Back Program**

Some EPA-certified reclaimers have active take-back programs via distribution partners, making it effortless for the contractor to drop off spent cylinders and pick up new ones. Reclaimers will then pick up these used cylinders, properly recover the heel, and recycle the steel (one of the most renewable materials on the planet).

Alternatively, other options include:[47]

•     Refrigerant users can utilize their own refrigerant heel recovery and cylinder recycling program as part of their sustainability and carbon footprint reduction goals;

•     Contractors can properly evacuate the cylinder to 15 in-Hg and send the cylinder(s) to a scrap metal recycler; and

•     Refrigerant producers and packagers can establish a seller take-back program for their wholesale customers that can be administered at a local level.



---

[47]    A similar flow chart was provided by CARB in its 2011 Analysis where end users could choose to properly recover the NRC heel and recycle the cylinder or return the cylinder to a take-back program location.

### (2)      Create Education Programs and Ensure Compliance

It is widely known that venting refrigerant gas to the atmosphere is illegal. However, proper recovery and recycling of NRCs is only addressed through industry guidelines, specifically *AHRI Guideline Q*. Worthington recommends codifying similar guidelines as a regulation to govern the proper disposal of NRCs. Such regulations would require recovery of the heel and recycling of the steel cylinder by a metal recycler, therefore diverting cylinders from landfills.

In addition, Worthington supports the approach adopted by CARB to implement end-user education programs that reinforce best practices for proper recovery and recycling of NRCs, as well as to remind technicians, installers and business owners of the consequences of venting.[48]

### (3)      Labeling:  Warning and Disposal Instructions

To enhance compliance and increase awareness and education, Worthington recommends that EPA require labeling of the cylinder and outer carton packaging informing the user of potential fines and other penalties related to the improper venting of NRCs.  For example, PHMSA/DOT currently requires the following to be printed on cylinder labels: "*Federal law forbids transportation if refilled-penalty up to $500,000 fine and 5 years imprisonment (49 U.S.C. 5124).*"  Worthington recommends including a similar statement on NRCs, such as:

*Federal law prohibits intentionally venting ozone-depleting substances (ODS) and their HFC substitutes. Penalties up to $48,762 / day and possible imprisonment if violated (42 U.S.C. 7401).*

In addition, Worthington recommends that EPA require that universal disposal instructions be printed on NRCs and the carton label, such as:

*Instruction for Disposal:*
*Do not vent residual pressure to atmosphere. Recover residual contents using proper recovery equipment, hoses and gauges to 15 in-Hg vacuum. Observe all precautions printed on the cylinder label. After recovery is complete, close valve and return for proper recycling in accordance with AHRI Guideline Q. Cylinder should be returned to Metal Recycler for processing.*

---

[48]    *CARB Lifecycle Analysis* at 140 (Appendix C:  Best Management Practices).

## V.         The AIM Act Does Not Authorize a Ban on Non-Refillable Cylinders

As a threshold matter, the AIM Act[49] does not require or authorize EPA to ban NRCs, and such a ban is not necessary to achieve the substantive goals of the AIM Act.  In operative part, the AIM Act[50] provides EPA with authority over the "servicing, repair, disposal, or installation of equipment."  The type of cylinder (refillable or non-refillable) is irrelevant to the potential for emissions during service, repair, disposal, or installation of HVACR "equipment."

While the term "equipment" is not specifically defined in the AIM Act, the legislation clearly distinguishes between "equipment" and "external containers" that store refrigerants.  For example, the AIM Act defines "recover" as "the process by which a regulated substance is:  (A)  removed, in any condition, **from equipment**; and (B) **stored in an external**

---

[49]   Citations to the AIM Act reference the version of the Act available on EPA's website (https://www.epa.gov/climate-hfcs-reduction/aim-act) as Section 103 of Division S of the Consolidated Appropriations Act, 2021 (H.R. 133).

[50]   The full text of Section 103(h) (emphasis added) reads as follows:

(h)  MANAGEMENT OF REGULATED SUBSTANCES.—

(1) IN GENERAL.—For purposes of maximizing reclaiming and minimizing the release of a regulated sub-stance from equipment and ensuring the safety of technicians and consumers, the Administrator shall promulgate regulations to control, where appropriate, any practice, process, or activity regarding **the servicing, repair, disposal, or installation of equipment** (including requiring, where appropriate, that any such servicing, repair, disposal, or installation be performed by a trained technician meeting minimum standards, as determined by the Administrator) that involves—

(A) a regulated substance;

(B) a substitute for a regulated substance;

(C) the reclaiming of a regulated substance used as a refrigerant; or

(D) the reclaiming of a substitute for a regulated substance used as a refrigerant.

(2) RECLAIMING.—

(A) IN GENERAL.—In carrying out this section, the Administrator shall consider the use of authority available to the Administrator under this section to increase opportunities for the reclaiming of regulated substances used as refrigerants.

(B) RECOVERY.—A regulated substance used as a refrigerant that is recovered shall be reclaimed before the regulated substance is sold or transferred to a new owner, except where the recovered regulated substance is sold or transferred to a new owner solely for the purposes of being reclaimed or destroyed.

(3) COORDINATION.—In promulgating regulations to carry out this subsection, the Administrator may coordinate those regulations with any other regulations promulgated by the Administrator that involve—

(A) the same or a similar practice, process, or activity regarding the **servicing, repair, disposal, or installation of equipment**; or

(B) reclaiming.

30

**container**, with or without testing or processing the regulated substance."[51]   Refrigerant-containing cylinders, of course, are external storage containers that the definition recognizes as distinct from HVACR "equipment."

Similarly, EPA's existing regulations implementing the stratospheric ozone protection provisions of Title VI of the Clean Air Act ("CAA"), which the current proposal is intended to supplement, do not contemplate regulation of refrigerant storage cylinders as part of the universe of equipment ("appliances" or "controlled products") subject to those regulations.[52]

- "Appliance" is defined as "any device which contains and uses a refrigerant and which is used for household or commercial purposes, including any air conditioner, refrigerator, chiller, or freezer."

- "Controlled products" are defined as products that contain a controlled substance and belong to one of six product categories, including:

   "(2) Domestic and commercial refrigeration and air-conditioning/heat pump equipment (whether containing controlled substances as a refrigerant and/or in insulating material of the product), e.g. Refrigerators, Freezers, Dehumidifiers, Water coolers, Ice machines, Air-conditioning and heat pump units."

EPA guidance also is clear that cylinders are not considered "appliances" under the Title VI regulations:[53]

   *Q: Is a section 608 certification required to pull the "heel" or residue out of an empty cylinder of refrigerant?*

   *A: No. Cylinders that store or transport bulk refrigerant are not considered appliances.*

Accordingly, EPA and the U.S. HVACR industry historically have viewed refrigerant cylinders as outside the scope of equipment regulated by the CAA Title VI regulations.

---

[51]   Section 103(b)(10).

[52]   *See* 40 C.F.R. Part 82, §82.3.

[53]   EPA, "EPA's Refrigerant Management Program: Questions and Answers for Section 608 Certified Technicians," available at:  https://www.epa.gov/section608/epas-refrigerant-management-program-questions-and-answers-section-608-certified.

EPA plainly has the power to adopt regulations that implement the AIM Act, but the agency's authority to do so is "limited to the authority delegated by Congress."[54]  Given the explicit text of the AIM Act, as well as the structure and history of Title VI of the CAA, Congress did not grant EPA authority to ban NRCs.  Instead, the only provision in the Act that addresses such refrigerant containers draws a distinction between "equipment" (which is subject to EPA's regulatory authority under Section 103(h)(1)) and "external containers," which are not referenced in that grant of regulatory authority.  If Congress intended for EPA to ban any type of cylinder, it could have readily provided EPA authority to regulate "external storage containers" of refrigerants as "equipment."  As the Supreme Court has admonished, Congress does not "hide elephants in mouseholes."[55]  The elimination of the industry producing NRCs is such an elephant, and an endangered one at that, as found by the ITC.

Under the Administrative Procedure Act ("APA"),[56] courts will "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[57]  To comply with the APA, EPA "must rely on facts in the record and its decisions must rationally relate to those facts."[58]  The APA provides the minimal but essential mandate that "[f]ederal administrative agencies are required to engage in 'reasoned decisionmaking.'"[59]  The proposed NRC ban is inconsistent with the agency's mandate under the APA.

---

[54] *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

[55] *Whitman v. American Trucking Assns., Inc.*, 531 US 457, 468 (2001).

[56] 5 U.S.C. § 551 *et seq.*

[57] 5 U.S.C. § 706.

[58] *See Bowen v. Am. Hosp. Assoc.*, 476 U.S. 610, 626 (1986).

[59] *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015), quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U. S. 359, 374 (1998) (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, Worthington urges EPA to reconsider the proposed ban on non-refillable cylinders.  Contrary to the agency's assertion, such a ban will not result in meaningful HFC emission reductions, and any such reductions will be offset by the increase in GHG emissions from increased manufacturing and transportation associated with the expansion of the refillable cylinder market.  Moreover, the ban has proven ineffective in curbing illegal imports of HFCs, as witnessed by the experience of the European Union.  The economic impact on Worthington, and the risks such a ban poses to the continued reliability of the nation's critical supply of refrigerants, have been largely overlooked by EPA's analysis and do not justify adoption of the counterproductive proposed ban.  Crucially, there is a better path forward that relies on technological advancements that are available to minimize end-of-life emissions from NRCs, as well as enhanced cylinder tracking, management, and education programs.

Worthington looks forward to working with EPA to develop a more effective and justified approach to achieving the goals of the AIM Act while minimizing unnecessary adverse impacts on the U.S. HVACR industry.

Respectfully submitted,

Wayne Powers
Director, Refrigerants, Foams and Adhesives
Worthington Industries
200 W. Old Wilson Bridge Rd.
Columbus, OH 43085
(614) 840-4746
Wayne.Powers@WorthingtonIndustries.com

Attachment:  Exhibit A (Confidential)



The Chemours Company
1007 Market Street
PO Box 2047
Wilmington, DE 19899

302-773-1000 t
chemours.com

July 6, 2021

U.S. Environmental Protection Agency
EPA Docket Center
Mail Code 28221T
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460.

Submitted via www.regulations.gov

Re: *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, Proposed Rule, 86 Fed. Reg. 27,150 (May 19, 2021).  Docket ID No. EPA-HQ-OAR-2021-0044.

The Chemours Company FC, LLC ("Chemours") appreciates the opportunity to comment on the Environmental Protection Agency's ("EPA" or "Agency") proposed rule to implement provisions of the American Innovation and Manufacturing Act ("AIM Act") (the "Proposed Rule").

Chemours supported passage of the AIM Act and is pleased that EPA is moving forward to implement the Act's allowance provisions necessary for the control and phasedown of hydrofluorocarbons ("HFCs") in the United States.  Chemours has developed and commercialized a portfolio of low global warming potential ("GWP") products that utilize hydrofluoroolefin ("HFO") technology.  HFO-based products, in addition to low GWP HFCs, can provide environmentally preferable and sustainable solutions in multiple end uses that are currently dependent on higher GWP HFCs, including refrigeration, air conditioning, foam blowing agents and propellants. Chemours' products can therefore help to facilitate the phasedown of HFCs required by the AIM Act utilizing a common metric -- the exchange value equivalent measure ("EVe") – that ensures the environmental objectives of the AIM Act will be secured in an even-handed manner.

As the comments to follow attest, Chemours supports the main elements of EPA's Proposed Rule.  Chemours, however, believes that several improvements and refinements can be made during the public notice and comment process.  Allowance allocations should be based on the twin objectives of the AIM Act – one, phasing down HFCs in end uses in a step-wise fashion that assures compliance with the 85% phasedown requirement, and two, preserving and enhancing U.S. manufacturing leadership and jobs. Therefore, Chemours has outlined several areas where EPA's proposed allowance allocation methodology can be improved, including with regard to initial allowance allocations and requiring that all production and importation of HFCs be required to "hold" a sufficient number of allowances.

JA233



The Chemours Company          302-773-1000 t
1007 Market Street            chemours.com
PO Box 2047
Wilmington, DE 19899

Chemours also offers comments on several other areas covered by EPA's Proposed Rule, including how allowance trading should be conducted and how EPA should address any market share that may have been gained through unfair trade practices. Chemours also believes that EPA's Proposed Rule could be improved through consideration of several alternatives to its proposed requirement for "refillable" cylinders. Finally, Chemours offers comments regarding several technical assessments that the Agency has provisionally put forward within its draft Regulatory Impact Assessment.

In short, Chemours commends EPA for moving quickly to implement the AIM Act and issue allowances by October 1, 2021, and believes that the Agency needs to "get it right". The AIM Act offers the opportunity to achieve massive public health and environmental benefits, quantified by EPA at over $280 billion dollars. The details of the regulatory system needed to obtain these benefits is exceedingly important and EPA should endeavor to provide regulatory stability that will allow affected industries to reasonably plan for future control requirements.

We want to thank the Agency for the dedication of the staff and the impressive work it has done to date to facilitate the publication of the Proposed Rule, host the various stakeholder engagements and for the thorough consideration of the comments that are attached.

Sincerely,

Esther Rosenberg, Global Regulatory Advocacy
The Chemours Company FC, LLC

JA234

The Chemours Company FC, LLC

# *CHEMOURS COMMENTS*

Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program under the American Innovation and Manufacturing Act

86 Fed. Reg. 27,150 (May 19, 2021)

---

## <u>Table of Contents</u>

I.    Introduction ................................................................................................ 4

II.    Chemours Supports a More Inclusive and Fair Approach to Allowance Allocations Utilizing the Years 2011-2019 ............................................... 6

    A.    EPA Should Use Multiple Market Share Data Points Selected from Full 2011-2019 Production and/or Consumption of HFCs to Allocate Allowances; EPA Should Not Finalize Proposed 2017 to 2019 Allocation Scheme ................................................................................. 6

        1.    Using Multiple Annual Market Share Data Points over Full Period 2011-2019 in Methodology to Allocate Allowances to Recently Active Producers and Importers is More Representative of the HFC Market ......................................................................... 7

        2.    Using Average of Three Highest Market Shares over 2011-2019 Period for Allocation Methodology Promotes Fairness............................. 8

    B.    Allocation of Allowances Based on Historic Production and Consumption is Consistent with Legislative Intent ................................................. 9

    C.    Allocation of Allowances to Historic Producers and Importers is Consistent with EPA's Prior Implementation of Clean Air Act Title VI ............ 12

III.    EPA Must Take Several Steps to Ensure Allowance Baseline Calculations Conform to the AIM Act and Promote U.S. Manufacturing ............................ 14

    A.    EPA Must Use 2011-2013 for Production and Consumption Baselines .............. 14

    B.    Entities That Did Not Report Production and Consumption of Fluorinated GHGs Despite Legal Obligation to Do So Should Not Receive Allowances ......................................................................... 15

    C.    EPA Should Allocate Allowances for More Than One Year .............................. 15

        1.    Consistent with Title VI of the CAA, the AIM Act Allows for Multi-Year Allowances and EPA Should Similarly Provide Multiyear HFC Allowances ....................................................... 15

        2.    EPA Previously Granted Multiyear Allowances and Should Similarly Provide for Multiple Year Allowances Under the AIM Act ......................................................................................... 17

The Chemours Company FC, LLC

D.   EPA Should Allocate All Allowances at Company, Rather than Facility
     Level ....................................................................................................... 18

IV.  EPA Should Require Allowances for Imported Products Containing HFCs ................... 19

     A.   The Requirement for Consumption Allowances Should Not be Limited to
          Bulk Substances ...................................................................................... 19

     B.   EPA Can Obtain Data for Current Imports of Products Containing HFCs ......... 21

     C.   Precedent Exists to Require Allowances for Imported Products ......................... 23

V.   Regardless of Allocation Methodology, EPA Must Address Market Share Gained
     Through Unfair Trade Practices ......................................................................... 24

VI.  EPA Should Not Finalize Proposed "Set-Aside" Allowance Allocation ....................... 26

     A.   A "Set-Aside" Pool is Not Authorized by the AIM Act and EPA Has Not
          Articulated a Supportable Rationale for Non-Mandatory Allowance Set-
          Asides ..................................................................................................... 26

     B.   The Proposed Allowance Allocations to New Entrants Is Contrary to
          Regulatory History of EPA Allowance Allocations Under Title VI ................... 27

     C.   Should EPA Finalize a Set-Aside Pool, It Must Be Limited in Scope and
          Duration .................................................................................................. 29

VII. EPA Should Follow Precedent Regarding Required Transfer Offsets and Use
     0.1% to 1.0% Offset Ratio ................................................................................ 30

VIII. EPA Should Only Ban Imports of Filled, Non-Refillable Containers ........................... 32

     A.   Costs Involved with Establishing a Returnable Cylinder Supply Chain and
          Associated Tracking System Are Excessive and Benefits May Be
          Negligible or Negative ............................................................................... 32

          1.   Costs for Refillable Cylinders Are Excessive and understated in
               the EPA Review ................................................................................. 32

          2.   EPA Has Overestimated Emission Reductions Associated with
               "Heels" Contained in Non-refillable Cylinders ....................................... 35

     B.   Alternative Mechanisms Are Available To Support Enforcement Goals
          and Prevent Illegal Imports ........................................................................ 35

     C.   EPA's Proposed Certification ID Tracking System Using QR Codes (or
          Similar Digital Technology) to Track HFCs is Not Feasible. ........................... 37

IX.  EPA Must Clarify Provisions Addressing HFC-23 ................................................... 38

     A.   Chemours Supports Ratification of the Kigali Amendment and Related
          Actions to Phasedown the Use of HFCs and Address Climate Change ............. 38

     B.   EPA Provisions Addressing HFC-23 Must Be Consistent with AIM Act
          Provisions Addressing All HFCs .................................................................. 39

     C.   The Statutory Design of the AIM Act Ensures that Environmental
          Objectives will be Achieved using Scientifically Derived Values ..................... 42

D.      EPA Either Must Review Existing Information on HFC-23 or Obtain
        Information Comparable to Information Intended to be Utilized for Other
        HFCs ................................................................................................................ 43

X.      EPA Must Also Clarify Several Other Provisions Respecting HFC-23 ........................... 44

        A.      HFC-23 Emissions Are to be Measured Against HCFC-22 Production............... 44

        B.      EPA Should Retain Ability to Obtain Two Extensions ........................................ 44

        C.      EPA Should Not Promulgate A Single List of Destruction Technologies .......... 44

        D.      EPA Should Clarify Regulatory Language Regarding Time Periods for
                Destruction ........................................................................................................ 45

XI.     EPA Should Allocate 2024 and Future Allowances Based on Consistent
        Methodology Pursuant to Requirements of the AIM Act .................................................. 45

        A.      EPA Has Limited, Specific Authority Concerning Allowance Allocations
                Under AIM Act ................................................................................................... 46

        B.      EPA Must Allocate Allowances Solely to Historical Producers and
                Importers of HFCs .............................................................................................. 47

        C.      Several Policy Reasons Weigh Against Alternative Allowance Allocation
                Systems ............................................................................................................... 49

        D.      EPA's Alternative Allowance Allocation Methodologies Could Hurt U.S.
                Production and Benefit Foreign Producers ......................................................... 50

XII.    Chemours Supports Reasonable Transparency Provisions .................................................. 51

        A.      Elements of EPA's Proposed Requirements Are Reasonable .............................. 51

        B.      EPA Should Reconsider Other Elements of Proposed Requirements .................. 51

XIII.   EPA Should Further Define "Process Agent" .................................................................... 52

XIV.    Additional Comments on Proposed Regulations and Requests for Further Input ............. 52

        A.      Container Heels ................................................................................................... 52

        B.      EPA Should Reconsider Regulatory Language Basing Violations on
                Amounts Measured Per Kilogram ....................................................................... 52

        C.      Imports for Feedstock or Destruction: ................................................................ 53

XV.     Addressing Health Risks Associated with Air Toxics in Communities Near
        Production Facilities ......................................................................................................... 54

XVI.    Comments on Draft Risk Assessment ................................................................................ 55

XVII.   Conclusion ......................................................................................................................... 56

The Chemours Company FC, LLC

# *CHEMOURS COMMENTS*

Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading
Program under the American Innovation and Manufacturing Act

86 Fed. Reg. 27,150 (May 19, 2021)

---

## I.     Introduction

The Chemours Company FC, LLC ("Chemours") has long supported EPA's
implementation of Clean Air Act ("CAA") provisions designed to protect the earth's
stratospheric ozone layer.  Chemours is a global leader in the production and sale of safe and
energy efficient refrigeration, air conditioning, foam insulation, fire suppression, propellants and
waste heat recovery fluids and thus has a vital interest in the transition to non-ozone depleting
substances ("non-ODS").

Recognizing the serious public health and environmental issues presented by climate
change, Chemours has also supported international efforts led by the United States to transition
away from hydrofluorocarbons ("HFCs") used in many of the applications cited above as
substitutes for class I and class II ODS.  In this regard, Chemours has supported efforts to obtain
the advice and consent of the U.S. Senate regarding the Kigali Amendment to the Montreal
Protocol and believes the United States should ratify the Amendment and participate in its
implementation through future Meetings of the Parties to the Montreal Protocol.

Congress developed the American Innovation and Manufacturing Act ("AIM Act") to
provide a statutory framework for the phasedown of HFCs in the United States.  This law directs
EPA to phasedown the production and consumption of regulated substances (HFCs) in a
comparable timeframe to that provided by the Kigali Amendment. And we believe that, on the
whole, the Environmental Protection Agency ("EPA") has done a commendable job in
developing a proposed rule within a short period of time given the requirement to both propose
and finalize a rule to phasedown the production and consumption of HFCs in the United States,
using an entirely new allowance allocation and trading program,  within 270 days.

As commendable as EPA's efforts have been to develop and finalize a plan for the
phasedown of HFCs and allocation, Chemours believes that there is room for improvement in the
proposed rule in several areas, most particularly with respect to the core regulations both
defining how allowance amounts will be calculated and how such allowances (which also
compose the compliance system) will be allocated within the United States.  Specifically,
Chemours believes that the proposed rule can be improved and clarified in several areas:

- EPA should use the <u>average of each active party's highest 3 years of EVe weighted
  production and/or consumption (as measured in annual market share) during the years
  2011-2019 as the basis for determining allowance allocations for active producers and
  importers</u> rather than the proposed 2017 to 2019 "highest year" (as measured in EVe
  weighted volume) methodology.  An adjusted average market share using multiple
  data points taken over a longer baseline period would provide for a more equitable

The Chemours Company FC, LLC

distribution of allowances than under EPA's proposal. <u>For avoidance of doubt, Chemours does NOT support a requirement that the highest 3 years must be consecutive.</u>

- EPA should allocate allowances solely to historic producers and importers of HFCs. While EPA has proposed that most allowances would be allocated on this basis, it is also proposing allowance set-asides and other measures affecting allowance allocations that are not specified in the AIM Act.  In addition, EPA should not allocate allowances to entities that did not report prior production and consumption of HFCs despite a legal obligation to do so.

- As EPA has done in all prior phaseouts of class I and class II ozone depleting substances, EPA should allocate allowances for multiple years.  Multi-year allocations are necessary to address commercial realities and enables companies to plan for the acquisition of necessary materials and establish stable supply chains. EPA should also allocate allowances on a company-wide rather than facility-level basis.

- Consistent with legislative intent, EPA should require allowances for *imported products that contain HFCs* as well as for HFCs that are imported in bulk containers. To allow importation of HFC containing products without allowances would create several strong incentives for foreign production to the direct disadvantage and economic injury of U.S. producers and companies engaged in the same business.

- EPA must address any market share that has been gained through unfair trade practices.  As detailed in our comments and an attached report, several importers of HFCs produced in China have used unfair trade practices to penetrate the U.S. market. Obtaining market share through such means should not be further rewarded through the allocation of allowances.

- EPA's proposed "set-aside" pool of allowances is not authorized by the AIM Act and EPA has not articulated a supportable rationale for its creation.  EPA's proposed allowance allocations to "new entrants" is also directly contrary to EPA's 30-year history concerning allowances for the ODS phaseout.

- EPA should follow the prior precedent of the ODS phaseout by not imposing a "confiscatory" transfer tax which was not contemplated when Congress directed that EPA promulgate an allowance allocation and trading program.  Any offsets required for the transfer of allowances should be minimized.

- In lieu of EPA's proposal to require "refillable" cylinders for HFCs, EPA should implement much less expensive and more effective alternatives to counter illegal imports of HFCs into the United States.  EPA's technical analysis has grossly underestimated the costs of this requirement and likely overestimated the emissions reductions that can be achieved by banning non-refillable cylinders.

5

- EPA should clarify provisions with respect to HFC-23 in line with AIM Act requirements and current efforts to destroy, to a very high efficiency, any HFC-23 produced that is not directly utilized in products.

- With respect to EPA's request for comment on methods to implement the AIM Act in 2024 and later years, EPA must recognize that it has only limited, specific authority conveyed by the AIM Act for this purpose. While EPA requests comment on a wide range of alternatives, the AIM Act specifically directs that EPA employ an allowance allocation and trading program.

- Chemours supports many other elements of EPA's proposed rule, including reasonable transparency provisions. In addition, certain proposed elements concerning container heels and the calculation of violations are well-intended but can be improved upon. EPA should also clarify timelines for destruction as well as for the use of an imported feedstock.

- EPA needs to correct several errors contained in its draft regulatory impact assessment ("RIA") and issue a corrected RIA in connection with publication of a final rule.

In summary, Chemours appreciates the considerable effort on the part of EPA that was necessary to proceed with this rulemaking in a timely fashion. But given the importance of this rulemaking to U.S. producers, importers and their customers down the value chain, EPA should take the time necessary to improve upon its initial work-product prior to finalization.

Congress approved the AIM Act to provide for both the phasedown of HFCs in the United States as well as the preservation and enhancement of associated jobs in the United States. EPA should examine all of its proposed allowance provisions to ensure that both objectives are pursued and that the predicted gains in economic activity and employment that were projected for the AIM Act – 150,000 direct and indirect U.S. jobs as well as $38.8 billion in annual economic activity – are fully realized.

Our detailed comments on how such goals may be accomplished follow.

## II.    Chemours Supports a More Inclusive and Fair Approach to Allowance Allocations Utilizing the Years 2011-2019

### A.    EPA Should Use Multiple Market Share Data Points Selected from Full 2011-2019 Production and/or Consumption of HFCs to Allocate Allowances; EPA Should Not Finalize Proposed 2017 to 2019 Allocation Scheme

EPA has proposed using the years 2017 to 2019 for the "initial framework" to determine the amount of allowances to be allocated to active producers and importers, with "active" status defined as companies that had documented HFC production or consumption in 2020.[1] EPA would utilize a company's single highest year of respective production and/or consumption of HFCs on an exchange value ("EVe") weighted basis to determine allowance allocations for

---

[1] 86 Fed. Reg. at 27,170.

The Chemours Company FC, LLC

2022-2023, calculating each producer's and importer's relative production and/or consumption market share.[2]  EPA is also taking comment on utilizing the 2011-2013 for allowance calculations and allocations as well as "some other combination of years, including all years between 2011 and 2019."  In response to this request for comment, Chemours supports EPA's approach of using 2020 production and/or consumption activity as an eligibility criterion for allocation of allowances. However, Chemours supports utilizing respective <u>averages of an entity's highest 3 years of production and/or consumption annual market share during the years 2011-2019 as weighted by EVe as the basis for determining allowance allocations for active producers and importers</u>. Again, f<u>or the avoidance of doubt, Chemours does NOT support a requirement that the highest 3 years must be consecutive.</u> For the reasons outlined below, Chemours believes this allocation methodology is superior to EPA's proposal of a "highest year" 2017-2019 allocation methodology.

> *1. Using Multiple Annual Market Share Data Points over Full Period 2011-2019 in Methodology to Allocate Allowances to Recently Active Producers and Importers is More Representative of the HFC Market*

Using multiple highest years selected from a 9-year period of production and/or consumption would help to obviate any unusual variability in production or import to calculate allowance allocations.  Chemours believes that EPA's main proposal to utilize a party's single highest production and/or consumption year in 2017 to 2019 is seriously flawed in this respect in that the formula would give undue weight to a producer or importer who experienced an unusually high single period of production and/or consumption  during any one of those three years.  Such a single "highest year" of production and/or consumption could be attributable to any number of circumstances including temporary market conditions,  an unusual carryover of production/consumption from one year to the next, or unusually high production or import at the end of one year.  There is no reason to believe that using a party's single "highest year" would assist in transitioning away from the use of HFCs or promoting the environmental goals of the AIM Act.  Rather, EPA's proposed option would essentially "lock in" such temporary variations and thereafter convey a disproportionate benefit or disbenefit.[3]

In contrast, using an average of a party's three highest annual market shares over the years 2011 to 2019 would represent a more statistically stable approach, given the availability of longer stream of production and consumption data, including the AIM Act statutory baseline years of 2011 to 2013, while accounting for market shifts that may have occurred during the longer timeframe.  In Footnote 48 in the Proposed Rule, EPA stated "If EPA finalizes an approach where it uses each company's highest market share instead of highest production and consumption level, the Agency would add up each company's high production and consumption

---

[2] *Id.,* proposed 40 C.F.R. §§84.9, 84.11.  EPA proposes to determine individual allowances by multiplying each entity's percentage of production/consumption with reference to the amount of "general pool" allowances.  *See* §§84.9(a)(4), 84.11(a)(4).  For ease of terminology, these comments refer to this calculation as an entity's "respective" production and consumption.

[3] EPA has included an Advanced Notice Of Proposed Rulemaking in this proposed rule which discusses various theoretical allowance allocation methods that the Agency is considering for use in 2024 and potentially succeeding years.  But by simply taking comment on these concepts, EPA would conceivably remain in position to utilize the 2022-2023 methodology in the future years. Therefore, it cannot be discounted for purposes of this rulemaking that using a highest year methodology for 2017 to 2019 will not convey a lasting benefit or have a lasting effect.  This is certainly with the range of possible long-term outcomes.

The Chemours Company FC, LLC

market share in the relevant years, and divide each company's high production and consumption market share by the total amount to determine what each company's revised market share would be for allowances available in the year." Use of annual market share as described in Footnote 48 instead of raw production and/or consumption data helps to normalize variations in market volume by putting all nine years on an equal footing. This recommended approach thus represents a better "picture" of the U.S. HFC industry as a whole.  EPA cannot assume, and the docket contains no technical information supporting the proposition, that an allocation system based on single data points taken from a shorter period of more recent years is somehow more representative of the *future market* in which allowances will be required to be "held" before production or importation can take place.  Rather, it may be argued that those who have participated in the market for a longer period of time are more likely to participate in the future market given their breadth of experience and capital investment. This is supported by the fact that many of the parties operating in the US market today (or their corporate predecessors) have participated in the previous phasedowns of Class I and Class II ODS. And a longer averaging period helps obviate the possibility that high market participation in just one year will inordinately skew the allocation of allowances among all market participants.

Under Chemours proposed alternative, relative "newcomers" to the production and importation of HFCs could still receive allowances, but they will not receive an outsized share relative to entities that have been producing and importing HFCs over the last decade.  Apart from being a more stable method to allocate allowances, and as outlined in greater detail below, selecting three highest market share data points over the longer 9-year data period thus also promotes fairness among market participants by recognizing the importance of consistency.  In contrast, EPA's stated rationale for using the highest single year "to account for fluctuations in the market" is irrational.[4]  Instead, of accounting for fluctuations (*e.g.*, so that an unusual production/consumption year would not *disadvantage* some entities) EPA's methodology would essentially lock in such market fluctuations and carry a serious risk of "over-rewarding" entities that happened to have an unusually robust production/consumption year in either 2017, 2018 or 2019.

> 2.  Using *Average of Three Highest Market Shares over 2011-2019 Period for Allocation Methodology Promotes Fairness*

Using the average of a party's three highest production and/or consumption market shares over 2011-2019 would provide more stability and predictability to the HFC allowance market than EPA's proposed methodology as well as recognize the sizeable investments that have already been made, and will continue to be necessary, for the development of safe, environmentally-superior alternatives to HFCs.  Specifically, using three highest market shares of 2011-2019 production would recognize that a substantial investment of resources was necessary in earlier years to allow for the transition from HFCs to low GWP HFOs that occurred in the latter half of the 2011-19 period.  This transition would not have occurred except with the direct support of some producers.  These investments have paid off environmentally, resulting for example in a transition from HFC-134a to HFO-1234yf in motor vehicle air conditioning ("MVAC") systems.

---

[4] 86 Fed. Reg. 27,170.

The Chemours Company FC, LLC

In contrast, the proposed approach of using the highest production or consumption occurring in 2017-2019 would actually *penalize* producers that took pre-2017 action to reduce a major end use of HFCs for MVAC systems and to obtain necessary certifications and regulatory approvals for other HFC substitutes. These companies would be penalized solely because they developed and marketed substitutes for HFCs prior to 2017 and thus may have produced or imported lesser amounts of HFCs in 2017 to 2019. But it is just such investments – which exceed $1 billion to date -- that have made the AIM Act's phasedown of HFCs technically and economically feasible in the United States, as well as assisting in the global transition away from HFCs. In addition, domestic producers rationalized high GWP assets and production capability in order to advance lower GWP facilities that offer long-term climate benefits. As a result, these producers reduced $CO_2$ equivalent emissions in advance of EPA's proposed rulemaking.

Over many years and at considerable expense, Chemours developed Opteon$^{TM}$ low global warming refrigerants and foam blowing agents, including HFO-1234yf to replace HFC-134a in automotive air conditioning systems, a major category of existing HFC use. Chemours also developed Opteon$^{TM}$ XP10 as a HFC-134a replacement in stationary equipment, Opteon$^{TM}$ XP40 as a R-404A/R507 and R22 replacement, Opteon$^{TM}$ XP44 for refrigerated transport and other low discharge temperature uses, Opteon$^{TM}$ XL41 as a R-410A replacement, Opteon$^{TM}$ XP30 for low-pressure chillers, and Opteon™ 1100 for foam insulation. These products were developed both in response to and in support of efforts to reduce production and use of HFCs and the necessary financial commitments to develop these environmentally superior productions were made well in advance of Congressional approval of the AIM Act. But taken together, along with similar efforts by other U.S. manufacturers, these new lower GWP products will be essential in allowing a transition away from the continued use of HFCs, which themselves represented a transition from substances with high ozone depletion potential.

Ironically, using data from just the 2017 to 2019 time period could correspondingly *reward* entities that took little or no action to transition away from HFCs over the last decade. The allocation methodology proposed by EPA would grant relatively more allowances to entities that in recent years either continued production and consumption of high GWP HFCs or just recently engaged in such activity, perhaps for as little as one year. Using 2017 – 2019 as the basis for allocation, importers using foreign sourced HFCs would gain an advantage under EPA's proposed allowance methodology despite not having made any significant investment to support a transition to lower climate impacting solutions. In contrast, using the average of a party's three highest production and/or consumption market shares during 2011-2019 as outlined above would recognize all entities that actively participated in the HFC market, including more recent participants, but it would help avoid this counter-intuitive result of rewarding market participants who didn't make the investment to move to lower climate impacting options.

B.    Allocation of Allowances Based on Historic Production and Consumption is Consistent with Legislative Intent

The allocation of allowances to historic producers and importers has a "proven track record" and would provide for an orderly phasedown of HFCs, similar to that experienced in the phasedown periods for ozone depleting substances ("ODS"). Allocation of allowances to historic producers and importers is also supported by the 30-year history of EPA's stratospheric

ozone program which has always allocated allowances in this manner. In regulations phasing out class I and class II ODS, EPA relied on information provided by companies which historically manufactured and imported regulated substances and allocated allowances on the basis of this information. Congress openly and deliberately intended a similar outcome in enacting the AIM Act. During consideration of the legislation, multiple statements from numerous parties involved in the development of the AIM Act attested to intent:

- "This legislation is modeled on Title VI of the Clean Air Act, which was enacted in 1990 with 401 bipartisan votes in the House and proved an able vehicle to foster an orderly, market-based phase down of HFCs' predecessors."[5]

- "These provisions are modeled on and integrated with the current Clean Air Act requirements applicable to this industry."[6]

- "The legislation is based substantially on existing EPA programs that allowed for orderly transitions from earlier generations of refrigerants in ways that protected the environment while supporting American-based companies' market objectives."[7]

The AIM Act provides for a graduated phase-down in the production and consumption of HFCs in the United States that will continue until 2036, when an 85% phasedown is specified.[8] In both form, substance and intent, the legislation is modeled on Title VI of the Clean Air Act. 42 U.S.C. §7671. The AIM Act "mimics" this statutory structure, including using some of the same terminology that is used in various provisions of Title VI. The fact that the AIM Act focuses exclusively on obtaining reductions of HFCs (which do not contribute to ozone depletion) as opposed to other controlled substances (known as class I and class II substances within Title VI that have the potential to deplete the stratospheric ozone layer) does not obviate this parallel statutory construction.

Specifically, the AIM Act incorporates provisions which are directly parallel to those contained in Title VI of the Act. These provisions include the use of similar definitions to Title VI in the AIM Act to govern the HFC phasedown (CAA section 601),[9] require monitoring and reporting of controlled substances (CAA section 602),[10] to provide for graduated phasedown schedules (CAA sections 604 and 605)[11] authorize exchange of allowances (CAA section 607)[12] provide for essential uses (CAA section 604(d))[13] and inclusion of a provision allowing EPA to accelerate the statutory phasedown schedule (CAA section 606).[14] This legislative structure was

---

[5] Hearing on H.R. 5544, Subcommittee on Environment and Climate Change, Energy and Commerce Committee, January 14, 2020, Opening Statement of Chairman Paul D. Tonko at 2.
[6] *Id., Testimony of David D. Doniger, Natural Resources Defense Council at 3*
[7] *Id*., Testimony of John Gaylen, Chairman, Board of Directors, Air-Conditioning, Heating, and Refrigeration Institute (AHRI) at 9.
[8] Section 103(e)(2) of Consolidated Appropriations Act, 2021, Pub. L 116-260.
[9] Consolidated Appropriations Act, 2021, Sec. 103(b).
[10] *Id*., Sec. 103(d).
[11] *Id.,* Sec. 103(e)
[12] *Id*., Sec. 103(g).
[13] *Id*., Sec. 103(e)(4).
[14] *Id*., Sec. 103(f).

deliberate as evidenced by Congressional statements prior to enactment,[15] as well as various facets of the legislation, including use of the same sequencing as parallel Title VI provisions.

The integration of the AIM Act with Title VI is also evident in a provision that requires enforcement, information, citizen suit and administrative law provisions of the CAA to apply to the implementation of the legislation.[16] This provision cross references CAA sections 113, 114, 304 and 307 and provides that such sections of the CAA "*shall apply* to [Sec. 103] and any rule, rulemaking, or regulation promulgated by the Administrator pursuant to [Sec. 103] as though this section were expressly included in Title VI of [the CAA]."[17] One consequence of this legislative structure is that the procedural requirements of the CAA in terms of public notice and comment,[18] the content of proposed rules,[19] venue and deadlines for judicial review[20] apply to rules promulgated pursuant to the AIM Act.

Finally, the AIM Act was intended to promote domestic production and investment. While titles may not be considered dispositive of intent, H.R. 5544 and S. 2657 as introduced and section 103 of H.R. 113 as approved by Congress were all entitled the "American Innovation and Manufacturing Act" for a reason. As explained by the legislation's prime sponsor in the U.S. House of Representatives and Chairman of the House subcommittee of jurisdiction:

> United States manufacturers are already investing billions of dollars in the research and development of new products and equipment to maintain their competitiveness. In fact, American companies are global leaders in the development of HFC substitutes. One such class of substitutes are known as HFOs. HFOs are more environmentally friendly. But even more importantly, American manufacturers stand to gain the most in the global marketplace by leaning into this transition.
>
> According to a study by the Interindustry Forecasting at the University of Maryland, the HFC phase-down will drive the creation of some 33,000 new United States manufacturing jobs, $12.5 billion more in direct manufacturing output annually, a significant trade balance improvement in equipment and chemicals, and a 25 percent growth of the U.S. share of the global export market.[21]

EPA's stated rationale for its allowance allocation methodology – to account for "fluctuations in the market" – does nothing to account for this underlying legislative intent that the AIM Act serves to advance U.S. manufacturing jobs and improve the U.S. balance in trade. EPA should therefore adopt an alternative allowance methodology, such as that proposed by Chemours, which would better address this statutory purpose by recognizing long-term commitments to the market for

---

[15] *See* n's. 5-7, *supra*.

[16] *Id.*, Sec. 103(k).

[17] *Id.*, Sec. 103(k)(1)(C) (emphasis added).

[18] *See* 42 U.S.C. §7607(d)(2)-(6), (h).

[19] *Id.*, §7607(d)(3).

[20] *Id.*, §7607(b).

[21] Opening remarks of Chairman Paul Tonko, Promoting American Innovation and Jobs: Legislation to Phase Down Hydrofluorocarbons, January 13, 2020, House Energy and Commerce Committee, Subcommittee on Environment and Climate Change, transcript at 2.

The Chemours Company FC, LLC

HFCs and HFC substitutes rather than more recent import activity to the primary benefit of foreign producers.

C.      Allocation of Allowances to Historic Producers and Importers is Consistent with EPA's Prior Implementation of Clean Air Act Title VI

Just as Title VI of the CAA provides for the phase-out of class I and class II substances[22] by concentrating on the production and consumption (import) of these regulated substances, the AIM Act similarly phases down the production (and importation) of HFCs into the United States.[23] As noted above, the provisions of the AIM Act regarding HFCs were based on comparable provisions in Title VI of the CAA. Therefore, the AIM Act is best interpreted as phasing down HFCs using an allowance allocation system that is consistent with regulations promulgated by EPA for the phase-out of class I and class II ODS, subject to certain exceptions, just as Title VI provided for a phaseout of class I and class II ODS, subject to certain exceptions.[24]

In this regard, Title VI required EPA to promulgate regulations to "phase out the production" of class I and class II ODS and to "ensure" that the consumption of these substances was phased out "in accordance with the same schedule."[25] EPA regulations to implement these provisions used data obtained from companies that produced and imported class I substances during baseline year(s) and allocated allowances on the same basis.[26] EPA also utilized this methodology with respect to the phaseout of class II HCFCs. EPA regulations promulgated a decade after the first class I regulations apportioned baseline production and consumption allowances to individual companies based on historical production and consumption of class II substances.[27] EPA has not deviated from this approach in nearly three decades. The most recent rule governing the HCFC phaseout continues to allocate allowances to those who historically produced and imported these substances.[28]

The AIM Act contains a similar directive to that contained in CAA Title VI. The EPA Administrator must "ensure that the annual quantity of all regulated substances produced or

---

[22] Class I substances include CFCs, halons, carbon tetrachloride and methyl chloroform; class II substances consist of HCFCs.

[23] It should be noted that the difference between the "phaseout" provided in Title VI and the "phasedown" as provided in the AIM Act may not actually constitute a difference in the longer term. Several provisions of the AIM Act provide mechanisms to accelerate the phasedown and EPA is authorized to determine whether a "technical transition" is warranted for regulated substances used in a sector or subsector. *See* AIM Act, section 103(i). Thus, EPA's attempt to implement the AIM Act differently from Title VI on this basis (*see* Section VI of these comments below regarding the proposed set aside pool) lacks statutory support. (*See* 86 Fed. Reg. at 27,176 claiming "it may be appropriate to continue to facilitate participation of new market entrants" on the basis of the difference between a "phaseout" and a "phasedown.") In the proposed rule, EPA has not disclaimed authority to utilize the AIM Act to accelerate the phasedown, nor disclaimed any ability to restrict end use of HFCs even to the extent of a 100% or near 100% phaseout. EPA, therefore, cannot claim to derive any authority based on the supposed differential between a "phaseout" in Title VI and "phasedown" in the AIM Act.

[24] See, for example, exceptions for medical devices, aviation safety, sanitation and food protection and critical uses. CAA §§ 604(d)(1)-(6), 42 U.S.C. § 7671c(d)(1)-(6).

[25] CAA §§ 604(c), 605(c), 42 U.S.C. §§ 7671c(c), 7671d(c).

[26] *See* 57 Fed. Reg. 33,754, 33,761-63 (July 30, 1992), 58 Fed. Reg. 65,018, 65,065-68 (Dec. 10, 1993).

[27] *See* 68 Fed. Reg. 2,851-3 (Jan. 21, 2003).

[28] 85 Fed. Reg. 15,258 (Mar. 17, 2020)); 40 C.F.R. §82.16 (a)(1), Tables 1 and 2.

consumed in the United States" does not exceed an amount calculated from "the production baseline" and "the consumption baseline" and the required percentage reduction in HFCs for a specified year.[29] Thus, EPA should adopt the same approach for allocating allowances to implement the HFC phase-down as it did with respect to the class I and class II ODS phase-out. This perspective is further strengthened by observing that the overall limit for production and importation of HFCs in the AIM Act is, in part, tied to the historical production and consumption of the *same substances* regulated under Title VI, *i.e.*, CFCs and HCFCs.[30]

The other element used in the AIM Act to calculate production and consumption baselines (which form the basis for calculating the available HFC allowances each year) is the prior production and consumption of HFCs from January 1, 2011 to December 31, 2013.[31] Therefore, the logic for allocating allowances based on this prior production and consumption points in the same direction as that for class I and class II allowances and allowances based on prior CFC and HCFC production and consumption. Allowances should be distributed to those who engaged in this prior production and consumption. This interpretation is further buttressed by the fact that language allocating allowances (AIM Act, sec. 103(e)(1)(D)) is contained within the same subsection as provisions providing for the use of historical CFC and HCFC production and consumption data in calculating baseline amounts.

In earlier transitions away from the use of CFCs and HCFCs, companies that previously produced regulated substances were considered to be the most impacted by the mandatory phasedown and eventual phase-out of their product lines. In order to reduce the production, import and use of these chemicals, EPA obtained information from companies concerning their prior production, import and export of regulated substances and used this data to calculate companies' baseline production and consumption allowances.[32] The phase-down and ultimate phase-out of class I and class II substances occurred through EPA applying a declining percentage of individual company baselines to the allocation of allowances that were necessary for further production and import.[33] As referenced above, EPA also adopted the same approach with regard to the phase-out of class II substances despite differences in the statutory language applying to these substances.[34] EPA regulations provided that "[e]very person apportioned baseline production allowances for class I controlled substances under 82.5(a) through (e) is also granted potential production allowances for [class II substances]."[35] In other words, class II

---

[29] Sec. 103(e)(2)(B). The applicable percentage for years 2020-2036 and thereafter is contained in a table. Sec. 103(e)(2)(C).

[30] *See* Sec. 103(e)(1)(B)(ii), (C)(ii).

[31] AIM Act, Sec. 103(e)(1)(B)(i), (C)(i).

[32] *See* 57 Fed. Reg. 33,574 (July 30, 1992).

[33] As explained in more detail in the final 1992 rule, "EPA obtained information on the documentation of companies' 1989 production, import, and export of [Class I substances] through a request issued under section 114 of the Act . . . Based on this information [with certain adjustments] the Agency calculated companies' baseline production and consumption allowances for the groups of newly regulated chemicals specified by section 602 (i.e., Group III—the newly regulated CFCs; Group IV – carbon tetrachloride; and Group V—methyl chloroform)." *Id.* at 33,781.

[34] For example, EPA was directed only to promulgate regulations to phase out production and consumption of class I substances (CAA §604(c)) versus regulations phasing out the production and consumption as well as "restricting the use" of class II substances (CAA §605(c)).

[35] 548 Fed. Reg. 65,068 (Dec. 10, 1993); 40 C.F.R. §82.9(a).

allowances were granted based on percentages of allowances apportioned under class I apportionments.

EPA has described this allocation system as one that facilitates "an orderly phase-out"[36] There are good reasons for this assessment. Allowances, based on historical information, inform both regulated parties and the market precisely what quantities of regulated substances can be produced and when. Given that allocation rules often span several years duration, maintaining this allocation methodology over time provides stability and predictability. Companies involved in the production and importation of regulated substances are given both information needed for production and supply chain planning and clear advance notice as to when new alternatives will need to be developed and brought to market. Thus, continuing this procedure both duplicates the past success of the stratospheric ozone program and recognizes the large investments that producers and importers have already made, and will need to make, in producing acceptable HFC substitutes. Conversely, there is no statutory directive in the AIM Act for EPA to utilize a different allowance allocation system and EPA should not attempt to "re-invent the wheel" when the Act clearly directs the Agency to follow the past pattern and practice regarding allowance allocations.

## III.    EPA Must Take Several Steps to Ensure Allowance Baseline Calculations Conform to the AIM Act and Promote U.S. Manufacturing

### A.    EPA Must Use 2011-2013 for Production and Consumption Baselines

EPA has proposed to use the 2011-2013 period for the calculation of HFC production and consumption baselines.[37] EPA has not, however, incorporated these statutory periods into the proposed regulations in 40 C.F.R. Part 84. EPA's proposed regulatory text uses a calculated amount of 375 MMTEVe and 299 MMTEVe for production and consumption baselines, respectively.[38] Rather than provide static numbers alone which cannot be independently verified by commenters, EPA should include regulatory text which incorporates the statutory baselines provided in the AIM Act. This is needed since EPA warns that "[o]nce established through the final rule, EPA does not intend to amend the baseline."[39]

The use of the 2011-2013 period for the calculation of HFC baselines is explicitly required by the AIM Act.[40] Therefore, any final regulations establishing specific amounts of the baselines must conform to this statutory mandate (as well as the statutory periods for HCFCs and CFCs). The AIM Act defines both the production and consumption HFC baselines with reference to these dates, but further references this period with regard to exchange values,[41] compliance provisions[42] and the quantity of allowances calculated under AIM Act.[43] In other

---

[36] 84 Fed. Reg. 41,510, 41513 (Aug 14, 2019).

[37] 86 Fed. Reg. at 27,166, Table 4.

[38] See Proposed 40 C.F.R. § 84.7(a)-(b).

[39] *Id.* at 27,166.

[40] AIM Act, section 103(e)(1)(B)(i)(I)-(II), (e)(1)(C)(i)(I)-(II).

[41] AIM Act, section 103(e)(1)(D), cross-referencing subparagraphs (B) and (C), cited *infra*.

[42] AIM Act, section 103(e)(2)(B).

[43] AIM Act, section 103(e)(2)(D), referencing section 103(e)(2)(B).

The Chemours Company FC, LLC

words, the statute is clear on its face that the HFC production and consumption baselines used for the phasedown of HFCs must use HFC production and consumption within 2011-2013.

Use of historical baselines is also consistent with prior phaseout of ozone depleting substances under Title VI of the Clean Air Act which, in all instances, used historical production and consumption in order to calculate the amount of available allowances during years in which the production and consumption of class I and class II substances was controlled.[44] And, as noted elsewhere in these comments, the AIM Act was intentionally drafted to follow provisions of Title VI, thus providing further statutory evidence of Congressional intent on how allowances should be calculated and allocated.

> B.    Entities That Did Not Report Production and Consumption of Fluorinated GHGs Despite Legal Obligation to Do So Should Not Receive Allowances.

Companies have been required to report production and importation over 25,000 metric tons of carbon dioxide equivalent since 2010.  40 C.F.R. Part 98, Subpart OO.  These requirements were contemporaneous with the 2011-2013 baseline period and included QA/QC requirements related to the data.  Therefore, in an instance where an entity did not report production or importation of HFCs despite legal requirements to do so, EPA should not accept any "after the fact" calculations for the purpose of receiving allowance allocations.  Apart from any considerations concerning non-contemporaneous data calculations, EPA should not reward non-compliance with allowance allocations in 2022-2023 or subsequent years.

EPA promulgated a final rule to establish the first 30 subparts of 40 C.F.R. Part 98 in 2009.[45]  Since that time, EPA has taken 33 separate actions to promulgate rules or provide other regulatory notices.[46]  EPA also maintains a website regarding greenhouse gas reporting requirements.[47]  This website contains the most recent verified reported data.  Thus, over the last decade, there has been more than adequate notice to those who may be required to report GHG emissions of the extent of those requirements and the means by which such emissions should be reported to the EPA.  If EPA has determined that data reported under Subpart OO is the most reliable data on which to base a portion of the required allowance allocations, it should not allow for exceptions for those who were required to report, but didn't, even if such late reporting could be subject to enforcement actions.[48]

> C.    EPA Should Allocate Allowances for More Than One Year

> > 1.    Consistent with Title VI of the CAA, the AIM Act Allows for Multi-Year Allowances and EPA Should Similarly Provide Multiyear HFC Allowances

Section 103(e)(2)(D)(i) of the AIM Act requires EPA to use the total quantity of allowances calculated for a year to determine the quantity of allowances that may be used in a

---

[44] As noted in VI.B, even where HCFC allowances were allocated to "new entrants" such allowances were calculated based on historical information.

[45] 74 Fed. Reg. 56,260 (Oct. 30, 2009).

[46] See https://www.epa.gov/ghgreporting/rulemaking-notices-ghg-reporting

[47] https://www.epa.gov/ghgreporting.

[48] Elsewhere in the proposed rule, EPA indicates that if a producer fails to keep records on production or fails to submit reports, the producer could be subject an enforcement action. 86 Fed. Reg. 27,194.

year "not later than October 1" of the preceding calendar year. EPA may also promulgate an accelerated schedule for the phaseout of HFCs pursuant to Sec. 103(f) that is not lower than allowances used during the prior year. Thus, except for years in which the EPA newly accelerates the phasedown of HFCs imposing a lower level of allowances than specified under the formula contained in section 103(e)(2)(C), there is no statutory difficulty to the allocation of allowances for more than one year. EPA must only determine the amount of allowances by October 1st of the year prior to the last year for which multi-year allowance allocations would apply. EPA has acknowledged this aspect of the AIM Act:

> The EPA Administrator would bear responsibility for allocating allowances either on an annual or multiyear basis, following a phase-down schedule for production and consumption.[49]

EPA has also noted that there are strong similarities in how the AIM Act would be implemented to Title VI:

> Mr. Tonko . . . And how does the regulatory program that this legislation creates compare to existing programs under Title VI of the Clean Air Act.

> Ms. Newberg. There are many similarities between what is in this bill [legislation that became the AIM Act] and what is in the current Title VI Clean Air Act and how we implement that in the domestic program. There are a few differences between the two, but these are relatively provisions that are more niche. And most of the main components, particularly the phase-down is very similar.

> Mr. Tonko. Thank you. And do you foresee EPA implementing a program that phases down HFCs in a substantially similar manner as to how CFCs and HCFCs were addressed?

> Ms. Newberg. I can speak to what is in this bill, and if we were to implement something that was based on this bill, then there is certainly a likelihood that we would do so in a similar manner.[50]

Given the strong parallels between the statutory provisions of the AIM Act and CAA Title VI and EPA's previous implementation of allowance systems for both CFCs and HCFCs, EPA should interpret the AIM Act to require multiyear allowances where feasible. Multiyear allowances have provided regulatory stability in implementation of the phasedown and phaseout of various ODS and EPA has not provided any rationale for deviating from this past interpretation of its authority and past practice with regard to implementing the AIM Act. This is particularly true given that, if implemented on an annual basis, producers and importers would be given only 3 months advance notice of allocation amounts for the upcoming year, presuming that

---

[49] Testimony of Cynthia Newberg, U.S. EPA Office of Stratospheric Ozone, House Energy & Commerce Subcommittee hearing on AIM Act at 21, cited *infra*, n.51.
[50] *Id*. at 22-23, Ms. Newberg responding to questions from Representative Tonko, lead sponsor of H.R. 5544, introduced in House of Representatives on January 7, 2020.

The Chemours Company FC, LLC

EPA could ensure Federal Register publication of a rule on or before October 1st of the prior year pursuant to AIM Act section 103(e)(2)(D). While 2022 allowance allocations may prove to be an anomaly by necessity (given the need to promulgate this rule within 270 days of enactment) there is no reason why EPA could not promulgate multiyear allowances consistent with the statutory step-down periods provided.[51]

### 2. EPA Previously Granted Multiyear Allowances and Should Similarly Provide for Multiple Year Allowances Under the AIM Act

Since the inception of the phaseout of ODS under CAA Title VI, EPA has recognized the value in allocating allowances for multiyear periods. As indicated by EPA in 1999:

> For class I substances, a quantity of allowances was allocated to listed companies as a baseline in the Federal Register. Allocating allowances for the full time period until a particular phaseout date provides certainty and stability for the market. Assuming the regulatory program includes smooth procedures for trading allowances, the full-term allocation of allowances establishes the basis for a 'marketable permit' system.[52]

In the phaseout of HCFCs, EPA provided annual allowances covering all years included within specified "step down" periods.[53] These phasedown periods included periods from 2010 through 2014, 2015 to 2020 and 2020 to 2029. In the latest HCFC allocation rule, EPA allocated production and consumption allowances for all years 2020 to 2029, or *a full 10 years*.[54] As per the Agency's own observations above, EPA should similarly specify annual allowances that should be available during the full AIM Act step down periods in order to promote stability and allow for efficient business planning and the associated allocation of resources.

From a practical standpoint, timeframes longer than one year – or even 3 months[55] should EPA provide the minimum notice permitted under the AIM Act to allocate allowances for an upcoming compliance year – are needed to address real world commercial realities. Producers need to be able to plan for the acquisition of production and packaging materials well ahead of the time that they will be needed. Producers also need to schedule production runs and equipment maintenance in advance and "firm up" necessary supply chains that support production. Multiyear contracts are often used for raw materials and sales commitments. Not knowing the amount of allowances that one will receive for upcoming years (absent efforts to accelerate the transition through additional rulemaking) both inhibits planning and the "smooth

---

[51] EPA has noted within the proposed rule that allowances may be later revoked or reduced and thus would have the ability to later reduce allocations due to any mistake in the initial allocation or with regard to an acceleration of the schedule pursuant to section 103(f).

[52] 64 Fed. Reg. at 16,377 (April 5, 1999).

[53] *See, e.g.,* 74 Fed. Reg. 66,412 (Dec. 15, 2009). In this rule, allowances were allocated for the production and consumption of HCFC-22 and HCFC-142b as well as other HCFCs for which allowances were not previously allocated. Allowance allocations covered all control periods (years) between and including 2010 to 2014, or a full 5 years.

[54] 85 Fed. Reg. 15,258 (Mar. 17, 2020).

[55] AIM Act, section 103(e)(2)(D)

transition" to alternatives that was contemplated through enactment of the AIM Act given prior experience with the Title VI ODS transition.

In addition, EPA should also allocate multiyear allowances to avoid possible disruption to the HFC phasedown should EPA fail to allocate allowances by October of the prior year. Practically speaking, while subject to a statutory mandate to "determine the quantity of allowances for the production and consumption of regulated substances that may be used in the following calendar year"[56] it may be reasonable to assume that EPA may not always complete an annual rulemaking process on time. For example, while EPA is required to promulgate annual rules for the Renewable Fuel Standard ("RFS") pursuant to CAA section 211(o), these annual rules have been chronically late and, in some cases, issued well after the beginning of compliance years.[57] To guard against this possible outcome – and the resulting disruption to the U.S. market – EPA should promulgate rules well in advance that cover multiple years covering at least the time periods covered by the statutory phasedowns – 2020-2023, 2024-2028, 2029-2033 and 2034-2035. As noted above, EPA can both allocate allowances for multiple years and avoid unintended results based on the AIM Act's specification that allowances provide a "limited authorization" for the production and consumption of a regulated substance.[58]

D.    EPA Should Allocate All Allowances at Company, Rather than Facility Level

EPA has historically apportioned baseline production and consumption allowances for class I and class II controlled substances at a company level. *See* 40 C.F.R. §§82.5, 82.17. There is nothing in the AIM Act which would support deviating from this past practice. Rather, as cited above, both the AIM Act as constructed (using parallel provisions to title VI of the CAA) and legislative history would dictate the conclusion that EPA follow a similar methodology of allowance allocations at the company level.

In addition, as a matter of overall policy, United States producers and importers require flexibility to address allowances from a corporate, rather than facility level. This becomes increasingly important as EPA implements the statutory phasedown provided by the AIM Act to realize lower levels of allowed production and consumption. Companies need the ability to efficiently plan for this transition by considering all manufacturing facilities and their relative capital needs over time.

Allocation of allowances at a facility level would also put an unnecessary additional burden on the process of allocation and transferring allowances among facilities that are operating within one corporate entity. It is likely that some consolidation of production will occur as production allowances are phased down since chemical plants cannot be run cost effectively at low capacity utilization given high fixed costs and other factors. Therefore, allocation at the facility level could result in the need for additional transfer of allowances

---

[56] AIM Act, section 103(e)(2)(D).

[57] For example, EPA did not promulgate RFS standards for 2014 and 2015 until December 2015 and, to date, has not proposed an RFS standard to cover the 2021 control period. To guard against this possible outcome – and resulting disruption to the U.S. market – EPA should promulgate rules well in advance that cover multiple years covering at least the time periods covered by the statutory phasedowns – 2020-2023, 2024-2028, 2029-2033 and 2034-2035.

[58] AIM Act, section 103(e)(2)(D)(ii).

between facilities, creating inefficiency and raising overall costs depending on the level of the required offset. It would also needlessly complicate and expand required reporting versus the time-proven company reporting process that has been effective during the phaseouts of class I and class II ODS.

Finally, over the 16-year phasedown schedule provided by the AIM Act, companies will need to adjust their internal allocation of allowances in order to meet market needs. In 2021, it is simply not possible to project with absolute accuracy what mix of products will be needed in 2030 or 2036. In any one year, the need for allowances also might shift if there is either a planned or unplanned production outage at a particular facility. Since EPA already receives facility-level information on production through requirements imposed by the GHGRP there is no programmatic need on the part of EPA for facility-level information on HFC-production under AIM Act regulations. Thus, EPA should implement a similar company-level allocation of allowances under the AIM Act as it has successfully used in the class I and class II ODS programs.

## IV.     EPA Should Require Allowances for Imported Products Containing HFCs

### A.     The Requirement for Consumption Allowances Should Not be Limited to Bulk Substances

EPA proposes to require allowances only for consumption of "bulk substances" and to exclude from the consumption baseline HFCs that are contained in a product.[59] EPA is also proposing to define "bulk" as "a regulated substance of any amount that is in a container for the transportation or storage of that substance such as cylinders, drums, ISO tanks and small cans."[60] Thus, HFCs that are imported into the United States in anything other than a bulk container as defined above would not require that an importer hold a contemporaneous consumption allowance.

This treatment of consumption allowances is in stark contrast to EPA's treatment of HFC production allowances whereby production effectively includes *all HFC produced* that is not destroyed except for the "inadvertent or coincidental creation of *insignificant quantities* of a regulated substance."[61] This means that HFC-containing products imported into the United States *won't require* allowances, but HFCs produced in the United States and then incorporated into U.S. products containing HFCs *will require* the expenditure of allowances. This is both illogical and inapposite to the AIM Act's explicit intent to promote domestic manufacturing. It creates an uneven playing field between U.S. produced and foreign produced products and actually serves to increase incentives for foreign production of HFC-based products. Further, allowing import of HFC-containing products with no regulatory limits or requirement of allowances could serve to undermine the phasedown goals by allowing imports of such goods to *increase* over the period of regulation unless specifically addressed by sector controls.

It also may be considered arbitrary and capricious for EPA to finalize such a disparate treatment of regulated substances given that EPA's rationale for its proposed regulations for

---

[59] 86 Fed. Reg. at 27,163; proposed 40 C.F.R. §84.5(b).
[60] Proposed 40 C.F.R. §84.3.
[61] *Id.*

consumption versus production allowances is sorely lacking.  In justification of this differential treatment, EPA indicates that it does not have data on HFCs contained in products during the baseline period and that it would be "administratively infeasible" to collect the data now.[62]  EPA also indicates that requiring a different mechanism for the HFC phasedown "could create confusion and would likely cause disruption within the imported products market."[63]

But EPA should have reasonably accessible data.  EPA's GHG Inventory Report Section 4.24 shows for the years 2011-19 data in Table 4-103 for the category "HFCs in Products and Foams."  It is not clear why such data would not be a sufficient basis for determining the overall amount of allowances and if there were issues concerning how individual companies were represented within the data, this could be addressed through requests and/or demands for additional information.  In other words, just as EPA has requested data from other companies in order to implement provisions of the AIM Act, the Agency could request such data or even invite companies to supply such data during the course of this rulemaking.

With regard to the inclusion of CFCs and HCFCs within baseline calculations, companies could also provide information related to when their import activity started and whether they used CFCs or HCFCs in these imports.[64]  In any event, in all likelihood, 1989 import activity in this category was likely extremely low since most import activity of foams and HVACR equipment started well after 1989.  Specifically, 2011-2013 reported data concerning GHGs in the "HFCs in Products and Foams" comprised 5.3% of the "Reported Net Supply (GHGRP)" total.  At a minimum, rather than provide a carte blanche exemption for HFCs contained in products, EPA should pursue realistic avenues to obtain the necessary information and require, as part of this rulemaking, future reporting and allowance holding requirements for importers of products containing HFCs.

There is also evidence that since 2011-2013 there has been an increasing trend to manufacture products containing HFCs outside the U.S. thus replacing what were once domestic sales and imports of bulk HFCs with products being manufactured outside the U.S. and then imported as products containing HFCs into the U.S. As noted above, GHG Inventory reporting data in Table 4-103 showed 5.3% of the 2011-2013 GHG Inventory in "HFCs in Products and

---

[62] 86 Fed. Reg. at 27,164.  EPA's GHG Inventory Report Section 4.24 shows 2011-19 data in Table 4-103 for the category "HFCs in Products and Foams."  It is unclear why EPA may consider this data to be insufficient as a basis for determining allowances.  One possibility would be that the companies included in this category could provide general information related to when their import activity started and whether they used CFCs or HCFCs in these imports.  Objectively, 1989 import activity in this category was likely extremely low since most import activity of foams and HVACR equipment started well after 1989.  And in 2011-2013 reported GHG in the "HFCs in Products and Foams" comprised 5.3% of the "Reported Net Supply (GHGRP)" total.  EPA should consider the feasibility of this type of approach on allocations.

[63] Id. at 27, 163.

[64] Since EPA has claimed it has insufficient information on 1989 activity to set a baseline, we suggest that EPA use the same CFC and HCFC factor derived from manufacturer and importer data to apply to the 2011-13 baseline for "HFCs in Products and Foam." Allowances for "HFCs in Products and Foam" could then be granted to parties that reported from 2011-19 using the same allowance scheme that will be used for manufacturers and importers.

The Chemours Company FC, LLC

Foams" with this figure nearly doubling to 9.8% of the 2017-2019 total.  Without regulatory coverage, this documented, increasing trend in imports could very well continue or expand.

In this regard, incentives exist for certain Article 5 (developing countries) to do just that.  Pursuant to the Kigali Amendment, Article V Group 1 countries are allowed their average HFC production for 2020 to 2022 and Article V Group 2 countries are allowed average 2024-2026 production, meaning that during the time period in which this final rule will be in effect, there is an incentive for some countries to "build their HFC baseline" from which phasedown requirements will later be imposed.  EPA should not add to these existing incentives by allowing for the importation of such production without limitation based solely on the fact that such HFC production would be contained within products shipped to the United States versus bulk containers. Quite simply, the environment will not distinguish as between any eventual releases of HFCs that occur as a result of HFCs in bulk containers or end products.

B.    EPA Can Obtain Data for Current Imports of Products Containing HFCs

EPA access and use of historical data for calculation of baselines and distribution of allowances may be distinguished from the requirement for possessing allowances to address consumption (import) of products containing HFCs.  While as outlined above in Section III of these comments, the calculation of baselines is directed by statute, in terms of the latter requirement to hold allowances to "cover" HFCs contained in products, EPA need only have a reasonable basis to do so, whether or not the HFC contained in the product is used in a blend or not.[65]  Under the AIM Act, "[n]o person shall . . . consume a quantity of a regulated substance without a corresponding quantity of consumption allowances."[66]

In terms of its legal authority to implement a requirement to hold allowances for HFCs contained in products, EPA may require such allowances in order to meet the phasedown schedules required in the AIM Act which EPA seeks to implement, in part, pursuant to its proposed regulatory language in §84.5(a).  EPA has already proposed that "no person may import bulk regulated substances except . . . by expending, at the time of the import, consumption or application-specific allowances . . ."[67]  Thus, the availability of historical data (EPA's rationale for not requiring consumption allowances be expended for HFCs contained in products) is not determinative of an ability to require allowances for HFCs contained within a product as reflected by EPA's own proposed regulatory language.  Under EPA's proposed regulations, the prohibition is applied prospectively to importations of HFCs that occur during future control periods and this provision does not provide for an exception whereby a person unable to obtain consumption allowances is exempted from compliance.  Therefore, EPA could easily amend the current proposed regulatory language in §84.5 to also limit importation of HFCs in products without expending an allowance:

"(b) Effective January 1, 2022, (1) No person may import bulk regulated substances or regulated substances contained in manufactured products except: (i) By expending, at the time of import, consumption or application-specific

---

[65] Pursuant to AIM Act, section 103(c)(3), EPA retains authority to regulated an HFC within a blend, while it cannot designate a blend as a regulated substance.

[66] AIM Act, section 103(e)(2)(ii).

[67] Proposed 40 C.F.R. §84.5(b).

allowances in a quantity equal to the exchange-value weighted equivalent of the regulated substance imported."

In terms of EPA's ability to obtain necessary information to implement such a requirement, the AIM Act expressly cross-references EPA's authority to demand the provision of information pursuant to authority contained in Section 114 of the Clean Air Act. Thus, EPA has authority to both collect any information that may be needed to implement a prohibition on the importation of HFCs in products and authority to implement this requirement through regulation. Alternatively, EPA could consider implementing a requirement to hold consumption allowances for HFCs contained in products only for such products where reasonably available or reasonably obtainable data exist.

In this regard, one example of available data exists with regard to HFC-152a as contained in imported aerosol dusters. As indicated by the chart below, considerable historical data exists with regard to this product. While EPA may not be able to obtain or replicate data in similar details with respect to all products containing HFCs, it is certainly not the case that no data exists.



Source: The Descartes Systems Group, Inc. - Datamyne

Moreover, apart from available HFC data, should EPA find that 1989 CFC and HCFC baseline data on products obtained from a market query is insufficient to complete baseline calculations, EPA could consider using the same CFC and HCFC scaleup factors it will be applying for HFC producers and importers, subject to appeal if an individual party can produce documentation showing that they exceeded the regulatory baseline levels. In short, the fact that EPA may have to undertake additional efforts to regulate products containing HFCs or obtain the necessary data to do so, does not alleviate its statutory burden to do so. EPA must undertake reasonable efforts so that production and consumption activities are equivalently controlled and unregulated imports of HFC-containing products are not allowed to exist where HFCs are

simply introduced into products offshore in order to avoid requirements to hold allowances when they are imported into the U.S.

C.    Precedent Exists to Require Allowances for Imported Products

EPA has previously banned importation of certain products containing Class II substances.[68] This action was taken to avoid additional skin cancer cases projected to occur if products (imported air conditioning units) containing HCFCs were allowed to be imported into the United States after the date on which manufacture of such products was banned in the United States.[69] While the legal authority for the "pre-charged rule" was determined to be Section 615 of the CAA (authority that is not applicable in the current rulemaking) prohibiting the importation of products containing HFCs without associated consumption allowances provides a similar benefit.  It would both decrease overall consumption of HFCs in the United States (since all importation of HFCs would be covered under the cap on consumption allowances) as well as equalize rules for U.S. and foreign manufacturers.

To be clear, requiring allowances for products containing HFCs is not the exact equivalent to banning the sale of such products as was done in the "pre-charged rule."  Rather, in the case of requiring allowances for HFCs in imported products, EPA would be implementing provisions of the AIM Act to reduce HFC production and consumption within the United States to specified phasedown limits (by accounting for all consumption of HFCs).  Products containing HFCs could still be imported and sold, but they would be required to be "covered" by a consumption allowance.

The prior precedent regarding HCFCs, however, serves to demonstrate that EPA has the means to enforce a prohibition on importation of products.  EPA's pre-charged rule regulations provided that "no person may sell or distribute, or offer to sell or distribute, in interstate commerce any product identified in [40 C.F.R. §82.306].  Those prohibited products were any pre-charged appliance or pre-charged appliance component "manufactured on or after January 1, 2010 containing HCFC-22, HCFC-142b or a blend containing one or both of these controlled substances."[70]  EPA could enforce similar prohibitions on products containing HFCs based on its overall directive in the AIM Act to limit the percentage of consumption of regulated substances in any one year as compared to baseline calculations.[71]  In other words, once EPA allocated allowances based on its baseline calculation for a specific year, additional imports not covered by consumption allowances would be prohibited since they would exceed the basis on which the overall cap on such allowances was calculated.

Requiring allowances for HFCs contained in imported products would also further environmental as well as economic goals of the AIM Act.  EPA would be capturing all HFCs utilized in the United States and not disadvantage U.S. companies who would face competition from HFC product producers that may not be subject to any current phasedown requirements under the Kigali Amendment or differentiated prohibitions.  Since China ratified Kigali on June 17 2021, its national commitments will be determined on the basis of being an Article 5 Group 1

---

[68] 74 Fed. Reg. 66,450 (Dec. 15, 2009).
[69] EPA estimated that approximately 1,700 total cases of cancer could be avoided.  *Id.* at 66,455.
[70] 40 C.F.R. §§82.306(a), (b).
[71] AIM Act, section 103(e)(2)(C).

country, meaning that it will not be subject to the same requirements as those that apply to United States (Article 2) producers and importers. Article 5 Group 1 Kigali ratifiers, China and Mexico, will be allowed to "peak" production of HFCs in 2022 and be subject only to a "freeze" in baseline in 2024 with graduated step-downs leading to an 80% phasedown by 2045 as compared with a U.S. commitment to reduce HFC production and consumption upon ratification and achieve an 85% phasedown by 2036. Other countries within "Article V Group 2" such as HFC-producing India, should it ratify the Kigali Amendment, may peak production through 2024-2026 and be subject to even later freeze and phasedown requirements. Requiring allowances for the consumption of HFCs in products in the United States would not violate the Kigali Amendment, but at the same time, it would help avoid deleterious effects whereby actual use of HFCs in the United States could continue above Kigali and AIM Act limitations based solely on the fact that HFCs were contained in a product versus a bulk container.

It is well known that there are manufacturing lines in Mexico that produce products destined for the US market. If products containing HFCs do not require an allowance for import from Mexico, this could create an increasing trend to shift manufacturing to Mexico instead of keeping in it the U.S. While Mexico has already ratified Kigali, they are currently building their baseline and as noted above, are not subject to its first 10% step down until 2029. If products containing HFCs do not require consumption allowances for import, then it is reasonable to expect that we will see an increased trend of HFCs being imported within the products coming from Mexico to the detriment of U.S. producers and manufacturers.

## V.    Regardless of Allocation Methodology, EPA Must Address Market Share Gained Through Unfair Trade Practices

EPA has proposed that "any entity that is subject to a [Department of Commerce] Final determination and is requesting allowances for 2022 or 2023 must provide documentation of full payment of the [Administrative Determination/Countervailing Duty] for HFC imported in 2017 through the date of [the] proposed rule."[72] EPA is also proposing to not allocate allowances in 2022 or 2023 to companies that Customs and Border Protection ("CBP") determines are in arrears for penalty amounts and indicates that EPA may revoke or retire previously issued allowances on this basis, as well as take other actions with regard to future allocations.[73] Chemours supports these proposals but believes EPA must also account for any market share that was gained on the basis of such conduct during the years on which allowance allocations are based. Simply put, companies should not be permitted to benefit from this past behavior in terms of gaining allowance allocations, even while they may have satisfied penalties that were levied as a result of such past misconduct.

Several importers of HFCs produced in China have used unfair trade practices to penetrate the U.S. market since 2013. These importers and their affiliates initially imported the most commercially significant HFC products, HFC blends and R-134a, at unfairly low prices. When Commerce issued antidumping orders imposing corrective duties on the unfairly traded HFCs, various importers began circumventing the antidumping orders by importing "unfinished" HFC blends, blending in third countries, or importing unfairly traded HFC components (e.g., R-

---

[72] 86 Fed. Reg. at 27,186.
[73] Id.

32 and R-125) for blending in the United States. The market share seized by these unfairly traded imports was the direct result of a persistent pattern of dumping, circumvention, and evasion of U.S. law. As a result, the U.S. manufacturers of HFCs suffered declining sales attributable to this conduct up to and during the period of time EPA is proposing to use as a basis for allowance allocations.  We are attaching a detailed accounting of these actions.[74]

Apart from this information, we would note that a 2016 International Trade Commission order determined that HFC blends produced in China and imported into the United States (R-404A, R-407C, R410A, R507A and R-507) were materially injuring an industry in the United States.[75]  The Department of Commerce determined that HFC blends and components from the People's Republic of China "are being, or are likely to be, sold in the United States at less than fair value."[76]  The period of investigation for this determination covered the time period from October 1, 2014 through March 31, 2015.  Therefore, to the extent that EPA utilizes a longer time period for allowance allocations as Chemours advocates, these prior activities should be taken into account in reducing corresponding allowances to importers engaged in these activities.

The Department of Commerce has also determined that imports from China were circumventing the antidumping duty imposed on them through the 2016 order.[77]  The Department of Commerce found that "[d]uring the period September 2016 through June 2019, monthly average exports of HFC components from China surged to 2,707,659 [kilograms ("Kg")]; an increase of 411.31 percent.  Likewise, over the same time periods, the monthly average import quantity of HFC components from China in the U.S. increased from 599,758 Kg per month to 2,247,847 Kg per month; a 274.4 percent increase."[78]  These increased imports of HFC components corresponded with a *decrease* of HFC blends, leading the Commerce Department to conclude that the HFC components were circumventing the 2016 Antidumping Order.[79]  Therefore, there exists specific findings by the U.S. Department of Commerce of dumping and circumvention during the time period that EPA has proposed to utilize for allowance allocations.  As per our initial comments above, EPA must account for all the effects of HFCs and HFC blends that are introduced into the United States in violation of applicable trade law.  EPA's proposal to address allowance allocations for only those companies with unsatisfied or continuing violations is insufficient; EPA would be conveying valuable allowance allocations based on the violations which would, at a minimum, reduce the economic penalties imposed and potentially convey a new profit stream on the basis of prior, unlawful conduct.

In addition, EPA should take further notice of the various actions taken over the years to circumvent lawful orders and antidumping duties, including by importers that blend Chinese

---

[74] A Brief History of Unfairly Traded Imports of HFCs from China, Cassidy Levy Kent, LLP, July 6, 2021 Attachment 2.

[75] 81 Fed. Reg. at 55,437.

[76] 81 Fed. Reg. 5,098 (Feb. 1, 2016).

[77] 85 Fed. Reg. 20,248 (April 20, 2010).

[78] *Preliminary Decision Memorandum for Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China:  HFC Components*, United States Department of Commerce, International Trade Commission, April 3, 2020 at 17.

[79] See *Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances;* 81 Fed. Reg. 42,314 (June 29, 2016) *(Final Determination); Hydrofluorocarbon Blends from the People's Republic of China: Antidumping Duty Order,* 81 Fed. Reg. 55, 436 (August 19, 2016).

The Chemours Company FC, LLC

HFC components, including R-125, R-32, R-134a and R-143a, in third counties and importers that bring "off-spec" blends into the United States where final blending is accomplished.[80] As provided in the AIM Act, an "allowance" is a "limited authorization for the production or consumption of a regulated substance."[81] As a "limited authorization" that does not constitute a "property right,"[82] EPA may properly take into account these prior actions and limit the allocation of allowances strictly to those United States producers and consumers who operated during the 2011-2013 baseline period or take other actions with respect to circumvention activities which would not effectively reward this behavior.

## VI.    EPA Should Not Finalize Proposed "Set-Aside" Allowance Allocation

A.    A "Set-Aside" Pool is Not Authorized by the AIM Act and EPA Has Not Articulated a Supportable Rationale for Non-Mandatory Allowance Set-Asides

EPA has proposed to provide a "set aside" of production and consumption allowances that would operate apart from what the Agency terms the "general pool" of production and consumption allowances.[83] Consumption and production allowances from this pool are available to entities that qualify for application-specific allocations mandated by the AIM Act that have not been identified by EPA prior to October 1, 2021. Consumption allowances are further made available to persons who reported to the GHGRP in 2020 but were not required to report, as well as "persons who are newly entering the HFC import market" and meet other qualifications.[84]

EPA bases this latter proposal on several non-statutory considerations which also have no basis in the legislative history of the AIM Act. EPA claims it is allocating such allowances to provide "as seamless a transition as possible to a regime where allowances are needed to produce and import HFCs, promoting equity, timeliness of implementation and availability of robust data."[85] A seamless transition, however, would involve implementing the AIM Act in a similar fashion to Title VI of the Clean Air Act which provided allowances to prior producers and consumers. Moreover, a "seamless transition" has already been proposed based on utilizing recent years (2017-2019 or alternatively other years within the 2011-19 period) as the basis for allocation of allowances.

Second, as detailed above, EPA claims that it can deviate from past practice in allowance allocations and provide a set-aside pool of allowances based on the distinction between a "phaseout" under Title VI of the CAA and a "phasedown" under the AIM Act. But this distinction is sorely lacking in substance and, indeed, inaccurate in practice. While Title VI of the CAA provides for a general phaseout, the title also allows for exemptions from the phaseout.[86] Thus, it is simply incorrect to indicate that all Class I and Class II substances will be phased out under Title VI. This may be demonstrated by initially noting that in 2021, over 30

---

[80] See "HFC Coalition Applauds the United States Department of Commerce for Initiating Investigations into Unlawful Circumvention of U.S. Law by Imports of HFC Refrigerants from China," American HFC Coalition, June 24, 2019.
[81] Sec. 103(a)(2).
[82] Id. §103(e)(2)(D)(ii)(I)(aa).
[83] Proposed 40 C.F.R. §84.15.
[84] Id. §84.15(c).
[85] 86 Fed. Reg. at 27,169.
[86] See nt, 88-90 infra, referencing CAA title VI provisions and exemptions.

years after the enactment of Title VI, not all production or consumption of Class I and Class II substances is prohibited.  For example, EPA has proposed to extend indefinitely the laboratory and analytical use exemption for Class I ODS.[87]  Methyl bromide can be used for quarantine and pre-shipment uses[88] and critical use exemptions, subject to approval, can still be applied for.[89]  Section 18 exemptions are available for imported products and domestic commodities growing in areas under quarantine for a regulated pest.[90]

Second, as pointed out above, the "phasedown" required by the AIM Act is subject to both potential acceleration (Section 103(f)) and full or partial restrictions in specific sectors or subsectors through rulemaking under Section 103(i).  Implementation of these provisions has the potential to result in a phasedown of HFCs that exceeds the mandatory 85% level.  In other words, the 85% phasedown is a floor and not necessarily a ceiling.  Thus, it is not "appropriate"[91], as EPA claims, to promulgate a new entrant set-aside on the basis of a claimed statutory distinction between Title VI and the AIM Act that does not exist and has little or no connection to the issue of what entities should be allocated allowances.

Finally, a proposal which would effectively transfer allowances to theoretical "new entrants" that would otherwise be allocated to producers and importers would unnecessarily complicate allowance distribution, particularly if EPA retained more allowances than needed for such supposed "new entrants".  We would note that EPA has offered no technical analysis or support in the docket for either the proposed amount of the available set-aside or any presumed economic benefits projected to flow from the set-aside.  And, to the extent a "set aside pool" would benefit new foreign producers by providing access to consumption allowances for new importers, such a result is directly contrary to the general purpose of the AIM Act to support domestic production.

B.    The Proposed Allowance Allocations to New Entrants Is Contrary to Regulatory History of EPA Allowance Allocations Under Title VI

Prior to the enactment of the 1990 Clean Air Act Amendments, which incorporated Title VI addressing stratospheric ozone protection, EPA implemented the Montreal Protocol using the authority of CAA §157(b) of the CAA.[92]  Under this authority, EPA created a system of production and consumption allowances and "apportioned allowances to producers and importers of controlled substances based on their 1986 levels of production and imports."[93]   While EPA considered several options for allowance allocations pursuant to CAA §157, it settled on allocations to historical producers and importers explaining that:

---

[87] 85 Fed. Reg. 47,940 (Aug. 7, 2020).

[88] 68 Fed. Reg. 238 (January 2, 2003).

[89] 79 Fed. Reg. 32,728 (June 6, 2014).

[90] United States Department of Agriculture Treatment Manual, Second Edition, 2016 at 2-3-1.

[91] 86 Fed. At 27,176 ("[G]iven that the AIM Act outlines a phasedown, but not a phaseout, of HFC production . . . it may be appropriate to continue to facilitate participation by new market entrants in the HFC import business.")

[92] CAA §157 was repealed by the 1990 Clean Air Act Amendments.  Similar, although not identical statutory language, was incorporated within CAA §615.

[93] 57 Fed. Reg. 33,756 (July 30, 1992).

EPA has concluded that the allocated quota system is the appropriate method for implementing the Montreal Protocol for several reasons. One, by directly regulating the supply of CFCs and halons, the allocated quota system is a straightforward method of ensuring that the requirements of the Montreal Protocol are met. Two, it is clearly lawful, in contrast to the auction and regulatory fee systems which raise legal issues. Three, as a market-based approach, the allocated quota system is economically efficient. Four, it is relatively simple to administer, since the producers and importers subject to the allocated quotas are small in number."[94]

After the 1990 Clean Air Act Amendments were enacted, EPA promulgated regulations under this new authority to allocate Class I ODS allowances. Again, EPA allocated all allowances to historical producers and importers consistent with statutory provisions that defined the "baseline year" for Class I substances as being calendar year 1986.[95] EPA later observed that the Class I ODS allowance system "proved highly successful."[96] For the HCFC phaseout, EPA considered several options to allocate allowances, including a one-time allocation or allowing for a re-allocation of allowances on a "rolling basis." [97] While the EPA initially implemented the phaseout of HCFCs without allowances on a "worst-first basis" (*i.e.*, phasing out specific HCFCs through regulatory deadlines without using allowances), the EPA later allocated allowances on the basis of *regulatory* baselines. Specifically, in the first HCFC allowance allocation rule, EPA allocated "100 percent of each company's historical consumption baseline for all Class II controlled substances."[98]

It is notable that in its 2003 HCFC allocation rule, EPA did provide allowance allocations for "new entrants" into the HCFC market.[99] But EPA proposed that new entrants would be small businesses that *began importing after the end of 1997 and before April 5, 1999*, the date of publication of the ANPRM [discussion allowance options]."[100] And for production allowances, EPA allocated allowances from baseline based on "the highest historical production for each company in the years 1994 through 1997. . . [plus] an additional pro-rata amount . . ."[101] Thus, it may be observed that <u>EPA's limited, prior implementation of "new entrant" allowance allocations was based on historical consumption not anticipated future consumption</u> and that the baseline period only extended up until the time that EPA solicited comment on an allowance allocation system. The situation regarding HCFCs can therefore be easily distinguished from the

[94] *Id.* at 30,579. See also 57 Fed. Reg. at 33,782 ("In today's rule, producers are receiving chemical-specific production allowances based on what they had reported as production in 1986, excluding any production that was used and consumed as a feedstock for another chemical." Producers and importers of these chemicals are receiving chemical-specific consumption allowances based on their reported production, imports and exports of these chemicals.")

[95] CAA §601(2).

[96] *See* 64 Fed. Reg. at 16,375 (Apr. 5, 1999).

[97] *Id*. at 16,337.

[98] 68 Fed. Reg. at 2,824 (Jan. 21, 2003).

[99] *Id.*

[100] *Id*. at 2,823 (emphasis added).

[101] Id. at 2,824.

The Chemours Company FC, LLC

AIM Act, under which production and consumption baselines for HFCs are explicitly defined and are fixed in time.[102]

In sum, in the 30-year history of ODS allowance allocations, EPA has overwhelmingly allocated allowances only to historical producers and importers of Class I and Class II substances. And, in the single case, where "new entrants" were defined, they were defined in terms of e*xisting* entities, with prior production and importation activities, not new theoretical entities who have not previously participated in the market for controlled/regulated substances.[103]

C.    Should EPA Finalize a Set-Aside Pool, It Must Be Limited in Scope and Duration

As indicated above, a set-side allowance pool is without support in the statutory provisions of the AIM Act. In addition, a set-aside pool that would benefit new imports of HFCs into the United States from foreign producers is contrary to the intent of the AIM Act to support U.S. manufacturing and innovation. As described by the Chairman of the House of Representatives cCommittee of Jurisdiction over the AIM Act:

> [The AIM Act] will benefit our economy, maintain American manufacturing leadership, create jobs, and protect the environment . . . The bill will help the United States maintain its position as a leader in the chemical, appliance, and equipment industries. It will also allow us to continue as a leader in innovation and on global environmental issues.

> * * *

> The European Union and other nations, like Japan, Canada and China, are already transitioning away from HFCs. This legislation will provide the certainty and stability American companies need to do the same. Not only will it help these companies remain competitive in the global market for air conditioning, heating and other consumer products, but it will also help them increase their share of the global market and it has the potential of creating tens of thousands of high quality American jobs. [104]

Therefore, a regulatory provision which explicitly conveys consumption allowances to *future importers* of HFCs is directly contrary to the expressed intent that the AIM Act promote American jobs and manufacturing. In effect, EPA's proposed set-aside would serve to both encourage and subsidize foreign HFC production. In the proposed rule and the docket for this rulemaking, EPA has identified no statutory purpose supporting such an allocation, nor has EPA cited any indication of Congress' intent that the AIM Act was designed to promote foreign

---

[102] *See* AIM Act section 103(e)(1).

[103] EPA has proposed to restrict such entities to those that are not "companies that are a subsidiary of, or have any common ownership stake with, another allowance holder." Proposed §84.15(f)(2).

[104] Promoting American Innovation and Jobs: Legislation to Phase Down Hydrofluorocarbons, House Energy and Commerce Committee, Subcommittee on Environment and Climate Change, January 14, 2020, Hearing Transcript at 11-12, accessed at https://docs.house.gov/meetings/IF/IF18/20200114/110388/HHRG-116-IF18-Transcript-20200114.pdf. Opening remarks of House Energy and Commerce Committee Chairman Frank Pallone.

production of HFCs and importation of these substances into the United States. To the contrary, any expression of Congressional intent in this matter is directly opposite.

Should the EPA continue to claim that it has discretion to promulgate a new entrant set-aside pool (which, at a minimum, is contradicted by the record of the consideration of the AIM Act) the Agency must take steps to narrow the scope of the proposed pool. Specifically, any set-aside pool apart from the allocation of allowances based on historic production and importation should be limited to a total amount of no more than 5 MMTCO2e as a one-time allocation. Failing this, any set-aside pool should be proportionately phased-down on the same schedule as provided in Section 103(e)(2)(C) of the AIM Act, *e.g.*, no more than 60 percent of the initial allocation starting in 2024, no more than 30 percent, starting in 2029. To be clear, such provisions would not alleviate the statutory infirmity of EPA's proposed regulations, but they would serve to mitigate longer term damage to existing U.S. manufacturers and importers.[105]

In addition, any allowances from the set-aside pool should also not be provided to existing suppliers and reclaimers. EPA's proposed regulatory language at 40 C.F.R. §84.15(c)(2) is unclear on this point. Allowances are made available to "persons who are newly entering the HFC import market, do not share corporate ownership or familial relations with entities in the HFC import market, and meet Small Business Administration conditions for a small business in 13 CFR part 121." It is well documented from EPA data that many reclaimers currently import HFCs from foreign sources and thus, under the proposed rule, may qualify for consumption allowances. Such entities should not be allowed to qualify for any additional allowances that might be provided through a new entrant set-aside pool.

In addition, should a reclaimer be able to qualify for allowances from a set-aside pool, then it would be reasonable to restrict the use of such allowances to their claimed line of business. That is, reclaimers need for access to virgin HFCs has been understood to be for the purpose of meeting product specification, *e.g.*, to "blend up" reclaimed material to meet necessary standards (AHRI 700). Should access be provided to set-aside allowances, EPA should ensure that any allowances allocated are actually used for reclamation activities and meeting the AHRI 700 standard. This should also be the collective extent of any allocation to this market segment that is granted.

Finally, if any initial "new entrant" leaves the HFC market, any allowances previously set-aside should be returned back to the general pool for distribution to other producers and importers. Again, the principle applied should be that set aside allowances only be allocated on the basis of the need to support domestic production.

## VII.    EPA Should Follow Precedent Regarding Required Transfer Offsets and Use 0.1% to 1.0% Offset Ratio

---

[105] Chemours is aware that EPA has only proposed set-aside amounts for 2022-2023. Proposed 40 C.F.R. §84.15. But EPA is also taking comment in this rule regarding allowance allocation protocols for years after 2023. Thus, to the extent that EPA considers this matter in connection with comments on 2024 and succeeding year allowances, EPA should refrain from extending a set-aside pool of allowances in those years, or in the alternative, proportionately reduce any pool established for 2022-2023.

EPA recognizes that there are "similarities in the text, structure, and function of the production and consumption phasedown provisions of the AIM Act and EPA's program phasing out ozone-depleting substances (ODS) under Title VI of the CAA."[106]  EPA should therefore utilize prior regulatory offset for transfers involving ODS which used 0.1% offset with regard to the transfer of HFCs (regulated substances) within the AIM Act.  At most, EPA should utilize no more than a 1% offset for transfers.  Both the statutory structure of the AIM Act and the requirement for a trading system limit EPA's discretion to impose higher levels of offsets.

EPA's proposal to consider offsets of 5% (or consider even higher offsets in future rulemakings) lacks a statutory basis as a method to achieve broad environmental results.  The AIM Act provides specific mechanisms to achieve further reductions in HFCs through either acceleration of the general phasedown (Sec. 103(f)) or through technical transitions (Sec. 103(i)).  EPA exceeds its statutory authority in the AIM Act by seeking what amounts to hefty "transfer taxes" that would inhibit transfer of HFC allowances.  Further, this transfer tax mechanism as proposed *would not be applicable to foreign producers*, making large offsets directly contrary to the intent of the AIM Act in terms of domestic production and jobs.

EPA can point to no legislative provision or Congressional intent which supports the imposition of high emission offsets.  To the contrary, Congress specified an "allowance allocation and trading program" be utilized in the phasedown of production and consumption allowances.[107]  Final rules for transfers are to result "in greater total reductions in the production of regulated substances" than would occur in the absence of a trade[108] but EPA is also directed under this same authority to "*permit 2 or more persons to transfer production allowances.*"[109]  This permission is conditioned on the requirement that a "transferor . . . will be subject . . . to an enforceable and quantifiable reduction . . . [that would not have occurred in the absence of the transaction."[110]  But there is no basis on the face of this language to infer unrestrained or unreasonable authority to impose high emission offsets.  Doing so, overly emphasizes the requirement for net reductions in HFC emissions over the requirement that EPA permit the transfer of allowances and implement an "allowance allocation and trading program."[111]

Imposing high emission offsets as a condition for trading would also produce other negative impacts on domestic producers.  Over the course of implementing a phasedown in HFC production, domestic producers will need to rationalize domestic production capacity.  Chemical plants inherently do not run efficiently at low-capacity utilization (*e.g.*, all parties running at 30% of capacity creates high unit fixed costs relative to the amount of product produced).  The ability to transfer allowances as between domestic producers so that some plants may run at higher capacity is essential to economic production of regulated substances. Transfers might also occur in response to unplanned production outages.   A high emission offset under these circumstances would only further worsen a strained supply situation.

---

[106] 86 Fed. Reg. at 27,154.
[107] AIM Act, section 103(e)(3).
[108] *Id.*, section 103(g)(2).
[109] *Id.* (emphasis added)
[110] *Id.*
[111] *Id.*, section 103(e)(3).

The Chemours Company FC, LLC

With regard to transfers as between different producers, high emission offsets also would greatly complicate negotiations to transfer allowances (which may or may not, depending on EPA actions with regard to other elements of the proposed rule, be good for only one year). As demand shifts from legacy HFCs to lower GWP alternatives, the explicit intent and design of the AIM Act, companies developing and commercializing the alternatives will need access to allowances from allowance-holding parties. Promulgating regulations that would impose arbitrarily higher offsets for such transfers (which will be transferring reduced quantities of legacy, high GWP HFCs) will unnecessarily constrain such economic activity and impede the transition to lower GWP (*i.e.*, lower EVe) alternatives. This is inapposite the intent of the AIM Act to facilitate such transitions.

## VIII.   EPA Should Only Ban Imports of Filled, Non-Refillable Containers

Chemours supports EPA efforts to stop illegal imports. Obviously, this effort can help facilitate the transition to lower-GWP alternatives and help protect domestic producers from the adverse financial impact of illegal imports. However, Chemours does not support the proposed requirement to mandate the universal use of refillable containers.[112] Instead, Chemours would propose that EPA ban all imports of *filled* non-refillable cylinders along with imposing a requirement for expanded record keeping at all U.S. packaging facilities. This would provide an alternative and more effective means to restrict/prevent illegal imports.

   A.    Costs Involved with Establishing a Returnable Cylinder Supply Chain and Associated Tracking System Are Excessive and Benefits May Be Negligible or Negative

      1.   *Costs for Refillable Cylinders Are Excessive and understated in the EPA Review*

The requirement to replace all disposable cylinders with refillable cylinders will require producers to incur significant costs (upwards of $90 million per company in some cases) to obtain the necessary number of cylinders to fulfill anticipated market demand. Furthermore, the physical production of the number of refillable cylinders that would be required (an estimated 7 to 10 million cylinders, far more than EPA's estimated requirement) is not feasible by the proposed deadline of January 1, 2023, when requirements regarding disposable cylinders would become effective. The July 1, 2023, timetable for full market conversion to returnable cylinders is woefully short based on long lead times needed for cylinders and valves and would also result in added cost and logistics for adding trips due to higher tare weights, return trips to filling facilities and additional stock of empty cylinders to account for possible slow returns of used, refillable cylinders. Adding to the burden of the proposed timetable is that shortly after incurring the costs of building the cylinder fleet, a major stepdown in allowances will occur, obsoleting a significant portion of the newly purchased cylinder fleet. As noted by a cylinder manufacturer during EPA's public hearing on the proposed rule:

> The proposed ban is intended to shift the market away from non-refillable cylinders, which the EPA significantly underestimates at only about four million

---

[112] Proposed 40 C.F.R. 84.5(i)

units per year. In fact, the ITC found that imports from China alone were 3.6 million units in 2019, which represents a relatively small portion of the market. As a manufacturer of both non-refillable and refillable cylinders, we can state with confidence that domestic producers cannot possibly meet the sudden and staggering demand for refillable cylinders that this ban would create. A refillable fleet would require up to five times as many cylinders to service the same demand. Thus, the domestic market for cylinders currently supplied by American manufacturers will shift right back to foreign manufacturers producing refillable cylinders with no meaningful environmental oversight.

Shipping heavier refillable containers from overseas will increase the greenhouse gas footprint of these products and create the very same HFC smuggling opportunities the cylinder ban was proposed to address. In 2020, Worthington filed a successful antidumping case against nonrefillable cylinder imports from China, and the Commerce Department recently imposed duties of 82 to 288 percent on these imports.[113]

Any supposed "cost-effective" environmental benefit in moving from disposable to refillable cylinders is also questionable. This issue was analyzed in a study commissioned by the California Air Resources Board.[114] As compared with other measures, including foam recovery from household refrigerators/freezers, refrigerant recovery and reclamation and recovery and reclamation from fire extinguishers, emissions reductions from banning the use of disposable 30 lb. refrigerant cylinders was relatively small and came at costs an order of magnitude higher than other options.[115] According to this analysis:

By banning disposable (non-refillable) cylinders [in California], an estimated 0.7 MMTCO2eq can be avoided by 2050, though at significant cost (i.e., net present value (NPV) cost of $254/MTCO2eq for HFCs through 2050, assuming a 5% discount rate).[116]

EPA's review of this issue contained in an analysis submitted to the docket[117] is incomplete and does not consider the full lifecycle analysis of the refillable cylinder supply chain nor does it compare this supply chain with that of non-refillable cylinders. This is a major flaw in EPA's analysis. The EPA study does not include full impact of initial refillable cylinder investment, investment at loading facilities, refillable cylinder refurbishment, valve cost or weight, seasonality of business, environmental impact of heavier cylinders, ergonomic impacts, reverse logistics, lower net product weight with refillables, or cylinder recycling. Specifically:

---

[113] Testimony of Wayne Powers, Director of Refrigerant, Foam and Adhesive, Worthington Industries, June 3, 2021.

[114] Lifecycle Analysis of High-Global Warming Potential Greenhouse Gas Destruction, Contract Number 070330, October 2011.

[115] Id. at xiv, Table 1.

[116] Id. at xv.

[117] Refillable and Non-Refillable Cylinders: Analysis of Use, Emissions, Disposal, and Distribution of Refrigerants, Stratospheric Protection Division, April, 20460, EPA-HQ-OAR-0044-0046.

The Chemours Company FC, LLC

- EPA assumes that a small refillable cylinder costs about $36.[118] But small refillable cylinders in Canada cost $60 each plus $15 to $20 for the valve, making total cost 6-7X the cost of the $12 non-refillable cylinder cited in the docket post. This means EPA underestimated total purchase costs per cylinder and valve by about 2x.

- EPA also underestimated the number of non-refillable cylinders used annually in the United States. Annual non-refillable cylinder use for stationary and mobile aftermarket refrigerants is in the range of 6 million units as referenced by the State of California's 2007 market study, not the 4.5 million assumed in the docket post. Chemours experience with small refillable cylinders in Canada shows that the refillable cylinder fleet size needs to be 5X the annual non-refillable cylinder use due to slow turn rates (only 1x/yr, not the 1.5X/yr in the docket post) and empty cylinder return logistics (empty cylinders returned in batches, not individually). Based on these estimates, total US small refillable cylinder fleet requirements could approach 30 million units. Factoring in a much larger fleet and twice the assumed cost per unit means that EPA's cost estimates are off by several orders of magnitude. An added consideration is that almost as soon as the investment has been made to establish this fleet, 2024 and 2029 step downs in HFC allowances will occur, possibly obsoleting a large portion of the fleet, depending on yet undetermined market choices of low GWP replacements.

- Higher tare weights for refillable cylinders (21 lbs per ICF study) versus non-refillables (6-7 lbs including carton) may create ergonomic issues for service technicians and others handling cylinders in the supply chain. A possible adaptation would be to reduce net refrigerant fill weights, which would lead to even higher fleet size and associated costs (cylinders, valves, outbound and return freight, etc.)

- The California report cited above also concluded in 2011 that there would be a significantly higher cost for the refillable supply chain, an estimated $50 million through 2050 in California alone. Because California GDP is approximately 15% of total U.S. GDP (Bureau of Economic Analysis 2019), extrapolating these estimates nationwide would mean a $340 million higher cost for a refillable cylinder system nationwide during the same time period as measured in 2011 dollars.

- Beyond costs to create the refillable cylinder fleet, additional costs should be expected for modification of automated packaging lines to fill small refillable cylinders instead of the current non-refillable packages. The larger footprint of small refillable cylinders versus current non-refillables might also create additional costs down the value chain for conversion of automotive service machines and contractor service van transport racks.

Again, Chemours shares EPA's goal to prevent illegal imports of HFCs. But more realistic cost estimates combined with the fact that much larger quantities of refillable cylinders will be needed almost immediately – and then potentially *not needed* as the HFCs are phased down in 2024 and 2029 leaving costly stranded assets given that cylinder useful life is approximately

---

[118] *Id*. at 16.

20 years – heavily weighs against adoption of EPA's proposed requirement for refillable cylinders.

### 2. EPA Has Overestimated Emission Reductions Associated with "Heels" Contained in Non-refillable Cylinders

EPA's assertion that the residual amount of HFC (heel) that remains in disposable cylinders "can measure up to eight percent of the quantity that was originally stored in the container"[119] appears likely to be related to heels of a 25-lb HFC-410A Non-Refillable cylinder that would remain if the contents were pulled down only to vapor pressure at 77F when the last drop of liquid was removed. In this case, an estimated 7.6% of HFC-410A contents would remain as vapor if the cylinder was disposed with no further removal of contents. However, a more likely scenario would be for a service technician to stop use when vapor pressure reaches suction pressure on the air conditioning equipment being serviced, leaving an estimated 4.4% of contents as vapor.

Similarly, HFC-134a Non-Refillable cylinders when "liquid empty" at 77 F would leave 3.1% of contents remaining as vapor. If a service technician stopped when vapor pressure equaled suction pressure on a medium temperature refrigeration unit, an estimated 1.0% of contents would remain. However, HFC-134a non-refillable cylinders used in automotive air conditioning service are used with service machines that pull the cylinder down to 15" Hg, leaving only 0.2% of contents as vapor. Thus, EPA cannot generalize from these results that prohibiting the use of non-refillable cylinders "would increase environmental benefit by ensuring the heels left in a cylinder are not released to the atmosphere when disposable cylinders are discarded."[120] Chemours also notes that the docket post estimates on average cylinder heel weights cited only a Stratus study that referred only to stationary aftermarket cylinders, omitting consideration of the much lower heels that would be expected from 134a cylinders used in automotive service machines.

Chemours Canada's experience with small refillable cylinders indicate that there are also heel losses which occur for these containers due to product contamination during cylinder conversions between products, during valve replacement and cylinder preparation for hydrotesting. Considering the possible actions to reduce heel losses in non-refillable cylinders and some heel losses occurring in refillable cylinders, Chemours believes that EPA's estimate that replacing disposable cylinders with refillable cylinders would prevent the release of 5.2 MMTCO2e of HFCs each year is likely excessive.[121]

### B. Alternative Mechanisms Are Available To Support Enforcement Goals and Prevent Illegal Imports

Instead of pursuing its proposed regulatory pathway, Chemours suggests that EPA implement an alternative approach whereby refillable cylinders would be required *only for imports* as a means of controlling illegal imports. Imposing refillable cylinder requirements for

---

[119] 86 Fed. Reg. at 27,187.

[120] *Id.*

[121] EPA's estimates may be found in the docket at "Refillable and Non-Refillable Cylinders: Analysis of Use, Emissions, Disposal, and Distribution of Refrigerants." *See* EPA-HQ-OAR-2021-0044-0046.

The Chemours Company FC, LLC

imports will assist in enforcement efforts by requiring a more substantial infrastructure for imports, with an associated financial investment, lessening the potential for fraud. Given the extensive reporting required for domestic producers, a parallel system is not required as a "physical" anti-fraud system for regulated substances produced in the United States. Rather, EPA can rely on reporting and other tracking systems that are extensive but inherently less expensive, backed up by the threat of enforcement for misreporting such activities.

Banning import of non-refillable cylinders containing HFCs would accomplish the same goal as EPA's proposal to switch to a "returnables only" market since it would not be economically viable to ship empty returnable cylinders back to parties outside the U.S. In addition, anti-dumping actions already taken regarding HFC blends (*e.g*., 410A, 404A) have already largely moved the U.S. market away from importing non-refillable cylinders containing HFC blends in favor of importing bulk components and blending/packaging in the U.S. market. The only major product that would be impacted by a ban on importing non-refillable cylinders containing HFCs would be HFC-134a and a measure to require domestic filling of packages would not impose an undue burden on the market since domestic HFC packaging capability already exists. EPA should also consider requiring packaging of neat HFCs and HFC blends at EPA-approved packaging facilities with record keeping requirements and audits in place, even if EPA opts to forego a ban on import of filled non-refillable cylinders.

An additional alternative to requiring that refillable cylinders be utilized in all cases would be for EPA to allow continued use of US-filled non-refillable cylinders but require that all used non-refillable cylinders be returned to a local refrigerant distributor or reclaimer for recovery of refrigerant and preparation for cylinder recycle in accordance with AHRI Guideline Q "Guideline for Content Recovery & Proper Recycling of Refrigerant Cylinders." DOT-39 non-refillable cylinders should not end up in landfills, but rather be recycled locally. The recovered HFCs could then be directed to EPA-certified reclaimers. Contractors could add a refrigerant recovery fee to their invoices (similar to current "tire disposal fees" charged in the automotive service market). EPA projections of the amount of emissions from cylinders assumes that improper disposal of non-refillable cylinders is occurring. Thus, imposing this alternative requirement would provide a dual benefit: it would provide greater control of emissions by specifying where and how non-refillable cylinders must be processed prior to recycle and it also supports reclaimers by giving them a source of virgin HFCs that have already been "covered" by production and consumption allowances. This could be done without market distortion that might occur should EPA determine to otherwise allocate either general or new entrant pool allowances to reclaimers.

In addition, EPA should also consider the following alternatives in lieu of the proposed ban on non-refillable cylinders in order to stop illegal imports:

- Institute an EPA-certified HFC packaging facility requirement (similar to the requirements for EPA-certified reclamation facilities) with the HFC packaging facilities subject to recordkeeping, reporting and audit requirements related to their handling of regulated substances including the allowance holders whose material is being packaged and their packaged quantity including handling and filling losses. This would provide a

far more traceable path for regulated substances than the proposed end to end package tracking requirement.

- Require all allowance holders who service the refrigerant aftermarkets to implement an authentication program for cylinders filled at the EPA-certified packaging facilities for placement into the market. This could be accomplished through a system similar to Chemours' IZON authentication program. The authentication feature would allow end-users and auditors to quickly check the validity of a cylinder in the field.

- Require pre-authorization of imports (primarily ISO containers).

- Require all HFC imports to use proper HTS codes. Coding system needs to be updated such that each HFC component and HFC-containing blend composition has a unique HTS code.

- Require that all imports be clearly identified on Customs' records as to the importing parent company (no "unassigned" or "blank" imports appearing on import subscription services) so the industry can self-monitor HFC activity.

- Require Certificate of Analysis (COA) on each ISO container entering the U.S. CBP should spot sample and test contents to ensure importers don't claim to be importing one product when it's actually importing another, higher GWP product.

- Require all imports of a regulated materials (e.g. virgin, used, recovered, recycled, reclaimed) to expend consumption allowances.

- Consider implementing a deposit on disposable cylinders to encourage proper evacuation and return for refrigerant reclamation and proper cylinder recycling. Contractors could add a cylinder disposal fee to invoices to cover the cost of proper processing of used non-refillable cylinders.
- Implement an EPA hotline and on-line portal for reporting of suspected illegal activity similar to "Operation Catch-22". Consider rewards for those who report (where illegal activity is found).

- Be very public in trade magazines, etc. regarding the existence of reporting hotlines and the potential for civil and criminal sanctions.

    C.    EPA's Proposed Certification ID Tracking System Using QR Codes (or Similar Digital Technology) to Track HFCs is Not Feasible.

Chemours supports EPA's general premise that in order to ensure that HFCs introduced into commerce in the United States are "legal" they need to be covered by an allowance or are the result of U.S. refrigerant reclamation. The proposed mechanism to track HFCs, however, essentially represents a theoretical concept and is not accompanied by a proven digital solution capable of accurately achieving EPA's objective.

The Chemours Company FC, LLC

EPA has proposed to track cylinders and product through the end-to-end supply chain using EPA certification system for QR codes for each container. But it is impossible to track each cylinder contents through full supply change through QR codes or other means. For domestic production, production is co-mingled in storage tanks, making it impossible to link a source container to finished product container. Import shipments are also co-mingled in storage tanks so they cannot be linked to a specific finished product container. Further, products like HFC-410A, HFC-404A, HFC-507, etc. are blends which are produced by further co-mingling two or more regulated HFCs, making the end-to-end product tracking even more cumbersome. EPA's proposed rules are also overly complex and not value-adding. They would also do little to restrict or limit illegal imports. Illegal imports need to be stopped before entering the US; tracking within the country would not necessarily identify or stop illegal imports.

Chemours would instead recommend using quality batch management practices to verify authenticity. EPA could simplify its tracking requirements and achieve the same objective. Rather than tracking the movements of cylinders through the supply chain, EPA could require authenticating cylinders filled in the U.S., using a unique identifier on each cylinder such as an IZON label with a QR code. The cylinder could then be authenticated at any point in the supply chain by verifying the code through the supplier system or even through uploading the authentic codes to the EPA system. Using this ability to "spot check" cylinders, EPA could therefore avert the need for additional tracking through each step in the supply chain, a system that would add additional costs and complexity, without providing additional benefits against illegal imports.

As an additional measure to better track regulated HFCs, we suggest mandating use of an EPA-certified HFC packaging facility (similar to the requirements for EPA-certified reclamation facilities) with the HFC packaging facilities subject to recordkeeping, reporting and audit requirements related to their handling of regulated substances including the allowance holders whose material is being packaged and their packaged quantity including handling and filling losses. This would provide points of concentration for HFC packaging, making the desired mass balance for each allowance holder versus their allowances far easier to manage than an end-to-end product tracking system.

## IX.    EPA Must Clarify Provisions Addressing HFC-23

### A.    Chemours Supports Ratification of the Kigali Amendment and Related Actions to Phasedown the Use of HFCs and Address Climate Change

Chemours has long supported U.S. ratification of the Kigali Amendment and adherence to the Paris Climate Agreement. During Congressional consideration of the AIM Act, Chemours signaled its support of this measure and the legislation's overall objective of reducing GHG-weighted emissions of HFCs by 85%. This support was consistent with other actions Chemours has taken to address climate change. For example, on September 13, 2018, Chemours initiated 10 corporate responsibility commitment goals that include at least a 99% reduction in fluorinated organic emissions by 2030.[122] In addition, as part of the 2018 Chemours Global Reporting Initiative Report, we communicated that we plan to reduce HFC-23 emissions by 99% by

---

[122] The Chemours Company - Chemours Announces Corporate Responsibility Commitments Tied to Its Growth Strategy).

2024.[123] Most recently, Chemours announced that it will improve upon its previous 2030 climate goal by adopting an aggressive 60% *absolute reduction* of operations-related greenhouse gas emissions by that date.[124]

Consequently, Chemours has taken multiple actions to control emissions of HFC-23. First, Chemours instituted measures to minimize the incidental production of HFC-23 during HCFC-22 production at its manufacturing facility, and to capture the majority of HFC-23 produced. These include control of the HCFC-22 manufacturing chemistry to limit HFC-23 production yield to less than 1.1%, and to capture the majority of the HFC-23 produced (process and equipment limitations preclude complete capture). Second, with respect to this production, Chemours is developing new process technology and designing a new production configuration to improve HFC-23 capture efficiency to over 99%, store this regulated substance and then ship it for highly efficient destruction of over 99.99%. As publicly announced,[125] this project includes the "design, custom-build and installation of proprietary technology" and has been expedited to be completed by the end of 2022, which would also coincide with the first full year in which the AIM Act is being implemented.

B.     EPA Provisions Addressing HFC-23 Must Be Consistent with AIM Act Provisions Addressing All HFCs

EPA has proposed several measures that could affect the production of HFC-23 as well as HFC-23 emissions. First, EPA is proposing that "creation of a regulated substance beyond insignificant quantities inadvertently or coincidentally created in three specific circumstances would be considered 'production.'"[126] EPA has also "outlined" a "general approach particular to HFC-23" involving the capture and control of HFC-23 to a specific standard.[127] Finally, EPA has indicated in preamble language (unaccompanied by proposed regulatory text) that use of HFC-23 allowances may be restricted in a manner that is not applied to other regulated HFCs. As explained in more detail below, EPA should clarify both preamble and regulatory language affecting HFC-23 to be consistent with the AIM Act and policy objectives regarding its implementation.

While the Administration has indicated that it will submit the Kigali Amendment for the advice and consent of the U.S. Senate, an action which Chemours also supports, EPA's proposed rule relies solely on the authority conveyed to the Agency by the AIM Act. In this regard, the AIM Act is a free-standing legislative enactment which neither amends the Clean Air Act[128] nor

---

[123] *See* at page 27:  https://www.chemours.com/en/-/media/files/corporate/crc/2018/chemours-2018-global-reporting-initiative-index.pdf?rev=9dd769f57f2b45b180c26bce04b32af4).

[124] Chemours Announces Ambitious Net Zero Greenhouse Gas Emissions Goal, April 15, 2021, accessed at https://www.chemours.com/en/news-media-center/all-news/press-releases/2021/chemours-announces-ambitious-net-zero-greenhouse-gas-emissions-goal.

[125] Chemours Announces Project to Reduce HFC-23 Emissions, March 8, 2021, accessed at https://www.chemours.com/en/news-media-center/all-news/press-releases/2021/chemours-announces-project-to-reduce-hfc-23-emissions.

[126] 86 Fed. Reg. at 27,178.

[127] *Id.*

[128] Section 103(k) of the AIM Act provides, instead, that certain procedural, information and enforcement sections of the Clean Air Act shall apply to rulemaking under the AIM Act, not substantive provisions of the Clean Air Act that impose standards and limitations.

any other pre-existing statute.  Thus, given the stand-alone nature of the authority that EPA relies on for this proposed rule, clarity is needed with regard to how new control requirements will apply to HFCs.  This extends to EPA's proposed regulations that affect HFC-23 production and use, where EPA must ensure comparable treatment of HFC-23 to provisions of the AIM Act affecting other "regulated substances."

In this regard, EPA has indicated that production of HFC-23 will "*generally require* the expenditure of production and consumption allowances unless the regulated substance is timely destroyed."[129]  EPA also is proposing to exercise "*significant discretion*" to "only allow production and consumption allowances to be expended for HFC-23 if the HFC-23 is refined and sold for consumptive uses."[130]  Additionally, EPA proposes to impose an emission limit beginning from October 1, 2022 (at the earliest) to October 1, 2023 (at the latest) which would apply to HFC-23, limiting emissions resulting from production to "0.1 kg of HFC-23 per 100 kg of HCFC-22 created on the line . . ."[131]

Since the requirement to hold unexpended production allowances that are needed to "cover" production of regulated substances is imposed beginning on January 1, 2022,[132] EPA needs, at a minimum, to clarify the proposed rule's provisions that will apply in the interim period between this date and the time period allowed for the installation, testing and verification of HFC-23 control and destruction equipment (*i.e.*, October 1, 2022 to potentially October 1, 2023).  Specifically, EPA needs to ensure that there will not be disparate treatment of one regulated substance (HFC-23) versus other regulated substances during such period.

As noted above, EPA appears to have asserted some leeway to accomplish this goal.  The Agency stated that requirements related to HFC-23 will only apply "generally" based on discretion, rather than being dictated by any specific provision of the AIM Act.  But at the same time EPA must ensure that regulatory provisions specific to HFC-23 do not conflict with applicable definitions contained in the AIM Act nor provisions that apply to HFC-23 and all other "regulated substances."[133]  This would especially hold true during the period of time prior to the imposition of unique emission limitations on HFC-23.

In this respect, EPA acknowledges that during this interim period "some facilities [that produce HCFC-22 and HFC-23] may need to install and calibrate new equipment in order to meet [the destruction standard]."[134]  Therefore, having recognized this required time period, it is incumbent upon EPA to not impose conflicting requirements which would effectively negate the availability of this transition period from *status quo ante* of substantial control of HFC-23 to *near-zero* emission requirements the Agency seeks to impose.  Clarification of both preamble

---

[129] 86 Fed. Reg. at 27,178 (emphasis added).
[130] *Id*. (emphasis added).
[131] Proposed 40 C.F.R. §84.27(a); *see also* 86 Fed. Reg. at 27,218.  This deadline, however, may also be extended by up to 1 year in six-month increments. *Id.* §84.27(a)(1).
[132] Proposed 40 C.F.R. §84.5(a); 86 Fed. Reg. at 27,210.
[133] Section 103(e) of the AIM Act provides that EPA "*shall establish* . . . a production baseline for the production of *all regulated substances* in the United States." This baseline is "the quantity equal to the sum of . . . the average annual quantity of *all regulated substances* produced in the United States during the period . . . beginning on January 1, 2011 . . . and . . . ending on December 31, 2013."  Parallel statutory language applies to consumption baselines.
[134] 86 Fed. Reg. at 27,178.

The Chemours Company FC, LLC

and regulatory text is needed to address the realistic need to design, manufacture, install, test and verify the operation of new emission control technology as well as systems that will improve the capture of HFC-23 and allow for collection and transport of this HFC-23 for destruction.[135]

Chemours seeks clarity that the Agency intends (as suggested in the preamble) that allowances are not required for HFC-23 emissions until emissions are controlled in compliance with the specified standard.[136] An option the Agency has is to allocate sufficient allowances to address the interim period after imposition of the requirements of §84.5(a) to hold allowances addressing production of HFC-23 and before full operational status of HFC-23 control equipment. That is, such allocations would last until such time as such production of HFC-23 is subject to the separate requirement (proposed in §84.27(a)) regarding the control of HFC-23 emissions, including any granted extensions pursuant to §84.27(a)(1). Another option the Agency should consider would be to address this matter through expansion of the exceptions allowed from the general requirement to expend allowances to cover the production of regulated substances (as proposed in §84.5(a)(3)) where regulated substances are destroyed to clarify that this exception also covers the interim period necessary for installation and operation of HFC-23 controls.

Under the first option, while EPA has not proposed specific allowance allocations under the proposed rule, to the extent that allowances for other HFCs are allocated based on prior production and consumption of HFCs during the baseline period established by the AIM Act, HFC-23 should be treated in an identical manner concerning all production of HFC-23[137] (again, for at least the period of time necessary to address the separate emission control standards that apply solely to HFC-23). In other words, sufficient allowances should be provided to prior producers in order to accommodate HFC-23 production prior to the time that new destruction technology for HFC-23 can be effectively installed.[138] In addition, all other HFC-23 specific restrictions discussed in the preamble that would impede the use of allowances would also not be imposed during such time.[139] With regard to the second option, EPA has proposed criteria under which a producer is not required to expend allowances when regulated substances are destroyed.

---

[135] Chemours would further note that while it may be "on notice" that EPA intends to proceed in some fashion with entirely new requirements specific to HFC-23, Chemours like all other regulated parties will not have specific notice of the final requirements that would apply until such time as EPA promulgates a final rule, which the Agency has announced will be in the fall of 2021 to coincide with the statutory requirement to issue a final rule.

[136] Alternatively, EPA could clarify that HFC-23 production is included within the total production (MMTEVe) figures provided for within the proposed 40 C.F.R. §84.7(a)(3) table and thus would be allocated pursuant to proposed §84.9.

[137] The AIM Act defines "produce" to mean the "manufacture of a regulated substance from a raw material or feedstock chemical [excluding destruction]." HFC-23 is produced from raw material during the production of HCFC-22.

[138] Chemours has previously noted that EPA has access to HFC-23 production data through GHGRP reporting under Subpart O. In order to implement this alternative EPA could utilize this data or request other company-specific data prior to the determination and allocation of allowances this fall.

[139] EPA indicates that it is "proposing to exercise . . . significant discretion to only allow production and consumption allowances to be expended for HFC-23 if the HFC-23 is refined and sold for consumptive uses, such as in semiconductor etching or refrigeration at very low temperatures." *Id*. It does not appear, however, that EPA has proposed regulatory language to implement this HFC-23 specific restriction. There is no proposed Part 84 regulatory text which even uses the term "consumptive use" much less imposes a particularized HFC-23 restriction. Chemours is also not aware of any other provision proposed by EPA that would apply such a restriction to other regulated substances.

The Chemours Company FC, LLC

This provision could be further clarified to address the interim period necessary to implement new HFC-23 capture and destruction technology.  In other words, an exemption could effectively serve as a substitute to the allocation of allowances based on prior HFC-23 production.

Regulatory language to accomplish the first alternative could be added to the end of proposed §84.9 as follows:

"(5) Production allowances based on prior production of HFC-23 during the baseline period for production of HFCs shall be made available to prior producers in sufficient quantity to address the amount of total HFC-23 produced during the manufacture of HCFC-22 during the period January 1, 2022, to October 1, 2022, and during any period covered by an extension granted pursuant to §84.27(a)(1)."

Regulatory language to accomplish the second option could be added to the end of proposed §§84.5(a) as follows:

"(4) An entity is not required to expend production allowances to produce HFC-23 that is not sold for consumptive uses during the period January 1, 2022, to October 1, 2022, and during any period covered by an extension granted pursuant to 84.27(a)(1)."

The legal and rational basis for either of the provisions would lie in EPA's proposed disparate treatment of *one* AIM Act regulated substance versus *all other* regulated substances considering that Congress provided for no such distinction but rather defined "regulated substances" with reference to a specific list of HFC (*i.e.* within Section 103(c)(1) of the AIM Act).  In other words, if EPA is to finalize provisions which impose restrictions unique to HFC-23, it must at the same time provide for reasonable accommodation of the intended transition to novel capture and destruction provisions that apply solely to HFC-23.

C.    The Statutory Design of the AIM Act Ensures that Environmental Objectives will be Achieved using Scientifically Derived Values

Within the AIM Act, Congress provided for the phaseout of HFCs using an allowance system that is based on exchange values.  Exchange values are essentially the relative global warming potential (GWP) of individual HFCs and these values must be used for establishing production and consumption baselines.  Production and consumption baselines are then, in turn, utilized for determining the quantity of allowances for production and consumption.[140]  The same exchange values are also used to implement other parts of the AIM Act.  Transfers of allowances are to use "the applicable exchange values" for listed regulated substances or the exchange value later promulgated for newly designated regulated substances.[141]

EPA noted this statutory structure when it observed that the AIM Act "requires EPA to phase down the consumption and production of statutorily-listed HFCs on an exchange value-weighted basis according to the schedule stated in [AIM Act Section] (e)(2)(C)."[142]  As a result,

---

[140] AIM Act, §103(e)(1)(D).
[141] *Id.* §103(g)(1).
[142] 86 Fed. Reg. at 27,153.

The Chemours Company FC, LLC

EPA proposed an "exchange value equivalent" to provide a "common unit of measure."[143]  This allows for "the comparison between, and calculation with, different regulated substances."[144]  This same common unit of measure is utilized with regard to the AIM Act's "allowance allocation and trading program."[145]  The trading program must use exchange value equivalents in order to ensure that GHG reductions can continue to be addressed even as different HFCs may be produced for different end uses over the next 15 years (when the 85% control level becomes fully effective).

As a result, the statutory allowance system based on exchange values ensures that the environmental goals of the AIM Act will be fully addressed, no matter what mix of HFCs may be in use 5, 10 or 15 years from now.  Regulated substances will be phased down based on their scientifically established contribution to climate change.  This statutory structure is, in essence, a zero-sum game: to utilize HFCs with relatively higher GWP, correspondingly more allowances are required to be held by producers and importers.  If relatively low GWP HFCs are produced or imported, correspondingly less allowances are required and more kilograms of an HFC can be produced or imported.  The effect on the environment is the same.

While in the proposed rule EPA notes that HFC-23 retains the highest exchange value among all regulated substances, within the context of implementing the AIM Act, this exchange value does not convey any advantage vis-à-vis other HFCs, but rather a statutory disadvantage.  Thus, EPA is not otherwise directed by the statute to provide for a more aggressive phasedown of higher GWP HFCs such as HFC-23.  Rather, the statute contemplates that diminution in use of higher GWP HFCs will occur as an economic result of the allowance system as well as other mechanisms noted above that may either accelerate the HFC phasedown or limit specific end uses.

D.      EPA Either Must Review Existing Information on HFC-23 or Obtain Information Comparable to Information Intended to be Utilized for Other HFCs

In the proposed rule and its presentation of aggregate 2011-2013 baselines for the calculation of HFC production and consumption allowances, EPA did not include information on HFC-23. EPA failed to provide such information despite being notified of its obligation to do so several months prior to the release of the proposed rule.[146] In addition, new information submitted to the docket (*i.e.*– HFC Production and Consumption – Proposed Rule, submitted in April 2021) included only 17 of the 18 regulated substances specified in the AIM Act, once again excluding HFC-23.  EPA has since requested information from prior producers of HFC-23. EPA should use this HFC-23 information, or other information of sufficient quality, to allocate allowances based on historical production and consumption of HFC-23 during the 2011-2013 baseline on the same basis as allowances are provided to other HFCs.  Alternatively, EPA could consider the allocation of allowances pursuant to the alternatives outlined above in Section IX.B.

---

[143] *Id*. at 27,161.
[144] *Id*.
[145] *See* AIM Act, section 103(e)(3)(A),(B).
[146] *See* Chemours Comments on EPA's NODA (86 Fed. Reg. 9,059 (Feb. 11. 2021)).  These comments have been resubmitted for the docket of this proposed rule.  (Attachment 1).

## X.    EPA Must Also Clarify Several Other Provisions Respecting HFC-23

### A.    HFC-23 Emissions Are to be Measured Against HCFC-22 Production

EPA's proposed regulatory language in 40 C.F.R. §84.27 indicates that "as compared to the amount of chemical intentionally produced . . . no more than 0.1 percent of HFC-23 created on the line may be emitted." Chemours understands that "chemical intentionally produced" references HCFC-22 and that this terminology intentionally distinguishes "chemical" from "regulated substance" meaning that the 0.1 percent of HFC-23 created is in relation to the amount of HCFC-22 produced.  EPA, however, should clarify in any final regulatory language that limitations on HFC-23 are measured against the production of HCFC-22 or other non-HFCs. In addition, EPA should provide a more specific metric for measuring the required level of emissions than the proposed percentile standard.  Specifically, Chemours would suggest utilizing a standard based on relative measurement of emissions.

Both revisions may easily be accomplished by amending the proposed regulatory language as follows:

"(a) No later than October 1, 2022, as compared with the amount of HCFC-22 produced on a facility line, no more than 0.1 kg of HFC-23 may be emitted per 100 kilograms of HCFC-22 produced by such facility line."

### B.    EPA Should Retain Ability to Obtain Two Extensions

EPA should retain the ability to request two, 6-month extensions for the imposition of any limitation on HFC-23 emissions as contained in the proposed regulatory text at 40 C.F.R. §84.27(a)(1)-(2).  The Preamble for the proposed rule requests comment on whether EPA should provide for only a single, one-year deferral of the emission standard with no possibility of an extension.[147] While, as described above, Chemours has publicly announced its plans to install new technology to address HFC-23 by the end of 2022, EPA should retain the proposed rule language allowing for the possibility of two, six-month extensions.  Any multi-million dollar project to effect a re-design of a production facility with new, untested technology risks possible delay and can experience unforeseen complications despite thorough advance planning.  EPA should retain the flexibility to review and approve extensions to account for these and other possibilities.

### C.    EPA Should Not Promulgate A Single List of Destruction Technologies

EPA has proposed a list of destruction technologies applicable to the destruction of regulated substances, except for HFC-23, as well as a list of destruction technologies that are specific to the destruction of HFC-23.[148]  EPA should not promulgate a single list of destruction technologies based solely on HFC-23.  HFC-23 is rarely used in blends.  Therefore, having a single list of destruction technologies based on HFC-23 is not needed.  Imposing overly stringent

---

[147] 86 Fed. Reg. at 27,179.
[148] Proposed §84.29.

The Chemours Company FC, LLC

requirements for other HFCs based on HFC-23 blends could cause material harm to current operators of destruction facilities.

    D.    EPA Should Clarify Regulatory Language Regarding Time Periods for Destruction

EPA has proposed that the expenditure of production allowances is not required if regulated substances are destroyed "within 30 days."[149]  Where offsite destruction of HFCs is used, allowances are not required if the HFCs are destroyed in 90 days.[150]  These provisions should be clarified to indicate that destruction is to occur within a time period measured from the point in time when a suitable amount of HFC is captured allowing for efficient destruction. Under systems that are in use or contemplated for installation, HFC-23 is first captured during the production of HCFC-22 and then stored until such time as it is either sold or a "batch" is designated for destruction.  But the time required for the collection of a batch will vary according to the production process and the operation of a specific facility.  While Chemours agrees that EPA should establish outside limits for ensuring destruction, these limits must reasonably reflect the production, capture and destruction process utilized for HFC-23.  Thus, EPA should revise the proposed regulatory language as follows:

> "(3) A person is not required to expend production allowances . . . if the regulated substances are destroyed using a technology approved by the Administrator for destruction under §84.29 within 30 days of the time in which a suitable batch is collected if the destruction technology is located at the facility where the production occurred or 90 days after a suitable batch is collected if the destruction technology is not located at the facility where the production occurred."

## XI.    EPA Should Allocate 2024 and Future Allowances Based on Consistent Methodology Pursuant to Requirements of the AIM Act

EPA describes Section XI of the preamble as an advanced notice of proposed rulemaking ("ANPRM") regarding ideas EPA is considering for "the criteria/framework for issuing allowances for 2024 and later years."[151]  This characterization is a misnomer since EPA is not charged with promulgating a "criteria/framework" for 2024 and later years.  Rather, Section 103(e)(2)(D) clearly directs EPA to use the "*quantity calculated*" for allowances "to determine the *quantity of allowances* for the production and consumption of regulated substances."  As noted in more detail below, various concepts for allowance "allocation", that in some cases may be characterized as "sale" rather than "allocation", are at odds with the statutory language of the AIM Act and cannot otherwise be supported under any authority conveyed to EPA by Congress.[152]

---

[149] Proposed §84.5(a)(3).

[150] *Id.*

[151] 86 Fed. Reg. at 27,157.

[152] EPA did examine other allocation structures, including fees and auctions, in connection with implementation of the Montreal Protocol using the authority of the former section 157(b) of the CAA. See 53 Fed. Reg. 30,566 (Aug. 12, 1988).  EPA received comments questioning the legal basis of such actions and, in the end,

A.     EPA Has Limited, Specific Authority Concerning Allowance Allocations Under AIM Act

Unlike many other federal departments and agencies, EPA has no "organic statute" that directs the Agency's operations.  EPA, instead, was created through an Executive Order.[153]  This order provided for the establishment and basic organizational structure of the agency and transferred to the EPA Administrator certain functions previously performed by other parts of the federal government.[154]  But, like all Executive Orders, the governmental reorganization plan that created EPA did not serve as new legislative authority for the operation of the Agency.

This history should be kept in mind when assessing the authority of EPA to implement a program to phasedown HFCs under the AIM Act.  Put simply, EPA cannot rely on other authority conveyed to the Agency to implement the AIM Act apart from the authority conveyed by that Act.  As noted above, while Congress intended EPA to implement the AIM Act in a manner consistent with its prior implementation of ODS programs pursuant to Title VI of the CAA, the AIM Act was not an amendment to the CAA, but rather a free-standing law.  Explicit cross-references to the CAA in the AIM Act were also not directed to parts of the CAA conveying substantive authority to control stationary sources, mobile sources, air toxics or other air pollutants.  Rather, the AIM Act cross-references provisions of the CAA that are specifically directed to administrative, venue, information gathering and enforcement authorities.[155] EPA must therefore find its authority for allowance allocations solely within the confines of the AIM Act.

As noted previously, EPA's stated rationale for proposing alternatives to the traditional allocation of allowances to producers and importers is based on the CAA providing for a *phaseout* of ODS versus *phasedown* of HFCs under the AIM Act.[156]  But this distinction is first inaccurate and second, of no value in interpreting EPA's legal authority with respect to allowance allocations.  First, EPA does not have complete legal authority to phase out all ODS -- given the many exceptions to the complete phaseout of ODS provided in Title VI noted previously.[157]  And clearly, not all ODS have been phased out pursuant to Title VI more than 30 years after both ratification of the Montreal Protocol and enactment of the 1990 Clean Air Act Amendments.  Pre-shipment and quarantine uses of ODS are still legal and, in some cases, required pursuant to authorities conveyed to other parts of the federal government.  It could also be inferred that since the ODS reductions occurred stepwise, they set precedents for the stepwise reductions that are required for HFCs under the AIM Act.

Second, even if EPA had complete authority with respect to ODS, the requirement to phasedown HFCs to 85% of historic production/consumption (with additional authority to reduce allowed production by more than 85% contained in several sections of the AIM Act) makes the distinction in authorities effectively meaningless.  Nowhere in the preamble of the proposed rule

---

finalized an allocated quota system indicating that "[a]ccording to economic theory, an allocated quota system should achieve EPA's regulatory goal at the lowest possible cost to society."  *Id.* at 30,567.

[153] Reorganization Plan No. 3 of 1970, 35 Fed. Reg. 15,623 (Oct. 6, 1970).

[154] *Id.* at Sec. 2.

[155] AIM Act, section 103(k).

[156] 86 Fed. Reg. 27,203.

[157] See n. 88-90, supra

does EPA disclaim authority to accelerate the phasedown of HFCs or to utilize authority conveyed to control HFCs in sectors or subsectors.[158]  Nor does EPA affirmatively state that it has authority *only* to phasedown HFCs to 85% of prior production and consumption.  EPA's conceptual framework for interpreting the AIM Act to provide it with latitude to consider a different allowance criteria/framework is therefore without foundation.  In order to articulate a difference between a phaseout and phasedown as between Title VI and the AIM Act as conveying authority with regard to allowance allocations, EPA must first specify precisely what that difference is and what legal constraints in the AIM Act prevent the Agency from exceeding an 85% reduction in HFC production and consumption relative to baseline.

Third, EPA fails to explain why any difference between an 85%, 95% or 99% phasedown in HFCs versus a theoretical 100% phaseout for Class I and Class II substances is meaningful with respect to the allocation methodology for allowances.  EPA provides no such explanation, but rather asserts that this differential (of whatever percentage it actually might be in reality) somehow authorizes the Agency to implement allowance allocation systems that use more recent years data apart from baselines, impose fees for acquiring allowances or allow the Agency to run an auction for allowances when no provisions in the AIM Act provide for such actions.  It is simply not enough to make a theoretical distinction between Title VI and the AIM Act. Such a distinction must have a meaningful difference that would justify implementing a completely different methodology of allocation allowances than EPA has utilized over the past 30 years.

Finally, AIM Act provisions regarding allowance allocations are clear and dispositive. The AIM Act provides that phase down of production and consumption of HFCs is to occur through an "allowance ***allocation*** and trading program."  Sec. 103(e)(3).  Thus, the plain meaning of the statute precludes EPA from selling, auctioning or using other financial mechanisms that require value to be provided to the government for allowances – some of the concepts that EPA states it is considering for allowances after 2023.  ***EPA is directed to allocate allowances*** under the AIM Act – not sell, auction or otherwise solicit financial contributions in order for an entity to obtain allowances.

    B.      EPA Must Allocate Allowances Solely to Historical Producers and Importers of HFCs

EPA has requested advance input on several "concepts" with regard to allowance allocations in 2024 and succeeding years.  These include allocating allowances based on past production and consumption while recognizing transfers among companies, allocating allowances based on more recent years of production and consumption, requiring a fee for every production or consumption allowance, using an auction system or some combination of the identified approaches, including phased-in fees or auctions.[159]  As noted above, EPA lacks any statutory basis in the AIM Act for any allowance approach apart from the required allocation and trading program provided in Section 103(e)(3) of the AIM Act.  There is no provision in the AIM Act which identifies any other basis other than historical production and consumption of HFCs,

---

[158] AIM Act, sections 103(f), (i).
[159] 86 Fed. Reg. at 27,203.

CFCs and HCFCs for the determination of the amount of allowances to be allocated.[160]  EPA is directed to phase down the production and consumption of regulated substances solely through "an allowance and trading program in accordance with [the AIM Act]."[161]  EPA may not find discretion when statutory language is explicit and thus, the Agency has no statutory basis on which to explore extra-statutory "concepts" for the distribution of allowances.

The prohibitions on production and consumptions of HFCs[162] are based on the quantity of total allowances that EPA is required to calculate based on past historical production of HFCs, CFCs and HCFCs.[163]  The AIM Act further provides that an allowance is "a limited authorization for the production or consumption of a regulated substance"[164] further tying allowances directly to these activities.  Where such an explicit connection between the determination of allowances and their intended use is provided by statute, EPA may not imply a broader economic scheme was intended and thus, allowing the Agency to utilize a wide range of theoretical allowance methodologies.  In short, Congress provided a definition for what allowances are, how the amount of available allowances is calculated and how allowances are to be used, which are all tied to historic production and consumption.  When such an explicit statutory scheme is provided, Congress is not required to legislate in the negative and specifically prohibit EPA from taking actions apart from the statutory scheme.

It is further revealing that EPA cites no statutory authority for the Agency to impose fees directly on producers and importers or to conduct an auction of allowances which would require the payment of fees to the U.S. Treasury.  In the past, EPA has disclaimed any such ability under the Clean Air Act unless specifically authorized:

> The [Clean Air Act] does not include a broad grant of authority for EPA to impose taxes, fees or other monetary charges specifically for GHGs and, therefore, additional legislative authority may be required if EPA were to administer such charges (which we will refer to collectively as fees). EPA may promulgate regulations that impose fees only if the specific statutory provision at issue authorizes such fees, whether directly or through a grant of regulatory authority that is written broadly enough to encompass them.[165]

EPA's sole rationale to support a fee or auction system (for which no statutory authorization is provided) is therefore the supposed difference of an 85% phasedown versus a theoretical (and inaccurately portrayed) 100% phaseout.  Given that EPA has no taxing authority within the CAA and that any authority for fees is specific to individual provisions in the CAA, nor does such authority exist for  either activity in the AIM Act, the comparison between the two statutes as a front of authority for a fee or auction system for HFC allowances is further

---

[160] in

[161] *Id.*, section 103(e)(3).
[162] Id., section 103(e)(2).
[163] Specifically, EPA is to use the quantity calculated pursuant to section 103(e)(2)(B) to determine the quantity of allowances than may be used in a given year.  *See* AIM Act, section 103(e)(2)(B).
[164] *Id.*
[165] 73 Fed. Reg. 44,411 (July 30, 2008).

undermined.  Furthermore, there is no indication in legislative history of the AIM Act that would demonstrate that Congress intended to convey such new authority to EPA.

That such fees or other economic instruments are not authorized is further underlined by the fact that when Congress intended to provide such authority with respect to ODS, it acted separately to provide such authority, not to EPA but to the Internal Revenue Service ("IRS") and not within the CAA or another environmental statute, but through language contained in an omnibus budget measure:

> This document contains final regulations relating to the tax on chemicals that deplete the ozone layer and on products containing such chemicals. These regulations reflect changes to the law made by the Omnibus Budget Reconciliation Act of 1989 and the Omnibus Budget Reconciliation Act of 1990. They affect manufacturers and importers of ozone depleting chemicals, manufacturers of rigid foam insulation, and importers of products containing or manufactured with ozone-depleting chemicals. In addition, these regulations affect persons, other than manufacturers and importers of ozone-depleting chemicals, holding such chemicals for sale or for use in further manufacture on January 1, 1990, and on subsequent tax-increase dates.[166]

The excise and floor tax regulations for ODS were promulgated by the IRS through a 1991 rulemaking and are contained in 26 C.F.R. Part 52.  EPA neither implements these regulatory provisions nor collects the taxes due.

C.    Several Policy Reasons Weigh Against Alternative Allowance Allocation Systems

EPA has historically recognized that prior producers and importers of regulated substances bear the financial burden (having their ability to sell a product diminished or extinguished) of implementing provisions concerning ODS.  At the same time, these parties have also historically invested in and developed new alternatives, allowing for an acceleration of the transition to safer and more environmentally beneficial alternatives.  Allocating allowances to prior producers and importers both recognizes the cost of new regulatory requirements on historic producers and importers and the substantial investments made by such companies to allow for a successful transition to safer and more environmentally beneficial alternatives.  The same cannot be said to be true for allowing equivalent access to allowances for entities that may have invested nothing in the transition to HFC alternatives but seek now to either simply import foreign-produced HFCs or compete in the domestic production market.

EPA has not provided any information as to why it would be justified to depart from the statutory language of the AIM Act or prior practice regarding the Agency's treatment of Class I and Class II ODS.  To the contrary, EPA admits that some concepts would raise costs to consumers, a goal nowhere expressed by Congress in the AIM Act in either its statutory language or legislative history.  Requiring companies to pay a fee for allowances would result in an "expected increase in the market price of HFCs that is likely to occur over time as [the

---

[166] 53 Fed. Reg. at 56,303 (Nov. 4, 1991).

amount of] allowances decrease . . . [this alternative] could increase the cost of HFCs."[167]  While EPA suggests that an increase in price could also foster "faster transition to alternatives," the AIM Act already includes authority to approve full, partial or graduated prohibitions on HFCs in individual sectors or subsectors based on the availability of substitutes and other factors.[168]  Given the provision of this explicit authority and criteria to approve a transition to HFC substitutes, EPA may not imply that broader authority exists elsewhere in the AIM Act.[169]

Both fees and auctions would introduce market uncertainty which could potentially raise costs without any corresponding environmental benefit.  Under the AIM Act, the graduated reduction of HFCs on an EVe basis ensures that the environmental goals of the legislation will be met.  Should an allowance system that either imposes or raises the cost of allowances be employed, these costs would only be additive.  And certain systems, *e.g.,* a short-term auction of allowances, could introduce increased prices based simply on market uncertainty through the "bidding up" of a diminishing supply of allowances.  None of this would inure to the benefit of the environment; rather the cost of allowances could actually have the opposite effect of incentivizing purchasers to make sure that increased costs associated with allowances were realized through longer-term production of HFCs and HFC-based products.

D.    EPA's Alternative Allowance Allocation Methodologies Could Hurt U.S. Production and Benefit Foreign Producers

The AIM Act addresses production and consumption of HFCs in the United States but must also be viewed in the broader context of the international market for HFCs.  In this regard, domestic producers have significant fixed asset sites and facilities that are dependent on meeting stricter environmental performance standards than the foreign suppliers. Domestic producers also have long supply chains and long-term business contracts for raw materials.  United States producers rely on a skilled workforce which, in turn, is dependent on maintaining employment levels.  To the extent that allowances are allocated or made available to entities that do not have such a historic investment in the United States and its workforce, the end result is directly contrary to the legislative intent of the AIM Act to focus on job creation in the United States.

According to the prime Senate sponsors of the legislation, Congress expected the AIM Act to "create 150,000 direct and indirect U.S. jobs as well as generate $38.8 billion in economic benefits annually by 2027."[170]  When the House Committee on Energy and Commerce marked up H.R. 5544, the House version of the AIM Act, on March 12, 2020, it forecast the creation of 33,000 new manufacturing jobs in the United States and an additional $12.5 billion per year in benefits to the U.S. economy.  The committee further cited the potential for the United States share of the global market for HVACR equipment to "grow by 25 percent over current levels and

---

[167] 86 Fed. Reg. at 27,203.

[168] AIM Act, section 103(i)(4).

[169] *See Fourdo Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228 (1957); *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444-45 (1987); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524-26 (1989).

[170] Carper and Kennedy Introduce Bill to Phasedown Use of HFCs, U.S. Senate Committee on Environment and Public Works, November 1, 2019. Accessed at: https://energycommerce.house.gov/committee-activity/markups/markup-of-hr-6160-and-hr-5544-subcommittee-on-environment-and-climate.

improve the trade balance by increasing exports and reducing imports."[171]  While all economic predictions contain some level of uncertainty, it is clear that Congress expected enactment of the AIM Act to benefit the U.S. economy and to create U.S. jobs.  Allowance allocation systems which would "update" allowance allocations and create a shift in allowance allocations that would benefit new importers or foreign production runs counter to this express goal.

## XII.   Chemours Supports Reasonable Transparency Provisions

### A.    Elements of EPA's Proposed Requirements Are Reasonable

EPA's proposal to release aggregated national data is reasonable in a case where there are three or more reporting entities.[172] This is similar to EPA's treatment of data with respect to HCFCs.  EPA's proposal to release aggregated inventory data as of December 31 each year is also reasonable and provides transparency.  Finally, EPA's proposal to publish, each year, company allowances on an EV-weighted basis is also supportable and similar to the current system used for ODS.

### B.    EPA Should Reconsider Other Elements of Proposed Requirements

EPA is taking comment on whether to release "all HFC data, unaggregated and in a format similar to how it would be reported to the EPA.[173] EPA recognizes that many of these data elements have previously been considered to constitute Confidential Business Information ("CBI") but articulates several assumptions as to the benefits that could be derived from such widespread disclosure, including facilitating implementation of the allocation program and "increase[ing] the public and current market participants' ability to provide complementary compliance assurance and pressure."[174]  EPA also indicates that public disclosure could facilitate compliance through "pressure" applied by customers, neighbors, investors and insurers.[175]

While Chemours supports disclosure of aggregated data as indicated above, HFC activity and information provided to the EPA remains CBI and must not be released by EPA at the company and/or transaction level.  Enactment of the AIM Act did not amend or make any fundamental change in Exemption 4 of the Freedom of Information Act ("FOIA").  And a rule under the authority of the AIM Act does not amend FOIA, the criteria for exemptions or EPA's current rules affecting the submittal and handling of a FOIA exemption claim.  Neither can EPA, through a proposed rule, alter expectations concerning CBI pursuant to *Food Mktg. Inst.* v. *Argus Leader Media,* 139 S. Ct. 2356, 2360 (2019).

Import data is available to EPA through other databases and systems.  Data from those other public, or pay, systems should be used for company specific data.  If the EPA identifies a gap between the data collected under the AIM Act and the public data (*e.g.* public import data shows "Unassigned" imports) then EPA should work with Customs and Import control to stop

---

[171] Memorandum to Subcommittee on Environment and Climate Change, Committee on Energy and Commerce Staff, March 10, 2020 at 3.

[172] 86 Fed. Reg. at 27,199.

[173] *Id*. at 27,198.

[174] *Id*. at 27, 197.

[175] *Id.* at 27, 198 citing law review article.

imports without proper documentation. In this regard, it is critical to prohibit masking of any information in U.S. Customs' records. Subscription customs data services today often have critical fields shown as "unknown," a practice that can be very protective of illegal importation.

## XIII.    EPA Should Further Define "Process Agent"

EPA has provided a definition for "process agent" since this term was not included within AIM Act statutory definitions. EPA's proposed definition, however, is too limited to include all relevant production processes. Chemours therefore requests that EPA revise the definition of "process agent" in the following manner:

> Process agent means the use of a regulated substance to form the environment for a chemical reaction or physical processing (e.g., use as a solvent, catalyst, suspension agent or stabilizer) where the regulated substance is not consumed in the reaction or physical processing, but is removed or recycled back into the process and where no more than trace quantities remain in the final product. A feedstock, in contrast, is consumed during the reaction."

The proposed change in regulatory language preserves all elements of EPA's proposed definition which are protective of the environment. Both removal and recycling back into a process are required and no more than "trace quantities" can remain in a final product. Thus, it is entirely consistent with the intent of the definition but would clarify that regulated substances may be utilized in more than strictly processes involving chemical reactions. Nothing within the AIM Act provides a basis for the more restrictive definition EPA has proposed.

## XIV.    Additional Comments on Proposed Regulations and Requests for Further Input

### A.    Container Heels

Importing container (ISO tank) heels are a necessary part of the global supply chain. Normal, small heel volumes returning in containers that were exported should be exempted from further requirements, particularly where there is little commercial value. Chemours would support requiring allowances for heel imports into the United States under the US Goods returned process as a method to deter illegal imports.

Along with this suggested policy, EPA should also consider a maximum heel weight to be applied with the policy. Ideally, that maximum heel weight would represent a vapor only heel based on actual industry data. Further, ISO tanks containing residual HFC heels should be directly connected to a full ISO tank shipment that originated in the US as a means of protecting against illegal imports coming into the US as ISO tank heels.

### B.    EPA Should Reconsider Regulatory Language Basing Violations on Amounts Measured Per Kilogram

EPA has incorporated regulatory language from 40 C.F.R. Part 82 to describe when an individual violation occurs. EPA should adopt a different metric for violations of the AIM Act given its utilization of exchange values, meaning that all amounts, as measured by weight, are not equivalent in terms of potential environmental harm.

The Chemours Company FC, LLC

Such a metric could utilize the AIM Act's provided EVe values relative to each other, or a more generalized grouping of regulated substances where violations for higher EVe value substances could be based on 1 kilogram, while lesser EVe regulated substance violations could be based on 2 to 4 kilograms, respectively. Such a system would provide more equitable treatment for violations based on different regulated substances or groups of substances.

C.    Imports for Feedstock or Destruction:

EPA has proposed that "an individual shipment authorized through a non-objection notice must be destroyed within 60 days of import."[176] EPA has proposed that this same time period apply where an individual shipment is used in a process resulting in its transformation."[177]

EPA should recognize that imported shipments for use in transformation can be utilized for periods that extend much longer than 60 days. In the case where a shipment is being used as a feedstock to produce other chemicals, for example, companies are required to provide documentation of this transformation when the material leaves inventory. This reporting should be sufficient to address any compliance concerns that led to the proposal of the 60 day time limit. Transformation may also vary according to production processes and general market conditions; therefore, where proper reporting is undertaken, EPA should impose no time limit under 40 C.F.R. §84.25 where a regulated substance is imported for purposes of transformation.

Given that transformation is statutorily excluded from the definition of "produce" within the AIM Act (Section 103(b)(7)(B)), it may be argued that EPA lacks authority to require allowances be expended for this activity. Similarly, EPA's authority over the transformation process is constrained to ensuring that transformation takes place. Whether or not EPA has sufficient authority, imposing a 60-day limit on transformation as proposed under 40 C.F.R. §84.25(b)(3) is neither reasonable nor supported by adequate rationale. Alternatively, EPA could consider applying a 60-day time limit not to transformation of the material, but rather to the time in-between the importation of the material to receipt of the material at the facility that will be engaging in transformation.

In the EPA proposed process to import regulated substances as feedstocks or for destruction Under 40 C.F.R. §84.25, the petition process to import without expending allowances is limited to only the import for destruction and transformation. We agree with EPA that the ability to import without allowances is limited to only apply in these two scenarios. We further agree with EPA that any import of a regulated substance (e.g. virgin, used, recovered, recycled or reclaimed) requires allowances to be expended.

Further, while there are legitimate needs for destruction, EPA must take appropriate steps to ensure that virgin HFCs are not imported into the US for destruction for the purpose of generating carbon credits.

---

[176] Proposed 40 C.F.R. §84.25(b)(3).
[177] *Id*. at 84.25(a)(3).

## XV.     Addressing Health Risks Associated with Air Toxics in Communities Near Production Facilities

It is difficult to predict with certainty if the transition to HFC substitutes will lead to a potential increase in emissions of the associated feedstocks and byproducts.  Production of HFC substitutes occurred during a portion of the time period considered in the regulatory impact assessment and thus some data examined may already reflect this trend towards substitutes, mitigating the effects of future transitions.  The overall projected benefits of the proposed rule are also extremely large, with EPA calculating net present cumulative benefits from 2022 to 2050 at $283.9 billion at a 3 percent discount rate.[178]  As noted by EPA, the rule "will reduce GHG emissions, which will benefit populations that may be especially vulnerable to damages associated with climate change."[179]

The draft Regulatory Impact Assessment notes that changes in any future health risks for communities living near HFC production facilities remain uncertain.   As noted by EPA, HFCs are not a local pollutant and have low toxicity to humans.[180] Furthermore, as EPA also notes, production facilities are often subject to mature environmental statutes in addition to the CAA, including the Resource Conservation and Recovery Act and the Emergency Planning and Community Right-to-Know Act.  To the extent production changes occasioned by the transition from HFCs to other alternatives exceed applicable regulatory levels, permits issued by local authorities may also be required.

In response to the solicitation for feedback on the key assumptions underlying the environmental justice analysis, there is established concern and specific deficiencies with the scientific methodologies utilized in the risk evaluation under Section 6(b) of the Toxic Substances Control Act ("TSCA").[181]  Comments submitted on behalf of the Halogenated Solvent Industry Association (HSIA) provide a detailed technical discussion regarding these issues and the concerns pertaining to the use of these outcomes as the basis for EJ analysis.

With regard to the overall "form" of EPA's proposed regulations, the Agency has noted that while trading of allowances is required by the AIM Act, it is difficult to predict how much trading will occur as between companies or facilities.  EPA indicates it is unable to predict the degree for which substitutes for HFCs will be produced.[182]  This makes it difficult to predict with any degree of certainty how the transition away from HFC production will affect communities that live in the vicinity of production facilities.  However, to the extent that HFC substitutes have already been approved under the Significant New Alternatives Program, effects on human health and the environment are closely examined, including maximum exposure concentrations for worker exposure, flammability and exposure occurring within the end use of the substitute, including the identification of activities with typical and maximum potential for exposure and

---

[178] Draft Regulatory Impact Analysis for Phasing Down Production and Consumption of Hydrofluorocarbons, EPA-HQ-OAR-2021-0044-0046 at 10.

[179] *Id*. at 17.

[180] *Id*. at 106.

[181] Problem Formulation of the Risk Evaluation for Carbon Tetrachloride (Methane, Tetrachloro-) CAS RN: 56-23-5; EPA Document # EPA-740-R1-7020) https://www.epa.gov/sites/production/files/2018-06/documents/ccl4_problem_formulation_05-31-18.pdf.

[182] *Id*. at 130.

The Chemours Company FC, LLC

who is expected to be exposed.[183]  These same or similar requirements will apply to new substitutes intended as replacements for existing HFCs.  Following this program, EPA's current approval process for HFC substitutes already includes a close examination of potential health and environmental effects that occurs prior to approval of new substitutes.

In addition, based on technical objectives of the manufacturing process, feedstocks are used and consumed, except for trace quantities, in the production of HFC alternatives, contributing to the minimization of exposure to communities in proximity to production facilities.  And per EPA's proposed requirements with regard to process agents, reuse and recycling of the process agents is required along with no more than trace quantities of the process agent remaining in the final product.  These and other aspects of the transition away from HFCs would serve to limit any localized effects and should be considered if EPA determines additional analysis is warranted.

## XVI.    Comments on Draft Risk Assessment

EPA has placed a Draft Regulatory Impact Analysis into the docket.[184]  Upon review of this draft, we believe several corrections and clarifications are appropriate.

First, in Table 6-7, the report references emissions of vinyl chloride from the Chemours Louisville facility.  However, at no time was vinyl chloride produced, handled, or emitted at the Louisville facility, including the period between 2010 and 2019.  Table 6-7 should be amended to eliminate the data point showing emissions of vinyl chloride from the facility.

Second, the Chemours Chambers Works facility is not a current producer of HFCs.  The production of HFCs at this facility was discontinued in 2014.  Therefore, this facility should be removed from Table 6-1.  Furthermore, in Tables 6-4, 6-5, and 6-6, the Chambers Works facility is identified as having releases associated with production of HFCs in the year 2019.  Because the production of HFCs ceased in 2014, this data is inaccurate and should be removed from Tables 6-4, 6-5, 6-6.  While Table 6-7 includes data from 2010-2014, when the facility did engage in the production of HFCs, the data is not specifically attributed to that time period and could therefore be misinterpreted to be ongoing.  The most accurate resolution of these issues would be complete elimination of reference to the Chambers Works facility as part of this impact assessment.

Third, in Table 6-2, there is a note that states that Chemours manufactures products made from HCFC-22 at the Chambers Works facility, resulting in emissions of HFC-23.  This statement is not accurate.  Chemours did not manufacture any products made from HCFC-22 during this period.  Instead, the emission of HFC-23 from this facility is only related to packaging activities, which were discontinued in 2015.  Because this statement is not accurate and the associated hypothesis is therefore incorrect, this statement should be removed from the note in Table 6-2.

---

[183] See SNAP Information Notice, OMB Control No. 2060-0226 (EPA Form 1264-14 (Rev. July 2020).
[184] Draft Regulatory Impact Analysis for Phasing Down Production and Consumption of Hydrofluorocarbons (HFCs), EPA-HQ-OAR-2021-0044-0046.

The Chemours Company FC, LLC

Fourth, in Table 6-20, the number of informal and formal enforcement actions during the last five years is presented at a facility level. As explained in previous points, the Chambers Works facility was not a producer of HFCs during this time period and therefore should not be included in this table as one of the nine HFC production facilities for which this data is presented. Furthermore, EPA notes that "these enforcement actions are not necessarily specific to the HFC production process."[185] Thus, it is questionable how this enforcement data is relevant to EPA's estimation of the costs and benefits of implementing the phasedown of HFCs or changes in feedstocks, catalysts and byproducts to HFC production and related health risks for communities living near HFC production facilities, EPA's stated focus of the RIA.[186].

Finally, the data presented in Table 6-21 for the Chemours El Dorado facility is inaccurate and should be corrected. This facility had one non-compliance in the first quarter of 2018 related to a lab error which was resolved upon discovery. There are no further non-compliance events identified subsequent to that event in the Enforcement and Compliance History Online (ECHO) database and identifying the facility as in non-compliance for 12 quarters in Table 6-21 is incorrect. In addition, the presentation of data in this table is not an accurate reflection of the compliance status for a facility. As noted in the detailed facility report data dictionary, there are several factors to consider when utilizing this data. There are known data problems which may impact the completeness, timeliness, or accuracy of the data. Furthermore, the information presented in the ECHO database is used to track ongoing cases and should not be interpreted as a final outcome related to the violation and the presented duration of violations is only an estimate and may not reflect accurately the resolution or final decision related to an alleged violation. Therefore, utilizing this data to broadly present quarters of non-compliance is both misleading and not aligned with the overall objectives of the regulatory impact assessment.

We request that all identified errors be corrected in the final RIA.

## XVII. Conclusion

Chemours appreciates the opportunity to submit these comments on EPA's proposed rule to implement the AIM Act. We believe that EPA should proceed to finalization of this rule, preferably within the window of time specified in the AIM Act. But EPA should also take the time necessary to fully review the detailed comments it has received from Chemours and other commenters. EPA's regulatory framework for the AIM Act will likely direct the phasedown of HFCs for the next decade and a half, if not longer. Thus, decisions that the Agency makes in 2021 with regard to allowance allocations, compliance measures, regulatory requirements regarding the transfer of regulated substances and allowances, how the Agency defines certain terms and requirements and what systems it will put in place to combat illegal imports will have lasting effects.

Chemours believes that the AIM Act provides EPA with sufficient authority to accomplish the dual goals of phasing down production and consumption of HFCs and preserving and enhancing U.S. leadership and economic activity with regard to HFC substitutes. EPA.

---

[185] *Id*. at 127.
[186] *Id.* at 8, 17.

The Chemours Company FC, LLC

however, should promulgate regulations that are both sufficiently precise and adequately supported in law and the administrative record to accomplish these goals.  This will take both time and additional revisions to the proposed regulatory text and supporting technical documents, including the draft RIA.

Attachment 1

**The Chemours Company**

**Comments on Notice of Data Availability Relevant to the United States Hydrofluorocarbon Baselines and Mandatory Allocations**
Docket ID No. EPA-HQ-OAR-2021-0044
February 25, 2021

---

### I. Introduction

EPA has requested comment on several matters concerning HFC use "in preparation for upcoming regulatory actions under the American Innovation and Manufacturing Act of 2020."[1] EPA is also requesting "comment on areas where additional information could improve the Agency's data on hydrochlorofluorocarbon consumption and production in the United States for [2011, 2012 and 2013]."[2] Specifically, among several other requests, the Agency has asked for input concerning:

(1) "[A]reas where additional information could improve the Agency's data on hydrochlorofluorocarbon consumption and production in the United States for [2011 to 2013.]"[3]

(2) "[T]he accuracy of the data and analyses presented in this notice and the draft reports in the docket . . . and potential data gaps."[4]

(3) Whether companies listed in Table 2 "is the complete listing of companies who produced or destroyed HFCs in [2011-2013]."[5]

(4) Whether there exist "potential data gaps" regarding companies that did not report HFC data pursuant to the GHGRP and "whether there are other gaps that the Agency has not considered."[6]

(5) Whether companies listed in Table 2 represent a "complete listing of companies to have imported and exported HFCs in [2011-2013.]"[7]

(6) "[C]omment on documents in the docket related to the applications for which section (e)(4)(B)(iv) of the AIM Act directs the Administrator to allocate the full

---

[1] 86 Fed. Reg. at 9,059.
[2] *Id.*
[3] *Id.*
[4] *Id.* at 9,060.
[5] *Id.* at 9.063.
[6] *Id.*
[7] *Id.*

quantity of allowances necessary, based on projected, current and historical trends."[8]

Chemours is pleased to provide information concerning these requested areas, as well as respond to the Agency's presentation of data in this NODA and the underlying rationale expressed by the Agency for the type and quantity of data presented.

## II.  EPA's Data Regarding HFC Consumption and Production in the United States is Incomplete Because it Omits Data on HFC-23

Table 1 of the NODA lists all regulated substances under the AIM Act with their respective chemical name, common name and global warming potential, expressed as "exchange values." And EPA makes clear what the purpose of this listing is by stating it is "providing this information in preparation for upcoming regulatory actions under the American Innovation and Manufacturing Act of 2020, included in the Consolidated Appropriations Act, 2021."[9]

But there is a serious omission in the data presented regarding the HFCs listed in Table 1. While, as EPA cites in the NODA, "the AIM Act states that for purposes of establishing the baselines . . . EPA *shall use* the statutorily provided exchange values *for each regulated substance* (*i.e., HFCs*)"[10] EPA does not include relevant data for all HFCs that are regulated substances under the AIM Act.  Specifically, Tables 3 and 4 of the NODA present data on the "net supply" and imports of "AIM-Listed HFCs" that *exclude all data* on HFC-23.  Since HFC-23 is a regulated substance under the AIM Act, Tables 3and 4 are therefore incomplete and must be modified to include all information concerning the production and consumption of HFC-23 during the statutory 2011-2013 baseline period.

### A.  The AIM Act Requires Data on Production and Consumption of all HFCs

The AIM Act contains a list of 18 "regulated substances" that specifically includes HFC-23.[11] The Act requires EPA to establish "a production baseline for the production of *all* regulated substances" and a "consumption baseline for the consumption of *all* regulated substances."[12] These production and consumption baselines are then utilized in provisions requiring a staged phasedown of production and consumption.[13]  Monitoring and reporting requirements also explicitly reference "regulated substances"[14] as well as provisions affecting transfers and the management of these substances so as to prevent leaks from equipment and ensure safety.[15] Thus, production and consumption of HFC-23 during the baseline period of 2011 to 2013 is not only relevant to this NODA, but absolutely necessary for eventual implementation of the AIM Act which this NODA is designed to facilitate.

---

[8] *Id.* at 9,064.
[9] *Id.* at 9,059.
[10] *Id.* at 9,061 (emphasis added).
[11] Continuing Appropriations Act, 2021 Sec. 103(c)(1).
[12] *Id.,* Sec. 103(e)(1)(A) (emphasis added).
[13] *Id.,* Sec. 103(e)(2).
[14] *Id.,* Sec. 103(d)
[15] *Id.,* Secs. 103 (g), (h).

### B. EPA Cannot Rely on Subpart OO to Address All HFC Production

The only "explanation" given in the NODA for the Agency's omission of HFC-23 data is with reference to GHGRP reporting requirements contained in 40 C.F.R. Part 98, Subpart OO.  EPA cites the definition of "produce" as contained in Subpart OO and claims that this definition is "similar" to the definition of "produce" in the AIM Act.  But this regulatory definition is different in several important respects from the statutory definition of "produce" in the AIM Act, including with reference to *all* provisions in the Subpart OO regulatory definition regarding HFC-23.[16]  Moreover, whether a 12-year old regulatory definition is "similar" to a 2020 statutory definition has no real meaning since Congress purposively and explicitly approved the AIM Act to regulate HFCs outside of the Clean Air Act ("CAA") without referencing the GHGRP.

In this regard, the genesis of the GHGRP is attributable to Congressional enactment of the Fiscal Year 2008 Consolidated Appropriations Act.  This Act contained an administrative provision which stated that:

> Of the funds provided in the Environmental Programs and Management account, not less than $3,500,000 shall be provided for activities to develop and publish a draft rule not later than 9 months after the date of enactment of this Act, and a final rule not later than 18 months after the date of enactment of this Act, to require mandatory reporting of greenhouse gas emissions above appropriate thresholds in all sectors of the economy of the United States.[17]

In its first rule to require mandatory reporting of greenhouse gases, EPA explained that it was not, in fact, relying on appropriations act language as statutory authority for the GHGRP, but rather relying on CAA sections 114 and 208 to require information on greenhouse gas ("GHG") emissions be submitted to the Agency.[18]  But neither CAA section 114 or 208 relate to the production or phaseout of HFCs, nor do they provide any direction to EPA concerning the meaning of "produce" within the context of the AIM Act.  Rather, the regulatory definition of "produce" under the GHGRP was developed by EPA at a different time, for an entirely different purpose than the AIM Act.

The regulatory definition of "produce" under the GHGRP was not conjoined to any program to phase out HFCs under the CAA, nor would EPA take specific action to control the use of HFCs under the CAA for another six years *after* promulgation of the GHGRP.[19]  While EPA may

---

[16] 86 Fed. Reg. at 9,063.  Despite EPA's claim that there is "sufficient overlap" between the two definitions, the GHGRP regulatory definition excludes HFC-23 while the AIM Act definition of "produce" contains no such exclusion.

[17] The Fiscal Year 2009 Omnibus Appropriations Act, Pub. L. 111-8 (Mar. 11, 2009), provided additional instruction to EPA on the use of $6,500,000 to develop and publish a final reporting rule.

[18] 74 Fed. Reg. 16,448 (Apr. 10, 2009).  It should also be noted that the Joint Explanatory Statement for the Fiscal Year 2008 appropriations measure also included report language stating that EPA should utilize its authority under the Clean Air Act to promulgate a greenhouse gas reporting rule.

[19] *See* 80 Fed. Reg. 42,870 (July 20, 2015).

certainly make use of data compiled by the GHGRP regulation in order to efficiently implement the AIM Act, it cannot interpret the AIM Act based on the prior existence of the GHGRP which, at its core, was the result of a directive by Congress on how the Agency should spend some of its allocated funds during 2009 and 2010. And EPA certainly should not fail to include data on HFC-23 production from this NODA on that basis.

To not address HFC-23 production and consumption would be contrary to EPA's expressed intent in this NODA to "alert stakeholders of information from the Environmental Protection Agency regarding hydrofluorocarbon consumption and production in the United States for the years 2011, 2012, and 2013 and solicit stakeholder input."[20]

.

### C.  EPA Should Use Existing Data Reported under 40 C.F.R. Subpart O Concerning HFC-23 Production

GHGRP regulations require reporting of HFCs under three separate subparts, L, O and OO. The NODA, however, indicates that "EPA anticipates at this time that the GHGRP data that will be used the most to inform the U.S. production and consumption baselines are supplies of HFCs listed as regulated substances in the AIM Act that are reported under Subpart OO of the GHGRP."[21] EPA, however, currently is in possession of extensive data on HFC-23 production during 2011-2013 pursuant to historical reporting under 40 C.F.R. Part 98, Subpart O. EPA should therefore review and utilize this existing data to supplement the aggregated HFC data included in Tables 3 and 4 for "AIM-Listed HFCS."

This should be corrected in any forthcoming proposed rule.

In the 2009 GHGRP Rule, EPA explained the logic behind its reporting requirements for fluorinated gases:

> EPA proposed provisions for facilities producing fluorinated gases in three separate subparts: 40 CFR part 98, Subpart L, Subpart O, and Subpart OO. Although there are many similarities across the chemicals and processes covered by the three subparts, the subparts were deliberately tailored to different sources and types of emissions. Subpart L was intended to address emissions of fluorinated GHGs from fluorinated GHG production. 40 CFR part 98, subpart O was intended to address HFC–23 generation and emissions from HCFC–22 production. 40 CFR part 98, subpart OO was intended to address flows affecting

---

[20] 86 Fed. Reg. at 9,059. The NODA also claims to provide information related to "total annual hydrofluorocarbon production and consumption between 2011 and 2013 reported to the Environmental Protection Greenhouse Gas Reporting Program as of March 30, 2020. *Id* (emphasis added). But by excluding production and consumption data on HFC-23, EPA has not provided data on total annual production and consumption, even though it has ready access to such information.
[21] 86 Fed. Reg. at 9,061 (emphasis added).

the U.S. industrial gas supply, including production, transformation, and destruction.

EPA determined that 40 CFR part 98, subpart O was necessary because HCFC–22 production and HFC–23 destruction facilities differ from other fluorinated gas production facilities in two key respects. First, the primary fluorinated GHG that they generate (HFC–23) is made as a byproduct to the production of a substance that is not defined as a fluorinated GHG (HCFC–22). Second, due to the very high GWP of HFC–23, each HCFC–22 facility generates very large quantities of $CO_2$-equivalent. For the second reason, EPA has worked with HCFC–22 producers for over ten years to understand and reduce HFC–23 emissions. The requirements for HCFC–22 producers are therefore based on a close knowledge of their production processes and methods for accounting for emissions. These methods are also comprehensive (e.g., accounting for emissions from equipment leaks and losses during transport of HFC–23 that is shipped off-site for destruction). These requirements may not be appropriate for other fluorinated gas producers, and, at the same time, the requirements for fluorinated gas producers may not be appropriate for HCFC–22 producers.[22]

The distinctions made in the 2009 GHGRP rule were therefore based on the type of production facilities involved as well as the "flow" of fluorinated GHGs in the industrial sector.  But given the production of HFC-23 by HCFC-22 facilities involves the production of a "regulated substance" for purposes of the AIM Act, the Subpart O data on such production is highly relevant to the NODA and implementation of the AIM Act.
 The data contained in Subpart O is also of high quality, given the contemporaneous nature of the reporting required as well as the detailed requirements that EPA established for both measuring and reporting information concerning HFC-23.  Specifically, Subpart O reporters must submit annual GHG reports that include HFC–23 emissions from all HCFC–22 production processes at the facility and HFC–23 emissions from each destruction process.[23]  Among other requirements, monitoring and actions to ensure data quality under Subpart O must include:

(a) The concentrations (fractions by weight) of HFC–23 and HCFC–22 in the product stream shall be measured at least weekly using equipment and methods (e.g., gas chromatography) with an accuracy and precision of 5 percent or better at the concentrations of the process samples.

(b) The mass flow of the product stream containing the HFC–23 shall be measured at least weekly using weigh scales, flowmeters, or a combination of volumetric and density measurements with an accuracy and precision of 1.0 percent of full scale or better.

(c) The mass of HCFC–22 or HCl coming out of the production process shall be measured at least weekly using weigh scales, flowmeters, or a combination of volumetric

---

[22] 74 Fed. Reg. at 56,307.
[23] *Id*. at 56,305.

and density measurements with an accuracy and precision of 1.0 percent of full scale or better.

* * *

(f) The mass of HFC–23 sent off site for sale shall be measured at least weekly (when being packaged) using flowmeters, weigh scales, or a combination of volumetric and density measurements with an accuracy and precision of 1.0 percent of full scale or better.

(g) The mass of HFC–23 sent off site for destruction shall be measured at least weekly (when being packaged) using flowmeters, weigh scales, or a combination of volumetric and density measurements with an accuracy and precision of 1.0 percent of full scale or better.[24]

To the extent existing Subpart O information on HFC-23 production during 2011-2013 is not considered complete or otherwise deficient, then EPA should solicit such information as a "data gap" in further action involving this notice or through an additional notice. But EPA should, at minimum, consider the information for the years 2011-2013 that is already compiled and submitted to the Agency during these baseline years.[25]

## III.  EPA Should Align Policy on "Data Gaps" With GHGRP Reporting

With the exception of its treatment of HFC-23 production and consumption as outlined above, Chemours agrees that EPA can utilize reported data under the GHGRP to help define baseline production and consumption of HFCs during the relevant 2011-2013 statutory period.  The GHGRP reporting has the benefit of being contemporaneous with the baseline period.  In addition, entities that reported under the GHGRP did so under a mandatory rule.  As EPA stated upon promulgation of the first GHGRP Rule, "[t]his rule is being issued pursuant to the CAA, therefore, violations of this rule would be violations of requirements of the CAA."[26]

EPA has interpreted its authority to demand information for regulatory purposes broadly.  In response to comments regarding the extent of reporting requirements under the 2009 final GHGRP Rule, EPA stated:

> *It is true that EPA has never issued a reporting rule of this scope under section 114 before. It is also true, however, that EPA has never undertaken such a comprehensive evaluation of how to address an air pollution problem under the CAA from the outset. And EPA has never undertaken such a comprehensive evaluation of emissions for pollutants like GHGs (which are long lived and therefore become well mixed in the atmosphere), and to address a phenomenon like climate change (which while global in nature, has regional impacts). Thus, it is not surprising that EPA is undertaking a unique approach to gathering and*

---

[24] *See* 40 C.F.R. §98.154
[25] *See* https://www.epa.gov/ghgreporting/ghg-reporting-program-data-sets.
[26] Mandatory Greenhouse Gas Reporting Rule: EPA's Response to Public Comments, Volume No. 9, Legal Issues, September 2009 at 3.

> *evaluating information to allow it to thoroughly analyze how best to address GHG emissions and climate change under the CAA. Rather than proceeding piecemeal, gathering information from only certain sources, or using the information already available in whatever form, EPA is undertaking an effort to gather a consistent, comprehensive and accurate set of data to allow a full appraisal of the possible ways to tackle this unique issue.[27]*

EPA also specifically addressed the need for information concerning the full extent of HFC production in order to address the overall supply of HFCs and resulting downstream emissions from HFC users:

> *Information from suppliers of industrial greenhouse gases is relevant to understanding the quantities and types of gases being supplied in the economy, in particular those that could be emitted downstream which will aid in evaluating action under CAA section 111, as well as various sections of title VI (e.g., 609 and 612) that address substitutes to ozone depleting substances. <u>For example, information regarding HFC production will assist us in calibrating the model we use to estimate HFC emissions from air conditioning units. If and when we go final with regulations covering users (and therefore direct emitters) of these industrial GHGs (e.g., electronics manufacturing), the information from suppliers will help us quality assure the information from direct emitters and determine if there are additional sources of emissions from which we need to gather information. In the meantime, it will give us a picture of the amount of such GHGs in commerce, and used by such direct emitting categories.</u>[28]*

In sum, in the initial GHGRP Rule and subsequent rules, EPA has made it abundantly clear that the comprehensive reporting of data, including data on HFC production is: (a) mandatory and subject to enforcement under the CAA; (b) necessary to support important policy objectives involving the "large and complex" issue of climate change; and (c) necessary from all sources in order to provide information on the total amount of GHGs in commerce. These characteristics and regulatory focus are relevant to EPA's request for comment on certain "data gaps."[29]

### A. "Gap Filling" Data Should Not Be Allowed for Entities Who Failed to Report or Otherwise Comply with the GHGRP

Companies that engaged in the production of HFC-23 and the destruction of HFC-23 have been required to report such activity for all years since 2010.[30] Specifically, pursuant to 40 C.F.R. Part 59, Subpart O, affected entities were required to calculate and report "[t]he mass of HFC-23 generated from each HCFC-22 production process . . . by using one of two methods, as applicable."[31] These entities were required to report the "[a]nnual mass of the HFC-23 generated

---

[27] *Id.* at 8-9 (Italics in original).
[28] *Id.* at 17-18 (Italics in original, underlining added).
[29] 86 Fed. Reg. at 9,064.
[30] 40 C.F.R. Part 98, Subpart O, 40 C.F.R. §98.3(b).
[31] 40 C.F.R. §98.153(a).

in metric tons . . . sent off site for sale in metric tons . . . sent off site for destruction"[32] as well as other HFC-23 data.

In addition, companies that produced a fluorinated GHGs -- and any bulk importer or exporter of fluorinated GHGs in amounts more than 25,000 metric tons of carbon dioxide equivalent ("CO2e") have been required to report such activity since 2010.[33] Under 40 C.F.R. Part 98, Subpart OO, affected entities were required to measure fluorinated GHGs using flowmeters, weigh scales or other measures, to maintain records and to report this data in a manner similar to entities affected by Subpart O.

These obligations were not inconsequential burdens; affected entities under Subpart O and OO needed to devote time, attention and resources to the data gathering and reporting process. But during the rulemaking process, EPA explicitly considered whether reporting of such data would be prohibitive for small business owners or others with limited resources:

> As reported in sections VIII.C and D of the proposal preamble (74 FR 16599 to 16602, April 10, 2009), and in the economic impacts section of the preamble to the final rule, EPA analyses determined that the rule will not have a significant economic impact on a substantial number of small entities. The rule has been developed in such a way as to minimize the impact on small entities.

> To facilitate implementation and compliance, EPA plans to conduct an active and comprehensive outreach, training, and technical assistance program for the final rule. The primary audience would be the potentially affected industries, with an emphasis on assisting small entities in industrial, commercial, and institutional sectors that have only had limited experience with air pollution regulations under the Clean Air Act.[34]

Despite these long-standing requirements and outreach to small entities, the NODA indicates that "there appear to be companies that imported or exported more than 25,000 metric tons carbon that have failed to report their imports to the GHGRP."[35] EPA does not indicate how many companies are involved or how such companies would be treated in terms of their past failure to comply with the GHGRP. But as a matter of policy, EPA should exclude such imports and exports from the data assembled as a result of this NODA on several bases. First, the lack of contemporaneous compliance during the baseline years 2011-2013 standing alone, calls into question whether the data would have been assembled in compliance with applicable requirements. For example, pursuant to Subpart OO, the mass of fluorinated GHG was to have been measures "coming out of the production process over the [applicable] period."[36] Second, requirements were imposed to ensure the quality and veracity of the data. Subpart OO required

---

[32] *Id.* §98.156(a)(7)-(9).

[33] 74 Fed. Reg. 56,260, 56,427 (Oct. 30. 2009); 40 C.F.R. Part 98, Subpart OO.

[34] Mandatory Greenhouse Gas Reporting Rule: EPA's Response to Public Comments, Volume No. 8, Compliance and Enforcement, September 2009 at 1.

[35] 86 Fed. Reg. at 9,064.

[36] 40 C.F.R. §98.412(a).

specific monitoring and "QA/QC" requirements.[37] It would not be clear how such requirements could be complied with retroactively. Finally, reports were also to have been submitted by April 1, 2011 describing the methods of direct measurement and estimation to be used and dated records were to be maintained.[38] None of these requirements were designed to be met – or can be met – after the fact. Thus, EPA should not utilize any data it receives pursuant to this NODA concerning HFCs that were not in compliance with applicable regulatory requirements at the time of generation.[39]

### B. "Gap-Filling" Data Should Not Be Allowed for Other Entities

EPA is additionally soliciting data from companies that imported or exported less than 25,000 metric tons CO2e of HFCs annually during 2011-2013.[40] While these entities may not have had any obligation to compile and submit HFC data to EPA, EPA should not utilize data it may receive from such entities for the purposes outlined in this NODA. Specifically, EPA cannot assure itself, after the fact, that the data is of the same quality as contemporaneously acquired data and that the data used the same required methods and technology for its collection. EPA also had no opportunity, prior to the data collection, to review methods of data collection and estimation.

This is not to penalize those who were under no previous legal obligation to report the import or export of HFCs, but to recognize the inherent difficulties in determining the extent of such activity during 2011-2013 when no contemporaneous records were required to be generated or retained. There would seem to be a considerable burden placed on the Agency to verify such retroactive information. In addition, disallowing utilization of such data avoids a situation where an entity that operated during the baseline period may have purposively stayed under the reporting threshold through the creation of multiple small entities.

### IV. EPA Must Consider Uncertainties in Data Concerning Mandatory Allowances

EPA contracted for outside consultant analysis regarding sectors identified in the AIM Act for mandatory allocations. This analysis utilized a variety of source material rather than data that was reported through mandatory reporting rules, such as the GHGRP. The data that EPA has assembled also contains various assumptions and uncertainties. For example, data on HFC use for metered dose inhalers indicates that prescriptions as reported may reflect either a "unit" or a "dose."[41] Information regarding the use of HFCs in the semiconductor industries identifies "three significant sources of uncertainty in this analysis."[42] It is also not clear with respect to specific end uses and products whether new alternatives will be developed and when. The development of alternatives could realistically impact the need to utilize HFCs.

---

[37] *Id.* §98.416

[38] *Id.* §§98.416, 98.417.

[39] To be clear, this is not a matter of correcting past data that may have been submitted in error. Rather, as described in the NODA, EPA appears to be soliciting data that was never submitted to the Agency, although such data was always required to have been submitted.

[40] 86 Fed. Reg. at 9,064.

[41] Market Characterization of the U.S. Metered Dose Inhaler Industry, February, 2021 at 18.

[42] Market Characterization of the U.S. Semiconductor Industry, February, 2021, Appendix A.

EPA must take these data quality and data limitations into account in the HFC production and consumption data it assembles pursuant to this NODA.  EPA may distinguish between contemporaneously reported data that was developed and submitted pursuant to regulation, and data that is estimated based on secondary sources of information.  This distinction weighs on the side of conservatism with regard to the data that will be assembled for use with respect to AIM Act mandatory allocations.

## V.  EPA Should Correct Company Names and List of Companies Contained in Table 2

Table 2 contains a list of companies that reported production, import, export, or destruction of HFCs during 2011-2013.  This table indicates that "Chemours" engaged in such activity.  The correct name for our company is "The Chemours Company" and we ask that EPA utilize this name in any subsequent NODAs or regulatory documents utilized in implementing the AIM Act.

Table 2 also lists ICOR International Inc.  On April 1, 2018, The Chemours Company, thru its wholly owned subsidiary, The Chemours Company FC, LLC acquired ICOR International.  As previously requested,[43] any future actions by EPA as a result of this NODA or in furtherance of implementation of the AIM Act should consider all production and consumption baseline information for ICOR International to be that of The Chemours Company.

---

[43] Chemours Letter to Katherine Sleasman, USEPA Headquarters, January 22, 2020.

Attachment 2

ENVIRONMENTAL PROTECTION AGENCY

———————

# A Brief History of Unfairly Traded Imports of HFCs from China

———————

Submitted on behalf of

American HFC Coalition

———————

July 6, 2021

CASSIDY LEVY KENT, LLP
Washington, DC

**Table of Contents**

Page

I. INTRODUCTION ................................................................................ 1

II. DISCUSSION ................................................................................... 4

   A. Imports of R-134a and the Major Commercial HFC Blends Penetrated the U.S. Market Using Unfair Trade Practices ................................................ 4

      1. Commerce Has Repeatedly Found Chinese Producers and their US Importers Are Selling at Triple-Digit Dumping Margins ..................... 4

      2. The USITC Repeatedly Found that Chinese HFC Imports Seized Market Share from U.S. Producers Based on Unfairly Low Prices .................. 7

   B. Almost As Soon As the 2016 and 2017 Antidumping Orders Were Published, Imports from China Began to Circumvent the Law ........................... 8

      1. Reblended R-421A – Commerce found that specific importers of unpatented R-421A reblended this material in the US to evade the antidumping duty law ............................................................. 9

      2. Indian HFC Blends Containing Chinese HFCs – Commerce found that Indian producers working with U.S. importers blended Chinese origin HFC's in India in order to evade the dumping law ........................ 11

      3. Unfinished HFC Blends – Commerce found that imports of "unfinished" blends of R-32 and R-125, which were then reblended in the United States into a blend covered by the antidumping order, were circumventing the order. ............................................................................. 12

      4. Transshipment through Hong Kong, Jamaica, Panama, and South Korea - Importers have mislabeled and falsely identified the origin of HFCs from China to evade the antidumping orders by transshipping through third countries. ........................................................................ 13

   C. Certain Importers Have Persistently Attempted to Evade or Circumvent the Antidumping Duty Orders ............................................................ 15

      1. Since late 2016, BMP and numerous affiliated companies owned by Ben Meng actively engaged in circumvention of the antidumping law. ...... 15

      2. BMP's Acknowledged Affiliate iGas is Affiliated with Chinese HFC Producer the Juhua Group ............................................................. 18

      3. Circumvention Through Transshipment ...................................... 20

i.    Puremann Transshipment through S. Korea ................................................. 20

ii.    iCool Transshipment through Hong Kong .................................................... 22

D.    Import Trends Established In Commerce Anti-Circumvention Proceedings Reveal The Importance Of Using An Expanded Period For Allocating Consumption Allowances ................................................................................ 23

III.  RECOMMENDATIONS .................................................................................... 25

A.    Using 2011-2019 as the Allocation Period Reduces the Impact of Unfairly Traded Imports on Consumption Allowances .............................................. 25

B.    U.S. Importers Found to be Circumventing the HFC Blends Order and/or the R-134a Order Should Not be Awarded Consumption Allowances Based on such Circumvention Activity ............................................................................... 27

**Table of Exhibits**

No.        Title

1          Commerce Final Decision Memorandum (May 28, 2020) issued in the Unpatented
           R-421A anti-circumvention inquiry (in full)

2          Gujarat Fluorochemicals Ltd. Quantity & Value Questionnaire Response
           (November 15, 2019) (public version) submitted in the Indian Blends anti-
           circumvention inquiry (in full)

3          Ships' manifest data showing imports from "Jamaica"

4          Photographs of the imported R-134a where the packaging is marked "Made in
           Korea" while the enclosed cylinder marked "Made in/Hecho en China"

5          BMP & Affiliates Quantity and Value Questionnaire (November 21, 2019) (public
           version) submitted in the R-421A anti-circumvention inquiry (excerpt)

6          Commerce preliminary analysis memorandum concerning BMP (April 3, 2020)
           issued in the Components anti-circumvention inquiry (excerpt)

7          Affiliation of BMP and Golden G

8          Documents Demonstrating BMP Group/Ben Meng Affiliations with Cool Master,
           iGas, Puremann, and the Juhua Group (Chinese Hydrofluorocarbons producer)

           **A** - Florida Division of Corporations registrations for various BMP affiliates,
           including iGas and BMP

           **B** - Import Bill of Lading from Panjiva.com showing Puremann's Tampa address
           and reporting "Person in charge Ben Men [sic]"

           **C** – Photograph showing country of origin declaration of Cool Master R-134a
           cannister (Puremann) and purchase receipt

           **D** – Puremann, Inc. "Company Introduction" provided on the "Gobiz Korea"
           website

           **E** - iGas *et al*., Quantity and Value Questionnaire Response (November 12, 2019)
           (public version) submitted in HFC Components anti-circumvention inquiry
           (excerpt)

iii

JA307

**F** –Juhua Group's Section D Questionnaire Response (March 10, 2014) (public version) at D-2 – D-3, submitted in antidumping duty Investigation of 1,1,1,2 Tetrafluoroethane from China (excerpt)

**G -** Zhejiang Juhua's (Juhua Group) 2018 Annual Report showing investment in iGas USA Inc. (excerpt)

9       Puremann Inc. website screenshots including Korean address and facility photographs

10      Photograph of Puremann 30lb R-134a cylinder showing U.S. address and declaring use of non-Korean raw materials

11      Photographs showing evolving country of origin declarations on BMP cannisters, showing "Made in Korea" later changed to "Product of Korea and USA"

12      Korean Import/Export Data

13      Ships' manifest data showing details of Puremann's circumventing imports during 2019-2020

14      Puremann's facility in Chungbuk. S. Korea (from Puremann website)

15      U.S. importer found to have circumvented Commerce hydrofluorocarbon antidumping duty orders; U.S. importers with histories of transshipment or non-compliance with country of origin requirements

## I.    INTRODUCTION

On April 30, 2021, the Environmental Protection Agency ("EPA") issued a proposed rule that would phase out HFC refrigerants,[1] including the HFC blends and HFC components subject to several antidumping ("AD") orders, anti-circumvention findings, and U.S. Customs and Border Protection ("CBP") enforcement actions. The NPRM proposes to allocate the volume of HFC products that may be sold in the United States, based on the 2017-2019 market share held by U.S. manufacturers and importers of HFCs.[2] The NPRM cautions, however, that such Consumption Allowances may not be issued to importers that have not complied "with Department of Commerce (DoC) and CBP HFC trade provisions."[3]

As outlined below, Chinese exporters and related importers of HFCs made in China have engaged in unfair trade practices to penetrate the U.S. market, at least since 2013. These importers and their Chinese suppliers initially imported the most commercially significant HFC products—select HFC blends and R-134—at unfairly low prices. When in 2016 and 2017 Commerce issued antidumping orders imposing high cash deposit requirements on these products, various importers began circumventing the antidumping order by importing "unfinished" HFC blends,[4] blending in third countries, or importing unfairly traded HFC components (*e.g.*, R-32 and R-125) for blending in the United States. This pattern of circumvention began almost immediately after the antidumping duty orders were issued and was combatted with anti-circumvention decisions by Commerce, enforcement actions by CBP, and, by 2019, domestic producers were forced to petition for new antidumping and countervailing

---

[1] *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 27,150 (May 19, 2021) ("*NPRM*").

[2] *Id.* at 27,169 (EPA proposes to "issue allowances to companies that produced and/or imported HFCs during 2017, 2018, or 2019 that were still active in 2020").

[3] *Id*. The NPRM similarly indicates that other violations of U.S. Law, such as "falsifying information or data; not disclosing financial conflicts of interest or familial relationships in certain circumstances; noncompliance with the AIM Act or proposed prohibitions under §84.5" may result in "administrative consequences" for violators. *Id.* at 27,185.

[4] HFC blends covered by the Commerce antidumping order include, R-404A, R-407A, R-407C, R-410A and R-507A.

duty ("CVD") investigations covering individual HFC components of the major HFC blends, including components R-32 and R-125.



Source: U.S. Census Bureau (downloaded from the USITC Dataweb).[5]

The considerable U.S. market share seized over time by these unfairly traded imports was the direct result of a persistent pattern of dumping, circumvention, and evasion of U.S. law. As a result, U.S. manufacturers of HFCs suffered declining sales revenues and profits, and failed to earn an adequate return on investment for more than six years, including the years 2017-2019 that EPA proposes to use to establish allowances. At the same time, importers of unfairly traded Chinese HFCs increased their share of the U.S. market on the basis of unfair trade practices. Having seized market share and sales volume through the use of unfairly low prices through

---

[5] Includes imports for consumption classified under subheadings 2903.39,2005m 2903.39.2020, 2903.39.2030, 3824.78.0000, 3824.78.0020, and 3824.78.0050, HTSUS.

Attachment 2

dumping and subsidization, importers of HFC blends and components from China should not receive Consumption Allowances based on sales of those dumped and subsidized imports.

The White House recently issued a comprehensive report setting a blueprint for enhancing domestic supply chains for a number of critical product groups, including computer chips and high-capacity batteries for electric vehicles.[6] Throughout, the report emphasizes the need to address overarching environmental concerns and, specifically, Chinese producers gaining U.S. market share by trading in products that were produced under lax environmental standards. "The Administration's approach to resilience must focus on building trade and investment partnerships with nations who share our values—valuing human dignity, worker rights, environmental protection, and democracy."[7] The Report goes on to emphasize the need to support "companies with strong track records of environmental compliance at their other or past operations."[8]

Consistent with these policies, the EPA should not award a disproportionate share of Consumption Allowances to circumventing importers associated with unfairly traded HFCs from China. Such a result is inconsistent with the purpose of the AIM Act. As important, the EPA must not award Consumption Allowances on the basis of market share seized by means of unfairly traded imports. Having increased market penetration through unfair trade practices, including dumping, subsidies, and circumvention of past antidumping duty orders, Chinese manufacturers should not further benefit through the assignment of Consumption Allowances to importers of the unfairly traded HFCs.

---

[6] *See Building Resilient Supply Chains, Revitalizing American Manufacturing, And Fostering Broad-Based Growth, 100-Day Reviews under Executive Order 14017* (June 2021), available at https://www.whitehouse.gov/wp-content/uploads/2021/06/100-day-supply-chain-review-report.pdf.

[7] *Id.* at 6.

[8] *Id.* at 143.

## II.    DISCUSSION

### A.    Imports of R-134a and the Major Commercial HFC Blends Penetrated the U.S. Market Using Unfair Trade Practices

1. Commerce Has Repeatedly Found Chinese Producers and their US Importers Are Selling at Triple-Digit Dumping Margins

Since at least 2013, imports of R-134a were being sold in the United States at dumped and subsidized price levels. The U.S. Department of Commerce ("Commerce") found that R-134a from China was being dumped by 280.67 percent[9] and was benefiting from subsidies ranging from 1.87 to 22.75 percent of the ad valorem U.S. price of the imported HFCs.[10] Although the U.S. International Trade Commission ("USITC") concluded that these imports were not yet a sufficient cause of injury to merit relief,[11] it was only a matter of time until rising volume of Chinese HFCs inflicted "material injury" on the domestic industry.

Less than two years later, in *Hydrofluorocarbon Blends from China,* Commerce found that Chinese imports of the subject "HFC" blends, including R-404A, R-407A, R-407C, R-410A, and R-507A, were being dumped at margins ranging from 101% to 216%.[12] This time, the USITC found that the domestic industry had been materially injured by the unfairly trade imports,[13] and Commerce issued an antidumping duty order in August 2016.[14] Furthermore, the first administrative review of the *HFC Blends Order* analyzed data submitted by Chinese

---

[9] *1,1,1,2-Tetrafluroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 79 Fed. Reg. 62,597 (October 20, 2014) ("*2014 R-134a DOC Final*").

[10] *Countervailing Duty Investigation of 1,1,1,2 Tetrafluoroethane from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 79 Fed. Reg. 62,594 (October 20, 2014).

[11] *See* 1,1,1,2—Tetrafluoroethane From China, Inv. No. 701-TA-509 and 731-TA-1244 (Final), USITC Pub. 4503 (December 2014). Antidumping and countervailing duties may be imposed only if the imports are both unfairly traded and cause or threaten to cause "material injury." *See* 19 U.S.C. §§ 1671 and 1673.

[12] The HFC Blends accounted for over 95 percent of the HFC blends sold in the U.S. market.

[13] *See* 1,1,1,2 -- Tetrafluoroethane (R-134a) from China, Inv. No. 731-TA-1313 (Final), USITC Pub. 4679 (April 2017) ("*2017 R-134a ITC Affirmative Final*").

[14] *Hydrofluorocarbon Blends from China; Antidumping Order,* 81 Fed. Reg. 55,436 (August 19, 2016) ("*HFC Blends Order*").

4

exporter/producers and found even higher antidumping duty margins: 285.73%.[15] Thus, having penetrated the U.S. market with low-priced imports, Chinese exporter/producers and their U.S. importers maintained their market share by continuing to sell at dumped prices.

In its second investigation of unfairly traded imports of R-134a, Commerce found that Chinese imports were being dumped at margins ranging from 148% to 167% and issued an antidumping order in April 2017.[16]

With antidumping duty orders in place on imports of major HFC blends (R-404A, R-407A, R-407C, R-410A, and R-507A) and R-134a, Chinese producers next began exporting R-32 and R-125, which was then blended by U.S. importers. Commerce commenced an antidumping investigation with respect to Chinese R-32 in 2020, and found antidumping margins ranging from 161% to 221% in March 2021.[17]

Most recently, in February 2021, Commerce initiated antidumping and countervailing duty investigations with respect to R-125, one of two individual HFC components used in HFC blends that was not already subject to antidumping duties.[18] Commerce found sufficient evidence

---

[15] *Hydrofluorocarbon Blends from the People's Republic of China: Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments*; 2016–2017, 84 Fed. Reg. 17,380 (April 24, 2019).

[16] *R-134a from China; Antidumping Order*, 82 Fed. Reg. 18,422 (April 19, 2017) ("*2017 R-134a Order*"). As noted above, in a previous investigation in 2013, Commerce found that imports of R-134a from China were benefitting from government subsidies and were also being dumped in the U.S. market. However, the USITC found that these unfairly traded imports were not causing material injury to the U.S. industry.

[17] *R-32 from China; Antidumping Duty Order*, 86 Fed. Reg. 13,886 (March 11, 2021) ("*R-32 Order*").

[18] *Pentafluoroethane (R–125) from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg. 8583 (February 8, 2021) ("*R-125 DOC Initiation*") and *Pentafluoroethane (R–125) from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 86 Fed. Reg. 8589 (February 8, 2021). At this point, confronted with the relentless efforts of Chinese HFC imports to penetrate the U.S. market, all U.S. manufacturers have ceased production of the remaining HFC component: R-143a.

in the petition to support the allegation that Chinese imports were being dumped and subsidized,[19] and the case is ongoing.

These four Commerce antidumping proceedings investigated dumped and subsidized products produced and exported by over 20 producers and exporters. Many of these producers were found to be dumping in multiple investigations, including the original R-134a investigation, the HFC blends investigation, and the later investigations of R-134a and HFC component R-32.[20]

Notably, EPA proposes that entities subject to AD/CVD duties pursuant to Commerce final determinations must document payment of applicable duties or demonstrate exemption from such duties before receiving allocations in 2022 or 2023.[21] AD/CVD duties are paid at the time of importation by the importer of record. Because each importer must file an Entry Summary (CBP Form 7501) that allows identification of applicable AD or CVD cash deposit rate that must be paid, these documents can be readily submitted to EPA by importers seeking allowances. Entry Summaries list the unique 10-digit "AD/CVD No." or "code" that Commerce assigns to each individually examined producer or exporter covered by an antidumping or countervailing duty order.[22] These codes identify the antidumping or countervailing duty deposit

---

[19] *R-125 DOC Initiation,* 86 Fed. Reg. at 8586. Commerce recently extended the date for its preliminary determination to August 10, 2021. The final determination should issue 75 days later. *See Pentafluoroethane (R–125) from the People's Republic of China: Postponement of Preliminary Determination in the Less-Than-Fair-Value Investigation*, 86 Fed. Reg. 29,752 (June 3, 2021).

[20] Each individually investigated producer and/or exporter and their resulting margins of dumping or subsidization are stated in tables included in Commerce's published final determinations, orders, and final results of administrative reviews. *See, e.g., HFC Blends Order*, 81 Fed. Reg. 55,436 at 55,438.

[21] *See NPRM,* 86 Fed. Reg. at 27,186 ("EPA is proposing that any entity that is subject to a DoC Final Determination and is requesting allowances for 2022 or 2023 must provide documentation of payment of the AD/CVD for HFC imported in 2017 through the date of this proposed rule, or provide evidence that those imports were not required to pay AD/CVD for those years.").

[22] *See* CBP Entry Summary, *available online at* https://www.cbp.gov/trade/programs-administration/entry-summary/cbp-form-7501, last accessed June 30, 2021. The unique AD/CVD numbers are reported in box 29.B of Form 7501 and take the form "A-570-028-0xx," where the first three digits indicate country of export (here, China), the middle three digits indicate the Commerce order (HFC Blends in this example), and the last three digits are the unique code Commerce assigns to individually examined producers and/or exporters.

rate assigned to examined producers or exporters.[23] At a minimum, each importer seeking an allowance should be required to provide an annual certification, subject to 18 U.S.C. § 1001, that it made required cash deposits with respect to all HFC imports covered by an AD and/or CVD order. EPA would then request copies of the Entry Summaries to verify the certifications.

2. The USITC Repeatedly Found that Chinese HFC Imports Seized Market Share from U.S. Producers Based on Unfairly Low Prices

In the five years from 2016 through 2021—capturing EPA's proposed three-year allowance base period—the USITC repeatedly concluded that unfairly traded imports of HFCs from China seized considerable market share from the U.S. industry. As a result, the production, U.S. sales, and market share of U.S. manufacturers has been depressed at least since 2013-2015, the period of investigation ("POI") covered by the first affirmative injury finding. This imbalance in market share as between U.S. producers and U.S. importers of Chinese-origin HFC blends and HFC components is primarily due to unfairly traded imports and is clearly reflected in the proposed 2017-2019 base period.

In August 2016, in *HFC Blends*, the USITC found that "***[t]he increase of subject imports' market share came almost entirely at the expense of the domestic industry***."[24] In April 2017, the USITC found "because of the elevated level of subject imports, the domestic industry was unable to obtain the market share it achieved in 2014 at any subsequent time during the POI."[25] Two Commissioners went on to find that the alarming surge in imports of unfairly traded R-134a justified a finding of "critical circumstances," saying

the increase in imports and inventories appears to reflect an effort by Chinese exporters to flood the U.S. market with low-priced R-134a. ***An importer testified that many new entrants were "hell bent" on gaining market share in the United States***. A significant importer, BMP, circulated weekly faxes to purchasers in 2016 touting a large supply of

---

[23] A producer and/or exporter's duty deposit rate can be changed in annual administrative reviews conducted in accordance with 19 U.S.C. § 1675.

[24] *See Hydrofluorocarbon Blends and Components from China*, Inv. No. 731-TA-1279 (Final), USITC Pub. 4629 (Aug. 2016) ("*2016 HFC Blends ITC Affirmative Final*") at 23 (emphasis added).

[25] *Id.* at 22-23.

Chinese product at low prices, which likely had an impact on both the automotive and HVAC aftermarket.[26]

In March 2021, the USITC again found that **"[l]ower-priced imports [of R-32] caused the domestic industry to lose sales and market share to subject imports. Specifically, the domestic industry lost \*\*\* percentage points of market share to the subject imports from 2017 to 2019."**[27] Most recently, in April 2021, the USITC issued an affirmative preliminary injury determination finding that the evidence supported the conclusion that subsidized and dumped imports of R-125 used low prices to gain market share at the expense of the domestic industry, saying, "the volume of subject imports relative to U.S. consumption increased significantly, and subject imports undersold domestic prices to a significant degree in the later portion of the POI. **The … increase in subject imports' market share from 2017 to 2019 came almost entirely at the expense of the domestic industry**".[28]

In short, over the entire period 2016 to the present, the market share held by various importers of HFC Blends (i.e., R-404A, R-407A, R-407C, R-410A, and R-507A) and HFCs R-32, R-125, and R-134a reflects a pattern of relentless unfair trade and circumvention of the antidumping duty orders covering HFC imports. Sales of such imports, and the share of consumption seized by reason of unfair trade and circumvention, should not be the basis of any award of Consumption Allowances.

**B.      Almost As Soon As the 2016 and 2017 Antidumping Orders Were Published, Imports from China Began to Circumvent the Law**

Following the publication of the antidumping orders on *HFC Blends* and *R-134a*, Chinese exporters and U.S. importers began to circumvent the high duty rates intended to remedy unfair trade. In 2017, Commerce commenced five scope proceedings, including one inquiry requested by CBP, to address imports of HFC Blends and R-134a that were being

---

[26] *Id.* at 28 (emphasis added).

[27] *See Difluoromethane (R-32) from China*, Inv. No. 731-TA-1472 (Final), USITC Pub. 5165 (March 2021) ("*2021 R-32 ITC Affirmative Final*") at 27 (emphasis added).

[28] *See Pentafluoroethane (R-125) from China*, Inv. No. 701-TA-662 and 731-TA-1554 (Preliminary), USITC Pub. 5170 (March 2021) ("*2021 R-125 ITC Affirmative Prelim*") at 41 (emphasis added).

8

blended in third-countries, repackaged prior to importation, or shipped into the United States and reblended after importation in very low cost operations. These scope inquiries were all later conducted under the anti-circumvention provisions of the statute.[29] The circumvention determinations by Commerce illustrate the disrupting tactics used by importers to maintain or increase their U.S. market share by evading the HFC Blends antidumping duty order.

    1.   <u>Reblended R-421A – Commerce found that specific importers of unpatented R-421A reblended this material in the US to evade the antidumping duty law</u>

The *HFC Blends* antidumping order excluded "patented" blends such as R-421A. BMP International Inc., and its numerous affiliates[30] (collectively, "BMP") imported R-421A but did not have the right to resell the patented product in its imported form; i.e., as R-421A. Instead, BMP added a small amount of another HFC component to the imported R-421A, converting the product into HFC Blends that are subject to the antidumping order (*i.e.*, R-404A, R-407A, and R-407C). That is, rather than reselling the imported R-421A as is, BMP blended the R-421A with another HFC, thus producing a blend that is subject to the order. Commerce found that the minor processing involved in re-blending R-421A, coupled with the value of the Chinese-origin components and the pattern of trade amounted to circumvention of the antidumping duty order.[31]

In particular, Commerce focused its investigation on four U.S. importers affiliated with BMP: L.M. Supply, Inc. ("LM Supply"), Cool Master U.S.A., LLC, BMP USA, Inc., and iGas, Inc.[32] These importers were supplied by T.T. International Co., Ltd ("TTI"), an exporter in China

---

[29] *See* 19 U.S.C. §§ 1677j(a), (b).

[30] *See* discussion at Part II.C.1, below.

[31] *Hydrofluorocarbon Blends from the People's Republic of China: Final Scope Ruling on Unpatented R-421A; Affirmative Final Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A*, 85 Fed. Reg. 34,416 (June 4, 2020) ("*R-421A Affirmative Anti-Circumvention Determination*").

[32] BMP USA is an affiliate of "BMP International Inc.," and is listed in *EPA Production and Consumption Tables,* Tables 3 and 4. Likewise, iGas, Inc., is an affiliate of BMP. *See* discussion at Part II.C, below.

trading in HFCs produced by multiple Chinese producers.[33] Furthermore, two of TTI's producers, Electrochemical Factory of Zhejiang Juhua Co., Ltd. and Zhejiang Quzhou Lianzhou Refrigerants Co., Ltd., are affiliated with BMP through the Juhua Group Corporation ("Juhua Group"). As discussed below, Juhua Group has an ownership interest in BMP affiliate iGas.[34] Finally, Electrochemical Factory of Zhejiang Juhua and Zhejiang Quzhou Lianzhou Refrigerants supplied TTI with R-134a during the July 2015 through December 2015 period of the Commerce R-134a investigation.[35]

In its final anti-circumvention decision, Commerce noted that

"(1) BMP's investment to blend HFCs in the United States is minimal in comparison to the investment require to create components;

"(2) BMP's R&D expenses are negligible;

"(3) the nature of BMP's production process in the United States is not significant;

"(4) BMP's production facility for completing finished HFC blends is not extensive; and

"(5) the value of processing performed in the United States represents a small proportion of the value of the merchandise sold in the United States."[36]

_____

[33] During the respective investigation periods, TTI exported subject HFC Blends (R-404A, R-407A, R-407C, R-410A and R-507A) and subject R-134a produced by three separate Chinese producers, including 1) Zhejiang Sanmei Chemical Ind Co., Ltd.; 2) Sinochem Environmental Protection Chemicals (Taicang) Co., Ltd.; and 3) Zhejiang Zhonglan Refrigeration Technology Co., Ltd. *See HFC Blends Order,* 81 Fed. Reg. at 55,438 and *2017 R-134a Order,* 82 Fed. Reg. at 18423. A fourth producer, Shandong Huaan New Material Co., Ltd., supplied TTI with HFC Blends but not R-134a during the respective POIs. *Id.*

The HFC Blends period of investigation ("POI") covered October 2014 through March 2015 and the R-134a POI covered July 2015 through December 2015.

[34] *See* discussion at Part II.C.2, below.

[35] *See 2017 R-134a Order*, 82 Fed. Reg. at 18423.

[36] *See* Final Decision Memorandum for Scope Ruling and Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China; Unpatented R-421A at 19-20 (May 28, 2020) (footnoted omitted), included in **Exhibit 1**.

Ultimately, Commerce found that "the nature of BMP's production process in the United States is not significant," and "the evidence placed on the record overwhelmingly supports that the process of assembly or completion is minor or insignificant within the meaning of section 781(a)(1)(C) of the Act…."[37]

> 2. <u>Indian HFC Blends Containing Chinese HFCs – Commerce found that Indian producers working with U.S. importers blended Chinese origin HFC's in India in order to evade the dumping law</u>

In this inquiry Commerce examined imports of HFC blends from India produced using Chinese R-32 that was shipped to India and then blended with Indian HFC components before re-export to the U.S. When determining that these imports were circumventing the *HFC Blends* order pursuant to 19 U.S.C. § 1677j(b), Commerce found that merely blending HFC components in India involved minor, comparatively low-cost processing operations and the value of the Chinese imports accounted for a significant portion of the value of the finished product ultimately exported to the United States.[38] As such, the mere blending of Chinese components in a third country (here India) was insufficient to change the Chinese origin of the resulting HFC blend for purposes of the antidumping law.[39]

Commerce singled out several Indian companies engaged in blending the Chinese-origin HFCs, including Gujarat Fluorochemicals Ltd. ("GFL"), SRF Limited ("SRF"), and Coolmate

---

[37] *Id.* at 22, 23.

[38] *Hydrofluorocarbon Blends from the People's Republic of China: Final Negative Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-410A Blend; Affirmative Final Determination of Circumvention of the Antidumping Duty Order by Indian Blends Containing Chinese Components*, 85 Fed. Reg. 61,930 (Oct. 1, 2020) ("*Indian Blends Affirmative Circumvention Final*").

[39] *See* Preliminary Decision Memorandum for Scope Ruling and Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China: Indian Blends (April 3, 2020) at Part XIII ) (pages 15 -25) (unchanged in final determination). This document is available to the public on the International Trade Administration's Centralized Electronic Service System, known as "ACCESS" (hereafter "ITA ACCESS"). ITA ACCESS is available at https://access.trade.gov/login.aspx.

Refrigerant Pvt. Ltd. ("Coolmate").[40] These producer/exporters were then shipping the finished HFC blends to five specifically identified importers in the United States: Altair Partners, LP,[41] Dynatemp International,[42] GFL Americas, LLC ,[43] Kivlan & Company, Inc., and Mondy Global, Inc.[44]

Following this determination, U.S. importers of HFC blends exported from India are subject to 216.37% antidumping duties unless the importer certifies to CBP upon entry that no Chinese origin components were used in the imported blend.[45]

3. <u>Unfinished HFC Blends – Commerce found that imports of "unfinished" blends of R-32 and R-125, which were then reblended in the United States into a blend covered by the antidumping order, were circumventing the order.</u>

Acting on an allegation that the antidumping order was being violated pursuant to the EAPA,[46] CBP requested Commerce to provide a ruling whether imports of R-32 and R-125 were covered by the *HFC Blends* antidumping duty order. When blended in 50/50 proportions, R-32 and R-125 become R-410A.[47] In this case, the imported products were not quite blended to 50/50 proportions. Instead, after importation, a small amount of additional HFC component was added to the "unfinished" blend to bring it into compliance with the ASHRAE definition of a subject HFC blend—and thus within the scope of the *HFC Blends Order*. Applying the statute and using

---

[40] Coolmate refused to participate in the proceeding and was thus denied eligibility for participating in the import certification regime adopted in this proceeding. *Indian Blends Affirmative Circumvention Final* at 61,932.

[41] Altair is listed in *EPA Production and Consumption Tables* at Table 4.

[42] Dynatemp is not listed in *EPA Production and Consumption Tables.*

[43] GFL Americas is not listed in *EPA Production and Consumption* Tables.

[44] *See* **Exhibit 2** Gujarat Fluorochemicals Limited ("GFL") Quantity & Value Questionnaire Response (November 15, 2019) (public version) at Attachment II-B, submitted in the Indian Blends anti-circumvention inquiry. Kivlan and Mondy are listed in *EPA Production and Consumption Tables* at Table 4.

[45] *Indian Blends Circumvention Final*, 85 Fed. Reg. at 61,933. Commerce requires these certificates to be placed on the record of relevant Commerce antidumping proceedings.

[46] The Enforce and Protect Act of 2015, 19 U.S.C. §1517 ("EAPA").

[47] *See* AHRI Standard 700, Table 2A.

12

"facts available" because certain parties failed to provide responsive information, Commerce found that the value added in the United States was not significant, that the value of the Chinese content was a significant portion of the total value of the finished product, and the blending in the United States amounted to only minor processing.[48]

Commerce identified several companies in its preliminary determination, including U.S. importer Weitron Inc. ("Weitron") and its affiliated Chinese exporter/producer Weitron International Refrigeration Equipment (Kunshan) Co., Ltd. ("Weitron Kunshan").[49]

In its final determination, Commerce required all importers "of partially finished R-32/R-125 blends produced in China" to pay cash deposits of up to 216.37%.[50]

4. <u>Transshipment through Hong Kong, Jamaica, Panama, and South Korea - Importers have mislabeled and falsely identified the origin of HFCs from China to evade the antidumping orders by transshipping through third countries.</u>

Following the imposition of antidumping duties on HFC blends and R-134a, the domestic industry began to identify numerous cases in which Chinese HFCs covered by an antidumping order were being imported from third-countries and improperly identified with a country-of-origin other than China. In each case, these imports were reported to CBP. Although the results of CBP's investigations are confidential and did not result in published "circumvention" decisions (as is CBP practice), in each case the pattern of imports stopped after the practice was identified. Examples follow:

---

[48] *Hydrofluorocarbon Blends from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order; Unfinished R-32/R-125 Blends*, 85 Fed. Reg. 4,632 (January 27, 2020) ("*Unfinished Blends Affirmative Circumvention Prelim*") (unchanged in final *Hydrofluorocarbon Blends from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order; Unfinished R-32/R-125 Blends*, 85 Fed. Reg. 15,428 (March 18, 2020) ("*Unfinished Blends Affirmative Circumvention Final*").

[49] *Unfinished Blends Affirmative Circumvention Prelim,* 85 Fed. Reg. at 4,634. The U.S. importer (Weitron) is listed in *EPA Production and Consumption Tables* at Table 4.

[50] *Unfinished Blends Affirmative Circumvention Prelim*, 85 Fed. Reg. at 4,633 (unchanged in final).

- In 2016-2017, BMP affiliate LM Supply, Inc. was transshipping Chinese origin R-134a through Jamaica.[51] These imports were reported to CBP. Although the details of CBP's investigation are confidential, the transshipments subsequently stopped.

- In early 2017, iCool Inc.[52] was transshipping Chinese HFCs through Panama and Hong Kong. These imports were reported to CBP. Although the details of CBP's investigation are confidential, the transshipments subsequently stopped.

- In mid-2018, Carquest was importing Chinese R-134a in box cartons shipped from South Korea and stamped "made in Korea." When the boxes were opened, the cylinders were marked "made in China." These imports were reported to CBP and subsequently removed from the market.[53]

- Pursuing an "e-allegation," filed by the HFC Coalition, CBP investigated the country of origin claimed by Puremann, Inc.,[54] with respect to imports of R-134a from Korea. Although the details are confidential, Puremann subsequently revised the marking on its cylinders to state that the R-134a was "processed in Korea from imported materials. A discussion of Puremann's circumvention (via transshipment through Korea) is provided in Part II.C.2.i, below.

In Part VIII.B.3 of the *NPRM,* EPA proposes formal consultations with CBP to address possible non-compliance with payment of AD/CVD duties by importers of record.[55] Specifically, where there is non-payment of AD/CVD, use of improper Harmonized Tariff Schedule ("HTS") classifications, or other duty evasion, EPA contemplates "discretion to revoke, retire or withhold allowances."[56] EPA should consult with CBP to ensure LM Supply, Inc. iCool, Inc., Puremann, Inc. (indeed ***all*** BMP affiliates), and Carquest Corporation are 1) complying with special duty

---

[51] *See* **Exhibit** 3 (ships' manifest data showing BMP/LM Supply imports of R-134a transshipped through "Jamaica").

[52] iCool Inc is listed in *EPA Production and Consumption Tables* at Table 4.

[53] *See* **Exhibit 4** (photographs of the imported R-134a where the packaging is marked "made in Korea" while the enclosed cylinder marked "made in China").

[54] Puremann is not listed by name in *EPA Production and Consumption Tables* but its affiliate "BMP International Inc." is listed in Tables 3 and 4.

[55] *See NPRM,* 86 Fed. Reg. at 27,186.

[56] *Id.*

liability under Commerce hydrofluorocarbon orders,[57] 2) properly reporting HTS classifications in accordance with 19 U.S.C. § 1484, and 3) properly declaring country of origin in accordance with by 19 U.S.C. § 1304.

### C.   Certain Importers Have Persistently Attempted to Evade or Circumvent the Antidumping Duty Orders

1. Since late 2016, BMP and numerous affiliated companies owned by Ben Meng actively engaged in circumvention of the antidumping law.

The president and owner of BMP International Inc. is Xianbin (Ben) Meng.[58] Recent Commerce anti-circumvention proceedings found that Ben Meng established nineteen or more affiliated entities, many of which are and have been engaged in importing Chinese origin HFC products. In the HFC Components anti-circumvention inquiry Commerce found "BMP has consistently shifted importers for its imports of HFC components."[59] Commerce noted further that "BMP's Q&V questionnaire response shows that between August 2016 and June 2019, BMP used at least four affiliated importers to import HFC components from China, … ."[60] This strategy appears to have been adopted to avoid eventual payment of cash deposits and duties of 216%. Indeed, Commerce concluded, "[t]hus, BMP's patterns of trade clearly shifted to avoid the duties placed upon HFC blends with the enactment of the [HFC Blends] Order."[61] The lead

---

[57] The orders presently include HFC Blends (A-570-028), R-134a (A-570-044) and R-32 (A-570-121).

[58] This relationship is disclosed in public company factual information certifications Ben Meng filed at Commerce, in accordance with 19 C.F.R. § 351.303(g). Examples are included in **Exhibit 5,** where Ben Meng is reported the owner of the BMP International and numerous BMP affiliates. *See also,* Florida Department of State corporate registration documents provided at **Exhibit 8.A** where Ben Meng is listed as officer and registered agent for numerous affiliates, including BMP USA and BMP Refrigerants, iGas, and LM Supply.

[59] *See* Commerce memorandum: Anti-Circumvention Inquiry of Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China – HFC Components: Business Proprietary Memorandum for BMP (April 3, 2020) ("*Commerce Memoranda on BMP*") (public version) at 8 (issued at preliminary determination). Excerpt included at **Exhibit 6**.

[60] *Id.*

[61] *Id.* at 9.

companies are BMP International, Inc. and iGas, Inc. Nineteen BMP/iGas affiliates
acknowledged by BMP and identified by Commerce include:[62]

- 7680 Paradise Point LLC
- 8105 Anderson LLC
- 8900 Armenia LLC
- AC Tampa Bay, Inc.
- Assured Comfort A/C Inc.
- BMP International, Inc.
- BMP Refrigerants Inc.
- BMP USA Inc.
- Cool Master U.S.A., L.L.C.
- E.T.S. of Tampa Bay, Inc.
- iGas USA Inc.
- iGas, Inc.
- L.M. Supply, Inc. (aka LMJ Supply, Inc.)
- MasterJ LLC
- MS Fund LLC
- Organic Apple, LLC
- Organic Orange, L.L.C.
- U.S. Ladder, Inc.
- U.S. Metal of Tampa, Inc.

As discussed below, Commerce has also found Ben Meng entity iGas USA to be
affiliated with Chinese HFC producers within the Juhua Group, based on Juhua's ownership
interest in iGas.[63]

Datamyne import statistics and bills of lading also identify Puremann, Inc., and Golden G
Imports LLC,[64] as importers of HFCs. These importers are likewise affiliated with BMP and
iGas. For example, Puremann Inc. ("Puremann," also known as "Pure Manna"), another U.S.

---

[62] BMP acknowledged affiliation between and among all of these 19 entities in a public
submission made on the record of the Unpatented R-421A anti-circumvention inquiry. *See*
**Exhibit 5** BMP and Affiliates Quantity and Value Questionnaire Response (November 21, 2019)
(public version), submitted Unpatented R-421A anti-circumvention inquiry.

[63] *See* **Exhibit 6**, Commerce *Memoranda on BMP* at 9.  Commerce also found that Juhua is a
state-owned Chinese entity.  *See, infra,* Section C(2).

[64] *See* **Exhibit 7** (Datamyne bills of lading and Florida corporate registration documents
concerning Golden G, which are discussed below).

16

importer of HFC components, appears to be affiliated with the BMP group through relationships with BMP affiliates iGas and Cool Master, as follows. *First*, the registered agent for iGas, Inc. is "Xianbin Meng," the owner and President of BMP.[65] In publicly available Bills of Lading, Puremann identifies "Ben Men [sic]" as the "person in charge" for U.S. imports of R-134a and reports its U.S. address to be "4912 W. Knox St. Tampa, Florida 33634."[66] *Second*, Cool Master is an undisputed affiliate of iGas and BMP, as noted above. Photographs of Cool Master canisters containing R-134a that were "processed in Korea" contain Puremann's address and contact information, including the Knox Street, Tampa address.[67] *Third*, Puremann's Korean affiliate is "the only Korean company which is registered and producing" R-134a in Korea.[68] This evidence indicates that Puremann and Cool Master, iGas and BMP are affiliated, and that Ben Meng owns or controls all of these entities.

Concerning Golden G Imports, this is a Florida limited liability corporation that was formed on April 29, 2019.[69] *First,* as shown on bills of lading obtained through Datamyne, however, Golden G was designated as consignee on U.S. shipments of hydrofluorocarbons from China that were scheduled to arrive in the United States nine and two days, respectively, ***prior*** to its formation (April 20, 2019 and April 27, 2019). These shipments actually arrived nine and eleven days after formation, on May 5 and 7, 2019. This timing indicates Golden G was formed to replace the importer of record on pre-existing orders. *Second,* both of these entries were made pursuant to purchase orders with the prefix "IGAS."[70] As discussed in Part II.B.I, above, iGas is

---

[65] *See* **Exhibit 8.A** (Florida Division of Corporations registration for iGas and BMP et al.).

[66] *See* **Exhibit 8.B** (Import Bill of Lading from Panjiva.com showing Puremann Tampa address, "Person in charge Ben Men [sic]" ).

[67] *See* **Exhibit 8.C** (Photograph of Cool Master R-134a cannister (Puremann) and purchase receipt)

[68] *See* **Exhibit 8.D** for the Puremann Inc. "Company Introduction" provided on "Gobiz Korea." Gobiz Korea is operated by the Small & Medium Business Corporation, which is a "non-profit, government-funded organization established to implement government policies and programs for the sound growth and development of Korean [small and medium enterprises]." *See* https://www.cbinsights.com/investor/small-medium-business-corporation.

[69] *See* **Exhibit 7 (**articles of incorporation).

[70] *See* **Exhibit 7 (**Datamyne bills of lading).

a U.S. importer and is one of the many BMP/Ben Meng affiliates. *Finally,* as shown in **Exhibit 8.A**, iGas was operating by at least August 2018. These facts appear to show that Golden G was formed to handle US entries that originally were to be made by iGas.

    2.   <u>BMP's Acknowledged Affiliate iGas is Affiliated with Chinese HFC Producer the Juhua Group</u>

iGas, Inc. is a corporation registered in Florida that imports HFC components R-32, R-125, and R-143a produced in China.[71] In filings made to Commerce, iGas acknowledged affiliation with Cool Master U.S.A., LLC; BMP International, Inc.; BMP Refrigerants Inc.; and BMP USA Inc.[72]

iGas is also affiliated with the Juhua Group Corporation ("Juhua Group") a Chinese entity and HFC producer Commerce previously found to be controlled by the Chinese national government. Specifically, in the 2014 R-134a investigation Commerce determined the Juhua Group to be "a 100 percent SASAC owned entity."[73] According to the Chinese central government, "SASAC" references the "State-owned Assets Supervision and Administration Commission," which is "an institution directly under the management of the State Council. It is an ad-hoc ministerial-level organization directly subordinated to the State Council. The Party Committee of SASAC performs the responsibilities mandated by the Central Committee of the

---

[71] *See* **Exhibit 8.E.** BMP, Cool Master, iGas Quantity and Value Questionnaire Response (November 12, 2019) (public version submitted in the HFC Components anti-circumvention inquiry) where iGas reports, "IGAS USA imports R-32, R125 and R143A produced in China. IGAS USA also blends these components into HFC blends such as R410A, R404A, R407A, R407C, R507. IGAS USA sells these HFC blends to distributors in the United States." The exhibit includes an excerpt covering BMP Int'l, BMP USA, Cool Master, and iGas USA).

[72] *Id*. S*ee also* **Exhibit 8.A**.

[73] *See 1,1,1,2-Tetrafluroethane From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62597 (Oct. 20, 2014), IDM at Comment 1 (page 9).

Chinese Communist Party."[74] As such, Commerce deemed the Juhua Group a Chinese state-owned enterprise.

Zhejiang Juhua Co., Ltd. ("Zhejiang Juhua"), a subsidiary of the Juhua Group, is a Chinese company that produces HFC components and HFC blends, including R-134a, R-32, R-125, and R-410a.[75] In its 2018 annual report, Zhejiang Juhua confirms that: (1) it made substantial investments in iGas USA, Inc.,[76] (2) refers to iGas as a "joint venture or associated enterprise" or "related party,"[77] and (3) had substantial transactions with iGas.[78]

Finally, Commerce found at least three Chinese HFC producers affiliated with the Juhua Group, and in turn iGas, BMP and the BMP affiliates, were dumping R-134a in the 2017 R-134a investigation. The producers are Electrochemical Factory of Zhejiang Juhua Co., Ltd.; Zhejiang Quzhou Lianzhou Refrigerants Co., Ltd.; and Zhejiang Organic Fluor-Chemistry Plant, Zhejiang Juhua Co., Ltd.[79] Two of these plants, Electrochemical Factory of Zhejiang and Zhejiang Quzhou Lianzhou, supplied Chinese exporter TTI, which is frequently the Chinese exporter on transactions involving HFC imports by BMP and its affiliates.[80]

---

[74] *See* http://en.sasac.gov.cn/ for a discussion of SASAC.

[75] *See* **Exhibit 8.F** Juhua Group's Section D Questionnaire Response (March 10, 2014) (public version) (excerpt) at D-2 – D-3, submitted in antidumping duty Investigation of 1,1,1,2 Tetrafluoroethane from China. *See also* **Exhibit 8.G** (Zhejiang Juhua's 2018 Annual Report at 6 (excerpt)).

[76] *See* **Exhibit 8.G** (Juhua 2018 Annual Report at 58-59, reporting a roughly $1.6 million investment in iGas and explaining that iGas is engaged in the "Production, procurement, mixing, storage, transportation, and sales of refrigerants and related products.").

[77] *Id.* (Excerpt of Juhua 2018 Annual Report at 209, 211, 216 (excerpt)).

[78] *Id.* (Excerpt of Juhua 2018 Annual Report at 211-212, 216-217 (excerpt)).

[79] *See 1,1,1,2 Tetrafluoroethane (R–134a) From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 12192, 12193-94 (March 1, 2017).

[80] *See* discussion at Part II.B.1, above.

19

The BMP, iGas, and their affiliates are thus supplied by and affiliated with the Juhua Group and Zhejiang Juhua. In other words, their imports of HFCs and the pattern of relentless market penetration through the use of two dozen affiliates reflects the underlying strategy of a Chinese state-owned enterprise to seize market share in the United States. EPA must not reward Juhua by assigning its importers Consumption Allowances.

3. Circumvention Through Transshipment

i. *Puremann Transshipment through S. Korea*

More recently, BMP affiliate Puremann, Inc., has begun shipping HFCs from Korea without payment of antidumping duties.[81] Puremann does not have HFC **production** capability in Korea. Photographs provide in **Exhibit 9** show a blending facility, not an HFC production facility. Having initially mismarked its products "made in Korea,"[82] Puremann more recently has changed that marking to "processed in Korea from imported materials."[83] (Discussed in more detail below.) Nevertheless, Korean import and export statistics show that the "imported" HFCs used in any processing by Puremann must have originated in China.[84]

Importantly, Puremann did not post antidumping duty cash deposits with respect to any importations of the mismarked "made in Korea" HFCs. For example, although ships' manifest

---

[81] As shown in **Exhibit 9** (prints from Puremann website showing the facility, Korean address, and products), Puremann operates a small blending facility at 332-13, Maehwagooin-Ro, Jangan-myeon Boeun-gun 376-841, Chungcheonbuk-do 28916 S. Korea. As shown in **Exhibit 10** (photograph of Puremann packaging for 30 lb. cylinder labeled "Processed in Korea from imported materials"), products sold in the United States give a U.S. address of 4912 W. Knox St. Tampa, Florida 33634 and more recently report processing using non-Korean origin raw materials.

[82] *See* **Exhibit 11** (photographs of BMP cannisters showing "Made in Korea" and later changed to "Product of Korea and USA")

[83] *See* **Exhibit 10** *See also*, **Exhibit 8.C** (photograph of recently purchased Puremann 12 ounce cannister of R-134a showing "Processed in Korea from imported materials")

[84] These data are included in **Exhibit 12** (Korean import and export data).

20

data show that Puremann had imports of R-134a in 2019-2020,[85] a Commerce administrative review of this period established that Puremann did not post anti-dumping duty deposits with respect to these imports. Indeed, the CBP import data do not even include any Puremann imports.[86] Because Puremann refused to file a response to the separate rates application[87] Commerce found that any imports of Chinese R-134a by Puremann would be subject to a 167.02% antidumping duty.[88]

Photographs of the Puremann facility in South Korea show that it lacks any equipment necessary for actual *production* of hydrofluorocarbon gases.[89] At best, its facility can transfer HFCs from ISO tanks (outside the building) to smaller 30 lb. cylinders or blend separate HFC components imported in ISO tanks into an HFC blend.[90] Indeed, on a page of "Gobiz Korea," a website supported by the Korean government, Puremann admits:

---

[85] **Exhibit 13** (ships' manifest data including Puremann imports). Note that the official Census Bureau import statistics for this period show imports of R-134a from Korea even though no R-134a was produced in Korea during that time.

[86] *1, 1, 1,2-Tetrafluoroethane (R-134a) from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2019-2020,* 86 Fed. Reg. 7854 (February 2, 2021) ("On July 16, 2020, Commerce placed U.S. Customs and Border Protection (CBP) data on the record of this review demonstrating that there were no entries of subject merchandise during the POR"). "No entries" of "subject merchandise," means that there were no imports by Puremann identified as R-134a from China and for which antidumping duties were paid.

[87] A separate rates application (or "SRA") is a responsive submission made by exporters and/or producers that is used by Commerce to determine whether the submitting party is controlled by the government of China. Because Puremann is believed to have offices in only the United States (Tampa) and Korea it should have been an easy matter to prepare and submit an SRA.

[88] *11,1,2-Tetrafluoroethane (R-134a) from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2019-2020,* 86 Fed. Reg. 30404 (June 8, 2021).

[89] *See* **Exhibit 14** for Puremann marketing materials showing images of Puremann's facility. As shown Puremann does not operate a chemical plant able to manufacture HFCs. Its equipment is sufficient only to fill cylinders or blend HFC components and fill cylinders.

[90] Following the principles laid down in the Commerce anticircumvention finding in *India Blends*, blending China HFC components in South Korea would not remove the finished HFC blend from the antidumping duty order. *India Blends Affirmative Circumvention Final,* 85 Fed. Reg. at 61,932 ("We determine that exports to the United States of certain HFC blends containing HFC components from India and China that are blended in India prior to importation into the United States, …, are circumventing the Order.").

> PureMann Inc, is the only Korean company which is registered and producing ecofriendly refrigerant gases like R134a, R410A and so on. … *But we import raw materials from China or India and produce high quality refrigerant gases in Korea factory through an automative [sic] refining and mixing process*.[91]

Because there is no manufacturing capacity for R-134a in Korea, the "made in Korea" cylinders were mismarked in violation of 19 U.S.C. § 1304. Thereafter, Puremann changed its labels to "processed in Korea from imported materials."[92] However, this label continues to violate U.S. marking law because it fails to disclose the country of origin of the materials as required by 19 U.S.C. § 1304 and 19 CFR § 134.11.

In short, Puremann, yet another affiliate of BMP, is only the latest example of the pattern of circumvention, mismarking, transshipment, and evasion that has been pursued since the HFC antidumping duty orders were published. From simple efforts to evade duties, such as the cardboard packaging marked "made in Korea" to cover "made in China" cylinders, to reblending patented HFC blends in order to circumvent the antidumping duty order, duty evasion has taken many forms and has involved many different strategies.

ii.    *iCool Transshipment through Hong Kong*

As discussed above, in early 2017, iCool Inc. was found to be transshipping Chinese HFCs through Panama and Hong Kong and the activity was reported to CBP. Although the details of CBP's investigation are confidential and thus cannot be cited here, the transshipments subsequently stopped so CBP intervention is presumed to have occurred.

iCool USA Inc. is listed in *EPA Production and Consumption Tables* at Table 4 and thus appears to seek a consumption allowance. *Before* awarding any allowance to this importer, however, EPA should require a full disclosure by iCool of *all* CBP findings concerning transshipment of HFC blends and/or components. If iCool refuses to provide the disclosure or

---

[91] *See* **Exhibit 8.D (**Gobiz Korea*).

[92] *See* **Exhibit 8.C** (the can of Coolmaster coolant was purchased November 15, 2020 at a Home Depot located in Pennsylvania).

the disclosure demonstrates that iCool market share was gained through transshipment, iCool should be denied any consumption allowance.

### D. Import Trends Established In Commerce Anti-Circumvention Proceedings Reveal The Importance Of Using An Expanded Period For Allocating Consumption Allowances

The HFC blends anti-circumvention inquiries were initiated in June 2019 and analyzed patterns of trade (i.e., U.S. imports) during the period July 1, 2011 through June 30, 2019.[93] This period captured imports occurring before and after the HFC Blends order was published on August 19, 2016.[94] Additionally, the period examined by Commerce roughly coincides with the 2011 to 2019 period over which EPA collected HFC production, import, and export data.[95] The trend in HFC imports from China is shown in the Figure on page 2, above.

The anti-circumvention statute instructs Commerce to consider "the pattern of trade, including sourcing patterns." *See, e.g.,* 19 U.S.C. § 1677j(a)(3)(A). Here, Commerce typically compares U.S. import levels of merchandise subject to the order before and after the order issues. It is looking for a pattern where importers avoid (circumvent) application of dumping duties by changing the imported product to one not covered by the order. In the case of Indian Blends, for example, importers switched from U.S. imports of Chinese-origin HFC Blends to imports of Chinese HFC components blended in India.

---

[93] *See, e.g., Hydrofluorocarbon Blends from the People's Republic of China: Initiation of Anti-Circumvention Inquiry of Antidumping Duty Order; Unpatented R-421A*, 84 Fed. Reg. 28281 (June 18, 2019).

[94] *HFC Blends Order,* 81 Fed. Reg. 55,438.

[95] *See, e.g.,* Quantity and Value Questionnaire for Chinese Producers, Exporters, and U.S. Importers of Unpatented R-421A issued to BMP USA Inc. and Affiliates (October 31, 2019), requiring monthly total quantity and value reporting of shipments (for Chinese exporters and/or producer) or imports (for U.S. importers) of Hydrofluorocarbon blends during the period July 1, 2011 through June 20, 2019. This document is publicly available on ITA ACCESS, at https://access.trade.gov/login.aspx.

Commerce discussed import trends for subject HFC blends (R-404A, R-407A, R-407C, R-410A, and R-507A) in the HFC Components[96] anti-circumvention inquiry saying,

> Record evidence demonstrates that there is a stark change in the pattern of trade since the Order was placed on HFC Blends, as demonstrated by the [record]. From July 2011, through August 2016 (i.e., when the Order took effect), the average monthly exports of HFC components from China to the United States were 529,556 kilograms (Kg). From September 2016, through June 2019, monthly average exports of HFC components from China to the United States *surged to 2,707,659 Kg; an increase of 411.31 percent*. Likewise, over the same time periods, the monthly average import quantity of HFC components from China into the U.S. increased from 599,875 Kg per month to 2,247,874 Kg per month; *a 274.72 percent increase*.

> [I]mports of HFC blends have decreased dramatically since the imposition of the [HFC Blends] Order. ITC Dataweb data show that, in 2016, a total of 9,874.6 metric tons (MT) of HFC blends classified under HTSUS 3824.78.0020 were imported from China. In 2018, that number dropped to 2,117.7 MT; a 78.55 percent decrease. Therefore, in light of significant record evidence, we preliminarily determine that the data provided on the record are clear, and that the massive decrease in imports of HFC blends into the United States, and corresponding massive increase of imports of HFC components into the United States, represent changes in the patterns of trade.[97]

These data show that advances on U.S. market share gained by imports of dumped HFC Blends—as repeatedly noted by USITC—continued occurring after the *HFC Blends Order* was published in August 2016, based on imports of HFC components used to produce subject HFC Blends after importation. As also discussed above, this continued assault on market share of U.S. producers led to petitions on imports of HFC components R-32 and R-125.

---

[96] Although Commerce preliminarily found that these imports were circumventing the antidumping duty order, it ultimately issued a negative final determination in HFC Components Inquiry based on the USITC's concern that an affirmative Commerce finding would conflict with the USITC's original injury determination concerning HFC components.

[97] *See* Preliminary Decision Memorandum for Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China: HFC Components (April 3, 2020) at 17-18 (emphasis added) (citations omitted).

### III.    RECOMMENDATIONS

The *NPRM* identifies "potential concerns with allocating allowances to entities that DoC has determined are dumping HFCs onto the U.S. market,"[98] but does not elaborate. The following recommendations suggest two means to allocate allowances, taking into account the distortions in market share caused by unfairly traded imports from China, as well as specific importers that attempted to circumvent the antidumping duty orders issued by Commerce. *First*, EPA should enlarge the period used to allocate consumption allowances to 2011-2019. This will reduce the extent to which U.S. market shares are distorted by the effects of extensive and continued imports of unfairly traded Chinese HFCs. *Second*, EPA should not allocate any consumption allowance to individual importers, and their affiliates, that have been specifically identified in final anti-circumvention rulings by Commerce.

### A.    Using 2011-2019 as the Allocation Period Reduces the Impact of Unfairly Traded Imports on Consumption Allowances

To ensure consumption allowances are not based on market share gains achieved by virtue of China's unfair trade practices, EPA should (1) use the full 2011-2019 period as the basis for Consumption Allowances, and (2) adopt an average market share approach to calculate the allocations.

*First*, EPA must not adopt an allocation period that is based on market penetration achieved by dumping and by circumvention of the anti-dumping orders. Rather, EPA's allocation period at a minimum should include the full 2011-2019 period, reflecting that the U.S. manufacturers of HFC products held a larger share of the U.S. market before the surge in unfairly traded imports that triggered the HFC Blends and R-134a investigations. Adopting this enlarged period partially addresses the severe impact of unfairly traded imports repeatedly identified by the USITC, as discussed above. Indeed, use of only the maximum year in the 2017-2019 period (as EPA proposed) enshrines and rewards importers and Chinese producers for dumping and, worse, particularly rewards importers that achieved a relatively larger market share in a single year by circumventing the antidumping duty orders.

---

[98] *NPRM*, 86 Fed. Reg. at 27,186.

*Second*, to ensure that allowances are not skewed toward U.S. importers of dumped and subsidized Chinese imports, EPA should base allowances on "each company's highest market share instead of highest production and consumption level," as envisioned in the *NPRM*.[99] Given that Chinese imports of HFCs increased over the 2011-2019 period, using annual production and consumption volumes to calculate allowances will inherently award higher Consumption Allowances to those U.S. importers that relied on dumped Chinese imports. Instead, EPA should base the allowances on annual market share, not the total quantity produced or sold.

*Third*, to fairly reflect that some market participants achieved a short-term surge in imports by circumventing the antidumping duty orders, the market share used to allocate allowances should be based on a three-year average. That is, the allowance should be calculated using each entity's market share during its three highest years of production and consumption within the 2011-2019 period. The highest three years need not be consecutive. This figure would be weighted by EVe as the basis for determining allowance allocations for "active" producers and importers.

As discussed above the USITC found "[t]he [2013-2015] increase of subject imports' market share came almost entirely at the expense of the domestic industry."[100] In the 2017 R-134a investigation, the USITC again found "the increase in imports and inventories appears to reflect an effort by Chinese exporters to flood the U.S. market with low-priced R-134a.[101] In the 2021 R-32 investigation covering the period 2017-2019 and January to September 2020, USITC yet again found "[l]ower-priced imports caused the domestic industry to lose sales and market share to subject imports."[102] These findings by the International Trade Commission establish that U.S. importers of Chinese origin HFC Blends and HFC components R-32 and R-125 gained U.S. market share through unfairly traded imports. To address this unfair trade, EPA's allocation period should at a minimum include the market shares held by U.S. producers before the findings

---

[99] *See NPRM*, 86 Fed. Reg. at 27,171, n.48.

[100] *See 2016 HFC Blends ITC Affirmative Final* at 23.

[101] *See 2017 R-134a ITC Affirmative Final* at 28.

[102] *See 2021 R-32 ITC Affirmative Final* at 27.

26

of dumping were issued. Any allocation based on 2017-2019 will simply reward importers for their sales of dumped Chinese HFC products.

### B. U.S. Importers Found to be Circumventing the HFC Blends Order and/or the R-134a Order Should Not be Awarded Consumption Allowances Based on such Circumvention Activity

As noted above, EPA should require "any entity that is subject to a DoC Final Determination and is requesting allowances for 2022 or 2023 [to] provide documentation of payment of the AD/CVD for HFC imported in 2017 through the date of this proposed rule, or provide evidence that those imports were not required to pay AD/CVD for those years."[103] Entry Summaries provide the necessary documentation and can be submitted with the application for a consumption allowance or maintained by the company and subject to audit by EPA.

However, certain importers should not be granted allowances at all. Commerce has issued formal determinations that certain U.S. importers of various hydrofluorocarbon products were circumventing the *HFC Blends Order*, in violation of the "anti-circumvention" statute. *See* 19 U.S.C. § 1677j. These specifically identified importers should not be awarded consumption allowances, because their share of the U.S. HFC market was initially established through the sale of unfairly traded (i.e., dumped) imports and then that share was maintained based on circumvention of the antidumping duty orders issued by Commerce. Accordingly, Commerce company-specific determinations of circumvention warrant action by EPA when awarding consumption allowances to these same companies.

Included in **Exhibit 15** (part I) are U.S. importers specifically identified by Commerce in three affirmative anti-circumvention inquiries completed in 2020, including *Reblended R-421A*, *Indian HFC Blends Containing Chinese HFCs*, and *Unfinished HFC Blends*. Many of these importers are found in Table 4 of the *EPA Production and Consumption Tables* and such importers are highlighted with an asterisk. Additionally, because these comments demonstrate both that BMP affiliate Puremann has gained market share through transshipment of Chinese origin R-134a through South Korea and that Puremann has refused to allow Commerce to review

---

[103] *NPRM*, 86 Fed. Reg. at 27,186.

Attachment 2

its entries of to establish margins of dumping, it too should be denied any Consumption Allowance.

Likewise EPA should consult with CBP to ensure that importers included in **Exhibit 15 (part II)** with histories of transshipment or non-compliance with country of origin requirements are no longer improperly avoiding Commerce duty liability.

\*     \*     \*     \*     \*

28

# Exhibit 1

Barcode:3980446-01 A-570-028 CIRC - Anti Circumvention Investigation R-421A



UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

A-570-028
CIRC - Unpatented R-421A
**Public Document**
E&C OII:  MR

May 28, 2020

| | |
|---|---|
| MEMORANDUM TO: | Joseph Laroski<br>Deputy Assistant Secretary<br> for Policy and Negotiations |
| FROM: | James Maeder<br>Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations |
| SUBJECT: | Final Decision Memorandum for Scope Ruling and Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China; Unpatented R-421A |

## I.    SUMMARY

We have analyzed the case and rebuttal briefs of interested parties in the anticircumvention inquiry of the antidumping duty order on hydrofluorocarbon blends (HFCs) from the People's Republic of China (China).[1]  We have not departed from our conclusions in the *Preliminary Determination*.[2]  We recommend that you approve the positions described in the "Discussion of the Issues" section of this Issues and Decision Memorandum.  Below is the complete list of the issues in this anticircumvention inquiry for which we received comments and rebuttal comments from interested parties:

| | |
|---|---|
| Comment 1: | Preliminary Scope Ruling |
| Comment 2: | Whether the Process of Assembly or Completion of R-421A Into HFC Blends in the United States is Minor and Insignificant |
| Comment 3: | Value Analysis |
| Comment 4: | Use of Surrogate Values to Value Material Inputs |
| Comment 5: | Certification Requirements |

---

[1] *See Hydrofluorocarbon Blends from the People's Republic of China:  Antidumping Duty Order*, 81 FR 55436 (August 19, 2016) (*Order*).

[2] *See Hydrofluorocarbon Blends from the People's Republic of China:  Scope Ruling on Unpatented R-421A; Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A; and Extension of Time Limit for Final Determination*, 85 FR 12512 (March 3, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

INTERNATIONAL
T R A D E
ADMINISTRATION

Barcode:3980446-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  Unpatented R-421A

## II.    BACKGROUND

On June 18, 2020, the Department of Commerce (Commerce) published the *Preliminary Determination* in the *Federal Register*.  In accordance with 19 CFR 351.309, we invited parties to comment on our *Preliminary Determination*.  On March 17, 2020, the HFC Coalition (the petitioners), BMP[3] and Choice Refrigerants (Choice) filed case briefs.[4]  On March 27, 2020, the petitioners, BMP and Choice filed rebuttal briefs.[5]  On April 9, 2020, we held a phone call in lieu of a hearing with Choice, to discuss issues that Choice raised in its case brief.[6]

## III.    MERCHANDISE SUBJECT TO THE SCOPE AND ANTI-CIRCUMVENTION INQUIRY

The scope and anti-circumvention inquiry cover imports of unpatented R-421A, a blend of HFC components R-125 and R-134a,[7] from China.  As part of the anti-circumvention inquiry, the petitioners alleged that the unpatented R-421A – which is not subject to the exclusion for patented R-421A – is being further-processed in the United States to create HFC blends that are subject to the *Order*.[8]

---

[3] LM Supply Inc., Cool Master USA, LLC, and their affiliated blenders, BMP USA Inc. and IGas Inc. (collectively, BMP).

[4] *See* Petitioners' Case Brief, "Hydrofluorocarbon Blends from the People's Republic of China:  Case Brief and Request for a Hearing," dated March 17, 2020 (Petitioners' Case Brief); *see also* BMP's Case Brief, "Hydrofluorocarbon Blends from the People's Republic of China:  Case Brief," dated March 17, 2020 (BMP's Case Brief); and Choice's Case Brief, "Hydrofluorocarbon Blends from the People's Republic of China:  Scope Ruling on Unpatented R-421A; Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A," dated March 16, 2020 (Choice's Case Brief).

[5] *See* Petitioners' Rebuttal Brief, "Hydrofluorocarbon Blends from the People's Republic of China:  Rebuttal Brief," dated March 27, 2020 (Petitioners' Rebuttal Brief); *see also* BMP's Rebuttal Brief, "Hydrofluorocarbon Blends from the People's Republic of China:  Rebuttal Case Brief," dated March 27, 2020 (BMP's Rebuttal Brief), and Choice's Rebuttal Brief, "Hydrofluorocarbon Blends from the People's Republic of China:  Scope Ruling on Unpatented R-421A; Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A," dated April 3, 2020 (Choice's Rebuttal Brief).  Choice timely filed its rebuttal brief on March 27, 2020.  However, due to the inclusion of a new argument raised in its rebuttal brief, Commerce rejected Choice's rebuttal brief and requested that it re-file the rebuttal brief omitting the untimely new argument.  *See* Commerce's Letter, "Hydrofluorocarbon Blends from the People's Republic of China Unpatented R-421A Anti-Circumvention Inquiry:  Rejection of Rebuttal Brief," dated April 2, 2020.  Also, on April 6, 2020, Choice filed comments requesting that Commerce reject BMP's rebuttal brief because it maintained that it included new affirmative arguments.  On April 7, 2020, we responded to Choice's comments in a letter and determined not to reject BMP's rebuttal brief.  *See* Commerce's Letter, "Hydrofluorocarbon Blends from the People's Republic of China Unpatented R-421A Anti-Circumvention Inquiry:  Response to Request by Choice Refrigerants to Reject Certain Rebuttal Arguments from the Anti-Circumvention Record," dated April 7, 2020.

[6] *See* Memorandum, "Ex Parte Phone Call with Choice Refrigerants," dated April 10, 2020.  Other than Choice, only the petitioners had requested a hearing, and they subsequently withdrew their request, on April 3, 2020.  Because no other party requested a hearing, we did not hold a hearing.

[7] R-125 is also known as Pentafluoroethane, and R-134a is also known as 1,1,1,2-Tetrafluoroethane.

[8] The *Order* covers five HFC blends (*i.e.*, R-404A, R-407A, R-407C, R-410A, and R-507/R-507A); R-421A is not one of the covered blends.

2

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

According to Choice (*i.e.*, the patent holder for R-421A), unpatented R-421A is chemically similar, but not identical, to Choice® R-421A, which is specifically excluded from the order.[9] Choice® R-421A is a proprietary refrigerant blend made of approximately 58 percent pentafluoroethane and approximately 42 percent 1,1,1,2-tetrafluoroethane, with a lubricating oil up to 20 percent of the refrigerant gases, comprised of 65-88 percent hydrotreated light napthenic distillate and 10-20 percent solvent refined light napthenic distillate petroleum.[10]

## IV.  SCOPE OF THE *ORDER*

The products subject to this order are HFC blends.  HFC blends covered by the scope are R-404A, a zeotropic mixture consisting of 52 percent 1,1,1 Trifluoroethane, 44 percent Pentafluoroethane, and 4 percent 1,1,1,2-Tetrafluoroethane; R-407A, a zeotropic mixture of 20 percent Difluoromethane, 40 percent Pentafluoroethane, and 40 percent 1,1,1,2-Tetrafluoroethane; R-407C, a zeotropic mixture of 23 percent Difluoromethane, 25 percent Pentafluoroethane, and 52 percent 1,1,1,2-Tetrafluoroethane; R-410A, a zeotropic mixture of 50 percent Difluoromethane and 50 percent Pentafluoroethane; and R-507A, an azeotropic mixture of 50 percent Pentafluoroethane and 50 percent 1,1,1-Trifluoroethane also known as R-507.  The foregoing percentages are nominal percentages by weight.  Actual percentages of single component refrigerants by weight may vary by plus or minus two percent points from the nominal percentage identified above.[11]

Any blend that includes an HFC component other than R-32, R-125, R-143a, or R-134a is excluded from the scope of the *Order*.

Excluded from the *Order* are blends of refrigerant chemicals that include products other than HFCs, such as blends including chlorofluorocarbons (CFCs), hydrochlorofluorocarbons (HCFCs), hydrocarbons (HCs), or hydrofluoroolefins (HFOs).

Also excluded from the *Order* are patented HFC blends, including, but not limited to, ISCEON® blends, including MO99™ (R-438A), MO79 (R-422A), MO59 (R-417A), MO49Plus™ (R-437A) and MO29™ (R-4 22D), Genetron® Performax™ LT (R-407F), Choice® R-421A, and Choice® R-421B.

---

[9] *See* Choice's Letter, "Application for Scope Ruling on Exclusion of Patented HFC Blends from Antidumping Duty Order A-570-028:  Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China," dated November 30, 2017 at 5.

[10] *Id*.

[11] R-404A is sold under various trade names, including Forane® 404A, Genetron® 404A, Solkane® 404A, Klea® 404A, and Suva®404A.  R-407A is sold under various trade names, including Forane® 407A, Solkane® 407A, Klea®407A, and Suva®407A.  R-407C is sold under various trade names, including Forane® 407C, Genetron® 407C, Solkane® 407C, Klea® 407C and Suva® 407C.  R-410A is sold under various trade names, including EcoFluor R410, Forane® 410A, Genetron® R410A and AZ-20, Solkane® 410A, Klea® 410A, Suva® 410A, and Puron®.  R-507A is sold under various trade names, including Forane® 507, Solkane® 507, Klea®507, Genetron®AZ-50, and Suva®507.  R-32 is sold under various trade names, including Solkane®32, Forane®32, and Klea®32.  R-125 is sold under various trade names, including Solkane®125, Klea®125, Genetron®125, and Forane®125.  R-143a is sold under various trade names, including Solkane®143a, Genetron®143a, and Forane®125.

Barcode:3980446-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  Unpatented R-421A

HFC blends covered by the scope of the *Order* are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) at subheadings 3824.78.0020 and 3824.78.0050. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope is dispositive.[12]

## V.    DISCUSSION OF THE ISSUES

### Comment 1:    Preliminary Scope Ruling

In the *Preliminary Determination,* Commerce found, based on a plain reading of the scope language, and consistent with statements made by Commerce in the underlying investigation, that the *Order* includes five blends: R-404A, R407A, R-407C, R-410A, and R-507A; and that R-421A, whether patented or unpatented, is not within the scope of the *Order*.[13]

*Choice's Arguments*

- Commerce should reconsider its position in the *Preliminary Determination* to find that non-patented versions of R-421A, or imports of patented R-421 imported by importers without patent rights, are subject to the *Order*.[14]  Commerce's *Preliminary Determination* does not adequately consider the entire record of this proceeding and underlying public policy.[15]  Additionally, Commerce staff have stated that the ruling was "already decided," which raises concerns that the outcome for the final determination will be pre-judged.[16]

- The plain language of the scope does not support a finding that the *Order* covers only the five named HFC blends.  Thus, Commerce's interpretation of the scope language is legally and logically unsupportable.[17]  Rather, the language in the scope suggests that the *Order* covers all HFC blends and the five listed blends are meant to be an illustrative, not exhaustive, list of HFC blends.[18]  Further, the *Order* language sets out several exclusions from the category of HFC blends, that would be entirely unnecessary if the scope was limited to five named blends.[19]  If Commerce wanted to limit the scope to five blends, it should have phrased the language to specifically state the *Order* covers "only" the five listed blends.  Additionally, the text of the *Order* must be interpreted with a view to the structure of the *Order*, which establishes an in-scope class, then expressly excludes certain subsets of that

---

[12] *See Order*.
[13] *See Preliminary Determination* PDM at 1 and 8-9.
[14] *See* Choice's Case Brief at 4-19.
[15] Choice claims that Commerce failed to properly address one of its submissions in its ruling.  *See* Choice's Case Brief at 5-6 (citing *Preliminary Determination* and Choice's Letter, "Additional Comments on Scope Inquiry for Exclusion of Patented HFC Blends from Antidumping Duty Order A-570-028:  Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China," dated April 17, 2019) (Choice's April 17, 2019 Letter)).
[16] *Id*. at 6 and footnote 2.
[17] *Id*. at 6.
[18] *Id*. at 7.  To support this claim, Choice references the scope language:  "{t}he products subject to this order are HFC blends.  HFC blends covered by the scope are R-404…R-407A…R-407C…R-410A…R-507."
[19] *Id*. at 7-8.  In support of this argument, Choice points out that there would be no basis for exclusion language for other HFC blends, such as R-421A, if they were already not within the scope of the *Order*, since R-421A is clearly not one of the five blends specified in the scope description.  Further, the exclusion for other blend types (*i.e.*, CFCs, HCFCs) would also be unnecessary.

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

class.[20]  Thus, based on the structure of the order, imports of non-patented R-421A are within the scope because they are not specifically excluded.

- Commerce does not have the authority to change an antidumping duty order[21] or interpret the scope language in a way contrary to its terms (*i.e.*, Commerce cannot change the scope to exclude an article that was included within the scope of an underlying determination).[22]  The understanding in the U.S. refrigerant industry, including participants that submitted scope rebuttal comments against Choice's request, is that all imported HFC blends are subject to the *Order*, unless the merchandise is expressly excluded from it.[23]

- The intent of the HFC blends investigation was to stop dumping of all HFC blends being imported from China.[24]  The actions taken by the petitioners and industry participants also support a general understanding that the scope broadly includes all types of HFC blends.[25]  The Petition's original scope language shows that the petitioners requested language encompassing the class of HFCs, subject to exclusions, and that this class included five specifically named HFCs, which were those that were being imported at the largest volumes.[26]  In the scope language, Commerce eventually omitted the word "including" but never indicated on the record that it intended to fundamentally re-write the scope proposed by the petitioner as it applied to patented HFCs.[27]  Further, Commerce did not change other portions of the scope language, including the description of the class of in-scope HFC blends or the exclusions that would have been unnecessary if the scope only pertained to five blends.

---

[20] *Id*. at 8 (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 204 L. Ed. 2d 841 (Fed. Circ. 2019) stating that an agency must use tools of construction when interpreting regulations to resolve any apparent ambiguity and the court should only defer to an agency's determination on an ambiguous decision after it carefully considers the text, structure, history and purpose of the regulation.).

[21] *Id*. at 8 (citing *Ericsson GE Mobile Communications, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995) (*Ericsson GE Mobile*)).

[22] *Id*. (citing *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Circ. 1990) (*Corona Corp.*); *see also Alsthom Atlantique v. United States*, 787 F.2d 565, 571 (Fed. Cir. 1986) (*Alsthom Atlantique*)).

[23] *Id*. at 6 (citing LM Supply's Letter, "Comments in response to Kenneth Ponder's and Choice's November 30, 2017 Application for a Scope Ruling," dated December 27, 2017).

[24] *Id*. (citing Petitioners' Letter, "Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China; Antidumping Duty Petition," dated June 25, 2015 (Petition)).

[25] *Id*. at 11.  Choice argues that the petitioners requested exclusions from the broad category of HFC blends to exclude patented blends that would have otherwise been included in the *Order*.  Choices also claims that this was followed by other industry participants, such as Kivlan, that requested similar express exclusions for patented products like R-421A, under the assumption that if these patented blends were not explicitly excluded they would be covered by the scope.  *See* Petition at 24-26; *see also* Kivlan and Company, Inc. (Kivlan)'s Letter, "Hydrofluorocarbon Blends and Components from the People's Republic of China, Case No. A-570-028," dated July 31, 2015 (Kivlan's Letter).

[26] *Id*. at 25-26.  Choice refers to the language "{t}he products subject to this investigation are blended hydrofluorocarbons (HFCs) and single HFC components of those blends thereof, whether or not imported for blending, <u>including</u> the following:  R-404A…R-407A…R-407C…R-410A…R-507A…R-507."  Choice claims Commerce has a policy to accept the class or kind of merchandise alleged in the petition absent some overarching reason to modify that class or kind.  *Id*. (citing *Eckstrom Industries, Inc. v. United States*, 27 F. Supp. 2d 217, 223 (CIT 1998) (*Eckstrom v. United States*).  Choice also notes that HFC components were subsequently dropped from the scope when the ITC failed to make an injury determination; a point that it finds is not relevant except to reinforce that when Commerce intended to alter the scope, it removed language rather than creating an exclusion.

[27] *Id*. at 10.

- In Commerce's *LTFV Prelim*, Commerce acknowledged that the scope language for HFC blends required an exclusion for patented versions of HFC blends, even for patented HFC blends that were not one of the five HFC blends it lists in the scope.[28]  If Commerce had intended only to cover the five chemicals mentioned in the scope, but not any other HFC blends, Commerce would have had no need to "modify" the scope to exclude the patented HFC blends because those were not one of the five named blends listed in the Petition.[29]  Commerce's interpretation that the scope covers five blends is inaccurate and was previously opposed by the petitioners out of concerns over the potential for evasion schemes.[30]

- Numerous portions of the record (some of which were inappropriately overlooked by Commerce in the *Preliminary Determination*) conflict with Commerce's belated statement that the scope language as originally drafted was limited only to the five named HFC blends. Specifically, Commerce's decision to limit the scope to five blends does not appear to be supported by the text of the documents cited, and no excerpted passages were provided; further the statements that Commerce uses to support its interpretation are inconclusive.[31]

- Ultimately, Commerce must address whether HFC blends that are listed as scope exclusions are in-scope if the merchandise did not qualify for the exclusion.[32]  If Commerce finds that unpatented versions of patented HFC blends listed as exclusions are out-of-scope, it renders the scope exclusions meaningless.[33]  Commerce's scope interpretation in the *Preliminary Determination* will result in an influx of unpatented chemicals being dumped into the U.S. market.  If importers had known, at the time of the investigation, that they could import any blend not listed as one of the five HFC blends, they would have labeled their merchandise as an unspecified HFC blend not listed in the scope.  Instead, importers manipulated their customs paperwork to make the shipments appear to be the exempt patented R-421A and to disguise the true nature of their shipments.[34]  Thus, Commerce's scope ruling rewards companies that cheat U.S. trade laws.  This ruling is inconsistent with the United States' President's efforts to enforce U.S. trade laws, combat illegal dumping, and protect American intellectual property.[35]

*Petitioners' Rebuttal Arguments*

---

[28] *Id.* at 12 (citing *Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China: Preliminary Determination of Sales at Less than Fair Value:  Preliminary Determination of Sales at Less than Fair Value, Affirmative Preliminary Determination of Critical Circumstances, in Part, and Postponement of Final Determination*, 81 FR 5098 (February 1, 2016) (*LTFV Preliminary Determination*), and accompanying PDM at 7, and the underlying Petition).  To support its rationale, Choice states that Commerce acknowledged that all blends were included when it responded to Kivlan's argument to include R-421A in the scope by stating, "{w}ith respect to Kivlan's argument, the petitioner has no objection to modifying the scope to exclude the patented blends R-421A and R-421B.  Accordingly, we have modified the scope to exclude these blends because this modification is consistent with the intent of the Petition."

[29] *Id.* at 12-13.

[30] *Id.* at 14 (citing Petitioners' letter, "The Antidumping Duty Investigation of Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China," dated May 16, 2016 at 20-21).

[31] *Id.* at 15 (citing *Preliminary Determination* PDM at 9 footnote 51).

[32] *Id.* at 15-16.

[33] *Id.* at 17-18.

[34] *Id.*

[35] *Id.* at 18-19.

6

- The petitioners did not comment on this issue.

*BMP's Rebuttal Arguments*

- Commerce appropriately concluded that R-421A, whether patented or unpatented, is not within the scope of the *Order* based on the plain language of the scope and (k)(1) factors under 19 CFR 351.225(k)(1).[36]  Commerce applied the appropriate interpretive framework outlined in the regulations and made its decision in accordance with decisions of the U.S. Court of International Trade (CIT) and U.S. Court of Appeals for the Federal Circuit (Federal Circuit).[37]

- The language of the scope limits the five named HFC blends to R-404A, R-407A, R-407C, R-410A, and R-507A and the phrase "HFC blends are covered by the scope <u>are</u>…" clearly demonstrates that the five blends are the only blends and not merely illustrative of a subset of HFC blends as claimed by Choice.[38]  Thus, the list of patented HFC blends cannot be interpreted to improperly expand the scope to include more than the five listed blends.[39]  Even if Commerce accepted Choice's argument that the examples of patented blends creates some ambiguity in the scope language, the record of the investigation supports the fact that the scope only includes the five named blends.[40]

- According to 19 CFR 351.225(k)(1), where the plain language of the scope is ambiguous, Commerce must consider "descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."  In this case, Commerce reviewed these sources in the *LTFV Final* and determined that the scope only covers the five blends explicitly listed in the first paragraph of the scope.[41]

- Choice raises an issue that has long been decided, which contradicts its claim that there is a common understanding in the industry that all HFC blends are in-scope.  Thus, Choice has overlooked the first paragraph of the scope or Commerce's explanation in the *LTFV Final*.[42]

**Commerce's Position:**

---

[36] *See* BMP's Rebuttal Brief at 1-5.

[37] *Id*. at 2 (citing *Meridian Prods., LLC v. United States*, 851 F. 3d 1375, 1381 (Fed. Cir. 2017); *see also Mid Continent Nail Corp. v. United States*, 725 F. 3d 1295, 1302 (Fed. Cir. 2013); *Tak Fat Trading Co. v. United States*, 396 F. 3d 1378, 1383 (Fed. Cir. 2005); and *ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F. 3d 82, 84 (Fed. Cir. 2012)).

[38] *Id*. at 2 (citing *Order*).

[39] *Id*. at 2.

[40] *Id*. at 3 (citing *Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 42314 (June 29, 2016) (*LTFV Final*), and accompanying Issues and Decision Memorandum (IDM) at Comment 5).

[41] *Id.*

[42] *Id*. at 5.

Barcode:3980446-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  Unpatented R-421A

In the *Preliminary Determination*, we examined the language of the *Order* and the description of the product contained in Choice's scope ruling request, as well as the description of the merchandise set forth in the Petition, the underlying investigation and as used by the International Trade Commission (ITC) for its injury determination.  We found that these sources are, together, dispositive as to whether the product at issue is subject merchandise, in accordance with 19 CFR 351.225(k)(1).  Choice does not present any new arguments that would cause us to reverse our decision for the final determination.[43]

When a request for a scope ruling is filed, Commerce examines the scope language of the order at issue and the description of the product contained in the scope-ruling request.[44]  Pursuant to Commerce's regulations, Commerce may also examine other information, including the description of the merchandise contained in the petition, the records from the investigations, and prior scope determinations made for the same product.[45]  If Commerce determines that these sources are sufficient to decide the matter, it will issue a final scope ruling as to whether the merchandise is covered by an order.  Where the descriptions of the subject merchandise are not dispositive, Commerce will consider the following factors provided at 19 CFR 351.225(k)(2):  (i) the physical characteristics of the product; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.

In accordance with 19 CFR 351.225(c) and (d), Commerce has reviewed the request in light of the description of the merchandise subject to the *Order*, as this description is set forth in the petition, the initial investigation, and the determinations of the Secretary (including all prior scope determinations) and the ITC.  Based on this review, we find that the issue of whether the product in this scope request is within the scope of the *Order* can be determined solely upon the application and the descriptions of the merchandise referred to in section 351.225(k)(1) of Commerce's regulations.  *See* 19 CFR 351.225(d).  Therefore, Commerce finds it unnecessary to consider the additional factors under 19 CFR 351.225(k)(2).

The scope language covering HFCs from China, is dispositive as to whether the product at issue is subject merchandise.  Further, we find that the factual record in this case, as well as statements by Commerce and the ITC in the underlying investigation (*see* below), support a finding that R-421A does not fall within the scope of the *Order*, in accordance with 19 CFR 351.225(k)(1).

The scope of the *Order* defines HFC blends as follows:

> The products subject to this order are HFC blends.  HFC blends covered by the scope are R-404A, a zeotropic mixture consisting of 52 percent 1,1,1 Trifluoroethane, 44 percent Pentafluoroethane, and 4 percent 1,1,1,2-Tetrafluoroethane; R-407A, a zeotropic mixture of 20 percent Difluoromethane, 40 percent Pentafluoroethane, and 40 percent 1,1,1,2-Tetrafluoroethane; R-407C, a zeotropic mixture of 23 percent Difluoromethane, 25 percent Pentafluoroethane, and 52 percent 1,1,1,2-Tetrafluoroethane; R-410A, a zeotropic mixture of 50

---

[43] *See Preliminary Determination* PDM at 8-10.
[44] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[45] *See* 19 CFR 351.225(k)(1).

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

percent Difluoromethane and 50 percent Pentafluoroethane; and R-507A, an azeotropic mixture of 50 percent Pentafluoroethane and 50 percent 1,1,1-Trifluoroethane also known as R-507.  The foregoing percentages are nominal percentages by weight.  Actual percentages of single component refrigerants by weight may vary by plus or minus two percent points from the nominal percentage identified above.[46]

Thus, the scope of the *Order* includes the following five blends:  R-404A, R407A, R-407C, R-410A, and R-507A.  Because R-421A is not one of these blends, we find that it does not fall within the scope and thus is not covered by the *Order.*  This finding is consistent with our finding in the *LTFV Final*, and the record of the underlying investigation.[47]  This language is also consistent with statements made during the HFCs investigation, where Commerce stated that "the blend portion of the scope is limited to five named HFC blends (*i.e.*, R-404A, R-407A, R-407C, R410A, and R-507)."[48]

The scope also contains an exclusion for patented HFC blends:

> Also excluded from the *Order* are patented HFC blends, including, but not limited to, ISCEON® blends, including MO99™ (R-438A), MO79 (R-422A), MO59 (R-417A), MO49Plus™ (R-437A) and MO29™ (R-4 22D), Genetron® Performax™ LT (R-407F), Choice® R-421A, and Choice® R-421B.[49]

Based on this language, there is no dispute that Choice® R-421A is excluded from the scope because the scope specifically excludes all patented HFC blends.  However, the relevant question is whether an unpatented version of a patented HFC blend falls within the scope of the HFC blends *Order*.  As discussed in the *Preliminary Determination*, and for the reasons explained above, we determined that it does not.[50]

In the underlying investigation, we determined that the scope only includes five HFC blends (R-404A, R407A, R-407C, R-410A, and R-507A).  In the *LTFV Final*, we stated that:

> The scope in the Petition defined the covered products, in relevant part, as follows:

---

[46] R-404A is sold under various trade names, including Forane® 404A, Genetron® 404A, Solkane® 404A, Klea® 404A, and Suva®404A.  R-407A is sold under various trade names, including Forane® 407A, Solkane® 407A, Klea®407A, and Suva®407A.  R-407C is sold under various trade names, including Forane® 407C, Genetron® 407C, Solkane® 407C, Klea® 407C and Suva® 407C.  R-410A is sold under various trade names, including EcoFluor R410, Forane® 410A, Genetron® R410A and AZ-20, Solkane® 410A, Klea® 410A, Suva® 410A, and Puron®.  R-507A is sold under various trade names, including Forane® 507, Solkane® 507, Klea®507, Genetron®AZ-50, and Suva®507.  R-32 is sold under various trade names, including Solkane®32, Forane®32, and Klea®32.  R-125 is sold under various trade names, including Solkane®125, Klea®125, Genetron®125, and Forane®125.  R-143a is sold under various trade names, including Solkane®143a, Genetron®143a, and Forane®125.
[47] *See LTFV Final* IDM at Comment 5 (("It is clear from this language that the blend portion of the scope is limited to five named HFC blends (*i.e.*, R-404A, R-407A, R-407-C, R410A, and R-507).  It is also clear that patented HFC blends, without limitation, are excluded." (citations omitted)).
[48] *See LTFV Preliminary Determination* PDM at 6-8.
[49] *See Order.*
[50] *See Preliminary Determination* PDM at 9.

9

The products subject to this investigation are HFCs and single HFC components of those blends thereof, whether or not imported for blending.  HFC blends covered by the scope <u>are</u> R-404A; . . . R-407A; . . . R-407C; . . . R-410A; . . . and R-507A, . . . also known as R-507.

Also excluded from this investigation are patented HFC blends, <u>such as</u> ISCEON® blends, including MO99™ (RR-438A), MO79 (R-422A), MO59 (R-417A), MO49Plus™ (R-437A) and MO29™ (R-422D), Genetron® Performax™ LT (R-407F), Choice® R-421A, and Choice® R-421B.

It is clear from this language that the blend portion of the scope is limited to five named HFC blends (*i.e.*, R-404A, R-407A, R-407-C, R410A, and R-507).  It is also clear that patented HFC blends, without limitation, are excluded.[51]

Similarly, the ITC defined its domestic like product as the same five blends, noted in Commerce's scope language,[52] and in the *ITC Final*, the ITC appropriately recognized Commerce's interpretation of the scope stating, "{t}he five in-scope blends are the major commercial refrigerant blends sold in the U.S. market for use in stationary air conditioning and refrigeration applications."  The *ITC Final* further stated that:

{t}he subject merchandise is referred to as….'in-scope blends' (R-404A, R407A, R-407C, R410A, and R-507A)…and '{o}ut-of-scope blends' or 'refrigerant blends' refer to any refrigerant blend that uses at least one in-scope HFC component and is not one of the five in-scope blends listed above.  These include all other refrigerant blends, including HFC, CFC, HCFC, and HFO blends, both proprietary and patented refrigerant blends."[53]

Further, the Petition clearly set forth the same blends listed in the current scope.  For instance, the language in the Petition states "HFC blends covered by the scope <u>are</u> R-404A; . . . R-407A; . . . R-407C; . . . R-410A; . . . and R-507A, . . . also known as R-507."[54]

Therefore, based on the foregoing, Commerce's determination that unpatented R-421 is non-subject merchandise because it is not one of the five blends listed in-scope is consistent with sources enumerated under 19 CFR 351.225(k)(1) including the Petition, the underlying investigation, and the ITC's determination.  Thus, our *Preliminary Determination* was made in accordance with Commerce's regulations for interpreting the language of the scope of an order

---

[51] *See LTFV Final* IDM at Comment 5.

[52] *See Hydrofluorocarbon Blends and Components from China; Investigation No. 7312-TA-1279 (Preliminary) August 2015 (ITC Prelim)* at I-15; *see also Hydrofluorocarbon Blends and Components from China Investigation No. 731-TA-1279 (Final) USITC Pub. 4629 (August 2016)* (*ITC Final*) at I-13, tables I-2, I-25, III-11.  *Id.* at II-6 showing in-scope blends as R-404a, R-407a, R-407c, R-507a, and R-410a and the column showing out-of-scope HFC substitutes in-scope blends, <u>one of which is R-421a, an out-of-scope HFC substitute for the in-scope blend R-407c.</u>

[53] *See ITC Final* at I-1, footnote 2.

[54] *See LTFV Final* IDM at Comment 5 (citing the Petition).

and is in accordance with Federal Circuit decisions with respect to Commerce's discretion and procedures for interpreting the scope of orders administered by Commerce.[55]

In its comments, Choice maintains that the plain language of the scope and the underlying record of the investigation do not support Commerce's interpretation.[56]  According to Choice, the scope language is written in such a way to suggest that HFC blends are covered, regardless of whether they are one of the five listed blends, unless expressly excluded from the scope.[57]  Thus, Choice asserts that unpatented R-421A must be in scope, because it is an HFCs blend and is not expressly excluded.[58]  According to Choice, this is the only logical interpretation from the sources enumerated in 19 CFR 351.225(k)(1).[59]  Choice finds that this interpretation matches the tone of the Petition, accurately reflects intentions of the petitioners, and the general understanding of industry representatives.[60]  Based on its understanding, Choice believes that Commerce erroneously interpreted the language of the scope and the intent of the petitioners in the underlying investigation.[61]

Regarding Choice's arguments, we disagree.  We find that Choice's interpretation of the scope language is flawed, overlooks previous determinations on what constitutes in-scope merchandise, and is not supported by record evidence.[62]  As noted above, the Petition clearly set forth the same blends listed in the current scope.  For instance, the language in the Petition states "HFC blends covered by the scope are R-404A; . . . R-407A; . . . R-407C; . . . R-410A; . . . and R-507A, . . . also known as R-507."[63]  Therefore, it is unreasonable to accept an interpretation that the Petition intended that other blends be covered, or that the resulting *Order* covers other blends not specifically listed within the scope language.  Further, as explained *supra*, Commerce has consistently interpreted the scope to only include the five named blends; in the *LTFV Final*, we stated that "{i}t is clear… that the blend portion of the scope is limited to five named HFC blends (*i.e.*, R-404A, R-407A, R-407-C, R410A, and R-507).  It is also clear that patented HFC blends, without limitation, are excluded."[64]

Choice maintains that, in the Petition, the petitioners had intended to include all HFC blends.[65]  We disagree with Choice, as we already addressed this argument in the *LTFV Final*:

> We disagree with the petitioners that they intended to include additional blends in the Petition, or that the intent of the Petition was altered in any way by the addition of language suggested by {Commerce}.  The petitioners agreed to change the "includes" language at {Commerce}'s suggestion prior to initiation, it

---

[55] *See, e.g., Arcelormittal Stainless*; *see also Duferco*.
[56] *See* Choice's Case Brief at 6-7.
[57] *Id.* at 7-8.
[58] *Id.* at 5 and 16-17.
[59] *Id.* at 9-17.
[60] *Id.*
[61] *Id.*
[62] In Choice's Case Brief, it claims that Commerce failed to consider Choice's April 17, 2019, Letter.  We agree that we inadvertently overlooked this submission.  Because Choice has incorporated those arguments in its Case Brief we address them in our determination.
[63] *See LTFV Final* IDM at Comment 5 (citing the Petition).
[64] *See LTFV Final* IDM at Comment 5 (citations omitted).
[65] *See* Choice's Case Brief at 6 and 11.

11

stated that "{t}he Coalition understands that this change was not intended to narrow or circumscribe the scope of the investigation, such that HFC blends or single component HFCs would be more narrowly defined or excluded from the investigation."[66]  The Petition clearly sets forth the same blends and components listed above as an exhaustive list,[67] and all discussion of the physical characteristics and uses of HFC blends is framed in terms of these products.[68,69] While the original Petition does suggest scope language which "includes" the five blends,[70] we find that this language lacks the specificity found throughout the Petition, given that the Petition elsewhere defines the blend portion of the scope solely in terms of the five named blends.

Further, on several occasions during the course of this investigation, {Commerce} interpreted the scope language as including only the five named blends and three components, and excluding all patented blends,[71] and the petitioners have not objected to these characterizations or offered any clarification.  For example, in their case brief related to scope issues, the petitioners did not comment on {Commerce}'s statements, but merely requested that {Commerce} alter one word to its proposed definition of "semi-finished blends."  *See* Comment 2, {in *LTFV Final* IDM}, above.

In fact, the petitioners themselves have affirmatively stated on at least one occasion that patented blends are out of the scope,[72] and on another objected to the exclusion from the scope of products which have patents pending but took no affirmative position on already-patented blends (beyond listing "various HFC

---

[66] *See* Petition Supplement at 3.
[67] *See* Petition at 11.
[68] *Id.* at 11-25.  For example, the Petition at 12 states that "an antidumping order covering HFC blends should also cover the HFC components used in those blends, as well as semi-finished blends that, when imported, are not yet in the correct proportions for R-404A, R-407A, R-407C, R-410A or R-507A," and the Petition also states on the same page that "{t}he five HFC blends covered by this petition are the major commercial refrigerants …"  (emphasis added in both places).
[69] The petitioners' intent to cover only the five named blends can also be seen in their proposed scope language related to semi-finished blends.  Specifically, this language limits semi-finished blends to those blends of PRC components used to produce the subject blends . . .that have not been blended to the specific proportions required to meet the definition of one of the subject HFC blends described above (R-404A, R-407A, R-407C, R-410A, and R-507A)."  *See* Initiation Notice, 80 FR at 43388.
[70] *See* Petition at 25, which states:
    The products subject to this investigation are blended hydrofluorocarbons ("HFCs")  and single HFC components  of those blends thereof, whether or not imported  for blending, including the following:  R-404A . . .
[71] *See, e.g.*, Refrigerant Solutions Scope Memorandum at 2 (stating "In the Petition, the petitioners stated that they intended to cover five HFC blends (*i.e.*, R-404A, R-407A, R-407C, R-410A, and R-507A) and three single HFC components of these blends (*i.e.*, R-32, R-125, and R-143a).  The petitioners also stated that they intended to exclude patented HFC blends, and they provided a short list of patented products as examples" (footnotes omitted and emphasis added)); *see also* Preliminary Scope Memorandum at 13, which states "According to the petitioners, most out-of-scope blends are covered by patents, and, thus, are explicitly excluded" (emphasis added).
[72] *See* Petitioners' Rebuttal Scope Comments at 2 (FN2) where the petitioners stated:  On July 31, 2015, Kivlan and Company, Inc., filed comments requesting that certain patented HFC blends, namely R-421A and R-421B, be excluded from the scope of this investigation.  These patented blends are already excluded by the scope language. The HFC Coalition therefore does not object to the request (emphasis added).

12

blends" that were excluded from the scope).[73]  Moreover, when {Commerce}
solicited comments on the appropriate product characteristics in this
investigation,[74] the petitioners limited their comments to container type[75]; we find
this significant because {Commerce}'s proposal was to define the specific
products included in the investigation as an exhaustive list of the five blends and
three components, with a catchall category for "other."[76]

Indeed, it was not until the rebuttal brief that the petitioners raised what is
tantamount to a wholly new argument, that the scope is broader than its plain
language and includes blends and components which were not specifically named
in the Petition.  According to this new argument, the scope has always covered
components such as R-152a, and R-227ea, and blends such as R-422b, R-422c,
and R-417c.[77]  However, we note that this argument is not supported by the
evidence on the record for the reasons noted above.  Further, we note that this
argument is contradicted by the petitioners themselves in their June 2, 2016,
Excluded Products Letter, where the petitioners explicitly indicated that the scope
of this investigation does not, in fact, include R-422b, R-422c, and R-417c.[78,79]

Based on our analysis in the *LTFV Final*, the petitioners acknowledged that the scope did not
include all HFC blends, and it is apparent that the scope does not cover all HFC blends for which
a specific exclusion is not in the scope language (*i.e.*, R-422b, R-422c, and R-417c).  Further, as
noted above, the petitioners did not object to Commerce's characterization of the scope language
throughout the investigation and there is nothing in the underlying investigation that supports
Choice's claims that the petitioners intended to include all blends or other blends besides the five
specifically mentioned blends.  Thus, we disagree with Choice that our interpretation is
inconsistent with either the Petition or the petitioners' intentions.[80]

Further, we do not find that the structure of the scope itself provides an indication that all HFC
blends are covered.  Choice fails to read the scope language as a whole focusing, instead, only on
the first sentence of the scope (*i.e.*, "{t}he products subject to this order are HFC blends").  It is
clear from the second sentence (*i.e.*, "HFC blends covered by the scope are…") that the scope
only covers five blends and that these blends are not an illustrative, but exhaustive list.  In the

---

[73] *See* Petitioners' Letter, "Hydrofluorocarbon Blends and Components Thereof from the People's Republic of
China:  Submission of Factual Information in Response to Scope Exclusion Request," dated June 2, 2016 (Excluded
Products Letter) at 2 and Attachment I.  This letter is the same as a letter of the same name filed on April 19, 2016,
except that the petitioners disclosed certain information for which they had initially requested business proprietary
treatment.
[74] *See* Petitioners' Letter, "Hydrofluorocarbon Blends and Components Thereof from the People's Republic of
China:  Comments on Product Characteristics," dated August 17, 2015.
[75] *See* Commerce's Letter, "Hydrofluorocarbon Blends and Components Thereof from the People's Republic of
China," dated August 12, 2015.
[76] *Id.* at Attachment.
[77] *See* Petitioners' Rebuttal Brief at 25-26.
[78] *See* Excluded Products Letter at Attachment.
[79] *See LTFV Final* IDM at Comment 5 (emphasis added).
[80] We note that the petitioners did not comment on the interpretation of the scope in the *Preliminary Determination*
in either its case or rebuttal briefs, which cuts against Choice's arguments regarding the petitioners' intentions.  *See*
Petitioners' Case Brief and Petitioners' Rebuttal Brief.

Barcode:3980446-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  Unpatented R-421A

*LTFV Final*, we addressed the same argument and disagreed that the language suggested that the five named blends are an illustrative, non-exhaustive, list of a larger category of HFC blends.  As noted above, in our *LTFV Final*, we stated:

> <u>The Petition clearly sets forth the same blends</u> and components <u>listed above as an exhaustive list</u>, and all discussion of the physical characteristics and uses of HFC blends is framed in terms of these products.[81]

Considering that we addressed which blends constitute subject merchandise in the *LTFV Final*, and this interpretation was reinforced by the ITC in the *ITC Final*, it is unlikely that the U.S. refrigerant industry understood that all imported HFC blends, not listed as an exclusion, are subject to the *Order*.  In fact, the record supports the opposite conclusion.  For instance, in ICOR's scope ruling comments it cites to the *LTFV Final*[82] and in the underlying investigation, ICOR argued that its three proprietary blends were outside the scope because it understood that since these blends are "…finished but not one of the named blends, they fall outside of the scope."[83]

In essence, Choice is requesting that Commerce revisit its previous determination, hoping for a different outcome.[84]  We find that by interpreting the language to include blends (whether patented or not), not explicitly identified in the scope language, we would broaden the scope, beyond what was intended in the underlying investigation.  As stated by Choice, Commerce does not have the authority to change an antidumping duty order or interpret the scope language to narrow or expand the scope in a way that was not originally intended.[85]  Therefore, since we are interpreting the scope in accordance with 19 CFR 351.225(k)(1), and not recommending any changes from the *LTFV Final*, we find that Choice's reliance on *Ericsson GE Mobile*, *Alsthom Atlantique* and *Corona Corp.* are inapposite.

As noted above, given that the record does not support that the scope includes all HFC blends, additional arguments proposed by Choice are misplaced.  For instance, Choice claims that when Commerce revised the scope to omit the word "including" it failed to properly acknowledge whether unpatented versions of patented products were also excluded.[86]  We find that there was

---

[81] *See LTFV Final* IDM at Comment 5.

[82] *See* ICOR's Letter, "HFC Blends and Components from the PRC:  Response to Kenneth Ponder's and Choice Refrigerants' November 30, 2017 Application for a Scope Ruling," dated December 5, 2017 at 2 (citing *LTFV Final* IDM at Comment 5).

[83] *See LTFV Final* IDM at Comment 5 (citing ICOR International Inc. (ICOR)'s Letter, "Case Brief of ICOR International Inc. Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China," dated May 11, 2016).

[84] Choice makes an unsupported argument in its case brief that staff indicated that outcome was "already decided." Thus, they found the decision to be prejudged.  Choice provides no evidence to support this assertion, but we note, to the extent we have already addressed the same arguments Choice raises in previous findings, we find that the decision has been predetermined.

[85] *See, e.g.*, *Wheatland Tube Co. v. United States*, 161 F. 3d 1365, 1370 (Fed. Cir. 1998) and *Ericsson GE Mobile*, 60 F. 3d at 782.

[86] Choice's argument suggesting that the scope from the Petition was revised by Commerce or fundamentally altered in a way contrary to the petitioners' intentions is misconstrued because Commerce did not rewrite the scope or omit the word "includes."  The petitioners agreed to change the scope language at Commerce's suggestion prior to initiation because the Petition indicated elsewhere that it only covered five blends.  In response to this suggestion,

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

no reason to address the outcome of unpatented versions of patented products when the scope only identifies the five blends that covered by the *Order*. If we intended to include unpatented versions of patented blends, not specifically mentioned in the scope, we would have addressed this in the investigation.

Choice's arguments rest on the assumption that the exclusion listed in the scope for patented blends indicates that unpatented versions of those same blends must be excluded, otherwise the exclusion is meaningless since it is not one of the five named blends. Here, we find that Choice mischaracterizes the intent of the exclusion language for patented HFC blends. The scope language, "{a}lso excluded from the *Order* are patented HFC blends, including, but not limited to…" was intended to exclude all patented HFC blends. The non-exhaustive list of patented HFC blends (*i.e.*, for blends such as MO99™ (RR-438A), MO79 (R-422A)) that follows emphasizes that any blend with a patent is excluded.[87] In some cases, the names of patented HFC blends were included for clarity at the request of interested parties, in order to emphasize that the blends were specifically excluded from the *Order*.[88] However, by including the blends in the illustrative list of patented blends that were excluded, we did not imply that such blends would otherwise have been included; only that doing so would provide a clear indicator for CBP's enforcement of the scope of the order. For example, in the *LTFV Preliminary Determination*, Commerce noted that "Kivlan requested that the scope of the investigation explicitly exclude blends that are currently under patent protection, including Choice R-421A and Choice R-421B."[89] The petitioners did not object to the modification to explicitly exclude HFC blends R-421A and R-421B from the scope; consequently, Commerce modified the scope to explicitly exclude R-421A and R-421B, because we found such an exclusion to be consistent with the intent of the Petition.[90] Commerce's determination was unchanged in the *LTFV Final*.[91]

---

[87] the petitioners stated that "{t}he Coalition understands that this change was not intended to narrow or circumscribe the scope of the investigation, such that HFC blends or single component HFCs would be more narrowly defined or excluded from the investigation." *See LTFV Final* IDM at Comment 5. Because the petitioners made this modification based on our suggested language, and; thus, was not in contravention of the petitioners' intentions, we find Choice's reference to *Eckstrom v. United States* (*i.e.*, Commerce's practice for accepting the petitioner(s) scope language) does not apply.

[87] *See LTFV Final* IDM at Comment 5, footnote 108 (citing Memorandum, "Antidumping Duty Investigation of Hydrofluorocarbon Blends and Components (HFCs) from the People's Republic of China (PRC): Analysis of Scope Comments Made by Refrigerant Solutions Limited," dated May 3, 2016, stating "In the Petition, the petitioners stated that they intended to cover five HFC blends (*i.e.*, R-404A, R-407A, R-407C, R-410A, and R-507A) and three single HFC components of these blends (*i.e.*, R-32, R-125, and R-143a). The petitioners also stated that they intended to exclude patented HFC blends, and they provided a short list of patented products as examples). Thus, we do not agree that by finding that unpatented versions of patented HFC blends listed as exclusions are out-of-scope, it renders the scope exclusions meaningless. The inclusion of patented versions of unpatented blends as examples for clarification purposes does not alter the meaning or intention of the scope language in any manner.

[88] *See* Kivlan's Letter at 1.

[89] *See LTFV Preliminary Determination* PDM at 7.

[90] *Id*.

[91] *See LTFV Final* IDM at Comment 5, footnote 109 (citing Petitioners' Letter, "Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China:  Response to Scope Comments," dated August 17, 2015, at 2 stating "{o}n July 31, 2015, Kivlan and Company, Inc., filed comments requesting that certain patented HFC blends, namely R-421A and R-421B, be excluded from the scope of this investigation.  These patented blends are already excluded by the scope language.  The HFC Coalition therefore does not object to the request.").

15

JA352

Barcode:3980446-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  Unpatented R-421A

Although Commerce does not, generally, include unnecessary exclusions for products which are not be covered by a scope, Commerce does include explicit exclusions for products which may be on the edge of the scope and which may risk being misinterpreted as in-scope merchandise.[92] Commerce also considers interested party comments in proceedings, and may include explicit exclusions for products for which interested parties request an exclusion.  This practice does not render the exclusions "meaningless" if the intent is to reduce confusion or to reinforce the language in the scope.  Additionally, the record does not contain implicit or explicit evidence supporting that we acknowledged an exclusion was necessary for patented blends even if they were not one of the five named blends.  Ultimately, we find that it would be inappropriate to use an exclusion as means to expand the scope beyond the language listed in the scope.

Further, and importantly, Choice does not acknowledge the history of the scope covered by this *Order*.  For the duration of the investigation, the scope also covered components and unfinished blends of HFCs.  When Commerce re-wrote the language for the *Order*, after the ITC's final determination, Commerce kept much of the existing structure, while only excising portions pertaining to components.  Thus, rather than combine the first two sentences of the scope of the *Order* to state that the order only covers the five listed HFC components, Commerce re-wrote the first sentence to remove references to components:

| Original *LTFV Final* Scope Excerpt | Final *Order* Scope Excerpt |
|---|---|
| "The products subject to this investigation are HFCs and single HFC components of those blends thereof, whether or not imported for blending.  HFC blends covered by the scope are…"[93] | "The products subject to this order are HFC blends.  HFC blends covered by the scope are…"[94] |

Further, at the time of the investigation, it was conceivable that certain blends of HFCs could have been construed as unpatented blends of HFCs, because the scope also included "semi-finished blends of Chinese HFC components."[95]  This language pertaining to unfinished blends was removed, in its entirety, from the language of the *Order*, to accommodate the ITC's final injury determination.[96]

---

[92] *See, e.g.*, *Stainless Steel Sheet and Strip in Coils from the Republic of Korea:  Preliminary Results of Countervailing Duty Changed Circumstances Review*, 71 FR 75937 (December 19, 2006).  The scope language states, "the subject sheet and strip is flat-rolled product in coils that is greater than 9.5 mm in width and less than 4.75 mm in thickness, and that is annealed or otherwise heat treated and pickled or otherwise descaled."  In the list of scope exclusions it states "{e}cluded from the scope of this order are the following:  (1) sheet and strip that is not annealed or otherwise heat treated and pickled or otherwise descaled, (3) plate (*i.e.*, flat-rolled stainless steel products of a thickness of 4.75 mm or more), (4) flat wire (*i.e.*, cold-rolled sections, with a prepared edge, rectangular in shape, of a width of not more than 9.5mm."  The products in the first, third, and fourth exclusions fall squarely outside the definition of in-scope merchandise, the first because it relates to product that is not annealed and pickled and the latter two because they involve merchandise of more than 4.75 mm in thickness or of not more than 9.5 mm in width.
[93] *See LTFV Final*, 81 FR at Appendix I – Scope of the Investigation.
[94] *See Order*, 81 FR at Scope of the Order.
[95] *See LTFV Final*, 81 FR at Appendix I – Scope of the Investigation.
[96] *See Order*, 81 FR at Scope of the Order.

16

Finally, Choice makes a number of unsupported arguments about the outcome of Commerce's ruling such as:  (1) there will be an increase in the dumping of unpatented chemicals; (2) importers will mislabel merchandise as an unspecified non subject HFC blend; (3) importers will manipulate their customs paperwork to circumvent the *Order*; and (4) the ruling will reward companies that cheat U.S. trade laws in contravention of the United States' President's efforts to enforce U.S. trade laws.  To the extent that our ruling on unpatented R-421A would lead to improper conduct by any importers or exporters, we have already addressed Choice's concern with respect to imports of unpatented R-421A with a finding of an affirmative anticircumvention determination.[97]  Further, we have several ongoing anti-circumvention proceedings examining various circumvention schemes by exporters/importers related to the HFCs *Order* in which we address similar concerns.  In this case, we have interpreted the scope of the *Order* in a manner that is consistent with the underlying investigation.  Based on this, we find no reason to alter our *Preliminary Determination*.

### Comment 2:  Whether the Process of Assembly or Completion of R-421A Into HFC Blends in the United States is Minor and Insignificant

In determining whether the process of assembly or completion in the United States is minor or insignificant, Commerce conducted its analysis using the interpretative framework outlined in sections 781(a)(1)(C) and 781(a)(2) of the Act.  Based on this evaluation, in the *Preliminary Determination*, we determined (1) that BMP's level of investment is minimal when compared to the level of investment required to build and maintain a components factory;[98] (2) the nature of BMP's production process in the United States is not significant;[99] and (3) BMP's response confirms that its research and development (R&D) expenses are negligible.[100]

*BMP's Arguments*

- The process of producing HFC blends is not "minor or insignificant" because:  (1) the level of investment in the United States is significant;[101] (2) the blending process is not simple;[102] and (3) the level of R&D in the United States is inconclusive.[103]

- Commerce's analysis of BMP's investments in the United States (*i.e.*, comparison of component production cost with the cost of blending operations) is flawed because the benchmark it uses for component production of "hundreds of millions of dollars" from an ITC statement is unreasonable.[104]  To establish this benchmark, Commerce selectively quotes from the ITC that, although recognizing that an HFC blending facility costs significantly less than an HFC components facility, still found that the process to transform HFC components into HFC blends substantial.[105]

---

[97] *See Preliminary Determination* PDM at 1 and 22.
[98] *Id*. at 18.
[99] *Id*. at 19.
[100] *Id*.
[101] *See* BMP's Case Brief at 2-3.
[102] *Id*. at 2-3.
[103] *Id*. at 4.
[104] *See* BMP's Case Brief at 2.
[105] *See ITC Final* at 12-13.

17

Barcode:3980446-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  Unpatented R-421A

- Record information shows that the amount of initial investment made by BMP for equipment is significant, especially for a small company without considering the investment in a skilled workforce and testing facilities, which were recognized by the ITC.[106]

- Blending is not a simple process, as supported by the ITC's opinion, and record information showing that BMP USA's production process:  (1) is not simple; (2) requires a large facility; and (3) requires significant training of skilled workers.[107]

- With respect to R&D expenditures, the blending industry is long-established, as evidenced by its existence during the original investigation.  Thus, it is not surprising that significant R&D is not required for this industry and, therefore, should not be considered a determinative factor for purposes of Commerce's analysis.[108]

*Petitioners' Rebuttal Arguments*

- Commerce should continue to find that BMP's process of assembly or completion of HFC components into HFC blends in the United States is insignificant because, contrary to BMP's claims, its level of investment and R&D expenditures in the United States are minimal.[109]

- Commerce used the appropriate analytical framework in the *Preliminary Determination* for evaluating the level of investment in the United States.  This framework was consistent with the statute as well as Commerce's longstanding practice and is supported by substantial evidence.[110]

- BMP's arguments that the completion of HFC blends in the United States is not insignificant rely solely on its arguments that pertain to its level of investment and R&D.  However, BMP overlooks that these factors are not dispositive, but are two of several factors Commerce uses to determine whether the process of assembly or completion is "minor or insignificant."[111] The statute does not instruct Commerce to use a particular method for evaluating the level of investment; therefore, Commerce may use any analysis it determines appropriate to assess whether the process of assembly or completion is "minor or insignificant."[112]  Commerce's analytical framework was appropriate because it measured the level of investment in the United States against the full investment involved in the complete production of finished HFC blends.[113]

---

[106] *See* BMP's Case Brief at 3 (citing BMP's Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Initial Questionnaire Response," dated January 17, 2020 (BMP's January 17, 2020 QR) at 16, 24 and 26-27).
[107] *Id*. at 3-4.
[108] *See* BMP's Case Brief at 4.
[109] *See* Petitioners' Rebuttal Brief at 3-6.
[110] *Id*. at 6.
[111] *Id*. at 3.
[112] *See* Petitioners' Rebuttal Brief at 3 (citing *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 FR 23895 (May 28, 2018) (*CORE from China*), and accompanying IDM at Comment 5).
[113] *Id*.

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

- The statute requires that Commerce measure "minor or insignificant" against the full investment involved in the completed production process and evaluate the pattern of trade to determine if there is any shifting between an affiliated Chinese exporter/producer and U.S. blender, and if any imports of components increased following the imposition of *Order*.[114] BMP misses the point that the analysis is not concerned with whether its investments in the United States are significant, but whether they are comparatively less significant than the investments required for production of finished HFC blends in China.[115] The statute requires this comparison to determine if circumvention is being achieved by shifting one or more of the last few minor or insignificant steps of the production process to the United States, and BMP provides no evidence for departing from this practice.[116]

- BMP cites to its claimed initial investment for blending equipment, which corroborates the evidence submitted by the HFC Coalition, showing that blending operations are insignificant.[117] This amount is undoubtedly dwarfed by "the hundreds of millions of dollars" the ITC stated was required to produce individual HFC components; a fact BMP admits in its case brief.[118]

- Commerce should reject BMP's argument that because the blending industry is long established there would be no need for this investment because:  (1) Commerce did not give undue weight to R&D expenditures to determine whether the HFC blending process in the United States was minor or insignificant; (2) BMP does not dispute Commerce's statement that its R&D expenses are negligible; and (3) Commerce's analysis of BMP's R&D expenditures was reasonable and consistent with record evidence.[119]

**Commerce's Position**:

We continue to find, for this final determination, that the process of assembly or completion is minor or insignificant within the meaning of section 781(a)(1)(C) of the Act, as informed by the factors in section 781(a)(2) of the Act. As an initial matter, the SAA lists the five statutory criteria in section 781(a)(2) of the Act and states that, "{n}o single factor will be controlling."[120] The importance of any one of the factors listed under section 781(a)(2) of the Act can vary from case to case based on the particular circumstances unique to each anti-circumvention inquiry. In our *Preliminary Determination*, we examined each of the criteria under section 781(a)(2) of the Act, based on both qualitive and quantitative factors. We determined that (1) BMP's investment to blend HFCs in the United States is minimal in comparison to the investment require to create

---

[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *See ITC Final* at 12-13.
[119] *Id.* at 12-13.
[120] *See* Statement of Administrative Action H.R. Rep. No. 103-316, Vol. 1  (1994) (SAA) at 893; *see also Preliminary Determination* PDM at 13.

19

JA356

components;[121] (2) BMP's R&D expenses are negligible;[122] (3) the nature of BMP's production process in the United States is not significant;[123] (4) BMP's production facility for completing finished HFC blends is not extensive;[124] and (5) the value of processing performed in the United States represents a small proportion of the value of the merchandise sold in the United States.[125] We focus on BMP's arguments pertaining to sections 781(a)(2)(A), 781(a)(2)(B), and 781(a)(2)(C) of the Act, below.

With respect to section 781(a)(2)(A) of the Act, we continue to find that BMP's investment to blend HFCs in the United States is minimal in comparison to the investment required to create the unpatented R-421A.  BMP argues that Commerce's analysis is flawed because it evaluates the amount of investment for component production using an inappropriate benchmark from the *ITC Final*,[126] based on a quote from an industry representative stating component production costs "hundreds of millions of dollars."[127]  According to BMP, Commerce overlooks that in the ITC Determination it found the amount to convert HFC components into HFC blends substantial.[128]  Further, BMP argues that the record shows that the amount of investment related to equipment, testing facilities, and maintaining a skilled workforce, when taken together, is significant.[129]

However, the information provided by BMP demonstrates that not only is the level of investment insignificant, it is significantly less than the costs associated with starting a component production facility.[130]  In this proceeding, BMP provided various figures in response to our inquiries with regard to the level of investment it incurred in the United States with respect to its process for completion of the unfinished HFC blends.  In its January 17, 2020 submission, BMP provided a table that outlines its level of investment, research and development expenditures in the United States from 1990 through 2019.[131]  Based on the level of investment detailed in our BPI Analysis Memorandum, we found that this figure calculated by BMP accurately represents

---

[121] *See Preliminary Determination* PDM at 18; *see also* Memorandum, "Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China:  Unpatented R-421A; Business Proprietary Memorandum," dated February 25, 2020 (BPI Analysis Memorandum) at 2-3.

[122] *See Preliminary Determination* PDM at 18; *see also* BPI Analysis Memorandum at 3.

[123] *See Preliminary Determination* PDM at 19; *see also* BPI Analysis Memorandum at 3-4.

[124] *See Preliminary Determination* PDM at 19; *see also* BPI Analysis Memorandum at 4.

[125] *See Preliminary Determination* PDM at 20; *see also* BPI Analysis Memorandum at 5 and Attachment 1.

[126] *See* BMP's Case Brief at 2.

[127] *See Preliminary Determination* PDM at 15 and 18 (citing ITC Hearing Transcript in the Matter of Hydrofluorocarbon Blends and Components from China Investigation No. 731-TA-1279 (Final), dated June 21, 2016 at Exhibits 1-4 and Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China: Scope Investigation Regarding Certain Unpatented HFC Blends:  Request to Apply Section 781(a) to Prevent Circumvention," dated August 15, 2018 at 15 and Exhibit 3); *see also* BPI Analysis Memorandum at 3.

[128] *See* BMP's Case Brief at 3.

[129] *Id.*

[130] As noted in the BPI Analysis Memorandum, R-421 is composed of HFC components R-125 and R-134a.  The production of the components used to make R-421A occurs in China.  Also, as stated in the *Preliminary Determination*, "after importation into the United States from China, BMP uses unpatented R-421A, and other components from China, to produce HFC blends that are covered by the *Order*," since it does not actually produce any components (or blends made from self-produced components) on its own.  *See* the BPI Analysis Memorandum at 3-5; *see also Preliminary Determination* at 17.

[131] *See* BMP's January 17, 2020 QR at Exhibit 12.

the initial investment BMP undertook in order to establish the business of converting R-421A into finished HFC blends.

Thus, we determined it was appropriate to compare the amount specified by the petitioners (*i.e.*, data from the ITC determination) regarding the initial amount required to start up the production of HFC components in China with the amount reported by BMP because both amounts represent the initial investment required to start the HFC blend production and the conversion process.

After comparing the amount to produce HFC components and semi-finished blends with the amount BMP calculated for its investment, we found that the level of investment is significant in China compared to the reported level of investment in the United States.[132]  Specifically, we estimated that the level of investment in China represents a significant portion of the total investment required for these types of businesses.[133]  While BMP argues that its investments are significant, especially for a small company,[134] we find that even with the inclusion of BMP's expenditures for labor and testing facilities the amount of investment required for blending operations was several orders of magnitude lower than for component operations.[135]

BMP argues that the analysis described above is flawed, based on the source proposed by the petitioners for investment costs for component production.[136]  However, we find that this is the most appropriate source because the exporter of unpatented R-421A selected for review in this anticircumvention case failed to provide any information from which to evaluate the costs of production.[137]  Additionally, BMP also failed to provide additional information with which to value imports of unpatented R-421A or cite to anything on the record of this proceeding showing the costs for R-421A or the underlying component production used to make the R-421A.  Thus, we selected the information proffered by the petitioners, as it was the only available blending information on the record.  Furthermore, while BMP argues that the ITC found that the cost for blending operations is not insignificant, BMP overlooks that the ITC was concerned with an analysis of determining class and kinds of merchandise, and not with circumvention.  Even assuming, *arguendo*, that the ITC found blending operations to be significant, this statement is not borne out by the data provided by BMP.[138]

With respect to section 781(a)(2)(B) of the Act, we continue to find that BMP's R&D expenditures in the United States are negligible.  BMP argues that the blending industry is long-

---

[132] *See Preliminary Determination* PDM at 18; *see also* BPI Analysis Memorandum at 2-3.

[133] *See* BPI Analysis Memorandum for the figures underlying the Commerce's conclusion.

[134] *See* BMP's Case Brief at 3.

[135] *See* BPI Analysis Memorandum at 4 showing that the total payroll and number of current workers is not significant even in conjunction with its investments in equipment and testing facilities; *see also* BPI Analysis Memorandum at 3; and BMP's January 17, 2020 QR at Exhibit 3 BMP USA's 2018 financial statements at 2 and Exhibit 3 IGas's 2018 financial statements at 4.

[136] *See* BMP's Case Brief at 3.

[137] *See Preliminary Determination* PDM at 4 and 14 (noting that T.T. International declined to provide a questionnaire response to the initial questionnaire it was issued on December 13, 2019.  *See* T.T. International's Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Unpatented R-421A Blends Anti-Circumvention Inquiry; Notification of TTI's Intent Not to Respond to Department Questionnaires," dated January 8, 2019.).

[138] *See* BPI Analysis Memorandum.

21

established, as evidenced by its existence during the original investigation.[139]  Thus, BMP argues that significant R&D is not required for this industry and, therefore, should not be considered a determinative factor for purposes of Commerce's analysis.[140]

As an initial matter, BMP does not produce HFC components, and, therefore, does not have any specific information from the producer regarding its R&D expenditures in China.[141]  However, in BMP's response, it provided information that outlines its research and development expenditures along with the level of investment it incurred in the United States since its inception.[142]  The specific figures provided by BMP are proprietary, however we note that, as a general matter, BMP reported negligible R&D expenditures.[143]  Based on this information, we found that the HFC blending operations appeared to be activities that do not require significant research and development initiatives and expenditures.[144]  Thus, with respect to section 781(a)(2)(B) of the Act, we determined that the level of R&D initiatives and expenditures in the United States is limited when compared to the R&D initiatives and expenditures likely necessary in China.

We agree with BMP's assertion that no R&D is required since, as discussed below, it only mixes the imported R-421A with imported components in a tank.  However, the point of the analysis is not whether BMP's R&D expenditures in the United States are significant or insignificant, but whether the R&D expenditures associated with converting the imported R-421A into finished HFC blends in the United States is significant in comparison to the investments that would be required for production of the imported R-421A.[145]  Therefore, we disagree with BMP's argument that we should disregard BMP's R&D as a factor, because it is unnecessary for the blending industry.  Rather, the fact that blenders incur minimal R&D expenditures confirm Commerce's affirmative circumvention finding.  Further, as pointed out by the petitioners, we considered the totality of factors in our affirmative circumvention finding and did not place emphasis solely on this factor.

With respect to section 781(a)(2)(C) of the Act, we continue to find that the nature of BMP's production process in the United States is not significant.  BMP argues that the ITC found that the nature of blending process is not insignificant and argues that the record shows the process is not simple, requires a large facility, and requires significant training of skilled workers.[146]

We disagree, with BMP's arguments.  BMP stated on the record that the blending process is relatively straightforward.[147]  There is also no chemical reaction or temperature change involved

---

[139] *See* BMP's Case Brief at 4.

[140] *Id.*

[141] *See* BMP's January 17, 2020 QR at 3.

[142] For the proprietary figures underlying the Commerce's conclusion, *see* the BPI Analysis Memorandum at 3.

[143] *Id.*

[144] *Id.*

[145] *See CORE from China* IDM at Comment 5.  Although the cited proceeding involved assembly or processing in a third country under section 781(b) of the Act, the language regarding section 781(b)(2) of the Act is essentially the same under both sections 781(a)(2)(C) and 781(b)(2)(C).

[146] *See* BMP's Case Brief at 3 (citing *ITC Final* at 12-13).

[147] *See* BPI Analysis Memorandum at 3 (citing LM Supply Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Supplemental Questionnaire Response," dated April 27, 2018 (LM Supply's April 27, 2018 SQR) at 3).

Barcode:3980446-01 A-570-028 CIRC - Anti Circumvention Inquiry - Unpatented R-421A

in blending HFCs.[148]  After the blend is tested, it is extracted from the mixing tank and packaged into smaller cylinders for resale.[149]  In addition, available information shows that production of HFC blends requires only basic setups (*i.e.*, tanks, pumps, and testing equipment) and a handful of workers.[150]  Finally, information on the record demonstrates that BMP's production process is fairly limited with only a single facility and a small number of blending employees to handle its blending operations.[151]  Based on the information BMP provided, this process requires less processing than production of the finished HFC blends in China.[152]  The specific details provided by BMP are proprietary, however we note that, as a general matter, BMP's reporting confirmed that the production process is straight-forward and does not require the same level of activities that production of the underlying HFC components requires.[153]

Based on the aforementioned, and consistent with the conclusions reached in our *Preliminary Determination*,[154] we continue to find that record evidence demonstrates that BMP's level of investment for blending unpatented R-421A into finished HFC blends is minimal, the production process is not extensive, and that BMP has not undertaken a significant level of R&D in order to process unpatented R-421A into finished HFC blends subject to the *Order*.[155]  As noted above, no single factor is controlling and the importance of any one of the factors listed under section 781(a)(2) of the Act can vary from case to case based on the particular circumstances unique to each anti-circumvention inquiry.  We find that the evidence placed on the record overwhelmingly supports that the process of assembly or completion is minor or insignificant within the meaning of section 781(a)(1)(C) of the Act, as informed by the factors in section 781(a)(2) of the Act.  Therefore, we find that there is no reason to change our affirmative circumvention finding for the final determination.

**Comment 3:  Value Analysis**

In accordance with sections 781(a)(1)(D) and 781(a)(2)(E) of the Act, in the *Preliminary Determination*, Commerce examined the figures placed on the record by participating parties and found that the value of the parts or components produced in the foreign country is a significant portion of the total value of the merchandise in question, and that the value of the processing performed in the United States represents a small proportion of the value of the merchandise sold in the United States.[156]

*BMP's Arguments*

---

[148] *Id.* at 3.
[149] *Id.*; *see also* LM Supply's April 27, 2018 SQR at 4.
[150] *See* BPI Analysis Memorandum at 4; *see also* BMP's January 17, 2020 QR at 16.
[151] *See* BMP's January 17, 2020 QR at 16.
[152] *See* the BPI Analysis Memorandum at 4.
[153] For the proprietary figures and details underlying the Commerce's conclusion, *see* BPI Analysis Memorandum at 3-6 and Attachment 1 and 2.
[154] *See Preliminary Determination* PDM at 18-20.
[155] *Id.* (citing BMP's January 17, 2020 QR at 16 Exhibits 12 and 20; BMP's January 17, 2020 QR at 16-17; and LM Supply's April 27, 2018 SQR at 4).
[156] *See Preliminary Determination* PDM at 20; *see also* BMP's January 17, 2020 Questionnaire Response (BMP's January 17, 2020 QR) at Exhibit 24; and BPI Analysis Memorandum.

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

- Commerce's methodology in the *Preliminary Determination* is unreasonable because it compared the value of all inputs from China to the total value of the finished blends. According to the statute, the parts and components used in the analysis will be the same ones subject to the circumvention inquiry (*i.e.*, R-421A).[157]

- The other components (*i.e.*, R-32 and R-143) used in the blending process are not a part of this circumvention inquiry. In addition, the only part or component that Commerce is proposing to include in the scope of the order is R-421A. Therefore, Commerce should only compare the value of the imported R-421A to the total value of the blends.

*Choice's Arguments*

- Commerce correctly found that BMP's imports of R-421A circumvented the HFC Blends Order.[158] BMP infringed on Choice's patent by importing patented R-421A into the United States without a license and clearly circumvented antidumping duties imposed on HFC blends and the HFC component R-134a. BMP fails to explain the reasoning behind importing the HFC blend R-421A and converting it into other HFC blends, rather than finishing the blending process in China or importing HFC components as blend feedstocks; it is clear that the reason was to avoid antidumping duties.[159]

- BMP fails to demonstrate, under section 781 of the Act, that the costs of converting R-421A into other HFC blends is significant. While BMP provides the asserted values of the R-421A imports and the final HFC blends, the marginal costs have not been provided. Rather, the marginal cost of producing BMP's blends should be zero because the added step to convert R-421A into a finished HFC blend is unnecessary. It is most economical for HFC blends to be blended at the point of manufacture. Therefore, BMP's marginal costs for its second blending step should be disregarded.[160]

- Commerce should also reject BMP's below-market valuation of imported R-421A. Instead, Commerce should obtain information on the market value of HFC blends and components in the relevant time frame. In addition, Commerce should consider the ownership of BMP affiliates and investigate the existence of preferential pricing from affiliated Chinese companies or subsidies from the Government of China.[161]

- IGas USA, and other newly formed shell companies in the BMP Group that imported and used R-421A without paying antidumping duties, should also be held liable since their only business is producing HFC blends.[162] Further, Commerce should consider the protection of U.S. intellectual property theft by foreign-backed enterprises. BMP admits that it does not

---

[157] *See* BMP's Case Brief at 5-6 (citing section 781(a) of the Act).
[158] *See* Choice's Case Brief at 19.
[159] *Id.* at 20.
[160] *Id.* at 21.
[161] *Id.*
[162] *Id.* at 22 (citing BMP's January 17, 2020 QR at 18).

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

hold a patent for R-421A or the license to use that patent.[163]  Yet, even though BMP's
exporter describes the imports as unpatented R-421A, BMP states that the imported R-421A
was considered patented.[164]  Therefore, Commerce and CBP should request all
documentation of communication between BMP affiliates and its exporter to verify
statements made on customs forms.  It is not plausible that BMP does not maintain such
business documentation.[165]

- Commerce should conduct a full forensic accounting of BMP's finances because the
  voluntary responses do not contain adequate information to determine the actual cost of
  finishing the HFC blends.[166]  Data reveals that the use of the circumvented R-421A
  represented a significant percentage of BMP's overall business during the relevant time
  period.  Choice estimates that such a scheme would have saved BMP nearly $100,000 for
  ever ISO container of HFC blend and could have resulted in BMP gaining market share in
  the U.S. refrigerant market.[167]

*BMP's Rebuttal Arguments*

- Contrary to Choice's allegations, BMP and its affiliates have not admitted that they illegally
  imported R-421A to avoid antidumping duties.  There is no record evidence supporting
  Choice's claims that:  (1) BMP or its affiliates committed patent infringement; (2) BMP can
  most economically blend HFC blends at the point of manufacture or that the marginal cost of
  blending should be zero; (3) the value of the imported R-421A is below-market; and (4)
  BMP made false statements to CBP.

- It is inapposite and without legal basis to request that Commerce investigate any Chinese
  government subsidies.  Further, there is no need for a forensic accounting analysis since
  BMP fully answered Commerce's questions.[168]

*Choice's Rebuttal Arguments*

- While BMP argues that Commerce should compare only the value of the imported R-421A
  and ignore the cost of other blending components,[169] the statute requires that Commerce
  compare the value of the parts or components to the total value of the merchandise.  The
  merchandise in this instance is the R-421A imported by BMP.  If Commerce disregards other
  blending components, then the value of R-421A as a component is 100 percent of the value
  of R-421A as merchandise, thus indicating circumvention.

---

[163] *Id.* (citing LM Supply's Letter, "Comments in response to Kenneth Ponder's and Choice Refrigerants' November
30, 2017 Application for a Scope Ruling," dated December 27, 2017, at 4-7).
[164] *Id.* (citing BMP's January 17, 2020 QR at 20).
[165] *Id.* at 23 (citing BMP's January 17, 2020 QR at 21).
[166] *Id.* at 23-24.
[167] *Id.* at 24.
[168] *See* BMP's Rebuttal Brief at 5-6.
[169] *See* Choice's Rebuttal Brief at 3 (citing BMP's Case Brief at 5-6).

- BMP is incorrect that the merchandise should be the three-component HFC blends that it creates by blending the R-421A with additional HFC components.  The statute does not specify a formula for determining what is significant and the courts have rejected interpretations of section 781 that "would render meaningless Congress's intent to address circumvention concerns."[170]

*Petitioners' Rebuttal Arguments*

- BMP's argument with respect to Commerce's value analysis pursuant to section 781(a)(1)(D) of the Act is unsupported by record evidence and precedent.[171]  BMP incorrectly asserts that Commerce should focus only on the value of R-421A rather than comparing the value of all imported inputs from China to the total value of the finished blend.  Commerce correctly calculated the value of the Chinese-origin unpatented R-421A using Mexican surrogate values.[172]

- Pursuant to section 781(a)(1)(D), Commerce concluded in the preliminary determination that the value of the components from China represented a significant portion of the total value of the merchandise sold in the United States.[173]  Commerce's findings should be unchanged in the final determination.

**Commerce's Position**

Under section 781(a)(1)(D) of the Act, Commerce considers whether the value of the parts or components produced in the foreign country to which the order applies (*i.e.*, China) is a significant portion of the total value of the merchandise.  In addition, section 781(a)(2)(E) of the Act directs Commerce to determine whether the value of processing performed in the United States represents a small proportion of the value of merchandise sold in the United States.

In the *Preliminary Determination*, with respect to the value analysis required by section 781(a)(1)(D) of the Act, we calculated the percentages of Chinese origin inputs, compared to the value of merchandise sold in the United States on a per-kilogram basis,[174] and determined that the value of the parts or components produced in China (*i.e.*, R-421A) represented a significant portion of the total value of merchandise sold in the United States (*i.e.*, R-407C, R-407A, and R-404A).[175]  Since China is an NME, Commerce used a surrogate value methodology in order to value unpatented R-421A.[176]

---

[170] *Id.* at 3-4 (citing *Deacero S.A. v. U.S.*, 817 F. 3d 1332, 1338 (Fed. Cir. 2016)).

[171] *See* Petitioners' Rebuttal Brief at 9 (citing BMP's Case Brief at 5).

[172] *Id.* at 9-10 (citing BPI Analysis Memo and associated surrogate value data, dated February 28, 2020; *see also* Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Surrogate Values Submission," dated January 13, 2019 at Exhibit 1; and BMP's Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Surrogate Value Comments," dated January 13, 2020, at Exhibit 1).

[173] *Id.* at 10 (citing *Preliminary Determination* PDM at 10-11; *see also* BPI Analysis Memo at 5).

[174] *See* BPI Analysis Memorandum at 5 and Exhibit 2.

[175] *See Preliminary Determination* PDM at 20; *see also* Preliminary Decision Analysis Memo; and BMP's January 17, 2020 QR at Exhibit 24.

[176] *See* BPI Analysis Memorandum at 6 (citing Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Initial Surrogate Country Selection Comments," dated January 3, 2020; and Petitioners' Letter,

Barcode:3980446-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  Unpatented R-421A

In addition, with respect to the value-added analysis required by section 781(a)(2)(E) of the Act, we compared the further manufacturing costs to convert the imported R-421A into subject merchandise for each of the finished HFC blends with the total U.S. sales value of those same blends,[177] and determined the Chinese inputs as a portion of the U.S. sales value are significantly higher than the processing values as a portion of the U.S. sales value.[178]  This means that the Chinese inputs constituted a more significant portion of the total value of merchandise than the costs of further manufacturing in the United States.  We conducted our value analysis in accordance with the law and Commerce's normal practice.  Our analysis demonstrated that (1) the value of unpatented R-421A was not a significant portion of the total value of the finished HFCs blends; and (2) the value of BMP's processing performed in the United States represents a small proportion of the value of the HFCs blends sold in the United States.[179]

It is important to note that Commerce's determination of circumvention is not based on any one criterion, but on the totality of circumstances.  19 CFR 351.225(g) states:

> Under section 781(a) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order imported parts or components referred to in section 781(a)(1)(B) of the Act that are used in the completion or assembly of the merchandise in the United States at any time such order is in effect.  In making this determination, the Secretary will not consider any single factor of section 781(a)(2) of the Act to be controlling.  In determining the value of parts or components purchased from an affiliated person under section 781(a)(1)(D) of the Act, or of processing performed by an affiliated person under section 781(a)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(f)(3) of the Act.

Therefore, when determining circumvention, the results of the input value and value-added analyses are considered in conjunction with the other statutory prongs, including the level of investment, the level of research and development, the nature of the production process, and the extent of production facilities in the United States.  Therefore, as noted above, our analysis demonstrates that (1) the value of unpatented R-421A was not a significant portion of the total value of the finished HFCs blends; and (2) the value of BMP's processing performed in the United States represents a small proportion of the value of the HFCs blends sold in the United States.  Thus, these factors, together with the totality of the circumstances, support an affirmative determination of circumvention.

---

"Hydrofluorocarbon Blends from the People's Republic of China:  Surrogate Values Submission," dated January 13, 2020).

[177] *Id.* at 5 and Attachment 1.

[178] *Id.* at 6 and Attachment 2.

[179] *Id.* at 5 and Attachment 1 (showing BMP's total cost for HFC blends R404A, R407C, and R407A represented 4.66, 10.37, and 6.55 percent of the total U.S. sales value, demonstrating that BMP's processing performed in the United States represents a small proportion of the value of HFCs blends sold in the United States.)  *Id.* at 5 and Attachment 2 (showing that the value of Chinese merchandise as a portion of the total value of U.S. sales for HFCs blends R407C, R407A, and R404A represents 80.02, 80.10, and 93.54 percent of the total U.S. sales value.)

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

We reject BMP's argument that Commerce's value analysis is incorrect.  BMP claims that Commerce's value analysis under section 781(a)(1)(D) is unreasonable because it compared the value of all Chinese-imported inputs to the value of the finished blends, rather than focusing on the value of R-421A, which is the subject of the circumvention inquiry.[180]  Since China is an NME country, we valued R-421A using Mexican GTA data for HFC blends (*i.e.*, HS heading 38.24.7801).[181]  Commerce has consistently used its surrogate value methodology in conducting circumvention proceedings for NME countries, and as discussed in Comment 4, we continue to find that it is appropriate to apply this methodology.  Further, despite BMP's claims to the contrary, our analysis <u>does not</u> include the value of components other than the merchandise subject to this anti-circumvention inquiry.[182]

Similarly, we find that the value analysis conducted under section 781(a)(2)(E) of the Act, is reasonable because, as required by the Act, we determined whether the value of the processing performed in the United States represents a small proportion of the value of the merchandise sold in the United States, by using the value of the processing costs that were incurred by BMP in the United States as a proportion of the total value of BMP's sales for each specific blend.  Although Choice argues Commerce should disregard any of BMP's further processing to convert R-421A into finished HFC blends in the United States, because the methodology applied in the *Preliminary Determination* demonstrates clear evidence of circumvention, we find that it is unnecessary to apply another methodology to calculate BMP's further processing costs for the final determination.[183]

Choice makes additional arguments which largely lack substantial record evidence (*e.g.*, Commerce should obtain information on the market value of HFC blends and components in the relevant time frame and should consider the ownership of BMP affiliates and investigate the existence of preferential pricing from affiliated Chinese companies or subsidies from the Government of China), but since (1) it is too late in the proceeding to collect additional information; and (2) we have already made a finding of anti-circumvention in the *Preliminary Determination*, and we have found no reason to change the results in the final determination, we find that it is unnecessary to consider additional information or conduct the further analyses hypothesized by Choice.

---

[180] *See* BMP's Case Brief at 5-6.

[181] BMP's argument suggests that Commerce inappropriately included components that were not subject to the inquiry, but overlooks that the HS category used to value R-421A is the category placed on the record by parties in this proceeding and most closely represents the imported R-421A.  Likewise, we did not include any additional components in our analysis under section 781(a)(1)(D).  *See* BPI Analysis Memo at 6 (citing Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Initial Surrogate Country Selection Comments," dated January 3, 2020 and Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China: Surrogate Values Submission," dated January 13, 2020).

[182] *See* BPI Analysis Memorandum at 5-6, Attachment 2, and associated surrogate value data showing that we used only HS category 3824.78.01 (category representing an HFC blend) to value the unpatented R421A input.

[183] As noted above, *see* BPI Analysis Memorandum at Attachment 1 (showing BMP's total cost for HFC blends R404A, R407C, and R407A represented 4.66, 10.37, and 6.55 percent of the total U.S. sales value, demonstrating that BMP's processing performed in the United States represents a small proportion of the value of HFCs blends sold in the United States).  *Id.* at 5 and Attachment 2 (showing that the value of Chinese merchandise as a portion of the total value of U.S. sales for HFCs blends R407C, R407A, and R404A represents 80.02, 80.10, and 93.54 percent of the total U.S. sales value).

28

Barcode:3980446-01 A-570-028 CIRC - Anti Circumvention Inquiry - Unpatented R-421A

**Comment 4:  Use of Surrogate Values to Value Material Inputs**

In the *Preliminary Determination* we noted that, because the purpose of this proceeding is to determine whether merchandise is being further-processed in the United States in order to circumvent the HFCs *Order* on China, an analysis of BMP's China-origin input costs falls under the purview of the Commerce's NME AD methodology.  Therefore, we utilized a Mexican surrogate value to value the input in question to determine whether the value of the merchandise produced in China is a significant portion of the value of the merchandise sold in the United States, pursuant to section 781(a)(1)(D) of the Act.[184]

*BMP's Argument*

- Commerce must determine circumvention using the actual values for the imported R-421A.[185]  Consequently, there is no legal basis for using surrogate values, since Commerce initiated the anti-circumvention inquiry pursuant to section 781 of the Tariff Act of 1930,[186] and is not calculating normal value, which is covered under section 773 of the Act[187] relating to NME proceedings.[188]  Further, Commerce's regulations require that components are valued at the actual value at the time of import, except if the components were purchased from an affiliated person, which is not the case here.[189]

*Petitioners' Rebuttal Argument*

- Commerce should continue to use surrogate values for this anti-circumvention inquiry.[190]  Neither the statute nor Commerce's regulations preclude the use of Commerce's NME methodology in anti-circumvention inquiries, including the use of surrogate values.[191]  Further, using surrogate values in anti-circumvention inquiries is consistent with Commerce's practice.[192]

- As explained in the *Preliminary Determination*, Commerce found using surrogate values was appropriate because the inquiry is an anti-circumvention proceeding initiated under the HFCs *Order*, which is an NME proceeding.[193]  Following BMP's interpretation of the statute, if Commerce relied on actual prices for Chinese HFC components, BMP and its suppliers could circumvent the *Order* simply be manipulating the price.[194]  This approach would reward the

---

[184] *See Preliminary Determination* PDM at 10-11.
[185] *See* BMP's Case Brief at 5.
[186] *Id*. at 4 (citing Section 781 of the Act).
[187] *Id*. at 4 (citing Sections 773(c)(1) and 773(c)(2) of the Act).
[188] *Id*. at 5.
[189] *See* BMP's Case Brief at 5 (citing 19 CFR 351.225(g) and 773(f)(3) of the Trade Act).
[190] *See* Petitioners' Rebuttal Brief at 7-8 (citing 19 CFR 351.225(g) and 773(f)(3) of the Trade Act).
[191] *Id*. at 7 (citing Petitioners' Letter, "Rebuttal Surrogate Country Comments," dated January 2020 at 2-7).
[192] *Id*. at 7 (citing *Preliminary Determination* PDM at 10-11; *Small Diameter Graphite Electrodes from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 47596 (June 6, 2012) (*Graphite Electrodes from China*), and accompanying IDM at Comment 2).
[193] *Id*. at 7-8.
[194] *Id*. at 8.

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

Barcode:3980446-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  Unpatented R-421A

most egregious sales at less-than-fair-value, by excluding those components from the *Order*.[195]

*Choice's Rebuttal Argument*

- Commerce should reject BMP's arguments for the following reasons:  (1) the record supports circumvention regardless of whether surrogate values or actual prices are considered;[196] (2) the CIT has explicitly approved using a surrogate value methodology in anti-circumvention proceedings;[197] (3) BMP was unable to provide evidence showing that it was not affiliated with its suppliers; and (4) BMP has maintained a non-arm's length relationship with T.T. International (TTI), as detailed in pending federal court litigation between BMP and TTI.[198]

**Commerce's Position:**

In the *Preliminary Determination*, to determine whether the process of assembly in the United States is minor or insignificant, we analyzed the five factors under section 781(a) of the Act. One of the factors we analyzed, involved a surrogate value methodology to determine whether the value of the parts or components referred to in subparagraph (B) (*i.e.*, parts or components produced in the foreign country with respect to which such order or finding applies) is a significant portion of the total value of the merchandise.[199]  In the *Preliminary Determination*, consistent with our practice in prior circumvention cases involving non-market economies, we used a surrogate value methodology for this factor.[200]  Because this analysis under section 781(a)(1)(D) of the Act involves an NME country (*i.e.*, China), we used a surrogate country (Mexico) to value the unpatented R-421A in question.[201]

While BMP claims that we have no authority to use a surrogate value methodology in anti-circumvention cases or that the facts are different here, we disagree.  Circumvention analyses take into account the particular facts of each proceeding.  In this case, we are analyzing the value of the inputs coming from China.  Unpatented R-421A is produced in China, an NME country, and is further processed into subject HFC blends in the United States.  While real prices paid for inputs are typically used in the cost buildup for ME companies in ME proceedings, this is an anti-circumvention proceeding that pertains to the HFC blends from China *Order*, which is an NME proceeding.  The presence of government controls on various aspects of NMEs render calculation of production costs invalid under Commerce's normal methodologies.  The purpose of anti-circumvention inquiries is to determine whether merchandise being sold to the United States is circumventing the HFC blends *Order* on China.  Thus, the application of Commerce's

---

[195] *Id.* at 8 (citing *Rhone Poulenc, Inc. v. United States*, 899 F. 2d 1185, 1188 (Fed. Cir. 1990) showing that the Federal Circuit has previously rejected interpretations of the statue that would in effect reward companies who engage in dumping.).
[196] *See* Choice's Rebuttal Brief at 2.
[197] *Id.* at 2 (citing *U.K. Carbon and Graphite Co., Ltd. v. U.S.*, 931 F. Supp. 2d 1322, 1336 (CIT 2013) (*U.K. Carbon and Graphite*)).
[198] *Id.* at 2 (citing Complaint (ECF#1), *T.T. International Co., Ltd. v. BMP International Co, Ltd. et al.*, No. 19-02044 (M.D. Fla. field August 16, 2019)).
[199] *See* section 781(a)(1)(D) of the Act.
[200] *See* *Graphite Electrodes from China* IDM at Comment 2, as upheld by the Court in *U.K. Carbon and Graphite*.
[201] *See* *Preliminary Determination* PDM at 10-11.

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

NME methodology is appropriate to analyze the unpatented R-421A costs in China.  Nothing in the statute precludes us from using a surrogate value methodology in a circumvention inquiry. Also, we have used a surrogate value methodology in prior circumvention analyses involving NME countries,[202] and the CIT has upheld this practice in our circumvention determinations.[203]

While BMP asserts that Commerce use its ME purchases to evaluate the value of Chinese inputs, BMP misses the point of our analysis of the value of the subject merchandise.  We are not valuing BMP's cost of its components; rather we are valuing components produced in China, in accordance with section 781(a)(1)(D) of the Act.  The ME purchases from other countries by a Chinese company do not represent the value of the merchandise produced in China, which is the goal of our analysis.

Further, we do not find BMP's argument that the regulations allow Commerce to resort to the methodology under section 773(f)(3) of the Act only when components were purchased from an affiliated person to be persuasive.  As noted above, Commerce has a consistent practice to use a surrogate value methodology in anti-circumvention cases for NME countries, which has been upheld by the CIT.[204]  Moreover, although BMP references section 773(f)(3) of the Act, that section is related to the calculation of normal value for market economies, and does not pertain to NME countries.[205]  Even assuming, *arguendo*, we found the portion of the statute cited by BMP to be meaningful for our analysis, BMP was unable to provide evidence demonstrating that its purchases of R-421A were made on an arm's length basis or came from unaffiliated suppliers. On the contrary, record evidence shows that BMP has maintained a long-standing relationship with certain Chinese suppliers of the merchandise in question and one of its companies is partially-owned by a Chinese company, which has subsidiaries that produce and export HFC components and subject blends.[206]  Therefore, we find no reason to change our valuation methodology for the final determination.

## Comment 5:   Certification Requirements

In the *Preliminary Determination* we stated that "{i}n light of Commerce's preliminary finding of circumvention, Commerce intends to consider whether to require importers of patented R-421A who claim their merchandise is not subject to the *Order* to maintain certification that the imported product is Choice® R-421A; and thus, meets the terms of the exclusion."[207]  Therefore, we invited interested parties to comment on this issue.

*Petitioners Arguments*

---

[202] *See, e.g.*, *Graphite Electrodes from China* IDM at Comment 2; *see also CORE from China* IDM at Comment 6.
[203] *See U.K. Carbon and Graphite*, 931 F. Supp. 2d 1322, 1336.
[204] *Id.*
[205] *See* 773(f)(3) with heading "{s}pecial Rules for Calculation of Cost of Production and for Calculation of Constructed Value.  For purposes of subsections (b) and (e)." We note that NMEs fall under 773(c), not subsections 773(b) and 773(e).
[206] *See* BPI Analysis Memorandum at 7, showing that BMP maintained a long-standing customer-supplier relationship with one of the Chinese suppliers from the underlying investigation and one of BMP's companies is partially-owned by a Chinese company named Zhejiang Juhua Co. Ltd.
[207] *See Preliminary Determination* PDM at 21.

31

- Commerce should adopt a certification regime or use particularized 10-digit case numbers to ensure that it is able to collect cash deposits on imports of unpatented R-421A but does not unlawfully collect cash deposits on entries of non-subject, patented Choice® R-421A.[208]

- Similar to a certification regime adopted by Commerce and CBP in other anti-circumvention cases, Commerce should instruct CBP to collect cash deposits and suspend liquidation for all entries of R-421A that are not accompanied by a certification executed by the importer of record that should:  (1) identify the importer of record; (2) identify the Chinese producer and the exporter; (3) prove the goods are properly patented; and (4) identify the license agreement authorizing the production of the goods being entered.[209]

- The importer of record should be prepared to provide the certification and supporting documentation to CBP and/or Commerce, upon request for a specific time period.[210] Alternatively, Commerce could isolate excluded entries by assigning foreign producers unique 10-digit case numbers for use within the AD/CVD Case Reference File, which is within ACE.[211]  Such a case number could be assigned only to entries to the company that produces Choice® R-421A, ensuring that the exclusion would only apply to this product. Using a 10-digit case number has the following benefits:  (1) it will be easier for CBP to enforce by not requiring the need for certifications or supporting documents; (2) because case numbers would be established within anti-circumvention determinations, interested parties would have an opportunity to weigh and comment on the merits of such assignments; and (3) where eligibility for a previously assigned 10-digit case number changes, interested parties, including the importer of record, could seek modification through a changed circumstances review.[212]

**Commerce's Position**:

We find that the implementation of certification requirements, as outlined by the petitioners, is appropriate in this instance.  Additionally, these certification requirements provide a means for companies like Choice to avoid application of AD duties under the HFCs *Order* for Choice® R-421A and prevent companies from exporting/importing unpatented versions of this product without paying the appropriate duties.

For the purposes of this anti-circumvention final determination, we have included certification language in the *Federal Register* notice,[213] and we will also include such certification language in our customs instructions to CBP, requiring that the importer/exporter identify the importer of record and the Chinese producer/exporter; provide documentation showing the goods are properly patented; and identify the license agreement authorizing the production of the goods being entered.  The certification requirements are similar to requirements adopted in numerous

---

[208] *See* Petitioners' Case Brief at 2-3.

[209] *Id.* at 2-3.

[210] *Id.* at 2-3.

[211] *Id.* at 4-5 (citing https://www.cbp.gov/sites/default/files/assets/documents/2017-Feb/ace-terminology-10digit-company-status-20170125.pdf, to show an explanation of CBP implementation of 10-digit case numbers provided by Commerce).

[212] *Id.* at 4-5.

[213] *See* Appendices II, III, and IV of the *Federal Register* notice that accompanies this decision memorandum.

Filed By: Manuel Rey, Filed Date: 5/29/20 2:43 PM, Submission Status: Approved

other anti-circumvention inquiries.[214] We find that these requirements are appropriate to ensure that duties are only collected on unpatented R-421A that are subject to this anti-circumvention inquiry and not on patented Choice® R-421A, which is explicitly excluded from the order. In this regard, we note that the certifications require timely completion at the time of shipment. Thus, while the certifications are only provided to CBP and Commerce on request, the certifications must be completed in real time on an entry- and shipment-specific basis. Further, we are unable to use the 10-digit case number, as suggested by the petitioner because (1) there is no existing mechanism to track or update such a specialized case number; (2) it could provide Choice's exporter with a duty-free loop-hole to ship other HFC blends through; and (3) in the future, there may be other licensed exporters of Choice® R-421A, and/or the current license holder may lose its license to export Choice® R-421A.

## VI.    RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting all of the above positions. If accepted, we will publish the final determination of this scope ruling and anticircumvention inquiry in the *Federal Register*.

☒                                    ☐
_____                          _____
Agree                                Disagree

                            5/28/2020
X  ~~~~~~~~
_____

Signed by: JOSEPH LAROSKI

_____
Joseph Laroski
Deputy Assistant Secretary
  for Policy and Negotiations

---

[214] *See, e.g., Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Inquiry on the Antidumping Duty Order,* 84 FR 70937 (December 26, 2019).

# Exhibit 2

# HUSCH BLACKWELL

Nithya Nagarajan
Partner

750 17th St. N.W., Suite 900
Washington, DC 20006-4675
Direct: 202.378.2409
Fax: 202.348.2319
nithya.nagarajan@huschblackwell.com

November 15, 2019

Received by CLK

NOV 2 1 2019

Case No. A-570-028
Total Pages: 19
Anti-Circ: Indian Blends
E&C: Operations

**PUBLIC VERSION**
Business Proprietary Information removed
from brackets in Attachment I pages 1 and 3,
and Attachment II-A to II-D.

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

> **Re:** ***Hydrofluorocarbon Blends from the People's Republic of China:***
> ***Response to Quantity and Value Questionnaire***

Dear Secretary Ross:

On behalf of Gujarat Fluor ochemicals Limited ("GFL"), we hereby submit the

foregoing quantity and value questionnaire response in the above-referenced proceeding.

## REQUEST FOR PROPRIETARY TREATMENT

Certain information contained herein is business confidential data that is proprietary.

This information is enclosed with brackets ("[ ]"). Disclosure of this information would cause

substantial competitive and commercial harm to the parties. Such data is marked as "Proprietary

Treatment Requested." Confidential treatment, subject to administrative protective order, is

Husch Blackwell LLP

# ᕼUSCH BLACKWELL

requested pursuant to 19 C.F.R. § 351.105(c) (2012).  Information marked as business

proprietary has been so marked for one or more of the following reasons, in accordance with 19

C.F.R. §351.105(c) (2012):

(1) Business or trade secrets concerning the nature of a product or production process;
(2) Production costs (but not the identity of the production components unless a particular component is a trade secret);
(3) Distribution costs and channels of distribution;
(4) Terms of sale (but not terms of sale offered to the public);
(5) Prices of individual sales, likely sales, or other offers (but not components of prices, such as transportation, if based on published schedules, dates of sale, product descriptions except business or trade secrets described in term 1 above, or order numbers);
(6) Names of particular customers, distributors, or suppliers (but not destination of sale or designation of type of customer, distributor, or supplier, unless the designation of destination would reveal the name);
(7) In an antidumping proceeding, the exact amount of the dumping margin on individual sales;
(8) In a countervailing duty proceeding, the exact amount of benefits applied for or received by a person from each of the programs under investigation . . . ;
(9) The names of particular persons from whom business proprietary information was obtained;
(10) The position of a domestic producer or workers regarding a petition;
(11) Any other specific business information the release of which to the public would cause substantial harm to the competitive position of the submitter.

The following lists the pages in which the business proprietary information appears and

the reason (referenced by the same number as listed above) that proprietary treatment is

requested for such information.

| Pages & Exhibit | Reason Number |
|---|---|
| Attachment I pages 1 and 3, and Attachment II-A to II-D | 2, 11 |

The disclosure of this information would cause substantial competitive harm to GFL.

Where appropriate, the data will be ranged or indexed in the public version of this submission.

Husch Blackwell LLP

# HUSCH BLACKWELL

Please contact us if you have any questions regarding this submission, or require additional information.

Respectfully submitted,

HUSCH BLACKWELL

*Nithya Nagarajan*

Nithya Nagarajan

Husch Blackwell LLP

# HUSCH BLACKWELL

Nithya Nagarajan
Partner

750 17th St. N.W., Suite 900
Washington, DC  20006-4675
Direct: 202.378.2409
Fax: 202.348.2319
nithya.nagarajan@huschblackwell.com

## REPRESENTATIVE CERTIFICATION

I, **Nithya Nagarajan,** with **Husch Blackwell LLP,** counsel to **Gujarat Fluorochemicals Limited,** certify that I have read the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 15, 2019,** pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028).** In my capacity as a counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of  my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to  the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn  from the record of the AD/CVD proceeding, the Department may preserve this submission,  including a business proprietary submission, for purposes of determining the accuracy of this  certification. I certify that I am filing a copy of this signed certification with this submission to  the U.S. Department of Commerce and that I will retain the original for a five-year period  commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature: _Nithya Nagarajan_

Date: _11/15/19_

Husch Blackwell LLP



**GUJARAT
FLUOROCHEMICALS
LIMITED**

(Earlier known as Inox Fluorochemicals Limited)

ABS Towers, 2nd Floor, Old Padra Road, Vadodara - 390 007, Gujarat, India

## COMPANY CERTIFICATION

I, **Manoj Agrawal, Chief Financial Officer,** currently employed by **Gujarat Fluorochemicals Limited** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 15, 2019,** pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **Gujarat Fluorochemicals Limited** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: _____November 15, 2019_____

Regd.Office : Survey No.16|3, 26,27 Ranjitnagar - 389 380, Tal. Ghoghamba, Dist. Panchmahals, Gujarat, India. Telefax: +91 2678 248 153
Delhi Office: INOX Towers, 17 Sector 16A, Noida 201 301, Uttar Pradesh, India. Tel: +91 (120) 6149 600  Fax: +91 (120) 6149 610
CIN : U24304GJ2018PLC105479

**PUBLIC SERVICE LIST**
**Hydrofluorocarbon Blends from the People's Republic of China**
**Case No. A-570-028**
**Anti-Circumvention Inquiry:**
**Indian Blends**

      I, Nithya Nagarajan, hereby certify that a copy of the foregoing submission was served in accordance with the Public Service List, published by the U.S. Department of Commerce on June 25, 2019. Service was made on the following parties on November 15, 2019.

Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
660 Pennsylvania Avenue, SE
Suite 401
Washington, DC 20003

James R. Cannon Jr., Esq.
Cassidy Levy Kent (USA) LLP
900 19th Street, NW
Suite 400
Washington, DC 20006

Sarah Sprinkle, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006

      /s/Nithya Nagarajan
      Nithya Nagarajan

Husch Blackwell LLP

PUBLIC VERSION

# ATTACHMENT I

**Submit all completed charts required by this questionnaire in Excel format.**

1.   In the chart provided in attachment II-A, please provide monthly and total quantity (in kilograms) and monthly and total value (in U.S. Dollars)[4] of your shipments of HFC blends (*i.e.*, R-404A, R-407A, R-407C, R-410A, and R-507/R-507A) for the time period of July 1, 2011, through June 30, 2019.  Provide a narrative explanation of how you aggregated these data from your books and records.

   **Response:**

   **Gujarat Flourochemical Ltd. ("GFL") utilizes a [                    ] to maintain its accounting records.  The data provided at Attachment II was generated from the [            ] using the  [                        ].  The [                    ] also segregate the sales of HFC Blends and non-HFC Blends which are the basis of all the reported data.**

2.   Provide a narrative description of your production process for each blend exported to the United States, including whether you self-produce one or more of the components and the source of any components not self-produced.

   **Response:**

   **GFL only produces HFC-410A and HFC-407C**

   ➢   **HFC-410a: - HFC-410A is a zeotropic blend of R32 and R125 in equal proportion where an equal quantity of both R32 and R125 are blended in a suitably designed and sized tank.  A closed circulation process whereby both R32 and R125 are mixed via a suitable pump to obtain a homogeneous blend. GC (Gas Chromatography) analysis is performed to ensure a proper blend. R125 is produced by GFL at its Dahej unit which manufactures the R125 using [                      ] as raw material inputs; R32 is mostly imported but is sourced from other Indian suppliers as well.   Any raw material components which are imported are done so in approved ISO containers. The product is exported either in approved disposable cylinders or ISO containers.**

   ➢   **HFC-407C: - HFC 407C is zeotropic blend of R32, R125 and R134a  with a ratio of 23%; 25% and 52% respectively. R32, R125 and R134a in the specific proportions are are blended in a suitably designed and sized tank. A closed circulation process whereby all three refrigerants are mixed via a suitable pump to obtain a homogeneous blend. GC (Gas Chromatography) analysis is performed to ensure a proper blend. R125 is produced by GFL at its Dahej unit which manufactures the R125 using [                      ] as raw material inputs.**

1

PUBLIC VERSION

**R32 is imported from China and R134a is imported from United States. Raw material is imported in approved ISO containers. The product is exported either in approved disposable cylinders or ISO containers.**

3.  Identify your top five U.S. importers. Fill in the chart provided in attachment II-B with the monthly quantities and values of your shipments of HFC blends to each of your top five U.S. importers.

    **Response:**

    **Please see attachment II-B which provides the monthly quantities and values of shipments of HFC blends to GFL's top five U.S. importers.**

4.  State whether you are affiliated with any:

    a.  producers of HFC components R-32, R-125, R-134a, and/or R-143a in China;
    b.  exporters of HFC components R-32, R-125, R-134a, and/or R-143a in China; or c.   importers of HFC blends in the United States.

    If yes, please identify those producers, exporters, or importers.

    **Response:**

    **GFL is not affiliated with producers, exporters, or importers in China.**

    **GFL exports blends of HFCs directly to the U.S. market as well as through GFL LLC USA, which is our wholly owned subsidiary, who in turn sells HFC blends in the United States. GFL does not have any other affiliated relationship in the United States with any producer, exporter, or importer**

5.  Indicate whether you imported or purchased any HFC components from China during the period July 1, 2011, through June 30, 2019 (*i.e.*, R-32, R-125, R-134a, or R-143a).

    If you did import or purchase any HFC components originating in China during the time period July 1, 2011, through June 30, 2019, please respond to the questions below. If you did not import or purchase components from China during the time period July 1, 2011, through June 30, 2019, you are not required to complete the remaining questions.

    **Response:**

    **During the time period July 1, 2011 to June 30, 2019, GFL purchased R-32 from suppliers in China and imported the R-32 into India for its consumption and blending operations in India. GFL did not resell R-32 to the United States as R-32 during this time period.**

2

PUBLIC VERSION

6.    Identify your top five Chinese suppliers of HFC components during the time period July 1, 2011, through June 30, 2019, and which component(s) you purchase from each supplier.

**Response:**

**GFL's top five Chinese suppliers for the period July 1, 2011 to June 30, 2019 are provided below:**

| Name of Chinese Suppliers | Name of Goods Supplied |
|---|---|
| [ | ] |
| [ | ] |
| [ | ] |
| [ | ] |
| [ | ] |

7.    Fill in the chart provided in attachment II-C with the monthly quantities and values of your purchases/imports of HFC components from China.

**Response:**

**Please see attachment II-C, which provides the monthly quantities and values of purchases/imports of HFC components from China.**

**It is important to note that GFL purchases and imports R-32 from China as there are limited sources of R-32 in India of the grade and quality required by GFL for its production operations. In order for GFL to continue to operate its business and production plants in India it needs a regular and steady source of supply of R-32 which it is unable to obtain in consistent quantities which is suitable to its production schedule. Accordingly, it has no choice but to source this material from China.**

8.    Provide a detailed narrative response as to what your company does with the imported HFC components from China (including, but not limited to, whether your company, or another company on behalf of your company, blends them to create HFC blends, resells the HFC components, etc.).

**Response:**

**Please see the response above to Question 2.**

9.    If your company, or another company on behalf of your company, blends the HFC

3

JA380

PUBLIC VERSION

components from China, identify all HFC blends (*e.g.*, R-404A, R-407A, R-407C, R-410A, or R-507/R-507A) your company produces using the imported HFC components. Please also identify if the HFC blends are then exported to the United States.

**Response:**

**Please see the response above to Question 2.**

10.    If your company, or another company on behalf of your company, blends the imported HFC components to create HFC blends, complete the chart in attachment II-D, which details the monthly quantities and values of each HFC blend identified in question 9 using the imported HFC components for the period of July 1, 2011, through June 30, 2019.

**Response:**

**Please see attachment II-D, which provides the monthly quantities and values of each HFC blends produced by GFL during the period July 1, 2011 to June 30, 2019.**

4

JA381

# ATTACHMENT II-A

PUBLIC VERSION

Attachment II-A

### HFC Blends Exported from India

| | R-404A | | R-407A | | R-407C | | R-410A | | R-507/R-507A | | Total Monthly Exports | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) |
| Jul-2011 | | | | | | | | | | | | |
| Aug-2011 | | | | | | | | | | | | |
| Sep-2011 | | | | | | | | | | | | |
| Oct-2011 | | | | | | | | | | | | |
| Nov-2011 | | | | | | | | | | | | |
| Dec-2011 | | | | | | | | | | | | |
| Jan-2012 | | | | | | | | | | | | |
| Feb-2012 | | | | | | | | | | | | |
| Mar-2012 | | | | | | | | | | | | |
| Apr-2012 | | | | | | | | | | | | |
| May-2012 | | | | | | | | | | | | |
| Jun-2012 | | | | | | | | | | | | |
| Jul-2012 | | | | | | | | | | | | |
| Aug-2012 | | | | | | | | | | | | |
| Sep-2012 | | | | | | | | | | | | |
| Oct-2012 | | | | | | | | | | | | |
| Nov-2012 | | | | | | | | | | | | |
| Dec-2012 | | | | | | | | | | | | |
| Jan-2013 | | | | | | | | | | | | |
| Feb-2013 | | | | | | | | | | | | |
| Mar-2013 | | | | | | | | | | | | |
| Apr-2013 | | | | | | | | | | | | |
| May-2013 | | | | | | | | | | | | |
| Jun-2013 | | | | | | | | | | | | |
| Jul-2013 | | | | | | | | | | | | |
| Aug-2013 | | | | | | | | | | | | |
| Sep-2013 | | | | | | | | | | | | |
| Oct-2013 | | | | | | | | | | | | |
| Nov-2013 | | | | | | | | | | | | |
| Dec-2013 | | | | | | | | | | | | |
| Jan-2014 | | | | | | | | | | | | |
| Feb-2014 | | | | | | | | | | | | |
| Mar-2014 | | | | | | | | | | | | |
| Apr-2014 | | | | | | | | | | | | |
| May-2014 | | | | | | | | | | | | |
| Jun-2014 | | | | | | | | | | | | |
| Jul-2014 | | | | | | | | | | | | |
| Aug-2014 | | | | | | | | | | | | |
| Sep-2014 | | | | | | | | | | | | |
| Oct-2014 | | | | | | | | | | | | |
| Nov-2014 | | | | | | | | | | | | |
| Dec-2014 | | | | | | | | | | | | |
| Jan-2015 | | | | | | | | | | | | |
| Feb-2015 | | | | | | | | | | | | |
| Mar-2015 | | | | | | | | | | | | |
| Apr-2015 | | | | | | | | | | | | |
| May-2015 | | | | | | | | | | | | |
| Jun-2015 | | | | | | | | | | | | |
| Jul-2015 | | | | | | | | | | | | |
| Aug-2015 | | | | | | | | | | | | |
| Sep-2015 | | | | | | | | | | | | |
| Oct-2015 | | | | | | | | | | | | |
| Nov-2015 | | | | | | | | | | | | |
| Dec-2015 | | | | | | | | | | | | |
| Jan-2016 | | | | | | | | | | | | |
| Feb-2016 | | | | | | | | | | | | |
| Mar-2016 | | | | | | | | | | | | |
| Apr-2016 | | | | | | | | | | | | |
| May-2016 | | | | | | | | | | | | |
| Jun-2016 | | | | | | | | | | | | |
| Jul-2016 | | | | | | | | | | | | |
| Aug-2016 | | | | | | | | | | | | |
| Sep-2016 | | | | | | | | | | | | |
| Oct-2016 | | | | | | | | | | | | |
| Nov-2016 | | | | | | | | | | | | |
| Dec-2016 | | | | | | | | | | | | |
| Jan-2017 | | | | | | | | | | | | |
| Feb-2017 | | | | | | | | | | | | |
| Mar-2017 | | | | | | | | | | | | |
| Apr-2017 | | | | | | | | | | | | |
| May-2017 | | | | | | | | | | | | |
| Jun-2017 | | | | | | | | | | | | |
| Jul-2017 | | | | | | | | | | | | |
| Aug-2017 | | | | | | | | | | | | |
| Sep-2017 | | | | | | | | | | | | |
| Oct-2017 | | | | | | | | | | | | |
| Nov-2017 | | | | | | | | | | | | |
| Dec-2017 | | | | | | | | | | | | |
| Jan-2018 | | | | | | | | | | | | |
| Feb-2018 | | | | | | | | | | | | |
| Mar-2018 | | | | | | | | | | | | |
| Apr-2018 | | | | | | | | | | | | |
| May-2018 | | | | | | | | | | | | |
| Jun-2018 | | | | | | | | | | | | |
| Jul-2018 | | | | | | | | | | | | |
| Aug-2018 | | | | | | | | | | | | |
| Sep-2018 | | | | | | | | | | | | |
| Oct-2018 | | | | | | | | | | | | |
| Nov-2018 | | | | | | | | | | | | |
| Dec-2018 | | | | | | | | | | | | |
| Jan-2019 | | | | | | | | | | | | |
| Feb-2019 | | | | | | | | | | | | |
| Mar-2019 | | | | | | | | | | | | |
| Apr-2019 | | | | | | | | | | | | |
| Jun-2019 | | | | | | | | | | | | |
| Total | | | | | | 1,500,000 | | | | | 2400000 | 15,000,000 |

# ATTACHMENT II-B

PUBLIC VERSION



Attachment II-B

Quantity and Value of Shipments of HFC Blends to Top 5 U.S. Customers/Importers

| | ALTAIR PARTNERS, LP | | DYNATEMP INTERNATIONAL | | GFL AMERICAS,LLC | | KIVLAN & COMPANY, INC | | MONDY GLOBAL, INC | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) |
| Total | 290000 | 2,000,000 | | | | | | | | |

# ATTACHMENT II-C

PUBLIC VERSION

**Attachment II-C**

**Quantity and Value of HFC Components Imported/Purchased from China**

| | R-32 | | R-125 | | R-134a | | R-143a | | Total Monthly Imports | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) |
| Jul-2011 | | | | | | | | | | |
| Aug-2011 | | | | | | | | | | |
| Sep-2011 | | | | | | | | | | |
| Oct-2011 | | | | | | | | | | |
| Nov-2011 | | | | | | | | | | |
| Dec-2011 | | | | | | | | | | |
| Jan-2012 | | | | | | | | | | |
| Feb-2012 | | | | | | | | | | |
| Mar-2012 | | | | | | | | | | |
| Apr-2012 | | | | | | | | | | |
| May-2012 | | | | | | | | | | |
| Jun-2012 | | | | | | | | | | |
| Jul-2012 | | | | | | | | | | |
| Aug-2012 | | | | | | | | | | |
| Sep-2012 | | | | | | | | | | |
| Oct-2012 | | | | | | | | | | |
| Nov-2012 | | | | | | | | | | |
| Dec-2012 | | | | | | | | | | |
| Jan-2013 | | | | | | | | | | |
| Feb-2013 | | | | | | | | | | |
| Mar-2013 | | | | | | | | | | |
| Apr-2013 | | | | | | | | | | |
| May-2013 | | | | | | | | | | |
| Jun-2013 | | | | | | | | | | |
| Jul-2013 | | | | | | | | | | |
| Aug-2013 | | | | | | | | | | |
| Sep-2013 | | | | | | | | | | |
| Oct-2013 | | | | | | | | | | |
| Nov-2013 | | | | | | | | | | |
| Dec-2013 | | | | | | | | | | |
| Jan-2014 | | | | | | | | | | |
| Feb-2014 | | | | | | | | | | |
| Mar-2014 | | | | | | | | | | |
| Apr-2014 | | | | | | | | | | |
| May-2014 | | | | | | | | | | |
| Jun-2014 | | | | | | | | | | |
| Jul-2014 | | | | | | | | | | |
| Aug-2014 | | | | | | | | | | |
| Sep-2014 | | | | | | | | | | |
| Oct-2014 | | | | | | | | | | |
| Nov-2014 | | | | | | | | | | |
| Dec-2014 | | | | | | | | | | |
| Jan-2015 | | | | | | | | | | |
| Feb-2015 | | | | | | | | | | |
| Mar-2015 | | | | | | | | | | |
| Apr-2015 | | | | | | | | | | |
| May-2015 | | | | | | | | | | |
| Jun-2015 | | | | | | | | | | |
| Jul-2015 | | | | | | | | | | |
| Aug-2015 | | | | | | | | | | |
| Sep-2015 | | | | | | | | | | |
| Oct-2015 | | | | | | | | | | |
| Nov-2015 | | | | | | | | | | |
| Dec-2015 | | | | | | | | | | |
| Jan-2016 | | | | | | | | | | |
| Feb-2016 | | | | | | | | | | |
| Mar-2016 | | | | | | | | | | |
| Apr-2016 | | | | | | | | | | |
| May-2016 | | | | | | | | | | |
| Jun-2016 | | | | | | | | | | |
| Jul-2016 | | | | | | | | | | |
| Aug-2016 | | | | | | | | | | |
| Sep-2016 | | | | | | | | | | |
| Oct-2016 | | | | | | | | | | |
| Nov-2016 | | | | | | | | | | |
| Dec-2016 | | | | | | | | | | |
| Jan-2017 | | | | | | | | | | |
| Feb-2017 | | | | | | | | | | |
| Mar-2017 | | | | | | | | | | |
| Apr-2017 | | | | | | | | | | |
| May-2017 | | | | | | | | | | |
| Jun-2017 | | | | | | | | | | |
| Jul-2017 | | | | | | | | | | |
| Aug-2017 | | | | | | | | | | |
| Sep-2017 | | | | | | | | | | |
| Oct-2017 | | | | | | | | | | |
| Nov-2017 | | | | | | | | | | |
| Dec-2017 | | | | | | | | | | |
| Jan-2018 | | | | | | | | | | |
| Feb-2018 | | | | | | | | | | |
| Mar-2018 | | | | | | | | | | |
| Apr-2018 | | | | | | | | | | |
| May-2018 | | | | | | | | | | |
| Jun-2018 | | | | | | | | | | |
| Jul-2018 | | | | | | | | | | |
| Aug-2018 | | | | | | | | | | |
| Sep-2018 | | | | | | | | | | |
| Oct-2018 | | | | | | | | | | |
| Nov-2018 | | | | | | | | | | |
| Dec-2018 | | | | | | | | | | |
| Jan-2019 | | | | | | | | | | |
| Feb-2019 | | | | | | | | | | |
| Mar-2019 | | | | | | | | | | |
| Apr-2019 | | | | | | | | | | |
| May-2019 | 140000 | | | | | | | | | |
| Jun-2019 | | | | | | | | | | |
| Total | 3000000 | | | | | | | | | 10,000,000 |

# ATTACHMENT II-D

PUBLIC VERSION

Attachment II-D

### Quantity and Value of HFC Blends Produced Using Imported R-32, R-125, R-134a, and/or R-143a

| | R-410A | | R-407C | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) | Quantity (kg) | Value (USD) |
| Jul-2011 | | | | | | | | | | |
| Aug-2011 | | | | | | | | | | |
| Sep-2011 | | | | | | | | | | |
| Oct-2011 | | | | | | | | | | |
| Nov-2011 | | | | | | | | | | |
| Dec-2011 | | | | | | | | | | |
| Jan-2012 | | | | | | | | | | |
| Feb-2012 | | | | | | | | | | |
| Mar-2012 | | | | | | | | | | |
| Apr-2012 | | | | | | | | | | |
| May-2012 | | | | | | | | | | |
| Jun-2012 | | | | | | | | | | |
| Jul-2012 | | | | | | | | | | |
| Aug-2012 | | | | | | | | | | |
| Sep-2012 | | | | | | | | | | |
| Oct-2012 | | | | | | | | | | |
| Nov-2012 | | | | | | | | | | |
| Dec-2012 | | | | | | | | | | |
| Jan-2013 | | | | | | | | | | |
| Feb-2013 | | | | | | | | | | |
| Mar-2013 | | | | | | | | | | |
| Apr-2013 | | | | | | | | | | |
| May-2013 | | | | | | | | | | |
| Jun-2013 | | | | | | | | | | |
| Jul-2013 | | | | | | | | | | |
| Aug-2013 | | | | | | | | | | |
| Sep-2013 | | | | | | | | | | |
| Oct-2013 | | | | | | | | | | |
| Nov-2013 | | | | | | | | | | |
| Dec-2013 | | | | | | | | | | |
| Jan-2014 | | | | | | | | | | |
| Feb-2014 | | | | | | | | | | |
| Mar-2014 | | | | | | | | | | |
| Apr-2014 | | | | | | | | | | |
| May-2014 | | | | | | | | | | |
| Jun-2014 | | | | | | | | | | |
| Jul-2014 | | | | | | | | | | |
| Aug-2014 | | | | | | | | | | |
| Sep-2014 | | | | | | | | | | |
| Oct-2014 | | | | | | | | | | |
| Nov-2014 | | | | | | | | | | |
| Dec-2014 | | | | | | | | | | |
| Jan-2015 | | | | | | | | | | |
| Feb-2015 | | | | | | | | | | |
| Mar-2015 | | | | | | | | | | |
| Apr-2015 | | | | | | | | | | |
| May-2015 | | | | | | | | | | |
| Jun-2015 | | | | | | | | | | |
| Jul-2015 | | | | | | | | | | |
| Aug-2015 | | | | | | | | | | |
| Sep-2015 | | | | | | | | | | |
| Oct-2015 | | | | | | | | | | |
| Nov-2015 | | | | | | | | | | |
| Dec-2015 | | | | | | | | | | |
| Jan-2016 | | | | | | | | | | |
| Feb-2016 | | | | | | | | | | |
| Mar-2016 | | | | | | | | | | |
| Apr-2016 | | | | | | | | | | |
| May-2016 | | | | | | | | | | |
| Jun-2016 | | | | | | | | | | |
| Jul-2016 | | | | | | | | | | |
| Aug-2016 | | | | | | | | | | |
| Sep-2016 | | | | | | | | | | |
| Oct-2016 | | | | | | | | | | |
| Nov-2016 | | | | | | | | | | |
| Dec-2016 | | | | | | | | | | |
| Jan-2017 | | | | | | | | | | |
| Feb-2017 | | | | | | | | | | |
| Mar-2017 | | | | | | | | | | |
| Apr-2017 | | | | | | | | | | |
| May-2017 | | | | | | | | | | |
| Jun-2017 | 260000 | 1,300,000 | | | | | | | | |
| Jul-2017 | | | | | | | | | | |
| Aug-2017 | | | | | | | | | | |
| Sep-2017 | | | | | | | | | | |
| Oct-2017 | | | | | | | | | | |
| Nov-2017 | | | | | | | | | | |
| Dec-2017 | | | | | | | | | | |
| Jan-2018 | | | | | | | | | | |
| Feb-2018 | | | | | | | | | | |
| Mar-2018 | | | | | | | | | | |
| Apr-2018 | | | | | | | | | | |
| May-2018 | | | | | | | | | | |
| Jun-2018 | | | | | | | | | | |
| Jul-2018 | | | | | | | | | | |
| Aug-2018 | | | | | | | | | | |
| Sep-2018 | | | | | | | | | | |
| Oct-2018 | | | | | | | | | | |
| Nov-2018 | | | | | | | | | | |
| Dec-2018 | | | | | | | | | | |
| Jan-2019 | | | | | | | | | | |
| Feb-2019 | | | | | | | | | | |
| Mar-2019 | | | | | | | | | | |
| Apr-2019 | | | | | | | | | | |
| May-2019 | | | | | | | | | | |
| Jun-2019 | | | | | | | | | | |
| Total | 6000000 | | | | | | | | | |

Notes :
Annual Average Cost of Production 2017-18 xx per Co
Annual Average Cost of Production 2018-19 xx per Co
* Cost of Production obtained from Annual Cost records of the Company and converted to USD by applying monthly exchange rate.
* Monthly exchange rates obtained from
https://www.xrates.com/average/?from=USD&to=INR&amount=1&year=2019
* Production of R-410 includes Production from R-32 domestic purchase of          During the financial year 2017-18

PUBLIC VERSION

|  | 2017 |  |
|---|---|---|
| Jan-17 | | *70* |
| Feb-17 | | |
| Mar-17 | | |
| Apr-17 | | |
| May-17 | | |
| Jun-17 | | |
| Jul-17 | | |
| Aug-17 | | |
| Sep-17 | | |
| Oct-17 | | |
| Nov-17 | | |
| Dec-17 | | |
|  | 2018 |  |
| Jan-18 | | *65* |
| Feb-18 | | |
| Mar-18 | | |
| Apr-18 | | |
| May-18 | | |
| Jun-18 | | |
| Jul-18 | | |
| Aug-18 | | |
| Sep-18 | | |
| Oct-18 | | |
| Nov-18 | | |
| Dec-18 | | |
| 2019 | | |
| Jan-19 | | |
| Feb-19 | | |
| Mar-19 | | |
| Apr-19 | | |
| May-19 | | |
| Jun-19 | | *70* |

# Exhibit 3

Attachment 2

| Bill of lading Nbr. | Date | Master/House | Carrier Code | Carrier | Vessel | IMO Code | Mode of Transport | Port of Departure | Port of Arrival | In bond entry type | Foreign Destination | Weight | Weight Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ZMIUNGB9106548 | 2/4/2017 S | | ZIMU | ZIM INTEGRATED SHIPPING SERVICES LTD | PORTO | 9481520 | VESSEL, CONTAINERIZED | PORT BUSTAMANTE,KING STON,JAMAICA | TAMPA,FL | | | 182938 LB | |
| ZMIUNGB9106549 | 2/4/2017 S | | ZIMU | ZIM INTEGRATED SHIPPING SERVICES LTD | PORTO | 9481520 | VESSEL, CONTAINERIZED | PORT BUSTAMANTE,KING STON,JAMAICA | TAMPA,FL | | | 27778 LB | |
| ZMIUSNH3834282 | 2/4/2017 S | | ZIMU | ZIM INTEGRATED SHIPPING SERVICES LTD | PORTO | 9481520 | VESSEL, CONTAINERIZED | PORT BUSTAMANTE,KING STON,JAMAICA | TAMPA,FL | | | 400663 LB | |
| ZMIUSNH3834326 | 2/4/2017 S | | ZIMU | ZIM INTEGRATED SHIPPING SERVICES LTD | PORTO | 9481520 | VESSEL, CONTAINERIZED | PORT BUSTAMANTE,KING STON,JAMAICA | TAMPA,FL | | | 333776 LB | |
| ZMIUSNH3834343 | 2/4/2017 S | | ZIMU | ZIM INTEGRATED SHIPPING SERVICES LTD | PORTO | 9481520 | VESSEL, CONTAINERIZED | PORT BUSTAMANTE,KING STON,JAMAICA | TAMPA,FL | | | 66866 LB | |

| Quantity | Quantity Unit | Measure | Measure Unit | Estimated Date | Shipper Declared | Shipper Address | Consignee Declared | Consignee Declared Address | Notify Name | Notify Address | Container Quantity | Month |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12600 CYL | | 5933 CF | | 2/3/2017 NOT DECLARED | | | LM SUPPLY,INC | 13809 20TH STREET N UNIT C TAMPA,FL 33613 | LM SUPPLY,INC | 13809 20TH STREET N UNIT C TAMPA,FL 33613 | 3 | 2 |
| 2 TNK | | 1978 GF | | 2/3/2017 NOT DECLARED | | | LM SUPPLY,INC | 13809 20TH STREET N UNIT C TAMPA,FL 33613 | LM SUPPLY,INC | 13809 20TH STREET N UNIT C TAMPA,FL 33613 | 2 | 2 |
| 9600 CYL | | 11886 GF | | 2/3/2017 T.T INTERNATIONAL CO.LTD. | ROOM 2911 MANHATTAN BUILDING 105 YOUHAO ROAD DALIAN 116001 CHINA TEL.041-82537172 | LM SUPPLY,INC | 13809 20TH STREET N UNIT C TAMPA, FL 33613 TEL.001-813-288-8101 | LM SUPPLY, INC | 13809 20TH STREET N UNIT C TAMPA, FL 33613 TEL.001-813-288-8101 | 6 | 2 |
| 8000 CYL | | 9888 GF | | 2/3/2017 T.T INTERNATIONAL CO.LTD. | ROOM 2911 MANHATTAN BUILDING 105 YOUHAO ROAD DALIAN 116001 CHINA TEL.041-82537172 | LM SUPPLY,INC | 13809 20TH STREET N UNIT C TAMPA, FL 33613 TEL.001-813-288-8101 | LM SUPPLY, INC | 13809 20TH STREET N UNIT C TAMPA, FL 33613 TEL.001-813-288-8101 | 5 | 2 |
| 1600 CYL | | 1978 GF | | 2/3/2017 T.T INTERNATIONAL CO.LTD. | ROOM 2911 MANHATTAN BUILDING 105 YOUHAO ROAD DALIAN 116001 CHINA TEL.041-82537172 | LM SUPPLY, INC | 13809 20TH STREET N UNIT C TAMPA, FL 33613 TEL.001-813-288-8101 | LM SUPPLY, INC | 13809 20TH STREET N UNIT C TAMPA, FL 33613 TEL.001-813-288-8101 | 1 | 2 |

| Short Container Description | In Transit | US Region | World Region by Port of Departure | Country by Port of Departure | State of Arrival Port | Vessel Country | Final Destination | Place of Receipt | Metric Tons | Harmonized | Container | Pieces |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R-134A,12600 CARTONS IN 12OZ DOT CAN UN NO.3159 CLASS NO.2.2 T-15/20OCANS UN NO.3159 CLASS NO.2.2 T-15/20OCANS UN NO.3159 CLASS NO.2.2 R-134A,12600 CARTONS [MORE] | No | GULF | CARIBBEAN | JAMAICA | FLORIDA, FL | LIBERIA | NINGBO (ZJ) | | 82.98 | | ZCSU2843069 | 4200 |
| R-134A IN 20000KG ISOTANK      UN NO.3159 CL ASS NO.2.2 R-134A IN 20000KG ISOTANK UN NO.3159 CL ASS NO.2.2 | No | GULF | CARIBBEAN | JAMAICA | FLORIDA, FL | LIBERIA | NINGBO (ZJ) | | 12.6 | | JHFU0121010 | 1 |
| 1,1,12-TETRAFLUOROETHANE/REFRIGERANT GAS (R 134A) [REFRIGERANT GAS R 134A] C LASS NO. 2.2  UN NO.3159   FP-NO MP-NO N.W:13060KGS    24H:001-813-288- 8101 ATT N.BEN MENG      [MORE] | No | GULF | CARIBBEAN | JAMAICA | FLORIDA, FL | LIBERIA | SHANGHAI (SH) | | 181.73 | | TGHU5212587 | 1600 |
| 1,1,12-TETRAFLUOROETHANE/REFRIGERANT GAS (R 134A) [REFRIGERANT GAS R 134A] C LASS NO. 2.2  UN NO.3159   FP-NO MP-NO N.W:10800KGS    24H:001-813-288- 8101 ATT N.BEN MENG      [MORE] | No | GULF | CARIBBEAN | JAMAICA | FLORIDA, FL | LIBERIA | SHANGHAI (SH) | | 151.4 | | ZCSU2636268 | 1600 |
| 1,1,12-TETRAFLUOROETHANE/REFRIGERANT GAS (R 134A) [REFRIGERANT GAS R 134A] CLASS NO. 2.2  UN NO.3159    FP-NO MP-NO N.W:2176KG S     24H:001-813-298-8101 ATTN.BEN MENG HS:2903998090      [MORE] | No | GULF | CARIBBEAN | JAMAICA | FLORIDA, FL | LIBERIA | SHANGHAI (SH) | | 30.33 | | ZCSU2575067 | 1600 |

| Description | Marks & Numbers | Harmonized | Container | Pieces | Description | Marks & Numbers | Harmonized | Container | Pieces | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| R134A 12600 CARTONS IN 120Z<br>DOT CAN   T 1512000CANS<br>UN NO.3159 CLASS NO.2.2 | N/M | | ZCSU2692021 | | 4200 R134A 12600 CARTONS IN 120Z<br>DOT CAN   T 1512000CANS<br>UN NO.3159 CLASS NO.2.2 | N/M | | ZCSU2720308 | | 4200 R134A 12600 CARTONS IN 120Z<br>DOT CAN   T 1512000CANS<br>UN NO.3159 CLASS NO.2.2 |
| R134A IN 2000KG ISOTANK<br>UN NO.3159 CLASS NO.2.2 | N/M | | JHFU0121025 | | 1 R134A IN 2000KG ISOTANK<br>UN NO.3159 CLASS NO.2.2 | N/M | | | | |
| 1,1,1,2-<br>TETRAFLUOROETHANE(REFRIGE<br>RANT GAS R 1 34A)<br>[REFRIGERANT GAS R 134A]<br>C LASS NO.2.2  UN NO.3159<br>FP:NO M:P NO N.W:10860KGS<br>24H:001-813-298-8101 ATT N:BEN<br>MENG        HS:2903390090<br>1600C:Y<br>LS/26560KGS/2176KGS/56CBM/40<br>GP 5 | N/M | | TGHU8223935 | | 1600 1,1,1,2-<br>TETRAFLUOROETHANE(REFRIGE<br>RANT GAS R 1 34A)<br>[REFRIGERANT GAS R 134A]<br>C LASS NO.2.2  UN NO.3159<br>FP:NO M:P NO N.W:13050KGS<br>24H:001-813-298-8101 ATT N:BEN<br>MENG        HS:2903390090<br>1600C:Y<br>LS/26560KGS/2176KGS/56CBM/4<br>0GP 5 | N/M | | | | 1600 1,1,1,2-<br>TETRAFLUOROETHANE(REFRIGE<br>RANT GAS R 1 34A)<br>[REFRIGERANT GAS R 134A]<br>C LASS NO.2.2  UN NO.3159<br>FP:NO M:P NO N.W:13050KGS<br>24H:001-813-298-8101 ATT N:BEN<br>MENG        HS:2903390090<br>1600C:Y<br>LS/26560KGS/2176KGS/56CBM/4<br>0GP 5 |
| 1,1,1,2-<br>TETRAFLUOROETHANE(REFRIGE<br>RANT GAS R 1 34A)<br>[REFRIGERANT GAS R 134A]<br>C LASS NO.2.2  UN NO.3159<br>FP:NO M:P NO N.W:10880KGS<br>24H:001-813-298-8101 ATT N:BEN<br>         HS:2903390090<br>1600C:Y<br>LS/26560KGS/2176KGS/56CBM/40<br>GP 5 | N/M | | ZCSU2656043 | | 1600 1,1,1,2-<br>TETRAFLUOROETHANE(REFRIGE<br>RANT GAS R 1 34A)<br>[REFRIGERANT GAS R 134A]<br>C LASS NO.2.2  UN NO.3159<br>FP:NO M:P NO N.W:108600KGS<br>24H:001-813-298-8101 ATT N:BEN<br>MENG HS:2903390090<br>1600C:Y<br>LS/26560KGS/2176KGS/56CBM/4<br>0GP 5 | N/M | | ZCSU2854675 | | 1600 1,1,1,2-<br>TETRAFLUOROETHANE(REFRIGE<br>RANT GAS R 1 34A)<br>[REFRIGERANT GAS R 134A]<br>C LASS NO.2.2  UN NO.3159<br>FP:NO M:P NO N.W:108600KGS<br>24H:001-813-298-8101 ATT N:BEN<br>MENG HS:2903390090<br>1600C:Y<br>LS/26560KGS/2176KGS/56CBM/4<br>0GP 5 |
| | | | | | 1600 1,1,1,2-<br>TETRAFLUOROETHANE(REFRIGE<br>RANT GAS R 1 34A)<br>[REFRIGERANT GAS R 134A]<br>C LASS NO.2.2  UN NO.3159<br>FP:NO M:P NO N.W:108600KGS<br>24H:001-813-298-8101 ATT N:BEN<br>MENG HS:2903390090<br>1600C:Y<br>LS/26560KGS/2176KGS/56CBM/4<br>0GP 5 | N/M | | TTNU9691074 | | |

JA395

| Marks & Numbers | Harmonized | Container | Pieces | Description | Marks & Numbers | Harmonized | Container | Pieces | Description | Marks & Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| N/M | | | | | | | | | | |
| N/M | | ZCSU2560175 | | 1600  1,1,1,2- TETRAFLUOROETHANE(REFRIGERANT GAS R 1 34A)  [REFRIGERANT GAS R 134A]  CLASS NO.2.2  UN NO.3159 FP:NO MP:NO N.W:13056KGS 24H:001-813-298-8101 ATT N:BEN MENG HS:2903399090     1600CY LS/26060KGS/2176 0KGS/56C/BM/40GP 5 | N/M | | ZCSU2564000 | | 1600  1,1,1,2- TETRAFLUOROETHANE(REFRIGE RANT GAS R 1 34A)  [REFRIGERANT GAS R 134A]  CLASS NO.2.2  UN NO.3159 FP:NO MP:NO N.W:13056KGS 24H:001-813-298-8101 ATT N:BEN MENG   HS:2903399090  1600CY LS/26060KGS/2176 0KGS/56C/BM/4 0GP 5 | N/M |
| N/M | | ZCSU2665892 | | 1600  1,1,1,2- TETRAFLUOROETHANE(REFRIGERANT GAS R 1 34A)  [REFRIGERANT GAS R 134A]  CLASS NO.2.2  UN NO.3159 FP:NO MP:NO N.W:10800KGS 24H:001-813-298-8101 ATT N:BEN MENG HS:2903399090     1600CY LS/26060KGS/2176 0KGS/56C/BM/40GP 5 | | | ZCSU2703229 | | 1600  1,1,1,2- TETRAFLUOROETHANE(REFRIGE RANT GAS R 1 34A)  [REFRIGERANT GAS R 134A]  CLASS NO.2.2  UN NO.3159 FP:NO MP:NO N.W:10800KGS 24H:001-813-298-8101 ATT N:BEN MENG   HS:2903399090  1600CY LS/26060KGS/2176 0KGS/56C/BM/4 0GP 5 | N/M |

# Exhibit 4

USCA Case #21-1251    Document #1955329    Filed: 07/15/2022    Page 402 of 561



Attachment 2



# Exhibit 5

**HUSCH BLACKWELL**

Nithya Nagarajan
Partner

750 17th St. N.W., Suite 900
Washington, DC  20006-4675
Direct: 202.378.2409
Fax: 202.348.2319
nithya.nagarajan@huschblackwell.com

November 21, 2019

Case No. A-570-028
Total Pages:  27
Anti-Circ: Unpatented R-421A
E&C: Operations

**PUBLIC VERSION**
Business Proprietary Information removed
from brackets in Response pages 3-5.

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re:**   *Hydrofluorocarbon Blends from the People's Republic of China:*
*Response to Quantity and Value Questionnaire*

Dear Secretary Ross:

On behalf of the following companies:

1. 7680 Paradise Point LLC
2. 8105 Anderson LLC
3. 8900 Armenia LLC
4. AC Tampa Bay, Inc.
5. Assured Comfort A/C Inc.
6. BMP International, Inc.
7. BMP Refrigerants Inc.
8. E.T.S. of Tampa Bay, Inc.
9. iGas USA Inc.
10. iGas, Inc.
11. MasterJ LLC

Husch Blackwell LLP

## HUSCH BLACKWELL

12. MS Fund LLC
13. Organic Apple, LLC
14. Organic Orange, L.L.C.
15. U.S. Ladder, Inc.
16. U.S. Metal of Tampa, Inc.

Collectively named "BMP and its affiliates", we hereby submit the foregoing quantity

and value questionnaire response in the above-referenced proceeding. Each of the company

certifications are being provided after the respective company's Q&V response.

**REQUEST FOR PROPRIETARY TREATMENT**

Certain information contained herein is business confidential data that is proprietary.

This information is enclosed with brackets ("[ ]").  Disclosure of this information would cause

substantial competitive and commercial harm to the parties.  Such data is marked as "Proprietary

Treatment Requested."  Confidential treatment, subject to administrative protective order, is

requested pursuant to 19 C.F.R. § 351.105(c) (2012).  Information marked as business

proprietary has been so marked for one or more of the following reasons, in accordance with 19

C.F.R. §351.105(c) (2012):

(1)  Business or trade secrets concerning the nature of a product or production process;

(2)  Production costs (but not the identity of the production components unless a particular component is a trade secret);

(3)  Distribution costs and channels of distribution;

(4)  Terms of sale (but not terms of sale offered to the public);

(5)  Prices of individual sales, likely sales, or other offers (but not components of prices, such as transportation, if based on published schedules, dates of sale, product descriptions except business or trade secrets described in term 1 above, or order numbers);

(6)  Names of particular customers, distributors, or suppliers (but not destination of sale or designation of type of customer, distributor, or supplier, unless the designation of destination would reveal the name);

(7)  In an antidumping proceeding, the exact amount of the dumping margin on individual sales;

(8)  In a countervailing duty proceeding, the exact amount of benefits applied for or received by a person from each of the programs under investigation . . . ;

Husch Blackwell LLP

JA402

PUBLIC VERSION

## OFFICE OF AD/CVD ENFORCEMENT
## QUANTITY AND VALUE QUESTIONNAIRE

**REQUESTER(S):**

**7680 Paradise Point LLC**

**7680 Paradise Pointe Circle South**

**St Petersburg FL 33711**

**8105 Anderson LLC**

**8105 Anderson Road,**

**Tampa, FL 33634**

**8900 Armenia LLC**
**8105 Anderson Road**
**Tampa, Florida 33634**

**AC Tampa Bay, Inc.**
**8105 Anderson Road**
**Tampa, Florida 33634**

**Assured Comfort A/C Inc.**
**8105 Anderson Road**
**Tampa, Florida 33634**

**BMP International Inc.**
**8105 Anderson Road**
**Tampa, Florida 33634**

**BMP Refrigerants Inc.**
**8101 Anderson Road**
**Tampa, Florida 33634**

**E.T.S. Industry Inc.**
**8105 Anderson Road**
**Tampa, Florida 33634**

**iGas USA, Inc.**
**8105 Anderson Road**
**Tampa, Florida 33634**

**IGas, Inc.**
**8101 Anderson Road**
**Tampa, Florida 33634**

1

PUBLIC VERSION

**MasterJ LLC**
**8101 Anderson Road**
**Tampa, Florida 33634**

**MS Fund LLC**
**8101 Anderson Road**
**Tampa, Florida 33634**

**Organic Apple, LLC**
**5520 Anderson Road**
**Tampa, Florida 33614**

**Organic Orange, LLC**
**8101 Anderson Road**
**Tampa, Florida 33634**

**U.S. Ladder, Inc.**
**8101 Anderson Road**
**Tampa, Florida 33634**

**U.S. Metal of Tampa, Inc.**
**8101 Anderson Road**
**Tampa, Florida 33634**

**Ben Meng**
**President**
**813-298-8101**
**813-886-7900 (fax)**
**ben@bmp-usa.com**

**REPRESENTATION:**         **Nithya Nagarajan**
**HUSCH BLACKWELL LLP**
**750 17th Street, NW,**
**Suite 900**
**Washington, D.C. 20006-4675**
**Direct:  202.378.2409**
**Fax:  202.378.2319**

**Nithya.Nagarajan@huschblackwell.com**

**CASE:**            Hydrofluorocarbon Blends from the People's Republic of China

**DATE OF INITIATION:**    June 18, 2019

**DUE DATE FOR Q&V RESPONSE:**    November 14, 2019

**OFFICIALS IN CHARGE:**    Andrew Medley, Ben Luberda

2

JA404

PUBLIC VERSION

## ATTACHMENT I

Please note that the Department of Commerce expects a response from each company in receipt of this questionnaire regardless of whether the company imported or exported the merchandise subject to this anti-circumvention inquiry from China into the United States.

If you are a producer/exporter in the People's Republic of China (China) of merchandise subject to this inquiry, in response to the questions below, please include only sales exported by your company directly to the United States. However, if your company made sales to third-countries for which you have knowledge that the merchandise was ultimately destined for the United States, please separately identify these sales quantities and the location (*i.e.*, countries) to which you made the sales

For all companies responding to this questionnaire, please use the invoice date when determining which sales to include within the period noted below. Generally, Commerce uses invoice date as the date of sale, as that is when the essential terms of sale are set. If you believe that another date besides the invoice date would provide a more accurate representation of your company's sales during the designated period, please report sales based on that date and provide a full explanation. Do not include any sales of merchandise subject to this inquiry manufactured in Hong Kong in your figures.

Even if you believe that you should be treated as a single entity along with other exporters, please do not report aggregate data for all of the companies that you believe should be treated as a single entity but separately report your company's quantity and value data below. Quantity and value data pertaining to other, possibly affiliated companies, that you believe should be treated together with your company as a single entity should be separately reported by those companies.

**Submit all completed charts required by this questionnaire in Excel format.**

1.  In the chart provided in attachment II-A, please provide monthly and total quantity (in kilograms) and monthly and total value (in U.S. Dollars)[4] of your shipments (if you are an exporter and/or producer) or imports (if you are an importer) of patented and/or unpatented R-421A or other blends of R-125 and R-134a for the time period of July 1, 2011, through June 30, 2019. Provide a narrative explanation of how you aggregated these data from your books and records.

**All the above companies are not importers of patented or unpatented R-421A and therefore all reported values in Attachment II-A would be [    ]. Accordingly, no separate Attachment II is being filed in conjunction with this response.**

2.  Identify whether you are a producer, exporter, or U.S. importer of patented/unpatented R- 421A produced in China and please specify whether your produce, export, or import patented R-421A, unpatented R-421A, or both.

**All the above companies are not producers, exporters, or U.S. importers of patented or unpatented R-421A produced in China.**

**7680 Paradise Point LLC is a company partially owned by [
                    ]. 7680 Paradise Point LLC [                    ] at 7680 Paradise Pointe**

3

PUBLIC VERSION

Circle South, St Petersburg FL 33711. 7680 Paradise Point LLC has never been involved with any business related to R421A.

8105 Anderson LLC is a company partially owned by [
          ]. 8105 Anderson LLC [              ] at 8105 Anderson Road, Tampa, FL 33634. 8105 Anderson LLC has never been involved with any business related to R421A.

8900 Armenia LLC is a company that was partially owned by [
              ]. 8900 Armenia LLC has never been involved with any business related to R421A.  As of [              ], 8900 Armenia LLC is no longer partially owned by [          ]

AC Tampa Bay, Inc. is a company partially owned by [                          ]. AC Tampa Bay, Inc. has never been involved with any business related to R421A.

Assured Comfort A/C Inc.  is a company owned by [            ]. The company provides air conditioner repair services. Assured Comfort AC imported and sold refrigerant blends like R410A, R407C, R404A in the United States prior to 2014. Assured Comfort AC Inc. has never been involved in importing or selling R421A.

BMP International Inc. is a company owned by [          ] and is an importer of HFC components and does not import R421A

BMP Refrigerants Inc. is a company registered by [          ].  However, the business is not now nor has it ever been operational. BMP Refrigerants Inc. has never been involved with any business related to R421A

E.T.S. Industry Inc. was a [                      ] but it was [              ]. E.T.S. Industry Inc. was never involved with any business related to R421A.

iGas USA, Inc. is partially owned by [          ] and is an importer of HFC components and does not import R421A

IGas, Inc. is a company registered by [            ] but the company has [
                      ]. iGas, Inc was registered to protect the iGas USA brand and to prevent other parties from registering a name similar to iGas USA. iGas, Inc. has never been involved with any business related to R421A.

MasterJ LLC is a company registered by [
          ]. However the company [                      ].  MasterJ LLC has never been involved with any business related to R421A.

MS Fund LLC is a company registered by [                          ]. However, the company [                  ]. MS Fund LLC has never been involved with any business related to R421A.

4

PUBLIC VERSION



Organic Apple, LLC is a company partially owned by [
          ]. Organic Apple, LLC [               ] at 5520 Anderson Road, Tampa, FL
Organic Apple, LLC has never been involved with any business related to R421A

Organic Orange, LLC is a company registered by [                    ].
However, the company [                    ]. Organic Orange LLC has never
been involved with any business related to R421A.

U.S. Ladder, Inc. is a company registered by [                    ]. However,
the company [                    ], U.S. Ladder, Inc. has never been involved
with any business related to R421A.

U.S. Metal of Tampa, Inc. is a company registered by [                    ].
However, the company [                    ]. U.S. Metal of Tampa, Inc. has
never been involved with any business related to R421A.

3.   If you are a producer and/or exporter of unpatented R-421A in China, identify
     your top five U.S. importers. Fill in the chart provided in attachment II-B with
     the monthly quantities and values of your shipments of unpatented R-421A to
     each of your top five U.S. importers.

**None of the above companies are producers and/or exporters of patented/unpatented R-421A.**

4.   If you are a U.S. importer of unpatented R-421A produced in China, identify your
     top five Chinese producers/exporters. Fill in the chart provided in attachment II-C
     with the monthly quantities and values of your purchases of unpatented R-421A
     from each of your top five Chinese producers/exporters.

**None of the above companies are U.S. importers of patented or unpatented R-421A or other blends of R-125 and R134A. Accordingly, these entities are not completing Table II-C.**

5.   State whether you are affiliated with any:

          a.  producers of unpatented R-421A in China;
          b.  exporters of unpatented R-421A in China; or
          c.  importers of unpatented R-421A produced in China into the United States.

     If yes, please identify those producers, exporters, or importers.

**Response:**

**All the above companies are affiliated with the following importers and users of R-421A produced in China into the United States.**
          LM Supply INC
          Cool Master U.S.A. LLC.
          BMP USA LLC

JA407

PUBLIC VERSION

**All three affiliated companies are submitting separate responses to this Quantity and Value questionnaire.**

6.    Provide the blend formula for your imports/exports of patented/unpatented R-421A.  If you import/export more than one blend formula as R-421A, list all of them.

**Response:**

**None of the above companies import or export patented or unpatented R-421A.**

7.    State whether you hold the patent to, or are a licensed producer, exporter, importer, or seller of **patented** R-421A.

**Response:**

**None of the above companies import patented R421A.**

Please respond to questions 8 through 11 (below) only if you are a U.S. importer of unpatented R-421A produced in China into the United States.  Producers/exporters need not respond to questions 8 through 11.

8.    Provide a detailed narrative response as to what your company does with the imported unpatented R-421A (including, but not limited to, whether your company, or another company on behalf of your company, blends it with HFC components (*e.g.,* R-32, R-125, R-134a) to create other HFC blends, resells the unpatented R-421A, etc.).

**Response:**

**As stated above, none of the above companies are importers of unpatented R-421A produced in China therefore per the Department's instructions, these entities are not responding to Questions 8 through 11.**

9.    If your company, or another company on behalf of your company, blends the unpatented R-421A with HFC components, identify all HFC blends (*e.g.,* R-404A, R-410A, R-507A) your company produces using the imported unpatented R-421A.  Please also identify if the HFC blends are then sold in the United States.

10.    If your company, or another company on behalf of your company, blends the imported unpatented R-421A with HFC components to create HFC blends, complete the chart in attachment II-D, which details the monthly quantities and values of each HFC blend identified in question 7 using the imported unpatented R-421A for the period of July 1, 2011, through June 30, 2019.

11.    If your company resells the unpatented R-421A, please identify the customers of the resold unpatented R-421A, and please explain whether, to the best of your knowledge, these customers are involved in the blending of the unpatented R-421A with HFC components to create HFC blends which are then sold in the United States.

6

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **7680 Paradise Point LLC.** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 21, 2019,** pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **7680 Paradise Point LLC.** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.


Signature: _____

Date: ___November 21, 2019_____

Attachment 2

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **8900 Armenia LLC,** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 21, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **8900 Armenia LLC,** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November21, 2019_____

JA410

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **AC Tampa Bay, Inc.** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November** 21**, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **AC Tampa Bay, Inc.** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 21, 2019_____

JA411

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **Assured Comfort A/C Inc.** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November**21, **2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **Assured Comfort A/C, Inc.** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 21 2019_____

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **BMP International Inc.** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November** 21**, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **BMP International Inc.** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 21, 2019_____

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **BMP Refrigerants Inc.** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November** 21**, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **BMP Refrigerants Inc.** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 21, 2019_____

JA414

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **E.T.S. Industry Inc.** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November** 21, **2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **E.T.S. Industry Inc.** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 21, 2019_____

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **iGas Inc.** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 21, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **iGas Inc.** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date:  ___November 21, 2019_____

### COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **MasterJ LLC** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 21, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **MasterJ LLC** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 21, 2019_____

JA417

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **MS Fund, LLC** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 21, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **MS Fund, LLC** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 21, 2019_____

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **Organic Apple, LLC** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 21, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **Organic Apple, LLC** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 21, 2019_____

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **Organic Orange, LLC** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November** 21, **2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **Organic Orange, LLC** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 21, 2019_____

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **U.S. Metal of Tampa, Inc.,** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 21 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **U.S. Metal of Tampa, Inc.,** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 21, 2019_____

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed at **U.S. Ladder, Inc.,** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November** 21**, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **U.S. Ladder, Inc.,** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___ November 21, 2019 _____

## COMPANY CERTIFICATION

I, **Ben Meng, Owner,** currently employed by **iGas USA Inc.** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November** 21**, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **iGas USA Inc.** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 21, 2019_____

# Exhibit 6

Barcode:3962141-01 A-570-028 CIRC - Anti Circumvention Inquiry - CVD Investigation



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-028
CIRC – HFC Components
~~Proprietary Document~~ **Public Version**
AD/CVD OII:  BAL

DATE:                        April 3, 2020

MEMORANDUM TO:       The File

THROUGH:                 Andrew Medley
                         Program Manager, Office II
                         AD/CVD Operations

FROM:                    Benjamin A. Luberda
                         Program Analyst, Office II
                         AD/CVD Operations

SUBJECT:                 Anti-Circumvention Inquiry of Antidumping Duty Order on
                         Hydrofluorocarbon Blends from the People's Republic of China –
                         HFC Components:  Business Proprietary Memorandum for BMP

---

## I.      Summary

In response to a request from the American HFC Coalition (the petitioner),[1] the Department of
Commerce (Commerce) initiated an anti-circumvention inquiry of the antidumping duty (AD)
order on hydrofluorocarbon (HFC) blends from the People's Republic of China (China),
pursuant to section 781(a) of the Tariff Act of 1930, as amended (the Act) and 19 CFR
351.225(g).[2]  Based on the information submitted by interested parties and our analysis in the
Preliminary Decision Memorandum (PDM),[3] Commerce preliminarily determines that imports of
HFC components difluoromethane (R-32), pentafluoroethane (R-125), and 1,1,1-trifluoroethane
(R-143a), that are exported from China and further processed in the United States into HFC
blends, are circumventing the AD order on HFC blends from China,[4] as provided by section
781(a) of the Act.  Because Commerce's findings regarding certain statutory criteria under

---

[1] *See* Petitioner's Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Request to Initiate Anti-
Circumvention Inquiry Pursuant to Section 781(a) of the Act," dated April 4, 2019.  The American HFC Coalition is
comprised of the following companies:  Arkema Inc., The Chemours Company FC LLC, Honeywell International
Inc., and Mexichem Fluor Inc.
[2] *See Hydrofluorocarbon Blends from the People's Republic of China:  Initiation of Anti-Circumvention Inquiry of
Antidumping Duty Order; Unpatented R-421A*, 84 FR 28281 (June 18, 2019).
[3] *See* Memorandum, "Preliminary Decision Memorandum for Anti-Circumvention Inquiry of the Antidumping Duty
Order on Hydrofluorocarbon Blends from the People's Republic of China:  HFC Components," dated concurrently
with this memorandum (PDM).
[4] *See Hydrofluorocarbon Blends from the People's Republic of China:  Antidumping Duty Order*, 81 FR 55436
(August 19, 2016) (*Order*).

Filed By: Benjamin Luberda, Filed Date: 4/7/20 11:32 AM, Submission Status: Approved

Barcode:3962141-01 A-570-028 CIRC - Anti Circumvention Inquiry - HFC Components

the value of components as a percentage of U.S. value, because R-134a is not subject to this inquiry, as it is subject to its own AD order.[43]

Using BMP's submitted data, and the calculated surrogate values, we calculated the below percentages of the Chinese origin inputs (excluding, R-134a), compared to the value of merchandise sold in the United States, on a per-kilogram basis:

- R-404A: 173.44%
- R-407A: 112.95%
- R-407C: 87.10%
- R-410A: 214.27%
- R-507: 190.83%
- Weighted Average: 188.40%

In this anti-circumvention inquiry, for all five blends, the percentages of the value of the Chinese inputs are significantly higher than the U.S. value of the finished merchandise. *See* Attachment 2 of this memorandum. Thus, we find that value of the parts or components produced in the foreign country makes up a significant portion of the total value of the merchandise sold in the United States.

### III.    Analysis of the Pattern of Trade and Sourcing under Section 781(a)(3) of the Act

(A) Pattern of Trade, Including Sourcing Patterns

BMP's reported data shows a clear shift in patterns of trade. First, BMP has consistently shifted importers for its imports of HFC components. BMP's Q&V questionnaire response shows that between August 2016 and June 2019, BMP used at least four[44] affiliated importers to import HFC components from China, never using more than [                    ].[45]

Moreover, BMP shifted its pattern of trade with the imposition of the *Order*. BMP reports that BMP International, LM Supply, Cool Master, and Assured Comfort were importing HFC blends into the United States from China.[46] Exhibit 24 of BMP's January 24, 2020 IQR shows that in 2016, BMP imported [      ] Kg of HFC blends subject to the *Order* on HFC blends from China, [    ] percent of which were imported in or before the month the *Order* took effect (*i.e.*,

---

[43] *See 1,1,1,2 Tetrafluoroethane (R-134a) from the People's Republic of China: Antidumping Duty Order*, 82 FR 18422 (April 19, 2017).

[44] These importers are BMP International, BMP USA, Cool Master, and iGas. Additionally, as noted above, BMP reports that Assured Comfort imported HFC components in 2016, but failed to place any data on the record regarding these imports.

[45] *See* BMP Q&V Response.

[46] *See* BMP January 24, 2020 IQR at 3-5

Barcode:3962141-01 A-570-028 CIRC - Anti Circumvention Inquiry – HFC Components

August 2016).[47]  In 2017, this number dropped to [      ] Kg, and [      ] in 2018 or 2019.[48]
However, one of BMP's companies, Cool Master, began importing [
            ].[49]  Conversely, BMP only began importing HFC components the
month the *Order* came into effect and has continued since then, reaching a peak of [      ] Kg
of imported HFC components from China in [            ].[50]  Thus, BMP's patterns of trade
clearly shifted to avoid the duties placed upon HFC blends with the enactment of the *Order*.  *See*
Attachment III of this memorandum.

    (B) Affiliation

In September 2018, BMP USA stopped all business operations with respect to the importation,
production, or sale of refrigerants and all of these operations transferred to iGas, which began
operations in October 2018.[51]  iGas is partially-owned ([  ] percent) by a Chinese company,
Zhejiang Juhua Co., Ltd. (Juhua), after an initial contribution of $[      ] in April 2018.[52]
Juhua has numerous subsidiaries, located in China, that produce and/or export HFC components
and subject blends, including Zhejiang Quzhou Juxin Fluorine Chemical Co., Ltd. (Juxin),
Zhejiang Quhua Fluor-Chemistry Co., Ltd., and Zhejiang Quzhou Lianzhou Refrigerants Co.,
Ltd.[53]  Because of the common ownership greater than five percent by Juhua in both iGas and
Juhua's subsidiaries, iGas, and thus BMP, are affiliated with these companies under section
771(33) of the Act and 19 CFR 351.102(b)(3).  Moreover, BMP did not disclose its affiliation
with Juhua's subsidiaries.  Thus, record evidence supports finding affiliation a factor of
circumvention for BMP.

    (C) Whether Imports in the United States Have Increased After the Initiation of the
        Investigation Which Resulted in the Issuance of the Order

BMP provided statistics of its imports of HFC components from July 1, 2011, to June 30, 2019,[54]
and production of finished HFC blends for the period January 1, 2016, to June 31, 2019.[55]
According to BMP's submitted data, from 2016 to 2019, (*i.e.*, after the *Order*) imports of HFC
components, and production of finished blends using the imported components, increased.[56]
Further, record evidence shows that BMP only imported HFC components after publication of

---

[47] *Id.* at Exhibit 24.
[48] *Id.*
[49] *Id.* at 12 and Exhibits 7 and 27.
[50] *See* BMP Q&V Response.
[51] *See* BMP January 24, 2020 IQR at 3, 16, and 33.
[52] *Id.* at 19 and Exhibit 14.
[53] *See* Juxin's January 24, 2020, Initial Questionnaire Response at Exhibit I-1.1
[54] *See* BMP Q&V Response.
[55] *See* BMP's Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Resubmission of Exhibit
26," dated February 24, 2020, at Exhibit 26.  While we did not ask BMP for data with respect to its blending of HFC
blends using Chinese-origin HFC components from before January 1, 2016, BMP reported that it began [
                                            ], and, thus, did not have any production
of HFC blends before this period.  *See* BMP January 24, 2020 IQR at 22.
[56] *See* BMP January 24, 2020 IQR at 3, stating BMP International imported refrigerant into the United States.  BMP
International Inc. imported HFC Blends produced in China, such as R410A, R404A, R407A, R407C and R507.
"Beginning in August 2016, BMP International also imported HFC components [                ] produced in
China.  After importation the HFC components were [                                            ].

# Exhibit 7

Attachment 2

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

**L19000115924**
**FILED 8:00 AM**
**April 29, 2019**
**Sec. Of State**
ccave

## Article I

The name of the Limited Liability Company is:

GOLDEN G IMPORTS LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

6415 MONETERY BLVD
TAMPA, FL.  33625

The mailing address of the Limited Liability Company is:

6415 MONETERY BLVD
TAMPA, FL.  33625

## Article III

The name and Florida street address of the registered agent is:

ROBIN A PUSKAR
6415 MONETERY BLVD
TAMPA, FL.  33625

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:  ROBIN PUSKAR

## Article IV

The name and address of person(s) authorized to manage LLC:

L19000115924
**FILED 8:00 AM**
**April 29, 2019**
**Sec. Of State**
ccave

    Title:  MGR
    ROBIN A PUSKAR
    6415 MONETERY BLVD
    TAMPA, FL.  33625

## Article V

The effective date for this Limited Liability Company shall be:

    04/29/2019

Signature of member or an authorized representative

Electronic Signature: ROBIN PUSKAR

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.



DESCARTES Datamyne     **USA Bills Import HOUSES**

| | |
|---|---|
| Bill of Lading Number | UULNNB1904AC808 |
| Port of Departure | NINGPO,NING BO,CHINA MAINLAND |
| World Region by Port of Departure | EASTERN ASIA |
| Port of Arrival | **LOS ANGELES,CA** |
| US Region | WEST |
| Carrier | (UULN) US UNITED LOGISTICS (NINGBO) INC |

| | | | |
|---|---|---|---|
| Arrival Date | 05/07/2019 | Weight | 72,000 K |
| Estimated Arrival Date | 04/27/2019 | Quantity | 4 TNK |
| Vessel | EVER LIBRA | Measure | 0 |
| Vessel Country | TAIWAN | In bond entry type | |
| Voyage | 0852E | Foreign Destination | |
| IMO Code | 9595486 | Mode of Transport | VESSEL. CONTAINERIZED. |
| Master/House | H (House) | | |
| Bill of Lading Master | EGLV143986724386 | | |
| Place of Receipt Declared | NINGBO CHINA | | |
| Country of Origin | CHINA | | |
| World Region by Origin Country | EASTERN ASIA | | |
| Metric Tons | 72.0 | | |

| | |
|---|---|
| Consignee | GOLDEN G IMPORTS LLC, FL |
| Consignee's State | FLORIDA, FL |
| Consignee's City | TAMPA, FL |
| Consignee's Zip Code | 33625 |
| Shipper | QUZHOU JUXIN FLUORINE CHEMICAL CO (CN) |

| Shipper Declared | Consignee Declared |
|---|---|
| **QUZHOU JUXIN FLUORINE CHEMICAL CO** | **GOLDEN G IMPORTS LLC** |
| QUZHOU, | 6415 MONTEREY BLVD |
| ZHEJIANG | TAMPA |
| CN | FL |
| | 33625 |
| | US |

Note: This database does not contain In Transit shipments.
Obs.: DATA SUBJECT TO MODIFICATIONS
Source: U.S. Customs and Border Protection (CBP).
©2019 Datamyne - Email: contact@datamyne.com

UULNNB1904AC808 - page 1

DESCARTES Datamyne          **USA Bills Import HOUSES**

| Notify | | | |
|---|---|---|---|

GOLDEN G IMPORTS LLC

6415 MONTEREY BLVD

TAMPA FL 33625 US

| HS | Teus Quantity | Container Quantity | Metric Tons |
|---|---|---|---|
| 290330 - FLUORINATED, BROMINATED OR IODINATED DERIVATIVES OF ACYCLIC | 4.00 | 4.00 | 72.00 |
| **Total** | **4.00** | **4.00** | **72.00** |

| Container | Pieces | Description | Harmonized |
|---|---|---|---|
| EURU5149595 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| EURU5149790 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| EURU5149804 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| EURU5245937 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |

| Container | Marks & Numbers |
|---|---|
| EURU5149595 | PO NO. IGAS-190403 N/M |
| EURU5149790 | PO NO. IGAS-190403 N/M |
| EURU5149804 | PO NO. IGAS-190403 N/M |
| EURU5245937 | PO NO. IGAS-190403 N/M |



DESCARTES Datamyne

**USA Bills Import HOUSES**

| | |
|---|---|
| Bill of Lading Number | UULNNB1904AC932 |
| Port of Departure | NINGPO,NING BO,CHINA MAINLAND |
| World Region by Port of Departure | EASTERN ASIA |
| Port of Arrival | **LOS ANGELES,CA** |
| US Region | WEST |
| Carrier | (UULN) US UNITED LOGISTICS (NINGBO) INC |

| | | | |
|---|---|---|---|
| Arrival Date | 05/05/2019 | Weight | 180,000 K |
| Estimated Arrival Date | 04/20/2019 | Quantity | 10 TNK |
| Vessel | EVER LENIENT | Measure | 0 |
| Vessel Country | UNITED KINGDOM | In bond entry type | |
| Voyage | 0853E | Foreign Destination | |
| IMO Code | 9604146 | Mode of Transport | VESSEL. CONTAINERIZED. |
| Master/House | H (House) | | |
| Bill of Lading Master | EGLV143986724645 | | |
| Place of Receipt Declared | NINGBO CHINA | | |
| Country of Origin | CHINA | | |
| World Region by Origin Country | EASTERN ASIA | | |
| Metric Tons | 180.0 | | |

| | |
|---|---|
| Consignee | GOLDEN G IMPORTS LLC, FL |
| Consignee's State | FLORIDA, FL |
| Consignee's City | TAMPA, FL |
| Consignee's Zip Code | 33625 |

| | |
|---|---|
| Shipper | QUZHOU JUXIN FLUORINE CHEMICAL CO (CN) |

| Shipper Declared | Consignee Declared |
|---|---|
| **QUZHOU JUXIN FLUORINE CHEMICAL CO** | **GOLDEN G IMPORTS LLC** |
| QUZHOU, | 6415 MONTEREY BLVD |
| ZHEJIANG | TAMPA |
| CN | FL |
| | 33625 |
| | US |

Note: This database does not contain In Transit shipments.
Obs.: DATA SUBJECT TO MODIFICATIONS
Source: U.S. Customs and Border Protection (CBP).
©2019 Datamyne – Email: contact@datamyne.com

UULNNB1904AC932 - page 3

DESCARTES Datamyne          **USA Bills Import HOUSES**

**Notify**

GOLDEN G IMPORTS LLC

6415 MONTEREY BLVD

TAMPA FL 33625 US

| HS | Teus Quantity | Container Quantity | Metric Tons |
|---|---|---|---|
| 290330 - FLUORINATED, BROMINATED OR IODINATED DERIVATIVES OF ACYCLIC | 10.00 | 10.00 | 180.00 |
| **Total** | **10.00** | **10.00** | **180.00** |

| Container | Pieces | Description | Harmonized |
|---|---|---|---|
| AAMU7000910 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| AAMU7000925 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| AAMU7000930 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| AAMU7000951 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| AAMU7000972 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| AAMU7000988 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| AAMU7000993 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| AAMU7001048 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| AAMU7001074 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |
| AAMU7001536 | 1 | REFRIGERANT GAS R125 UN NO. 3220 CLASS 2.2 . | |

Note: This database does not contain In Transit shipments.          UULNNB1904AC932 - page 4
Obs.: DATA SUBJECT TO MODIFICATIONS
Source: U.S. Customs and Border Protection (CBP).
©2019 Datamyne - Email: contact@datamyne.com

**DESCARTES Datamyne**        **USA Bills Import HOUSES**

| Container | Marks & Numbers |
| --- | --- |
| AAMU7000910 | PO NO. IGAS-190403 N/M |
| AAMU7000925 | PO NO. IGAS-190403 N/M |
| AAMU7000930 | PO NO. IGAS-190403 N/M |
| AAMU7000951 | PO NO. IGAS-190403 N/M |
| AAMU7000972 | PO NO. IGAS-190403 N/M |
| AAMU7000988 | PO NO. IGAS-190403 N/M |
| AAMU7000993 | PO NO. IGAS-190403 N/M |
| AAMU7001048 | PO NO. IGAS-190403 N/M |
| AAMU7001074 | PO NO. IGAS-190403 N/M |
| AAMU7001536 | PO NO. IGAS-190403 N/M |

# Exhibit 8

# Exhibit 8-A



## Detail by Street Address

Florida Profit Corporation
IGAS INC

### Filing Information

| | |
|---|---|
| **Document Number** | P18000068833 |
| **FEI/EIN Number** | 36-4897416 |
| **Date Filed** | 08/10/2018 |
| **Effective Date** | 08/20/2018 |
| **State** | FL |
| **Status** | ACTIVE |

### Principal Address

8105 ANDERSON ROAD
TAMPA, FL 33634

### Mailing Address

8105 ANDERSON ROAD
TAMPA, FL 33634

### Registered Agent Name & Address

MENG, XIANBIN
8101 ANDERSON ROAD
TAMPA, FL 33634

### Officer/Director Detail

**Name & Address**

Title P

MENG, XIANBIN
8101 ANDERSON ROAD
TAMPA, FL 33634

### Annual Reports

| Report Year | Filed Date |
|---|---|
| 2019 | 04/30/2019 |

### Document Images

| | |
|---|---|
| 04/30/2019 -- ANNUAL REPORT | View image in PDF format |
| 08/10/2018 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

JA439

FLORIDA DEPARTMENT of STATE                                     DIVISION OF CORPORATIONS



## Detail by Entity Name

Florida Profit Corporation
BMP INTERNATIONAL, INC.

Filing Information

| | |
|---|---|
| **Document Number** | P07000049143 |
| **FEI/EIN Number** | 20-8916439 |
| **Date Filed** | 04/23/2007 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 03/27/2015 |
| **Event Effective Date** | NONE |

Principal Address

8101 Anderson Road
Tampa, FL 33634

Changed: 03/24/2018

Mailing Address

P.O. BOX 15762
TAMPA, FL 33684

Changed: 01/08/2017

Registered Agent Name & Address

Meng, Xianbin
8101 Anderson Road
Tampa, FL 33634

Name Changed: 04/01/2017

Address Changed: 03/24/2018

Officer/Director Detail

**Name & Address**

Title P

Meng, Xianbin
8101 Anderson Road
Tampa, FL 33634

Title VP

Shi, Linna
8101 Anderson Road
Tampa, FL 33634

Annual Reports

| Report Year | Filed Date |
|---|---|
| 2017 | 01/08/2017 |
| 2018 | 03/24/2018 |
| 2019 | 04/30/2019 |

Document Images

7/9/2019                                              Detail by Entity Name

| | |
|---|---|
| 04/30/2019 -- ANNUAL REPORT | View image in PDF format |
| 03/24/2018 -- ANNUAL REPORT | View image in PDF format |
| 04/01/2017 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 01/08/2017 -- ANNUAL REPORT | View image in PDF format |
| 03/26/2016 -- ANNUAL REPORT | View image in PDF format |
| 03/27/2015 -- Amendment | View image in PDF format |
| 01/09/2015 -- ANNUAL REPORT | View image in PDF format |
| 09/10/2014 -- ANNUAL REPORT | View image in PDF format |
| 04/09/2013 -- ANNUAL REPORT | View image in PDF format |
| 03/22/2012 -- ANNUAL REPORT | View image in PDF format |
| 04/21/2011 -- ANNUAL REPORT | View image in PDF format |
| 03/18/2011 -- Amendment | View image in PDF format |
| 03/29/2010 -- ANNUAL REPORT | View image in PDF format |
| 04/29/2009 -- ANNUAL REPORT | View image in PDF format |
| 01/18/2008 -- ANNUAL REPORT | View image in PDF format |
| 04/23/2007 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

JA441

7/9/2019                                                    Detail by Entity Name



# Detail by Entity Name

Florida Profit Corporation
BMP REFRIGERANTS INC

### Filing Information

| | |
|---|---|
| **Document Number** | P17000101013 |
| **FEI/EIN Number** | N/A |
| **Date Filed** | 12/27/2017 |
| **Effective Date** | 01/02/2018 |
| **State** | FL |
| **Status** | ACTIVE |

### Principal Address

8105 ANDERSON ROAD
TAMPA, FL 33634

### Mailing Address

PO BOX 15762
TAMPA, FL 33684

### Registered Agent Name & Address

MENG, XIANBIN
8105 ANDERSON ROAD
TAMPA, FL 33634

### Officer/Director Detail

**Name & Address**

Title P

MENG, XIANBIN
8105 ANDERSON ROAD
TAMPA, FL 33634

Title VP

BMP USA INC
8105 ANDERSON ROAD
TAMPA, FL 33634

### Annual Reports

| Report Year | Filed Date |
|---|---|
| 2019 | 04/30/2019 |

### Document Images

| | |
|---|---|
| 04/30/2019 -- ANNUAL REPORT | View image in PDF format |
| 12/27/2017 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

JA442

7/9/2019                                          Detail by Entity Name



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

## Detail by Entity Name

Florida Profit Corporation
BMP USA, INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | P13000101162 |
| **FEI/EIN Number** | APPLIED FOR |
| **Date Filed** | 12/23/2013 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 03/27/2015 |
| **Event Effective Date** | NONE |

**Principal Address**

8105 Anderson Road
TAMPA, FL 33634

Changed: 03/24/2018
**Mailing Address**

P.O. Box 15762
TAMPA, FL 33684

Changed: 09/10/2014
**Registered Agent Name & Address**

MENG, XIANBIN
8105 anderson road
TAMPA, FL 33634

Address Changed: 03/24/2018
**Officer/Director Detail**
**Name & Address**

Title P

MENG, XIANBIN
8105 anderson road
TAMPA, FL 33634

Title V

SHI, LINNA
8105 anderson Road
TAMPA, FL 33634

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2017 | 01/08/2017 |
| 2018 | 03/24/2018 |
| 2019 | 04/30/2019 |

**Document Images**

| | |
|---|---|
| 04/30/2019 -- ANNUAL REPORT | View image in PDF format |
| 03/24/2018 -- ANNUAL REPORT | View image in PDF format |
| 01/08/2017 -- ANNUAL REPORT | View image in PDF format |
| 03/26/2016 -- ANNUAL REPORT | View image in PDF format |
| 03/27/2015 -- Amendment | View image in PDF format |
| 01/09/2015 -- ANNUAL REPORT | View image in PDF format |
| 09/10/2014 -- ANNUAL REPORT | View image in PDF format |
| 12/23/2013 -- Domestic Profit | View image in PDF format |

search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=PreviousList&searchNameOrder=BMPUSA ...     1/2

JA443

Attachment 2

7/9/2019                                    Detail by Entity Name

**Florida Department of State, Division of Corporations**

JA444

Attachment 2

8/9/2018  Search Corporations, Limited Liability Companies, Limited Partnerships, and Trademarks by Officer or Registered Agent

Florida Department of State                  DIVISION OF CORPORATIONS



Department of State / Division of Corporations / Search Records / Search by Officer or Registered Agent /

Previous List  Next List            Officer/RA Name Search

                              Search

## Officer/Registered Agent Name List

| Officer/RA Name | Entity Name | Entity Number |
|---|---|---|
| MENG, XIANBIN | U.S. LADDER, INC. | P07000081241 |
| MENG, XIANBIN | AC TAMPA BAY, INC. | P08000036517 |
| MENG, XIANBIN | AC TAMPA BAY, INC. | P08000036517 |
| MENG, XIANBIN | AC TAMPA BAY, INC. | P08000036517 |
| MENG, XIANBIN | U.S. METAL OF TAMPA, INC. | P12000072179 |
| MENG, XIANBIN | U.S. METAL OF TAMPA, INC. | P12000072179 |
| MENG, XIANBIN | BMP USA, INC. | P13000101162 |
| MENG, XIANBIN | BMP USA, INC. | P13000101162 |
| MENG, XIANBIN | L.M. SUPPLY, INC. | P14000086193 |
| MENG, XIANBIN | L.M. SUPPLY, INC. | P14000086193 |
| MENG, XIANBIN | BMP REFRIGERANTS INC | P17000101013 |
| MENG, XIANBIN | BMP REFRIGERANTS INC | P17000101013 |
| MENG, XIANBIN | IGAS USA, INC. | P18000032862 |
| MENG, XIANBIN | IGAS USA, INC. | P18000032862 |
| MENG, XIN | CHINA UNICOM (AMERICAS) OPERATIONS LIMITED INC. | F17000000543 |
| MENG, XIN | BLESSHAMPTONS LLC | L13000025315 |
| MENG, XIN | BLESSHAMPTONS LLC | L13000025315 |
| MENG, XIUXIA | LUCKY STAR SPA LLC | L11000124045 |
| MENG, XIUXIA | A SHINNING STAR LLC | L12000090495 |
| MENG, XIUXIA | A SHINNING STAR LLC | L12000090495 |

Previous List  Next List            Officer/RA Name Search

                              Search

Florida Department of State, Division of Corporations

JA446

Attachment 2

Florida Department of State    DIVISION OF CORPORATIONS



 Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

# Detail by Entity Name

Florida Profit Corporation
BMP INTERNATIONAL, INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | P07000049143 |
| **FEI/EIN Number** | 20-8916439 |
| **Date Filed** | 04/23/2007 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 03/27/2015 |
| **Event Effective Date** | NONE |

**Principal Address**

8101 Anderson Road
Tampa, FL 33634

Changed: 03/24/2018

**Mailing Address**

P.O. BOX 15762
TAMPA, FL 33684

Changed: 01/08/2017

**Registered Agent Name & Address**

Meng, Xianbin
8101 Anderson Road
Tampa, FL 33634

Name Changed: 04/01/2017

Address Changed: 03/24/2018

**Officer/Director Detail**

**Name & Address**

Title P

Meng, Xianbin
8101 Anderson Road
Tampa, FL 33634

JA447

Attachment 2

8/9/2018            Detail by Entity Name

Title VP

Shi, Linna
8101 Anderson Road
Tampa, FL 33634

**Annual Reports**

| Report Year | Filed Date |
| --- | --- |
| 2017 | 01/08/2017 |
| 2017 | 04/01/2017 |
| 2018 | 03/24/2018 |

**Document Images**

| | |
| --- | --- |
| 03/24/2018 -- ANNUAL REPORT | View image in PDF format |
| 04/01/2017 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 01/08/2017 -- ANNUAL REPORT | View image in PDF format |
| 03/26/2016 -- ANNUAL REPORT | View image in PDF format |
| 03/27/2015 -- Amendment | View image in PDF format |
| 01/09/2015 -- ANNUAL REPORT | View image in PDF format |
| 09/10/2014 -- ANNUAL REPORT | View image in PDF format |
| 04/09/2013 -- ANNUAL REPORT | View image in PDF format |
| 03/22/2012 -- ANNUAL REPORT | View image in PDF format |
| 04/21/2011 -- ANNUAL REPORT | View image in PDF format |
| 03/18/2011 -- Amendment | View image in PDF format |
| 03/29/2010 -- ANNUAL REPORT | View image in PDF format |
| 04/29/2009 -- ANNUAL REPORT | View image in PDF format |
| 01/18/2008 -- ANNUAL REPORT | View image in PDF format |
| 04/23/2007 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

JA448

8/9/2018    Detail by Entity Name

# Detail by Entity Name

Florida Profit Corporation
BMP REFRIGERANTS INC

**Filing Information**

**Document Number**          P17000101013
**FEI/EIN Number**           NONE
**Date Filed**               12/27/2017
**Effective Date**           01/02/2018
**State**                    FL
**Status**                   ACTIVE

**Principal Address**

8105 ANDERSON ROAD
TAMPA, FL 33634

**Mailing Address**

PO BOX 15762
TAMPA, FL 33684

**Registered Agent Name & Address**

MENG, XIANBIN
8105 ANDERSON ROAD
TAMPA, FL 33634

**Officer/Director Detail**

**Name & Address**

Title P

MENG, XIANBIN
8105 ANDERSON ROAD
TAMPA, FL 33634

Title VP

BMP USA INC
8105 ANDERSON ROAD
TAMPA, FL 33634

**Annual Reports**

**No Annual Reports Filed**

**Document Images**

12/27/2017 -- Domestic Profit        View image in PDF format

Florida Department of State, Division of Corporations

JA449

8/9/2018                                 Detail by Entity Name

Florida Department of State                                         Division of Corporations



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

## Detail by Entity Name

Florida Profit Corporation
BMP USA, INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | P13000101162 |
| **FEI/EIN Number** | APPLIED FOR |
| **Date Filed** | 12/23/2013 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 03/27/2015 |
| **Event Effective Date** | NONE |

**Principal Address**

8105 Anderson Road
TAMPA, FL 33634

Changed: 03/24/2018

**Mailing Address**

P.O. Box 15762
TAMPA, FL 33684

Changed: 09/10/2014

**Registered Agent Name & Address**

MENG, XIANBIN
8105 anderson road
TAMPA, FL 33634

Address Changed: 03/24/2018

**Officer/Director Detail**

**Name & Address**

Title P

MENG, XIANBIN
8105 anderson road
TAMPA, FL 33634

Title V

Attachment 2

8/9/2018                    Detail by Entity Name

SHI, LINNA
8105 anderson Road
TAMPA, FL 33634

### Annual Reports

| Report Year | Filed Date |
| --- | --- |
| 2016 | 03/26/2016 |
| 2017 | 01/08/2017 |
| 2018 | 03/24/2018 |

### Document Images

| | |
| --- | --- |
| 03/24/2018 -- ANNUAL REPORT | View image in PDF format |
| 01/08/2017 -- ANNUAL REPORT | View image in PDF format |
| 03/26/2016 -- ANNUAL REPORT | View image in PDF format |
| 03/27/2015 -- Amendment | View image in PDF format |
| 01/09/2015 -- ANNUAL REPORT | View image in PDF format |
| 09/10/2014 -- ANNUAL REPORT | View image in PDF format |
| 12/23/2013 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

JA451

# Detail by Entity Name

Florida Profit Corporation

IGAS USA, INC.

## Filing Information

| | |
|---|---|
| **Document Number** | P18000032862 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 04/06/2018 |
| **Effective Date** | 04/04/2018 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 05/07/2018 |
| **Event Effective Date** | NONE |

## Principal Address

8105 ANDERSON ROAD
TAMPA, FL 33634

## Mailing Address

PO BOX 15762
TAMPA, FL 33684

## Registered Agent Name & Address

MENG, XIANBIN
8101 ANDERSON ROAD
TAMPA, FL 33634

## Officer/Director Detail

**Name & Address**

Title P

MENG, XIANBIN
8101 ANDERSON ROAD
TAMPA, FL 33634

## Annual Reports

**No Annual Reports Filed**

## Document Images

05/07/2018 -- Amendment      View image in PDF format

04/06/2018 -- Domestic Profit      View image in PDF format

Florida Department of State, Division of Corporations

JA452

# Exhibit 8-B

6/16/2021          Puremann Inc., 4912 W. KNOX ST. TAMPA FL3 3634 USA FAX 81 TE3 545-1491 PERSON IN CHARGE BEN MEN | Buyer Report — P...

Panjiva
MENU

- Panjiva
- Solutions
- Products
- Data
- Pricing
- S&P Global
- Search
-      En
- Demo Request a Demo
- Sign in

Supply Chain Intelligence about:

# Puremann Inc.

Company profile 🇺🇸 United States

### See Puremann Inc.'s products and suppliers

Thousands of companies like you use Panjiva to research suppliers and competitors.

Request a Demo

JA454

6/16/2021        Puremann Inc., 4912 W. KNOX ST. TAMPA FL3 3634 USA FAX 81 TE3 545-1491 PERSON IN CHARGE BEN MEN | Buyer Report — P...

## Reveal patterns in global trade

Top countries/regions that supply Puremann Inc.
Origin Country/Region

- South Korea
  119 shipments (100.0%)

## Easy access to trade data

### U.S. Customs records organized by company

119 U.S. shipments available for Puremann Inc., updated weekly since 2007

| Date | Buyer | Supplier | Details | 43 more fields |
|------|-------|----------|---------|----------------|
| 2021-01-24 | Puremann Inc. | Puremann Inc. | REFRIGERANT GAS R134A CLASS2. 2 UN NO3159<br>REFRIGERANT GAS R134A CLASS2. 2 UN NO3159 | Bill of lading |
| 2021-01-06 | Puremann Inc. | Puremann Inc. | REFRIGERANT GAS R134A CLASS2. 2 UN NO3159 | Bill of lading |
| 2020-12-28 | Puremann Inc. | Puremann Inc. | REFRIGERANT GAS R134A CLASS2. 2 UN NO3159<br>REFRIGERANT GAS R134A CLASS2. 2 UN NO3159 | Bill of lading |

Shipment data shows what products a company is trading and more. Learn more

JA455

6/16/2021          Puremann Inc., 4912 W. KNOX ST. TAMPA FL3 3634 USA FAX 81 TE3 545-1491 PERSON IN CHARGE BEN MEN | Buyer Report — P…

## Explore trading relationships hidden in supply chain data

**Supply chain map**



[See all 2 suppliers of Puremann Inc.](#)

## Contact information for Puremann Inc.

**Address**

4912 W. KNOX ST. TAMPA FL3 3634 USA FAX 81 TE3 545-1491 PERSON IN CHARGE BEN MEN

**Top products**

1. refrigerant gas

**Top HS Codes**

1. HS 29 - Organic chemicals
2. HS 38 - Chemical products n.e.c.

JA456

6/16/2021          Puremann Inc., 4912 W. KNOX ST. TAMPA FL3 3634 USA FAX 81 TE3 545-1491 PERSON IN CHARGE BEN MEN | Buyer Report — P…

See more goods shipped on Panjiva

## Sample Bill of Lading

**119 shipment records available**

Date
2021-01-24
Shipper Name
Puremann Inc,
Shipper Address
332-13 MAEHWAGOOIN-RO JANGAN-MYEON BOEUN CHUNGBUK 28916 SOUTH KO TEREA
FAX. 82
Consignee Name
Puremann Inc.
Consignee Address
4912 W. KNOX ST. TAMPA FL3 3634 USA FAX 81 TE3 545-1491 PERSON IN CHARGE BEN MEN
Notify Party Name
Puremann Inc.
Notify Party Address
4912 W KNOX ST. SUITE 100, TAMPA FL33634 US
Weight
46272
Weight Unit
K
Weight in KG
46272.0
Quantity
2720
Quantity Unit
CYL
Shipment Origin
South Korea
Details
46,272.0 kg
From port: Busan, South Korea
To port: Tampa, Florida
Place of Receipt
Busan South Korea
Foreign Port of Lading
Busan, South Korea
U.S. Port of Unlading
Tampa, Florida
U.S. Destination Port
Tampa, Florida
Commodity
REFRIGERANT GAS R134A CLASS2. 2 UN NO3159 REFRIGERANT GAS R134A CLASS2. 2 UN NO3159
Container

JA457

6/16/2021    Puremann Inc., 4912 W. KNOX ST. TAMPA FL3 3634 USA FAX 81 TE3 545-1491 PERSON IN CHARGE BEN MEN | Buyer Report — P…

MSKU1363500
MSKU9003095
Carrier Name
SHANGHAI SUPREME INTERNATIONAL FREIGHT FORWARDING CO LTD
Vessel Name
NYK LYNX
Voyage Number
049E
Bill of Lading Number
SSNFSPNB20121490
Master Bill of Lading Number
MAEU911586914
Lloyd's Code
9229324
HTS Codes
HTS 2903.39

| Buyers of similar products | Suppliers of similar products | Buyers similar to Puremann Inc. |
|---|---|---|
| • refrigerant gas buyers | • refrigerant gas manufacturers | • Db Bldg Fasteners Inc. |

**Thousands of companies use Panjiva to research suppliers and competitors**

Request a Demo

- Solutions
- Buyers
- Suppliers
- Logistics
- Governments
- Analysts

- Products
- Panjiva Platform
- Market Intelligence Platform
- Xpressfeed™
- Technology

- Data
- United States
- Brazil
- Central & South America
- India
- Pakistan
- Panjiva Research

- Company
- Blog
- Press
- Contact

JA458

6/16/2021        Puremann Inc., 4912 W. KNOX ST. TAMPA FL3 3634 USA FAX 81 TE3 545-1491 PERSON IN CHARGE BEN MEN | Buyer Report — P...

- Jobs

55 Water Street, 42nd Floor
New York, NY 10041

Request a demo

- **English**
- Español
- 中文

- Terms of Use
- Sitemap
- Privacy Policy
- Cookie Notice
- Cookie Settings
- Do Not Sell My Personal Information

© 2021 S&P Global

JA459

# Exhibit 8-C



# Exhibit 8-D

10/30/2020                              PureMann Inc - Other Energy Related Products

**Gobiz** KOREA                                    Join Free            Sign In

# PureMann Inc

Home              Company Profile              Products              BBS

# Company Introduction

PureMann Inc, is the only Korean company which is registered and producing eco-friendly refrigerant gases like R134a, R410A and so on. The existing refrigerant companies in Korea have a shape like normal trading company. They import gases from China and recharge in small cylinders to distribute in domestic market. But we import raw materials from China or India and produce high quality refrigerant gases in Korea factory through an automative refining and mixing process. Though we have not been in existence for long period, we took a contract and supplied to many companies in various industrial fields. A refrigerant gas is used in various fields. Especially, Automobile(Manufacturing &   After service market), household, office and industrial cooling air conditioning system market is very huge and intense in the world. With a high quality and Korea premium, PureMann is trying to advance into the big market.

    

# Main Products

JA463

Attachment 2

10/30/2020                                    PureMann Inc - Other Energy Related Products



Refrigerants gas R-134a

**Depend on quantity**



Refrigerants gas R-410A

**Depend on quantity**



Refrigerants gas R-404A

**Depend on quantity**



Extinguishing agent R-125

**Depend on quantity**

© 1996~2020 Korea SMEs and Startups Agency, All Rights Reserved

JA464

# TRADING

**Since its inception of 1982, we have developed and operated training programs which concentrate on advanced management courses, technologies, quality, and management training.**



## Global Cooperation News

### New Global Innovation Growth Center

2019-01-16

The Small and medium Business Corporation (SBC) is planning to establish a new Global Innovation Growth

### APEC Young Entreprenerus Global Networking Program

2018-11-07



https://www.kosmes.or.kr/sbc/SH/EHP/SHEHP001M0.do

1/2

# SME NEWS



## MOU signed between SBC-KRX-KB Securities

2019-01-16

On Nov. 29, 2018, The Small and medium Business Corporation (SBC) signed an MOU with




## 2018 Job Fair Gyeongsang |

2018-11-07

Vice President of SB '2018 Job Fair in Gy)

SME Innovation Center

Bobiz KOREA

Ministry of SMEs and Startups

KOREA TOURISM ORGANIZATION

KOREA.ne
university up Korea



# Exhibit 8-E

**HUSCH BLACKWELL**

Nithya Nagarajan
Partner

750 17th St. N.W., Suite 900
Washington, DC 20006-4675
Direct: 202.378.2409
Fax: 202.348.2319
nithya.nagarajan@huschblackwell.com

November 12, 2019

Case No. A-570-028
Total Pages: 169
Anti-Circ: HFC Components
E&C: Operations

**PUBLIC VERSION**
Business Proprietary Information removed
from brackets in Q&V Response pages 2-5
and Attachments II-A to II-D.

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

      Re:    *Hydrofluorocarbon Blends from the People's Republic of China:
           Response to Quantity and Value Questionnaire*

Dear Secretary Ross:

      On behalf of the following companies:

      1. 7680 Paradise Point LLC

      2. 8105 Anderson LLC

      3. 8900 Armenia LLC

      4. AC Tampa Bay, Inc.

      5. Assured Comfort A/C Inc.

      6. BMP International, Inc.

      7. BMP Refrigerants Inc.

      8. BMP USA Inc.

      9. Cool Master U.S.A., L.L.C.

      10. E.T.S. of Tampa Bay, Inc.

      11. iGas USA Inc.

Husch Blackwell LLP

**HUSCH BLACKWELL**

12. iGas, Inc.
13. L.M. Supply, Inc. (AKA LMJ Supply, Inc.)
14. MasterJ LLC
15. MS Fund LLC
16. Organic Apple, LLC
17. Organic Orange, L.L.C.
18. U.S. Ladder, Inc.
19. U.S. Metal of Tampa, Inc.

Collectively named "BMP and its affiliates", we hereby submit the foregoing quantity and value questionnaire response in the above-referenced proceeding. Each of the company certifications are being provided after the respective company's Q&V response.

### REQUEST FOR PROPRIETARY TREATMENT

Certain information contained herein is business confidential data that is proprietary. This information is enclosed with brackets ("[ ]"). Disclosure of this information would cause substantial competitive and commercial harm to the parties. Such data is marked as "Proprietary Treatment Requested." Confidential treatment, subject to administrative protective order, is requested pursuant to 19 C.F.R. § 351.105(c) (2012). Information marked as business proprietary has been so marked for one or more of the following reasons, in accordance with 19 C.F.R. §351.105(c) (2012):

(1)     Business or trade secrets concerning the nature of a product or production process;
(2)     Production costs (but not the identity of the production components unless a particular component is a trade secret);
(3)     Distribution costs and channels of distribution;
(4)     Terms of sale (but not terms of sale offered to the public);
(5)     Prices of individual sales, likely sales, or other offers (but not components of prices, such as transportation, if based on published schedules, dates of sale, product descriptions except business or trade secrets described in term 1 above, or order numbers);
(6)     Names of particular customers, distributors, or suppliers (but not destination of sale or designation of type of customer, distributor, or supplier, unless the designation of destination would reveal the name);

Husch Blackwell LLP

BMP International Inc.

### COMPANY CERTIFICATION

I, **Ben Meng, President,** currently employed by **BMP International Inc.** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 12, 2019,** pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **BMP International Inc.** in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: ___November 12, 2019_____

**PUBLIC VERSION**

## OFFICE OF AD/CVD ENFORCEMENT
## QUANTITY AND VALUE QUESTIONNAIRE

**REQUESTER(S):**             **BMP International Inc.**
                             **8105 Anderson Road**
                             **Tampa, Florida 33634**
                             **Ben Meng, President**
                             **813-298-8101**
                             **813-889-7900**
                             **ben@bmp-usa.com**


**REPRESENTATION:**           **Nithya Nagarajan**
                             **Partner**
                             **HUSCH BLACKWELL LLP**
                             **750 17th Street, NW,**
                             **Suite 900**
                             **Washington, D.C. 20006-4675**
                             **Direct: 202.378.2409**
                             **Fax: 202.378.2319**
                             **Nithya.Nagarajan@huschblackwell.com**

**CASE:**                    Hydrofluorocarbon Blends from the People's Republic of China

**DATE OF INITIATION:**   June 18, 2019

**DUE DATE FOR Q&V RESPONSE:**    November 5, 2019

**OFFICIALS IN CHARGE:**      Andrew Medley, Ben Luberda

1

PUBLIC VERSION

Submit all completed charts required by this questionnaire in Excel format.

1. In the chart provided in attachment II-A, please provide monthly and total quantity (in kilograms) and monthly and total value (in U.S. Dollars)4 of your shipments (if you are an exporter and/or producer) or imports (if you are an importer) of merchandise under U.S. Harmonized Tariff Schedule (USHTS) code 2903.39.2035 ("Difluoromethane; pentafluoroethane; and 1,1,1-trifluoroethane") for the time period of July 1, 2011, through June 30, 2019. Provide a narrative explanation of how you aggregated these data from your books and records.

**Response:**

**The monthly and total quantity and value of BMP International Inc's ("BMP**

**International") imports is provided at Attachment II-A.  BMP International Inc.**

**maintains an [                                                                                    ].**

**Whenever BMP International receives the Importer Security Filing ("ISF") from the**

**exporter for an upcoming shipment, it [**

**                                                                    ] based on the ISF and the ISF is**

**[                                      ].  When the exporter sends the commercial invoice, packing list,**

**and bill of lading, BMP International matches the invoice with the contract and records the**

**invoice information in the [                        ].  The commercial invoice, packing list and bill of**

**lading are also linked to the [                        ].  When the product is received at the warehouse,**

**BMP International matches the quantity with the commercial invoice and records the**

**[                                                        ] and into the company's Quickbooks system.  In**

**order to complete the attachment, BMP International totaled the monthly quantities and**

**values of the relevant imports based on the commercial invoice date.**

2. Identify whether you are a producer, exporter, or U.S. importer of R-32, R-125, and/or R143a produced in China.

2

PUBLIC VERSION

**Response:**

**BMP International has imported R-32, R125 and R143A produced in China since**

**[                ]. Before that BMP International imported HFC blends from China, including**

**R410A, R404A, R407A, R407C and R507. BMP International resells all imported product**

**in the United States. BMP International does not blend any HFC components.**

3.If you are a producer and/or exporter of R-32, R-125, and/or R-143a in China, identify your top five U.S. importers. Fill in the chart provided in attachment II-B with the monthly quantities and values of your shipments under USHTS 2903.39.2035 to each of your top five U.S. importers.

**Response:**

**Not applicable..  BMP International is not a producer or exporter of R-32, R-125 or R-**

**143a.**

4. If you are a U.S. importer of R-32, R-125, and/or R-143a produced in China, identify your top five Chinese producers/exporters. Fill in the chart provided in attachment II-C with the monthly quantities and values of your purchases under USHTS 2903.39.2035 from each of your top five Chinese producers/exporters.

**Response:**

**The requested information is provided at Attachment II-C.  This response has been**

**aggregated in the same manner as our response to Attachment II-A.  The [            ]**

**maintained by BMP International contains the quantity and value of each import and the**

**identity of the exporter.   In order to complete the attachment, BMP International filtered**

**the information in the [                    ] to obtain the monthly quantities and**

**values that BMP International received from [            ].**

5. State whether you are affiliated with any: a. producers of HFC components R-32, R-125, and/or R-143a in China; b. exporters of HFC components R-32, R-125, and/or R-143a in China; or c. importers of HFC components R-32, R-125, and/or R-143a produced in China into the United States. If yes, please identify those producers, exporters, or importers.

3

JA474

PUBLIC VERSION

**Response:**

**BMP International is affiliated with the following importers of HFC components R-32, R-125 and R143A produced in China:**

**[**

**]**

**A separate response is being submitted for each of these companies.**

Please respond to questions 6, 7, 8, and 9 (below) only if you are a U.S. importer of HFC components R-32, R-125, and/or R-143a produced in China into the United States. Producers/exporters need not respond to questions 6, 7, 8, and 9.

6. Provide a detailed narrative response as to what your company does with the imported HFC components (including, but not limited to, whether your company, or another company on behalf of your company, blends them to create HFC blends, resells the HFC components, etc.).

**Response:**

**BMP International resells all HFC components to [                    ]. The components are sold in ISO tanks. No HFC components or HFC blends were  sold back to BMP International by [                ].  See response to question 9.**

7. If your company, or another company on behalf of your company, blends the HFC components, identify all HFC blends (e.g., R-404A, R-410A, R-507A) your company produces using the imported HFC components. Please also identify if the HFC blends are then sold in the United States.

**Response:**

**BMP International was not involved in blending the HFC components. All HFC components were sold to [                ].  See response to question 9.**

8. If your company, or another company on behalf of your company, blends the imported HFC components to create HFC blends, complete the chart in attachment II-D, which details the monthly quantities and values of each HFC blend identified in question 7 using the imported HFC components for the period of July 1, 2011, through June 30, 2019.

4

JA475

PUBLIC VERSION

**Response:**

**Not applicable. BMP International does not blend HFC components.  [                    ]**

**has submitted a separate response to this questionnaire with the requested information.**

9. If your company resells the HFC components, please identify the customers of the resold HFC components, and please explain whether, to the best of your knowledge, these customers are involved in the blending of the HFC components to create HFC blends which are then sold in the United States.

**Response:**

**BMP International sells HFC components to [                    ]. [                    ] resells**

**some of the HFC components in the United States and also blends the HFC components to**

**create HFC blends which are then sold in the United States.**

5

BMP USA Inc.

## COMPANY CERTIFICATION

I, **Ben Meng, President,** currently employed by **BMP USA Inc.** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 12, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028).** I certify that the public information and any business proprietary information of **BMP USA Inc.** in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: __November 12, 2019_____

PUBLIC VERSION

## OFFICE OF AD/CVD ENFORCEMENT
## QUANTITY AND VALUE QUESTIONNAIRE

| | |
|---|---|
| **REQUESTER(S):** | **BMP USA Inc.**<br>**8101 Anderson Road**<br>**Tampa, Florida 33634**<br>**Ben Meng, President**<br>**813-298-8101**<br>**813-889-7900**<br>**ben@bmp-usa.com** |
| **REPRESENTATION:** | **Nithya Nagarajan**<br>**Partner**<br>**HUSCH BLACKWELL LLP**<br>**750 17th Street, NW,**<br>**Suite 900**<br>**Washington, D.C. 20006-4675**<br>**Direct:  202.378.2409**<br>**Fax:  202.378.2319**<br>**Nithya.Nagarajan@huschblackwell.com** |
| **CASE:** | Hydrofluorocarbon Blends from the People's Republic of China |
| **DATE OF INITIATION:** | June 18, 2019 |
| **DUE DATE FOR Q&V RESPONSE:** | November 5, 2019 |
| **OFFICIALS IN CHARGE:** | Andrew Medley, Ben Luberda |

1

PUBLIC VERSION

Submit all completed charts required by this questionnaire in Excel format.

1. In the chart provided in attachment II-A, please provide monthly and total quantity (in kilograms) and monthly and total value (in U.S. Dollars) of your shipments (if you are an exporter and/or producer) or imports (if you are an importer) of merchandise under U.S. Harmonized Tariff Schedule (USHTS) code 2903.39.2035 ("Difluoromethane; pentafluoroethane; and 1,1,1-trifluoroethane") for the time period of July 1, 2011, through June 30, 2019. Provide a narrative explanation of how you aggregated these data from your books and records.

**Response:**

**The monthly and total quantity and value of BMP USA Inc's ("BMP USA") imports is**

**provided at Attachment II-A.   BMP USA maintains an [**

**] for each year. Whenever BMP USA receives the**

**Importer Security Filing ("ISF") from the exporter for an upcoming shipment, it [**

**] based on the ISF and the ISF is linked to the [              ].  When the**

**exporter sends the commercial invoice, packing list, and bill of lading, BMP USA matches**

**the invoice with the contract and records the invoice information in the [              ].  The**

**commercial invoice, packing list and bill of lading are also linked to the [              ].  When**

**the product is received at the warehouse, BMP USA matches the quantity with the**

**commercial invoice and records the inventory information into the [**

**] system.  In order to complete the attachment, BMP USA totaled**

**the monthly quantities and values of the relevant imports based on the commercial invoice**

**date.**

2. Identify whether you are a producer, exporter, or U.S. importer of R-32, R-125, and/or R143a produced in China.

2

**Response:**

**BMP USA imports R-32, R125 and R143A produced in China. BMP started importing**

**these components in [               ]. BMP USA also blends these components into HFC**

**blends such as R410A, R404A, R407A, R407C, R507.  BMP USA sells these HFC blends to**

**[               ] in the United States.**

3.If you are a producer and/or exporter of R-32, R-125, and/or R-143a in China, identify your top five U.S. importers. Fill in the chart provided in attachment II-B with the monthly quantities and values of your shipments under USHTS 2903.39.2035 to each of your top five U.S. importers.

**Response:**

**Not applicable.  BMP USA is not a producer or exporter of R-32, R-125 or R-143a.**

4. If you are a U.S. importer of R-32, R-125, and/or R-143a produced in China, identify your top five Chinese producers/exporters. Fill in the chart provided in attachment II-C with the monthly quantities and values of your purchases under USHTS 2903.39.2035 from each of your top five Chinese producers/exporters.

**Response:**

**The requested information is provided at Attachment II-C.  This response has been**

**aggregated in the same manner as our response to Attachment II-A.   The [          ]**

**maintained by BMP USA contains the quantity and value of each import and the identity**

**of the exporter.   In order to complete the attachment, BMP USA filtered the information**

**in the [          ] by exporter name to obtain the monthly quantities and values that BMP**

**USA received from each exporter.**

5. State whether you are affiliated with any: a. producers of HFC components R-32, R-125, and/or R-143a in China; b. exporters of HFC components R-32, R-125, and/or R-143a in China; or c. importers of HFC components R-32, R-125, and/or R-143a produced in China into the United States. If yes, please identify those producers, exporters, or importers.

**Response:**

**BMP USA is affiliated with the following importers of HFC components R-32, R-125 and**

**R143A produced in China.**

3

JA481

PUBLIC VERSION

[

]

**A separate response is being submitted for each of these companies.**

Please respond to questions 6, 7, 8, and 9 (below) only if you are a U.S. importer of HFC components R-32, R-125, and/or R-143a produced in China into the United States. Producers/exporters need not respond to questions 6, 7, 8, and 9.

6. Provide a detailed narrative response as to what your company does with the imported HFC components (including, but not limited to, whether your company, or another company on behalf of your company, blends them to create HFC blends, resells the HFC components, etc.).

**Response:**

**BMP USA [                                                    ] in the United States in ISO**

**tanks or 125lbs cylinders. BMP USA also blends these components into HFC blends such as**

**R410A, R404A, R407A, R407C, R507. These HFC blends are packaged in ISO tanks, 30lbs**

**cylinder or 125lbs cylinders and sold to distributors in the United States.**

7. If your company, or another company on behalf of your company, blends the HFC components, identify all HFC blends (e.g., R-404A, R-410A, R-507A) your company produces using the imported HFC components. Please also identify if the HFC blends are then sold in the United States.

**Response:**

**See response to question 6 above.  BMP USA blends R404A, R407A, R407C, R410A and**

**R507 and sells the blends to distributors in the United States.  BMP USA also uses**

**unaffiliated third-party companies [                              ] and [**

**            ] to blend R404A, R407A, R407C, R410A and R507 and then sells the HFC**

**blends in the United States.**

8. If your company, or another company on behalf of your company, blends the imported HFC components to create HFC blends, complete the chart in attachment II-D, which details the monthly quantities and values of each HFC blend identified in question 7 using the imported HFC components for the period of July 1, 2011, through June 30, 2019.

4

JA482

PUBLIC VERSION

**The requested information is provided at Attachment II-D. BMP USA records the quantity and value of every sale made in the United States in [                ]. Whenever BMP USA receives a purchase order from a customer, it creates an invoice in [                ] with the product item code, quantity, unit price, ship to address, bill to address, and payment terms. BMP USA's production is based on sales such that the sales information is reflective of its production. In order to complete the attachment, BMP USA summed the monthly sales quantities and values for each HFC blends**

9. If your company resells the HFC components, please identify the customers of the resold HFC components, and please explain whether, to the best of your knowledge, these customers are involved in the blending of the HFC components to create HFC blends which are then sold in the United States.

**Response:**

**BMP USA sells HFC components to the companies listed below.**

**[**

**]**

**Our understanding is that the unaffiliated companies blend the HFC components to create HFC blends. BMP USA does not know what these companies do with the HFC blends, but assumes at least some of the blends are sold in the United States.**

**[                ] is submitting a separate response to this questionnaire with information on its operations. The other companies are not affiliated with BMP USA.**

5

JA483

Cool Master U.S.A., LLC

## COMPANY CERTIFICATION

I, **Ben Meng, President,** currently employed by **Cool Master U.S.A., LLC** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 12, 2019**, pursuant to the **Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **Cool Master U.S.A., LLC** in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: __November 12, 2019_____

**PUBLIC VERSION**

---

## OFFICE OF AD/CVD ENFORCEMENT
## QUANTITY AND VALUE QUESTIONNAIRE

---

**REQUESTER(S):**          **Cool Master U.S.A., LLC**
                           **8101 Anderson Road**
                           **Tampa, Florida 33634**
                           **Ben Meng, President**
                           **813-298-8101**
                           **813-889-7900**
                           **ben@bmp-usa.com**


**REPRESENTATION:**         **Nithya Nagarajan**
                            **Partner**
                            **HUSCH BLACKWELL LLP**
                            **750 17th Street, NW,**
                            **Suite 900**
                            **Washington, D.C. 20006-4675**
                            **Direct:  202.378.2409**
                            **Fax:  202.378.2319**
                            **Nithya.Nagarajan@huschblackwell.com**


**CASE:**                   Hydrofluorocarbon Blends from the People's Republic of China


**DATE OF INITIATION:**     June 18, 2019


**DUE DATE FOR Q&V RESPONSE:**      November 5, 2019


**OFFICIALS IN CHARGE:**      Andrew Medley, Ben Luberda

1

PUBLIC VERSION

Submit all completed charts required by this questionnaire in Excel format.

1. In the chart provided in attachment II-A, please provide monthly and total quantity (in kilograms) and monthly and total value (in U.S. Dollars) of your shipments (if you are an exporter and/or producer) or imports (if you are an importer) of merchandise under U.S. Harmonized Tariff Schedule (USHTS) code 2903.39.2035 ("Difluoromethane; pentafluoroethane; and 1,1,1-trifluoroethane") for the time period of July 1, 2011, through June 30, 2019. Provide a narrative explanation of how you aggregated these data from your books and records.

**Response:**

**The monthly and total quantity and value of Cool Master U.S.A., LLC. 's ("Cool Master")**

**imports is provided at Attachment II-A.  Cool Master U.S.A., LLC maintains an [**

**] for each year. Whenever Cool Master**

**receives the Importer Security Filing ("ISF") from the exporter for an upcoming shipment,**

**it creates a record in the [            ] with the quantity, estimated arrival time, and the**

**exporter's information based on the ISF and the ISF is linked to the [            ].  When**

**the exporter sends the commercial invoice, packing list, and bill of lading, Cool Master**

**matches the invoice with the contract and records the invoice information in the [**

**].  The commercial invoice, packing list and Bill of lading are also linked to the [**

**].  When the product is received at the warehouse, Cool Master matches the quantity**

**with the commercial invoice and records the inventory information into the [**

**].  In order to complete the attachment, Cool Master**

**totalled the monthly quantities and values of the relevant imports based on the commercial**

**invoice date.**

2. Identify whether you are a producer, exporter, or U.S. importer of R-32, R-125, and/or R143a produced in China.

2

JA487

PUBLIC VERSION

**Response:**

**Cool Master only imported R-32, R125 and R143A produced in China during a [**

**]. The company also imports R134A, R421A and R407C into the**

**United States.** **The company sold all imported product in the United States and did not**

**blend any HFC components.**

3.If you are a producer and/or exporter of R-32, R-125, and/or R-143a in China, identify your top five U.S. importers. Fill in the chart provided in attachment II-B with the monthly quantities and values of your shipments under USHTS 2903.39.2035 to each of your top five U.S. importers.

**Response:**

**Not applicable.  Cool Master is not a producer or exporter of R-32, R-125 or R-143a.**

4. If you are a U.S. importer of R-32, R-125, and/or R-143a produced in China, identify your top five Chinese producers/exporters. Fill in the chart provided in attachment II-C with the monthly quantities and values of your purchases under USHTS 2903.39.2035 from each of your top five Chinese producers/exporters.

**Response:**

**The requested information is provided at Attachment II-C.  This response has been**

**aggregated in the same manner as our response to Attachment II-A.  The [                    ]**

**maintained by Cool Master contains the quantity and value of each import and the identity**

**of the exporter.  In order to complete the attachment, Cool Master filtered the information**

**in the [          ] by the exporter name to obtain the monthly quantities and values that**

**Cool Master received from each exporter.**

5. State whether you are affiliated with any: a. producers of HFC components R-32, R-125, and/or R-143a in China; b. exporters of HFC components R-32, R-125, and/or R-143a in China; or c. importers of HFC components R-32, R-125, and/or R-143a produced in China into the United States. If yes, please identify those producers, exporters, or importers.

PUBLIC VERSION

**Response:**

**COOL Master is affiliated with the following importers of HFC components R-32, R-125**

**and R143A produced in China.**

**[**

                    **]**

**A separate response is being submitted for each of these companies.**

Please respond to questions 6, 7, 8, and 9 (below) only if you are a U.S. importer of HFC components R-32, R-125, and/or R-143a produced in China into the United States. Producers/exporters need not respond to questions 6, 7, 8, and 9.

6. Provide a detailed narrative response as to what your company does with the imported HFC components (including, but not limited to, whether your company, or another company on behalf of your company, blends them to create HFC blends, resells the HFC components, etc.).

**Response:**

**COOL Master sells all HFC components to [                    ]. The components are sold in**

**ISO tanks. No HFC components or HFC blends were sold back to COOL Master by [**

          **].  See response to question 9.**

7. If your company, or another company on behalf of your company, blends the HFC components, identify all HFC blends (e.g., R-404A, R-410A, R-507A) your company produces using the imported HFC components. Please also identify if the HFC blends are then sold in the United States.

**COOL Master was not involved in blending the HFC components. All HFC components**

**were sold to [                    ].  See response to question 9.**

8. If your company, or another company on behalf of your company, blends the imported HFC components to create HFC blends, complete the chart in attachment II-D, which details the monthly quantities and values of each HFC blend identified in question 7 using the imported HFC components for the period of July 1, 2011, through June 30, 2019.

4

PUBLIC VERSION

**Response:**

**Not applicable. COOL Master does not blend HFC Components. [                    ] has**

**submitted a separate response to this questionnaire with the requested information.**

9. If your company resells the HFC components, please identify the customers of the resold HFC components, and please explain whether, to the best of your knowledge, these customers are involved in the blending of the HFC components to create HFC blends which are then sold in the United States.

**Response:**

**COOL Master sells HFC components to [                    ]. [                    ] resells some of**

**the HFC components in the United States and also blends the HFC components to create**

**HFC blends which are then sold in the United States.**

5

JA490

IGAS USA Inc.

## COMPANY CERTIFICATION

I, **Ben Meng, President,** currently employed by **IGAS USA Inc.** certify that I prepared or otherwise supervised the preparation of the attached submission of **Hydrofluorocarbon Blends from the People's Republic of China: Quantity and Value Questionnaire Response, due on November 12, 2019, pursuant to the Anti-Circumvention Inquiry on Hydrofluorocarbon Blends from the People's Republic of China (A-570-028)**. I certify that the public information and any business proprietary information of **IGAS USA Inc.** in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: __November 12, 2019_____

**PUBLIC VERSION**

---

### OFFICE OF AD/CVD ENFORCEMENT
### QUANTITY AND VALUE QUESTIONNAIRE

---

**REQUESTER(S):**          **IGAS USA Inc.**
                           **8105 Anderson Road**
                           **Tampa, Florida 33634**
                           **Ben Meng, President**
                           **813-298-8101**
                           **813-889-7900**
                           **ben@bmp-usa.com**


**REPRESENTATION:**        **Nithya Nagarajan**
                           **Partner**
                           **HUSCH BLACKWELL LLP**
                           **750 17th Street, NW,**
                           **Suite 900**
                           **Washington, D.C. 20006-4675**
                           **Direct:  202.378.2409**
                           **Fax:  202.378.2319**
                           **Nithya.Nagarajan@huschblackwell.com**


**CASE:**                  Hydrofluorocarbon Blends from the People's Republic of China

**DATE OF INITIATION:**    June 18, 2019

**DUE DATE FOR Q&V RESPONSE:**    November 5, 2019

**OFFICIALS IN CHARGE:**    Andrew Medley, Ben Luberda

1

PUBLIC VERSION

Submit all completed charts required by this questionnaire in Excel format.

1. In the chart provided in attachment II-A, please provide monthly and total quantity (in kilograms) and monthly and total value (in U.S. Dollars)4 of your shipments (if you are an exporter and/or producer) or imports (if you are an importer) of merchandise under U.S. Harmonized Tariff Schedule (USHTS) code 2903.39.2035 ("Difluoromethane; pentafluoroethane; and 1,1,1-trifluoroethane") for the time period of July 1, 2011, through June 30, 2019. Provide a narrative explanation of how you aggregated these data from your books and records.

**Response:**

**The monthly and total quantity and value of iGAS USA Inc's ("iGAS USA") imports is provided at Attachment II-A. IGAS USA maintains an [                    ] for each year. Whenever IGAS USA receives the Importer Security Filing ("ISF") from the exporter for an upcoming shipment, it creates a record in the [          ] with the quantity, estimated arrival time, and the exporter's information based on the ISF andthe ISF is linked to the [          ]. When the exporter sends the commercial invoice, packing list, and bill of lading, IGAS USA matches the invoice with the contract and records the invoice information in the [          ]. The commercial invoice, packing list and bill of lading are also linked to the [          ]. When the product is received at the warehouse, IGAS USA matches the quantity with the commercial invoice and record the inventory into the [                              ] system. In order to complete the attachment, IGas USA summed the monthly quantities and values based on the commercial invoice date**

2. Identify whether you are a producer, exporter, or U.S. importer of R-32, R-125, and/or R143a produced in China.

2

PUBLIC VERSION

**Response:**

IGAS USA imports R-32, R125 and R143A produced in China. IGAS USA also blends

these components into HFC blends such as R410A, R404A, R407A, R407C, R507. IGAS

USA sells these HFC blends to distributors in the United States.

3.If you are a producer and/or exporter of R-32, R-125, and/or R-143a in China, identify your top five U.S. importers. Fill in the chart provided in attachment II-B with monthly quantities and values of your shipments under USHTS 2903.39.2035 to each of your top five U.S. importers.

**Response:**

**Not applicable. IGAS USA is not a producer or exporter of R-32, R-125 or R-143a.**

4. If you are a U.S. importer of R-32, R-125, and/or R-143a produced in China, identify your top five Chinese producers/exporters. Fill in the chart provided in attachment II-C with the monthly quantities and values of your purchases under USHTS 2903.39.2035 from each of your top five Chinese producers/exporters.

**Response:**

The requested information is provided at Attachment II-C.  This response has been

aggregated in the same manner as our response to Attachment II-A.  The [            ]

maintained by IGAS USA contains the quantity and value of each import and the identity

of the exporter.  In order to complete the attachment, IGAS USA filtered the information

in the [        ] by exporter to obtain the monthly quantities and values that IGAS USA

received from each exporter.


5. State whether you are affiliated with any: a. producers of HFC components R-32, R-125, and/or R-143a in China; b. exporters of HFC components R-32, R-125, and/or R-143a in China; or c. importers of HFC components R-32, R-125, and/or R-143a produced in China into the United States. If yes, please identify those producers, exporters, or importers.

**Response:**

IGAS USA  is affiliated with  the below importers of HFC components R-32, R-125 and

R143A produced in China.

3

PUBLIC VERSION

[

]

**These companies are submitting their own responses to the questionnaire.**

Please respond to questions 6, 7, 8, and 9 (below) only if you are a U.S. importer of HFC components R-32, R-125, and/or R-143a produced in China into the United States. Producers/exporters need not respond to questions 6, 7, 8, and 9.

6. Provide a detailed narrative response as to what your company does with the imported HFC components (including, but not limited to, whether your company, or another company on behalf of your company, blends them to create HFC blends, resells the HFC components, etc.).

**Response:**

**IGAS USA resells the HFC components to other companies in the United States. The**

**components are sold in ISO tanks or 125lbs cylinders. IGAS USA also blends these**

**components into HFC blends such as R410A, R404A, R407A, R407C, R507. These HFC**

**blends are packaged in ISO tanks, 30lbs cylinder or 125lbs cylinders and sold to**

**distributors in the United States.**

7. If your company, or another company on behalf of your company, blends the HFC components, identify all HFC blends (e.g., R-404A, R-410A, R-507A) your company produces using the imported HFC components. Please also identify if the HFC blends are then sold in the United States.

**Response:**

**See response to question 6.  IGAS USA blends R404A, R407A, R407C, R410A and R507**

**and [                              ] in the United States. IGAS USA also uses an**

**unaffiliated third-party company called [                              ] to blend R404A,**

**R407A, R407C, R410A and R507 and then sells the HFC blends in the United States.**

8. If your company, or another company on behalf of your company, blends the imported HFC components to create HFC blends, complete the chart in attachment II-D, which details the monthly quantities and values of each HFC blend identified in question 7 using the imported HFC components for the period of July 1, 2011, through June 30, 2019.

4

JA496

PUBLIC VERSION

**Response:**

**The requested information is provided at Attachment II-D. In order to complete this attachment, IGAS USA summed its monthly sales of each HFC blends. IGAS USA records the quantity and value of every sale made in the United States in [                    ]. Whenever IGAS USA receives a purchase order from the customer, it creates an [**

**                    ] with the product item code, quantity, unit price, ship to address, bill to address, and payment terms. IGAS USA's production is based on sales and the sales information is, therefore, reflective of the company's production. In order to complete the attachment, IGAS USA summed the monthly sales quantities and values for each HFC blend**

9. If your company resells the HFC components, please identify the customers of the resold HFC components, and please explain whether, to the best of your knowledge, these customers are involved in the blending of the HFC components to create HFC blends which are then sold in the United States.

**Response:**

**IGAS USA sells HFC components to the unaffiliated companies listed below.**

**[**

**                                        ]**

**IGAS USA's understanding is that these companies blend the HFC components to create HFC blends. IGAS USA does not know what these companies do with the HFC blends, but assumes at least some of them are sold in the United States**

5

# Exhibit 8-F



**GDLSK**
GRUNFELD DESIDERIO LEBOWITZ
SILVERMAN : KLESTADT LLP

Barcode:3187000-01 A-570-998 INV - Investigation -

NEW YORK
WASHINGTON, DC
LOS ANGELES
HONG KONG

March 10, 2014

Case No. A-570-998
Total Pages: 50
Investigation
POI: 4/1/13-9/30/13

**Business Proprietary Information
On Narrative Page D-19
and in Exhibits D-1 to D-9 has been ranged or deleted**

**PUBLIC VERSION**

**VIA ELECTRONIC FILING**
Hon. Penny Pritzker
Secretary of Commerce
Enforcement and Compliance
Room 1870
U.S. Department of Commerce
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

    Attn:  Joshua Startup

    Re:    *Juhua Group's Section D Response*: **Antidumping Duty Investigation of 1,1,1,2
           Tetrafluoroethane from the People's Republic of China**

Dear Madam Secretary:

    This Section D questionnaire response is filed by GDLSK, on behalf of the Juhua Group

to support the Sections A, C, D (packing only) Questionnaire responses filed on behalf of

Weitron International Refrigeration Equipment (Kunshan) Co., Ltd., an exporter of subject

merchandise, in the above referenced investigation. We note that this response is being

submitted as factual information under 19 CFR 351.102(b)(21)(i).

Filed By: DChoudhary@gdlsk.com, Filed Date: 3/10/14 2:40 PM, Submission Status: Approved

Barcode:3187000-01 A-570-998 INV - Investigation  -

Should you have any questions concerning this matter, please do not hesitate to contact

us.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

Bruce M. Mitchell (DC)

Bruce M. Mitchell
Max F. Schutzman
Ned. H. Marshak
Dharmendra N. Choudhary

Filed By: DChoudhary@gdlsk.com, Filed Date: 3/10/14 2:40 PM, Submission Status: Approved

Barcode:3187000-01 A-570-998 INV - Investigation -

## SECTION D
## Factors of Production Questionnaire

### I.     General Explanation

This section of the antidumping questionnaire instructs you on how to report the **factors of production** (factors) of the merchandise under consideration. Please refer to the cover letter to determine your reporting requirements.

A.     Factors of Production

Factors of production are used to construct the value of the product sold by your company in the United States. The Department will use the input amounts you report, along with the appropriate price from the chosen **surrogate country**, to construct the **normal value** of the merchandise under consideration sold by your company to the U.S. market. Surrogate values for overhead, selling, general and administrative (SG&A) expenses and profit will also be added. Unless otherwise instructed by the Department, you should report factors information for all models or product types in the U.S. market sales listing submitted by you (or the exporter) in response to Section C of the questionnaire, including that portion of the production that was not destined for the United States. The reported amounts should reflect the factors of production used to produce one unit of the merchandise under consideration.

If you believe that your company uses any raw materials that should be classified as factory overhead expenses rather than valued as factors of production and directly included in normal value, please: (1) notify the Department official in charge, and (2) identify these materials in your first Section D questionnaire response. Your first Section D questionnaire response should contain a comprehensive list of all such materials you consider to be part of factory overhead. Please provide this information to the Department immediately, as this will afford your company and the Department sufficient time to evaluate your company's specific use of the raw material and to determine the most appropriate manner in which the raw material should be valued.

If you have any questions regarding how to compute the factors of the merchandise under consideration, please contact the official in charge before preparing your response to this section of the questionnaire.

**Answer: This questionnaire response to Section D of the Department's questionnaire is provided by the Juhua Group Corporation to support the Questionnaire Response of Weitron International Refrigeration Equipment (Kunshan) Co., Ltd ("Weitron China"), in connection with Weitron-China's exportation of R134a to the United Sates, which was**

8937932_1

8936461_1   03/06/2014 3:48 pm

Barcode:3187000-01 A-570-952 INV - Investigation -

resold by Wietron-USA during the Period of Investigation ("POI").

Weitron China did not produce R134a. Rather, it obtained bulk R134a in isotanks from a member of the Juhua Group, Zhejiang Quhua Fluor-chemistry Co., Ltd ("QuHua"), which Weitron-China then packed and shipped to the United States. Thus, this response is limited to the factors of production of bulk R134a supplied by the Juhua Group to Weitron. The information in this response consists of Juhua Group proprietary business information, which the Juhua Group is submitting directly to the Department, through counsel, for the Department's use in the calculation of Weitron's dumping margins.

The actual producers of R134a are two members of the Juhua Group: Zhejiang Juhua Co., Ltd., at its Organic Fluorine Plant ("JuHuaOP") and Zhejiang Qzhou Juxin Fluorochemical Industrial Co., Ltd ("JuXin"), located in QuZhou City, ZheJiang Province, China. These companies are collectively referred to as "JuHua" or "JuHua Group." JuHuaOP and JuXin sell R134a to another member of the Juhua Group, QuHua, which as noted, supplies the bulk R134a to Weitron.

The Juhua Group and Weitron are not affiliated parties.

JuHuaOP and JuXin have reported the weighted average FOPs for the bulk R134a sold to Weitron which was packed by Weitron in China for sale by Weitron-USA to its unaffiliated customers in the U.S. market during the POI. A printout of the FOP file detailing the FOPs for each input used to produce bulk R134a sold by the Juhua Group to Weitron is provided in Exhibit D-1. The factors of production have been provided on a per Ton unit basis.

We note that two members of the Juhua Group, QuHua and Zhejiang Quzhou Lianzhou Refrigerants Co., Ltd. (Lianzhou) sold subject R134a directly to the United States during the POI. The R134a sold by Quhua and Lianzhou also was produced by JuHuaOP and JuXin. QuHua and Lianzhou have submitted Separate Rate Applications to the Department, describing the corporate structure of the Juhua Group. In addition, QuHua is a mandatory respondent in the Department's countervailing duty investigation.

Additional information regarding members of the Juhua Group involved in the production and/or sale of subject merchandise and/or inputs which are used, directly or indirectly, in the production and/or sale of subject merchandise is found in Exhibit D--9. This exhibit consists of information previously submitted to the Department in QuHua's CVD questionnaire response, at pages 4 – 7.

8936461_1 03/06/2014 3:48 pm

8937932_1

Filed By: DChoudhary@gdlsk.com, Filed Date: 3/10/14 2:40 PM, Submission Status: Approved

# Exhibit 8-G

https://translate.googleusercontent.com/translate_f

Company code: 600160

2018 Annual Report

Company abbreviation: Juhua

# Zhejiang Juhua Co., Ltd.
# 2018 Annual Report

Zhejiang Juhua Co., Ltd. 2018 Annual Report

**Board of Directors of Zhejiang Juhua Co., Ltd.**

2018 Annual Report

1 / 235

**important hint**

1. The company's board of directors, board of supervisors, directors, supervisors, and senior management ensure that the contents of the annual report is true, accurate, and complete. There are no false records, misleading statements or major omissions, and bear individual and joint legal responsibilities.

2. All directors of the company attended the board meeting.

3. Tianjian Certified Public Accountants (Special General Partnership) issued a standard unqualified audit report for the company.

4. Hu Zhongming, person in charge of the company, Wang Xiaoming, person in charge of accounting work, and Wang Xiaoming, person in charge of accounting institutions (accounting officer) Statement: Guarantee the truthfulness, accuracy and completeness of the financial report in the annual report.

5. The profit distribution plan for the reporting period or the plan for the conversion of provident funds to share capital after consideration by the board of directors

Based on the company's total share capital of 2,745,166,103.00 shares at the end of 2018 as a base, cash is distributed to all shareholders for every 10 shares of 1.5 Yuan (including tax), a total of 411,774,915.45 yuan of dividends will be distributed; this time, the stock dividend distribution method will not be adopted, nor will the capital public

JA505

Zhejiang Juhua Co., Ltd. 2018 Annual Report

Provident fund turned into share capital. This plan still needs to be implemented after being reviewed and approved by the company's 2018 annual shareholders' meeting.

Six, forward-looking statements risk statement

√Applicable □Not applicable

Forward-looking statements such as future plans and development strategies involved in this report do not constitute the company's substantial commitment to investors.

Investors pay attention to investment risks.

7. Is there any non-operating capital occupation by the controlling shareholder and its related parties?

no

8. Is there any external guarantee that violates the prescribed decision-making procedures?

no

Nine, major risk warning

In this report, the company has described in detail the risk factors that may arise for the realization of the company's future development strategy and business objectives.

And the measures that the company has taken or will take. Please refer to the discussion and analysis on the company's future development

Discuss and analyze the risks that the company may face.

Ten, other

□Applicable √Not applicable

Section 1  Interpretation ......................................................................................................................... 4

Section 2  Company profile and main financial indicators ..................................................................... 9

Section Three  Company Business Overview .......................................................................................... 14

Section 4  Business Discussion and Analysis .......................................................................................... 18

Section 5  Important matters ................................................................................................................... 67

table of Contents

JA506

Section 6    Changes in common shares and shareholder status .................................................. 86

Section 7    Preference shares ......................................................................................................... 93

Section 8    Directors, supervisors, senior managers and employees ............................................ 94

Section 9    Corporate Governance ................................................................................................. 99

Section 10   Corporate Bonds .......................................................................................................... 101

Section 11   Financial Report ........................................................................................................... 102

Section 12   Documents for reference .............................................................................................. 235

3 / 235

JA507

## Section 1 Interpretation

1. Interpretation

In this report, unless the context otherwise requires, the following words have the following meanings:

I. Interpretation of common words

Company or company Refers to Zhejiang Juhua Co., Ltd.

Juhua shares

Controlling shareholder/Juhua Group Refers to Juhua Group Co., Ltd.

Chemical Group

Quhua Fluoride Company Refers to Zhejiang Quhua Fluorine Chemical Co., Ltd., a wholly-owned subsidiary of Juhua

Juxin Fluoride Company Refers to Zhejiang Quzhou Juxin Fluorine Chemical Co., Ltd., a wholly-owned subsidiary of Juhua

Lanxi Fluoride Company Refers to Zhejiang Lanxi Juhua Fluorine Chemical Co., Ltd., a subsidiary of Juhua Co., Ltd.

Liuzhou Refrigeration Company Refers to Zhejiang Quzhou Liuzhou Refrigerant Co., Ltd., a wholly-owned subsidiary of Juhua

Fluorine Chemical Company Refers to Zhejiang Quzhou Fluorine Chemical Co., Ltd., a wholly-owned subsidiary of Juhua

Kaisheng Fluoride Company refers to Zhejiang Kaisheng Fluorine Chemical Co., Ltd.

Kaisheng Electronic Company refers to Zhejiang Kaisheng Electronic Material Co., Ltd.

Jusheng Fluoride refers to Zhejiang Jusheng Fluorine Chemical Co., Ltd., a subsidiary of Juhua Holdings

Quzhou Xinju Company refers to Zhejiang Quzhou Xinju Fluorine Material Co., Ltd., a subsidiary of Juhua Holdings

Boru Electronics refers to Zhejiang Boru Electronic Technology Co., Ltd.

Jusu Chemical Company refers to Zhejiang Quzhou Jusu Chemical Co., Ltd., a wholly-owned subsidiary of Juhua

Juhua Nylon Company refers to Zhejiang Juhua Nylon Co., Ltd., a wholly-owned subsidiary of Juhua Co., Ltd.

Ningbo Juhua Company refers to Ningbo Juhua Chemical Technology Co., Ltd., a wholly-owned subsidiary of Juhua Co., Ltd.

Ningbo Juxie Company refers to Ningbo Juxie Energy Co., Ltd., a wholly-owned subsidiary of Juhua

Ninghua New Material Company refers to Juhua New Materials Co., Ltd. and Juhua Holding Sun Company
Division

Juhang High-tech Company refers to Zhejiang Juhang High-tech Co., Ltd., a subsidiary of Juhua Holdings

Lihui Fuhua Company refers to Zhejiang Lihui Fuhua Chemical Co., Ltd., a subsidiary of Juhua Holdings

Juhua Hong Kong refers to Juhua Trading (Hong Kong) Co., Ltd., a wholly-owned subsidiary of Juhua

Zhnnan Petrochemical Company refers to Zhejiang Juhua Zhnnan Petrochemical Engineering Co., Ltd., a subsidiary of Juhua Holdings

Liuzhou Refrigeration Technology Company Juhua Liuzhou Refrigeration Technology Co., Ltd., Juhua Holding Sun Company
the company

Jinju Chemical Company refers to Zhejiang Jinju Chemical Co., Ltd., a subsidiary of Juhua Holdings

Tianjin Bairui Company refers to Tianjin Bairui Polymer Material Co., Ltd. and Juhua Holding Sun Company

Technology Center Company refers to Zhejiang Juhua Technology Center Co., Ltd., a subsidiary of Juhua Holdings

New Materials Research Institute refers to Zhejiang Juhua New Materials Research Institute Co., Ltd., a subsidiary of Juhua Holdings
the company

Montreal agreement    Refers to the Montreal Convention. It is the United Nations in order to prevent the chlorofluorocarbons in industrial products from sinking the earth.
book.    The oxygen layer continues to cause deterioration and damage, inheriting the general principles of the 1985 Vienna Convention for the Protection of the Ozone Layer.

JA508

The Montreal Protocol refers to the resolution adopted at the 26th Meeting of the Parties to the Montreal Protocol on October 15, 2016.

On September 16, 1987, 26 member states were invited to sign the environment in Montreal, Canada Protection Convention

| | |
|---|---|
| The Final Book Kigali Amendment | Amendment to reduce HFCs. The effective date is January 1, 2019. |
| k/a | Refers to thousand tons/year |
| CDM | Refers to the clean development mechanism and is one of the flexible compliance mechanisms introduced in the Kyoto Protocol. The core content is Allow developed and developing countries to transfer and obtain project-level emission reduction offsets Developing countries implement greenhouse gas emission reduction projects |
| ODS | Refers to ozone depleting substances (Ozone Depleting Substances), destroying the atmospheric ozone layer, harm Chemical substances in human living environment |
| ODS alternatives | Refers to products that replace ozone-depleting substances |
| CFCs | Refers to chlorofluorocarbons, a group of halogenated alkanes composed of chlorine, fluorine, and carbon. At first it was used as a refrigerator to cool Agent, but since it will decompose the ozone layer, from January 1, 1996, chlorofluorocarbons The compound is officially banned |
| Refrigerants | Refers to also known as refrigerant, refrigerant, and refrigerant, which is the medium substance used in various heat engines to complete energy conversion |
| 2. Major Outsourcing raw material | Refers to the following purchased materials |
| VCM | Refers to vinyl chloride, which undergoes addition polymerization under the action of an initiator to produce polyvinyl chloride (PVC) plastic. Also By copolymerizing with certain unsaturated compounds to become a modified variety to improve certain properties |
| fluorite | The main component is calcium fluoride (CaF2), which is an important mineral for extracting fluorine |
| industrial salt | Refers to sodium chloride, white crystal form, its source is mainly seawater, easily soluble in water, glycerin, slightly soluble in ethanol. Liquid ammonia, insoluble in concentrated hydrochloric acid. Industrially used to manufacture soda ash, caustic soda and other chemical products, ore smelting Refining |
| Calcium carbide | Refers to calcium carbide, an important basic chemical raw material, mainly used to produce acetylene gas. Also used in organic synthesis, oxygen Acetylene welding |
| Spermidine | Refers to tetrachloroethane, a colorless liquid with a chloroform-like smell. Non-flammable, toxic and irritating, mainly used for health The raw material for producing trichloroethylene and tetrachloroethylene is also used as a non-flammable solvent for resin, rubber, fat, etc. Used in the production of metal detergents, insecticides, herbicides, etc. |
| coal | Refers to a combustible black or brownish black sedimentary rock, mainly composed of carbon. Together with a different number of others Elemental composition is mainly hydrogen, sulfur, oxygen and nitrogen. Used as an energy resource, mainly burned to produce electricity Power and/or heat, and can also be used for industrial purposes, such as refining metals, or producing fertilizers and many chemical |

2018 Annual Report

4 / 235

Zhejiang Juhua Co., Ltd. 2018 Annual Report

2018 Annual Report

| | |
|---|---|
| benzene | Industrial products<br>Refers to an organic compound, a colorless liquid with a special smell, which can be extracted from coal tar and petroleum, is<br>A variety of raw materials and solvents for the chemical industry. Used as synthetic dyes, synthetic rubber, synthetic resin, synthetic fiber<br>dimension |
| Sulfur concentrate | Refers to pyrite, semiconductor mineral, the main raw material for producing sulfur and sulfuric acid. When Au, Co, Ni is included<br>Take associated elements |

3. The main products refer to the following classified products

1. Fluorine chemical raw materials refer to the following products

| | |
|---|---|
| AHF | Refers to anhydrous hydrogen fluoride, widely used in atomic energy, chemical, petroleum and other industries, is it a strong oxidant<br>Take elemental fluorine, various fluorine refrigerants, inorganic fluorides, basic raw materials of various organic fluorides<br>It is made into hydrofluoric acid for various purposes, used in the manufacture of graphite and catalysis for the manufacture of organic compounds, etc. |
| Methane chloride | Refers to monochloromethane ($CH_3Cl$), dichloromethane ($CH_2Cl_2$), chloroform (also known as chloroform, $CHCl_3$),<br>Carbon tetrachloride ($CCl_4$), the general term for four products, is an important chemical raw material and organic solvent. In the fisher<br>Division, dichloromethane is the raw material of R32, chloroform is the raw material of R22, and carbon tetrachloride is the raw material of PCE<br>material |
| PCE | Refers to tetrachloroethylene, mainly used as cleaning (dry) lotion, solvent and chemical synthesis agent; as raw material intermediate<br>Used to produce HFC-125 |
| TCE | Refers to trichloroethylene, is an important chemical raw material, used in industry for metal cleaning, electronic components cleaning;<br>As a raw material intermediate, it can be used to produce tetrachloroethylene, HFC-125, HFC-134a, etc.; also used for extraction<br>Agents, solvents and low temperature thermal oil media |
| HCFC-142b | Refers to difluorochloroethane, which is mainly used in refrigeration and air-conditioning systems, heat pumps, and various mixed refrigerants in high-temperature environments<br>Important components, and the middle of polymer (plastic) foaming, thermostatic control switch and aviation propellant<br>It is also used as a raw material for PVDF and fluororubber chemicals |
| HCFC-141b | Refers to monofluorodichloroethane, which can replace CFC-11 as a foaming agent for rigid polyurethane foam.<br>CFC-113 is used as a cleaning agent, and it can also be used as a raw material for fluorinated chemicals |
| Methanol | Refers to saturated monohydric alcohol, basic organic chemical raw materials and high-quality fuel. Mainly used in fine chemicals, plastics<br>And other fields, it is used to manufacture various organic products such as formaldehyde, acetic acid, methyl chloride, methylamine, dimethyl dimethyl,<br>It is also one of the important raw materials for pesticides and medicines |

2. Refrigerant

| | |
|---|---|
| CFC-12 | Refers to the following products<br>Refers to dichlorodifluoromethane, mainly used as piston refrigerator, refrigerator, refrigerator, air conditioner, refrigerant |
| HCFCs | Refers to hydrochlorofluorocarbons and is a substitute for a series of refrigerants, mainly including HCFC-22, HCFC-123,<br>HCFC-124, HCFC-141b and HCFC-142b, etc., of which HCFC-22 production accounts for all HCFCs<br>Has a relatively large proportion and is mainly used as a raw material for refrigerants, foaming agents and other chemical products |

5 / 215

JA510

Zhejiang Juhua Co., Ltd. 2018 Annual Report

**HFCs**    Refers to hydrofluorocarbons, which help to avoid ozone-depleting substances, and is often used to replace ozone-depleting substances, such as Chlorofluorocarbons (CFCs) commonly used in refrigerators, air conditioners and insulating foam production

**F22**    Refers to also known as HCFC-22, R22, used for reciprocating compressors, used in household air conditioners, central air conditioners, mobile Air conditioners, heat pump water heaters, dehumidifiers, freeze dryers, cold storages, food freezing equipment, marine systems Refrigeration equipment such as cold equipment, industrial refrigeration, commercial refrigeration, freezing and condensing units, supermarket display cabinets, etc. Etc.; HCFC-22 is also widely used as raw material for Teflon resin and the middle of gas fire extinguishing agent 1211 Body, and physical blowing agent for polymers (plastics). Can also be used as aerosol for pesticides and paint Propellant is the basic raw material for producing various fluorine-containing polymer compounds

**HFC-32**    Refers to also as R32, difluoromethane, is a kind of refrigerant, no damage to the atmospheric ozone layer, and can be used with HFC-125 Mixed into HFC-410a

**HFC-134a**    Refers to also as R134, 1,1,1,2-tetrafluoroethane, is a fluorine refrigerant, mainly used to replace the refrigeration industry CFCs used in, including refrigerators, freezers, water dispensers, car air conditioners, central air conditioners, Wet machine, cold storage, commercial refrigeration, ice water machine, ice cream machine, freezing, condensing unit and other refrigeration equipment, It can also be applied to aerosol propellants, medical aerosols, insecticide propellants, polymers (plastics) Foaming agent, and magnesium alloy protective gas. Widely used as car air conditioner, refrigerator, central air conditioner, Refrigerant for commercial refrigeration and other industries, and can be used in medicine, pesticides, cosmetics, cleaning industry

**HFC-125**    Refers to pentafluoroethane, a kind of refrigerant, which does not damage the ozone layer of the atmosphere, and is mainly used in air conditioning, industrial Used in commercial refrigeration, chiller and other industries to prepare R404A, R407C, R410A, R507 and other refrigeration Agent, used to replace R22, R12, etc. Can also be used as a fire extinguishing agent to replace part of the halon series Gunpowder; HFC-410a mixed with HFC-32 Is a new refrigerant

**HFC-245fa**    Refers to pentafluoropropane, which is a kind of foaming agent, used for polyurethane (PU) development of refrigerators, cold storages and building boards Foam; can also be used as a refrigerant to replace R-123 and R-22 refrigerants in central air conditioners (chillers)

**HFC-410a**    Refers to the mixture of HFC-125 and HFC-32, which is currently the mainstream recognized and recommended by most countries in the world Low temperature environmentally friendly refrigerant, widely used in the initial installation and re-adding process of new refrigeration equipment

6 / 235

2018 Annual Report

**HFO-1234(f)**    Refers to the fourth-generation refrigerant, the Chinese name 2,3,3,3-tetrafluoropropene, is a substitute for the third-generation refrigerant, used in Refrigerator refrigerant, fire extinguishing agent, heat transfer medium, propellant, foaming agent, gas medium, extinguishing agent Bacterial carrier, polymer monomer, particle removal fluid, carrier gas fluid, abrasive polishing agent, replacement drying Agent, electric circulating working fluid and other fields

**3. Fluoropolymer refers to the following products**

**TFE**    Refers to tetrafluoroethylene, used in the manufacture of polytetrafluoroethylene and other fluoroplastics, fluoroether and polyfluoroethylene propylene body

**PTFE**    Refers to polytetrafluoroethylene, a polymer compound formed by polymerization of tetrafluoroethylene, which has excellent comprehensive performance.

JA511

Page 8

7/8/2020

Attachment 2

USCA Case #21-1251    Document #1955329    Filed: 07/15/2022    Page 516 of 561

https://translate.googleusercontent.com/translate_f

7 / 285

Zhejiang Juhua Co., Ltd. 2018 Annual Report

| | |
|---|---|
| ETFE | Refers to the ethylene-tetrafluoroethylene copolymer, which is the strongest fluoroplastic. It maintains the good heat resistance of PTFE.<br>At the same time of chemical resistance and electrical insulation performance, radiation resistance and mechanical properties have been greatly improved.<br>The tensile strength can reach 50MPa, which is close to twice that of PTFE. Mainly used in anti-corrosion lining, house<br>Roofing materials, covering materials for agricultural greenhouses, canopy materials for various shaped buildings, such as stadium stands,<br>Building one roof, casino, various canopies, parking lots, exhibition halls and museums, etc. The material is gold<br>It is a unique strong adhesion characteristic, and its average linear expansion coefficient is close to that of carbon steel. It is a metal<br>Ideal composite material |
| HFP | Refers to hexafluoropropylene, which can be used as a raw material for the preparation of fluorosulfonic acid ion exchange membrane, fluorocarbon oil and polyperfluoroethylene propylene.<br>Can also prepare a variety of fluorine-containing fine chemical products, pharmaceutical intermediates, fire extinguishing agents |
| FEP | Refers to polyperfluoroethylene propylene, has similar characteristics to PTFE, and has a good processing technology for thermoplastics<br>Art, mainly used to make the inner layer of pipes and chemical equipment, the surface layer of the drum and various wires and cables, in<br>Widely used in the production of wire and cable in electronic equipment transmission lines used in high temperature and high frequency, computer<br>Internal connection wires, aerospace wire, and other special purpose installation wires, oil mine logging cables,<br>Submersible motor winding wire, micro motor lead wire, etc. |
| VDF | Refers to vinylidene fluoride, mainly used as a monomer raw material for fluororesin and fluororubber |
| PVDF | Refers to the copolymerization of polyvinylidene fluoride, vinylidene fluoride polymer, or vinylidene fluoride with a small amount of other fluorine-containing vinyl monomers<br>Polymer, which has the characteristics of fluorine resin and general resin, in addition to having good chemical resistance and high resistance<br>In addition to temperature resistance, oxidation resistance, weather resistance, and radiation resistance, it also has piezoelectricity, dielectricity, heat<br>Electricity and other special properties are the second largest products among fluoroplastics, mainly used in petroleum<br>Chemical, electronic and electrical, and fluorocarbon coatings. Is the entire fluid processing system of petrochemical equipment or<br>One of the best materials for lined pumps, valves, pipe fittings, storage tanks and heat exchangers. Be wide<br>It is widely used in the storage and transportation of high-purity chemicals in the semiconductor industry.<br>Porous membranes, gels, separators, etc., are used in lithium secondary batteries, and this use has become an increasing demand for PVDF.<br>One of the fastest growing markets. PVDF is one of the main raw materials for fluorocarbon coatings, which are widely used<br>Used in power stations, airports, highways, high-rise buildings, etc. In addition, PVDF resin can also be used with other trees<br>Fat blending modifications, such as PVDF and ABS resin blending to obtain composite materials, has been widely used in construction,<br>Car decoration, home appliance shell, etc. |
| FKM | Refers to fluororubber, which refers to a synthetic polymer elastomer containing fluorine atoms on the carbon atoms of the main chain or side chain.<br>Aerospace, automotive, petroleum, and household appliances have been widely used, and are among the most advanced industries in national defense.<br>Irreplaceable key materials |
| 4. Fine fluorine | Refers to the following products |
| Scholastic | |

High temperature resistance, corrosion resistance, non-stick, self-lubricating, excellent dielectric properties, very low coefficient of friction, Compressible

Shrinkage or extrusion processing, can also be made into an aqueous dispersion for coating, impregnation or fiber. In the original

Zimeng, national defense, aerospace, electronics, electrical, chemical, machinery, instruments, meters, construction, textile,

Widely used in metal surface treatment, pharmaceutical, medical, textile, food, metallurgy and other fields

JA512

9/290

Zhejiang Juhua Co., Ltd. 2018 Annual Report

## Miscellaneous craft

Wet electronic chemicals refer to the chemical products with the highest requirements on quality and purity among the fine chemical and electronic information industries.

Subdivided fields, including electronic grade hydrochloric acid, electronic grade nitric acid, electronic grade sulfuric acid, electronic grade hydrofluoric acid, etc.

Mainly used in flat panel display, semiconductor and photovoltaic solar fields

**Page 10**

2018 Annual Report

## Section 2 Company Profile and Main Financial Indicators

### 1. Company Information

| The company's Chinese name | Zhejiang Juhua Co., Ltd. |
| The Chinese abbreviation | Juhua shares |
| The company's foreign name | ZHEJIANG JUHUA CO.,LTD |
| Abbreviation of the company's foreign name | ZJJH |
| The company's legal representative | Hu Zhongming |

- 9 - 235

### 2. Contact person and contact information

| | Secretary of the Board | Securities Affairs Representative |
|---|---|---|
| Name | Lin Yanhua | Julie |
| contact address | Zhejiang Juhua, Kecheng District, Quzhou City, Zhejiang Province | Zhejiang Juhua, Kecheng District, Quzhou City, Zhejiang Province |
| | Co., Ltd. | Co., Ltd. |
| phone | 0570-3091758 | 0570-3091704 |
| fax | 0570-3091777 | 0570-3091777 |
| email | gfzq6@juhua.com.cn | zhul6@juhua.com.cn |

### 3. Introduction

| Company registered address | Kecheng District, Quzhou City, Zhejiang Province |
| Postal code of company registered address | 324004 |
| Company office address | Kecheng District, Quzhou City, Zhejiang Province |
| Postal code of company office address | 324004 |
| company website | http://www.jhgf.com.cn |

JA513

USCA Case #21-1251      Document #1955329      Filed: 07/15/2022      Page 518 of 561

Zhejiang Juhua Co., Ltd. 2018 Annual Report

1. The company's main business, business model and industry description during the reporting period

1. Main business: The company is a leading domestic advanced manufacturing base of fluorine chemicals and chlor-alkali chemicals.

The business is in the research and development, production and sales of basic chemical raw materials, food packaging materials, fluorinated chemical raw materials and subsequent products, with chlor-alkalization

Chemical industry, sulfuric acid chemical industry, coal chemical industry, basic fluorine chemical industry and other necessary chemical industry self-supporting system, and on this basis, formed a

Complete fluorinated chemical products including basic supporting raw materials, fluorine refrigerants, organic fluorine monomers, fluoropolymers, fine chemicals, etc.

Industry chain, and involved in the petrochemical industry.

14 / 235

https://translate.googleusercontent.com/translate_f

18/290

JA514

The company has many products, is widely used, and has a high degree of relevance to other industries (the company's main product uses, please read the first section of this report

"Interpretation", Section 4 "Discussion and Analysis of Business Situation"). The company's fluoropolymer materials, food packaging materials and other new chemical materials

The material performance is superior, and its application range continues to expand into wider and deeper fields as technology advances and consumption upgrades.

2. Main business model: mainly R&D-procurement-production-sales model. The company's production management plan approved by the board of directors

Planning, on the basis of a comprehensive budget, the procurement department carries out intensive procurement of raw and auxiliary materials, and each production entity unit prepares production operations

Concretely implement the plan and organize the implementation. The sales department is responsible for product sales.

The company belongs to the chemical raw materials and chemical products manufacturing industry;

Industrial chain, leading domestic product scale technology, of which fluorine refrigerants are in the global leading position), is a means of production, directly

The industry supply cycle, downstream consumption cycle and macro cyclical fluctuations, and the company's product price elasticity and performance elasticity are greater.

Has obvious periodic characteristics. As the company continues to increase the development of advanced chemical materials, the company's industrial chain is complete, and multiple chemical subsidiaries

Industry, and the continuous deepening of supply-side structural reforms, etc., the cyclical volatility of the company's industry has weakened. Company product cost,

Expenses and revenue (product price, sales volume) are the main drivers of company performance.

3. Industry situation: During the reporting period, the world economy has recovered and grown, my country's economy has progressed steadily, and the supply side of the chemical industry has undergone structural changes

The reform has advanced in depth, the safety and environmental pollution prevention policies have become stricter, the competition order of the industry in which the company is located continues to improve, and the prices of majo

As the pivot rises, the industry's concentration will further increase (for details, please read Section 4 "Discussion and Analysis of Business Situation" of this report).

15 /235

JA515

2018 Annual Report

2. Explanation of major changes in the company's main assets during the reporting period

☐ Applicable √Not applicable

3. Analysis of core competitiveness during the reporting period

√Applicable ☐Not applicable

Since the company was established 21 years ago, its business has developed steadily. The company has gradually transformed from a basic chemical industry enterprise to China's leading fluorine chemical industry

The company has become a leading domestic advanced manufacturing base of fluorine chemicals, chlor-alkali chemicals, and coal chemicals.

The characteristics of clustering, basicization, recycling and industrialization have accumulated spatial layout, industrial chain, scale technology, brand, market, investment

Sources, management and other development of the competitive advantages of fluorinated chemicals and new chemical materials, and formed a pattern of industrial collaboration and high-end extension of the industrial chain

With trends.

The company's main product production technology, safety and environmental protection technology and its supporting facilities, production and operation management level are all in line

Industry leadership. Under the environment of deepening supply-side structural reforms and increased safety and environmental governance, the company has a competitive advantage

Continuously strengthen.

(1) Advantages of industrial chain and spatial layout

The company specializes in its main business, and has now developed into a leading enterprise in China's fluorine chemical industry.

The complete fluorinated chemical industry chain including refrigerants, organic fluoromonomers, fluoropolymers, fine chemicals, etc.; in addition, the company is a

The leading VDC-PVDC material supplier in China, the main manufacturer of cyclohexanone-caprolactam, and actively layout the electronic chemical materials industry,

Interwoven with the fluorinated chemical industry chain into a network structure industrial layout, forming a synergistic and intensive development advantage.

The company's production base is mainly concentrated in the company's Quzhou headquarters and the surrounding Ningbo and Jiaxi areas. The core industrial space layout is base;

Clustering and intensive and coordinated development have obvious advantages. Relying on a complete industrial chain, the company adheres to the green and high-end development of the industry, "Base

"Eco-parking, product serialization, and economic recycling" have achieved remarkable results. The establishment of an advantageous industrial cluster with fluorine chemical as the core

The transformation of single product competition to industrial competition and industrial cluster competition is an extension of the company's low-cost operation, low-cost development, and high-end industry

A solid support has been accumulated.

Starting from strategic planning, the company attaches great importance to the industrial chain and spatial layout, with "beautiful giant", "Sansheng (production, living,

"Ecological" giant" construction as a breakthrough, adhere to the principle of circular economy 4R (reduction, reuse, recycling, remanufacturing), complete

The high-end extension of the industrial chain and the creation of a beautiful ecological chemical park provide favorable support for the company's sustainable development under the new situation.

(2) Advantages of scale and technology

The company's leading product scale is domestically leading, the main products are produced using international advanced standards, and the core business of fluorine chemical is in the domestic market.

Leading position (including fluorine refrigerants in the world's leading position), special chlor-alkali new materials in the domestic leading position. As of the end of 2018, the company

The company has 240 authorized patents (including 6 foreign authorized patents).

During the reporting period, the company acquired 100% equity of Zhejiang Juhua Technology Center Co., Ltd. and Zhejiang Juhua New Materials Research Institute Co., Ltd.,

JA516

Attachment 2
7/8/2020

Zhejiang Juhua Co., Ltd. 2018 Annual Report

2    Products and Production

(1). Main business model
√Applicable □Not applicable

Fluorine refrigerants and their substitutes, fluoropolymers, food packaging materials, fluorinated chemical raw materials, fluorinated fine chemicals, petrochemicals

Research, development, production and sales of materials, coal chemicals, basic chemical products and other products.

The main situation of adjusting the business model during the reporting period
□Applicable √Not applicable

(2). Main products
√Applicable □Not applicable

| product | Industry subdivision | Main upstream raw materials, material | Main downstream application area | Main factors affecting price |
|---|---|---|---|---|
| AHF | Fluorine chemical raw material | Fluorite, sulfuric acid, Fluorine | Fluorine chemical, refrigerant | Manufacturing cost, supply and demand |
| Methane chloride, fluoride raw materials | Fluorine chemical raw materials | Chlorine, methanol | Fluorine chemical, refrigerant | Manufacturing cost, supply and demand |
| TCE | Fluorine chemical raw materials | chlorine | Fluorine chemical, refrigerant, cleaning agent | Manufacturing cost, supply and demand status |
| PCE | Fluorine chemical raw material | chlorine | Fluorine chemical, refrigerant, cleaning agent | Manufacturing cost, supply and demand status |
| HCFC-141b | Fluorine | Alkanes, carbon tetrachloride. | Foaming agent, cleaning agent | Manufacturing cost, supply and demand |
| | | Vinylidene chloride, Hydrofluoric acid | | |
| R11, R12 | Refrigerant | AHF, CCL4 | Now mainly used in pharmaceutical | Industrial policy |
| R22 | Refrigerant | AHF, CHCL3 | Air conditioning, fluoride | Manufacturing cost, supply and demand |
| R32 | Refrigerant | AHF, CH2CL2 | Air conditioner, refrigerator, mixed refrigerant | Manufacturing cost, supply and demand |
| HFC-134a | Refrigerant | AHF, TCE | Automotive air conditioning, commercial air conditioning | Manufacturing cost, supply and demand |
| R410A | Refrigerant | R32, R125 | air conditioning refrigerating system | Manufacturing cost, supply and demand |
| R404A | Refrigerant | R134a, R125 | Air conditioning, low and medium temperature refrigeration | Manufacturing cost, supply and demand |
| R507 | Refrigerant | R134a, R125 | Air conditioning, low and medium temperature refrigeration | Manufacturing cost, supply and demand |
| R125 | Refrigerant | AHF, TFE monomer mixed working medium, air conditioning | | Manufacturing cost, supply and demand |
| R245 | Refrigerant | CCL4, VCM | Air conditioner, foaming agent | Manufacturing cost, supply and demand |

47/235

2018 Annual Report

**Page 43**

| | | | | |
|---|---|---|---|---|
| TFE | Fluoropolymer material | R22, water vapor material | Fluorine chemical raw materials | Manufacturing cost, supply and demand |
| PTFE | Fluoropolymer material | TFE monomer material | Chemical anti-corrosion, sealing, anti... Building materials and other industries | Manufacturing cost, supply and demand |
| HFP | Fluoropolymer material | TFE monomer material | New refrigerant, fire extinguishing agent... | Manufacturing cost, supply and demand |
| FEP | Fluoropolymer material | HFP monomer | Fluoropolymers, pharmaceutical intermediates | Manufacturing cost, supply and demand |
| | Fluoropolymer material | HFP monomer | High temperature wire and cable, valve... | Manufacturing cost, supply and demand |
| PVDF | Fluoropolymer material | R142b, VDF material | Other industries | Manufacturing cost, supply and demand |
| | | | Solar backsheet film, water treatment... Wait | Manufacturing cost, supply and demand |
| VDC | Food packaging materials Chloride, VCM | | Fluorine chemical raw materials, food... Raw materials | Manufacturing cost, supply and demand |
| PVDC resin | Food packaging materials VDC, VCM | | Packaging of food, medicine and military... Material processing | Manufacturing cost, supply and demand |
| PVDC membrane | Food packaging materials PVDC resin | | Food and medicine packaging | Manufacturing cost, supply and demand |
| Cyclohexane | Petrochemical material | benzene, H2 | Organic solvents, synthetic caprolactam | Manufacturing cost, supply and demand |
| Caprolactam | Petrochemical material | Cyclohexanone, ammonia And organic materials such as adipic acid | Nylon, engineering plastic, plastic film | Manufacturing cost, supply and demand |
| Methanol | Coal chemical product | Hydrogen peroxide membrane | Fine chemicals, plastics and other fields | Manufacturing cost, supply and demand |
| Liquid ammonia | Coal chemical product | Coal | Manufacturing costs, supply and demand status of raw materials for chemical fertilizers, medicines and pesticides | |
| Industrial sulfuric acid | basic chemical industry | pyrite, water, air | Basic chemical products, fluorinated salt industry | Manufacturing cost, supply and demand |
| Chlorosulfonic acid | Hydrogen chloride and trioxygen in basic chemical industry | Sulfur | Manufacturing cost, supply and demand products | |
| Calcium chloride | Limestone, hydrochloric acid and snow-melting agent, desiccant for basic chemical industry | | Manufacturing cost, supply and demand | |

(3). R&D and innovation

√Applicable □Not applicable

During the reporting period, the company continued to adhere to the combination of self-development and cooperative development, the introduction of technology and the absorption and re-innovation of imported technology

Combining the principles, actively promote technological progress and new product development, and promote the transformation of the main production equipment APC, R&D investment of 496 million

Yuan, implement new product development (small and medium-sized test, etc.), industrialization verification and industrialization, industrial upgrading (process transformation, informatization, intelligence,

Safety and environmental protection improvement, etc.) 110 R&D projects, and through the acquisition of Zhejiang Juhua Technology Center Co., Ltd. and Zhejiang Juhua New Materials Research

Research Institute Co., Ltd. 100% equity, establish and improve independent research and development system, quickly enhance the independent innovation capability of core technology; increase technology storage

Equipment, increase product variety, improve product quality, improve production technology, and enhance the company's core competitiveness and sustainable development capabilities.

Attachment 2
7/8/2020           1,940:        Zhejiang Juhua Co., Ltd. 2018 Annual Report       0.12

Basic situation of major environmental violations during the reporting period

□Applicable √Not applicable

(3). Other information

□Applicable √Not applicable

(Fives)      Investment status analysis

1. Overall analysis of foreign equity investment

√Applicable □Not applicable

In the reporting period, the total amount of foreign equity investment was RMB 141,193,700, an increase of RMB 84,392,200 compared with the previous year, an increase of 6.33%, mainly

The reason is that in 2018, RMB 370 million was invested to increase the capital of Zhejiang Jinju Chemical Co., Ltd., and RMB 380 million was increased to Zhejiang Quzhou Jusu Chemical

Co., Ltd., RMB 252.8488 million acquisition of Zhejiang Juhua Technology Center Co., Ltd., and RMB 18.4120 million acquisition of Juhua Group Finance Co., Ltd.

This is due to the 16% equity of the responsible company.

Unit: ten thousand yuan

| Name of company invested | Main business | Investment method | Investment |
|---|---|---|---|
| Shanghai Aixin Liquefied Gas Limited the company | Wholesale hazardous chemicals, etc. | Capital increase | 433.92 |
| Zhejiang Quzhou Jusu Chemical Co., Ltd. the company | Polyvinylidene chloride resin, polyvinylidene chloride Production and sales of enc emulsion | Capital increase | 38000 |
| Lianzhou refrigerant in Quzhou, Zhejiang has Limited company | Blending and filling of single refrigerant | Capital increase | 6000 |
| Gas USA, Inc. | Production, procurement, mixing, storage, transportation And sales of refrigerants and related products | New | 3,000 |
| Zhejiang Jinju Chemical Co., Ltd. | production and sales of methanol, liquid ammonia | Capital increase | 37000 |
| Tianjin Bairui polymer materials Limited company | Plastic film products, machinery and equipment manufacturing, Processing, sales, etc. | Takeover | 3046 |
| Juhua Group Finance Co., Ltd. | CBRC approved business | Takeover | 18411.2 |

58 / 235

2018 Annual Report

JA519

Zhejiang Juhua Co., Ltd. 2018 Annual Report

**(1) Significant equity investment**

√Applicable □Not applicable

Unit: ten thousand yuan

| Invested company name | Main business | Investment method | Post bet Book capital | Post-investment ratio |
|---|---|---|---|---|
| Zhejiang Juhua Technology Center Co., Ltd. | Research and development of chemical materials, chemical environmental protection, etc. Development, technology transfer, technology consulting services | Takeover | 6,083.67 | 25284.88 |
| the company | Wait for | Takeover | | |
| Zhejiang Juhua New Materials Research and Development Limited company | Development in the development and application of new products and technologies | Takeover | | |
| Zhejiang Quzhou Giant Fluoride Plastics Chemical Co., Ltd. | Production and sales of vinylidene chloride resin, polyvinylidene chloride Capital increase | 38000 | 38000 | 100.00% |
| Zhejiang Jujui Chemical Limited company | Production and sales of methanol, liquid ammonia, etc. | Capital increase | 58250 | 37000 | 64.85% |
| Juhua Group Finance limited liability company | CBRC approved business | Takeover | 80000 | 18412 | 46.00% |
| Zhejiang Juhua Technology Research Center Co., Ltd. | Development and application of new products and technologies | Takeover | 5000 | 25284.88 | 100.00% |

**(2) Material non-equity investments**

√Applicable □Not applicable

unit: yuan

| project name | Opening number | Increase in this period | Transfer to fixed assets Produce | End of period | Engineering progress degree(%) | Project income source |
|---|---|---|---|---|---|---|
| 1000t/a polyvinylidene chloride | 86,934,445. 02 | 84,468.3 | 124,175.03 | 47,227,808. 33 | 85 | [Note] |
| High performance ethylene barrier Materials Phase I | | 99.63 | 6.32 | | [Note] | |

[Note]: The raised funds invested 535 million yuan, and the rest were self-raised funds.

**(3) Financial assets measured at fair value**

√Applicable □Not applicable

unit: yuan

| project name | | | Ending balance | | | |
|---|---|---|---|---|---|---|

Designated financial assets measured at fair value and whose changes are included in the current period's profit and loss

https://translate.googleusercontent.com/translate_f

Attachment 2
7/8/2020

**Page 60**

2018 Annual Report

99 / 235

Zhejiang Juhua Co., Ltd. 2018 Annual Report

(six)　Major asset and equity sale

√Applicable □Not applicable

As approved by the tenth meeting of the seventh session of the board of directors of the company and the first extraordinary general meeting of the company in 2018, the company will be a wholly-owned subsidiary

The 100% equity of Zhejiang Kaisheng Fluorine Chemical Co., Ltd. and the 100% equity of Zhejiang Borui Electronic Technology Co., Ltd. are jointly conducted as a target

Publicly listed for transfer. For details, please refer to the company's "Lin 2017-53 "Juhua shares transfer of equity of wholly-owned subsidiaries and change part of the raised capital investment

Project Announcement, Lin 2018-02 "Juhua Shares 2018 First Extraordinary General Meeting Resolution Announcement" and Lin 2018-08 "Juju

Announcement on the Progress of Equity Transfer of the Wholly-owned Subsidiaries

(Seven)　Analysis of major holding companies

√Applicable □Not applicable

| Subsidiaries and affiliates business | nature | Business Scope | Registered capital | Total assets | Net assets | Net profit |
|---|---|---|---|---|---|---|
| | Secretary of State | | (Ten thousand yuan) | (Ten thousand yuan) | (ten thousand yuan) | (ten thousand yuan) |
| Zhejiang Quhua Fluorine Chemical Co., Ltd. Limited company | manufacturing | Fluorine chemical raw materials and fluorine refrigerant production and sales | 22,359.72 | 197,691.08 | 166,679.27 | 60,659.54 |
| Zhejiang Quzhou Jinxin Fluoride Chemical Co., Ltd. | manufacture | Fluorine refrigerant production and sales | 113,014.10 | 170,750.75 | 151,122.08 | 31,194.45 |
| Zhejiang Quzhou fluorine chemical Engineering co., ltd. | manufacture | Production and sales of hydrofluoric acid | 2,000.00 | 7,990.80 | 16,534.50 | 5,724.32 |
| Zhejiang Quzhou Giant Plastics Engineering co., ltd. | manufacture | Tetrachlorethylene, Trichloroethylene, PVDC Retail for production and sales | 73,000.00 | 90,601.19 | 71,118.48 | 10,073.51 |
| Tianjin Berry Polymer Materials Co., Ltd. | industry | Plastic film products manufacture, production and sales | 1,036.83 | 2,049.11 | 1,652.12 | -35.49 |
| Ningbo Juhua Chemical Engineering Technology Co., Ltd. | Exploration | Chemical raw material production, Sales | 26,251.67 | 121,780.49 | 105,356.78 | 41,019.09 |
| Ningbo Juhua New Material Limited company | industry | Chemical raw materials and products manufacture, production and sales | 5,000.00 | 8,012.62 | 3,374.36 | -237.48 |
| Ningbo Juxie Energy has Limited company | commodity | Chemical raw materials and products trading　Sales | 5,000.00 | 28,063.64 | 11,173.32 | 859.59 |
| Quzhou Juhua Nylon has | industry | Caprolactam, cyclohexanone | | | | |

Zhejiang Juhua Co., Ltd. 2018 Annual Report

| Company | Business type | Description | Registered capital | | | |
|---|---|---|---|---|---|---|
| Limited liability company | manufacturer | West for production and sale | 62,067.00 | 94,316.64 | 80,339.95 | 10,848.15 |
| Zhejiang Jusheng Fluorine Chemical Limited company | manufacturer | Production and sales of fluorine products | USD1,300,094.15 | 22,555.73 | | 7,850.35 |
| Zhejiang Quzhou Xin Ju Fluoride Materials Co., Ltd. | manufacturer | Ultra high molecular weight poly (four Production and sales of 3,000,000.00 | 1,792.82 | 1,404.72 | | -0.48 |
| Zhejiang Borui Electronics Industry Technology Co., Ltd. | manufacturer | Electronic special gas products, etc. Production and sales 72,660.00 | 0.00 | 0.00 | | -979.59 |
| Zhejiang Kaisheng Fluorine Chemical Limited company | manufacturer | Electronic wet chemical production Production and sales 15,000.00 | 0.00 | 0.00 | ~1,179.37 | |
| Zhejiang Kaiheng Electronic Materials Limited company | manufacturer | Electronic grade hydrofluoric acid Production and sales 20,000.00 | 0.00 | 0.00 | | -45.44 |

60 / 235

**Page 61**

2018 Annual Report

| Company | Business type | Description | Registered capital | | | |
|---|---|---|---|---|---|---|
| Materials Co., Ltd. | | Manufacturing and sales | | | | |
| From Quzhou Lianzhou, Zhejiang Refrigerant Co., Ltd. | manufacturer | Mixing and refrigerant charging Production 8,700.00 | 33,185.54 | 17,085.90 | | 2,402.75 |
| Zhejiang Juhua Lianzhou Sanitary Cold Technology Co., Ltd. | manufacturer | Mixing and refrigerant charging Production 6,000.00 | 6,036.00 | 5,941.09 | | -58.91 |
| Zhejiang Juhang High-technology Technology Co., Ltd. | manufacturer | Food additives, etc. Production and sales 1,200.00 | 1,560.83 | 1,454.13 | | 137.48 |
| Zhejiang Lanxi Juhua Fluoride Chemical Co., Ltd. | manufacturer | Fluorine refrigerant production and sales Production and sales 5,000.00 | 15,889.39 | 11,827.25 | | 6,180.62 |
| Juhua Trading (Hong Kong) Limited company | trading | Chemical raw materials and products Sales USD2,000 | 15,426.34 | 11,162.98 | | 868.71 |
| Zhejiang Juhua Inspection Installation Chemical Engineering Co., Ltd. | service | Petrochemical plant and others Industrial equipment installation/maintenance 6,000.00 repair | 17,588.19 | 7,395.15 | | 2,380.92 |
| Zhejiang Lishui Huahua Engineering co., ltd. | commodity trading | Chemical raw materials and products Sales 1,000.00 | 6,371.17 | 5,812.52 | | 3,433.22 |
| Zhejiang Jinju Chemical Industry Limited company | manufacture | Production and sales of ammonia products | 86,251.95 | 67,697.03 | | 1,555.33 |

| Company | Business type | Main products / business | | | |
|---|---|---|---|---|---|
| Zhejiang Juhua Technologies Heart Limited | New products, new technologies Development and applied research, service | The production of scientific research products Production and sales, technical consulting Inquiry and service | 13,626.31 | 7,652.83 | 400.54 |
| Zhejiang Juhua New Material technology Research Institute Co., Ltd. | service | Production and sales of chemical materials Sales, technology development technology Technical transfer, technical consultation | 4,588.40 | 4,299.44 | 240.59 |
| Juhua Group Finance Limited liability company | financial service | Operating the Chinese banking industry Supervision and Management Committee In accordance with relevant regulations Political regulations and other regulations Approved business | 893,559.82 106,547.61 | | 6,366.36 |
| Shanshan New Material (Quzhou State) Co., Ltd. | Production manufacture | Production of lithium hexafluorophosphate, | 12,000.00 | 68,538.77 10,433.29 -6,928.25 | |
| Shanghai Juhua Industrial Development Exhibition Co., Ltd. | trading | Sales of chemical raw materials and products | 7,000.00 | 17,790.27 | 6,512.05 | 368.36 |
| Juhua Zhao, Quzhou, Zhejiang And electronic chemical materials Limited company | Sales manufacture | Electronic chemical production industry | 4,400.00 | 4,637.19 | 4,386.62 | 259.53 |
| Quzhou Fuhuihua | industry | Production and sales of heptafluoropropane | 1200.00 817.63 | 1,909.46 | 383.40 |
| Industrial Technology Co., Ltd. | Manufacture sale | Investment management | | | |
| Zhejiang Silicon Valley Giant Investment Capital Management Co., Ltd. | Industry (except securities, period investment and Goods), equity investment and Related consulting services. | | 600.00 | 439.68 | 388.82 | -49.76 |
| Quzhou Juhuaihuachenwu Flow Co., Ltd. | Warehousing, storage, goods | | 2,000.00 | 104.08 -1,479.55 | -0.02 |
| Zhejiang Juhua shares have Limited company Lanxi pesticide plant | industry Pesticide production manufacture | | 2,688.00 | 9.40 -9,368.56 | -0.14 |

Page 62

2018 Annual Report

44 / 235

Zhejiang Juhua Co., Ltd. 2018 Annual Report

| | | | Zhengxin Technology Co., Ltd. | |
|---|---|---|---|---|
| the company | Electronic chemical materials, chemical products Production and sales of industrial products | | 111,034.18 | 100,733.58 | -789.91 |
| Shanghai Aixin LPG Body Co., Ltd. | Sale Hazardous chemicals, chemicals industry Product wholesale, goods and commodity trading | 668.00 | 8,782.39 | 1,852.68 | 1,048.65 |
| Gea USA Inc | Technology Import and Export commodity/chemical raw materials and products trading    Sales | USD294.17 | 41,661.58 | 19,574.19 | -595.87 |

Note: The company holds Zhejiang Borui Electronic Technology Co., Ltd., Zhejiang Kaisheng Fluorine Chemical Co., Ltd. and its subsidiary Zhejiang Kaihong Electronic Materials

The shares of Material Co., Ltd. were all transferred to Zhengxin Technology Co., Ltd. in April 2018.

Explanation of the impact of the net profit derived from a single subsidiary, or the investment income of a single shareholding company on the company's net profit of more than 10%:

| Subsidiaries and associated companies | Operating income (ten thousand yuan) | Operating profit (ten thousand yuan) | Net profit (ten thousand yuan) |
|---|---|---|---|
| Zhejiang Quhua Fluorine Chemical Co., Ltd. | 356,047.49 | 67,074.65 | 60,659.54 |
| Zhejiang Quzhou Juxin Fluorine Chemical Co., Ltd. | 214,217.99 | 40,423.18 | 31,194.45 |
| Ningbo Juhua Chemical Technology Co., Ltd. | 211,822.82 | 48,953.84 | 41,019.09 |

In 2018, the company's 3 subsidiaries and associated companies had a performance change of more than 30%, and had a significant impact on the company's consolidated operating performance.

The performance changes and reasons are as follows:

| company name | Net profit (ten thousand yuan) | | | Reason for change |
|---|---|---|---|---|
| | 2018 | 2017 | Variation% | |
| Zhejiang Quhua Fluorine Chemical Co., Ltd. | 60,659.54 | 28,674.83 | 111.54 | Product price increase and production and sales Volume increase |
| Zhejiang Quzhou Juxin Fluorine Chemical Co., Ltd. | 31,194.45 | 22,100.97 | 41.15 | Product price increase and production and sales Volume increase |
| Ningbo Juhua Chemical Technology Co., Ltd. | 41,019.09 | 21,382.41 | 91.84 | Product price increase and production and sales Volume increase |

JA524

Zhejiang Juhua Co., Ltd. 2018 Annual Report

(Eight)    The situation of the structured subject controlled by the company.
□Applicable √Not applicable

3. The company's discussion and analysis on the company's future development

(One)    Industry pattern and trends
√Applicable □Not applicable

For details, please refer to "Industry Basis" in "Analysis of Operating Information in Chemical Industry" in Section 4 "Discussion and Analysis of Business Situation" of this report.

(two)    Company development strategy
√Applicable □Not applicable

1. Company development strategy

Company Vision: To be a respected enterprise.

Company mission: to become a first-class enterprise.

The company's development strategy: adhere to scientific development, open development, integrated development, industrial management and capital management are equally important, management, technology

Combining technology, market, and mechanism innovation, with fluorine chemical as the core, new materials, new environmental protection, new energy, and new uses as industrial transformation

Upgrading direction, give full play to the company's accumulated competitive advantages, accelerate innovation-driven, transformation and upgrading, and realize the characteristic industrialization of industrial bases,

Integration of the industrial chain, high-end products, serialization, high-quality, refined, differentiated, and complex, making the company a domestic

The leader of fluorine chemical industry, the domestic first-class chemical new material supplier and service provider.

2. Business unit strategy

(1) Fluorine chemical development strategy

**Fluorine chemical is the company's core main business,** insisting on the development path of high-end, specialization, internationalization, and technology leadership, fluorine polymerization

Substances, ODS substitutes, fluorine-containing electronic chemicals, and fluorine-containing fine chemicals, coordinate development, give priority to the development of fluorine materials, and further enrich fluorine

Connotation of the chemical industry chain, forming an industrial pattern of large-scale basic raw materials, serialization of intermediate products, and refinement and functionalization of downstream products,

Initially realize the transformation of fluorine chemical to high-end, materialization and specialization, build the company into the most comprehensive fluorine chemical in China

Enterprises, enhance and establish the leadership, initiative and control in the field of domestic fluoride industry, achieve sustainable development, and make the company a country

The world's first-class fluoride chemical enterprises lay a solid industrial foundation.

(2) Development strategy of chlor-alkali sector

Adhere to the linkage of fluorine and chlorine, take the high-tech industry as the leading factor, support and promote the development of the company's fluorine chemical industry, further strengthen the production of chlor-alkali

The industry has advantages in technology, market, brand, product structure, etc., rely on technology, management and system innovation to cultivate independent research and development capabilities and nuclear

Focus on competitiveness, build a new chlor-alkali industry chain centered on new chlor-alkali materials and special chlorine-containing chemicals;

Ningbo base's port advantage, accelerate the effective integration of the company's local port and Ningbo base resources, and strengthen the development of new varieties and new technology products.

JA525

**Page 124**

2018 Annual Report

123 / 258

3. The basic situation of the company

1. Company Overview

√Applicable ☐Not applicable

Zhejiang Juhua Co., Ltd. (hereinafter referred to as the company or the company) approved by the Zhejiang Provincial People's Government, Zhejiang Zhengdi [1998] No. 68,

Initiated and established by Juhua Group Co., Ltd., registered on June 17, 1998 with Zhejiang Provincial Administration for Industry and Commerce

In Quzhou City, Zhejiang Province. The company now holds a business license with a unified social credit code of 91330007042945534C and registered capital

2,745,166,103.00 yuan, the total number of shares is 2,745,166,103 shares (each par value is 1 yuan). Among them, the circulation of limited sales conditions

Shares: 86,746,046 A-shares; 2,658,420,057 A-shares with unlimited sales. The company's stock was listed in 1998

Listed on the Shanghai Stock Exchange on June 26, 2014).

The company belongs to the chemical industry. The main business activities are research and development, production and sales of chemical raw materials and products, food additives,

Cylinder inspection, provide related technical services, consultation and technology transfer, and operate import and export business. The main products are: refrigerant, petrochemical

Materials, fluorinated chemical raw materials, fluoropolymer materials, food packaging materials, fluorinated fine chemicals, basic chemical products and others.

The financial statements were approved by the company on April 17, 2019, and the 24th meeting of the seventh board of directors approved the report.

2. Scope of consolidated financial statements

√Applicable ☐Not applicable

The company will Zhejiang Juhong High-tech Co., Ltd. (hereinafter referred to as Juhong High-tech Company), Zhejiang Lanxi Juhua Fluorine Chemical Co., Ltd.

Division (hereinafter referred to as Lanxi Fluoride Company), Zhejiang Quhua Fluorine Chemical Co., Ltd. (hereinafter referred to as Quhua Fluoride Company), Zhejiang Quzhou Ju

Plastic Chemical Co., Ltd. (hereinafter referred to as Juju Chemical Company), Ningbo Juhua Chemical Technology Co., Ltd. (hereinafter referred to as Ningbo Juhua Company),

Zhejiang Quzhou Juxin Fluorine Chemical Co., Ltd. (hereinafter referred to as Juxin Fluoride Company), Ningbo Juxie Energy Co., Ltd. (hereinafter referred to as Ningbo)

Juxie Company), Zhejiang Quzhou Xinju Fluorine Material Co., Ltd. (hereinafter referred to as Quzhou Xinju Company), Juhua Trading (Hong Kong) Co., Ltd.

Division (hereinafter referred to as Juhua Hong Kong Company), Zhejiang Jusheng Fluorine Chemical Co., Ltd. (hereinafter referred to as Jusheng Fluorine Company), Quzhou Juhuajin

Co., Ltd. (hereinafter referred to as Juhua Nylon Company), Zhejiang Quzhou Lianzhou Refrigerant Co., Ltd. (hereinafter referred to as Lianzhou Refrigeration Company)

Division, Ningbo Juhua New Materials Co., Ltd. (hereinafter referred to as Ningbo New Materials Co., Ltd.), Zhejiang Quzhou Fluorine New Chemical Co., Ltd. (hereinafter referred to as

Referred to as Fuxin Chemical Company), Zhejiang Juhua Jian'an Petrochemical Engineering Co., Ltd. (hereinafter referred to as Jian'an Petrochemical Company), Zhejiang Lishui Fuhua

JA526

Zhejiang Juhua Co., Ltd. 2018 Annual Report

Chemical Co., Ltd. (hereinafter referred to as Lishui Fuhua Company), Zhejiang Juhua New Materials Research Institute Co., Ltd. (hereinafter referred to as the Research Institute),

Zhejiang Jinju Chemical Co., Ltd. (hereinafter referred to as Jinju Chemical Company), Zhejiang Juhua Technology Center Co., Ltd. (hereinafter referred to as technology in

Xin), Tianjin Bairui Polymer Material Co., Ltd. (hereinafter referred to as Tianjin Bairui Company) and Zhengzhou Juhua Liuzhou Refrigeration Technology Co., Ltd

(Hereinafter referred to as Juhua Liuzhou Company) and 21 other Sun subsidiaries are included in the scope of the consolidated financial statements of this period.

Note the change in the scope of consolidation and the description of equity in other entities.

Fourth, the basis for the preparation of financial statements

1. Basis of preparation

The company's financial statements are prepared on the basis of continuous operations.

2018 Annual Report

124 / 235

**Page 125**

2. Continue to operate

√Applicable □Not applicable

The company has no events or circumstances that have caused significant doubts about the ability to continue operations within 12 months from the end of the reporting period.

V. Important accounting policies and accounting estimates

Specific accounting policies and accounting estimation tips:

√Applicable □Not applicable

Important note: The company accrues the provision for bad debts of receivables, depreciation of fixed assets, and intangibles based on actual production and operation characteristics

Specific accounting policies and accounting estimates have been formulated for transactions or events such as asset amortization and revenue recognition.

1. Statement of compliance with corporate accounting standards

The financial statements prepared by the company comply with the requirements of enterprise accounting standards, and truly and completely reflect the company's financial status and operations

Achievements, changes in shareholders' equity and cash flow and other relevant information.

2. Accounting period

The company's fiscal year starts on January 1 and ends on December 31 of the Gregorian calendar.

3. Business cycle

√Applicable □Not applicable

The business cycle of the company's business is relatively short, with 12 months as the standard for dividing the liquidity of assets and liabilities.

JA527

5. The continuous third-level of fair value measurement project, the adjustment information and unobservable parameter sensitivity between the opening and closing book value of the period

Sex analysis

□Applicable √Not applicable

6. For the continuous fair value measurement project, if there is a conversion between all levels during the period, the reason for the conversion and the policy to determine the time of conversion

Policy

□Applicable √Not applicable

7. Changes in valuation techniques and the reasons for the changes during the period

□Applicable √Not applicable

8. Fair value of financial assets and financial liabilities not measured at fair value

□Applicable √Not applicable

9. Others

□Applicable √Not applicable

12. Related parties and related transactions

1. The parent company of the company

√Applicable □Not applicable

2018 Annual Report

Unit: Ten Thousand Yuan Currency: RMB

| Parent company name | Registration | Nature of business | Registered capital | Parent company Shareholding ratio (%) | Parent company to the enterprise Of voting rights (%) |
|---|---|---|---|---|---|
| Juhua Group has | Hangzhou | Manufacturing, business | 400,000.00 | 51.91% | 54.09% |
| Limited company | | Wait | | | |

Description of the parent company of the company

As of December 31, 2018, Juhua Group Co., Ltd. directly held 38.65% of the company's shares, and another 13.26%

The shares are deposited as the trust and guarantee property of 17 Juhua EB in Juhua Group-Zhecheng Securities-17 Juhua EB Guarantee and Trust Property

Account (with Zhecheng Securities, the trustee of 17 Juhua EB as the nominal holder), through its wholly-owned subsidiary Zhejiang Juhua Investment Co., Ltd.

208 / 235

JA528

The company holds 2.18% of the company's shares, and the total voting right ratio is 54.09%.
The ultimate controlling party of this enterprise is the State-owned Assets Supervision and Administration Commission of Zhejiang Provincial People's Government

other instructions:

no

2. The company's subsidiaries

For details of the company's subsidiaries, see the note

√Applicable □Not applicable

For details, please refer to the explanation of the equity in other entities in the notes to the financial statements.

## 3. The company's joint ventures and associated enterprises

Please refer to the notes for the important joint ventures or associates of the company

□Applicable √Not applicable

Other joint ventures or associated enterprises that have had a related party transaction with the company in the current period, or have a balance with the company in the previous period

details as following

√Applicable □Not applicable

| Name of joint venture or joint venture | Relationship with the company |
|---|---|
| IGAS USA, INC | The company's associates |
| Shanghai Aixin Liquefied Gas Co., Ltd. | The company's associates |
| Zhejiang Quzhou Juhua Showa Electronic Chemical Materials Co., Ltd. | The company's associates |
| Division | |
| Juhua Group Finance Co., Ltd. | The company's associates |
| Zhejiang Jinju Chemical Co., Ltd. | [Note 1] |
| Zhejiang Borui Electronic Technology Co., Ltd. | [Note 2] |
| Zhejiang Kaisheng Fluorine Chemical Co., Ltd. | [Note 2] |
| Zhejiang Kaiheng Electronic Material Co., Ltd. | [Note 2] |

other instructions

√Applicable □Not applicable

[Note 1]: In September 2018, Zhejiang Jinju Chemical Co., Ltd. was changed from an associate to a subsidiary due to the company's capital increase.

[Note 2]: In April 2018, Zhejiang Borui Electronic Technology Co., Ltd., Zhejiang Kaisheng Fluorine Chemical Co., Ltd. and its subsidiaries Zhejiang

2018 Annual Report

209/238

JA529

Attachment 2
7/8/2020

Zhejiang Juhua Co., Ltd. 2018 Annual Report

Jiang Kaiheng Electronic Materials Co., Ltd. was changed from a subsidiary of the company to a subsidiary of an associated company due to the equity transfer.

4. The situation of other related parties

√Applicable □Not applicable

| Name of other related parties | Relationship between other related parties and the company |
|---|---|
| Juhua Group Corporation Automobile Transportation Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Juhua Equipment Manufacturing Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Juhua Chemical Mining Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Juhua Chemical Materials Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Juhua Group Company Xinglua Industrial Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Juhua Calcium Carbide Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Juhua Logistics Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Gerui New Materials Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Juhua Xinlian Chemical Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Quzhou Fluorosilicone Technology Research Institute | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang South Engineering Construction Supervision Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Juhua Holdings Limited | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Kejian Safety and Health Consulting Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Juhua Group Import and Export Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Juhua Hanzhong New Material Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Juhua Group Corporation Engineering Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Qingke Environmental Protection Technology Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Huajiang Technology Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Quzhou Jutai Building Material Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Juhua Group Pharmaceutical Factory | Also controlled by Juhua Group Co., Ltd. |
| Quzhou Juhua Renewable Resources Technology Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Quzhou Qingtai Environmental Engineering Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Quzhou Qingyuan Biological Technology Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Juhua New Materials Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Zhejiang Juxing Optical Material Co., Ltd. | Also controlled by Juhua Group Co., Ltd. |
| Quzhou Chemical Industry Company Shanghai Debang Company | Also controlled by Juhua Group Co., Ltd. |
| Lanxi Pesticide Factory | Settlement of unregistered companies |
| Lanxi Shuangfeng Jidong Water Supply Co., Ltd. | Subsidiary company |
| Juhua Group Company Shangyu Joint-stock Company | Shareholding company of Juhua Group Co., Ltd. |

https://translate.googleusercontent.com/translate_f

Zhejiang Feida Environmental Protection Technology Co...controlled by Juhua Group Co., Ltd.

JA530

Attachment 2

7/8/2020

Zhejiang Juhua Co., Ltd. 2018 Annual Report

other instructions

no

## 5. Related party transactions

(1). Connected transactions for the purchase and sale of goods, provision and acceptance of labor services

Procurement of goods / acceptance of labor services

√Applicable □Not applicable

| Related party | Related transaction content | Current amount | Unit Currency: RMB Amount in the previous period |
| --- | --- | --- | --- |
| Juhua Group Co., Ltd. | Materials, hydropower, etc. | 2,362,818,813.21 | 2,031,697,204.12 |
| Zhejiang Jinju Chemical Co., Ltd. | Methanol, nitrogen, etc. | 515,518,759.46 | 553,853,481.63 |
| Juhua Group Corporation Automobile Transportation Co., Ltd. | freight, repair services, etc. | 67,506,828.10 | 42,237,961,986.10 36,726,486.37 |
| Zhejiang Juhua Equipment Manufacturing Co., Ltd. | Engineering materials, spare parts, etc. | 65,446,333.35 | 66,284,099.72 |
| Zhejiang Juhua Chemical Mining Co., Ltd. | Fluorite mine | | 14,618,386.65 |
| Zhejiang Juhua Chemical Materials Co., Ltd. | Engineering materials, color expansion, etc. | 43,315.13 | 43,537,992.92 |
| Juhua Group Company Xinghua Industrial Co., Ltd. | Greening fee, meal fee, etc. | 36,646,253.99 | 29,794,467.80 |
| Zhejiang Juhua Calcium Carbide Co., Ltd. | High-purity nitrogen, calcium carbide, etc. | 24,455,011.13 | 3,860,973.74 |
| Zhejiang Juhua Logistics Co., Ltd. | Freight, warehousing services, etc. | 5,498,919.83 | 14,506,069.67 |
| Zhejiang Gersi New Materials Co., Ltd. | Steel lined PTFE straight pipe, etc. | 5,201,834.21 | 166,337.83 |
| Shanghai Juhua Industrial Development Co., Ltd. | alumina coal, technical consulting services | 3,600,696.85 | 60,613,234.82 |
| Zhejiang Juhua Xinlian Chemical Co., Ltd. | Woven bags | 3,692,695.79 | 1,797,659.25 |
| Quzhou Fluorosilicone Technology Research Institute | consulting service | 3,527,097.08 | 2,443,138.91 |
| Supervision service of Zhejiang South Engineering Construction Supervision Co., Ltd. | | 13,889,502.01 | |
| Juhua Holdings Limited | consultation service | 1,547,169.82 | |
| Zhejiang Borui Electronic Technology Co., Ltd. | Hydrogen chloride | 1,497,452.00 | |
| Zhejiang Kejian Safety & Health Consulting Co., Ltd. | Hazard Prevention Evaluation Service | 859,682.64 | |
| Shandon New Materials (Quzhou) Co., Ltd. | lithium hexafluorophosphate | 436,068.38 | 670,016.56 |
| Zhejiang Kaisheng Fluorine Chemical Co., Ltd. | Sulfuric acid, hydrochloric acid, etc. | 354,128.21 | 2,564.11 |
| Zhejiang Juhua Group Import and Export Co., Ltd. | chemical raw materials | 309,860.68 | 3,802,921.92 |
| Zhejiang Juhua Jiancheng New Materials Co., Ltd. | chemical raw materials | 287,145.21 | 1,078,888.89 |
| Juhua Group Corporation Engineering Co., Ltd. | Repair costs, etc. | 159,262.04 | 40,264,778.00 |
| Zhejiang Qingke Environmental Protection Technology Co., Ltd. | Services | 61,320.76 | |
| Zhejiang Huqiang Technology Co., Ltd. | Technical testing services | 57,603.38 | 2,564.11 |
| Zhejiang Quzhou Jutai Building Material Co., Ltd. | Building | 53,070.32 | 1,149,260.01 |
| Zhejiang Engineering Design Co., Ltd. | Technical Advisory Services | 37,735.85 | |
| Juhua Group Pharmaceutical Factory | Warehousing Services | 8,490.57 | 3,896,154.70 |
| Zhejiang Quzhou Fuhai Chemical Technology Co., Ltd. | anhydrous hydrofluoric acid | | 177,366.99 |
| Lanxi Shuangfeng Julong Water Supply Co., Ltd. | utilities | | |
| total | | 3,417,201,855.64 | 3,148,312,460.71 |

| Sales of goods / provision of services √Applicable □Not applicable | Related party | Related transaction content | Current amount | Unit Currency: RMB Amount in the previous period |
| --- | --- | --- | --- | --- |
| IGAS USA, INC. | Material sales | | 233,708,704.68 | |

JA531

**Page 212**

2H / 235

2018 Annual Report

| Company | Description | Value 1 | Value 2 |
|---|---|---|---|
| Juhua Group Corporation Engineering Co., Ltd. | Sales, etc. | 399,206.48 | 551,017.54 |
| Juhua Group Company Automobile Transportation Co., Ltd. | Material Sales | 177,004.39 | 165,667.28 |
| Juhua Group Corporation Xinghua Industrial Co., Ltd. | | 1,394,312.54 | 1,740,054.66 |
| Juhua Group Pharmaceutical Factory | Electricity, steam, nitrogen, etc. | 1,004,416.53 | 1,007,202.86 |
| Juhua Group Co., Ltd. | Technical service, inspection and maintenance | 100,357.09 | 33,995,373.81 |
| Quzhou Fluorosilicone Technology Research Institute etc. | | | 251,526.45 |
| Quzhou Juhua Renewable Resources Technology Co., Ltd. scrap steel, etc. | | 1,421,333.35 | 1,428,311.96 |
| Quzhou Qingxi Environmental Engineering Co., Ltd. material sales, inspection and maintenance | | 48,907.25 2,101,729.65 | 3,976,621.77 |
| Shanshan New Materials (Quzhou) Co., Ltd. material sales, inspection and maintenance | | 6,030,565.26 | 7,063,043.38 |
| Shanghai Aixin Liquefied Gas Co., Ltd. | Sales of refrigerants and other material | | 3,999,225.04 |
| Shanghai Juhua Industrial Development Co., Ltd. | Sales of materials such as methyl chloride | 5,465,529.10 | 50,324,955.65 |
| Zhejiang Borui Electronic Technology Co., Ltd. | Sales of materials such as hydrogen chloride | | 3,002,288.01 |
| Zhejiang Huajiang Technology Co., Ltd. | Biological filter material | | 684,753.55 |
| Zhejiang Juhua New Materials Co., Ltd. liquid ammonia and other materials sales | | 34,005,675.21 | 14,399,789.15 |
| Zhejiang Jinju Chemical Co., Ltd. | Material sales, inspection and maintenance | 26,303,767.99 | 8,595,232.07 |
| Zhejiang Juhua Calcium Carbide Co., Ltd. | Inspection and maintenance | | 1,189,678.00 |
| Hexafluoropropylene and other materials sales of Zhejiang Juhua Hanzhong New Materials Co., Ltd. | | 3,042,614,033.81 23,566,770.17 | 3,971,863.25 |
| Zhejiang Juhua Chemical Materials Co., Ltd. | Anhydrous calcium chloride | 3,405.93 | 5,555.47 |
| Zhejiang Juhua Chemical Mining Co., Ltd. Calcium carbide slag | | | 68,375.94 |
| Zhejiang Juhua Import and Export Co., Ltd. industrial salt, ammonium sulfate | | 3,780,662.29 | 5,156,567.36 |
| Zhejiang Juhua Logistics Co., Ltd. | Inspection and maintenance | 112,043.85 | |
| Zhejiang Juhua Equipment Manufacturing Co., Ltd. | Inspection and maintenance | 988,962.44 | 8,497,216.57 |
| Zhejiang Juhua Xinlian Chemical Co., Ltd. Hydrofluoric acid treatment fee | | 3,687,13 4,251,309.90 | 53,929,402.81 |
| Zhejiang Kaifeng Electronic Material Co., Ltd. anhydrous hydrofluoric acid, etc. | | | 16,171,924.70 |
| Zhejiang Kaisheng Fluorine Chemical Co., Ltd. anhydrous hydrofluoric acid, etc. | | | 2,612,07 |
| Zhejiang Qingke Environmental Protection Technology Co., Ltd. dish-keeping film | | | 195,088,125.92 |
| Zhejiang Quzhou Fuhui Chemical Technology Co., Ltd. material sales, labor costs, etc. | | 130,667,667.70 | |
| Zhejiang Gerui New Materials Co., Ltd. | Material sales | 29,617,824.22 | 17,918,704.70 |
| Zhejiang Quzhou Juhua Showa Electronic Materials Co., Ltd. electricity and steam; electricity and steam Limited company | | 6,078,826.91 | 15,971,235.46 |
| Zhejiang Quzhou Jutai Building Material Co., Ltd. gypsum, etc. | | 4,378,763.88 | 4,156,026.15 |
| total | | 1,007,553,319.37 | 395,984,970.73 |

Description of related party transactions for the purchase and sale of goods, provision and acceptance of labor services

☐ Applicable ☑Not applicable

JA532

Attachment 2

7/8/2020

Zhejiang Juhua Co., Ltd. 2018 Annual Report

(2). Related commissioned management/contracting and entrusted management/outsourcing

The company's entrusted management/contracting situation table:

√Applicable □Not applicable

Client/outsourcing Trustee/Contractor/Trusted/Contracted Contract

Unit: Currency: RMB

| Party name | Party name | Type of production | Start date | Expiration date | Package revenue is planned according to<br>according to | Escrow revenue/collection<br>Contract<br>confirmation<br>income<br>the same | Contract<br>confirmation |
|---|---|---|---|---|---|---|---|
| Juhua Group Limited the company | Other assets<br>tube | 2016 12 | December 2018 600,000/year (including tax) | 566,037.74 | | | |
| Juhua Group Limited the company | Other assets<br>tube | January 1<br>2017 12 | December 31<br>2019 12 | 10,000/month (including tax) 113,207.54 | | | |
| the company | | January 1 | December 31 | | | | |

Description of related hosting/contracting

√Applicable □Not applicable

(1) Juhua Group Co., Ltd. entrusted the company to manage Zhejiang Juhua Xinlian Chemical Co., Ltd. and Juhua Group Company's plasticizing plant

The daily production and operation activities of the enterprise are entrusted from January 1, 2016 to December 31, 2018.

After the expiry of the contract, if the parties to the contract do not raise any objection, the entrusted management period is automatically extended by 1 year, and the entrusted management fee is 600,000 yuan/year (including tax). In the current period, 600,000 yuan (including tax) for the custody fee was received, and 600,000 yuan (including tax) was received in the same period last year.

(2) Juhua Group Co., Ltd. entrusted the company to manage the daily production and operation activities of Zhejiang Juhua Carbide Co., Ltd.

From January 1, 2017 to December 31, 2019, after the expiration of the entrusted management period, if the parties to the contract do not raise an objection, the entrust management period is automatically extended for 1 year, and the standard of entrusted management fees is 10,000/month (including tax), which is settled every six months. This period has received

The management fee is 120,000 yuan (including tax).

(3). Related lease

The company as the lessor:

√Applicable □Not applicable

Unit: Currency: RMB

| Tenant name | Lease assets<br>class | Rental income recognized in the current period | Rental income recognized in the previous period |
|---|---|---|---|

The company entrusted management / outsourcing situation table:

□Applicable √Not applicable

Related management/outsourcing information

□Applicable √Not applicable

**Page 213**

212 / 235

2018 Annual Report

https://translate.googleusercontent.com/translate_f

JA533

Attachment 2
7/8/2020

Zhejiang Juhua Co., Ltd. 2018 Annual Report

Zhejiang Quzhou Juhua Showa Electronic Chemicals Materials    380,932.38
Limited company
Industrial Land of Zhejiang Quzhou Fuhai Chemical Technology Co., Ltd.    161,349.04

The company as the lessee:
√Applicable □Not applicable

Unit: Currency: RMB

| Lessor name | Types of leased assets | The lease fee confirmed in the current period | The lease fee confirmed in the previous period |
| --- | --- | --- | --- |
| Juhua Group Pharmaceutical Factory | warehouse | 25,471.70 | 16,216.22 |
| Juhua Group Co., Ltd. | Plant | 3,589,889.36 | 1,373,312.87 |
| Juhua Group Co., Ltd. | Office building | 378,300.00 | 100,000.00 |
| Zhejiang Juhua Calcium Carbide Co., Ltd. | land | 232,262.39 | 217,825.23 |
| Zhejiang Juhua Logistics Co., Ltd. | warehouse | 7,727.27 | 7,657.66 |
| Warehouse of Zhejiang Juxing Optical Material Co., Ltd. | | 193,200.00 | 193,200.00 |
| Warehouse of Zhejiang Juhua Building Materials Co., Ltd. | | 363,591.15 | 78,120.00 |
| Factory Building of Zhejiang Juhua Equipment Manufacturing Co., Ltd. | | 1,960,000.00 | |
| Juhua Group Corporation Engineering Co., Ltd. | Equipment | 316,012.07 | |
| total | | 7,066,453.94 | 1,886,331.98 |

Related lease description
□Applicable √Not applicable

(4). Related guarantees

The company as the guarantor
□Applicable √Not applicable

The company as the guaranteed party
√Applicable □Not applicable

Unit: Currency: RMB

| guarantor | Guarantee amount | Guarantee start date | Guarantee maturity date | Whether the guarantee has been fulfilled |
| --- | --- | --- | --- | --- |
| Juhua Group Co., Ltd. | 29,900,000.00 | 2018-6-21 | 2019-5-24 | no | complete |
| Juhua Group Co., Ltd. | 20,000,000.00 | 2018-3-15 | 2019-3-14 | no | |

Description of related guarantee
□Applicable √Not applicable

Page 214

2018 Annual Report

213 / 235

JA534

Zhejiang Juhua Co., Ltd. 2018 Annual Report

(5). Fund borrowing of related parties

√Applicable □Not applicable

Unit: Currency: RMB

| Related party | Borrowing amount | Start date | expiry date | Explanation |
|---|---|---|---|---|
| **Break in** | | | | |
| Lanxi City ShuangFeng Giant Dragon Water Co., Ltd. | 830,04 | | | ShuangFeng Dragon has occupied the funds in All returned in January 2018 |
| Juhua Group Co., Ltd. 53,330,000.00 | | | | Jinju Chemical Company is controlled by the company Before the merger, Xianghua Group Co., Ltd. Loan from the company 53,330,000.00 Yuan, the company's holding merger Jinjuhua Transferred into the industrial company. |
| **Take out** | | | | |

(6). Asset transfer and debt restructuring of related parties

√Applicable □Not applicable

Unit: Currency: RMB

| Related party | Related transaction content | Current amount | Amount in the previous period |
|---|---|---|---|
| Juhua Group Co., Ltd. | Disposal of fixed assets | 7,918.00 | |
| Quzhou Juhua Renewable Resources Technology Co., Ltd. disposes of fixed assets | | 529,207.93 | |
| Zhejiang Jinju Chemical Co., Ltd. (before merger) purchased forklift | | 30,709.00 | 173,864.00 |
| Juhua Group Corporation Engineering Co., Ltd. Purchase equipment | | 463,222.52 | 17,314.49 |
| Juhua Group Co., Ltd. | Purchase equipment | 3,502,304.12 | 21,243,035.32 |
| Purchase land use rights | | 7,835,290.93 | |
| Zhejiang Engineering Design Co., Ltd. | Purchase equipment | 243,138.72 | 3,419,805.13 |
| Zhejiang Juhua Group Import and Export Co., Ltd. | Purchase equipment | 7,962,035.68 | 22,940,269.36 |
| Zhejiang Juhua Xinlian Chemical Co., Ltd. | Purchase equipment | 5,481.04 | 56,414,343.40 |
| Zhejiang Juhua Equipment Manufacturing Co., Ltd. | Purchase equipment | 70,678,007.77 | 47,137,064.47 |
| Zhejiang Juhua Chemical Materials Co., Ltd. | Purchase equipment | | 2,491,050.60 |
| Zhejiang Feida Environmental Protection Technology Co., Ltd. | Purchase equipment | 184,112,000.00 | |
| total | | 1,539,395,327.10 | 161,674,037.70 |

JA535

(7). Key management personnel compensation
√Applicable □Not applicable

Key management personnel compensation

Unit: Ten Thousand Yuan Currency: RMB

| project | Current amount | Amount in the previous period |
|---|---|---|
| | 361.07 million | RMB 3.2092 million |

(8). Other related party transactions
√Applicable □Not applicable

(1) Juhua Group Co., Ltd., Juhua Group Company Engineering Co., Ltd., Zhejiang Engineering Design Co., Ltd., Juhua Group

Xuanhua Industrial Co., Ltd., Zhejiang Juhua Equipment Manufacturing Co., Ltd., Zhejiang Gerui New Materials Co., Ltd. and Zhejiang Qingkehuan

Bao Technology Co., Ltd. provides construction and installation services and engineering design services to the company and its subsidiaries through bidding

12.44294 million yuan, 85.833 million yuan, 36.695 million yuan, 7.629 million yuan, 31.607 million yuan, 1.0002 million yuan and

RMB 187,800, the total amount of such services in the same period last year was RMB 83.9076 million. Quzhou Qingtai Environmental Engineering Co., Ltd.

Jiang Quzhou Jutai Building Materials Co., Ltd. provided waste liquid and sewage treatment services to the company and its subsidiaries for a total of 61,650,500 yuan.

The same period last year was RMB 47,495,500. Juhua Group Co., Ltd. and Zhejiang Jinjui Chemical Co., Ltd. to the company and its subsidiaries

The total amount of transferred sewage rights is 2.201 million yuan.

The total amount of transferred sewage rights is 2.201 million yuan.

(2) As approved by the company's board of directors in the last period, the subsidiary Jusu Company will develop its 100kt/a polyvinylidene chloride high-performance barrier material project

(Phase I) Sections B and C adopt the (EPC) project general contracting method and are issued to Juhua Group Corporation Engineering Co., Ltd., Zhejiang

Juhua Equipment Manufacturing Co., Ltd. and Zhejiang Engineering Design Co., Ltd. The B and C sections of this project have been completed and converted to solid.

A total of RMB 27,135,500 was paid for the total contracting cost of the project, and RMB 72,093,300 was paid in advance for the same period last year. Simultaneously 18 years D

The project was started, and the (EPC) project general contracting method was adopted, which was issued to Zhejiang Juhua Equipment Manufacturing Co., Ltd. and Zhejiang Engineering Design

The project was started, and the (EPC) project general contracting method was adopted, which was issued to Zhejiang Juhua Equipment Manufacturing Co., Ltd. and Zhejiang Engineering Design

For the limited company, a total of RMB 23,233,900 was paid for the general contracting cost of the project in this period.

(3) Transactions with Juhua Group Finance Co., Ltd.

(1) Estimated deposits in the current period

1. Transactions with Juhua Group Finance Co., Ltd.

| Opening number | Increase in this period | Decrease in this period | Ending balance |
|---|---|---|---|
| 304,245,174.36 | 38,493,949,974.53 | 38,269,457,939.06 | 528,737,209.83 |

2. Loan acceptance status

| Opening number | Increase in this period | Decrease in this period | Ending balance |
|---|---|---|---|
| 5,000,000.00 | 5,000,000.00 | 5,000,000.00 | 5,000,000.00 |

3. Juhua Group Finance Co., Ltd. received interest of RMB 5,655,008.77 in the current period, which was 2,956,076.78 in the same period of the previous year

yuan.

JA536

Page 216

2018 Annual Report

215 / 235

yuan.

4. The loan interest paid to Juhua Group Finance Co., Ltd. was 193,877.08 yuan in the current period, compared with 188,681.25 in the same period last year.

6. Receivables due from related parties

(1). Items receivable

√Applicable □Not applicable

Unit: Currency: RMB

| project name | Related party | Ending balance | | Opening Balance | |
|---|---|---|---|---|---|
| | | Book balance | Bad debt provision | Book balance | Bad debt provision |
| Bills receivable and accounts receivable | TAS USA, INC | 24,593,101.95 | 1,229,655.10 | | |
| Bills receivable and accounts receivable | Juhua Group Co., Ltd. | 21,277,887.26 | | 295.83 | 16,045,382.4 | 751,769.11 |
| Bills receivable and accounts receivable | Lanshan New Materials (Quzhou) | 15,369.52 | 1,536.95 | | 97,293.84 | 4,864.69 |
| Bills receivable and accounts receivable | Zhejiang Borui Electronic Technology | 83,783.56 | 4,104.66 | | 9 | |
| Bills receivable and accounts receivable | Zhejiang Gerui New Materials | 8,744,970.60 | 437,248.53 | | | |
| Bills receivable and accounts receivable | limited company | | | | | |
| Bills receivable and accounts receivable | Zhejiang Jinhua New Material | 7,053,685.18 | 352,684.26 | | | |
| Bills receivable and accounts receivable | Co., Ltd. | | | | | |
| Bills receivable and accounts receivable | Zhejiang Kaihong Electronic Materials | 2,144,659.42 | 107,227.97 | | | |
| Bills receivable and accounts receivable | limited company | | | | | |
| Bills receivable and accounts receivable | Zhejiang Kaihong Fluorine Chemical | 1,656,659.061.td. | 87,832.95 | | | |
| Bills receivable and accounts receivable | Zhejiang Quzhou Juhua Chemical | 3,977,494.45 | 198,874.72 | | 13,593,935.9 | 334,696.80 |
| Bills receivable and accounts receivable | Technology Co., Ltd. | | | | 1 | |
| Bills receivable and Limited electronic chemical materials | Zhejiang Quzhou Juhua Showa | 106,740.47 | 5,337.02 | | | |
| accounts receivable | the company | | | | | |
| Bills receivable and accounts receivable | Zhejiang Julua Chemical Mining limited company | 113.74 | 5.69 | | 390.62 | 19.53 |
| Bills receivable and accounts receivable | Lanxi Pesticide Factory | 60,266,197.95 | 33,507,430.15 | | 60,266,197.9 | 33,507,430 |
| | | | | | 5 | .15 |

JA537

2018 Annual Report

| | | | | |
|---|---|---|---|---|
| Bills receivable accounts receivable | Zhejiang Jinju Chemical Co., Ltd. | 3,750.00 | | |
| Bills receivable accounts receivable Holding companies | | 187.50 | | |
| Bills receivable accounts receivable | Zhejiang Juhua Hangzhou New Materials Co., Ltd. | 5,682,377.27 | 284,118.86 | |
| Bills receivable accounts receivable | Zhejiang Juhua Equipment Manufacturing Limited company | 6,339,527.36 | 316,976.37 | |
| Bills receivable accounts receivable | Beijing Juhua Group Company Engineering Limited company | 366,630.86 | 18,331.54 | |
| Bills receivable accounts receivable | Zhejiang Juhua Chemical Materials Limited company | 982,000.00 | | |
| Bills receivable accounts receivable | Shanghai Juhua Industrial Development Limited company | 77,595.00 | | |
| Subtotal | | 130,550,563.16 | 35,932,233.84 | 103,455,081. |

| | | | | |
|---|---|---|---|---|
| Prepayments | Juhua Group Co., Ltd. | 74,046.60 | | |
| Prepayments | Quzhou Oingui Environmental Engineering Cheng Co., Ltd. | 652,480.60 | 30 | |
| Prepayments | Zhejiang Juhua Hanzhou New Materials Co., Ltd. | 654.29 | 6,498.18 | |
| Prepayments | Zhejiang Juhua Chemical Mining Limited company | 0.08 | | |
| Prepayments | Zhejiang Juhua Logistics Co., Ltd. 16,078.90 the company | | | |
| Prepayments | Zhejiang Juhua Equipment Manufacturing 216.33 Limited company | | | |
| Prepayments | Zhejiang Juhua Group Mouth co., ltd. | 580,000.00 | | |
| Subtotal | | 538,264.20 | 1,238,978.78 | |
| | | 511.87 | | |

35,218,394.55

| | | | | | |
|---|---|---|---|---|---|
| Other receivables | Juhua Group Company Engineering 40,237.31 Limited company | | | | |
| Juhua Group Co., Ltd. | | 171,130.00 | | | |
| Other receivables | Lanxi Pesticide Factory | 92,864,321.67 51,631,675.43 92,864,321.6 | 856.50 100,600.00 10,030.00 | | |
| Other receivables | | 7 | | | |
| Other receivables | Lanxi City Shuangfeng Giant Dragon Water Co., Ltd. | 51,631,675 43 | | | |
| Other receivables | Shanshan New Materials (Quzhou) 20,000.00 Limited company | 1,640,030.04 280,253.37 | | | |
| Other receivables | | 1,000.00 | | | |

# Exhibit 9





JA541

# Exhibit 10

Attachment 2



# AUTO and HVAC

**INSIDE CONTAINER COMPLIES WITH PRESCRIBED SPECIFICATIONS**
**LE CONTENU DE L'EMBALLAGE EST CONFORME AUX NORMES PRESCRITES**
**ESTE CYLINDRO CUMPLEM CON LAS ESPECIFICACIONS REQUERIDAS POR LA LEY**

# 30 LB. 13.6 kg

## Processed in Korea from imported materials

**PUREMANN INC.**
**4912 W KNOX ST. SUITE 100**
**TAMPA, FL 33634, U.S.A**
**Tel:(813) 884-1900**



**NON-RETURNABLE**
**EMBALLAGE PERDU**
**CYLINDER DESECHABLE**

**NON-REFILLABLE**
**NE PAS REUTILISER**
**NO RELLENABLE**

## DO NOT STORE ABOVE 125° F
## NE PAS STOCKER A PLUS DE 52° C
## NO ALMACENARLO SOBRE 52° C

# Exhibit 11



KEEP YOUR RECEIPT
RETURN POLICY VARIES BY PRODUCT TYPE

Unless noted below allowable returns for
items on this receipt will be in the form
of an in store credit voucher if the
return is done after 10/19/18

If you have questions regarding the
charges on your receipt, please
email us at:
YORKfrontend@menards.com



Sale Transaction

AUTOMOTIVE AC REFRIGERAN
2612772       6  #4.49          26.94

TOTAL                            26.94
                                  2.22
TOTAL SALE                       29.16
                                 29.16
 Auth Code:06435D
 Chip Inserted
 a0000000031010
 TC - 6d56915100d76242

TOTAL NUMBER OF ITEMS =    6

THE FOLLOWING REBATE RECEIPTS WERE
PRINTED FOR THIS TRANSACTION:
 4178

GUEST COPY

The Cardholder acknowledges receipt of
goods/services in the total amount shown
hereon and agrees to pay the card issuer
according to its current terms.

THIS IS YOUR CREDIT CARD SALES SLIP
PLEASE RETAIN FOR YOUR RECORDS.

THANK YOU, YOUR CASHIER,

53785 09 4401  07/21/18  07:31AM 3164







Attachment 2



JA547

# Exhibit 12

Attachment 2

Update : Apr 2020 / Volume unit : MT

| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Import from | China | - | 3,912 | 5,736 | 5,670 | 6,138 | 5,702 | 5,218 | 6,894 | 7,476 | 5,684 | 1,842 |
| | India | - | - | - | - | - | 36 | 108 | 36 | 108 | 37 | 37 |
| | US | 213 | 48 | 362 | 84 | 14 | 15 | 14 | 15 | 18 | 18 | 1 |
| Export to | China | 3 | - | - | - | - | - | - | 0 | - | 0 | - |
| | India | 15 | - | - | - | - | - | - | - | - | - | - |
| | US | - | - | 3 | - | | 36 | 51 | 277 | 1,271 | 1,182 | 393 |

Source: Korea Customs Service

# Exhibit 13

Attachment 2

PureMann entries, 01/01/2019 - 07/31/2020

| Date | Consignee Declared | Shipper Declared | Short Container Description | Country of Origin | Port of Arrival | Final Destination | Weight | Weight Unit | Quantity | Quantity Unit | Month | Consignee Declared Address | Shipper Address |
|------|--------------------|--------------------|-----------------------------|-------------------|-----------------|-------------------|--------|-------------|----------|---------------|-------|-----------------------------|-----------------|

Source: Descartes Datamyne

JA551

# Exhibit 14

KOREAN / ENGLISH



# For your Safety, Property and Nature

**UL & FM approved fire extinguishing agents**



퓨어만 Attachment 2



# Various applications in our life

### Our products can be applied to all areas in our life



# Purified & Mixed Products in Korea

### Various products of PureMann are being produced in Korea

http://www.puremann.com/?[3/1/2019 4:06:21 PM]

퓨어만 Attachment 2

 

# For your Safety, Property and Nature

**UL & FM approved fire extinguishing agents**

# Exhibit 15

**Exhibit 15**

I.  **U.S. importers identified by Commerce in affirmative anti-circumvention inquiries completed in 2020**

*Reblended R-421A* **anticircumvention determination**:

- L.M. Supply, Inc.,
- Cool Master U.S.A., L.L.C.,
- BMP USA, Inc.
- iGas USA Inc.

*Indian Blends* **anticircumvention determination**:

- *Altair Partners, LP,
- Dynatemp International,
- GFL Americas, LLC,
- *Kivlan & Company, Inc., and
- *Mondy Global, Inc.

*Unfinished Blends* **anticircumvention determination**:

- *Weitron, Inc.

II.  **U.S. importers with histories of transshipment or non-compliance with country of origin requirements that merit consultation with CBP before awarding consumption allowances**

- L.M. Supply, Inc.
- *iCool Inc.,
- Puremann, Inc., and
- Carquest Corporation

* Indicates the importer is listed in Table 4 of the EPA Production and Consumption Tables (April 2021).

JA557